Roksana D. Moradi-Brovia (Bar No. 266572)
W. Sloan Youkstetter (Bar No. 296681)
**RESNIK HAYES MORADI LLP**
17609 Ventura Blvd., Suite 314
Encino, CA 91316
**Telephone:** (818) 285-0100
**Facsimile:** (818) 855-7013
roksana@RHMFirm.com
sloan@RHMFirm.com

*Attorneys for Debtor*
Northern Holdings, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>NORTHERN HOLDINGS, LLC,<br><br><div align="right">Debtor.</div> | Case No. 8:20-bk-13014-MW<br><br>Chapter 11<br><br>**DEBTORS' OPPOSITION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (2380 Live Oak Road, Paso Robles, CA 93446, 1172 San Marcos Road, Paso Robles, CA 93446 and APN 027-145-022); DECLARATIONS OF LEROY CODDING AND BRANT A. SHEAFFER IN SUPPORT THEREOF**<br><br>Date:  November 30, 2020<br>Time:  9:00 a.m.<br>Place: Courtroom 6C<br>     411 West Fourth Street,<br>     Santa Ana, CA 92701 |

**TO THE HONORABLE MARK S. WALLACE, UNITED STATES BANKRUPTCY JUDGE; MOVANT FARM CREDIT WEST, FLCA AND ITS ATTORNEYS OF RECORD; AND TO ALL INTERESTED PARTIES:**

Northern Holdings, LLC the debtor and debtor-in-possession ("DIP") in the above-referenced Chapter 11 case (the "Debtor"), hereby submits its opposition to the *Motion for Relief from the Automatic Stay under 11 U.S.C. §362(d)(1), (2), and (4)* (the "Motion for Relief") [Docket No. 11] filed by Farm Credit West, FLCA (the "Movant"), as follows:

# __Table of Contents__

I.    INTRODUCTION .................................................................................. 3

II.   STATEMENT OF FACTS ...................................................................... 4

    a.    *Background* ................................................................................... 4

    b.    *Progress Since Case Was Filed* ................................................... 6

III.  ARGUMENT ........................................................................................ 7

    a.    *11 U.S.C. §362(d)(1)* ................................................................... 7

      i.   *Adequate protection* ................................................................. 7

      ii.  *Equity Cushion* ......................................................................... 7

      iii. *The Debtor Filed this Case in Good Faith* ............................... 9

    b.    *11 U.S.C. §362(d)(2)(A) and (d)(2)(B)* .................................... 13

      i.   Reorganization is in Process ................................................... 14

      ii.  The Property is Necessary for an Effective Reorganization ..... 14

    c.    *11 U.S.C. §362(d)(4)* ................................................................ 14

IV.   CONCLUSION ................................................................................... 17

**DECLARATION OF LEROY CODDING** ................................................ 18

**DECLARATION OF BRANT A. SHEAFFER** ........................................... 2

**RESNIK HAYES
MORADI LLP**

## I.   **INTRODUCTION**

The Debtor owns real properties located at 2380 Live Oak Road, Paso Robles, CA 93446 ("Live Oak"), 1172 San Marcos Road, Paso Robles, CA 93446 ("1172"), and APN 027-145-022 ("Texas Road") (collectively, the "Subject Properties").

On or about March 17, 2020, the Debtor's sole and managing member, Leroy Codding - through his other limited liability company, Business Loan Capital - obtained a certified valuation report of the Subject Properties, prepared by The Property Sciences Group, Inc. (the "Appraisal Report"). The Appraisal Report is attached and incorporated herein and asserts a value of **$25,500,000** for the Subject Properties.  Per the Motion for Relief, the Movant holds a lien on the Subject Properties in the amount of $19,040,509.25. As such, the Movant is secured by an *equity cushion of 25.33%*.

On the other hand, the Movant asserts that the value of the Subject Properties is $15,000,000 based on a declaration from the previous owner, Erich Russell in his Chapter 11 bankruptcy case. *See Declaration of Erich Russell in Response to Farm Credit West Motion re Use, Accounting and Control of Cash Collateral filed on February 14, 2020* (the "Russell Declaration") [Docket No. 45 in Case 9:20-bk-10035-DS].  The Movant fails to attach an appraisal or a broker price opinion of the Subject Properties to the Motion for Relief.  The Movant's evidence of value is therefore inferior to the Debtor's evidence of value.

The Subject Properties were sold to the Debtor for value because Erich Russell ("Mr. Russell") transferred title in exchange for *debt assumption and a promissory note to Mr. Russell for the difference between outstanding debt and appraised value consisting of $6,440,000*.  The sale was an arms-length transaction because Mr. Russell is not a member of the Debtor, is not related and does not have any other relation to Mr. Codding, other than what is disclosed herein.  This was not an insider transaction.

The Movant makes unsubstantiated allegations that the "Debtor is an insider of Mr. Russell" and that "Mr. Russell is an insider of the Debtor." There is no evidence provided in support of those allegations. The Movant just requests that the Court assume that the

**RESNIK HAYES
MORADI LLP**

Debtor is an insider of Mr. Russell. *As set forth in detail below, the Debtor is not an insider of Mr. Russell nor is Mr. Russell an insider of the Debtor.*

## II.    STATEMENT OF FACTS

*a.    Background*

The Debtor commenced its bankruptcy case by filing for relief under Chapter 11 of 11 U.S.C. §101 et seq. (the "Bankruptcy Code") on October 28, 2020.  The Debtor is operating its business and managing its financial affairs as a DIP pursuant to §§1107 and 1108 of the Bankruptcy Code.

The Debtor is a Minnesota LLC created on April 30, 2012 for the purpose of acquiring and restructuring a wine importer/distribution company in St. Paul, MN. Subsequently, the business held a minority stake in a newly formed import company and later disbanded in spinoffs.

Leroy Codding is the sole and managing member of the Debtor ("Mr. Codding").

The Debtor owns and operates three real properties as set forth below.  The Debtor acquired the above properties from Mr. Russell on October 27, 2020.

| "Live Oak" | FMV $9,700,000 |
|---|---|
| 2380 Live Oak Road<br>Paso Robles, CA  93446<br><br>*2 homes on the property.* | 1st TD:<br><u>Farm Credit</u> (cross-collateralized with 1172 and Texas Road)<br>$19,040,509.25 (per the Motion for Relief) |
| Unit #1 is vacant (tenant moved 10/20/2020); new tenants to move in on/or about 12/1/2020 for $1,800/month.<br><br>Tenant #2 is former owner Erich Russell (see below) who pays $12,000; lease ends 1/1/2022; rent is current.<br><br>*Debtor will contract with a third party to farm and will receive revenue from fruit sales.* | Property Taxes:<br>County of San Luis Obispo County Tax Collector<br>$13,625.84 |

RESNIK HAYES
MORADI LLP

| "1172" | FMV $11,500,000 |
|---|---|
| 1172 San Marcos Road<br>Paso Robles, CA 93446<br><br>*Winery facility (42,000 sq ft) and residential apartment.*<br><br>Winery tenant is Rabbit Ridge Wine Winery. Base rate of $15,000/month; rent is current. Profit share of third party Custom Crush revenue of approximately $11,400/month. Billed monthly in arrears.<br><br>Apartment tenant is Bill Tolar who pays $1,600; lease ends 6/30/2021; rent is current.<br><br>*Debtor will contract with a third party to farm and will receive revenue from fruit sales.* | 1st TD:<br><u>Farm Credit</u> (cross-collateralized with Live Oak and Texas Road)<br>$19,040,509.25 (per the Motion for Relief)<br><br>Property Taxes:<br>County of San Luis Obispo County Tax Collector<br>$3,200,000 |
| "Texas Road"<br><br>Address or only APN 027-145-022<br><br>*42-acre vineyard (permits obtained for a single family residence but no plan to proceed with construction at this point)*<br><br>*Debtor will contract with a third party to farm and will receive revenue from fruit sales.* | FMV $4,300,000<br><br>1st TD:<br><u>Farm Credit</u> (cross-collateralized with 1172 and Live Oak)<br>$19,040,509.25 (per the Motion for Relief)<br><br>Property Taxes:<br>County of San Luis Obispo County Tax Collector<br>$6,618.26 |

The Debtor also owns equipment: various pumps and irrigation capital equipment; trellis systems, miscellaneous winery equipment.

This case was filed in order to stop a foreclosure sale of the Subject Properties by Movant and so that the Debtor can reorganize its financial affairs.

In or about 2019, Mr. Russell and the Debtor became acquainted because Mr. Codding originally approached Mr. Russell with a financial backer and an offer to

**RESNIK HAYES**
**MORADI LLP**

1   purchase the winery facility and 1172 for $12,800,000.  Mr. Russell declined.  On or about

2   September 2019, Mr. Russell and Mr. Codding had another agreement with a different

3   buyer to lease the vineyard and buy out the winery facility for $9,800,000.  Because the

4   Movant refused to decouple its cross-collateralization on the Subject Properties, the

5   agreement failed.

6          In early 2020, Mr. Codding, through another one of his entities worked on an if-

7   come deal to structure a business plan for Mr. Russell via third party recapitalization.  Mr.

8   Russell was unable to secure such third-party financing and therefore, he sold the above

9   assets to the Debtor for their appraised value on October 27, 2020.  *The payment came in*

10  *the form of debt assumption and a promissory note to Mr. Russell for the difference*

11  *between outstanding debt and appraised value.*

12         The company that Mr. Russell used to operate the above assets is called Rabbit

13  Ridge Wine Sales, Inc. ("RRWSI") and was acquired by a distinct entity.  Mr. Russell is

14  not a shareholder of, an officer or director of, or have any interest in RRWSI after it was

15  acquired.  It held and holds no land or physical plant assets.

16

17         *b.      Progress Since Case Was Filed*

18         The Movant filed its Motion for Relief nine days after the case was filed.  The

19  Debtor filed its *Schedules and Statements* on November 10, 2020 [Docket No. 17].  The

20  Debtor is in substantial compliance with the requirements of the U.S. Trustee's Office

21  ("UST").

22         The Debtor is currently negotiating the sale of 1172 for $11,400,000.  The Debtor is

23  also currently negotiating lease agreements of some or all of the vineyard blocks to third

24  party growers.  This will generate additional income for the Debtor.

25         The Debtor believes that with the potential sale of 1172 and/or a refinance with the

26  additional income from the vineyard blocks that it will pay Movant's claim, the property

27  taxes on the Subject Properties, and Mr. Russell's unsecured claim.

28

**RESNIK HAYES**
**MORADI LLP**

# III.    ARGUMENT

*a.    11 U.S.C. §362(d)(1)*

The Movant claims that it should be granted relief from the automatic stay under 11 U.S.C. §362(d)(1) based on "cause."  Specifically, the Movant asserts that 1) the Movant's interest in the Subject Properties is not adequately protected and 2) the case was filed in bad faith.

However, the Debtor proposes to pay adequate protection payments <u>and</u> there is an equity cushion of 25.33%.  Thus, there is no cause to grant relief.

## i.    *Adequate protection*

The Debtor offers Movant the following adequate protection:

- Monthly adequate protection payments of $30,400, starting December 1, 2020, through confirmation of a plan of reorganization ("plan"), or until a stipulation for Plan treatment is negotiated, and/or case dismissal.

The source of the adequate protection payments is the rental income from Live Oak and 1172.

Based on the forgoing, the Movant is adequately protected by the Debtor's proposed adequate protection payments and the Movant's equity cushion of 25.33%, as analyzed in detail below.

## ii.    *Equity Cushion*

Pursuant to 11 U.S.C. §362(g), the Movant has the burden of proof on the issue of equity in the property.  In *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984), the Ninth Circuit explained that although the existence of an equity cushion as a method of adequate protection is not specifically mentioned in §361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court.  Further, the existence of an equity cushion, standing alone, can provide adequate protection and

**RESNIK HAYES
MORADI LLP**

1  that a 20% cushion has been held to be an adequate protection by itself for a secured

2  creditor.

3       On or about March 17, 2020, the Debtor's sole and managing member, Leroy

4  Codding - through his other limited liability company, Business Loan Capital - obtained a

5  certified valuation report of the Subject Properties, prepared by Brant A. Sheaffer of The

6  Property Sciences Group, Inc. (the "Appraisal Report").  A true and correct copy of the

7  Appraisal Report is **Exhibit "A"** to the attached Declaration of Mr. Shaeffer.  The

8  Appraisal Report asserts a value of ***$25,500,000*** for the Subject Properties.

9       Per the Motion for Relief, the Movant holds a lien on the Subject Properties in the

10  amount of $19,040,509.25. As such, the Movant is secured by an *equity cushion of*

11  *$6,459,490.75* – or 25.33% of the fair market value of the Real Properties.[1] This standing

12  alone provides the Movant adequate protection.

13       Moreover, the Movant submits *inferior evidence* to support its assertions that the

14  Subject Properties are allegedly worth $15,000,000: *a declaration submitted by Mr.*

15  *Russell in his Chapter 11 case* (the "Russell Declaration") [Docket No. 45 in Case 9:20-

16  bk-10035-DS].

17       The Russell Declaration was filed as of *February 14, 2020*, about one month prior

18  to the "as of" date of the Appraisal Report. Although an owner can testify to value of their

19  property pursuant to the Rule 701 of the Federal Rules Evidence, Mr. Russell's testimony

20  should be given little weight because he fails to assert or explain that he has the

21  knowledge, skill, experience, training or education to value the Subject Properties or

22  properties of this sort.  Hence Mr. Russell's testimony has little credibility.

23  ///

24  ///

25  ///

26  ///

27  _____

28      [1] Equity cushion calculation ($25,500,000-$19,040,509.25)/$25,500,000) = 25.33%

1

### iii.  The Debtor Filed this Case in Good Faith

2      The Movant asserts that the case was filed in bad faith because 1) "this Court

3  already found there is no equity in the Collateral as part of its prior relief from stay ruling,

4  and the Debtor should be bound by the same result on collateral estoppel grounds and

5  because the Debtor is a non-statutory insider of Russell."  The Movant asserts and requests

6  that the Court assume, without submitting evidence, that the Debtor is an insider of Mr.

7  Russell.  *See Memorandum of Points and Authorities in Support of Motion for Relief*

8  [Docket No. 11-1], pg. 8, lines 11-15.

9      The Movant also asserts, without submitting evidence, that the Subject Properties'

10  value "is eroding postpetition due to the accrual of ad valorem real property taxes."  *See*

11  *Memorandum of Points and Authorities in Support of Motion for Relief* [Docket No. 11-1],

12  pg. 8, lines 17.

13      In the Ninth Circuit, a bankruptcy filing will only be deemed to be lacking in "good

14  faith" where the evidence establishes that the debtor's actions constitute a "clear abuse of

15  the bankruptcy process."  *Idaho Dep't of Lands v. Arnold* (*In re Arnold*), 806 F.2d 937, 939

16  (9th Cir. 1986) (emphasis added); see *In re Yanik*, 8 F.3d 34 (9th Cir. 1993).  In ruling

17  upon a good faith challenge, the courts weigh "an amalgam of factors", and "no single fact

18  or factor will be dispositive."  *In re Arnold*, 806 F.2d at 939.

19      "The test is whether a debtor is attempting to unreasonably deter and harass

20  creditors or attempting to effect a speedy, efficient reorganization on a feasible basis.  *Id.*"

21  *See In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994)

22      The good faith inquiry "is essentially directed to two questions: (1) whether the

23  debtor is trying to abuse the bankruptcy process and invoke the automatic stay for

24  improper purposes; and (2) whether the debtor is really in need of reorganization."  *In re*

25  *Marshall*, 298 B.R. 670, 680-81 (Bankr. C.D. Cal. 2003).

26      The Bankruptcy Appellate Panel for the Ninth Circuit stated in *In re Thirtieth*

27  *Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983) (quoting *In re Loeb Apartments, Inc.*, 89

28  F.2d 461, 463 (7th Cir, 1937)):

**RESNIK HAYES
MORADI LLP**

> If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... to mortgage foreclosures, and to invoke the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization, on a feasible basis ... good faith cannot be denied.

The Fifth Circuit stated:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court."

*Matter of Little Creek Development Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986)

In order to determine that an entity is a non-statutory insider, " it is not necessary that a non-statutory insider have actual control; rather, the question "is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length."" *In re Winstar Comm*, 554 F.3d 382, 396-97 (3d Cir. 2009); *See In re U.S. Med.,* 531 F.3d 1272, 1277 (10th Cir. 2008); *S.Rep. No. 95-989*, at 25 (1978).

The appeal in *In re Winstar Comm*, arose "out of the self-described 'strategic partnership' between Winstar Communications, Inc. (the bankrupt corporation) and Lucent Technologies Inc. (one of Winstar's primary creditors and suppliers), [and] presents us with an issue of first impression — *when a creditor can be considered a non-statutory insider for purposes of extending the time for recovery of preferential payments*." (Emphasis Added).  *In re Winstar Comm*, 554 F.3d at 388; *See U.S. Bank N.A. v. Village at Lakeridge, LLC*, 814 F.3d 993, 1000 (9th Cir. 2016).

1    "Whether a creditor is an insider is a factual inquiry that must be conducted on a

2  case-by-case basis." *U.S. Bank N.A. v. Village at Lakeridge, LLC*, 814 F.3d at 1000; *See,*

3  *e.g., In re Friedman*, 126 B.R. 63, 67, 70–71 (B.A.P. 9th Cir. 1991) (describing in detail

4  the alleged insiders' relationships with the debtor); *Miller v. Schuman (In re Schuman)*,81

5  B.R. 583, 586–87 (9th Cir. BAP 1987) (per curiam) (analyzing facts to determine whether

6  the debtor and alleged insider had a sufficiently close relationship to warrant finding

7  insider status).

8    Insider status may be based on a professional or business relationship with the

9  debtor, in addition to the Code's per se classifications, where such relationship compels the

10  conclusion that the individual or entity has a relationship with the debtor, close enough to

11  gain an advantage attributable simply to affinity rather than to the course of business

12  dealings between the parties.  *In re Friedman*, 126 B.R. at 70.  "Courts may not bypass this

13  intensive factual analysis by finding that a third party became an insider as a matter of law

14  when he acquired a claim from an insider."  *U.S. Bank N.A. v. Village at Lakeridge, LLC*,

15  814 F.3d at 1000.

16    **Here, the Movant requests that the Court make assumptions, without**

17  **providing evidence, that would lead it to make a finding that the case was filed in bad**

18  **faith.**  It simply has not shown any cause for the Court to grant relief pursuant to

19  §362(d)(1).

20    First, the Subject Properties have significant equity as shown by the Appraisal

21  Report.  The equity cushion is 25.00%, which is considerably above the threshold of 20%.

22  The Movant relies on the opinion of Mr. Russell for the value without providing a

23  foundation as to his expertise or skill at valuing these properties.  The Court should give

24  Mr. Russell's opinion little weight.

25    Second, the Movant asserts "this Court" already found that the Subject Properties

26  lacked equity and the Debtor "should be bound by the same result on collateral estoppel

27  grounds…."  *This Court has clearly not yet made any findings.*

28

**RESNIK HAYES
MORADI LLP**

11

1    Mr. Russell filed his Chapter 11 in the Northern District.  That Bankruptcy Court
2  made a decision on value based on the record in front of it.  However, property values are
3  not stagnant, but fluctuate.  To that end, the Debtor obtained the Appraisal Report valuing
4  the Subject Properties as $25,500,000 as of March 2020 – this was about a month after the
5  Russell Declaration.  Moreover, the Appraisal Report is the basis of the Debtor's purchase
6  price of the Subject Properties; certainly, the Debtor would not pay $10,000,000 more for
7  these properties than they are worth.  *At a minimum, the parties should be given an*
8  *opportunity to obtain current appraisals so that the Court can determine value.*

9    Third, the Movant asserts that the Debtor is an insider of Mr. Russell.  The totality
10  of the "evidence" attached to the Motion for Relief to show that the Debtor is an insider is
11  just a collection of emails from the Movant's counsel and Mr. Russell's counsel discussing
12  Mr. Codding's role in working to negotiate a new loan on behalf of Mr. Russell… *It*
13  *should be noted that the Debtor is not mentioned in the email chain and Mr. Codding is*
14  *referred to as the managing partner of Fluid Advisors.*

15    These emails in no way demonstrate that the relationship between the Debtor and
16  Mr. Russell compels a conclusion that the relationship was close enough for the Debtor to
17  gain an advantage attributable simply to affinity rather than to the course of business
18  dealings between the parties.  The Debtor requests that the Court set an evidentiary hearing
19  to determine whether the Debtor is an insider of Mr. Russell and whether Mr. Russell is an
20  insider of the Debtor.

21    Fourth, the Movant asserts that the property taxes are causing the Subject Properties
22  to decline in value.  The Movant provides no evidence as to how or why the property taxes
23  are causing the properties to decline in value.  The Movant has an equity cushion of 25%.
24  Nonetheless, the Debtor still proposes to pay the Movant monthly adequate protection
25  payments, which will consist of all rental income generated by the Subject Properties.
26  ///
27  ///
28  ///

**RESNIK HAYES
MORADI LLP**

1    Fifth, the Movant asserts that further cause exists based on a discussion in *Matter of*

2  *Little Creek Development Co.* of what facts typically exist when showing that a case was

3  filed in bad faith.  Again, the Movant requests that the Court find bad faith without

4  sufficient evidence.

5    The Motion for Relief was filed nine days after the Debtor filed the case and before

6  the Debtor had not yet filed its Schedules and Statements.  The Meeting of Creditors

7  pursuant to 11 U.S.C §341(a) and Chapter 11 Status Conference have yet to be held.  The

8  Debtor has not been given an opportunity to explain its plan for reorganization.  It is

9  mystifying how the Movant can assert, without evidence in support, that there is "no

10  chance of reorganizing and was filed merely to delay FCW's foreclosure remedies."

11    Additionally, this case is not just a two-party dispute.  Based on the equity in the

12  Subject Properties, the Debtor will seek to not only pay Movant's claim in full but also the

13  property taxes and Mr. Russell's unsecured claim in full.

14    Thus, the Movant provides no evidence showing cause for granting of relief.

15

16    b.    *11 U.S.C. §362(d)(2)(A) and (d)(2)(B)*

17    Movant argues that it should be granted relief from the automatic stay under 11

18  U.S.C. §362(d)(2)(A) and (d)(2)(B) because there is no equity in the Subject Properties

19  and the properties are not necessary to an effective reorganization.

20    As shown above, the Subject Properties have significant equity, but the lack of

21  equity in a property for a debtor or the estate <u>alone</u> is simply not sufficient grounds for

22  relief from the stay if the property is necessary to an effective reorganization that is in

23  process.

24    The Supreme Court, in its seminal decision, *United Sav. Ass'n v. Timbers of Inwood*

25  *Forest Assoc. Ltd.*, 484 U.S. 365 (1988), made it clear that merely establishing a lack of

26  equity is not enough to entitle a secured creditor to relief from stay where the debtor can

27  establish that the property is necessary to an effective reorganization.  The Court held that

28  in determining whether a property is necessary for an effective reorganization, a debtor

must show that there is "a reasonable possibility of a successful reorganization within a reasonable time." *Id.* at 376.

### i.     Reorganization is in Process

The Debtor filed its *Schedules and Statements* on November 10, 2020 [Docket No. 17]. The Debtor is in substantial compliance with the requirements of the U.S. Trustee's Office ("UST").

The Debtor is currently negotiating the sale of 1172 for $11,400,000. The Debtor is also currently negotiating lease agreements of some or all of the vineyard blocks to third party growers. This will generate additional income for the Debtor.

The Debtor believes that with the potential sale of 1172 and/or a refinance with the additional income from the vineyard blocks that it will be pay Movant's claim, the property taxes on the Subject Properties, and Mr. Russell's unsecured claim.

### ii.     The Property is Necessary for an Effective Reorganization

The Subject Properties are necessary to an effective reorganization as the Debtor intends to sell 1172 for $11,400,000. The Debtor anticipates that with the net sale proceeds from 1172, along with for the rental income, and the third party revenue sharing, it will be able to pay all claims in full during this bankruptcy case. Therefore, the Subject Properties are vital to its financial "bottom-line."

If the Movant is granted relief from the stay, the Debtor will lose all of its assets and income source, which will be disastrous to Debtor's financial rehabilitation. In fact, there will be no reorganization without the properties and the income they generate or will generate in the future. Thus, the Subject Property are necessary for an effective reorganization.

### c.     *11 U.S.C. §362(d)(4)*

The Movant is requesting extraordinary relief.

RESNIK HAYES
MORADI LLP

14

1   The Court must find three elements to be present for the Movant to obtain relief

2   under §362(d)(4).  First, the debtor's bankruptcy filing must have been part of a scheme.

3   Second, the object of the scheme must be to delay, hinder, or defraud creditors.  Third, the

4   scheme must involve either (a) the transfer of some interest in the real property without the

5   secured creditor's consent or court approval, or (b) multiple bankruptcy filings affecting

6   the property. *In re First Yorkshire Holdings, Inc.*, 470 B.R. 864, 870 (9th Cir. BAP 2012).

7   For the court to grant relief under § 362(d)(4), and trigger two years of prospective

8   relief as to the subject real property, it must affirmatively find that the three elements

9   above are present. *Id*. at 871; *See In re Abdul Muhaimin,* 343 B.R. 159, 169

10  (Bankr.D.Maryland 2006) ("The precise language is: `if the court finds....' For the court to

11  make such an affirmative finding, it must have proof of the elements required to justify

12  such relief.").

13  The Ninth Circuit stated that,

14  "Certain "badges of fraud" strongly suggest that a transaction's purpose is to
    defraud creditors unless some other convincing explanation appears. These
15  factors, not all of which need be present, include 1) a close relationship
    between the transferor and the transferee; 2) that the transfer was in
16  anticipation of a pending suit; 3) that the transferor Debtor was insolvent or
    in poor financial condition at the time; 4) that all or substantially all of the
17  Debtor's property was transferred; 5) that the transfer so completely depleted
    the Debtor's assets that the creditor has been hindered or delayed in
18  recovering any part of the judgment; and 6) that the Debtor received
    inadequate consideration for the transfer."
19
    *In re Woodfield*, 978 F.2d 516, 518 (9th Cir. 1992).
20
21  Here, the Movant desires to obtain possession of the Subject Properties and

22  foreclose because they have significant equity.  A foreclosure sale should easily pay the

23  Movant's claim in full.  As such, the Movant makes wild accusations about schemes that

24  do not exist and invent facts that suit its narrative.

25  However, the Debtor can provide a "convincing explanation" as to why Mr. Russell

26  transferred the Subject Properties to the Debtor for valuable consideration as explained

27  above.  Mr. Russell could not obtain refinancing or sell the properties.  Mr. Russell lives

28  and works on Live Oak.  If the Movant was able to foreclosure, the new owner would evict

**RESNIK HAYES**
**MORADI LLP**

Mr. Russell.  He would need to move and lose his livelihood (the winery facility on Live Oak).  Rather than lose everything, Mr. Russell transferred title to the Debtor in exchange for *debt assumption and a promissory note to Mr. Russell for the difference between outstanding debt and appraised value consisting of $6,440,000*.  The transfer was for valuable consideration.  The Debtor requests that the Court set an evidentiary hearing to determine whether transfer was for valuable consideration.

Furthermore, the badges of fraud are not present here.  There is no close relationship between the Debtor and Mr. Russell.  *The Movant submits no evidence supporting this allegation.*  The Debtor concedes that the transfer for value was on the eve of foreclosure, but that is not *per se* indicative of fraud.  The Debtor does not know the financial condition of Mr. Russell, but the Subject Properties' value exceeds all liens on them.  The purpose of the transfer was to allow the Debtor to pay all claims in full and to maximize the ability for the Subject Properties to generate income.  The Debtor desires to pay the Movant in full within a reasonable amount of time.  As shown above, the transfer was for valuable consideration.

Thus, there is simply no scheme to defraud and for that reason, the Movant is not entitled to *in rem* relief.

///

///

///

///

///

///

///

///

///

///

///

1

2                              IV.    <u>**CONCLUSION**</u>

3          WHEREFORE, the Debtor respectfully requests that the Court deny the Motion for

4  Relief and/or set an evidentiary hearing to determine the Subject Properties' value, to

5  determine whether the Debtor is an insider of Mr. Russell, and/or determine whether the

6  transfer between Mr. Russell and the Debtor was for valuable consideration.

7

8  Dated:  November 16, 2020                    **RESNIK HAYES MORADI LLP**

9

10                                              By: /s/ Roksana D. Moradi-Brovia
                                                    **Roksana D. Moradi-Brovia**
11                                                  **W. Sloan Youkstetter**
                                                    *Attorneys for Debtor*
12                                                  Northern Holdings, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RESNIK HAYES
MORADI LLP**

17

# DECLARATION OF LEROY CODDING

I, Leroy Codding, declare as follows:

1.    I am over the age of 18.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently with respect thereto.  Where facts are alleged upon information and belief, I believe them to be true.

2.    I am the sole and managing member and the custodian of records of Northern Holdings, LLC, the debtor and debtor-in-possession herein (the "Debtor").  I am authorized to make decisions for the Debtor.

3.    The Debtor is a Minnesota LLC created on April 30, 2012 that I created for the purpose of acquiring and restructuring a wine importer/distribution company in St. Paul, MN.  Subsequently, the business held a minority stake in a newly formed import company and later disbanded in spinoffs.

4.    I have been in the wine business since 1993, which I entered upon graduating from Cal Poly with a degree in agricultural business and a concentration in wine marketing.  I grew up in a farming family, which is what drew me to agriculture.

5.    For about a decade, I was chiefly involved in sales and marketing/sales management in wine.  Then in my early 30s, I became involved in operations.  There was a basis for this in my formal education and training.

6.    Thereafter, I was responsible for operations, finance, sales/ marketing and public relations for a family owned winery: Talbott Vineyards.  We were the largest private vineyard holder in Monterey county.

7.    My area of responsibility included 1200 acres under vine in three distinct sub-AVAs across five parcels.  I was also responsible for a winery facility producing 120,000 9L cases annually and financial management, including profit and loss responsibility, as well as cash flow was under my purview.

**RESNIK HAYES
MORADI LLP**

8.    During this time, we were remitting about $2 million quarterly in cash to the parent company, Robert Talbott Inc.

9.    After leaving day to day responsibilities at Talbott, I remained on the board until the wine company was sold to Gallo some years later.

10.    During that time, I ran a wine distribution and import company with the purpose of getting it rehabilitated and sold.  When we accomplished this sale to Southern Wine and Spirits, I restructured another small wine wholesaler/ importer.  This was when the Northern Holding LLC was founded.  Subsequent to that, I was responsible for initiating the business plan and obtaining funding for a ground-up national import company with a portfolio from Italy, France, Chile, Argentina and South Africa.

11.    I make this declaration in support of the Debtor's opposition to the *Motion for Relief from the Automatic Stay under 11 U.S.C. §362(d)(1), (2), and (4)* (the "Motion for Relief") [Docket No. 11] filed by Farm Credit West, FLCA (the "Movant")

12.    The Debtor commenced its bankruptcy case by filing for relief under Chapter 11 of 11 U.S.C. §101 et seq. (the "Bankruptcy Code") on October 28, 2020.  The Debtor is operating its business and managing its financial affairs as a DIP pursuant to §§1107 and 1108 of the Bankruptcy Code.

13.    The Debtor owns and operates three real properties as set forth below.  The Debtor acquired the above properties from Erich Russell ("Mr. Russell") on October 27, 2020.

///

///

///

///

///

///

///

///

**RESNIK HAYES
MORADI LLP**

| "Live Oak" | FMV $9,700,000 |
|---|---|
| 2380 Live Oak Road<br>Paso Robles, CA 93446<br><br>*2 homes on the property.*<br><br>Unit #1 is vacant (tenant moved 10/20/2020); new tenants to move in on/or about 12/1/2020 for $1,800/month.<br><br>Tenant #2 is former owner Erich Russell (see below) who pays $12,000; lease ends 1/1/2022; rent is current.<br><br>*Debtor will contract with a third party to farm and will receive revenue from fruit sales.* | 1st TD:<br><u>Farm Credit</u> (cross-collateralized with 1172 and Texas Road)<br>$19,040,509.25 (per the Motion for Relief)<br><br>Property Taxes:<br>County of San Luis Obispo County Tax Collector<br>$13,625.84 |
| "1172" | FMV $11,500,000 |
| 1172 San Marcos Road<br>Paso Robles, CA 93446<br><br>*Winery facility (42,000 sq ft) and residential apartment.*<br><br>Winery tenant is Rabbit Ridge Wine Winery. Base rate of $15,000/month; rent is current. Profit share of third party Custom Crush revenue of approximately $11,400/month. Billed monthly in arrears.<br><br>Apartment tenant is Bill Tolar who pays $1,600; lease ends 6/30/2021; rent is current.<br><br>*Debtor will contract with a third party to farm and will receive revenue from fruit sales.* | 1st TD:<br><u>Farm Credit</u> (cross-collateralized with Live Oak and Texas Road)<br>$19,040,509.25 (per the Motion for Relief)<br><br>Property Taxes:<br>County of San Luis Obispo County Tax Collector<br>$3,200,000 |

**RESNIK HAYES
MORADI LLP**

| "Texas Road" | FMV $4,300,000 |
| --- | --- |
| Address or only APN 027-145-022 | 1st TD: <u>Farm Credit</u> (cross-collateralized with 1172 and Live Oak) $19,040,509.25 (per the Motion for Relief) |
| *42-acre vineyard (permits obtained for a single family residence but no plan to proceed with construction at this point)* | |
| *Debtor will contract with a third party to farm and will receive revenue from fruit sales.* | Property Taxes: County of San Luis Obispo County Tax Collector $6,618.26 |

14.     Mr. Russell is not a member of the Debtor.  I was not or currently an insider of Mr. Russell.  We are not related.  We have a business relationship that will be described below.

15.     The Debtor also owns equipment: various pumps and irrigation capital equipment; trellis systems, miscellaneous winery equipment.

16.     This case was filed in order to stop a foreclosure sale of the Subject Properties by the Movant and so that the Debtor can reorganize its financial affairs.

17.     In or about 2019, Mr. Russell and I became acquainted because I originally approached Mr. Russell with a financial backer and an offer to purchase the winery facility and 1172 for $12,800,000.  Mr. Russell declined.  On or about September 2019, Mr. Russell and I had another agreement with a different buyer to lease the vineyard and buy out the winery facility for $9,800,000.  Because the Movant refused to decouple its cross-collateralization on the Subject Properties, the agreement failed.

18.     In early 2020, I, through another one of my entities worked on an if-come deal to structure a business plan for Mr. Russell via third party recapitalization.  Mr. Russell was unable to secure such third-party financing and therefore, he sold the above assets to the Debtor for their appraised value on October 27, 2020.  *The payment came in the form of debt assumption and a promissory note to Mr. Russell for the difference between outstanding debt and appraised value.*  I believe that the transfer was for valuable consideration.

RESNIK HAYES
MORADI LLP

19.     The company that Mr. Russell used to operate the above assets is called Rabbit Ridge Wine Sales, Inc. ("RRWSI") and was acquired by a distinct entity.  Mr. Russell is not a shareholder of, an officer or director of, or have any interest in RRWSI after it was acquired.  It held and holds no land or physical plant assets.

20.     The Movant filed its Motion for Relief nine days after the case was filed. The Debtor filed its *Schedules and Statements* on November 10, 2020 [Docket No. 17]. The Debtor is in substantial compliance with the requirements of the U.S. Trustee's Office ("UST").

21.     I am currently negotiating the sale of 1172 for $11,400,000.  I am also currently negotiating lease agreements of some or all of the vineyard blocks to third party growers.  This will generate additional income for the Debtor.

22.     I believe that with the potential sale of 1172 and/or a refinance with the additional income from the vineyard blocks that it will pay the Movant's claim, the property taxes on the Subject Properties, and Mr. Russell's unsecured claim.

23.     The Subject Properties are vital to its financial "bottom-line." I believe that the Subject Properties are necessary for an effective reorganization.

24.     On or about March 17, 2020, I - through my other limited liability company, Business Loan Capital - obtained a certified valuation report of the Subject Properties, prepared by The Property Sciences Group, Inc. (the "Appraisal Report").  I obtained the appraisal for potential financing on the Subject Properties.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Monday, November 16, 2020, at _____, California.



SEE NEXT PAGE
_____
Leroy Codding
*Declarant*

**RESNIK HAYES
MORADI LLP**

22

19.    The company that Mr. Russell used to operate the above assets is called Rabbit Ridge Wine Sales, Inc. ("RRWSI") and was acquired by a distinct entity.  Mr. Russell is not a shareholder of, an officer or director of, or have any interest in RRWSI after it was acquired.  It held and holds no land or physical plant assets.

20.    The Movant filed its Motion for Relief nine days after the case was filed. The Debtor filed its *Schedules and Statements* on November 10, 2020 [Docket No. 17]. The Debtor is in substantial compliance with the requirements of the U.S. Trustee's Office ("UST").

21.    I am currently negotiating the sale of 1172 for $11,400,000.  I am also currently negotiating lease agreements of some or all of the vineyard blocks to third party growers.  This will generate additional income for the Debtor.

22.    I believe that with the potential sale of 1172 and/or a refinance with the additional income from the vineyard blocks that it will pay the Movant's claim, the property taxes on the Subject Properties, and Mr. Russell's unsecured claim.

23.    The Subject Properties are vital to its financial "bottom-line."  I believe that the Subject Properties are necessary for an effective reorganization.

24.    On or about March 17, 2020, I - through my other limited liability company, Business Loan Capital - obtained a certified valuation report of the Subject Properties, prepared by The Property Sciences Group, Inc. (the "Appraisal Report").  I obtained the appraisal for potential financing on the Subject Properties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Monday, November 16, 2020, at ___Paso Robles___, California.

DocuSigned by:

Leroy Codding
*Declarant*

**RESNIK HAYES**
**MORADI LLP**

22

## DECLARATION OF BRANT A. SHEAFFER

I, Brant A. Sheaffer, declare and state as follows:

1.      I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently with respect thereto.  Where facts are alleged upon information and belief, I believe them to be true.

2.      I am a California certified appraiser (State Certification No. AG033878) and have been in good standing in the State of California.  I am a member of the Appraisal Institute ("MAI") (member #474916).

3.      I am employed as the Senior Vice President – Managing Director of the Commercial Division for The Property Sciences Group, Inc. ("PSG").  PSG's offices are located at 130 North Brand Boulevard, Suite 415, Glendale, CA 91203.

4.      I have prepared certified valuation reports for a multitude of property types, including: retail, commercial, office, multi-family, industrial, residential subdivisions and land.  I have also prepared certified valuation reports of eight wineries and vineyards.  I am qualified to make this declaration based upon my extensive knowledge of appraising wineries and vineyards.

5.      Leroy Codding, on behalf of Business Loan Capital LLC, retained me to prepare a value appraisal report of three properties located at:

- 1172 San Marcos Road, Paso Robles, CA 93446 – APN 026-104-001 ("1172");

- 2380 Live Oak Road, Paso Robles, CA 93446 – APN 026-342-039 ("Live Oak");

- APN 027-145-022, no street address for this property, access through 1172 ("Texas Road").

6.      Collectively, these real properties are hereinafter referred to as the "Subject Properties."

NIK HAYES
DRADI LLP

7.      I thereafter prepared a report which values the Subject Properties at $25,500,000, as of March 17, 2020 (the "Appraisal Report").  Attached hereto as **Exhibit "A"** is a true and correct copy of the Appraisal Report.

8.      In the course of preparing the Appraisal Report, I followed the practices and procedures required of my profession in determining the value of wineries and vineyards.

9.      Other than as set forth herein, I have no preexisting relationship with Leroy Codding, Business Loan Capital LLC or Northern Holdings, LLC, the debtor and debtor-in-possession in Chapter 11 Case No. 8:20-bk-13014-MW.

10.      I do not own an interest in the Subject Properties and have not been offered an interest in it.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed on November ___, 2020, at _____, California.

SEE NEXT PAGE
_____
**Brant A. Sheaffer**
*Declarant*

NIK HAYES
DRADI LLP

7.    I thereafter prepared a report which values the Subject Properties at $25,500,000, as of March 17, 2020 (the "Appraisal Report").  Attached hereto as **Exhibit "A"** is a true and correct copy of the Appraisal Report.

8.    In the course of preparing the Appraisal Report, I followed the practices and procedures required of my profession in determining the value of wineries and vineyards.

9.    Other than as set forth herein, I have no preexisting relationship with Leroy Codding, Business Loan Capital LLC or Northern Holdings, LLC, the debtor and debtor-in-possession in Chapter 11 Case No. 8:20-bk-13014-MW.

10.    I do not own an interest in the Subject Properties and have not been offered an interest in it.


I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.


Executed on November 16th, 2020, at Pleasant Hill, California.


**Brant A. Sheaffer**
*Declarant*

# EXHIBIT A



# APPRAISAL OF A
### *Winery & Vineyards*



**PROPERTY**

**1172 San Marcos Road & 2380 Live Oak Road**

**Paso Robles, CA 93446**

**PSG File Number: 855971**

| | |
|---|---|
| **EFFECTIVE DATE:** | As Is: March 17, 2020 |
| **DATE OF REPORT:** | March 31, 2020 |
| **PREPARED FOR:** | Business Loan Capital |
| **PREPARED BY:** | The Property Sciences Group Inc. |

**Property Sciences**

Protecting the Future of America's Lenders

**PropSci.com**

March 31, 2020

**Ms. Carrie Beavers**
**Business Loan Capital**
15375 Barranca Parkway, Suite B-202
Irvine, CA 92618

Dear Ms. Beavers:

In response to your request we have completed an appraisal of the property indicated in the following table:

| | |
|---|---|
| **Property Type** | *Winery & Vineyards* |
| **Address** | *1172 San Marcos Road* |
| | *& 2380 Live Oak Road* |
| **City, State, Zip Code** | *Paso Robles, CA 93446* |
| **Report Type** | *Appraisal Report* |
| **Effective Date** | *March 17, 2020* |
| **Interest Appraised** | *Fee Simple* |
| **Intended Use** | *Collateral Lending* |
| **Site Area** | *18,168,440 sq. ft. (417.09 acres)* |
| **Gross Building Area** | *57,181 sq. ft.* |
| **Number of Units** | |

The value stated herein is based on our understanding of the site and improvement descriptions as represented to us by the owner's representative, client, public records, our inspection and other available sources. It is your responsibility to read the report and inform the appraisers of any errors or omissions you are aware of prior to utilizing it. This report is for the exclusive use of the client indicated above, and no other party shall have any right to rely on any service provided by The Property Sciences Group, Inc. without prior written consent. Except as noted within the engagement letter, release of this appraisal to any third party without authorization from The Property Sciences Group, Inc. is expressly prohibited. The Property Sciences Group, Inc. will not be responsible for any actions or occurrences as a result of unauthorized use of this report.

The following conclusions are premised on the Scope of Work as set forth throughout the attached report, Appraisers' Certification and the Assumptions and Limiting Conditions as cited in the attached report, as well as the facts and circumstances as of the valuation date. In addition, our appraisal is in compliance with the

**The Property Sciences Group, Inc.**
**www.PropSci.com**

| Seattle | Florida | Northern California | Southern California |
|---|---|---|---|
| 1830 Cascade Ave S, Suite 225 | 4651 Salisbury Road, Suite 4012 | 395 Taylor Boulevard, Suite 250 | 130 North Brand Boulevard, Suite 415 |
| Seattle, WA 98188 | Jacksonville, FL 32256 | Pleasant Hill, CA 94523 | Glendale, CA 91203 |
| Tel:(206) 319-5215 | Tel:(925) 246-7300 | Tel:(925) 246-7300 | Tel:(213) 443-4500 |
| Fax(925) 273-9876 | Fax(925) 273-9876 | Fax(925) 273-9876 | Fax(925) 273-9876 |

requirements of the Uniform Standards of Professional Appraisal Practice (USPAP), adopted by the Appraisal Standards Board of The Appraisal Foundation; and Title XI, Real Estate Appraisal Reform Amendments, of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). The report also complies with the Supplemental Standards of Appraisal Practice and Code of Professional Ethics of the Appraisal Institute. We certify that this assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan. In addition, we have read, understood, and satisfied the Competency Provision of the USPAP.

An "Extraordinary Assumption" is defined by USPAP as "an assumption directly related to a specific assignment of the effective date of the assignment results, which if found to be false, could alter the appraiser's opinions or conclusions." USPAP further states that "Extraordinary Assumptions" presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market trends; or about the integrity of data used in the analysis.

A "Hypothetical Condition" is defined by USPAP as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of the analysis." USPAP further states that "Hypothetical Conditions" are contrary to known facts about physical, legal or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of the data used in the analysis. The use of extraordinary assumptions and/or hypothetical conditions may have affected the assignment results.

*Inspection of Residential Villa* - On the date of inspection we were unable to inspect the interior of residential villa on the Live Oak Road vineyard property as an elderly family member was under a shelter in place order due to the outbreak of the COVID-19 virus. We were provided with a few photos of the interior and have relied on these along with discussions with the owner. The appraisal analysis that the property is in good condition and that the condition and quality of interior finishes is consistent with the details we were provided. Any change in these assumptions may result in different value estimates.

*Delinquent Property Taxes -* According to the County Tax Collector, as of the date of the report, taxes for two of the three parcels that make up the subject property are delinquent. The taxes for 026-342-039, the Live Oak Road Vineyard and Residence are delinquent resulting from unpaid prior year taxes for 2019. The outstanding redemption balance is $927.79 according to the assessor's records. The taxes for 026-104-001, the San Marcos Road Winery and Vineyard are delinquent resulting in unpaid taxes from 2005 through 2018. The outstanding balance for this parcel totals $2,814,407.80. There may be interest accruing on these delinquent amounts and the balance due may be more than the amount noted or the owner may have already instituted a re-payment plan. This appraisal analysis assumes that all tax payments, liens and judgments will be made, or are, current and that there will be no adverse effect on the subject property resulting from unpaid taxes, liens or judgments.

As of the effective date, the short and long-term impact on the real estate market from the COVID-19 virus is unknown. However, due to the virus, it is reasonable to assume that current market conditions will extend marketing times beyond the recent historical levels. Additionally, it could have a negative impact on values, but the impact is still unknown

The effective date of the As Is Market Value is March 17, 2020, the date of inspection. As a result of our study and investigation, we conclude that the estimated As Is Market Value of the subject property's Fee Simple Estate, predicated on an estimated exposure time of up to 12 months, as of March 17, 2020, was:

| AS IS MARKET VALUE |
| --- |
| *Twenty-Five Million Five Hundred Thousand Dollars* |
| *($25,500,000)* |

Thank you for the opportunity to provide this service.  Respectfully submitted,

**The Property Sciences Group, Inc.**

Brant A. Sheaffer, MAI
VP, Regional Manager
AG033878
Exp. 2/14/2021
Phone: (206) 319-5215
Email: Brant.Sheaffer@PropSci.com

Arthur O. Neudek, MAI AI-GRS
Managing Director
3002063
Exp. 4/7/2020
Phone: (925) 246-7342
Email: Arthur.Neudek@PropSci.com

Transmittal Letter

Table of Contents

Certification

Introduction

Page

I.   **SUBJECT PROPERTY** ................................................................................................. **3**

II.  **GEOGRAPHIC DESCRIPTION** ................................................................................... **10**

III. **MARKET OVERVIEW** ................................................................................................. **23**

IV.  **SITE AND BUILDING DESCRIPTION** ....................................................................... **37**

V.   **HIGHEST AND BEST USE** ......................................................................................... **65**

VI.  **VALUATION METHODOLOGY** .................................................................................. **67**

VII. **COST APPROACH** ..................................................................................................... **68**

VIII. **RECONCILIATION AND CONCLUSION** .................................................................... **82**

We certify that, to the best of our knowledge and belief,

the statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions.

We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved; any specified interest or bias has not affected the impartiality of my opinions and conclusions.

Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP), Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), and the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

Brant A. Sheaffer, MAI has not inspected the subject property but has prepared the report. Arthur O. Neudek, MAI AI-GRS did not inspect the subject property but has supervised the appraisal process, made a thorough review of the work file including the finished report, recommended changes where appropriate, and concurs with the analysis and value conclusions stated herein. Mr. Sheaffer and Mr. Neudek have met the minimum continuing education and ethics requirements for Members of the Appraisal Institute. The Property Sciences Group Inc. accepts full and complete responsibility for the appraisal.

The undersigned hereby acknowledge that they have the necessary education and appropriate experience to complete the appraisal assignment in a competent manner.

The appraisers acted in an independent capacity and not as employees/partners, principals, nor agents of the clients institution.

The appraiser has not performed appraisal services, as appraiser or in any other capacity, for the subject property within the three years immediately preceding acceptance of this assignment.

Robert Barnes (AG041310 exp. 11/16/2020) a certified general real estate appraiser and employee of The Property Sciences Group Inc. provided significant professional assistance to the persons signing this report by performing an interior/exterior inspection of the subject and furnishing photographs, descriptions and measurements of the site and improvements. No other person(s) provided significant professional assistance to the person(s) signing this report.

|  |  | March 31, 2020 |
| --- | --- | --- |
| Brant A. Sheaffer, MAI | AG033878 | Date |
| VP, Regional Manager | Exp. 2/14/2021 | |

|  |  | March 31, 2020 |
| --- | --- | --- |
| Arthur O. Neudek, MAI AI-GRS | 3002063 | Date |
| Managing Director | Exp. 4/7/2020 | |

## PROPERTY AND REPORT SUMMARY

| | |
|---|---|
| **Property Type** | Winery & Vineyards |
| **Address** | 1172 San Marcos Road & 2380 Live Oak Road |
| **City, State, Zip** | Paso Robles, CA  93446 |
| **APN(s)** | 026-104-001,027-145-022,026-342-039 |
| **Zoning** | AG - Agricultural (San Luis Obispo County) |
| **Ownership** | Erich Russell |
| **Interest Appraised** | Fee Simple |
| **Intended Use of Appraisal** | Collateral Lending |
| **Site Area** | 18,168,440 sq. ft. (417.09 acres) |
| **Gross Building Area** | 57,181 sq. ft. |
| **Net Rentable Area** | 57,181 sq. ft. |

**Dates of Value**

| | |
|---|---|
| **As Is Market Value** | March 17, 2020 |
| **Date of Report** | March 31, 2020 |

## VALUATION SUMMARY

| | | | |
|---|---|---|---|
| **Cost Approach** | *$25,500,000* | **Final Market Value Conclusions** | |
| | | | |
| | | *As Is Value* | *$25,500,000* |
| **Sales Approach** | *Not Developed* | | |
| | | *Exposure Time* | *12 months* |
| | | | |
| **Income Approach** | *Not Developed* | *Insurable Value* | *$11,680,000* |
| | | *Liquidation Value* | *$16,470,000* |



| SUBJECT PROPERTY | |
|---|---|
| Property Type | *Winery & Vineyards* |
| Address | *1172 San Marcos Road & 2380 Live Oak Road* |
| City, State, Zip | *Paso Robles, CA 93446* |
| APN: | *026-104-001, 027-145-022, 026-342-039* |

The subject consists of a winery facility with three vineyards with a total gross land area of 471 acres, of which 252 acres is planted with various varietals of wine grapes. Building improvements include a 7,532 square foot residential villa and a 43,210 square foot winery facility that includes production and storage, administrative offices and a wine tasting area located in the barrel storage area. The properties are operated as the Rabbit Ridge Winery with the San Marcos Road and Texas Road vineyards located northwest of Paso Robles in the Paso Robles -San Miguel District AVA and the Live Oak Road vineyard located southwest of Paso Robles in the Paso Robles - Willow Creek District AVA. The site and its primary improvements are summarized as follows:

| Parcel | Size (Acres) | Williamson Act |
|---|---|---|
| 026-342-039 | 160.00 | Yes |
| 026-104-001 | 156.09 | No |
| 027-145-022 | 155.00 | Yes |
| Total | 471.09 | |

….*Protecting the future of America's Lenders*

| PRIMARY VINEYARD SUMMARY | | |
|---|---|---|
| Variety | Total Blocks | Total Size (Production Acres) |
| Cabernet Sauvignon | 13 | 42.28 |
| Zinfandel | 10 | 39.29 |
| Petite Sirah | 6 | 27.32 |
| Petit Verdot | 8 | 24.65 |
| Syrah | 7 | 23.57 |
| Grenache Blanc | 11 | 20.71 |
| Primitivo | 3 | 19.18 |
| Sauvignon Blanc | 3 | 17.79 |
| Merlot | 4 | 14.28 |
| Cabernet Franc | 3 | 6.40 |
| Tempranillo | 1 | 4.54 |
| Mourvedre | 2 | 4.38 |
| Viognier | 3 | 3.14 |
| Aglianico | 1 | 2.58 |
| Nero d'Avola | 1 | 1.42 |
| Marsanne | 1 | 0.92 |
| Total | 77 | 252.43 |

| PRIMARY IMPROVEMENT SUMMARY | | |
|---|---|---|
| Type | Yr. Built | Total Size (Sq. Ft.) |
| Residential Villa | 1987 | 7,532 |
| Labor Dwelling | 2000 | 900 |
| Manufactured Home | 2000 | 900 |
| Shop Building | 2000 | 2,400 |
| Winery Facility | 2007 | 43,210 |
| Barn / Shop Building | 1990 | 943 |
| Barn / Shop Building | 1990 | 1,296 |
| Total | | 57,181 |

## APPRAISERS

| | | |
|---|---|---|
| Brant A. Sheaffer, MAI | VP, Regional Manager | CA – AG033878 |
| Arthur O. Neudek, MAI, AI-GRS | Managing Director | CA – 3002063 |
| The Property Sciences Group, Inc. | Phone: 925.246.7300 | |
| 395 Taylor Blvd, Suite 250 | Fax: 925.349.7200 | |
| Pleasant Hill, CA 94523 | http://www.propsci.com | |

## CLIENT

| | |
|---|---|
| **Client:** | Ms. Carrie Beavers |
| | Business Loan Capital |
| **Address:** | 15375 Barranca Parkway, Suite B-202 |
| | Irvine, CA 92618 |

## DATE OF APPRAISAL

| | |
|---|---|
| **Effective Date of As-Is Value** | *March 17, 2020* |
| **Date of Inspection** | *March 17, 2020* |
| **Date of Report** | *March 31, 2020* |

## OWNER AND OCCUPANCY

| | |
|---|---|
| **Preliminary Report** | *No* |
| **Owner** | *Erich Russell* |
| **Occupancy Rate** | *Tenant : 0%* |
| | *Vacant : 0%* |
| | *Total : 100%* |

## SALE HISTORY

| | | |
|---|---|---|
| **Transfers in past 5 years** | | *No* |
| | **Source** | *Public Record* |

The subject property is not currently listed for sale and to the best of our knowledge, the subject has not sold or otherwise transferred in the past five years.

## REPORT TYPE

This is an Appraisal Report, compliant with FIRREA (Financial Institutions, Reform, Recovery, and Enforcement Act of 1989, as amended by the Dodd-Frank Reform Act) and the reporting requirements set forth under Standards Rule 2-2 (a) of the Uniform Standards of Professional Appraisal Practice (USPAP) for an Appraisal Report. It contains the data, reasoning, and analyses used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the stated intended use. The appraisers are not responsible for unauthorized use of this report. The appraisers possess the necessary experience and competence to complete this appraisal in conformity with the USPAP competency rule.

## STANDARD OF VALUE

"Market Value Definition" is stated as follows (Federal Register 12 CFR, part 34, Subpart C-Appraisals 34.42 Definitions (g)): The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;

- Both parties are well informed or well advised, and acting in what they consider their own best interests;

- A reasonable time is allowed for exposure in the open market;

- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto;

- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale;

"As Is Market Value" is stated as follows: An estimate of the market value of a property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date of inspection.

## INTENDED USE & INTENDED USER

The intended use of this report is for **Collateral Lending** any other use is prohibited. The intended user of this report is **Business Loan Capital**. Release of this appraisal to any third party without authorization from *The Property Sciences Group Inc.* is expressly prohibited.  A third party is defined as anyone other than the client indicated on the cover page.  *The Property Sciences Group Inc.* will not be responsible for any actions or occurrences as a result of unauthorized use of this report.

## PROPERTY INTEREST APPRAISED

A "Fee Simple Estate" is defined as follows: Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

Personal property is defined as follows:  1. Identifiable tangible objects that are considered by the general public as being "personal"-for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate.  (USPAP, 2010-2011 ed.)   2. Consists of every kind of property that is not real property; movable without damage to itself or the real estate; subdivided into tangible and intangible.

No items of personal property were included in the valuation of the subject.

*The definition noted above is derived from the Dictionary of Real Estate Appraisal, Appraisal Institute, 5th Edition, 2010.*

## SCOPE OF APPRAISAL AND REPORTING PROCESS

The scope of the appraisal included:

- interior/exterior inspection
- reviewed operating statements
- reviewed historical operating statements
- researched comparable sales
- interviewed principals leasing brokers, appraisers, city and government personnel and/or local property managers
- reviewed published surveys
- reviewed public records
- reviewed private data providers
- reviewed PSG files

The type and extent of the analysis is further addressed in the Methodology Section of this Report.  The appraisers have analyzed/appraised the subject's property type before and possess the necessary competence to complete this appraisal in conformity with the competency provision of USPAP. This appraisal has been prepared in conformity with the:

- ➢ Uniform Standards of Professional Appraisal Practice (USPAP)
- ➢ Financial Institutions Reform, Recovery, & Enforcement Act of 1989 (FIRREA)

*....Protecting the future of America's Lenders*

> ➢ Appraisal Institute Code of Professional Ethics
> ➢ Appraisal Institute Standards of Professional Appraisal Practice
> ➢ Federal Deposit Insurance Corporation (FDIC)
> ➢ Code of Federal Regulations (CFR) requirements for above

The appraisers reviewed:

> ➢ published market reports from leading brokerage houses and providers
> ➢ public records
> ➢ private party data providers including Costar Inc., Loopnet, TRW, Dataquick, and Multiple Listing Services among others
> ➢ proprietary data retained in Property Sciences files

The Scope of Work is further delineated throughout the various sections of this report.  The reader is directed to the various sections of this report for a more detailed explanation of the scope of work as it relates to the relative section of the report.

## EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS

An "Extraordinary Assumption" is defined by USPAP as "an assumption directly related to a specific assignment of the effective date of the assignment results, which if found to be false, could alter the appraiser's opinions or conclusions." USPAP further states that "Extraordinary Assumptions" presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market trends; or about the integrity of data used in the analysis.

A "Hypothetical Condition" is defined by USPAP as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of the analysis." USPAP further states that "Hypothetical Conditions" are contrary to known facts about physical, legal or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of the data used in the analysis. The use of extraordinary assumptions and/or hypothetical conditions may have affected the assignment results.

*Inspection of Residential Villa* - On the date of inspection we were unable to inspect the interior of residential villa on the Live Oak Road vineyard property as an elderly family member was under a shelter in place order due to the outbreak of the COVID-19 virus. We were provided with a few photos of the interior and have relied on these along with discussions with the owner. The appraisal analysis that the property is in good condition and that the condition and quality of interior finishes is consistent with the details we were provided. Any change in these assumptions may result in different value estimates.

**Delinquent Property Taxes -** According to the County Tax Collector, as of the date of the report, taxes for two of the three parcels that make up the subject property are delinquent. The taxes for 026-342-039, the Live Oak Road Vineyard and Residence are delinquent resulting from unpaid prior year taxes for 2019. The outstanding redemption balance is $927.79 according to the assessor's records. The taxes for 026-104-001, the San Marcos Road Winery and Vineyard are delinquent resulting in unpaid taxes from 2005 through 2018. The outstanding balance for this parcel totals $2,814,407.80. There may be interest accruing on these delinquent amounts and the balance due may be more than the amount noted or the owner may have already instituted a re-payment plan. This appraisal analysis assumes that all tax payments, liens and judgments will be made, or are, current and that there will be no adverse effect on the subject property resulting from unpaid taxes, liens or judgments.

## EXPOSURE TIME

Exposure Time is defined in the Dictionary of Real Estate Appraisal (Appraisal Institute, 5th Edition, 2010) as "The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal."

As noted in the Sales Comparison Approach, there have been several sales of comparable properties within the market area. The marketing time for the comparable sales ranged from five months to approximately two years. Given the availability of mortgage financing, the desire for similar product, and specific information regarding sales of comparable properties, a reasonable Market Value Conclusion at the estimate of Market Values, assuming sufficient and reasonable marketing efforts, was up to 12 months. Additionally, assuming an active market with adequate buyers and sellers in addition to adequate financing, the estimated marketing time for the subject is also 12 months.

## REGIONAL DESCRIPTION

The subject is part of the South Central Coast Region, which comprises the Counties of Monterey, San Luis Obispo, Santa Barbara and Ventura Counties. The region is separated from the inland Central Valley by the Santa Lucia Mountains and provides for the fertile Salinas, Santa Maria and Santa Ynez Valleys of the South Central Coastal Region. The coastal region is characterized by Pacific Coast beaches, ocean views, warm climate, and intensive agriculture. The mild climate, picturesque coastline, scenic mountains, and numerous parks and beaches make the region a popular tourist and relocation destination.

San Luis Obispo, Santa Barbara and Ventura Counties are often referred to as the "tri-counties" region.

....Protecting the future of America's Lenders

## REGIONAL MAP



....*Protecting the future of America's Lenders*

## COUNTY DESCRIPTION

Created in 1850 as one of 27 original counties in California, San Luis Obispo County is part of CaliforniaÆs Central Coast area and is part of the Tri-Counties region, which incorporates Santa Barbara and Ventura Counties to the south. San Luis Obispo County is midway between Los Angeles (200 miles south) and San Francisco (200 miles north) and comprises approximately 3,316 square mile of land. The County is accessible north-to-south by U.S. Highway 101 and scenic Highway 1. Routes from the east include State Highways 41, 46, 58 and 166. The County is bordered by Santa Barbara County on the south, Monterey County to the north, Kern County to the east, and approximately 80 miles of Pacific coastline on the west. Much of the county is mountainous, with most of the developed land and the majority of the population located along Highway 101, which runs down the central fertile valleys of the County.

There are seven incorporated cities within San Luis Obispo County, including Arroyo Grande, Atascadero, Grove Beach, Morro Bay, Paso Robles, Pismo Beach and San Luis Obispo. There are several unincorporated towns and communities including Baywood-Los Osos, Cambria, Cayucos, Nipomo, Oceano, San Miguel, San Simeon, Santa Margarita and Templeton. Of the total San Luis Obispo County area, 3,250 square miles are unincorporated. Approximately 21% of the County population is classified as ôruralö by the California Department of Finance.

Commercial air carriers American Eagle, US Airways, Delta Connection (SkyWest), and United Express (SkyWest), provide daily service to Las Vegas, Los Angeles, Phoenix, San Francisco, San Jose, and Salt Lake City, from San Luis Obispo County Regional Airport (SBP). Greyhound Bus Lines maintains a daily schedule to bus stations located in Arroyo Grande, Atascadero, Paso Robles, and San Luis Obispo. Amtrak offers daily service from the Coast Starlight and Pacific Surfliner trains to depots in San Luis Obispo, Paso Robles and Grover Beach (Arroyo Grande).

The Santa Lucia Mountains running diagonally from the northwest to southeast generally divide San Luis Obispo County into a coastal area and the rolling hills of a high-desert inland area. Other major geographic features include the San Andreas Fault, which cut across the extreme eastern portion of the County; the headwaters of the Salinas River; and Lake Nacimiento. The southern part of San Luis Obispo County is relatively level, while the northwest portion of the County is generally more rugged. To the south, the Santa Maria River borders San Luis Obispo County.

....Protecting the future of America's Lenders

Property Sciences

The mainstays of the economy are California Polytechnic State University with its almost 20,000 students, tourism, and agriculture. San Luis Obispo County is the third largest producer of wine in California, surpassed only by Sonoma and Napa Counties. Wine grapes are by far the largest agricultural crop in the County, and the wine production they support creates a direct economic impact and a growing wine country vacation industry. The area has ideal climatic conditions. Summer temperature hovers around mid-80s in the daytime and declines to mild 50s in the nighttime. The coastal areas have typical California coast weather û foggy mornings with cool breezes later in the day.

The mild climate, picturesque coastline, scenic mountains, and numerous parks and beaches make San Luis Obispo County a popular tourist and relocation destination. The County is famous for its beaches and is also home to more than 60 wineries with some 30,000 acres of planted vineyards located in South San Luis Obispo County. In recent years the agricultural base has shifted from cattle ranching and fruit production to grape production for the growing wine industry. With warm sunny days and cool evenings, the valleys share a unique microclimate suited to growing a wide variety of grapes as well as other agricultural crops. Agriculture is dominant in San Luis Obispo County with strawberries being the dominant row crop.

Also, located along the central coast are Vandenberg Air Force Base, located to the southwest in Santa Barbara County, and Fort Hunter Liggett Army Base, located to the northwest in Monterey County. The 98,000-acre Vandenberg Air Force Base was originally established in 1941 as the US Army's Camp Cooke. The base was transferred to the US Air Force in 1957 and began its transformation into a space and ballistic missile test facility. In 1972 Vandenberg was selected as the West Coast Space Shuttle launch and landing site. Over four billion dollars was spent on new space shuttle modifications to the existing facility. Currently the base is regularly used for the launch of government and private satellites into orbit and the facility is also one of the main development centers of the U.S. Missile Defense System. Fort Hunter Liggett serves primarily as a training facility, where activities such as field maneuvers and live fire exercises are performed. The fort comprises 165,000 acres and is the largest United States Army Reserve command post. Both of these bases have added to the economic base of San Luis Obispo County.

Mining is becoming less significant countywide, as oil and gas development and production decrease. Manufacturing has slowly been recovering from the recession of the early 1990s. Government is the largest industry employer in the County, providing about 20% of all employment, with the majority of jobs in education. The largest projected growth industries in the County over the next several years are services and retail trade. The County's largest employers with 1,000 or more, full or part-time employees are shown below:

Property Sciences

| SAN LUIS OBISPO COUNTY MAJOR EMPLOYERS | | |
| --- | --- | --- |
| **Employer Name** | **Location** | **Industry** |
| AMI Sierra Vista Radiology | San Luis Obispo | Physicians & Surgeons |
| Atascadero State Hospital | Atascadero | Hospitals |
| Cal Poly State San Luis Obispo | San Luis Obispo | Schools-Universities & Colleges Academic |
| California Mid-State Fair | Paso Robles | Concert Venues |
| Child Abuse & Neglect Child | San Luis Obispo | Business Management Consultants |
| County Office of Education | San Luis Obispo | Schools |
| Cuesta College | Paso Robles | Schools-Universities & Colleges Academic |
| Department of Social Svc | San Luis Obispo | Government Offices-Us |
| Diablo Canyon Nuclear Power | Not Available | Power Plants |
| Division of Juvenile Justice | Paso Robles | State Govt-Correctional Institutions |
| Ernie Ball Inc | San Luis Obispo | Musical Instruments-Manufacturers |
| French Hospital Medical Ctr | San Luis Obispo | Hospitals |
| Glenair Inc | Paso Robles | Communications Consultants |
| Medi-Cal Eligibility Info | San Luis Obispo | Government Offices-County |
| Mental Marketing | Templeton | Advertising-Agencies & Counselors |
| Morro Bay Art Assn Gallery | Morro Bay | Art Galleries & Dealers |
| Pacific Gas & Electric Co | San Luis Obispo | Electric Companies |
| Pacific Gas & Electric Co | Avila Beach | Electric Companies |
| San Luis Obispo County EMS | San Luis Obispo | Government Offices-County |
| San Luis Obispo County Social | San Luis Obispo | Government Offices-County |
| San Luis Obispo Sheriff's Dept | San Luis Obispo | Sheriff |
| Sierra Vista Regional Med Ctr | San Luis Obispo | Hospitals |
| Social Services Dept | San Luis Obispo | Government Offices-County |
| Trust Rcm | San Luis Obispo | Hospitals |
| Twin Cities Community Hospital | Templeton | Hospitals |

## CITY DESCRIPTION

Paso Robles is located approximately 18 miles inland from the Pacific coast and is midway between Los Angeles and San Francisco on Highway 101, about 220 miles from each city. The City is strategically located approximately 30 miles north of San Luis Obispo, benefiting from the nearby urban support while taking in the serenity of the local environment. Located on the Salinas River, the city is known for its hot springs, its abundance of wineries, production of olive oil, almond orchards, and for playing host to the California Mid-State Fair. Highway 46 enters Paso Robles on its eastern border, easily connecting California's San Joaquin Valley and Interstate 5 to Paso Robles. State Highway continues west allowing access to the coast near the towns of Cambria and San Simeon.

Paso Robles is located in the rolling hills of the upper Salinas River Valley, which is mainly dry grassland and oak woodland. Primarily a farming community for many decades, Paso Robles now renowned for thermal springs and wines. Paso Robles has an attractive downtown and linear commercial corridors along Spring Street. The City offers residents a small-town lifestyle combined with modern amenities.

Property
Sciences

## POPULATION CHARACTERISTICS

The population distribution within the Paso Robles Area reveals a similar number of people living in rural San Luis Obispo County as in the City of Atascadero, highlighting the dispersement of the rural economy. Population growth is expected to slow in Paso Robles, while remaining steady in the more populated areas within San Luis Obispo County, San Luis Obispo, and other competing rural markets.

| Population – County and Selected Cities | | | | |
|---|---|---|---|---|
| | *2000* | *2010* | *2018* | *2023* |
| San Luis Obispo County | *246,672* | *269,637* | *284,993* | *291,433* |
| Arroyo Grande | *15,840* | *17,252* | *18,263* | *18,701* |
| Atascadero | *26,751* | *28,310* | *30,105* | *30,792* |
| El Paso de Robles (Paso Robles) | *24,454* | *29,793* | *31,630* | *32,383* |
| Grover Beach | *12,898* | *13,156* | *13,974* | *14,307* |
| Pismo Beach | *8,260* | *7,655* | *8,075* | *8,266* |
| San Luis Obispo | *41,094* | *45,119* | *47,652* | *48,737* |
| San Miguel, San Luis Obispo County | *1,428* | *2,336* | *2,564* | *2,621* |
| Templeton | *6,208* | *7,674* | *8,285* | *8,478* |



* Data provided courtesy of EASI

….*Protecting the future of America's Lenders*

| Population Change (%) County and Selected Cities | | | |
|---|---|---|---|
| | *2000-2010* | *2010-2018* | *2018-2023* |
| San Luis Obispo County | *9.3 %* | *5.7 %* | *2.3 %* |
| Arroyo Grande | *8.9 %* | *5.9 %* | *2.4 %* |
| Atascadero | *5.8 %* | *6.3 %* | *2.3 %* |
| El Paso de Robles (Paso Robles) | *21.8 %* | *6.2 %* | *2.4 %* |
| Grover Beach | *2.0 %* | *6.2 %* | *2.4 %* |
| Pismo Beach | *-7.3 %* | *5.5 %* | *2.4 %* |
| San Luis Obispo | *9.8 %* | *5.6 %* | *2.3 %* |
| San Miguel, San Luis Obispo County | *63.6 %* | *9.8 %* | *2.2 %* |
| Templeton | *23.6 %* | *8.0 %* | *2.3 %* |



....*Protecting the future of America's Lenders*

## INCOME CHARACTERISTICS



The median household income for the Paso Robles was $94,874, slightly lower than the County and only higher than two other cities within the County. Its average household income is near the low end of the range compared to many nearby cities.

....Protecting the future of America's Lenders

## HOUSING CHARACTERISTICS



According to CoreLogic, the median home price for a single-family residence in the subject"s Paso Robles area as of January 2020 was $484,000. Overall, housing prices decreased by approximately 5.1% in the subject"s area from January 2019 to January 2020. In general, Paso Robles has more owner occupied homes than rental housing units. The city has about 55% owner occupied housing.

## EMPLOYMENT CHARACTERISTICS





The City of Paso Robles has a diverse employment base, which encompasses many different areas of the economy. As illustrated in the table above, manufacturing and wholesale trade is the largest employment sector, providing 33% of jobs within the city. The second sector is other jobs, which accounts for 24.54% of total employment, while retail accounts for 17.12% of employment in the city.

As of January 2020, the San Luis Obispo-Paso Robles MSA reported an unemployment rate of 3.1%, lower than the statewide rate of 3.9% reported for California as a whole during the same period.

## SUMMARY AND ANALYSIS

Paso Robles offers all the amenities of family life including attractive and available housing, ample City services, state-of-the-art recreation facilities, easy access retail shopping, well rated public schools, and attractive neighborhoods. Paso Robles has sustained strong, uninterrupted economic growth since 1993. While Paso Robles retains the characteristics of a rural community, it is developing into a center of industry, viticulture, art, recreation, commerce, and housing for San Luis Obispo County and strong regional economic indicators suggest the area is position to grow and maintain its current status for the foreseeable future.

Property Sciences

## NEIGHBORHOOD

### Live Oak Road Vineyard

The subject's Live Oak Vineyard and Residential Villa is located north of Live Oak Road in unincorporated rural are approximately four miles southwest of Downtown Paso Robles. The area is part of the Paso Robles Willow Creek District AVA and consists of primarily agricultural land uses predominantly concerned with vineyard cultivation as well as supporting rural residential estate development with a number of noteworthy wineries in the area. The neighborhood boundaries are best defined by the Willow Creek AVA designation.

The neighborhood as well as its infrastructure is rural. Both roads feature older asphalt paving and do not feature lane markers nor are they improved with curbs or gutters. However, PG&E utilities and various county services are available to the site, which is additionally serviced by a shared private well and septic system. The properties in the area generally reflect average levels of maintenance and condition and the market appeal and acceptance of the properties is average. The neighborhood is in the stable stage of its life cycle. The stable stage is defined as "a stage in a neighborhood life cycle in which the neighborhood experiences equilibrium without marked gains or losses."

### San Marcos Road & Texas Road Vineyards

The subject's San Marcos Road Winery and Vineyard and Texas Road Vineyard are located south and north, respectively, of San Marcos Road in unincorporated rural are approximately five miles north of Downtown Paso Robles. The area is part of the Paso Robles San Miguel District AVA and consists of primarily agricultural land uses predominantly concerned with vineyard cultivation as well as supporting rural residential estate development with a number of noteworthy wineries in the area. The neighborhood boundaries are best defined by the San Miguel AVA designation.

The neighborhood as well as its infrastructure is rural. Both roads feature older asphalt paving and do not feature lane markers nor are they improved with curbs or gutters. However, PG&E utilities and various county services are available to the site, which is additionally serviced by a shared private well and septic system. The properties in the area generally reflect average levels of maintenance and condition and the market appeal and acceptance of the properties is average. The neighborhood is in the stable stage of its life cycle. The stable stage is defined as "a stage in a neighborhood life cycle in which the neighborhood experiences equilibrium without marked gains or losses."

....Protecting the future of America's Lenders

## MAP OF PASO ROBLES AVA AND DISTRICTS



## OVERVIEW

## AGRICULTURAL MARKET OVERVIEW

The following data is extracted from various sources specializing in agricultural land data including the USDA Economic Research Service. It is noted that large-scale agricultural land value studies occur with less frequency than do those for more traditional commercial real estate product and the data presented is considered to be the most current and relevant information available at the time of this report. Since the mid-1980's farm crisis, farm real estate values have been predominantly rising in both nominal and inflation-adjusted terms.

According to preliminary data from the 2018 CDFA Crop Year Report, In 2018, California's farms and ranches received almost $50 billion in cash receipts for their output. This represents a slight increase over adjusted cash receipts for 2017.

California's agricultural abundance includes more than 400 commodities. Over a third of the country's vegetables and two-thirds of the country's fruits and nuts are grown in California. California is the leading US state for cash farm receipts, accounting for over 13 percent of the nation's total agricultural value. The top producing commodities for 2018 include:

| | |
|---|---|
| Dairy Products, Milk — $6.37 billion | Strawberries — $2.34 billion |
| Grapes — $6.25 billion | Lettuce — $1.81 billion |
| Almonds — $5.47 billion | Floriculture — $1.22 billion |
| Cattle and Calves — $3.19 billion | Tomatoes — $1.20 billion |
| Pistachios — $2.62 billion | Oranges — $1.12 billion |

## Average Cropland Value – United States



Dollars per acre

USDA - NASS
August 2, 2018

There are many factors that play a significant role in farmland values. Farmland values are determined by factors that affect the land market as a whole, as well as factors that affect the value of individual parcels relative to each other. Often nationwide trends obscure regional variances.  Historically, crop and pasture land prices did not diverge significantly because pasture was essential for feeding farm animals; however, in recent years, on a nationwide basis cropland values have exceeded pasture values due to primarily higher returns associated with cropland. In California typically cropland, such as the subject, commands a significantly higher value per acre than pastureland does with an average 2017 value recorded of $11,740 per acre, representing a 4.0% year over year increase as of August versus $2,700 per acre for pasture land which is unchanged over the past five years.

....Protecting the future of America's Lenders





It is noted that nonfarm-related factors also have an impact on farmland values. Empirical studies of farmland values have found that in some areas of the country, returns form agricultural production are secondary in terms of value to a parcel's proximity to urban areas. The demand for land that can be developed for urban use is the most significant nonfarm factor affecting farmland values in areas experiencing faster population growth. However, it is noted that beyond a certain threshold, the relationship between urban proximity and farmland values becomes less relevant.



**Farm real estate values are highest close to population centers**

$1,000 per acre

Source: USDA, Economic Research Service using data from USDA, National Agricultural Statistics Service, 2008 June Area Survey and Census Bureau's Census of Population. Farm real estate includes the value of land and buildings. The categories include towns greater than the minimum size indicated; for example, the 5,000-residents category includes towns of any size greater than 5,000 residents (including over 50,000).

The United States farm real estate value, a measurement of the value of all land and buildings on farms, averaged $3,140 per acre for 2018, up $60 per acre (1.9 percent) from 2017 values. Regional changes in the average value of farm real estate ranged from an 8.3 percent increase in the Southern Plains region to 1.4 percent decrease in the Northern Plains region. The highest farm real estate values were in the Corn Belt region at $6,430 per acre. The Mountain region had the lowest farm real estate value at $1,140 per acre.

The United States cropland value averaged $4,130 per acre, an increase of $40 per acre from the previous year. In the Southern Plains region, the average cropland value increased 4.7 percent from the previous year, while in the Lake region, cropland values decreased by 0.6 percent.

The United States pasture value increased by $40 per acre (3.0 percent) from 2017 values. The Southern Plains region had the highest increase from 2017 at 5.6 percent. The Pacific region remained unchanged at $1,650 per acre.

Property
Sciences

## CALIFORNIA AGRICULTURAL MARKET

**2019 Cal-ASFMRA Trends in Agricultural Land and Lease Values Report (Region 6 – Central Coast):**

In regards to the San Luis Obispo County wine grape market the 2019 California Chapter of the ASFRMA trends report summarizes the current state of the market as follows.

"This market is broken down into three fairly distinct growing areas, which impacts the underlying land and vineyard values, along with grape/bottle prices. Unlike Monterey County, land suitable for vineyards in San Luis Obispo County has little to no competition from vegetable and berry growers.

Starting at the north end of the county, vineyards located west of Paso Robles/Templeton and Highway 101 set the upper end of the range, with vineyards currently selling for approximately $50,000 to more than $70,000 per net vine acre. These values are influenced by above average grape and bottle pricing (Cabernet Sauvignon), smaller parcel sizes, and rural estate and/or winery site appeal. Most of the sales in this area are purchased by wineries looking to secure fruit or lifestyle buyers looking to enter the wine industry.

Staying at the north end of the county and moving east of Highway 101, parcels tend to get larger and rural estate and winery site appeal has less influence on the land and vineyard values. These large vineyard properties are mostly owned and purchased by growers, wineries, and institutional investors. Grape pricing for this area tends to be closer to county average and the profitability of the vineyard has a significant impact on value. Most of the plantable land in this area is within the Paso Robles Ground Water Basin that restricts new plantings and additional water usage without an off-set as outlined by the county. These restrictions have resulted in increased demand and value for vested, plantable land, with values mostly falling between $15,000 and $22,500 per acre. Plantable land sales that require an off-set for its irrigation supply indicate values less than $15,000 per acre, with some non-vested land sales as low as $5,000 to $10,000 per acre. In 2018 there was a group of vineyard sales that had below average profitability and in many cases were approaching the end of their economic life. These sales can be generalized as having grape pricing near county average, with historical production dropping below four tons per acre, and in some cases only break-even production (less than three tons per acre). These less profitable/interim vineyards supported values near plantable land and up to around $30,000 per net vine acre. The next group of vineyard sales for this area are near mid-life with average production levels and grape prices, indicating values mostly between $30,000 and $40,000 per net vine acre. Vineyard values beyond $40,000 per net vine acre are mostly young to mid-life, with production levels near or above five tons per acre, and grape pricing near county average. In 2018 a new high was set near $70,000 per net vine acre for an East Paso Robles/Shandon vineyard. This was purchased by an institutional investor and the property featured a large young vineyard, with good water resources, and exceptional production capabilities. Even with this new high observed in the East Paso Robles/Shandon growing area, demand for grapes going into the 2018 harvest started to soften, with several reports of uncontracted Cabernet Sauvignon selling for a steep discount. This is not uncommon for a large crop year and time will tell if there is any impact on vineyard values going forward. With that said, there was no measurable evidence of softening vineyard or land values in 2018.

Edna Valley is the most established southern vineyard market in San Luis Obispo County and has some similarities to West Paso Robles/Templeton, in that values are influenced by above average grape and bottle pricing (Pinot Noir & Chardonnay), smaller parcel sizes, and rural estate and/or winery site appeal. Enda Valley is not an active market and values historically have been at the upper end of the range for San Luis Obispo County and more in line with the cool climate growing areas in Santa Barbara County."

For dry range/pastureland in the region the 2019 Trends report goes on to note the following:

> For several years, the Temblor Mountain Range/Carrizo Plains market was influenced by out of town buyers purchasing ranches for recreational, retreat and home-site purposes. Since the downturn in the economy, the demand from these types of buyers has been reduced. These sales are divided into two main groups: ranches of 1,500 acres and smaller, and ranches 1,500 acres to 15,000 acres. The first group ranges from $800 to $7,000 per acre, while the second group ranges from $300 to $1,200 per acre. The primary influence that drove prices up on the smaller parcels was residential and/or recreational uses. The larger ranches may also be further divided into parcels purchased for recreational, retreat and home site desirability, versus those ranches purchased for grazing land. The larger ranches that offer scenic vistas, hunting, and other forms of recreation are typically forested, watershed land and of little use for grazing. These ranches tend to set the upper limit of the price range. The large ranches purchased for cattle grazing are selling for between $500 and $1,500 per acre. A large 21,000± acre dry pasture ranch in northern San Luis Obispo/Monterey County, sold in December 2016 for $1,482/acre.
>
> Parcels along the Pacific Ocean and Coastal Mountain Range with rural residential appeal have continued to remain stable to strong during the past several years. After 2007, this market saw a decline in activity and prices; however, it has shown substantial recovery over that past several years. This area is very attractive for large, rural home sites, with these properties typically being less than 1,000 acres. Sales range from $2,500 per acre for large dry pasture ranches with limited utility and/or lack of ocean views, to $15,000 per acre for smaller, desirable parcels with coastal influence, ocean views and/or cultivatable land. There have been several sales of small to medium size (120-600 acres) ranch properties along the coastal Santa Lucia Mountains in 2017 and 2018. These sales ranged in price from $9,000 to $13,750 per acre. The primary differences in pricing were due to location, ocean views and buyer/seller motivation."

....Protecting the future of America's Lenders

## VALUES: LAND AND LEASE

| LAND USE | VALUE PER ACRE | ACTIVITY / TREND | RENT RANGE | ACTIVITY / TREND |
|---|---|---|---|---|
| **SANTA CLARA COUNTY** | | | | |
| Row Crops - Gilroy | $20,000 - $40,000 | Moderate/Stable | $400 - $1,000 | Moderate/Stable |
| Rangeland | $1,500 - $3,000 | Limited/Stable | $15 - $30 | Limited/Stable |
| **MONTEREY COUNTY** | | | | |
| Row Crops | $26,000 - $70,000 | Moderate/Stable-Sl.Increasing | $1,000 - $3,300 | Moderate/Stable |
| Rangeland | $700 - $2,000 | Limited/Stable | $6 - $30 | Limited/Stable |
| Wine Grapes | $35,000 - $75,000 | Limited/Stable | N/A | N/A |
| **SANTA CRUZ COUNTY** | | | | |
| Row Crops | $40,000 - $72,000 | Moderate/Stable-Sl.Increasing | $1,700 - $3,000 | Moderate/Stable |
| **SAN BENITO COUNTY** | | | | |
| Row Crops | $20,000 - $40,000 | Limited/Stable | $450 - $1,800 | Moderate/Stable |
| Rangeland | $600 - $2,500 | Limited/Stable | $6 - $30 | Limited/Stable |
| **SAN LUIS OBISPO AND SANTA BARBARA COUNTIES** | | | | |
| Row Crops | $25,000 - $58,000 | Limited/Stable | $1,300 - $3,000 | Limited/Stable |
| Coastal Rangeland (San Luis Co) | $2,500 - $15,000 | Limited/Stable | $7 - $20 | Limited/Stable |
| Inland Rangeland (San Luis Co) | $300 - $7,000 | Limited/Stable | $5 - $15 | Limited/Stable |
| Rangeland (Santa Barbara Co) | $2,500 - $15,000 | Limited/Stable | $7 - $20 | Limited/Stable |
| Wine Grapes | $25,000 - $75,000 | Moderate/Sl. Increasing | N/A | N/A |
| **VENTURA COUNTY** | | | | |
| Row Crops/Strawberries | $45,000 - $81,000 | Limited/Decreasing | $1,700 - $4,300 | Moderate/Sl. Decreasing |
| Lemons | $50,000 - $86,000 | Limited/Stable | N/A | N/A |
| Avocados | $37,000 - $63,000 | Limited/Stable | N/A | N/A |

*....Protecting the future of America's Lenders*

## VALUES: LAND AND LEASE

| LAND USE | VALUE PER ACRE | ACTIVITY / TREND | RENT RANGE | ACTIVITY / TREND |
|---|---|---|---|---|
| **SANTA CLARA COUNTY** | | | | |
| Row Crops - Gilroy | $20,000 - $40,000 | Moderate/Stable | $400 - $1,000 | Moderate/Stable |
| Rangeland | $1,500 - $3,000 | Limited/Stable | $15 - $30 | Limited/Stable |
| **MONTEREY COUNTY** | | | | |
| Row Crops | $26,000 - $70,000 | Moderate/Stable-Sl.Increasing | $1,000 - $3,300 | Moderate/Stable |
| Rangeland | $700 - $2,000 | Limited/Stable | $6 - $30 | Limited/Stable |
| Wine Grapes | $35,000 - $75,000 | Limited/Stable | N/A | N/A |
| **SANTA CRUZ COUNTY** | | | | |
| Row Crops | $40,000 - $72,000 | Moderate/Stable-Sl.Increasing | $1,700 - $3,000 | Moderate/Stable |
| **SAN BENITO COUNTY** | | | | |
| Row Crops | $20,000 - $40,000 | Limited/Stable | $450 - $1,800 | Moderate/Stable |
| Rangeland | $600 - $2,500 | Limited/Stable | $6 - $30 | Limited/Stable |
| **SAN LUIS OBISPO AND SANTA BARBARA COUNTIES** | | | | |
| Row Crops | $25,000 - $58,000 | Limited/Stable | $1,300 - $3,000 | Limited/Stable |
| Coastal Rangeland (San Luis Co) | $2,500 - $15,000 | Limited/Stable | $7 - $20 | Limited/Stable |
| Inland Rangeland (San Luis Co) | $300 - $7,000 | Limited/Stable | $5 - $15 | Limited/Stable |
| Rangeland (Santa Barbara Co) | $2,500 - $15,000 | Limited/Stable | $7 - $20 | Limited/Stable |
| Wine Grapes | $25,000 - $75,000 | Moderate/Sl. Increasing | N/A | N/A |
| **VENTURA COUNTY** | | | | |
| Row Crops/Strawberries | $45,000 - $81,000 | Limited/Decreasing | $1,700 - $4,300 | Moderate/Sl. Decreasing |
| Lemons | $50,000 - $86,000 | Limited/Stable | N/A | N/A |
| Avocados | $37,000 - $63,000 | Limited/Stable | N/A | N/A |

| LAND USE | ROW CROPS | RANGELAND COASTAL (San Luis County) | RANGELAND INLAND (San Luis County) | RANGELAND (Santa Barbara County) | WINE GRAPES |
|---|---|---|---|---|---|
| SAN LUIS OBISPO COUNTY & SANTA BARBARA COUNTY | | | | | |
| 2018 | $25,000 - $58,000 | $2,500 - $15,000 | $300 - $7,000 | $2,500 - $15,000 | $25,000 - $75,000 |
| 2017 | $23,500 - $70,000 | $2,500 - $15,000 | $500 - $2,500 | $2,500 - $15,000 | $25,000 - $70,000 |
| 2016 | $23,000 - $70,000 | $3,000 - $15,000 | $300 - $7,500 | $3,000 - $15,000 | $28,000 - $70,000 |
| 2015 | $20,000 - $70,000 | $2,500 - $15,000 | $300 - $7,500 | $2,500 - $15,000 | $25,000 - $70,000 |
| 2014 | $20,000 - $58,000 | $2,500 - $12,500 | $300 - $7,500 | $1,500 - $12,000 | $40,000 - $60,000 |
| 2013 | $20,000 - $54,000 | $2,500 - $9,000 | $500 - $7,500 | $1,000 - $9,000 | $25,000 - $60,000 |
| 2012 | $20,000 - $60,000 | $3,000 - $9,000 | $300 - $7,000 | $1,000 - $9,000 | $18,000 - $50,000 |

*Source: 2019 Cal-ASFMRA Trends in Agricultural Land and Lease Values Report*

## WINERY / VINEYARD REAL ESTATE MARKET OVERVIEW

*California Wine Industry*

The revival of winemaking in California began in the mid-1950s. Frank Bartholomew revived Agoston Haraszthy's long idle Buena Vista Winery one of the region's original wineries from the mission era; J.D. Zellerbach founded Hanzell Winery; and the Sebastianis began producing wines under their label in the early 1960s. Today there are 3,540 total bonded wineries scattered throughout California.

In recent years, the industry's production has become more centralized. A few wineries now produce and distribute most of the standard competitive wines, and a number of smaller wineries produce the higher quality, more expensive wines. Many of these wines have gained a worldwide reputation for quality and value. Both types of wineries produce wines, which represent some of the best buys for the American wine consumers. Although in recent years the U.S. average annual consumption of wine has stabilized near 3.5 gallons per person per year, there is continued demand for quality wines at reasonable prices with China becoming a burgeoning market.



*Source: Wine Institute*

Property Sciences

## Major California Wine Regions

Grapes can be grown in California wherever soil and water conditions are favorable, except at higher elevations or near the coast, where the temperatures and/or heat summations are too low.  In general, the grape growing areas of California have mild to moderate winters, with rainfall varying from 3 to 4 inches in the southern deserts to 40 inches in parts of northern Sonoma and Mendocino Counties.  The ripening season is usually rainless except in the dry-wine areas of the coastal valleys, where occasional rains may occur after September 1. Damaging hailstorms almost never occur.  The hot, dry summers and cold winters, tend to suppress the spread of Phylloxera.  Downy mildew, black rot, and anthracnose are unknown in cultivate vineyards.  Similarly, the grape moths *Eudemis*, *Cochylis*, and the berry moth are absent.

There are six major geographical grape growing regions in California.  The geographic regions are distinguished by their differences in climates brought about by the topography of the state and its proximity to the ocean.  The regions are the North Coast, Central Coast, South Coast, Central Valley, Shasta Cascade, and the Hot Desert.

## Rootstock Varieties

The selection of grape vine rootstock has a significant impact on the overall health of the grape vine and in turn the quality of the fruit, and ultimately vineyard value.  The grape vine pest-Phylloxera (Pronounced Fy-lox-er-a), was first seen in California in 1852, and is now generally distributed throughout Northern California.  The major impact of this underground insect is that it attacks the roots of grape vines, causing a reduction in yield over time. In 1863, species of native American grapes were taken to Botanical Gardens in England.  These cuttings carried Phylloxera, which is indigenous to North America and native vine varieties had developed resistance.  European vines had no such evolutionary protection.  By 1865. Phylloxera had spread to vines in Provence.  Over the next 20 years, it inhabited and decimated nearly all the vineyards of Europe.  After failing to eradicate the pest, Thomas Munson, a horticulturist in Texas, suggested grafting the European vinifera vines onto American riparian rootstocks.  It was only in this manner that the European wine industry could be retrieved from extinction.  The use of Phylloxera resistant rootstock is now the main preventative measure.  Generally, most vines grown today are grafted onto disease resistant rootstock.

There are several Phylloxera resistant rootstocks available to growers, but only a few are deemed suitable for use in California.  St. George and AXR1 have been two rootstocks commonly used in Northern California.  St. George is a variety of *Vitis rupestris*, a Phylloxera resistant species native to the Eastern United States.  It is most suited for the drier hillside locations of the non-irrigated coastal valleys.  It is not resistant to nematodes or to oak root fungus.  AXR1 is a hybrid between *Vitis vinifera* and *Vitis rupestris*.  This rootstock was believed to have been resistant to Phylloxera and produces greater yields than St. George rootstock.  It performs well under irrigation and in the deeper, heavier soils of the floors of the coastal valleys.  Over the years, other rootstocks such as 3309, 1103 and SO4, which have high resistance to Phlloxera.

In addition to Phylloxera, many vineyards along creeks and rivers had become infested with Pierce's disease, which also affects vines and lowers yields over time.  This disease is due to bacteria, which is transmitted by the "Leaf Hopper" or glassy-winged sharpshooter.  The insect leaps from leaf to leaf along the vines, and inject the bacterium into the sap of nearby grapevines.  The bacterium lives and multiplies in a plant's xylem, eventually blocking the movement of water and killing the vine.  All rootstocks are susceptible to the disease and the main method of prevention is the use of pesticides to keep the insects away from the vines.

While 15 counties have been identified by the State as being infested with the insect, primarily in Southern California and Southern San Joaquin Valley, damage by Pierce's disease has affected less than one percent of the state's 568,000 wine grape acres since 1994, but because the glassy-winged sharpshooter moves quickly and Pierce's disease can kill a vine in two years, California has responded to stop this potentially devastating threat.  Recently, the Los Alamos National Laboratory and UC Davis have come up with a hybrid grape vine that is immune to Xylella Fastidiosa (XF), a bacterium that causes Pierces Disease. This Hybrid produces an antimicrobial protein that blocks XF infection. The experts imagine that with this new technology it will help the farmer to have less reliance on chemicals, as growers fend off the glassy winged sharp shooter.

### *Central Coast Wine Region*
The subject property is located in the greater Central Coast Californian Wine Region. The Central Coast is a large encompassing American Viticultural Area (AVA) that extends from the south of San Francisco all the way to Santa Barbara, California. The region contains 40 AVAs including Paso Robles, Santa Cruz Mountains, Monterey, and Santa Barbara and each of these sub-regions specializes in different types and expressions of wine. While the Central Coast may not have the same namesake as Napa Valley, it does happen to produce some of California's most intriguing, up-and-coming wines.

The Central Coast AVA in California covers the long stretch of coastline from San Francisco Bay south to Santa Barbara and reaches inland from the Pacific Ocean to the borders of the Central Valley. The climate and topography vary enormously across this immense region, making it impossible to generalize about winegrowing conditions. Chardonnay and Pinot Noir are the most important grapes planted in the region, but Cabernet Sauvignon, Zinfandel and Sauvignon Blanc make up a sizable chunk of the wines produced here.

Running for approximately 280 miles from Contra Costa County to the Santa Ynez Valley, the Central Coast AVA covers some of California's most famous AVAs outside of Napa and Sonoma counties, including Paso Robles, Chalone, Santa Cruz Mountains and Santa Maria Valley. The rugged, mountainous topography of the area has been brought about by years of tectonic shift, and the famous San Andreas Fault cuts much of the AVA off from the rest of the United States. The Santa Lucia Mountains, the Galiban Range and the Santa Cruz Mountains all run through this part of California.

The first cultivated vineyards in the Central Coast were planted in the 1700s, although early Spanish explorers found wild grapes growing around the rivers in the region. The early vineyards (mostly planted to the Mission variety) were established by Spanish missionaries moving north toward San Francisco from the first missions in San Diego and Los Angeles counties. The steadily growing wine industry in this part of California was all but killed off in the 1920s by Prohibition and didn't begin to recover until the American wine renaissance of the 1960s and 1970s, when winemakers began to look for interesting examples of terroir in the state.

The San Andreas Fault contributes significantly to the soil types found in the AVAs of the Central Coast. Soil on the western side of the fault is marked by areas of limestone all the way up the coast. This area was once part of an ancient seabed, and the calcareous soils here are the result of fossilized marine animals. There are also areas of shale and loam in the Salinas Valley in Monterey, and sandy, gravelly soils surrounding San Francisco Bay. Soils range in depth and fertility across the Central Coast AVA, with thin, mountainous types being more suited to quality and the more fertile alluvial types in the valleys being better for high yields and bulk production.

The eastern boundary of the Central Coast AVA is around 60 miles inland, and much of the region is influenced by winds from the Pacific Ocean, funneled into the vineyard areas by a series of important valleys and mountain gaps throughout the region. Monterey Bay is arguably the most important contributor, blowing strong winds and fog down the Salinas Valley as well as providing cool breezes to the more inland areas of San Benito and the southern end of the Santa Clara Valley. San Francisco Bay is important as well but, being on the northern edge of the AVA, it has more of an influence on the North Coast and Central Valley AVAs.

The cool climate in much of the Central Coast AVA is excellently suited to the Burgundy varieties of Pinot Noir and Chardonnay, despite the fact that the northernmost part of the region is a full 10 degrees closer to the equator than Burgundy. The hotter, more inland areas of the Central Coast are also good for Zinfandel, which is planted in San Benito County and Paso Robles. Cabernet Sauvignon does well in the higher-altitude parts of the AVA, particularly in the Santa Cruz Mountains north of Monterey Bay.

Small wineries are abundant on the Central Coast, as are large, well-respected producers who use the Central Coast AVA for wines made with grapes grown in more than one county. Many of the cult Sine Qua Non wines are labeled under this AVA, meaning that some of the most expensive single wines in California (and indeed the whole of the New World) are sold under the Central Coast AVA.

## CONCLUSION

The subject consists of a rural residential/agricultural property consisting of three vineyards, a large residential villa and a winery facility. Two of the vineyards are located in the Paso Robles San Miguel District AVA, and one is in the Paso Robles Willow Creek District AVA.  All three parcels are suitable for a vineyard and have been used for permanent plantings (wine grapes), a winery facility and residential occupancy. The majority of California appears to have emerged a recent period of prolonged drought, which began in 2012 and endured to reach historical levels making it the worst drought of the past 100 years, the sustainability of available water supplies continue to impact the outlook for farmland and vineyards. Historically, agricultural land has been among the most stable real estate products available, through the future of the California agricultural market is heavily depended on the ability to minimize susceptibility to extreme drought conditions such as those seen in recent years and the ability to sustain a sufficient production volume for farmers to remain profitable at current commodity prices.

## SITE DESCRIPTION

| | | | | |
|---|---|---|---|---|
| **Assessor's Parcel Number** | *026-104-001,027-145-022,026-342-039* | | | |
| **Lot Area (acres)** | *417.09 acres* | | | |
| **Lot Area (sq. ft.)** | *18,168,440 sq. ft.* | Source | *Public Record* | |
| **Shape** | *Irregular* | | | |
| **Topography** | *Rolling* | | | |
| **Census Tract** | *100.16* | | | |
| | Map | Date | Zone | |
| **FEMA** | *06079C0400G* | *November 16, 2012* | *X* | |
| | *The subject sites are located in Flood Zone X, defined as, "Areas determined to be outside 500-year floodplain determined to be outside the 1% and 0.2% annual chance floodplains." Flood insurance is not required for properties in this zone.* | | | |
| **Easements** | *No* | | | |
| **CC&Rs** | *No* | | | |

## SITE DESCRIPTION

The subject property consists of three parcels that total 471.09 acres. The Assessor's parcel maps are copied later in this report. The subject property consists of a three legally separate parcels summarized in the following table.

| Parcel | Size (Acres) | Williamson Act |
|---|---|---|
| 026-342-039 | 160.00 | Yes |
| 026-104-001 | 156.09 | No |
| 027-145-022 | 155.00 | Yes |
| Total | 471.09 | |

## VINEYARD DESCRIPTION

The subject has 16 primary varieties of grapes. The predominant varietals grown at the subject are Cabernet Sauvignon, Zinfandel, Petite Sirah, Petit Verdot, Syrah, Grenache Blanc, Primitivo, Sauvignon Blanc, and Merlot. All vines are provided water by drip irrigation.

*PIERCE'S DIESEASE*

The subject property's vineyards are located on hillsides. According a statement from the owner, the vineyard is not affected by the disease. Irrigation water is distributed to the individual blocks of the subject property via a drip irrigation system. This system consists of one drip line with emitters per row. Each drip line is suspended from each vineyard stake.

| PRIMARY VINEYARD BLOCK SUMMARY | | |
|---|---|---|
| Variety | Number of Blocks | Total Size (Production Acres) |
| *Large Commercial Production Blocks* | | |
| Merlot | 4 | 17.55 |
| Viognier | 2 | 2.50 |
| Syrah | 2 | 2.70 |
| Cabernet Franc | 1 | 2.33 |
| Cabernet Sauvignon | 1 | 1.53 |
| Mourvedre | 1 | 0.25 |
| *Subtotal* | | 26.86 |
| *Minor Decorative/Supplemental Blocks* | | |
| Syrah/Cab Franc/Misc. | 4 | 1.14 |
| Total | | 28.00 |

The vineyard blocks are summarized above and maps of the vineyard are included on the following pages. Of the 87.92 acres planted at the Live Oak Road Vineyard, the majority were replanted from 2017 to present with a handful of older vines form 1999 and 2008 remaining. In addition to this, there are 38.5 acres of the site that have been terraced and are ready to be planted and have irrigation systems installed to cultivate additional wine grapes.

The vines at the San Marcos Road Vineyard are older having been planted in 1997 and 1998. Currently only 34 acres are actively being farmed and the remaining 57 acres have been allowed to fallow and are eligible for replanting under the TAP program for vine replacement which provided subsidies for the costs of materials associated with replanting a vineyard. The majority of the vines at the Texas Road Vineyard were planted between 2003 and 2007. Currently 74.5 acres are being farmed with 4046 acres that have fallowed and are eligible for replanting under the TAP program.

Determining the economic life of vineyard plantings can be challenging. Many commercial producers would conclude the optimum winemaking economic lifespan of a vine is between 20 and 40 years old, placing the majority of the subject plantings within this range and suggesting a replanting event may be on the horizon.

Property Sciences

However, many boutique winemakers prefer older vineyards for the greater depth of flavor of the fruit they produce and it is not uncommon for "old vine" commercial plantings to reach an age range of 50 to 60 years or as many as 100 years old for "ancient vine" designation. Therefore, while yields tend to diminish substantially on older vines, this loss in volume can often be recovered by the higher bottle prices that wines produced from old vine grapes can command. Accordingly given the subject's market position and its appeal to the premium market segment, the remaining economic life of the subject's plantings is deemed adequate so as to not negatively impact the value or marketability of the subject property.

**Live Oak Vineyard Map**



Water for the Live Oak Rd Vineyard is supplied from five wells on site which provide sufficient water for the residence and vineyard. The GPM pump capacity was not disclosed. There is one 30,000-gallon cement storage tank and two 5,000-gallon plastic storage tanks.

### San Marcos Road Vineyard Map



Water for the San Marcos Rd Vineyard is supplied from three wells on site which provide sufficient water for the winery and vineyard. The well has a 65-75 GPM pump capacity and there are three water storage tanks with on 60,000-gallon raw water tank, a 30,000 gallon tank for reverse osmosis water for the winery, and a 30,000 gallon cement tank for vineyard irrigation water.

**Texas Road Vineyard Map**



Water is supplied from on wells on site which provides sufficient water for the vineyard with a capacity of 75-100 GPM and two 5,000-gallon plastic storage tanks and a pumping station.

### *Groundwater*

Groundwater resources have long played a significant role in the development, growth and sustainability of the Santa Luis Obispo Valley. The major groundwater resources are detailed as follows:

Property Sciences



On September 16, 2014, Governor Jerry Brown signed into law a three-bill legislative package, composed of AB 1739 (Dickinson), SB 1168 (Pavley), and SB 1319 (Pavley), collectively known as the Sustainable Groundwater Management Act (SGMA). For the first time in its history, California has a framework for sustainable, groundwater management - "management and use of groundwater in a manner that can be maintained during the planning and implementation horizon without causing undesirable results."

SGMA requires governments and water agencies of high and medium priority basins to halt overdraft and bring groundwater basins into balanced levels of pumping and recharge. Under SGMA, these basins should reach sustainability within 20 years of implementing their sustainability plans. For critically over-drafted basins, that will be 2040. For the remaining high and medium priority basins, 2042 is the deadline.

Through the Sustainable Groundwater Management Program, DWR provides ongoing support to local agencies through guidance and financial and technical assistance. SGMA empowers local agencies to form Groundwater Sustainability Agencies (GSAs) to manage basins sustainably and requires those GSAs to adopt Groundwater Sustainability Plans (GSPs) for crucial groundwater basins in California. The subject's Live Oak

Road Vineyard derives its groundwater from a high priority SGMA basin according to AQUAOSO's water mapping services and accordingly is subject to the 2042 deadline. The subject's San Marcos Road and Texas Road Vineyards derive their groundwater from a very low priority basin and are not subject to the deadline.

**_Williamson Act_**

According to the information provided and confirmed by Santa Barbara County the subject property is subject to a Williamson Act contract. The California Land Conservation Act of 1965 — known as the Williamson Act — enables local governments to enter into contracts with private landowners for the purpose of restricting specific parcels of land to agricultural or related open space use. In return, landowners receive property tax assessments, which are much lower than normal because they are based upon farming and open space uses as opposed to full market value. The preferred method of cancellation for these contracts is through a non-renewal process. Minimum contract periods range from 10 to 20 years and typically the non-renewal process must commence within the first year of the new contract period. In order to cancel outside of these circumstances an application for cancellation must be granted by the local government in finding that:

1. That the cancellation is for land on which a notice of nonrenewal has been served.
2. That cancellation is not likely to result in the removal of adjacent lands from agricultural use.
3. That cancellation is for an alternative use which is consistent with the applicable provisions of the city or county general plan.
4. That cancellation will not result in discontiguous patterns of urban development.
5. That there is no proximate, noncontracted land which is both available and suitable for the proposed use or that development of the contracted land would provide more contiguous patterns of urban development (GC §51282(b)).

If a cancellation is granted the owner is subject to a cancellation fee equal to 12.5% of the fair market value of the land in question.

## LEGAL DESCRIPTION

The Assessor's Parcel Number 026-104-001,027-145-022,026-342-039 A Preliminary Report was not provided for our review; however, we assume that the legal description coincides with the Assessor's Parcel Map.

....*Protecting the future of America's Lenders*

Property Sciences

## ALQUIST-PRIOLO GEOLOGIC HAZARDS ACT

All properties in California are subject to some degree of seismic risk. The Alquist-Priolo Special Studies Zone Act of 1972 was enacted by the State of California to regulate development near active earthquake faults. The Act required the State Geologist to delineate earthquake fault zones along known faults in California. Cities and counties affected by the identified zones must limit certain development projects within the zones unless geologic investigation demonstrates that the sites are not threatened by surface displacement from future faulting. The Alquist-Priolo maps identify areas at risk of having surface ruptures; they do not address seismic risk due to soil composition or distance from an active fault. According to information provided by the California Department of Conservation website (http://www.conservation.ca.gov) the subject property is not located within the boundaries of a Special Studies Zone. The appraisers are not qualified in the determination of seismic risk, and the client is advised to consult a geotechnical expert in the determination of seismic risk.

## SOIL CONDITIONS/TOXIC CONDITIONS

Soil studies of the subject property were not made available or reviewed as part of this appraisal. The soils are presumed adequate to support development, as evidenced by the existing improvements. This appraisal is based on the special assumption that the property is not adversely affected by any environmental or toxic conditions. The appraisers are not qualified in the determination of environmental or toxic conditions, and the client is advised to consult an expert in this area.

Soil composition maps for the subject's vineyards obtained from the USDA Web Soil Survey mapping system are copied below.

....Protecting the future of America's Lenders



**Live Oak Road Vineyard**
California Revised Storie Index (CA)—San Luis Obispo County, California, Paso Robles Area

## California Revised Storie Index (CA)

| Map unit symbol | Map unit name | Rating | Component name (percent) | Acres in AOI | Percent of AOI |
|---|---|---|---|---|---|
| 152 | Linne-Calodo complex, 9 to 30 percent slopes | Not Applicable for Storie Index | Nacimiento, silty clay loam (15%) | 81.7 | 45.4% |
|  |  |  | Los Osos, clay loam (10%) |  |  |
|  |  |  | Unnamed, similar to Linne soil (5%) |  |  |
|  |  |  | Unnamed, similar to Calodo soil (4%) |  |  |
|  |  |  | Rock outcrop (1%) |  |  |
|  |  |  | Ayar, silty clay (1%) |  |  |
|  |  |  | Balcom, loam (1%) |  |  |
|  |  |  | Cropley, clay (1%) |  |  |
|  |  |  | Diablo, clay (1%) |  |  |
|  |  |  | Lockwood, shaley loam (1%) |  |  |
| 154 | Linne-Calodo complex, 50 to 75 percent slopes | Not Applicable for Storie Index | Zakme, clay (15%) | 80.5 | 45.7% |
|  |  |  | Unnamed, similar to Linne soil (15%) |  |  |
|  |  |  | Unnamed, similar to Calodo soil (8%) |  |  |
|  |  |  | Unnamed, slopes of 30 to 50 percent (1%) |  |  |
|  |  |  | Rock outcrop (1%) |  |  |
|  |  |  | Ayar, silty clay (1%) |  |  |
|  |  |  | Balcom, loam (1%) |  |  |
|  |  |  | Diablo, clay (1%) |  |  |
|  |  |  | Los Osos, clay loam (1%) |  |  |
|  |  |  | Shimmon, loam (1%) |  |  |
| 179 | Nacimiento-Los Osos complex, 9 to 30 percent slopes | Not Applicable for Storie Index | Unnamed, similar to Los Osos soil (10%) | 9.8 | 5.5% |
|  |  |  | Positas, coarse sandly loam (10%) |  |  |
|  |  |  | Balcom, loam (10%) |  |  |
|  |  |  | Diablo, clay (5%) |  |  |

| Map unit symbol | Map unit name | Rating | Component name (percent) | Acres in AOI | Percent of AOI |
|---|---|---|---|---|---|
| | | | Shimmon, loam (5%) | | |
| | | | Ayar, silty clay (5%) | | |
| | | | Unnamed, slopes of 30 to 50 percent (1%) | | |
| | | | Unnamed, gricb surfaces (1%) | | |
| | | | Rincon, clay loam (1%) | | |
| | | | Greenfield, fine sandy loam (1%) | | |
| | | | Arbuckle, fine sandy loam (1%) | | |
| 198 | Santa Lucia-Lopez complex, 15 to 50 percent slopes | Not Applicable for Stone Index | Gazos, shaly clay loam (15%) | 4.2 | 2.4% |
| | | | Linne, shaly clay loam (5%) | | |
| | | | Urban land (5%) | | |
| | | | Zakme, clay (5%) | | |
| | | | Unnamed, deeper similar to Santa Lucia (5%) | | |
| | | | Calodo, clay loam (5%) | | |
| | | | Rock outcrop (2%) | | |
| | | | Lockwood, shaly loam (2%) | | |
| | | | Unnamed, slopes of 9 to 15 percent (1%) | | |
| Totals for Area of Interest | | | | 176.2 | 100.0% |



**San Marcos Road Vineyard**

## California Revised Storie Index (CA)

| Map unit symbol | Map unit name | Rating | Component name (percent) | Acres in AOI | Percent of AOI |
|---|---|---|---|---|---|
| 102 | Arbuckle-Positas complex, 9 to 15 percent slopes | Grade 1 - Excellent | Arbuckle (40%) | 27.0 | 18.0% |
| 105 | Arbuckle-Positas complex, 50 to 75 percent slopes | Not Applicable for Storie Index | Shimmon, loam (15%) | 44.7 | 29.7% |
| | | | Unnamed, similar to Positas (10%) | | |
| | | | Badland (10%) | | |
| | | | Balcom, loam (2%) | | |
| | | | Greenfield, fine sandy loam (1%) | | |
| | | | Unnamed, slopes of 70 to 90 percent (1%) | | |
| | | | Nacimiento (1%) | | |
| 106 | Arbuckle-San Ysidro complex, 2 to 9 percent slopes | Grade 1 - Excellent | Arbuckle (40%) | 24.1 | 16.0% |
| 150 | Hanford and Greenfield gravelly sandy loams, 2 to 9 percent slopes | Grade 2 - Good | Hanford (40%) | 4.1 | 2.7% |
| | | | Greenfield (30%) | | |
| 157 | Metz-Tujunga complex, occasionally flooded, 0 to 5 percent slopes | Grade 2 - Good | Metz (35%) | 0.4 | 0.3% |
| 179 | Nacimiento-Los Osos complex, 9 to 30 percent slopes | Not Applicable for Storie Index | Balcom, loam (10%) | 49.3 | 32.8% |
| | | | Positas, coarse sandy loam (10%) | | |
| | | | Unnamed, similar to Los Osos soil (10%) | | |
| | | | Ayar, silty clay (5%) | | |
| | | | Shimmon, loam (5%) | | |
| | | | Diablo, clay (5%) | | |
| | | | Greenfield, fine sandy loam (1%) | | |
| | | | Rincon, clay loam (1%) | | |

| Map unit symbol | Map unit name | Rating | Component name (percent) | Acres in AOI | Percent of AOI |
|---|---|---|---|---|---|
| | | | Arbuckle, fine sandy loam (1%) | | |
| | | | Unnamed, grcb surfaces (1%) | | |
| | | | Unnamed, slopes of 30 to 50 percent (1%) | | |
| 194 | San Emigdio fine sandy loam, 0 to 2 percent slopes, cool, MLRA 15 | Grade 1 - Excellent | San Emigdio (85%) | 0.7 | 0.5% |
| Totals for Area of Interest | | | | 150.4 | 100.0% |

....Protecting the future of America's Lenders



## California Revised Storie Index (CA)

| Map unit symbol | Map unit name | Rating | Component name (percent) | Acres in AOI | Percent of AOI |
|---|---|---|---|---|---|
| 105 | Arbuckle-Positas complex, 50 to 75 percent slopes | Not Applicable for Storie Index | Shimmon, loam (15%) | 10.0 | 6.2% |
| | | | Unnamed, similar to Positas (10%) | | |
| | | | Badland (10%) | | |
| | | | Balcom, loam (2%) | | |
| | | | Greenfield, fine sandy loam (1%) | | |
| | | | Nacimiento (1%) | | |
| | | | Unnamed, slopes of 70 to 90 percent (1%) | | |
| 176 | Nacimiento silty clay loam, 30 to 50 percent slopes, MLRA 15 | Grade 4 - Poor | Nacimiento (82%) | 25.8 | 15.9% |
| 179 | Nacimiento-Los Osos complex, 9 to 30 percent slopes | Not Applicable for Storie Index | Balcom, loam (10%) | 120.4 | 74.3% |
| | | | Positas, coarse sandly loam (10%) | | |
| | | | Unnamed, similar to Los Osos soil (10%) | | |
| | | | Shimmon, loam (5%) | | |
| | | | Diablo, clay (5%) | | |
| | | | Ayar, silty clay (5%) | | |
| | | | Greenfield, fine sandy loam (1%) | | |
| | | | Rincon, clay loam (1%) | | |
| | | | Unnamed, gr/cb surfaces (1%) | | |
| | | | Unnamed, slopes of 30 to 50 percent (1%) | | |
| | | | Arbuckle, fine sandy loam (1%) | | |
| 181 | Nacimiento-Los Osos complex, 50 to 75 percent slopes | Grade 4 - Poor | Nacimiento (35%) | 5.9 | 3.6% |

| Map unit symbol | Map unit name | Rating | Component name (percent) | Acres in AOI | Percent of AOI |
|---|---|---|---|---|---|
| Totals for Area of Interest | | | | 162.1 | 100.0% |

## EASEMENTS

A Preliminary Report, which typically contains easements of record, was not provided for our review. No easements were noted during our inspection, other than typical public utility easements, and this appraisal assumes there are no easements that negatively impact the use, marketability, or value of the subject property.

## CC&Rs

A Preliminary Report, which would typically contain reference to conditions, covenants and restrictions (CC&Rs), was not provided for our review. This appraisal assumes there are no CC&Rs that negatively impact the use, marketability, or value of the subject property.

## SITE IMPROVEMENTS

| | | | |
|---|---|---|---|
| Parking Total | 13 | Ratio | 0.22/1,000 sq. ft.GBA |
| Open Spaces | 13 | Surface | Asphalt |
| Garage Spaces | 0 | | |
| Landscaping | Average | | |
| Curbs | No | Sidewalks | No |
| Storm Drains | No | | |
| Water Service | Private | Sewer Service | Septic |

## REAL ESTATE TAXES

| Parcel # | 026-342-039 | 026-104-001 | 027-145-022 |
|---|---|---|---|
| Land | $277,975 | $1,538,138 | $173,023 |
| Improvements | $2,205,052 | $10,827,217 | $1,082,841 |
| Personal Property | $11,460 | $1,399,711 | $0 |
| Exemptions | ($7,000) | $0 | $0 |
| Total Assessed Value | $2,487,487 | $13,765,066 | $1,255,864 |
| | | | |
| Tax Rate | 1.08368% | 1.08368% | 1.08368% |
| Annual Taxes | $26,956 | $149,169 | $13,610 |
| Special Assessments/Direct Charges | $0 | $0 | $0 |
| Sub Total | $26,956 | $149,169 | $13,610 |
| | | | |
| Defaulted Taxes | Yes | Yes | No |
| Payment Plan in Effect | No | No | No |
| Redemption Amount | $928 | $2,814,408 | $0 |
| Total Taxes | $27,884 | $2,963,577 | $13,610 |

SITE & IMPROVEMENTS DESCRIPTION

Specific property tax information for the 2019/2020 tax year is shown in the preceding table and represents current information based on current assessed value. According to the County Tax Collector, as of the date of the report, taxes for two of the three parcels that make up the subject property are delinquent. The taxes for 026-342-039, the Live Oak Road Vineyard and Residence are delinquent resulting from unpaid prior year taxes for 2019. The outstanding redemption balance is $927.79 according to the assessor's records. The taxes for 026-104-001, the San Marcos Road Winery and Vineyard are delinquent resulting in unpaid taxes from 2005 through 2018. The outstanding balance for this parcel totals $2,814,407.80. There may be interest accruing on these delinquent amounts and the balance due may be more than the amount noted or the owner may have already instituted a re-payment plan. This appraisal analysis assumes that all tax payments, liens and judgments will be made, or are, current and that there will be no adverse effect on the subject property resulting from unpaid taxes, liens or judgments.

In 1978, the voters of California enacted Proposition 13. This bill limited property taxes to 1% of the 1975 assessed value plus any voter approved city, special district or county bonds. The State Board of Equalization cannot increase the assessed values more than 2% per year. However, if a property is sold or substantially improved, the assessed or taxable value adjusts to market value of the property (usually sales price) as estimated by the County Assessor's Office as of the transaction date.

....*Protecting the future of America's Lenders*

## ZONING DESCRIPTION

| | |
|---|---|
| **Primary Zoning Purpose** | *AG - Agricultural (San Luis Obispo County)* |
| **Permitted Uses** | *The majority of uses aside from Agricultural Accessory Structures require additional project based permitting, most in the form of an administrative land use permit. These uses include crop production and grazing, animal keeping, forestry, cannabis activities, and kennels.* |
| **Change in Zoning Likely** | *No* |

| Development Standards | Permitted | Subject's Actual |
|---|---|---|
| **Lot Size** | *Not specified* | *18,168,440* |
| **FAR** | *Not specif* | *0.00* |
| **Coverage** | *Not specif* | *0%* |
| **Parking** | *8* | *13* |
| **Legally Permitted** | *Yes* | |
| **Conforming** | *Yes* | |

For winery uses, parking is required at a rate of 1 space per 2,000 sf of active use area, 1 per 5,000 sf of storage. According to the Municipal Code, the subject property's current use and development are legal and conforming. The improvements could be re-built to their current density if destroyed by natural disaster.

## Aerial Photo - Live Oak Rd



## Parcel Map - Live Oak Rd



## Aerial Photo - San Marcos Rd



## Parcel Map - San Marcos Rd



## Aerial Photo - Texas Rd



Property Sciences

## Parcel Map - Texas Road



## BUILDING DESCRIPTION

The subject consists of a winery facility with three vineyards with a total gross land area of 471 acres, of which 252 acres is planted with various varietals of wine grapes. Building improvements include a 7,532 square foot residential villa and a 43,210 square foot winery facility that includes production and storage, administrative offices and a wine tasting area located in the barrel storage area. The primary improvements are summarized as follows.

| PRIMARY IMPROVEMENT SUMMARY | | |
|---|---|---|
| Type | Yr. Built | Total Size (Sq. Ft.) |
| Residential Villa | 1987 | 7,532 |
| Labor Dwelling | 2000 | 900 |
| Manufactured Home | 2000 | 900 |
| Shop Building | 2000 | 2,400 |
| Winery Facility | 2007 | 43,210 |
| Barn / Shop Building | 1990 | 943 |
| Barn / Shop Building | 1990 | 1,296 |
| Total | | 57,181 |

## SUBJECT PHOTOS


View of Winery Facility


View of Winery Facility


View of Winery Facility


View of Winery Facility


View of Winery Facility


View of Winery Facility

Property
Sciences

## SUBJECT PHOTOS



View of Winery Facility



View of Winery Facility



San Marcos Rd Vineyard



San Marcos Rd Vineyard



Texas Rd Vineyard



Texas Rd Vineyard

## SUBJECT PHOTOS



Live Oak Rd Vineyard



Live Oak Rd Vineyard



Live Oak Rd Vineyard



Live Oak Rd Vineyard



Live Oak Rd Vineyard



Live Oak Rd Vineyard

## HIGHEST & BEST USE AS VACANT

### LEGALLY PERMISSIBLE

Zoning for the subject property is AG - Agricultural (San Luis Obispo County). Permitted uses in a AG - Agricultural zoning district are primarily agricultural and single family residential. A change in the current zoning is unlikely. The site is suitable for agricultural and rural residential use.

### PHYSICALLY POSSIBLE

The subject consists of three parcels that total Site Area Square Feet> sq. ft., Site Area Acres acres. The topography is rolling / hilly with no apparent drainage or easement problems. No soil problems are presumed. All customary and usual utilities are available. The site has average access and average street visibility. The site is not limited by its physical characteristics, except for size.

### FINANCIALLY FEASIBLE

The subject lies in unincorporated, San Luis Obispo County near the city of Paso Robles. Land uses around the subject are primarily agricultural and rural residential. The area is among one of the more well-regarded wine producing regions in California, outside of the Napa and Sonoma with generally appreciating agricultural values and agricultural production is generally believed to be financially feasible in the current economic climate. However, increasing operating costs, especially including labor costs, and recent declines in commodity prices stand to have a negative impact on the long-term viability of less productive or smaller scale operations.

### MAXIMALLY PRODUCTIVE USE AND IDEAL IMPROVEMENT

It has been concluded in the previous sections that the subject site is constrained by its size, the zoning regulations that apply to the site, and the demand for allowable uses. Considering the subject's location, nearby uses, zoning, and current real estate marketplace, an agricultural and rural residential use would result in maximum productivity to site.

### CONCLUSION

A development similar to the current rural residential and winery / vineyard use combined, would be legally permissible, physically possible, financially feasible, and will result in the maximum productivity to the site. These uses therefore result in the highest and best use, as though vacant.

....*Protecting the future of America's Lenders*

## HIGHEST AND BEST USE AS IMPROVED

The subject property is currently improved with an Estate Vineyard & Winery Property. This use is physically possible based on the size, shape and location of the site; it is legally permissible based on zoning, building and other applicable codes; it is financially feasible given the historical occupancy and use, demand in the market for similar properties. The combination of these factors with the remaining physical and economic life of the structure, result in this being the maximally productive use. The building improvements are assumed to be in good physical condition and functional for their current use. No adverse external influences were noted. Therefore, continued Estate Vineyard & Winery use of the subject property is the highest and best use as improved

.

The Cost Approach adds land acquisition costs and building costs (direct and indirect), to arrive at a total replacement cost for the subject property. From this figure the applicable depreciation is subtracted to determine an As Is depreciated value. The Cost Approach is a good indicator of value when the subject property is new and accurate data exists on building costs. There must also be recent land sales in order to estimate the site value. However, the Cost Approach is subject to discrepancy in the assemblage of information required including: building costs, estimation of depreciation, and estimation of entrepreneurial incentive or profit.

The Cost Approach was developed due to the unique nature of the subject property's improvements as a special purpose property and the availability of recent land sales in this market from which to determine a site value.

The Sales Comparison Approach involves direct comparisons of the property being appraised to similar properties that have sold in the same or a similar market in order to derive an estimate of value for the subject property. This approach is based on the principle of substitution and that an informed purchaser would not pay more for a property than the cost of acquiring another property with similar utility. This approach is applicable when an active market provides a sufficient quantity of comparable sales that can be verified from reliable sources.

The Sales Comparison Approach was excluded in appraising the subject property since adequate data from reliable comparable sales was not available to provide a reasonable value estimate for the subject property.

The Income Capitalization Approach is based on the principle of anticipation and is a procedure in appraisal analysis that converts anticipated benefits to be derived from the ownership of property into a present dollar value estimate. The Income Capitalization Approach is widely applied in appraising income-producing properties since they are typically purchased for investment purposes and the projected net income stream and capitalization rate are the critical factors determining market value via this approach.

Given the specific characteristics of the subject property, the fact that large vineyards are not often leased and there is a lack of adequate lease comparable data, and the fact that the going concern value of the winery operation was beyond the scope of our assignment, the Income Capitalization Approach was not performed.

<u>**The Cost Approach**</u> adds land acquisition costs and building costs (direct and indirect), thereby arriving at a total replacement cost for the subject property.  From this figure, the applicable depreciation is subtracted.  The Cost Approach has been developed to estimate the value of the subject's real property, including the FF&E.  We have estimated the replacement costs of the building and site improvements. No vineyard establishment costs were included in our depreciated replacement cost analysis as the available land sales featured relatively comparable levels of planted vineyard land and therefore our adjusted land value indicators have already accounted for this factor.

***Site Value Estimate***   A summary of the data on comparable vineyard land sales is itemized in the following table.  All of the comparables feature a relatievely comparable level of planted vineyard land relative to the overall site area. The selected indicated is the price per net vineyard acre which is the relationship between sale price relative to the plantage acreage as planted acreage is the primary driver of value and this is the preferred metric utilized by local market participants. However, in order to accommodate for the incremental value of the additional non-planted land area we have adjusted for variances in this factor at a rate of $10,000 per non-vineyard acre variance factored as the difference in the percentage of planted acreage relative to the sale price. The sales produced an unadjusted price range from $27,449  to $84,591 per net vine acre (planted acreage) and are considered the best available comparables at the time of this report.

As the subject consists of three vineyards with differing characteristics, we have included an adjustment grid for each vineyard. The subject's Live Oak Road Vineyard is located southwest of Paso Robles in the Willow Creek District of the Paso Robles AVA. This vineyard has better soils than the other two and has produced grapes that have been used in several highly rated wines in recent years.

The subject's San Marcos Road Vineyard and the Texas Road Vineyard are located adjacent to each other. These viveyards are located northwest of Paso Robles in the San Miguel District of the Paso Robles AVA.

**Property Sciences**

| VINEYARD LAND SALES - LIVE OAK ROAD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **NAME**<br>**LOCATION**<br><br>COUNTY<br>SUB COUNTY A/VA<br>AGRICULTURAL REGION (ASFMRA)<br>APN | **SUBJECT**<br>Rabbit Ridge - Live Oak<br>2340 Live Oak Road<br>Paso Robles, CA<br>San Luis Obispo County<br>Paso Robles-Willow Creek AVA<br>Region 6 - Central Coast<br>026-342-039 | **SALE 1**<br>Amour Ridge Vineyard<br>1660 Adobe Road<br>Rural Salinas River, CA<br>San Luis Obispo County<br>Paso Robles Estrella District<br>Region 6 - Central Coast<br>026-183-009 & -010 | **ADJ.** | **SALE 2**<br>Rancho Real/Murmur Vineyard<br>6920 Hwy 101<br>Santa Maria, CA<br>Santa Barbara County<br>Santa Maria Valley AVA<br>Region 6 - Central Coast<br>061-020-015 | **ADJ.** | **SALE 3**<br>Pine Hawk Vineyard<br>2651 Pine Hawk Way<br>San Miguel CA<br>San Luis Obispo County<br>Paso Robles AVA<br>Region 6 - Central Coast<br>019-071-075 & -076 | **ADJ.** | **LISTING**<br>Vogelzang Vineyard<br>1575 Alisos Avenue<br>Santa Ynez, CA<br>Santa Barbara County<br>Happy Canyon AVA<br>Region 6 - Central Coast<br>141-080-036 | **ADJ.** |
| VERIFICATION<br>DOCUMENT # | Inspection<br>Owner/Public Records | M.L.S. Fiyer, FARES<br>Broker - Jenny Heisten<br>1150N | | Press Release, M.L.S. FARES<br>Broker - Jenny Heisten<br>17991 | | M.L.S. LoopNet<br>Broker - Jenny Heisten<br>16Mi | | M.L.S. Flyer<br>Broker - Carey Kendall | |
| BUYER<br>SELLER | | Stan Vineyard LLC<br>Amour Ridge LLC | | Gallo Vineyards Inc<br>Reach/L Real LLC | | Caretro Cellars<br>Noris Ulsen | | N/Ap | |
| **SALE PRICE**<br>**PRICE/NET VINE ACRE** | | **$2,690,000**<br>**$27,449** | | **$14,500,000**<br>**$68,720** | | **$2,800,000**<br>**$51,367** | | **$9,500,000**<br>**$84,591** | |
| RIGHTS CONV'D<br>ADJ. SALE PRICE | Fee Simple | Fee Simple<br>$2,690,000 | | Fee Simple<br>$14,500,000 | | Fee Simple<br>$2,800,000 | | Fee Simple<br>$9,500,000 | |
| FINANCING<br>ADJ. SALE PRICE | | Conventional<br>$2,690,000 | | Conventional<br>$14,500,000 | | Conventional<br>$2,800,000 | | Available<br>$9,500,000 | |
| COND. OF SALE<br>CONCESSIONS<br>ADJ. SALE PRICE | | Market<br>None Known<br>$2,690,000 | | Market<br>None Known<br>$14,500,000 | | Market<br>None Known<br>$2,800,000 | | Market<br>None Known<br>$9,500,000 | |
| DATE OF SALE<br>ADJ. SALE PRICE | | Aug-18<br>$2,690,000 | | Apr-18<br>$14,500,000 | | Jan-18<br>$2,800,000 | | Active Listing<br>$9,025,000 | -5% |
| LOCATION | Average | Similar | | Superior | 20% | Similar | | Superior | 20% |
| SITE<br>EXISTING USE<br>PARCEL (SQ. FT.) (GROSS)<br>ACRES (GROSS)<br>PARCEL (SQ. FT.) (PLANTED)<br>ACRES (PLANTED)<br>% PLANTED (of Total)<br>SHAPE<br>ZONING<br>ZONING DESCRIPTION<br>CERTIFIED ORGANIC<br>PLANTINGS AT SALE | Agricultural<br>8,988,600<br>180.00<br>1,026,786<br>97.92<br>55%<br>Irregular<br>AG<br>Agricultural<br>No<br>Permanent (Vineyard) | Agricultural<br>5,014,192<br>130.12<br>4,268,000<br>98.00<br>76%<br>Rectangular<br>AO<br>Agricultural<br>No<br>Permanent (Vineyard) | 9.8% | Agricultural<br>19,005,984<br>436.31<br>9,191,160<br>211.00<br>44%<br>Rectangular<br>AG-II-100<br>Agricultural<br>No<br>Permanent (Vineyard) | -2.0% | Agricultural<br>14,265,494<br>140.80<br>14,265,494<br>54.5+<br>38%<br>Rectangular<br>AO<br>Agricultural<br>Yes<br>Permanent (Vineyard) | -9.8% | Agricultural<br>4,740,169<br>106.82<br>1,047,150<br>76.83<br>71%<br>Rectangular<br>AG-II-100<br>Agricultural<br>No<br>Permanent (Vineyard) | 2.0% |
| PLANTING SUMMARY<br>TYPE<br>PRIMARY VARIETAL MIX (% Planted)<br><br><br><br>PLANTED ACREAGE<br>IRRIGATION | Wine Grapes<br>Cabernet Sauvignon (20%)<br>Petit Verdot (19%)<br>Grenache (14%), Cab Franc (7%)<br>Tempranillo (5%), Mourvedre (6%)<br>97.9<br>Drip Line | Wine Grapes<br>Cabernet Sauvignon<br>Merlot<br>Syrah<br><br>98.0<br>Similar | 9.8% | Wine Grapes<br>Pinot Noir, Chardonnay<br>Syrah, Grenache, Viognier<br>Pinot Gris, Gamay<br><br>211.0<br>Similar | 5% | Wine Grapes<br>Cabernet Sauvignon (63%)<br>Syrah (37%)<br><br><br>54.5<br>Similar | | Wine Grapes<br>Sauvignon Blanc (34%)<br>Cabernet Sauvignon (17%)<br>Viognier (18%) Mourvedre (18%)<br>Merlot (6%)<br>76.84<br>Similar | |
| FRONTAGE/ACCESS<br>UTILITIES | Average<br>Available On Site | Similar<br>Similar | | Similar<br>Similar | | Similar<br>Similar | | Similar | |
| WATER SUPPLY | Private Wells 3<br>3 Holding Tanks (40k Gallons)<br>GPM Not Discussed | Private Wells - 1<br>110 GPM Ag Well | 10% | Private Wells (Capacity<br>Undisclosed, Assumed Adequate) | | Private Wells: 2<br>High Capacity Ag Well &<br>Domestic Well GPM Not<br>Disclosed | | Private Wells - 2<br>500 GPM Ag Well &<br>75 GPM Domestic Well | |
| IRRIGATION DISTRICT<br>SGMA BASIN PRIORITY<br>ORCHARD CONDITION<br>TOPOGRAPHY<br>ENTITLEMENTS<br>WILLIAMSON ACT<br>IMPROVEMENTS | N/A<br>Very Low<br>Average<br>Rolling & Mountain Slope<br>None<br>Yes<br>As If Vacant | N/A<br>High<br>Similar<br>Similar<br>Similar<br>No<br>Similar | 5% | N/A<br>Very Low<br>Similar<br>Similar<br>Similar<br>No<br>Similar | | N/A<br>High<br>Similar<br>Similar<br>Similar<br>No<br>2 Modular Homes<br>(640 sf & 728 sf) | 5% | N/A<br>Medium<br>Similar<br>Similar<br>Similar<br>No<br>Minimal | -5% | 6% |
| **TOTAL NET ADJUSTMENT**<br>ADJUSTED SALE PRICE<br>**FINAL ADJ. PRICE / NET VINE ACRE** | | 24.8%<br>$3,358,491<br>**$34,270** | | -17.0%<br>$12,037,477<br>**$57,050** | | -3.8%<br>$2,554,804<br>**$46,865** | | -29.5%<br>$4,341,119<br>**$53,003** | |

69

*....Protecting the future of America's Lenders*

Property Sciences

## VINEYARD LAND SALES - SAN MARCOS ROAD

| NAME LOCATION COUNTY SUB-COUNTY AVA AGRICULTURAL REGION (ASFMRA) APN | SUBJECT Rabbit Ridge - San Marcos 1172 San Marcos Road Paso Robles, CA San Luis Obispo County Paso Robles: San Miguel AVA Region 6 - Central Coast 026-104-001 | SALE 1 Armour Ridge Vineyard 1600 Adobe Road Rural Salinas River, CA San Luis Obispo County Paso Robles Estrella District Region 6 - Central Coast 026-183-009 & -010 | ADJ. | SALE 2 Rancho Real/Murmur Vineyard 6920 Hwy 101 Santa Maria, CA Santa Barbara County Santa Maria Valley AVA Region 6 - Central Coast R61-020-013 | ADJ. | SALE 3 Pine Hawk Vineyard 2651 Pine Hawk Way San Miguel CA San Luis Obispo County Paso Robles AVA Region 6 - Central Coast 019-071-075 & -076 | ADJ. | LISTING Vogelzang Vineyard 1575 Alisos Avenue Santa Ynez, CA Santa Barbara County Happy Canyon AVA Region 6 - Central Coast 141-080-039 | ADJ. |
|---|---|---|---|---|---|---|---|---|---|
| VERIFICATION DOCUMENT # | Inspection Owner/Public Records | MLS, Flyer, FARES Buyer - John's Hesston 5150% | | Press Release, MLS, FARES Broker - Jonna Houston 17991 | | MLS, CoStar Broker - John's Houston Nbw. | | MLS, Flyer Broker - Carey Kendall | |
| BUYER SELLER | | Stan Vineyard LLC Armour Ridge LLC | | Stoltz Vineyards Inc Rancho Real LLC | | Camino Cellars Ninis Lilisen | | NAp | |
| **SALE PRICE PRICE/NET VINE ACRE** | | **$2,680,000 $27,449** | | **$14,500,000 $68,720** | | **$2,800,000 $51,367** | | **$9,500,000 $84,591** | |
| RIGHTS CONV'D ADJ. SALE PRICE | Fee Simple | Fee Simple $2,680,000 | | Fee Simple $14,500,000 | | Fee Simple $2,800,000 | | Fee Simple $9,500,000 | |
| FINANCING ADJ. SALE PRICE | | Conventional $2,680,000 | | Conventional $14,500,000 | | Conventional $2,800,000 | | Available $9,500,000 | |
| COND. OF SALE CONCESSIONS ADJ. SALE PRICE | | Market None Known $2,680,000 | | Market None Known $14,500,000 | | Market None Known $2,800,000 | | Market None Known $9,500,000 | |
| DATE OF SALE ADJ. SALE PRICE | | Aug-19 $2,680,000 | | Apr-19 $14,500,000 | | Jan-19 $2,800,000 | | Active Listing $9,025,000 | -5% |
| LOCATION | Average | Similar | | Superior | 20% | Similar | | Superior | 20% |
| SITE EXISTING USE PARCEL (SQ. FT. - GROSS) ACRES (GROSS) PARCEL (SQ. FT. - PLANTED) ACRES (PLANTED) % PLANTED (of Total) SHAPE ZONING ZONING DESCRIPTION CERTIFIED ORGANIC PLANTINGS AT SALE | Agricultural 6,969,000 160.00 1,401,040 34.00 22% Irregular A/C Agricultural No Permanent (Vineyard) | Agricultural 5,014,192 130.12 4,268,000 98.00 75% Rectangular A/O Agricultural No Permanent (Vineyard) | 15.9% | Agricultural 19,005,884 436.31 9,101,160 211.00 44% Rectangular AG-II-100 Agricultural No Permanent (Vineyard) | 8.0% | Agricultural 14,205,494 140.60 14,205,494 54.5+ 38% Rectangular AO Agriculture Yes Permanent (Vineyard) | 6.5% | Agricultural 4,740,166 106.82 3,347,150 76.84 71% Rectangular AG-II-100 Agriculture No Permanent (Vineyard) | 6.2% |
| PLANTING SUMMARY TYPE PRIMARY VARIETAL MIX (% Planted) | Wine Grapes Sauvignon Blanc (20%), Primitivo (26%), Zinfandel (19%), Cabernet Sauvignon (17%), Petite Sirah (15%), Syrah (11%) | Wine Grapes Cabernet Sauvignon Merlot Syrah | | Wine Grapes Pinot Noir, Chardonnay Syrah, Grenache, Viognier Pinot Gris, Gamay | | Wine Grapes Cabernet Sauvignon (63%), Syrah (37%) | | Wine Grapes Sauvignon Blanc (34%), Cabernet Sauvignon (17%), Viognier (16%) Mourvedre (16%), Merlot (6%) | |
| PLANTED ACREAGE IRRIGATION | 34.0 Drip Line | 98.0 Similar | | 211.0 Similar | 5% | 54.5 Similar | | 76.84 Similar | |
| FRONTAGE/ACCESS UTILITIES | Average Available On Site | Similar Similar | | Similar Similar | | Similar Similar | | Similar Similar | |
| WATER SUPPLY | Private Wells - 3 Holding Tanks (1200 gallons) 65-85 GPM Domestic Well | Private Wells - 1 110 GPM Ag Well | 10% | Private Wells (Capacity Undisclosed; Assumed Adequate) | | Private Wells - 2 High Capacity Ag Well & Domestic Well/GPM Not Disclosed | | Private Wells - 2 500 GPM Ag Well & 75 GPM Domestic Well | |
| IRRIGATION DISTRICT SGMA BASIN PRIORITY ORCHARD CONDITION TOPOGRAPHY ENTITLEMENTS WILLIAMSON ACT IMPROVEMENTS | N/A High Average Rolling & Moderate Slope None Yes As If Vacant | N/A High Similar Similar Similar No Similar | | N/A Very Low Similar Similar Similar No Similar | -5% | N/A High Similar Similar Similar No 2 Modular Homes (640 sf & 728 sf) | -5% | N/A Medium Similar Similar Similar No Minimal | |
| TOTAL NET ADJUSTMENT ADJUSTED SALE PRICE FINAL ADJ. PRICE / NET VINE ACRE | | 35.9% $3,655,660 $37,302 | | 12.0% $12,759,816 $60,472 | | 2.0% $2,681,605 $52,984 | | -25.1% $34,871,680 $83,400 | |

**VINEYARD LAND SALES - TEXAS ROAD**

| NAME / LOCATION / COUNTY / SUB-COUNTY AVA. / AGRICULTURAL REGION (ASFMRA) / APN | SUBJECT Rabbit Ridge - Texas Road 1172 San Marcos Road Paso Robles, CA San Luis Obispo County Paso Robles San Miguel AVA Region 6 - Central Coast 027-145-022 | SALE 1 Armour Ridge Vineyard 1600 Adobe Road Rural Salinas River, CA San Luis Obispo County Paso Robles Estrella District Region 6 - Central Coast 026-161-019 & -010 | ADJ. | SALE 2 Rancho Real/Murmur Vineyard 8020 Hwy 101 Santa Maria, CA Santa Barbara County Santa Maria Valley AVA Region 6 - Central Coast 101-020-013 | ADJ. | SALE 3 Pine Hawk Vineyard 2051 Pine Hawk Way San Miguel, CA San Luis Obispo County Paso Robles AVA Region 6 - Central Coast 019-071-070 & -078 | ADJ. | LISTING Vogelzang Vineyard 1635 Alisos Avenue Santa Ynez, CA Santa Barbara County Happy Canyon AVA Region 6 - Central Coast 141-080-039 | ADJ. |
|---|---|---|---|---|---|---|---|---|---|
| VERIFICATION / DOCUMENT # | Inspection Owner/Public Records | MLS Flyer; EARES Broker - Jerry Hentzen 31509 | | Press Release; BCS EARES Broker - Jerry Hunston 17901 | | MLS LoopNet Broker - Jerry Hentzen N/Av. | | MLS Flyer Broker - Carey Kendall | |
| BUYER / SELLER | --- | Stan Vineyard LLC Armour Ridge LLC | | Baltic Vineyards Inc Triangle Real LLC | | Gastaro Cellars Tassi (Unvn) | | N/Ap. | |
| **SALE PRICE** / **PRICE/NET VINE ACRE** | --- | **$2,690,000** **$27,449** | | **$14,500,000** **$68,720** | | **$2,820,000** **$51,387** | | **$6,000,000** **$84,591** | |
| PROFIT % CONV'D / ADJ. SALE PRICE | Fee Simple | Fee Simple $2,690,000 | | Fee Simple $14,500,000 | | Fee Simple $2,820,000 | | Fee Simple $6,000,000 | |
| FINANCING / ADJ. SALE PRICE | --- | Conventional $2,690,000 | | Conventional $14,500,000 | | Conventional $2,820,000 | | Available $6,500,000 | |
| COND. OF SALE / CONCESSIONS / ADJ. SALE PRICE | --- | Market None Known $2,690,000 | | Market None Known $14,500,000 | | Market None Known $2,800,000 | | Market None Known $6,500,000 | |
| DATE OF SALE / ADJ. SALE PRICE | --- | Aug-18 $3,000,000 | | Apr-18 $14,500,000 | | Jun-18 $2,800,000 | | Active Listing $6,525,000 | -15% |
| LOCATION | Average | Similar | | Superior | -20% | Similar | | Superior | -20% |
| SITE EXISTING USE / PARCEL (SQ. FT - GROSS) / ACRES (GROSS) / PARCEL (SQ. FT - PLANTED) / ACRES (PLANTED) / % PLANTED (of Total) / SHAPE / ZONING / ZONING DESCRIPTION / CERTIFIED ORGANIC / PLANTINGS AT SALE | Agricultural 6,958,600 159.80 3,249,960 74.64 46% Irregular AG Agricultural No Permanent (Vineyard) | Agricultural 5,848,192 138.12 4,268,880 98.00 70% Rectangular AG Agricultural No Permanent (Vineyard) | 13.2% | Agricultural 19,085,664 436.31 9,191,160 211.00 48% Rectangular AG-II-100 Agricultural No Permanent (Vineyard) | 0.1% | Agricultural 14,205,464 140.80 14,705,464 54.51 39% Rectangular AG Agricultural Yes Permanent (Vineyard) | -4.7% | Agricultural 4,140,199 108.82 2,347,150 76.84 71% Rectangular AG-II-100 Agricultural No Permanent (Vineyard) | 3.8% |
| PLANTING SUMMARY TYPE / PRIMARY VARIETAL MIX (% Planted) | Wine Grapes Zinfandel (26%), Merlot (18%), Petite Sirah (11%), Field Varietal (9%), Grenache (8%), Cabernet Sauv (8%), Syrah (4%), Primitivo (2%), Viognier (2%) | Wine Grapes Cabernet Sauvignon Merlot Syrah | | Wine Grapes Pinot Noir, Chardonnay Syrah, Grenache, Viognier Pinot Gris, Gamay | | Wine Grapes Cabernet Sauvignon (83%) Syrah (17%) | | Wine Grapes Sauvignon Blanc (34%) Cabernet Sauvignon (17%) Viognier (16%) Mourvedre (16%) Merlot (8%) | |
| PLANTED ACREAGE / IRRIGATION | 74.6 Drip Line | 98.0 Similar | | 211.0 Similar | (A) | 54.5 Similar | | 76.84 Similar | |
| FRONTAGE/ACCESS / UTILITIES | Average Available On Site | Similar Similar | | Similar Similar | | Similar Similar | | Similar Similar | |
| WATER SUPPLY | Private Well - 1 2 Holding Tanks (10k Gallons) 75-180 GPM Domestic Well | Private Wells - 1 310 GPM Ag Well | 10% | Private Wells (Capacity Unrecorded; Assumed Adequate) | | Private Wells - 2 High Capacity Ag Well & Domestic Well (GPM Not Disclosed) | | Private Wells - 2 600 GPM Ag Well & 75 GPM Domestic Well | |
| IRRIGATION DISTRICT / SOIL BASIN PRIORITY / ORCHARD CONDITION / TOPOGRAPHY / ENTITLEMENTS / WILLIAMSON ACT / IMPROVEMENTS | N/A High Average Rolling & Moderate Slope None Yes As if Vacant | 10A High Similar Similar Similar No Similar | | N/A Very Low Similar Similar Similar No Similar | -5% | N/A Med High Similar Similar Similar Yes 2 Modular Homes (245 sf & 726 sf) | -6% | N/A Medium Similar Similar Similar No Minimal | |
| TOTAL NET ADJUSTMENT / ADJUSTED SALE PRICE / FINAL ADJ. PRICE / NET VINE ACRE | --- | 23.2% $3,313,289 **$33,809** | | 18.9% $11,611,771 **$55,032** | | -10.3% $2,511,109 **$48,068** | | -28.8% $4,628,319 **$60,233** | |



## COMPARABLE LAND SALES PHOTOS



SALE 1                                          SALE 2



SALE 3                                          LISTING

**Live Oak Road Vineyard Site**

The adjusted land sale prices range from $34,270 to $63,003 per net vineyard (planted) acre, with an average of $50,297. Taking into account the Willow Creek District AVA, soil quality and history of producing highly rated wines, we have concluded at a price per acre at the upper end of the range. Accordingly, it is our opinion that a unit indicator of **$60,000 per net vineyard (planted) acre** is supportable for the subject's 87.9 acres of planted vineyards.

In addition to the the planted acreage, the subject has 38.5 acres of plantable land that has been terraced and is ready for planting. To estimate a value of the plantable land, we have deducted the costs associated with planting the vines and installing the irrigation system. Planting costs are estimated at $8,375 per acre (based on $5 per vine and 1,675 vines per acre) and the cost of installing a drip irrigation system is estimate at $6,000 per acre, resulting in total costs of $14,375 per acre that must be deducted from the unit indicator above. Deducting these costs from the estimate of $60,000 for a planted acre results in a price indication of $45,625 ($60,000 - $14,375 = $45,625) per plantable acre. Accordingly we have estimated the subject's **38.5 acres of plantable land based on $45,000 per acre**.

The subject's site value for the Live Oak Road Vineyard is calculated as follows:

| Site Value Estimate - Live Oak Road | | | |
|---|---|---|---|
| **Item** | **Size (acres)** | **$/Acre** | **Value Indication** |
| Planted Vineyards | 87.9 | $60,000 | $5,275,200 |
| Plantable Land | 38.5 | $45,000 | $1,732,500 |
| **Indicated Value** | | | $7,007,700 |
| **Rounded to nearest $100,000** | | | **$7,000,000** |

**San Marcos Road Vineyard Site**

The adjusted land sale prices range from $37,302  to $63,400 per net vineyard (planted) acre, with an average of $53,509.  Taking into account the San Miguel District AVA, and soil quality, we have concluded at a price per acre at the lower end of the range.  Accordingly, it is our opinion that a unit indicator of **$40,000 per net vineyard (planted) acre** is supportable for the subject's 34.0 acres of planted and actively farmed vineyards.

In addition to the the planted acreage, the subject has 57.0 acres of land that was previously planted with vines that have now fallowed, is fully trellised and irrigated, and is eligible for replanting under the TAP Program incentives. To estimate a value of the plantable land, we have deducted the costs associated with planting the vines.  Planting costs are estimated at $8,375 per acre (based on $5 per vine and 1,675 vines per acre) that must be deducted from the unit indicator above. Deducting these costs from the estimate of $40,000 for a planted acre results in a price indication of $31,625 ($40,000 - $8,375 = $31,625) per plantable acre. Accordingly we have estimated the subject's **57.0 acres of plantable land based on $31,500 per acre**.

The subject's site value for the San Marcos Road Vineyard is calculated as follows:

| Site Value Estimate - San Marcos Road | | | |
|---|---|---|---|
| **Item** | **Size (acres)** | **$/Acre** | **Value Indication** |
| Planted Vineyards | 34.0 | $40,000 | $1,360,000 |
| Plantable Land | 57.0 | $31,500 | $1,795,500 |
| **Indicated Value** | | | $3,155,500 |
| **Rounded to nearest $100,000** | | | **$3,200,000** |

....*Protecting the future of America's Lenders*

**Texas Road Vineyard Site**

The adjusted land sale prices range from $33,809 to $60,233 per net vineyard (planted) acre, with an average of $48,786. Taking into account the San Miguel District AVA, and soil quality, we have concluded at a price per acre at the lower end of the range. Accordingly, it is our opinion that a unit indicator of **$40,000 per net vineyard (planted) acre** is supportable for the subject's 74.5 acres of planted and actively farmed vineyards.

In addition to the the planted acreage, the subject has 40.46 acres of land that was previously planted with vines that have now fallowed, is fully trellised and irrigated, and is eligible for replanting under the TAP Program incentives. To estimate a value of the plantable land, we have deducted the costs associated with planting the vines. Planting costs are estimated at $8,375 per acre (based on $5 per vine and 1,675 vines per acre) that must be deducted from the unit indicator above. Deducting these costs from the estimate of $40,000 for a planted acre results in a price indication of $31,625 ($40,000 - $8,375 = $31,625) per plantable acre. Accordingly we have estimated the subject's **40.46 acres of plantable land based on $31,500 per acre**.

The subject's site value for the Texas Road Vineyard is calculated as follows:

| Site Value Estimate - Texas Road | | | |
|---|---|---|---|
| Item | Size (acres) | $/Acre | Value Indication |
| Planted Vineyards | 74.5 | $40,000 | $2,981,600 |
| Plantable Land | 40.5 | $31,500 | $1,274,490 |
| **Indicated Value** | | | $4,256,090 |
| **Rounded to nearest $100,000** | | | **$4,300,000** |

## VALUE OF IMPROVEMENTS

In estimating the replacement cost new of the subject improvements, cost estimates for the buildings and site improvements were derived from the *Marshall Valuation Service* (Calculator Method), a widely used and well regarded guide for the development of reproduction and replacement cost estimates.  This service provides data on a variety of building types and classes of construction with appropriate adjustments for quality, condition, timing and geographic location.

Costs developed reflect the final cost to the owner and include typical costs of:

1.   Architectural and engineering services, including normal surveying costs.
2.   Plans, plan checking and estimated average permit fees.
3.   Normal construction loan fees and interest during typical course of construction.
4.   Sales tax on materials.
5.   Utilities from the lot line to the structure for typical setbacks.
6.   Contractor overhead and profit, including on-site supervision, but not developer/entrepreneurial profit.
7.   Costs of typical site preparation, including foundation excavation and backfill.

*Direct Costs*

Estimates for direct costs were separated into three main categories: main residential building improvements, retail winery improvements, and wine production facility improvements. To account for economies of scale, the building base cost was adjusted using an area/shape multiplier and height multiplier. Current and local cost multipliers were also incorporated into the cost analysis to account for local and current market conditions. As previously noted no vineyard establishment costs were included in our depreciated replacement cost analysis as the majority of available land sales featured relatively comparable levels of planted vineyard land and therefore our adjusted land value indicators have already accounted for this factor.

*Indirect Costs*

Indirect costs include interest, property taxes, excess municipal and professional fees, and developer's profit. For the purpose of our analysis, the construction period was estimated at twelve months.  Taxes were estimated at 1.08368% of the land value for 18 months.  Conversations with several developers indicated an anticipated developer's profit range of 5% to 20% of the total direct and indirect costs.   A 10% profit was considered appropriate for the subject given the current economic climate.

*Estimate of Accrued Depreciation*

Depreciation is a loss in utility and, thus, value from any cause.  We have estimated the life expectancy and depreciation rate for each component of the subject's improvements.  A depreciation breakdown is shown at the

....*Protecting the future of America's Lenders*

bottom of the Replacement Cost Summary Table. We also considered other forms of depreciation such as functional and external obsolescence which the subject does not exhibit.

**FF&E Value**   Valuation of the subject's FF&E was beyond the scope of our assignment and we would advise the client obtain a valuation from a personal property appraiser experienced in valuing equipment and fixtures for wineries.

**Site Value**   As discussed in the fee simple site value estimate section of this report the value of the subject's supporting vineyard sites was estimated at **$7,000,000** for the Live Oak Road Vineyard site which is improved with the Residential Villa, and at **$3,200,000** for the San Marcos Road Vineyard site which is improved with the Rabbit Ridge Winery facility.

**Presentation of Cost Approach**   The value of the improved sites for the Live Oak Road Vineyard and Residence and the San Marcos Road Vineyard and winery facility are presented in the tables on the following pages. No table is presented for the Texas Road Vineyard as there are no building improvements on that site.

## REPLACEMENT COST SUMMARY
## Rabbit Ridge - Live Oak Rd Residential Villa & Vineyard

**Direct Building Costs**

Main Buildings - Residences
*Marshall Valuation Service - Average/Good/Excellent Quality, Class D\* Residence, Section 12, Page 27, 29 (August 2018)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Primary Residential Villa | 7,532 | SF | @ | $ | 343.00 | $ | 2,583,476 |
| Labor Dwelling | 900 | SF | @ | $ | 82.00 | $ | 73,800 |
| Mobile Home | 900 | SF | @ | $ | 82.00 | $ | 73,800 |
| Height Multiplier | | | | | | | 1.00 |
| Current Multiplier | | | | | | | 1.02 |
| Local Multiplier (Santa Barbara) | | | | | | | 1.21 | *$3,279,610* |

Accessory Improvements
*Marshall Valuation Service - Average/Good Quality, Class S Farm Buildings, Section 17 (May 2019)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Shop Building | 2,400 | SF | @ | $ | 30.50 | $ | 73,200 |
| Perimeter Multiplier | | | | | | | 1.000 |
| Current Multiplier | | | | | | | 1.02 |
| Local Multiplier (Santa Barbara) | | | | | | | 1.21 | *$90,343* |

Site Improvements
*Included in Vineyard Land Value*

| **Indirect Building Costs** | Construct. Period | | Rate | Land Value | | |
|---|---|---|---|---|---|---|
| Taxes on Land | 18 | months | 1.08368% | $ 7,000,000 | $ | 113,929 |
| Permits & Fees | | | @ | 5% | $ | 168,498 |
| Professional Fees (Architects, engineers, surveys, etc.) | | | @ | 5% | $ | 168,498 |
| Marketing Fees | | | | | $ | 15,000 |
| **Total Indirect Costs** | | | | | | *$465,924* |

| | | | |
|---|---|---|---|
| **Total Direct & Indirect Costs** | | | **$3,835,878** |
| Developer's Profit (% of Total Direct & Indirect Costs) | 10.0% | | $383,588 |
| **TOTAL REPLACEMENT COSTS NEW** | | | **$4,219,466** |

| | | | | |
|---|---|---|---|---|
| **Minus Total Depreciation** | | | | |
| Physical | 36% | | $ (1,530,923) | -$1,530,923 |
| **Subtotal - Physically Depreciated Replacement Costs** | | | | **$2,688,542** |
| Functional | 0% | | $ - | |
| External | 0% | | $ - | $0 |
| **Total Depreciated Replacement Cost** | | | | **$2,688,542** |

| | |
|---|---|
| **Plus Site Value** | **$7,000,000** |
| **TOTAL REPLACEMENT COST** | **$9,688,542** |

| **As Is Market Value** Indicated by the Cost Approach (Rounded to nearest $100,000): | **$ 9,700,000** |
|---|---|

| Depreciation Table | Life Expectancy | Eff. Age | % Deprec. | Replacement Costs \* | Depreciation |
|---|---|---|---|---|---|
| Residences | 55 | 20 | 36% | $4,106,348 | **$1,493,217** |
| Accessory Buildings | 45 | 15 | 33% | $113,118 | **$37,706** |
| **Total Depreciation via Age/Life Method** | | | 36% | $4,219,466 | **$1,530,923** |
| \* Replacement cost adjusted by local and current multipliers | | | | | |

*....Protecting the future of America's Lenders*

## REPLACEMENT COST SUMMARY
### Rabbit Ridge - San Marcos Rd Winery & Vineyard

**Direct Building Costs**

Winery Buildings - Production/Tasting/Office/Guest Suite
*Marshall Valuation Service - Good/Excellent Quality, Class D/C Winery Buildings, Section 13 Page 24 (May 2018)*

| | | | | | | |
|---|---|---|---|---|---|---|
| Main Winery Building | 43,210 | SF | @ | $ 153.00 | $ 6,611,130 | |
| Perimeter Multiplier | | | | | 1.000 | |
| Current Multiplier | | | | | 1.04 | |
| Local Multiplier (Santa Barbara) | | | | | 1.21 | **$8,319,446** |

Wine Production & Accessory Improvements
*Marshall Valuation Service - Average/Good Quality, Class S Farm Buildings, Section 17 (May 2019)*

| | | | | | | |
|---|---|---|---|---|---|---|
| Barn/Shop Building | 943 | SF | @ | $ 30.50 | $ 28,762 | |
| Barn/Shop Building | 1,296 | SF | @ | $ 30.50 | $ 39,528 | |
| Perimeter Multiplier | | | | | 1.000 | |
| Current Multiplier | | | | | 1.02 | |
| Local Multiplier (Santa Barbara) | | | | | 1.21 | **$84,283** |

Site Improvements
*Included in Vineyard Land Value*

| **Indirect Building Costs** | Construct. Period | | Rate | Land Value | | |
|---|---|---|---|---|---|---|
| Taxes on Land | 18 | months | 1.08368% | $ 3,200,000 | $ 52,159 | |
| Permits & Fees | | | @ | 10% | $ 840,373 | |
| Professional Fees (Architects, engineers, surveys, etc.) | | | @ | 5% | $ 420,186 | |
| Marketing Fees | | | | | $ 15,000 | |
| **Total Indirect Costs** | | | | | | **$1,327,719** |

| | | | | | |
|---|---|---|---|---|---|
| **Total Direct & Indirect Costs** | | | | | **$9,731,448** |
| Developer's Profit (% of Total Direct & Indirect Costs) | | 10.0% | | | $973,145 |
| **TOTAL REPLACEMENT COSTS NEW** | | | | | **$10,704,592** |

**Minus Total Depreciation**

| | | | | |
|---|---|---|---|---|
| Physical | 22% | | $ (2,390,727) | -$2,390,727 |
| **Subtotal - Physically Depreciated Replacement Costs** | | | | **$8,313,865** |
| Functional | 0% | | $ - | |
| External | 0% | | $ - | $0 |
| **Total Depreciated Replacement Cost** | | | | **$8,313,865** |

| | |
|---|---|
| **Plus Site Value** | **$3,200,000** |
| **TOTAL REPLACEMENT COST** | **$11,513,865** |

**As Is Market Value** Indicated by the Cost Approach (Rounded to nearest $100,000):   **$ 11,500,000**

**Depreciation Table**

| | Life Expectancy | Eff. Age | % Deprec. | Replacement Costs * | Depreciation |
|---|---|---|---|---|---|
| Winery Building | 45 | 10 | 22% | $10,597,233 | $2,354,941 |
| Accessory Improvements | 45 | 15 | 33% | $107,359 | $35,786 |
| **Total Depreciation via Age/Life Method** | | | 22% | $10,704,592 | $2,390,727 |

* Replacement cost adjusted by local and current multipliers

*....Protecting the future of America's Lenders*

**Conclusion**   As indicated on the Cost Approach Summary Tables included on the preceding pages, adding land value to the depreciated replacement cost results in a total value estimate.

The value conclusion for the three parcels that make up the subject are summarized below:

| AS IS VALUE CONCLUSION | |
|---|---|
| **Item** | **Value Conclusion** |
| Live Oak Road Vineyard & Residential Villa | $9,700,000 |
| San Marcos Road Vineyard & Winery Facility | $11,500,000 |
| Texas Road Vineyard | $4,300,000 |
| **Total As Is Value** | **$25,500,000** |

Accordingly, the as is real property value of the subject property's Fee Simple interest, as derived by the **Cost Approach**, as of March 17, 2020, was:

<u>As Is Market Value via The Cost Approach</u>

*TWENTY-FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS*

*($25,500,000)*

| APPROACHES TO VALUE | VALUE INDICATOR |
|---|---|
| Cost Approach | $25,500,000 |
| Sales Approach | Not Developed |
| Income Approach | Not Developed |
| **Concluded As Is Market Value** | **$25,500,000** |

The Cost Approach was developed due to the unique nature of the subject property's improvements as a special purpose property and the availability of recent land sales in this market from which to determine a site value. The Cost Approach is our sole valuation methodology as large winery properties like the subject are generally built by owner users for their own specific use.

The Sales Comparison Approach was not developed due to the lack of recent sales data on winery and vineyard properties of a similar size that would be directly comparable to the subject property.

The Income Capitalization Approach has not been developed as similar properties with a large component of non-producing open space are predominantly purchased by owner-users and not for leased investments.

As of the effective date, the short and long-term impact on the real estate market from the COVID-19 virus is unknown. However, due to the virus, it is reasonable to assume that current market conditions will extend marketing times beyond the recent historical levels. Additionally, it could have a negative impact on values, but the impact is still unknown

The effective date of the As Is Market Value is March 17, 2020, the date of engagement for this assignment. As a result of our study and investigation, we conclude that the estimated As Is Market Value of the subject property's Fee Simple Estate, predicated on an estimated exposure time of up to 12 months, as of March 17, 2020, was:

| AS IS MARKET VALUE |
|---|
| *Twenty-Five Million Five Hundred Thousand Dollars* |
| **($25,500,000)** |

Property Sciences

## INSURABLE REPLACEMENT VALUE

At the request of the client, an insurable replacement cost estimate is provided. Insurable Replacement Cost is defined as:

> The current replacement cost of building structures only, including existing tenant improvements. The estimate of Insurable Replacement Cost should include allowances for repair, engineering and design fees, building permit fees, as well as contractor's overhead and profit. It will not include: (1) costs associated with land acquisition and development; (2) professional fees not directly related to repairs; (3) taxes; (4) financing costs; (5) property owner's overhead and profit; (6) loss of income during repairs; (7) loss of personal property not necessary to the operation, management or marketing of the project; and (8) any/all other costs not relevant to the repair of the insured damages.

The estimated cost new of improvements is based on current prices of labor and materials to either reproduce the improvements or to replace the improvements with equally desirable facilities with similar utility. In estimating the replacement cost new of the subject improvements, *Marshall Valuation Service* figures for construction similar building improvements were used. Costs developed reflect the final cost to the owner and include typical costs of:

1. Professional fees such as average architect's & engineer's fees, landscape design, etc.
2. Plans, plan checking and estimated average permit fees.
3. Normal construction loan fees and interest during typical course of construction.
4. Materials, sales tax on materials, and labor costs are included.
5. Utilities from the lot line to the structure for typical setbacks.
6. Contractor overhead and profit, including on-site supervision, workmen's compensation, fire & liability insurance, unemployment insurance, equipment, temporary facilities, security, etc. are included. It is noted that the developer/entrepreneurial profit is not included.
7. Costs of typical site preparation, including foundation excavation and backfill.

The costs reflect the current replacement cost of fully finished buildings, including engineering and design fees; permit fees; contractor's overhead and profit, and all tenant improvements. The costs do not include costs associated with land acquisition and development; professional fees not directly related to repairs, taxes, financing costs, owner's overhead and profit; loss of income during repairs, chattels not included above; and all other costs not relevant to the repair of insured damages.

**NOTE: The Insurable Replacement Cost provided should be considered a preliminary estimate. The appraisers are not licensed contractors or professional insurance underwriters. The estimate provided is based on published guidelines for general property types and not specific to the subject property. For a complete and accurate account of the cost to replace the existing improvements, we recommend that a licensed contractor or insurance company be contacted to estimate the current construction costs.**

….*Protecting the future of America's Lenders*

## INSURABLE REPLACEMENT COST SUMMARY
### Rabbit Ridge - Live Oak Rd Residential Villa & Vineyard

**Direct Building Costs**

Main Buildings - Residences
*Marshall Valuation Service - Average/Good/Excellent Quality, Class D\* Residence, Section 12, Page 27, 29 (August 2018)*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Primary Residential Villa | 7,532 | SF | @ | $ | 343.00 | $ 2,583,476 | | |
| Labor Dwelling | 900 | SF | @ | $ | 82.00 | $    73,800 | | |
| Mobile Home | 900 | SF | @ | $ | 82.00 | $    73,800 | | |
| Height Multiplier | | | | | | 1.00 | | |
| Current Multiplier | | | | | | 1.02 | | |
| Local Multiplier (Santa Barbara) | | | | | | 1.21 | *$3,279,610* | |
| | | | | | | | | |
| **Total Direct Costs** | | | | | | | *$3,279,610* | |

INSURABLE REPLACEMENT COST ESTIMATE (Rounded to nearest $10,000):     **$   3,280,000**

*\* Replacement cost adjusted by local and current multipliers*

## INSURABLE REPLACEMENT COST SUMMARY
### Rabbit Ridge - San Marcos Rd Winery & Vineyard

**Direct Building Costs**

Winery Building - Production / Tasting / Office / Guest Suite
*Marshall Valuation Service - Good/Excellent Quality, Class D/C Winery Buildings, Section 13 Page 24 (May 2018)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Retail Tasting Room | 43,210 | SF | @ | $ | 153.00 | $ 6,611,130 | |
| Perimeter Multiplier | | | | | | 1.000 | |
| Current Multiplier | | | | | | 1.04 | |
| Local Multiplier (Santa Barbara) | | | | | | 1.21 | *$8,319,446* |

Wine Production & Accessory Improvements
*Marshall Valuation Service - Average/Good Quality, Class S Farm Buildings, Section 17 (May 2019)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Barn / Shop Building | 943 | SF | @ | $ | 30.50 | $    28,762 | |
| Barn / Shop Building | 1,296 | SF | @ | $ | 30.50 | $    39,528 | |
| Perimeter Multiplier | | | | | | 1.000 | |
| Current Multiplier | | | | | | 1.02 | |
| Local Multiplier (Santa Barbara) | | | | | | 1.21 | *$84,283* |
| | | | | | | | |
| **Total Direct Costs** | | | | | | | *$8,403,729* |

INSURABLE REPLACEMENT COST ESTIMATE (Rounded to nearest $10,000):     **$   8,400,000**

*\* Replacement cost adjusted by local and current multipliers*

## LIQUIDATION VALUE

The estimated liquidation (disposition) valuation of the subject is premised on the As Is Market Value estimated in the referenced appraisal. The disposition value differs from the market value in the respect that a disposition value is based upon the seller being under compulsion to sell.

The **Liquidation (Quick Sale) Value**[1] is stated as the most probable price, which a specified interest in real property is likely to bring under all of the following conditions:

1. Consummation of the sale will occur within a limited future marketing period specified by the client;
2. The actual market conditions currently prevailing are those to which the appraised property interest is subject;
3. Buyer and seller each acting prudently and knowledgably:
4. The seller is under compulsion to sell:
5. The buyer is typically motivated;
6. Both parties acting in what they consider their best interests;
7. An adequate marketing effort made for the limited time for completion of sale;
8. Payment is made in cash, in U.S. dollars or in terms of financial arrangements comparable thereto;
9. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Given the current financial market and lack of demand for service station properties, a significant discount over the previously concluded As Is Real Property Value is reasonable for the estimate of a disposition value for the subject. It reflects not only the discounted price but also the cost to hold and sell the real estate during the short marketing period. The Disposition Value assumes an immediate sale and closing of the property within one month timeframe, as stipulated by the client.

To establish an appropriate discount to apply in this process, we believe the annual return projected for the property would have to be increased to a level that would catch the immediate attention of investors and justify a very short due diligence period and the immediate execution of purchase on the property. Given the good quality and large size of the subject property, which would limit the potential pool of buyers, a 15% discount is deemed reasonable. The estimated 15% discount is indicated in the following table as "lender ownership factors".

In addition to the overall 15% discount there are other fees that need to be deducted to arrive at the liquidation value. These fees include costs of taking possession of the asset, management of the asset, existing liens, delinquent taxes (if any), and brokerage fees associated with disposition of the asset. The estimated fees applicable to the subject are summarized in the following table.

---

[1] *The definition noted above is derived from the Dictionary of Real Estate Appraisal, 5th Edition, 2010.*

## Liquidation (Disposition) Value Calculations

| | | | |
|---|---|---|---|
| **Market Value:** | | | **$25,500,000** |
| | | | |
| Less Cost of: | | | |
| 1) Taking Possession (Legal & Closing Fees, etc.) | | 5.0% | ($1,275,000) |
| | | | |
| 2) Preserving the Asset (Operating Expenses during 6-MONTH Holding Period) | | | |
| Real Estate Taxes | Current Tax Rate | 1.0837% | ($276,338) |
| Property Insurance | $0.28 - $0.79/SF of GBA | $0.55/SF of GBA | ($31,450) |
| Improvement Maintenance/Repairs/Security | $0.21 - $0.81/SF of GBA | $0.40/SF of GBA | ($22,872) |
| Vineyard Management | $4,000 - $9,000/Acre/Year | $5,000/Acre/Year | ($219,800) |
| Misc/Contingency | 5% - 15% of Subtotal | 10.0% | ($55,046) |
| Total Operating Costs (12 MONTHS) | | | ($605,506) |
| | | | |
| **Total Lender Costs** | | | **($1,880,506)** |
| | | | |
| 3) *Lender Ownership Factors | | 15.0% | ($3,825,000) |
| | | | |
| 4) Delinquent Real Estate Taxes (If Any) | | | ($2,815,336) |
| | | | |
| **Gross Liquidation (Disposition) Value Estimate:** | | | **$ 16,979,158** |
| | | | |
| 5) Sales Commissions | | 3.0% | ($509,375) |
| | | | |
| **Net Liquidation (Disposition) Value Estimate:** | | | **$ 16,469,783** |
| | | ROUNDED | **$16,470,000** |
| | | % of Market Value | 64.6% |

* Lender Ownership Factors: A reduction in value due to the real estate being owned and marketed by the lender. Assumptions: 1) Business operations have ceased and the property is closed and vacant; 2) Lender in possession; 3) The lender is motivated to sell the asset therefore total combined exposure and marketing time allowed to achieve a sale is assumed to be twelve **months or less**.

## ADDENDA

Assumptions and Limiting Conditions
Professional Qualifications
Assessor's Information
Property Tax Bills
Vineyard Details
Client's Engagement Letter

....Protecting the future of America's Lenders

# ASSUMPTIONS AND LIMITING CONDITIONS

BY THIS NOTICE, ALL PERSONS AND FIRMS REVIEWING, UTILIZING OR RELYING UPON THIS REPORT IN ANY MANNER, BIND THEMSELVES TO ACCEPT THESE ASSUMPTIONS AND LIMITING CONDITIONS.  Do not use this report if you do not so accept.  These conditions are a part of the appraisal report; they are a preface to any value conclusion, certification, definition, fact or analysis.  This appraisal report is an economic study to estimate value as defined herein.  It is not a geotechnical, engineering, construction, legal or architectural study nor survey, and expertise in these areas, among others, is not implied.

1.    LIMIT OF LIABILITY:

The liability of the Appraisers, The Property Sciences Group Inc. and employees and affiliated independent contractors is limited to the client only (client indicated on cover page of report) and to the fee actually received by the Appraisers (total per appraisal).  Further, there is no accountability, obligation, nor liability to any third party.  A third party is defined as anyone other than the client indicated on the cover page.  If, however, this report is placed in the hands of anyone other than client, the client shall make such party aware of all assumptions and limiting conditions of the assignment and related discussions.  The Appraisers are in no way to be responsible for any costs incurred to discover or correct deficiencies of any type present in the property; physically, financially, and/or legally.  In the case of limited partnerships or syndication offerings or stock offerings in real estate, client agrees that in case of lawsuit (brought by lender, partner or part owner in any form of ownership, tenant, or any other party), any and all awards, settlements of any type in such suit, regardless of outcome, client will hold Appraisers completely harmless in any such action.

2.    COPYRIGHT, PUBLICATION, DISTRIBUTION, USE OF REPORT:

This report is Copyrighted© and reproduction of this document (any part thereof or in its entirety) without the authorization from The Property Sciences Group Inc. is expressly prohibited.

Possession of this report or any copy thereof does not carry with it the right of publication, nor may it be used for other than its intended use; the physical report(s) remain the property of the Appraisers for the use of the client, the fee being for the analytical services only.

The Bylaws and Regulations of the Appraisal Institute require each Member and Candidate to control the use and distribution of each appraisal report signed by such Member or Candidate; except as hereinafter provided, the client may not distribute copies of this appraisal to any third party.  This report may not be released to any third party without the authorization of The Property Sciences Group Inc.  Any unauthorized release will render the appraisal to be invalid.  Neither all nor any part of this appraisal report shall be disseminated to the general public by the use of advertising media, public relations, news, sales or other media for public communication without the prior written consent of the Appraisers.  (See last item in following list for client agreement/consent.)



3.    CONFIDENTIALITY:

This appraisal is to be used only in its entirety and no part is to be used without the whole report.  All conclusions and opinions concerning the analysis set forth in the report were prepared by the Appraisers whose signatures appear on the appraisal report, unless indicated as "Review Appraiser."  No change of any item in the report shall be made by anyone other than the Appraisers and/or officer of The Property Sciences Group Inc.  The Appraisers and The Property Sciences Group Inc. shall have no responsibility if any such unauthorized change is made.

The Appraisers may not divulge the material (evaluation) contents of the report, analytical findings or conclusions, or give a copy of the report to anyone other than the client or his/her designee as specified in writing except as may be required by the Appraisal Institute for standards or ethics enforcement, or by a court of law or body with the power of subpoena.

4.    TRADE SECRETS:

This appraisal was obtained from The Property Sciences Group Inc. or related companies and/or its individuals or related independent contractors and consists of "trade secrets and commercial or financial information" which is privileged and confidential and exempted from disclosure under 5 U.S.C. 552 (b) (4).  Notify the Appraisers signing the report or officers of The Property Sciences Group Inc. of any request to reproduce this appraisal in whole or part.

5.    INFORMATION USED:

No responsibility is assumed for accuracy of information furnished by work of or work by others, the client, his/her designee, or public records.  This information includes, but is not limited to, numerical street address, lot and block numbers, Assessors Parcel Numbers, lot dimensions, lot sizes, dimensions of the improvements, gross building areas, net rentable areas, rent schedules or rent rolls, income data, operating expenses, operating budgets, property taxes, and related data.  The Appraisers are not liable for such information or the work of possible subcontractors.  The comparable data relied upon in this report has been confirmed with one or more parties familiar with the transaction or from affidavit or other source thought reasonable; all are considered appropriate for inclusion to the best of our factual judgment and knowledge.  An impractical and uneconomic expenditure of time would be required in attempting to furnish unimpeachable verification in all instances, particularly as to engineering and market-related information.  It is suggested that the client consider independent verification as a prerequisite to any transaction involving sale, lease, loan, or other significant commitment of funds on the subject property.  Any material error in any of the above data could have a substantial impact on the value conclusions indicated in the appraisal.  Therefore, the Appraisers reserve the right to amend the appraisal and value conclusions if made aware of any such error. Accordingly, the client should carefully review all assumptions, data, leases, rent rolls, relevant calculations, and value conclusions within 30 days after the delivery of this report (the delivery date being indicated on the transmittal letter) and notify the Appraisers of any errors/omissions.

6.    TESTIMONY, CONSULTATION, COMPLETION OF CONTRACT FOR APPRAISAL SERVICES:

The contract for appraisal, consultation or analytical service, is fulfilled and the total fee payable upon completion of the report.  The Appraisers or those assisting in preparation of the report will not be asked or required to give testimony in court or hearing because of having made the appraisal, in full or in part, nor engage in post-appraisal consultation with client or third parties except under separate and special arrangement and at additional fee.  If



testimony or deposition is required because of any subpoena, the client shall be responsible for any additional time, fees, and charges regardless of issuing party.

7.    EXHIBITS:

The sketches and maps in this report are included to assist the reader in visualizing the property and are not necessarily to scale.  Various photos, if any, are included for the same purpose as of the date of the photos.  Site plans are not surveys unless shown from separate surveyor.

8.    LEGAL, ENGINEERING, FINANCIAL, STRUCTURAL, OR MECHANICAL NATURE HIDDEN COMPONENTS, SOIL:

The Appraisers and/or The Property Sciences Group Inc. has no responsibility for matters legal in character or nature, nor of any architectural, structural, mechanical, or engineering nature.  No opinion is rendered as to the title, which is presumed to be good and merchantable.  The property is appraised as if free and clear, unless otherwise stated in particular parts of the report.  No attempt has been made to render an opinion of or status of easements that may exist, unless stated otherwise (i.e. that the scope of the assignment does indeed include an analysis of easements).

The legal description is assumed to be correct as used in this report as furnished by the client, his/her designee, or other sources.  However, the Appraisers and The Property Sciences Group Inc. can not guarantee the accuracy of the legal description.  The client should verify the accuracy of the legal description before recordation with any deeds of trust.  This responsibility remains with the client and is not maintained by the Appraisers nor The Property Sciences Group Inc.

Please note that no advice is given regarding mechanical equipment or structural integrity or adequacy, nor soils and potential for settlement, drainage, and such (seek assistance from qualified architect and/or engineer) nor matters concerning liens, title status, and legal marketability (seek legal assistance), and such.  The lender and owner should inspect the property before any disbursement of funds.  Further, it is likely that the lender or owner may wish to require mechanical or structural inspections by qualified and licensed contractor, civil or structural engineer, architect, or other expert.

The Appraisers have inspected as far as possible, by observation, the land and the improvements.  However, it was not possible to personally observe conditions beneath the soil or hidden structural, or other components.  We have not critically inspected mechanical components within the improvements and no representations are made herein as to these matters unless specifically stated and considered in the report.  The value estimate considers there being no such conditions that would cause a loss of value.  The land or the soil of the area being appraised appears firm, unless otherwise stated in the report.  However, subsidence in the area is unknown.  The Appraisers do not warrant against this condition or occurrence of problems arising from soil conditions.

The appraisal is based on there being no hidden, unapparent, or apparent conditions of the property site, subsoil, or structures or toxic materials which would render it more or less valuable.  The Appraisers and/or The Property Sciences Group Inc. have no responsibility for any such conditions or for any expertise or engineering to discover them.  All mechanical components are assumed to be in operable condition and status standard for properties of the



subject type.  Conditions of heating, cooling, ventilating, electrical and plumbing equipment are considered to be commensurate with the condition of the balance of the improvements unless otherwise stated.  No judgment may be made by us as to adequacy of insulation, type of insulation, or energy efficiency of the improvements or equipment which is assumed standard for subject age and type.

If the Appraisers have not been supplied with a termite inspection, survey or occupancy permit, no responsibility or representation is assumed or made for any costs associated with obtaining same or for any deficiencies discovered before or after they are obtained.  No representation or warranties are made concerning obtaining the above mentioned items.

The Appraisers have no responsibility for any costs or consequences arising due to the need, or the lack of need for flood hazard insurance.  An agent for the National Flood Insurance Program should be contacted to determine the actual need for flood hazard insurance.

9.    LEGALITY OF USE:

The appraisal is based on the premise that, there is full compliance with all applicable federal, state and local environmental regulations and laws, unless otherwise stated in the report, and also that all applicable zoning, building and use regulations and restrictions of all types have been complied with unless otherwise stated in the report.  Further, it is assumed that all required licenses, consents, permits, or other legislative or administrative authority, local, state, federal and/or private entity or organization have been or can be obtained or renewed for any use considered in the value estimate.

10.    COMPONENT VALUES:

The distribution of the total valuation in this report between land and improvements applies only under the existing program of utilization.  The separate valuations for land and building must not be used independently, or in conjunction with any other appraisal and are invalid if so used.

11.    AUXILIARY AND RELATED STUDIES:

No environmental or impact studies, special market study or analysis, highest and best use analysis study or feasibility study have been requested or made unless otherwise specified in an agreement for services or in the report.

12.    DOLLAR VALUES, PURCHASING POWER:

The market value estimated, and the costs used, are as of the date of the estimate of value.  All dollar amounts are based on the purchasing power and price of the dollar as of the date of the value estimate.

13.    INCLUSIONS:

Furnishings and equipment or personal property or business operations, except as specifically indicated and typically considered as a part of real estate, have been disregarded with only the real estate being considered in the value estimate unless otherwise stated.  In some property types, business and real estate interests and values are combined.



14.   PROPOSED IMPROVEMENTS, CONDITIONED VALUE:

Improvements proposed, if any, on or off-site, as well as any repairs required are considered, for purposes of this appraisal to be completed in good and workmanlike manner according to information submitted and/or considered by the Appraisers.  In cases of proposed construction, the appraisal is subject to change upon inspection of property after construction is completed.  This estimate of market value is as of the date shown, as proposed, as if completed and operating at levels shown and forecasted.

15.   VALUE CHANGE, DYNAMIC MARKET, INFLUENCES, ALTERATION OF ESTIMATE BY APPRAISERS:

The estimated market value, which is defined in the report, is subject to change with market changes over time; value is highly related to exposure, time, promotional effort, terms, motivation and conditions surrounding the offering. The value estimate considers the productivity and relative attractiveness of the property physically and economically in the marketplace.  The appraisal report and value estimate are subject to change if physical or legal entity or financing are different than that envisioned in this report.

16.   MANAGEMENT OF THE PROPERTY:

It is assumed that the property which is the subject of this report will be under prudent and competent ownership and management; neither inefficient nor superefficient.

17.   FEE:

The fee for this appraisal or study is for the service rendered and not for the time spent on the physical report or the physical report itself.  Amount or payment of fee for services is not contingent on any result, approval amount or other estimates or statements.

18.   AUTHENTIC COPIES:

The authentic copies of this report are signed in blue ink.  Any copy that does not have the above is unauthorized and may have been altered.

19.   INSULATION AND TOXIC MATERIALS:

In this appraisal assignment, the existence of potentially hazardous material used in the construction or maintenance of the building, such as the presence of urea-formaldehyde foam insulation, and/or the presence of asbestos containing building materials (ACBM), and/or the existence of toxic waste, which may or may not be present on the property, was not observed, unless stated in the report; nor do the Appraisers have any knowledge of the existence of such materials on or in the property.  The Appraisers, however, are not qualified to detect such substances.  The existence of urea-formaldehyde insulation, or ACBM, or other potentially hazardous waste material may have an effect on the value of the property.  It is recommended that the client retain an expert in this field, if desired.  If such substances are present, the value of the property may be adversely affected and re-appraisal at additional cost will be necessary to estimate the effects of such.



20.    REVIEW:

Unless otherwise noted herein, named Review Appraiser of/from The Property Sciences Group Inc. has reviewed the report only as to general appropriateness of technique and format, and has not necessarily inspected the subject or market comparable properties.

21.    CHANGES, MODIFICATIONS:

The Appraisers and/or officers of The Property Sciences Group Inc. reserve the right to alter statements, analysis, conclusions or any value estimates in the appraisal if there becomes known to us facts pertinent to the appraisal process which were unknown to us when the report was finished.

22.    AFTER TAX ANALYSIS AND/OR VALUATION:

Any "after" tax income or investment analysis and resultant measures of return on investment are intended to reflect only possible and general market considerations, whether as part of estimating value or estimating possible returns on investment at an assumed value or price paid.  Note that the Appraisers do not claim expertise in tax matters and advises client and any others using the appraisal to seek competent tax advice.  The Appraisers are in no way to be considered as tax advisors or investment advisors.

23.    INCOME PROJECTIONS:

Any cash flows indicated in the appraisal are forecasts of estimated future operating characteristics, and are predicated on the information and assumptions contained within the appraisal.  Any projections of income, expenses, and/or economic conditions utilized in the appraisal are not predictions of the future.  Rather, they are estimates of current market expectations of future income, expenses, and/or economic conditions.  The achievement of these financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that can not be assured.  Actual income and expenses may vary from the projections contained in the appraisal.  The Appraisers and/or The Property Sciences Group Inc. does not warrant that these income and expenses will occur.  Projections may be affected by circumstances beyond the current realm of knowledge or control of the Appraisers and/or The Property Sciences Group Inc.

24.    RECOMMENDATIONS (IMPLIED AND/OR EXPLICIT):

Unless specifically set forth in the body of the appraisal, nothing contained in said shall be construed to represent any direct or indirect recommendation of the Appraisers and/or The Property Sciences Group Inc. to buy, sell, or hold the properties at the values stated.  Such decisions involve substantial investment strategy questions and must be specifically addressed in consultation form.  Such decisions are beyond the scope of the appraisal analysis, unless stated otherwise (i.e. that the scope of the appraisal does indeed include a recommendation to buy, sell, or hold the subject property).

25.    CLEAR AND MARKETABLE TITLE:

Unless specifically noted in the body of the appraisal, it is assumed that title to the subject property (or properties) are clear and marketable, and that there are no recorded or unrecorded liens, leases, matters, or exceptions to title that would adversely affect the subject's marketability or market value.  The Appraisers and/or The Property Sciences Group Inc. are not aware of any title defects nor have been advised of any title defects, unless such as specifically noted in the report.  However, the Appraisers and/or The Property Sciences Group Inc. have not examined title and



makes no representations relative to the condition thereof.  Unless stated otherwise, the Appraisers have not been provided with (nor reviewed) a preliminary title report.  The Appraisers are not qualified experts in title matters.

26.    AMERICANS WITH DISABILITIES ACT (ADA):

The Americans with Disabilities Act (ADA) became effective January 26, 1992.  Unless otherwise noted in the report, the Appraisers have not made a specific compliance survey and analysis of the property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value and marketability of the property.  Unless otherwise noted in the report, the Appraisers have no direct evidence relating to this issue and have not considered possible noncompliance with the requirements of the ADA in estimating the value of the property.

27.    CONDITIONS OF ACCEPTANCE:

Acceptance of, and/or use of this appraisal report by client constitutes acceptance of the above conditions. Appraisers' liability extends only to stated client, not subsequent third parties nor users of any type, and the total liability of Appraisers and The Property Sciences Group Inc. is limited to the amount of the appraisal fee received.



PROFESSIONAL QUALIFICATIONS OF
# Brant A. Sheaffer, MAI
Brant.sheaffer@propsci.com - direct: 503-704-8661

Brant Sheaffer is the Vice President –Regional Manager, Pacific Northwest of the Commercial Division for Property Sciences. Mr. Sheaffer has returned to the firm, having started his appraisal career with Property Sciences in Northern California in 2002. Prior to rejoining the company Mr. Sheaffer worked for Colliers International and previously worked for CBRE. Mr. Sheaffer has valued a multitude of property types including, retail, office, multi-family, industrial, residential subdivisions and land. Areas of expertise include valuation of multifamily properties for agency lenders (Fannie Mae, Freddie Mac), retail properties ranging from net leased assets to regional shopping malls, hospitality and lodging properties and retail fuel stations. Mr. Sheaffer is an experienced ARGUS user.

## PROFESSIONAL EXPERIENCE

**THE PROPERTY SCIENCES GROUP INC.**, Seattle, WA
An appraisal, research, and consulting services firm focusing on every major category of real estate and most special purpose type properties throughout the United States.
**Vice President –Regional Manager, Pacific Northwest**                    **10/2016 – Present**

**COLLIERS INTERNATIONAL**, Seattle, WA
Worked on a team focused on valuation of multifamily properties. Assignments included large investment grade properties for agency lending (Fannie Mae, Freddie Mac), student housing, micro-apartments, congregate housing, LIHTC transaction and HUD Rent Comparability Studies.
**Senior Valuation Specialist**                                        **6/2011-10/2016**

**CBRE**, Seattle, WA & Portland, OR
Worked as a Senior Appraiser for a global real estate services firm, and supervised two trainee appraisers.  Assignments were primarily for institutional clients (CMBS market, life insurance & pension companies, and national lenders). Worked on a variety of property types, but with a primary focus on retail properties ranging from single tenant net lease up to regional shopping malls.
**Senior Appraiser**                                                  **7/2006-6/2011**

**THE PROPERTY SCIENCES GROUP INC.**, Concord, CA
Started as a trainee working on commercial assignments Upon being licensed, was promoted to supervising, training and reviewing trainee appraisers.
**Senior Staff Appraiser   (Trainer/Reviewer)**                         **1/2005-6/2006**
**Associate**                                                         **9/2002-1/2005**

## EDUCATION

**BS**, Bachelor of Science, Business Administration - Emphasis in Marketing Management
***California State University, Hayward*** - College of Business & Economics                    **2001**

## PROFESSIONAL LICENSES/AFFILIATIONS

State of Washington – Certified General Appraiser, 1101767 Exp. 6/2020
State of Oregon – Certified General Appraiser, C001276  Exp. 6/2020
State of Idaho - Certified General Appraiser, CGA-3333  Exp. 6/2020
State of California - Certified General Appraiser, AG033878  Exp. 2/2021


Appraisal Institute – MAI Designated Member # 474916



Business, Consumer Services & Housing Agency

# BUREAU OF REAL ESTATE APPRAISERS
# REAL ESTATE APPRAISER LICENSE

## Brant A. Sheaffer

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    AG 033878

Effective Date:    February 15, 2019
Date Expires:    February 14, 2021

Jim Martin, Bureau Chief, BREA

3045681

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE "CHAIN LINK"

PROFESSIONAL QUALIFICATIONS OF
# Arthur O. Neudek, MAI, AI-GRS

Arthur.Neudek@PropSci.com - Direct: 925-246-7342

Arthur Neudek, MAI is the Vice President of Institutional Client Services at Property Sciences and currently manages the firm's Southern California Branch. He has worked with several national accounting firms providing real estate valuation services. Primary emphasis of these valuations was preparation of lease-by-lease analysis of large, institutional grade multi-tenant properties. He served as a Beta tester for ARGUS in Dallas in the 1980's and has worked with the software since. He has an additional specialty in hospitality properties, having worked with a real estate appraisal firm solely involved in valuing hospitality properties.

## PROFESSIONAL EXPERIENCE

**THE PROPERTY SCIENCES GROUP INC.**., Commercial Division, Pleasant Hill, CA/Glendale, CA
Prepare and review commercial appraisals with a specialty in hospitality.
**Vice President**                                                                                     **2013-Present**

**NATIONAL VALUATION CONSULTANTS (NVC),** Boston, MA
Prepared appraisals on investment grade real estate nationally, with specialties in hospitality and senior housing. Clients included CALPERS, Angelo Gordon, CALSTRS, LACERA, and RREEF.
**Senior Associate**                                                                                    **2011-2013**

**INTEGRA REALTY RESOURCES,** Boston, MA
Prepared appraisals and did litigation support on hospitality and recreational properties throughout New England, as well as various types of investment grade real estate.
**Appraiser**                                                                                            **2009-2011**

**ACCENTURE (**fka **ZENTA),** New York, NY
Worked on contract CMBS underwriting team at several large investment banks. Assets underwritten included shopping centers, industrial buildings, hotels, apartment complexes, and office buildings located in major US markets. Primary personal responsibility included reviewing third-party appraisals for lending purposes.
**Vice President**                                                                                      **2005-2007**

**RESORT REALTY ADVISORS & INTEGRA REALTY RESOURCES,** Boston, MA
Prepared feasibility and appraisal reports on hospitality and recreation properties. Types of properties included nationally franchised limited and full-service hotels, four-diamond rated resorts on the East Coast, golf course and golf course subdivisions and mountainside time-share projects.
**Appraiser**                                                                                            **2002-2005**

**CITIZENS BANK,** Providence, RI
Created and managed real estate appraisal, environmental for growing bank corp. Reviewed and prepared real estate appraisals for lending purposes. Prepared debt restructures plans for troubled real estate loans. Responsibilities included supervision, review and training of junior staff. Integral part of loan committee and reviewed all real estate loans.
**Chief Real Estate Appraiser**                                                                                           **1992-1994**

**KENNETH LEVENTHAL/ERNST & YOUNG,** Dallas, TX
Managed real estate valuation services for national consulting firm. Assignments included purchase price allocations, appraisals for corporate planning. Responsibilities included supervision, review and training of junior staff. Prepared and reviewed workout plans for troubled real estate loans.
**Manager, Valuation Services**                                                                                          **1989-1991**

**INTERFIRST BANK,** Dallas, TX
Worked in real estate appraisal area for national bank.
**Vice- President**                                                                                                              **1984-1989**

## EDUCATION

**Ph.D. Coursework,** Real Estate                                                                                    **1988-1990**
*University of North Texas, Denton, TX*

**M.S.,** Real Estate Finance and Urban Land Economics                                                     **1979**
*University of Wisconsin, Madison* (studied under Dr. James A. Graaskamp)

**B.B.A.,** Finance                                                                                                                   **1978**
*University of Wisconsin, Madison*

## PROFESSIONAL LICENSES/AFFILIATIONS

    State of California – Certified General Appraiser, AG3002063
    State of Washington- Certified General Appraiser, 1102357
    State of Oregon- Certified General Appraiser, C001171
    Appraisal Institute- MAI Designation
    Appraisal Institute – AI-GRS Designation

Business, Consumer Services & Housing Agency

# BUREAU OF REAL ESTATE APPRAISERS
## REAL ESTATE APPRAISER LICENSE



**Arthur O. Neudek**

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    3002063

Effective Date:     April 8, 2018
Date Expires:       April 7, 2020

Jim Martin, Bureau Chief, BREA

3038881

THIS DOCUMENT CONTAINS A TRUE WATERMARK · HOLD UP TO LIGHT TO SEE "CHAIN LINK"

# Property Information Search Results

One matching record was found for APN 026-104-001.

| Assessment Number | Street Address(es) | Structure Type | Characteristics | Map |
|---|---|---|---|---|
| 026-104-001 | 1172 San Marcos Rd<br>1166 San Marcos Rd | Land #0 | <u>Select</u> | <u>Map</u> |

Assessment Information for the 2019/2020 Tax Year

| | | | |
|---|---|---|---|
| Assessment Number: | 026-104-001 | Assessed Value: | 13,765,066 |
| Street Address: | 1172 San Marcos Rd | Land Value: | 1,538,138 |
| Street Address 2: | 1166 San Marcos Rd | Improvements: | 10,827,217 |
| Tax Rate Area: | 104-001 | Personal Property: | 224,223 |
| Parcel Size: | 156.09 Acres | Fixtures Value: | 1,175,488 |
| Link to Map: | <u>026104001</u> | Total Exemption: | 0 |
| | | Net: | 13,765,066 |

Property Information as of March 1, 1982

| Structure | | Miscellaneous Improvements |
|---|---|---|
| Structure Type: | Land | |
| Original Size: | 0 | |
| Addition Size: | 0 | |
| Total Area: | 0 | Improvements: (none) |
| Year Built: | 0 | |
| Bedrooms: | 0 | |
| Bathrooms: | 0 | |
| Levels: | 0 | |
| Parking: | None | |

Disclaimer:
The data contained in this database is deemed reliable but not guaranteed. This information should be used for informational use only and does not constitute a legal document for the description of these properties. Every effort has been made to ensure the accuracy of this data; however, this material may be slightly dated which would have an impact on its accuracy. The San Luis Obispo County Assessor's Office disclaims any responsibility or liability for any direct or indirect damages resulting from the use of this data.

# Property Information Search Results

One matching record was found for APN 026-342-039.

| Assessment Number | Street Address(es) | Structure Type | Characteristics | Map |
|---|---|---|---|---|
| 026-342-039 | 2380 Live Oak Rd<br>2370 Live Oak Rd | Residence #1 | <u>Select</u> | <u>Map</u> |

Assessment Information for the 2019/2020 Tax Year

| | | | | |
|---|---|---|---|---|
| Assessment Number: | 026-342-039 | Assessed Value: | 2,537,337 |
| Street Address: | 2380 Live Oak Rd | Land Value: | 277,975 |
| Street Address 2: | 2370 Live Oak Rd | Improvements: | 2,205,052 |
| Tax Rate Area: | 104-009 | Personal Property: | 54,310 |
| Parcel Size: | 160 Acres | Fixtures Value: | 0 |
| Link to Map: | <u>026342039</u> | Total Exemption: | 0 |
| | | Net: | 2,537,337 |

Property Information as of January 4, 2011

| Structure | | Miscellaneous Improvements | |
|---|---|---|---|
| Structure Type: | Residence #1 | | |
| Original Size: | 4,830 | Description: | Pool - Below Ground |
| Addition Size: | 2,233 | Size: | 0 |
| Total Area: | 7,063 | Description: | Pool House |
| Year Built: | 1987 | Size: | 305 |
| Bedrooms: | 3 | Description: | Workshop |
| Bathrooms: | 4 | Size: | 0 |
| Levels: | 1 | Description: | Tennis Court |
| Parking: | Garage | | |

Disclaimer:
The data contained in this database is deemed reliable but not guaranteed. This information should be used for informational use only and does not constitute a legal document for the description of these properties. Every effort has been made to ensure the accuracy of this data; however, this material may be slightly dated which would have an impact on its accuracy. The San Luis Obispo County Assessor's Office disclaims any responsibility or liability for any direct or indirect damages resulting from the use of this data.

# Property Information Search Results

One matching record was found for APN 027-145-022.

| Assessment Number | Street Address(es) | Structure Type | Characteristics | Map |
|---|---|---|---|---|
| 027-145-022 | 0 San Marcos Rd | Land #0 | Select | Map |

Assessment Information for the 2019/2020 Tax Year

Property Information as of December 29, 2000

| | | Structure | Miscellaneous Improvements |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Assessment Number: | 027-145-022 | Structure Type: | Land |
| | | Original Size: | 0 |
| Assessed Value: | 1,255,864 | | |
| Land Value: | 173,023 | Addition Size: | 0 |
| Improvements: | 1,082,841 | | |
| Street Address: | 0 San Marcos Rd | Total Area: | 0 |
| Personal Property: | 0 | Year Built: | 0 |
| Tax Rate Area: | 104-001 | Fixtures Value: | 0 | Bedrooms: | 0 |
| Parcel Size: | 155 Acres | Total Exemption: | 0 | Bathrooms: | 0 |
| Link to Map: | 027145022 | Net: | 1,255,864 | Levels: | 0 |
| | | | | Parking: | None |

Improvements: (none)

Disclaimer:
The data contained in this database is deemed reliable but not guaranteed. This information should be used for informational use only and does not constitute a legal document for the description of these properties. Every effort has been made to ensure the accuracy of this data; however, this material may be slightly dated which would have an impact on its accuracy. The San Luis Obispo County Assessor's Office disclaims any responsibility or liability for any direct or indirect damages resulting from the use of this data.

# COUNTY OF SAN LUIS OBISPO

## JAMES W. HAMILTON, CPA    Auditor-Controller / Treasurer-Tax Collector

### 2019/20 ANNUAL SECURED PROPERTY TAX BILL
FISCAL YEAR JULY 1, 2019 TO JUNE 30, 2020

**DUPLICATE BILL**

RUSSELL ERICH

**www.SloCountyTax.org**

1055 Monterey Street, Rm D-290
San Luis Obispo, CA 93408
(805) 781-5831

**Property Assessment For Fiscal Year 2019/20**

| ⑫ Description | | Assessed Values |
|---|---|---|
| LAND | | 1,538,138 |
| IMPROVEMENTS | | 10,827,217 |
| PERSONAL PROPERTY | * | 224,223 |
| FIXTURES | * | 1,175,488 |
| **Net Assessed Value** † | | **13,765,066** |

† For Questions Regarding Assessed Values Call 805-461-6143

| ① Assessment | ② Bill Number | ③ Tax Rate Area | ④ Total Tax Rate |
|---|---|---|---|
| 026-104-001 | 2019/20 950-000-502 | 104-001 | 1.08368 |

| ⑤ Assessed Owner |
|---|
| As of January 1, 2019<br>RUSSELL ERICH |

| ⑨ First Installment Due | |
|---|---|
| 12/12/2019 | **$74,584.63** |

| ⑥ Property Description |
|---|
| T26S R12E PTN SECS 5 & 6 PAR 1<br>OR 2370/228 |

| ⑩ Second Installment Due | |
|---|---|
| 2/1/2020 | **$74,584.63** |

| ⑪ Total Taxes Due | **$149,169.26** |
|---|---|

| ⑦ Legal Description |
|---|
| T26S R12E PTN SECS 5 & 6 PAR 1 OR 2370/228 |

**Tax Calculation**

| ⑬ Service Agency | Contact | Rate | Amount |
|---|---|---|---|
| PROP 13 TAX RATE | (805) 781-5831 | 1.00000 | 137,650.68 |
| STATE WATER PROJ | (805) 781-5252 | 0.00400 | 550.60 |
| CUESTA CCD 2014 BOND | (805) 788-2968 | 0.01925 | 2,649.76 |
| PASO UNIF 2006 GO BD | (805) 788-2968 | 0.01190 | 1,638.04 |
| PASO SFID 2016 BND | (805) 788-2968 | 0.04853 | 6,680.18 |
| **Total** | | 1.08368 | 149,169.26 |

| ⑧ Important Messages |
|---|
| **This is a Revised tax bill for the fiscal year 2019/20**<br>This revised tax bill has been generated due to a change in the assessed values of the property listed above. Additional bill information listed below.<br><br>**THIS BILL REPLACES BILL NUMBER(S):**<br>**2019/20 026,104,001**<br>**AND IS DUE AND PAYABLE ON DATES INDICATED.**<br><br>**See reverse side for important taxpayer information.** |

| Assessment | Bill Number | Installment | Due Date: | Amount Due: |
|---|---|---|---|---|
| **026-104-001** | **2019/20 950-000-502** | **2** | **February 1, 2020** | **$74,584.63** |

**If paid AFTER April 10, 2020, amount due is $82,063.09**

14916926

New mailing address? Line out old address and write in new address below.

Signature required for address change _____

RUSSELL ERICH

### Duplicate Bill

Pay online with e-Check (no fee) or credit / debit card (2.39% fee) at:

www.slocountytax.org

    

If paying by check, return this stub with check payable to:

**County Tax Collector (or "SLOCTC")**
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

| Assessment | Bill Number | Installment | Due Date: | Amount Due: |
|---|---|---|---|---|
| **026-104-001** | **2019/20 950-000-502** | **1** | **December 12, 2019** | **$74,584.63** |

**If paid AFTER January 13, 2020, amount due is $82,043.09**

14916926

New mailing address? Line out old address and write in new address below.

Signature required for address change _____

RUSSELL ERICH

### Duplicate Bill

Pay online with e-Check (no fee) or credit / debit card (2.39% fee) at:

www.slocountytax.org

   

If paying by check, return this stub with check payable to:

**County Tax Collector (or "SLOCTC")**
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

ENV2

QUESTIONS: CONTACT THESE DEPARTMENTS FOR HELP

| TAX COLLECTOR | www.slocountytax.org | (805) 781-5831 | Email: ttc@co.slo.ca.us | 1055 Monterey St., Room D-290, San Luis Obispo, CA 93408 |
|---|---|---|---|---|

PAYMENTS: The Tax Collector's office is responsible for collecting and processing tax payments. We accept as payments only those items drawn in U.S. dollars on U.S. banks.

CREDIT CARD FEE – Payments made by credit or debit cards are subject to a 2.39% fee ($3.95 minimum), which covers the charges made to the County by credit card companies.

ONLINE – Electronic bank transfers (e-Checks) **and credit card payments are accepted on the Tax Collector's website at:** www.slocountytax.org

HOME BANKING – Enter Assessment Number(s) in the Account Number field.

BY MAIL – Payment should be made by check, cashier's check, or money order. Do not mail cash. The Tax Collector is not responsible for cash sent by mail.

BY PHONE – Credit cards or e-Checks only.

IN PERSON – Cash, checks, and credit cards at the above address.

TO AVOID PENALTIES: The first installment must be paid no later than December 10 and the second installment must be paid no later than April 10. A 10% penalty is added to the first installment after December 10, and a 10% penalty and delinquency cost are added to the second installment after April 10. If December 10 or April 10 falls on a Saturday, Sunday, or legal holiday, payments made by 5:00 p.m. or the close of business, whichever is later, on the next business day are not considered delinquent.

IMPORTANT: The second installment cannot be paid before the first installment is paid. Partial payments are not accepted.

RETURNED PAYMENTS: If payment is returned by the bank for any reason, that payment will be removed, a returned payment fee will be added, and delinquent penalties will accrue as required by law.

PRIOR TAXES ARE UNPAID: If this wording appears in box 8, there are delinquent taxes which could jeopardize the property. When taxes become delinquent, redemption penalties, costs, and fees are added as **required by law. Prior years' taxes are not included in this tax bill. For payment information,** including MONTHLY and ANNUAL payment plan options, contact the Redemption Division of the Tax Collector's office at (805) 781-5836.

RESPONSIBILITY OF TAXPAYER: The taxpayer is responsible to ensure that the taxes are paid. Failure to receive a tax bill does not relieve the taxpayer of the responsibility to pay the taxes when they become due and payable and does not provide a basis for removing penalties. Examine the bill carefully before paying. Be certain it covers your property. The property description is located in box 6. Be certain that you have obtained a bill for each assessment for which you are responsible. The Tax Collector does not determine the amount of tax you pay.

TAX BILL CALCULATIONS: The Auditor-Controller's office is responsible for calculating taxes due by multiplying the assessed value of your property by the tax rate shown in box 13, plus any special assessments shown in box 13. Tax rates are established by the County Board of Supervisors.

DISTRIBUTION OF TAXES: Additional information regarding the distribution of property taxes may be obtained at: http://www.slocounty.ca.gov/acttc/property-tax-allocation

PROPERTY TAX POSTPONEMENT FOR SENIOR CITIZENS, BLIND, OR DISABLED PERSONS:

**The State Controller's Office (SCO) administers the Property Tax Postponement (PTP) program, which allows eligible homeowners** to postpone payment of current-year property taxes on their primary residence. PTP applications are accepted from October 1 to February 10 each year.

Go to the SCO website at http://www.sco.ca.gov/ardtax_prop_tax_postponement.html for more information. If you have any questions, call 800-952-5661 or email postponement@sco.ca.gov

| ASSESSOR | www.slocounty.ca.gov/assessor | (805) 781-5643 | Email: assessor@co.slo.ca.us | 1055 Monterey St., Room D-360, San Luis Obispo, CA 93408 |
|---|---|---|---|---|

ASSESSED VALUE: The Assessor's office is responsible for assessing property values. If the taxpayer disagrees with the assessed value shown in box 12, the taxpayer has the right to an informal review by contacting the County Assessor's office. If an informal agreement cannot be reached, the taxpayer has the right to file an Application for Changed Assessment with the County Assessment Appeals Board. Applications must be filed with the County Clerk, 1055 Monterey Street, Room D-120, County Government Center, San Luis Obispo, CA 93408, from July 2 through September 15, or for 60 days following the mailing of any notice of assessment outside the regular period. Additional information regarding the Assessment Appeals and forms may be obtained at: www.slocounty.ca.gov/clerk

If an informal or formal assessment review is requested, relief from penalties shall apply only to the difference between the County Assessor's final determination of value and the value on the assessment roll for the fiscal year covered.

ADDRESS CHANGES: Tax bills are mailed to the latest **address on the Assessor's roll.** To change the mailing address, please see the stubs below or go to: www.slocountytax.org

ASSESSMENT DATE: The fiscal year is for the period of July 1 through June 30. Taxes for the current fiscal year are levied on both real and personal property as it existed at 12:01 a.m. on January 1 of the preceding fiscal year.

10% PENALTY: An asterisk (*) in box 12 next to the property value indicates the assessed valuation includes a 10% penalty pursuant to Revenue & Taxation Code Section 463.

**HOMEOWNERS' EXEMPTION REQUIREMENTS:** If you filed a claim for the Homeowners' Property Tax Exemption, you declared under penalty of perjury that you are the owner of this property and that it is your principal place of residence. You are required by law to terminate this claim if either or both of the following events occurred prior to 12:01 a.m., January 1: (1) ownership of the property transfers to another party, (2) your principal place of residence changes to another location. If you are not eligible for this exemption, you must notify the Assessor in writing on or before December 10, or you will be subject to payment in the amount of taxes the exemption represents, plus applicable penalties and interest. If you move to another home, you must file a new exemption claim for that property. The exemption cannot be transferred. To request a new Homeowners' Exemption Claim form or if you have questions, contact the County Assessor.

To avoid penalties, payment must be in the Tax Collector's office by 5:00 p.m., or deposited in the United States mail or independent delivery service, or entered online through the Tax Collector's website prior to midnight on the delinquency date. Home Banking payments must be entered with a posting date prior to midnight on the delinquency date. **DO NOT SEND CASH BY MAIL**; any loss is assumed by the taxpayer.

| If paying online: e-Check is free; fee for using credit or debit card | If paying by check: |
|---|---|
| ➢ Go to www.slocountytax.org<br>➢ Options to pay: | ➢ Make check payable to:<br>    SLO County Tax Collector or "SLOCTC"<br>➢ Insert this stub with your payment |

**IMPORTANT – ADDRESS CHANGE**

If needed, please change the address information on **the front of this stub, <u>sign your name</u>,** and send with your payment, or go to **www.slocountytax.org** for an address change form to complete.

If the return envelope is not available, mail to:

**James W. Hamilton, CPA**
County Auditor – Controller – Treasurer – Tax Collector
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

2

---

To avoid penalties, payment must be in the Tax Collector's office by 5:00 p.m., or deposited in the United States mail or independent delivery service, or entered online through the Tax Collector's website prior to midnight on the delinquency date. Home Banking payments must be entered with a posting date prior to midnight on the delinquency date. **DO NOT SEND CASH BY MAIL**; any loss is assumed by the taxpayer.

| If paying online: e-Check is free; fee for using credit or debit card | If paying by check: |
|---|---|
| ➢ Go to www.slocountytax.org<br>➢ Options to pay: | ➢ Make check payable to:<br>    SLO County Tax Collector or "SLOCTC"<br>➢ Insert this stub with your payment |

**IMPORTANT – ADDRESS CHANGE**

If needed, please change the address information on **the front of this stub, <u>sign your name</u>,** and send with your payment, or go to **www.slocountytax.org** for an address change form to complete.

If the return envelope is not available, remit to:

**James W. Hamilton, CPA**
County Auditor – Controller – Treasurer – Tax Collector
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

1



Tuesday, March 31, 2020

## James W. Hamilton, Auditor - Controller - Treasurer - Tax Collector - Public Administrator

| Taxes on the Web Home | New Search |    Information for Year: 2019/20

# Redemption Summary Amounts

Assessment Number:   026,104,001
Assessee:   RUSSELL ERICH

| Default Information: | Power of Sale Information: |
|---|---|
| Number: C4928 Date: 6/30/2009 | Number: Date: |

Description:   T26S R12E PTN SECS 5 & 6 PAR 1 OR 2370/228

| **Payoff Calculation for:    April 2020** | |
|---|---|
| Audit Amount (see detail below) | 1,377,528.87 |
| Redemption Penalty/Interest (see detail below) | 1,466,686.00 |
| Redemption Fee | 15.00 |
| Search and Rescission | 0.00 |
| Miscellaneous Fees (see detail below) | 0.00 |
| Less Installment Plan Credit | 0.00 |
| **Total Payoff Amount:** | **$2,814,407.80** |

**Miscellaneous Fees Detail**

| Date | Description | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | Total Miscellaneous Fees (included above): | $0.00 |

**Tax Bill Detail and Redemption Penalties/Interest**

| Roll Year | Penalty Year | Bill Number | 1st Paid | Tax + Penalty + Cost = Audit Amount | | | | Redemption Penalties |
|---|---|---|---|---|---|---|---|---|
| | | | | Tax | Penalty | Cost | **Audit Amount** | |
| 04-05 | 6/30/2011 | 11-952,000,587 | N | 10,456.30 | 0.00 | 0.00 | 10,456.30 | 16,625.51 |
| 05-06 | 6/30/2011 | 11-952,000,581 | N | 6,985.78 | 0.00 | 0.00 | 6,985.78 | 11,107.39 |
| 06-07 | 6/30/2011 | 11-952,000,582 | N | 626.02 | 0.00 | 0.00 | 626.02 | 995.37 |
| 07-08 | 6/30/2011 | 11-952,000,583 | N | 69.76 | 0.00 | 0.00 | 69.76 | 110.91 |
| 08-09 | 6/30/2009 | 09-026,104,001 | Y | 72,549.70 | 7,254.97 | 10.00 | 79,814.67 | 141,471.91 |
| 08-09 | 6/30/2013 | 13-951,000,007 | N | 1,698.52 | 130.64 | 20.00 | 1,849.16 | 2,089.17 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 09-10 | 6/30/2010 | 10-026,104,001 | N | 146,737.66 | 14,673.70 | 10.00 | 161,421.42 | 259,725.65 |
| 09-10 | 6/30/2013 | 13-951,000,006 | N | 1,415.14 | 116.94 | 20.00 | 1,552.08 | 1,740.62 |
| 10-11 | 6/30/2011 | 11-026,104,001 | N | 143,990.42 | 14,399.04 | 10.00 | 158,399.46 | 228,944.76 |
| 10-11 | 6/30/2013 | 13-951,000,005 | N | 1,217.16 | 108.66 | 20.00 | 1,345.82 | 1,497.10 |
| 11-12 | 6/30/2012 | 12-026,104,001 | N | 142,370.38 | 14,237.02 | 10.00 | 156,617.40 | 200,742.23 |
| 11-12 | 6/30/2013 | 13-951,000,004 | N | 1,069.06 | 103.78 | 20.00 | 1,192.84 | 1,314.94 |
| 12-13 | 6/30/2013 | 13-026,104,001 | N | 143,342.70 | 14,334.26 | 20.00 | 157,696.96 | 176,311.52 |
| 13-14 | 6/30/2014 | 14-026,104,001 | N | 142,513.72 | 14,251.36 | 20.00 | 156,785.08 | 149,639.40 |
| 14-15 | 6/30/2015 | 15-026,104,001 | N | 142,012.94 | 14,201.28 | 20.00 | 156,234.22 | 123,551.25 |
| 15-16 | 6/30/2016 | 16-026,104,001 | Y | 71,705.13 | 7,170.51 | 20.00 | 78,895.64 | 49,476.53 |
| 16-17 | 6/30/2017 | 17-026,104,001 | N | 150,432.62 | 15,043.26 | 20.00 | 165,495.88 | 76,720.63 |
| 17-18 | 6/30/2018 | 18-026,104,001 | Y | 74,609.44 | 7,460.94 | 20.00 | 82,090.38 | 24,621.11 |
| | | | | | | | | |
| | | | | | | | | |
| | | | Totals | $1,253,802.45 | $123,486.42 | $240.00 | **$1,377,528.87** | **$1,466,686.00** |

**Privacy and Conditions of Use Policies**          **Copyright © 2004 County of San Luis Obispo, California**

COUNTY OF SAN LUIS OBISPO

## JAMES W. HAMILTON, CPA   Auditor-Controller / Treasurer-Tax Collector

## 2019/20 ANNUAL SECURED PROPERTY TAX BILL
### FISCAL YEAR JULY 1, 2019 TO JUNE 30, 2020
**DUPLICATE BILL**

RUSSELL ERICH

### www.SloCountyTax.org
1055 Monterey Street, Rm D-290
San Luis Obispo, CA 93408
(805) 781-5831

Property Assessment For Fiscal Year 2019/20

| ⑫ Description | Assessed Values |
|---|---|
| LAND | 277,975 |
| IMPROVEMENTS | 2,205,052 |
| PERSONAL PROPERTY      * | 11,460 |
| HOMEOWNERS | -7,000 |

| Net Assessed Value   † | 2,487,487 |
|---|---|

† For Questions Regarding Assessed Values Call 805-461-6143

| ① Assessment | ② Bill Number | ③ Tax Rate Area | ④ Total Tax Rate |
|---|---|---|---|
| 026-342-039 | 2019/20 026-342-039 | 104-009 | 1.08368 |

| ⑤ Assessed Owner |
|---|
| As of January 1, 2019 |
| RUSSELL ERICH |

| ⑨ First Installment Due | |
|---|---|
| 11/1/2019 | **$13,478.19** |

| ⑥ Property Description |
|---|
| T27S R11E SEC 12 NE 1/4 |

| ⑩ Second Installment Due | |
|---|---|
| 2/1/2020 | **$13,478.19** |

| ⑪ Total Taxes Due | **$26,956.38** |
|---|---|

| ⑦ Legal Description |
|---|
| T27S R11E SEC 12 NE 1/4 |

Tax Calculation

| ⑬ Service Agency | Contact | Rate | Amount |
|---|---|---|---|
| PROP 13 TAX RATE | (805) 781-5831 | 1.00000 | 24,874.90 |
| STATE WATER PROJ | (805) 781-5252 | 0.00400 | 99.48 |
| CUESTA CCD 2014 BOND | (805) 788-2968 | 0.01925 | 478.84 |
| PASO UNIF 2006 GO BD | (805) 788-2968 | 0.01190 | 296.00 |
| PASO SFID 2016 BND | (805) 788-2968 | 0.04853 | 1,207.16 |
| **Total** | | 1.08368 | 26,956.38 |

| ⑧ Important Messages |
|---|
| **View and pay taxes online at: www.slocountytax.org** |
| ADDRESS CHANGE - To change address information make changes on stub, sign, and send with your payment, or complete Change of Address form at: www.slocountytax.org |
| **PRIOR YEAR TAXES ARE UNPAID – Please call 805-781-5836** |
| **\*\*\*\* 1ST INSTALLMENT PAID 12/10/19 \*\*\*** |
| **See reverse side for important taxpayer information.** |

| Assessment | Bill Number | Installment | Due Date: | Amount Due: |
|---|---|---|---|---|
| 026-342-039 | 2019/20 026-342-039 | 2 | February 1, 2020 | $13,478.19 |

**If paid AFTER April 10, 2020, amount due is $14,846.00**

2695638

New mailing address? Line out old address and write in new address below.

Signature required for address change _____

RUSSELL ERICH

## Duplicate Bill

Pay online with e-Check (no fee) or credit / debit card (2.39% fee) at:
www.slocountytax.org

    

If paying by check, return this stub with check payable to:
**County Tax Collector (or "SLOCTC")**
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

---

| Assessment | Bill Number | Installment | Due Date: | Amount Due: |
|---|---|---|---|---|
| 026-342-039 | 2019/20 026-342-039 | 1 | November 1, 2019 | PAID |

**1st installment has been paid on December 10, 2019 $13,478.19**

2695638

New mailing address? Line out old address and write in new address below.

Signature required for address change _____

RUSSELL ERICH

## Duplicate Bill

Pay online with e-Check (no fee) or credit / debit card (2.39% fee) at:
www.slocountytax.org

    

If paying by check, return this stub with check payable to:
**County Tax Collector (or "SLOCTC")**
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

ENV1

QUESTIONS? CONTACT THESE DEPARTMENTS FOR HELP

| TAX COLLECTOR | www.slocountytax.org | (805) 781-5831 | Email: ttc@co.slo.ca.us | 1055 Monterey St., Room D-290, San Luis Obispo, CA 93408 |
|---|---|---|---|---|

PAYMENTS: The Tax Collector's office is responsible for collecting and processing tax payments. We accept as payments only those items drawn in U.S. dollars on U.S. banks.

CREDIT CARD FEE – Payments made by credit or debit cards are subject to a 2.39% fee ($3.95 minimum), which covers the charges made to the County by credit card companies.

ONLINE – Electronic bank transfers (e-Checks) **and credit card payments are accepted on the Tax Collector's website at:** www.slocountytax.org

HOME BANKING – Enter Assessment Number(s) in the Account Number field.

BY MAIL – Payment should be made by check, cashier's check, or money order. Do not mail cash. The Tax Collector is not responsible for cash sent by mail.

BY PHONE – Credit cards or e-Checks only.

IN PERSON – Cash, checks, and credit cards at the above address.

TO AVOID PENALTIES:  The first installment must be paid no later than December 10 and the second installment must be paid no later than April 10. A 10% penalty is added to the first installment after December 10, and a 10% penalty and delinquency cost are added to the second installment after April 10. If December 10 or April 10 falls on a Saturday, Sunday, or legal holiday, payments made by 5:00 p.m. or the close of business, whichever is later, on the next business day are not considered delinquent.

IMPORTANT:  The second installment cannot be paid before the first installment is paid. Partial payments are not accepted.

RETURNED PAYMENTS:  If payment is returned by the bank for any reason, that payment will be removed, a returned payment fee will be added, and delinquent penalties will accrue as required by law.

PRIOR TAXES ARE UNPAID:  If this wording appears in box 8, there are delinquent taxes which could jeopardize the property. When taxes become delinquent, redemption penalties, costs, and fees are added as **required by law. Prior years' taxes are not included in this tax bill. For payment information,** including MONTHLY and ANNUAL payment plan options, contact the Redemption Division of the Tax Collector's office at (805) 781-5836.

RESPONSIBILITY OF TAXPAYER:  The taxpayer is responsible to ensure that the taxes are paid. Failure to receive a tax bill does not relieve the taxpayer of the responsibility to pay the taxes when they become due and payable and does not provide a basis for removing penalties. Examine the bill carefully before paying. Be certain it covers your property. The property description is located in box 6. Be certain that you have obtained a bill for each assessment for which you are responsible. The Tax Collector does not determine the amount of tax you pay.

TAX BILL CALCULATIONS: The Auditor-Controller's office is responsible for calculating taxes due by multiplying the assessed value of your property by the tax rate shown in box 13, plus any special assessments shown in box 13. Tax rates are established by the County Board of Supervisors.

DISTRIBUTION OF TAXES:  Additional information regarding the distribution of property taxes may be obtained at: http://www.slocounty.ca.gov/acttc/property-tax-allocation

PROPERTY TAX POSTPONEMENT FOR SENIOR CITIZENS, BLIND, OR DISABLED PERSONS:
**The State Controller's Office (SCO) administers the Property Tax Postponement (PTP) program, which allows eligible homeowners** to postpone payment of current-year property taxes on their primary residence. PTP applications are accepted from October 1 to February 10 each year.

Go to the SCO website at http://www.sco.ca.gov/ardtax_prop_tax_postponement.html for more information. If you have any questions, call 800-952-5661 or email postponement@sco.ca.gov

| ASSESSOR | www.slocounty.ca.gov/assessor | (805) 781-5643 | Email: assessor@co.slo.ca.us | 1055 Monterey St., Room D-360, San Luis Obispo, CA 93408 |
|---|---|---|---|---|

ASSESSED VALUE: The Assessor's office is responsible for assessing property values.  If the taxpayer disagrees with the assessed value shown in box 12, the taxpayer has the right to an informal review by contacting the County Assessor's office. If an informal agreement cannot be reached, the taxpayer has the right to file an Application for Changed Assessment with the County Assessment Appeals Board. Applications must be filed with the County Clerk, 1055 Monterey Street, Room D-120, County Government Center, San Luis Obispo, CA 93408, from July 2 through September 15, or for 60 days following the mailing of any notice of assessment outside the regular period. Additional information regarding the Assessment Appeals and forms may be obtained at: www.slocounty.ca.gov/clerk

If an informal or formal assessment review is requested, relief from penalties shall apply only to the difference between the County Assessor's final determination of value and the value on the assessment roll for the fiscal year covered.

ADDRESS CHANGES:  Tax bills are mailed to the latest **address on the Assessor's roll.** To change the mailing address, please see the stubs below or go to: www.slocountytax.org

ASSESSMENT DATE:  The fiscal year is for the period of July 1 through June 30. Taxes for the current fiscal year are levied on both real and personal property as it existed at 12:01 a.m. on January 1 of the preceding fiscal year.

10% PENALTY:  An asterisk (*) in box 12 next to the property value indicates the assessed valuation includes a 10% penalty pursuant to Revenue & Taxation Code Section 463.

**HOMEOWNERS' EXEMPTION REQUIREMENTS:**  If you filed a claim for the Homeowners' Property Tax Exemption, you declared under penalty of perjury that you are the owner of this property and that it is your principal place of residence. You are required by law to terminate this claim if either or both of the following events occurred prior to 12:01 a.m., January 1: (1) ownership of the property transfers to another party, (2) your principal place of residence changes to another location. If you are not eligible for this exemption, you must notify the Assessor in writing on or before December 10, or you will be subject to payment in the amount of taxes the exemption represents, plus applicable penalties and interest. If you move to another home, you must file a new exemption claim for that property. The exemption cannot be transferred. To request a new Homeowners' Exemption Claim form or if you have questions, contact the County Assessor.

To avoid penalties, payment must be in the Tax Collector's office by 5:00 p.m., or deposited in the United States mail or independent delivery service, or entered online through the Tax Collector's website prior to midnight on the delinquency date. Home Banking payments must be entered with a posting date prior to midnight on the delinquency date. **DO NOT SEND CASH BY MAIL**; any loss is assumed by the taxpayer.

| If paying online: e-Check is free; fee for using credit or debit card | If paying by check: |
|---|---|
| ➢ Go to www.slocountytax.org<br>➢ Options to pay:    eCheck  VISA  MasterCard  DISCOVER  AMERICAN EXPRESS | ➢ Make check payable to:<br>    SLO County Tax Collector or "SLOCTC"<br>➢ Insert this stub with your payment |

**IMPORTANT – ADDRESS CHANGE**

If needed, please change the address information on **the front of this stub, <u>sign your name</u>,** and send with your payment, or go to **www.slocountytax.org** for an address change form to complete.

If the return envelope is not available, mail to:

**James W. Hamilton, CPA**
County Auditor – Controller – Treasurer – Tax Collector
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

2

To avoid penalties, payment must be in the Tax Collector's office by 5:00 p.m., or deposited in the United States mail or independent delivery service, or entered online through the Tax Collector's website prior to midnight on the delinquency date. Home Banking payments must be entered with a posting date prior to midnight on the delinquency date. **DO NOT SEND CASH BY MAIL**; any loss is assumed by the taxpayer.

| If paying online: e-Check is free; fee for using credit or debit card | If paying by check: |
|---|---|
| ➢ Go to www.slocountytax.org<br>➢ Options to pay:    eCheck  VISA  MasterCard  DISCOVER  AMERICAN EXPRESS | ➢ Make check payable to:<br>    SLO County Tax Collector or "SLOCTC"<br>➢ Insert this stub with your payment |

**IMPORTANT – ADDRESS CHANGE**

If needed, please change the address information on **the front of this stub, <u>sign your name</u>,** and send with your payment, or go to **www.slocountytax.org** for an address change form to complete.

If the return envelope is not available, remit to:

**James W. Hamilton, CPA**
County Auditor – Controller – Treasurer – Tax Collector
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

1



Tuesday, March 31, 2020

**James W. Hamilton, Auditor - Controller - Treasurer - Tax Collector - Public Administrator**

| **Taxes on the Web Home** |  **New Search** |    Information for Year: 2019/20

# Redemption Summary Amounts

Assessment Number:   026,342,039
Assessee:   RUSSELL ERICH

| Default Information: | Power of Sale Information: |
|---|---|
| Number: E9042<br>Date: 6/30/2019 | Number:<br>Date: |

Description:   T27S R11E SEC 12 NE 1/4

**Payoff Calculation for:    April 2020**

| | |
|---|---:|
| Audit Amount (see detail below) | 805.66 |
| Redemption Penalty/Interest (see detail below) | 107.13 |
| Redemption Fee | 15.00 |
| Search and Rescission | 0.00 |
| Miscellaneous Fees (see detail below) | 0.00 |
| Less Installment Plan Credit | 0.00 |
| **Total Payoff Amount:** | **$927.79** |

**Miscellaneous Fees Detail**

| Date | Description | Amount |
|---|---|---:|
| | | |
| | | |
| | Total Miscellaneous Fees (included above): | $0.00 |

**Tax Bill Detail and Redemption Penalties/Interest**

| Roll Year | Penalty Year | Bill Number | 1st Paid | Tax + Penalty + Cost = Audit Amount | | | | Redemption Penalties |
|---|---|---|---|---|---|---|---|---|
| | | | | Tax | Penalty | Cost | **Audit Amount** | |
| 17-18 | 6/30/2019 | 18-972,196,822 | N | 714.24 | 71.42 | 20.00 | 805.66 | 107.13 |

| | | | Totals | $714.24 | $71.42 | $20.00 | **$805.66** | **$107.13** |
|---|---|---|---|---|---|---|---|---|

**Privacy and Conditions of Use Policies**

**Copyright © 2004 County of San Luis Obispo, California**

**COUNTY OF SAN LUIS OBISPO**

## JAMES W. HAMILTON, CPA    Auditor-Controller / Treasurer-Tax Collector

## 2019/20 ANNUAL SECURED PROPERTY TAX BILL
### FISCAL YEAR JULY 1, 2019 TO JUNE 30, 2020
**DUPLICATE BILL**

RUSSELL ERICH

# www.SloCountyTax.org

1055 Monterey Street, Rm D-290
San Luis Obispo, CA 93408
(805) 781-5831

**Property Assessment For Fiscal Year 2019/20**

| ⑫ Description | Assessed Values |
|---|---|
| LAND | 173,023 |
| IMPROVEMENTS | 1,082,841 |
| **Net Assessed Value** † | **1,255,864** |

† For Questions Regarding Assessed Values Call 805-461-6143

| ① Assessment | ② Bill Number | ③ Tax Rate Area | ④ Total Tax Rate |
|---|---|---|---|
| 027-145-022 | 2019/20 027-145-022 | 104-001 | 1.08368 |

| ⑤ Assessed Owner |
|---|
| As of January 1, 2019 |
| RUSSELL ERICH |

| ⑨ First Installment Due | |
|---|---|
| 11/1/2019 | **$6,804.77** |

| ⑥ Property Description |
|---|
| T25S R12E PTN SEC 31 SW1/4 |

| ⑩ Second Installment Due | |
|---|---|
| 2/1/2020 | **$6,804.77** |

| ⑪ Total Taxes Due | **$13,609.54** |
|---|---|

| ⑦ Legal Description |
|---|
| T25S R12E PTN SEC 31 SW1/4 |

**Tax Calculation**

| ⑬ Service Agency | Contact | Rate | Amount |
|---|---|---|---|
| PROP 13 TAX RATE | (805) 781-5831 | 1.00000 | 12,558.68 |
| STATE WATER PROJ | (805) 781-5252 | 0.00400 | 50.22 |
| CUESTA CCD 2014 BOND | (805) 788-2968 | 0.01925 | 241.74 |
| PASO UNIF 2006 GO BD | (805) 788-2968 | 0.01190 | 149.44 |
| PASO SFID 2016 BND | (805) 788-2968 | 0.04853 | 609.46 |
| **Total** | | 1.08368 | **13,609.54** |

| ⑧ Important Messages |
|---|

**View and pay taxes online at: www.slocountytax.org**

ADDRESS CHANGE - To change address information make changes on stub, sign, and send with your payment, or complete Change of Address form at: www.slocountytax.org

**\*\*\*\* 1ST INSTALLMENT PAID 12/10/19 \*\*\***

**See reverse side for important taxpayer information.**

| Assessment | Bill Number | | Installment | Due Date: | Amount Due: |
|---|---|---|---|---|---|
| 027-145-022 | 2019/20 027-145-022 | | 2 | February 1, 2020 | $6,804.77 |

If paid AFTER April 10, 2020, amount due is $7,505.24

1360954

New mailing address? Line out old address and write in new address below.

Signature required for address change _____

RUSSELL ERICH

### Duplicate Bill

Pay online with e-Check (no fee) or credit / debit card (2.39% fee) at:
www.slocountytax.org

    

If paying by check, return this stub with check payable to:
**County Tax Collector (or "SLOCTC")**
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

---

| Assessment | Bill Number | | Installment | Due Date: | Amount Due: |
|---|---|---|---|---|---|
| 027-145-022 | 2019/20 027-145-022 | | 1 | November 1, 2019 | PAID |

1st installment has been paid on December 10, 2019 $6,804.77

1360954

New mailing address? Line out old address and write in new address below.

Signature required for address change _____

RUSSELL ERICH

### Duplicate Bill

Pay online with e-Check (no fee) or credit / debit card (2.39% fee) at:
www.slocountytax.org

    

If paying by check, return this stub with check payable to:
**County Tax Collector (or "SLOCTC")**
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

ENV1

QUESTIONS? CONTACT THESE DEPARTMENTS FOR HELP

| TAX COLLECTOR | www.slocountytax.org | (805) 781-5831 | Email: ttc@co.slo.ca.us | 1055 Monterey St., Room D-290, San Luis Obispo, CA 93408 |
|---|---|---|---|---|

PAYMENTS: The Tax Collector's office is responsible for collecting and processing tax payments. We accept as payments only those items drawn in U.S. dollars on U.S. banks.

CREDIT CARD FEE – Payments made by credit or debit cards are subject to a 2.39% fee ($3.95 minimum), which covers the charges made to the County by credit card companies.

ONLINE – Electronic bank transfers (e-Checks) **and credit card payments are accepted on the Tax Collector's website at:** www.slocountytax.org

HOME BANKING – Enter Assessment Number(s) in the Account Number field.

BY MAIL – Payment should be made by check, cashier's check, or money order. Do not mail cash. The Tax Collector is not responsible for cash sent by mail.

BY PHONE – Credit cards or e-Checks only.

IN PERSON – Cash, checks, and credit cards at the above address.

TO AVOID PENALTIES: The first installment must be paid no later than December 10 and the second installment must be paid no later than April 10. A 10% penalty is added to the first installment after December 10, and a 10% penalty and delinquency cost are added to the second installment after April 10. If December 10 or April 10 falls on a Saturday, Sunday, or legal holiday, payments made by 5:00 p.m. or the close of business, whichever is later, on the next business day are not considered delinquent.

IMPORTANT: The second installment cannot be paid before the first installment is paid. Partial payments are not accepted.

RETURNED PAYMENTS: If payment is returned by the bank for any reason, that payment will be removed, a returned payment fee will be added, and delinquent penalties will accrue as required by law.

PRIOR TAXES ARE UNPAID: If this wording appears in box 8, there are delinquent taxes which could jeopardize the property. When taxes become delinquent, redemption penalties, costs, and fees are added as **required by law. Prior years' taxes are not included in this tax bill. For payment information,** including MONTHLY and ANNUAL payment plan options, contact the Redemption Division of the Tax Collector's office at (805) 781-5836.

RESPONSIBILITY OF TAXPAYER: The taxpayer is responsible to ensure that the taxes are paid. Failure to receive a tax bill does not relieve the taxpayer of the responsibility to pay the taxes when they become due and payable and does not provide a basis for removing penalties. Examine the bill carefully before paying. Be certain it covers your property. The property description is located in box 6. Be certain that you have obtained a bill for each assessment for which you are responsible. The Tax Collector does not determine the amount of tax you pay.

TAX BILL CALCULATIONS: The Auditor-Controller's office is responsible for calculating taxes due by multiplying the assessed value of your property by the tax rate shown in box 13, plus any special assessments shown in box 13. Tax rates are established by the County Board of Supervisors.

DISTRIBUTION OF TAXES: Additional information regarding the distribution of property taxes may be obtained at: http://www.slocounty.ca.gov/acttc/property-tax-allocation

PROPERTY TAX POSTPONEMENT FOR SENIOR CITIZENS, BLIND, OR DISABLED PERSONS:

**The State Controller's Office (SCO) administers the Property Tax Postponement (PTP) program, which allows eligible homeowners** to postpone payment of current-year property taxes on their primary residence. PTP applications are accepted from October 1 to February 10 each year.

Go to the SCO website at http://www.sco.ca.gov/ardtax_prop_tax_postponement.html for more information. If you have any questions, call 800-952-5661 or email postponement@sco.ca.gov

| ASSESSOR | www.slocounty.ca.gov/assessor | (805) 781-5643 | Email: assessor@co.slo.ca.us | 1055 Monterey St., Room D-360, San Luis Obispo, CA 93408 |
|---|---|---|---|---|

ASSESSED VALUE: The Assessor's office is responsible for assessing property values. If the taxpayer disagrees with the assessed value shown in box 12, the taxpayer has the right to an informal review by contacting the County Assessor's office. If an informal agreement cannot be reached, the taxpayer has the right to file an Application for Changed Assessment with the County Assessment Appeals Board. Applications must be filed with the County Clerk, 1055 Monterey Street, Room D-120, County Government Center, San Luis Obispo, CA 93408, from July 2 through September 15, or for 60 days following the mailing of any notice of assessment outside the regular period. Additional information regarding the Assessment Appeals and forms may be obtained at: www.slocounty.ca.gov/clerk

If an informal or formal assessment review is requested, relief from penalties shall apply only to the difference between the County Assessor's final determination of value and the value on the assessment roll for the fiscal year covered.

ADDRESS CHANGES: Tax bills are mailed to the latest **address on the Assessor's roll.** To change the mailing address, please see the stubs below or go to: www.slocountytax.org

ASSESSMENT DATE: The fiscal year is for the period of July 1 through June 30. Taxes for the current fiscal year are levied on both real and personal property as it existed at 12:01 a.m. on January 1 of the preceding fiscal year.

10% PENALTY: An asterisk (*) in box 12 next to the property value indicates the assessed valuation includes a 10% penalty pursuant to Revenue & Taxation Code Section 463.

**HOMEOWNERS' EXEMPTION REQUIREMENTS:** If you filed a claim for the Homeowners' Property Tax Exemption, you declared under penalty of perjury that you are the owner of this property and that it is your principal place of residence. You are required by law to terminate this claim if either or both of the following events occurred prior to 12:01 a.m., January 1: (1) ownership of the property transfers to another party, (2) your principal place of residence changes to another location. If you are not eligible for this exemption, you must notify the Assessor in writing on or before December 10, or you will be subject to payment in the amount of taxes the exemption represents, plus applicable penalties and interest. If you move to another home, you must file a new exemption claim for that property. The exemption cannot be transferred. To request a new Homeowners' Exemption Claim form or if you have questions, contact the County Assessor.

To avoid penalties, payment must be in the Tax Collector's office by 5:00 p.m., or deposited in the United States mail or independent delivery service, or entered online through the Tax Collector's website prior to midnight on the delinquency date. Home Banking payments must be entered with a posting date prior to midnight on the delinquency date. **DO NOT SEND CASH BY MAIL**; any loss is assumed by the taxpayer.

| If paying online: e-Check is free; fee for using credit or debit card | If paying by check: |
|---|---|
| ➢ Go to www.slocountytax.org<br>➢ Options to pay: | ➢ Make check payable to:<br> SLO County Tax Collector or "SLOCTC"<br>➢ Insert this stub with your payment |

**IMPORTANT – ADDRESS CHANGE**

If needed, please change the address information on **the front of this stub, <u>sign your name,</u>** and send with your payment, or go to **www.slocountytax.org** for an address change form to complete.

If the return envelope is not available, mail to:

**James W. Hamilton, CPA**
County Auditor – Controller – Treasurer – Tax Collector
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

2

To avoid penalties, payment must be in the Tax Collector's office by 5:00 p.m., or deposited in the United States mail or independent delivery service, or entered online through the Tax Collector's website prior to midnight on the delinquency date. Home Banking payments must be entered with a posting date prior to midnight on the delinquency date. **DO NOT SEND CASH BY MAIL**; any loss is assumed by the taxpayer.

| If paying online: e-Check is free; fee for using credit or debit card | If paying by check: |
|---|---|
| ➢ Go to www.slocountytax.org<br>➢ Options to pay: | ➢ Make check payable to:<br> SLO County Tax Collector or "SLOCTC"<br>➢ Insert this stub with your payment |

**IMPORTANT – ADDRESS CHANGE**

If needed, please change the address information on **the front of this stub, <u>sign your name,</u>** and send with your payment, or go to **www.slocountytax.org** for an address change form to complete.

If the return envelope is not available, remit to:

**James W. Hamilton, CPA**
County Auditor – Controller – Treasurer – Tax Collector
1055 Monterey St., Room D-290
San Luis Obispo, CA 93408

1



**USDA** San Luis Obispo County, California

Non-Cropland
☑ Acres
HEL

Common Land Unit
Cropland    Non-cropland    CRP

Farm **593**
Tract **3366**

Wetland Determination Identifiers
● Restricted Use
▼ Limited Restrictions
■ Exempt from Conservation Compliance Provisions

Leaflet | Powered by Esri
2019 Crop Year

Tract 1 of 1

United States Department of Agriculture (USDA) Farm Service Agency (FSA) maps are for FSA Program administration only. This map does not represent a legal survey or reflect actual ownership; rather it depicts the information provided directly from the producer and/or National Agricultural Imagery Program (NAIP) imagery. The producer accepts the data 'as is' and assumes all risks associated with its use. USDA-FSA assumes no responsibility for actual or consequential damage incurred as a result of any user's reliance on this data outside FSA Programs. Wetland identifiers do not represent the size, shape, or specific determination of the area. Refer to your original determination (CPA-026 and attached maps) for exact boundaries and determinations or contact USDA Natural Resources Conservation Service (NRCS).

USDA  **San Luis Obispo County, California**



**Common Land Unit**
Cropland    Non-cropland    CRP

**Farm 960**
**Tract 3275**

**Wetland Determination Identifiers**
● Restricted Use
▼ Limited Restrictions
■ Exempt from Conservation Compliance Provisions

2019 Crop Year

Tract 1 of 1

United States Department of Agriculture (USDA) Farm Service Agency (FSA) maps are for FSA Program administration only. This map does not represent a legal survey or reflect actual ownership; rather it depicts the information provided directly from the producer and/or National Agricultural Imagery Program (NAIP) imagery. The producer accepts the data 'as is' and assumes all risks associated with its use. USDA-FSA assumes no responsibility for actual or consequential damage incurred as a result of any user's reliance on this data outside FSA Programs. Wetland identifiers do not represent the size, shape, or specific determination of the area. Refer to your original determination (CPA-026 and attached maps) for exact boundaries and determinations or contact USDA Natural Resources Conservation Service (NRCS)

**GI** ENVIRONMENTAL AGRICULTURAL
Analytical Chemists

July 1, 2019

**SOIL ANALYSIS**   CC 1981978:1-3

| | |
|---|---|
| Customer ID | : 8-1089 |
| Sampled On | : June 17, 2019 |
| Sampled By | : Pedro Guillen |
| Received On | : June 18, 2019 |
| Depth | : 5" |

**Buttonwillow Warehouse Company**
Attn: Eric Browning
2203 Wisteria Lane
Paso Robles, CA  93446

**Analytical Results for R.R. Live Oak**

### Syrah Soil Analysis - Primary and Secondary Nutrients

| Sample Area | Variety | PPM Nitrate-N | PPM Phosphorus | PPM Exch. K | meq/L Sol. K | PPM Exch. Ca | meq/L Sol. Ca | PPM Exch. Mg | meq/L Sol. Mg | PPM Exch. Na | meq/L Sol. Na | meq/L Sulfate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Field 2: System 4 Syrah | Syrah | 11.7 | 20 | 200 | 0.128 (2%) | 6950 | 6.03 (72%) | 397 | 1.06 (13%) | 60 | 1.14 (14%) | 0.863 |
| Field 1: System 19 Syrah | Syrah | 19.7 | 30 | 160 | 0.206 (2%) | 5630 | 7.73 (62%) | 440 | 2.25 (18%) | 70 | 2.36 (19%) | 1.94 |
| Field 1: System 12 Syrah | Syrah | 20.3 | 13 | 110 | 0.146 (1%) | 5430 | 8.06 (62%) | 451 | 2.53 (20%) | 60 | 2.21 (17%) | 2.60 |

### Syrah Soil Analysis - Micro Nutrients and Base Saturation

| Sample Area | PPM Zinc | PPM Manganese | PPM Iron | PPM Copper | PPM Boron | meq/L Chloride | meq/100g CEC | % CEC - Ca | % CEC - Mg | % CEC - K | % CEC - Na | % CEC - H |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Field 2: System 4 Syrah | 1.9 | 5.6 | 7.7 | 1.8 | 0.12 | 0.36 | 38.7 | 89.7 | 8.45 | 1.30 | 0.651 | < 1.00 |
| Field 1: System 19 Syrah | 10.5 | 9.7 | 8.2 | 1.3 | 0.15 | 2.26 | 32.4 | 86.7 | 11.2 | 1.23 | 0.880 | < 1.00 |
| Field 1: System 12 Syrah | 3.6 | 6.6 | 6.9 | 1.2 | 0.19 | 2.16 | 31.3 | 86.6 | 11.9 | 0.885 | 0.767 | < 1.00 |

### Syrah Soil Analysis - Additional Elements

| Sample Area | Units pH | dS/m ECe | SAR | % Limestone | Tons/AF GypReq Calc. | Tons/AF Lime Req | % | Moisture Low | Opt | High | % Saturation |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Field 2: System 4 Syrah | 7.73 | 0.68 | 0.6 | 20.2 | < 0.50 | 0 | 17.8 | | | | 63.4 (Clay ) |
| Field 1: System 19 Syrah | 7.75 | 1.09 | 1.1 | 41.0 | < 0.50 | 0 | 22.8 | | | | 68.3 (Clay ) |
| Field 1: System 12 Syrah | 7.79 | 1.12 | 1.0 | 36.8 | < 0.50 | 0 | 22.5 | | | | 66.5 (Clay ) |

Good [■■■■■] Problem   Low [◀◀◀] High   [■] Indicates physical conditions and/or phenological and amendment requirements.

Note:   Color coded bar graphs have been used to provide you with 'AT-A-GLANCE' interpretations.

Note:   Soils with gypsum requirements over 10 tons should be applied incrementally at a maximum of 10 tons per acre per year and reanalyzed yearly after each application.

**Corporate Offices & Laboratory**
853 Corporation Street
Santa Paula, CA 93060
TEL: (805)392-2000
Env FAX: (805)525-4172 / Ag FAX: (805)392-2063
CA ELAP Certification No. 1573

**Office & Laboratory**
2500 Stagecoach Road
Stockton, CA 95215
TEL: (209)942-0182
FAX: (209)942-0423
CA ELAP Certification No. 1563

**Office & Laboratory**
563 E. Lindo Avenue
Chico, CA 95926
TEL: (530)343-5818
FAX: (530)343-3807
CA ELAP Certification No. 2670

**Office & Laboratory**
3442 Empresa Drive, Suite D
San Luis Obispo, CA 93401
TEL: (805)783-2940
FAX: (805)783-2912
CA ELAP Certification No. 2775

**Office & Laboratory**
9415 W. Goshen Avenue
Visalia, CA 93291
TEL: (559)734-9473
FAX: (559)734-8435
CA ELAP Certification No. 2810



July 1, 2019

**SOIL ANALYSIS**         CC 1981978:1-3
Customer ID  :  8-1089

**Buttonwillow Warehouse Company**

**SOIL ANALYSIS**         Footnotes and comments:

1)  The need for soil Nitrate is dependent upon crop phenology (Growth Stage) and crop requirement. A soil Nitrate level of 10 - 40 ppm is preferred for a short time during critical periods of uptake into the vine. It is highly desirable to have low soil Nitrate (< 5ppm) prior to winter rainfall and cold soil conditions. Use the leaf Nitrogen level to determine primary Nitrogen requirement.

2) The color code for each plant nutient reflects the relative nutrient availablitity for each nutrient as it is influenced by pH, soil texture, CEC, limestone, salinity and organic matter content.

If you have any questions regarding your results, please call.

FRUIT GROWERS LABORATORY, INC.

SB1:KEB

Scott Bucy, Director of Ag. Services

**GI ENVIRONMENTAL AGRICULTURAL**
Analytical Chemists

July 1, 2019

**Buttonwillow Warehouse Company**
Attn: Eric Browning
2203 Wisteria Lane
Paso Robles, CA  93446

**Recommendation**       CC 1981978:1-3
Customer ID    :  8-1089
Sampled On     :  June 17, 2019
Sampled By     :  Pedro Guillen
Received On    :  June 18, 2019
Depth          :  5"

**Analytical Results for R.R. Live Oak**

Based on the results of the laboratory analysis conducted on your soil samples, the following are our recommendations.

### Soil Recommendation for Syrah

| Sample Area | Variety | N Nitrogen | P2O5 Phosphorus | K2O Potassium | Ca Calcium | Mg Magnesium | SO4 Sulfur | Zn Zinc | Mn Manganese | Fe Iron | Cu Copper | B Boron | Lime Req Tons/AF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Field 2: System 4 Syrah | Syrah | 70 | 185 | 120 | None | None | 65 | None | None | 56 | None | 1.60 | 0 |
| Field 1: System 19 Syrah | Syrah | 50 | 335 | 120 | None | None | None | None | None | 62 | None | 1.60 | 0 |
| Field 1: System 12 Syrah | Syrah | 45 | 365 | 300 | None | None | None | None | None | 66 | None | 1.40 | 0 |
| Lbs/Acre/Year    Applied via | | Soil | Soil | Soil | Soil | Soil | Soil | Soil | Soil | Soil | Soil | Soil | Soil |

If you have any questions regarding your results, please call.

FRUIT GROWERS LABORATORY, INC.

*Scott Bucy*

SB1:KEB

Scott Bucy, Director of Ag. Services

**Corporate Offices & Laboratory**
853 Corporation Street
Santa Paula, CA 93060
TEL: (805)392-2000
Env FAX: (805)525-4172 / Ag FAX: (805)392-2063
CA ELAP Certification No. 1573

**Office & Laboratory**
2500 Stagecoach Road
Stockton, CA 95215
TEL: (209)942-0182
FAX: (209)942-0423
CA ELAP Certification No. 1563

**Office & Laboratory**
563 E. Lindo Avenue
Chico, CA 95926
TEL: (530)343-5818
FAX: (530)343-3807
CA ELAP Certification No. 2670

**Office & Laboratory**
3442 Empresa Drive, Suite D
San Luis Obispo, CA 93401
TEL: (805)783-2940
FAX: (805)783-2912
CA ELAP Certification No. 2775

**Office & Laboratory**
9415 W. Goshen Avenue
Visalia, CA 93291
TEL: (559)734-9473
FAX: (559)734-8435
CA ELAP Certification No. 2810



**ENVIRONMENTAL   AGRICULTURAL**
Analytical Chemists

July 1, 2019

**Buttonwillow Warehouse Company**
Attn:  Eric Browning
2203 Wisteria Lane
Paso Robles, CA  93446

**PLANT ANALYSIS**  CC 1981978:4-5, 7-8
Customer ID   :  8-1089
Sampled On    :  June 17, 2019
Sampled By    :  Pedro Guillen
Received On   :  June 18, 2019

**Analytical Results for R.R. Live Oak**

### Syrah Plant Tissue Analysis

| Sample Area | % Nitrogen | % Phosphorus | % Potassium | % Calcium | % Magnesium | ppm Zinc | ppm Manganese | ppm Iron | ppm Copper | ppm Boron | % Sodium |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Field 2: System 4 Syrah | 3.59 | 0.288 | 0.916 | 2.33 | 0.240 | 70.0 | 58 | 160 | 11 | 41.1 | 0.029 |
| Field 1: System 19 Syrah | 3.59 | 0.359 | 0.922 | 1.44 | 0.281 | 93.5 | 73 | 130 | 14 | 54.5 | 0.034 |
| Field 1: System 15 Syrah | 3.92 | 0.321 | 0.653 | 1.96 | 0.285 | 56.6 | 49 | 91 | 9 | 74.9 | 0.028 |
| Field 1: System 12 Syrah | 3.83 | 0.270 | 0.777 | 2.18 | 0.297 | 79.9 | 70 | 102 | 8 | 70.7 | 0.024 |
| Optimum Range - Average | 3.5 - 4.5 | 0.25 - 0.50 | 1.2 - 1.4 | 1.5 - 3.5 | 0.23 - 0.50 | 30 - 150 | 30 - 200 | 100 - 250 | 6 - 20 | 25 - 40 | 0.0 - 0.15 |

Good █�─── Problem   Low ▬▬▬ High

Note:   Color coded bar graphs have been used to provide you with 'AT-A-GLANCE' interpretations.

If you have any questions regarding your results, please call.

FRUIT GROWERS LABORATORY, INC.

*Scott Bucy*

SB1:KEB

Scott Bucy, Director of Ag. Services

**Corporate Offices & Laboratory**
853 Corporation Street
Santa Paula, CA 93060
TEL: (805)392-2000
Env FAX: (805)525-4172 / Ag FAX: (805)392-2063
CA ELAP Certification No. 1573

**Office & Laboratory**
2500 Stagecoach Road
Stockton, CA 95215
TEL: (209)942-0182
FAX: (209)942-0423
CA ELAP Certification No. 1563

**Office & Laboratory**
563 E. Lindo Avenue
Chico, CA 95926
TEL: (530)343-5818
FAX: (530)343-3807
CA ELAP Certification No. 2670

**Office & Laboratory**
3442 Empresa Drive, Suite D
San Luis Obispo, CA 93401
TEL: (805)783-2940
FAX: (805)783-2912
CA ELAP Certification No. 2775

**Office & Laboratory**
9415 W. Goshen Avenue
Visalia, CA 93291
TEL: (559)734-9473
FAX: (559)734-8435
CA ELAP Certification No. 2810



**GL ENVIRONMENTAL AGRICULTURAL**
Analytical Chemists

July 1, 2019

**PLANT ANALYSIS**  CC 1981978:6
Customer ID   : 8-1089
Sampled On   : June 17, 2019
Sampled By   : Pedro Guillen
Received On   : June 18, 2019

**Buttonwillow Warehouse Company**
Attn:  Eric Browning
2203 Wisteria Lane
Paso Robles, CA  93446

**Analytical Results for R.R. Live Oak**

**Mourvedre Plant Tissue Analysis**

| Sample Area | % Nitrogen | % Phosphorus | % Potassium | % Calcium | % Magnesium | ppm Zinc | ppm Manganese | ppm Iron | ppm Copper | ppm Boron | % Sodium |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Field 1: System 20 Mourvedre | 2.95 | 0.230 | 0.716 | 1.68 | 0.264 | 61.7 | 55 | 86 | 9 | 66.1 | 0.020 |
| Optimum Range - Average | 3.5 - 4.5 | 0.25 - 0.50 | 1.2 - 1.4 | 1.5 - 3.5 | 0.23 - 0.50 | 30 - 150 | 30 - 200 | 100 - 250 | 6 - 20 | 25 - 40 | 0.0 - 0.15 |

Good   Problem   Low   High

Note:   Color coded bar graphs have been used to provide you with 'AT-A-GLANCE' interpretations.

If you have any questions regarding your results, please call.

FRUIT GROWERS LABORATORY, INC.

*Scott Bucy*

SB1:KEB

Scott Bucy, Director of Ag. Services

**Corporate Offices & Laboratory**
853 Corporation Street
Santa Paula, CA 93060
TEL: (805)392-2000
Env FAX: (805)525-4172 / Ag FAX: (805)392-2063
CA ELAP Certification No. 1573

**Office & Laboratory**
2500 Stagecoach Road
Stockton, CA 95215
TEL: (209)942-0182
FAX: (209)942-0423
CA ELAP Certification No. 1563

**Office & Laboratory**
563 E. Lindo Avenue
Chico, CA 95926
TEL: (530)343-5818
FAX: (530)343-3807
CA ELAP Certification No. 2670

**Office & Laboratory**
3442 Empresa Drive, Suite D
San Luis Obispo, CA 93401
TEL: (805)783-2940
FAX: (805)783-2912
CA ELAP Certification No. 2775

**Office & Laboratory**
9415 W. Goshen Avenue
Visalia, CA 93291
TEL: (559)734-9473
FAX: (559)734-8435
CA ELAP Certification No. 2810



**ENVIRONMENTAL  AGRICULTURAL**
Analytical Chemists

July 1, 2019

**Recommendation**    CC 1981978:4-5, 7-8
Customer ID    : 8-1089
Sampled On    : June 17, 2019
Sampled By    : Pedro Guillen
Received On    : June 18, 2019
Depth    :

**Buttonwillow Warehouse Company**
Attn: Eric Browning
2203 Wisteria Lane
Paso Robles, CA  93446

**Analytical Results for R.R. Live Oak**

Based on the results of the laboratory analysis conducted on your plant tissue samples, the following are our recommendations.

Plant Tissue Recommendation for Syrah

| Sample Area | N Nitrogen | P2O5 Phosphorus | K2O Potassium | Ca Calcium | Mg Magnesium | Zn Zinc | Mn Manganese | Fe Iron | Cu Copper | B Boron |
|---|---|---|---|---|---|---|---|---|---|---|
| Field 2: System 4 Syrah | 15 | None | 35 | None | 20 | 1 | 1 | None | None | None |
| Field 1: System 19 Syrah | 15 | None | 35 | 10 | 20 | 0.5 | 1 | 0.5 | None | None |
| Field 1: System 15 Syrah | None | None | 35 | None | 20 | 1 | 1.5 | 1 | None | None |
| Field 1: System 12 Syrah | None | None | 35 | None | 20 | 0.5 | 1 | 1 | 1 | None |
| Lbs/Acre/Year    Applied via | Soil | Soil | Soil | Soil | Foliar | Foliar | Foliar | Foliar | Foliar | Soil |

*  Apply either the soil or the foliar but not both. The amount of nitrogen recommended (soil/foliar) accounts for the relative differences in uptake between soil applied and foliar applied nitrogen.
See application notes for further explaination.

If you have any questions regarding your results, please call.

FRUIT GROWERS LABORATORY, INC.

SB1:KEB

*Scott Bucy*

Scott Bucy, Director of Ag. Services

**Corporate Offices & Laboratory**
853 Corporation Street
Santa Paula, CA 93060
TEL: (805)392-2000
Env FAX: (805)525-4172 / Ag FAX: (805)392-2063
CA ELAP Certification No. 1573

**Office & Laboratory**
2500 Stagecoach Road
Stockton, CA 95215
TEL: (209)942-0182
FAX: (209)942-0423
CA ELAP Certification No. 1563

**Office & Laboratory**
563 E. Lindo Avenue
Chico, CA 95926
TEL: (530)343-5818
FAX: (530)343-3807
CA ELAP Certification No. 2670

**Office & Laboratory**
3442 Empresa Drive, Suite D
San Luis Obispo, CA 93401
TEL: (805)783-2940
FAX: (805)783-2912
CA ELAP Certification No. 2775

**Office & Laboratory**
9415 W. Goshen Avenue
Visalia, CA 93291
TEL: (559)734-9473
FAX: (559)734-8435
CA ELAP Certification No. 2810



# ENVIRONMENTAL • AGRICULTURAL
### Analytical Chemists

July 1, 2019

**Recommendation**    CC 1981978:6

Customer ID    : 8-1089
Sampled On    : June 17, 2019
Sampled By    : Pedro Guillen
Received On    : June 18, 2019
Depth    :

**Buttonwillow Warehouse Company**
Attn:  Eric Browning
2203 Wisteria Lane
Paso Robles, CA  93446

**Analytical Results for R.R. Live Oak**

Based on the results of the laboratory analysis conducted on your plant tissue samples, the following are our recommendations.

### Plant Tissue Recommendation for Mourvedre

| Sample Area | N Nitrogen | P205 Phosphorus | K2O Potassium | Ca Calcium | Mg Magnesium | Zn Zinc | Mn Manganese | Fe Iron | Cu Copper |
|---|---|---|---|---|---|---|---|---|---|
| Field 1: System 20 Mourvedre | 20 | None | 35 | None | 20 | 1 | 1 | 1 | None |
| Lbs/Acre/Year    Applied via | Soil | Soil | Soil | Soil | Foliar | Foliar | Foliar | Foliar | Foliar |

\*  Apply either the soil or the foliar but not both. The amount of nitrogen recommended (soil/foliar) accounts for the relative differences in uptake between soil applied and foliar applied nitrogen.
See application notes for further explaination.

If you have any questions regarding your results, please call.

FRUIT GROWERS LABORATORY, INC.

*Scott Bucy*

Scott Bucy, Director of Ag. Services

SB1:KEB



**Corporate Offices & Laboratory**
853 Corporation Street
Santa Paula, CA 93060
TEL: (805)392-2000
Env FAX: (805)525-4172 / Ag FAX: (805)392-2063
CA ELAP Certification No. 1573

**Office & Laboratory**
2500 Stagecoach Road
Stockton, CA 95215
TEL: (209)942-0182
FAX: (209)942-0423
CA ELAP Certification No. 1563

**Office & Laboratory**
563 E. Lindo Avenue
Chico, CA 95926
TEL: (530)343-5818
FAX: (530)343-3807
CA ELAP Certification No. 2670

**Office & Laboratory**
3442 Empresa Drive, Suite D
San Luis Obispo, CA 93401
TEL: (805)783-2940
FAX: (805)783-2912
CA ELAP Certification No. 2775

**Office & Laboratory**
9415 W. Goshen Avenue
Visalia, CA 93291
TEL: (559)734-9473
FAX: (559)734-8435
CA ELAP Certification No. 2810

# FRUIT GROWERS LABORATORY, INC. www.fglinc.com

**CHAIN OF CUSTODY**
*AND ANALYSIS REQUEST DOCUMENT*

ORIGINAL

## CLIENT DETAILS — SECTION I

Client: Buttonwillow Warehouse Co.

☐ New customer    Customer number: 8-1089

Address: _____

Phone: 805-226-2953

FAX: _____    E-mail: ebrowning@techag.com

Project name: R.R. Live Oak

Contact person: Eric Browning

Billing information (if different from above)

Name: _____

Address: _____

> (8-1089)
> **Buttonwillow Warehouse Company**
> **CC 1981978**
> KMR-06/19/2019-09:51:50

Phone: _____

FAX: _____

Contact pe...

Purchase o...

## SAMPLING — SECTION II

Sampler(s): Pedro Guillen
831-682-0744

Date of sampling: 6/17/19

Time: 4 p.m.    Mileage: _____

## REPORT INFORMATION — SECTION III

Rush analysis : 5 Days _____ 7 Days _____
Subject to surcharge

QA/QC report required : yes _____

Lab number : CC1981978

Lab Loc:  SP ☐  STK ☐  VI ☐  CH ☐  SLO ☒

## SAMPLE INFORMATION — SECTION IV

**SAMPLE INFO** columns: Recommendations: Yes (Y) No (N) Preplant (PP) / Soil Texture: Light (L) Medium (M) Heavy (H) / Irrigation: Solid Set Sprinklers (SSS) Dragline Sprinklers (DLS) / Furrow (F) Fanjet (FJ) Flood (FL) Drip (DP) Fogger (FO) / Plant Condition: Very Good (VG) Good (G) Fairly Good (FG) Fair (F) Poor (P)

**ANALYSES REQUESTED** — SOIL ANALYSES: Comprehensive Soil Suitability, Gypsum Requirement, Organic Materials Analysis, Other: Specify; PLANT TISSUE ANALYSES: Leaf/Petiole Combination, Comprehensive Leaf, Comprehensive Petiole, Other: Specify; OTHER ANALYSES: Whole Fruit; PATHOLOGY: Citrus Phytophthora, Citrus Nematode, Avocado Phytophthora, P.Cin, Disease Assay; IRRIGATION SUITABILITY; ADDITIONAL ANALYSES

| Sample Number | Location/Description | Date of Planting | Crop | Growth Stage | Sample Depth | SAMPLE INFO | Comprehensive Soil Suitability | Leaf/Petiole Combination |
|---|---|---|---|---|---|---|---|---|
| 1 | Field 2: System 4 Syrah | | Grapes | Bloom | 5" | Y M DP FG | ✓ | |
| 2 | Field 1: System 19 Syrah | | | | 5" | | ✓ | |
| 3 | Field 1: System 12 Syrah | | | | 5" | | ✓ | |
| 1 | Field 2: System 4 Syrah | | | | | | | ✓ |
| 2 | Field 1: System 19 Syrah | | | | | | | ✓ |
| 3 | Field 1: System 20 Mourvedre | | | | | | | ✓ |
| 4 | Field 1: System 15 Syrah | | | | | | | ✓ |
| 5 | Field 1: System 12 Syrah | ↓ | ↓ | ↓ | ↓ ↓ ↓ ↓ | | | ✓ |

## REMARKS — SECTION V

## CUSTODY — SECTION VI

Relinquished by and subject to the terms and conditions on the reverse of this document.

Relinquished by: _____  Print Name: Pedro Guillen  Date 6/18/19  Time 8:35 AM

Received by: _____  Print Name: (illeg.)  Date _____  Time _____

Relinquished by: _____  Print Name: (illeg.)  Date _____  Time 1700

Received by: GSL  Print Name: GSL  Date 6/14/(19)  Time 1700

---

**CORPORATE OFFICE & LABORATORY**
853 Corporation Street
Santa Paula, CA 93060
Tel: (805) 392-2000
Fax: (805) 392-2063

**OFFICE & LABORATORY**
2500 Stagecoach Road
Stockton, CA 95215
Tel: (209) 942-0181
Fax: (209) 942-0423

**OFFICE & LABORATORY**
563 E. Lindo Avenue
Chico, CA 95926
Tel: (530) 343-5818
Fax: (530) 343-9807

**OFFICE & LABORATORY**
3442 Empresa Drive, Suite D
San Luis Obispo, CA 93401
Tel: (805) 783-2940
Fax: (805) 786-2974

**FIELD OFFICE**
Madera, California
Tel: (559) 734-9473
Mobile: (559) 737-2399
Fax: (559) 734-8435



San Luis Obispo County, California

Non-Cropland
☑ Acres
HEL

Common Land Unit
Cropland    Non-cropland    CRP

Wetland Determination Identifiers
● Restricted Use
▼ Limited Restrictions
■ Exempt from Conservation Compliance Provisions

Farm **593**
Tract **3366**

2019 Crop Year

Tract 1 of 1

United States Department of Agriculture (USDA) Farm Service Agency (FSA) maps are for FSA Program administration only. This map does not represent a legal survey or reflect actual ownership; rather it depicts the information provided directly from the producer and/or National Agricultural Imagery Program (NAIP) imagery. The producer accepts the data 'as is' and assumes all risks associated with its use. USDA-FSA assumes no responsibility for actual or consequential damage incurred as a result of any user's reliance on this data outside FSA Programs. Wetland identifiers do not represent the size, shape, or specific determination of the area. Refer to your original determination (CPA-026 and attached maps) for exact boundaries and determinations or contact USDA Natural Resources Conservation Service (NRCS).



**USDA** **San Luis Obispo County, California**

2019 Crop Year

Farm **960**
Tract **3275**

Tract 1 of 1

FARM 960---LIVE OAK ROAD

| BLOCK NUMBER | ACRES | VARIETY | YEAR PLANTED | SPACING |
|---|---|---|---|---|
| 1 | 1.81 | PETITE SIRAH | 2018 | 6'6 X 6'6 |
| 2 | 4.54 | TEMPRANILLO | 2018 | 6'6 X 6'6 |
| 3 | 2.57 | PETIT VERDOT | 2020 | 3'3 X 6'6 |
| 4 | 0.92 | CABERNET SAUVIGNON | 2018 | 6'6 X 6'6 |
| 5 | 0.54 | CABERNET SAUVIGNON | 2018 | 6'6 X 6'6 |
| 6 | 3.48 | CABERNET SAUVIGNON & PETITE VERDOT | 2018 | 6'6 X 6'6 |
| 7 | 3.55 | GRENACHE & MOURVEDRE | 2017 | 6'6 X 6'6 |
| 8 | 4.87 | SYRAH | 2017 | 6'6 X 3'3 |
| 9 | 10.33 | SYRAH & CABERNET SAUVIGNON &  CABERNET FRANC | 2017 & 1999 | 6'6 x 3'3 |
| 10 | 3.83 | SYRAH & GRENACHE | 2017 | 6'6 X 6'6-GRENACHE 6'6 X 3'3 SYRAH |
| 11 | 2.67 | PETIT VERDOT & GRENACHE | 2018 | 6'6 X 6'6 |
| 12 | 5.21 | MOURVEDRE & GRENACHE | 2019 | 6'6 X 3'3 |
| 13 | 1.01 | GRENACHE | 2019 | 6'6 X 3'3 |
| 14 | 0.21 | VIOGNIER | 2008 | 3'6 X 2'3 |
| 15 | 1.84 | | | |
| 16 | 4.37 | PETIT VERDOT | 2020 | 6'6 X 3'3 |
| 17 | 3.94 | PETITE VERDOT | 1999 & 2020 | 6'6 X 3'3 |
| 18 | 1.44 | CABERNET SAUVIGNON | 2017 | 6'6 X 6'6 |
| 19 | 2.83 | NERO D'AVOLA & GRENACHE | 2019 | 6'6 X 3'3 |
| 20 | 5.16 | AGLIANICO & GRENACHE | 2019 | 6'6 X 3'3 |
| 21 | 0.2 | CABERNET SAUVIGNON | 2017 | 6'6 X 6'6 |
| 22 | 3.36 | CABERNET SAUVIGNON | 2017 | 6'6 X 3'3 |
| 23 | 0 | UNPLANTED | | |
| 24 | 3.59 | CABERNET SAUVIGNON | 2017 | 6'6 X 6'6 |
| 25 | 0.49 | CABERNET SAUVIGNON | 2017 | 6'6 X 6'6 |
| 26 | 2.26 | PETITE SIRAH | 2018 | 6'6 X 6'6 |
| 27 | 2.61 | PETIT VERDOT | 2020 | 6'6 X 3'3 |
| 28 | 1.3 | CABERNET FRANC | 2017 | 6'6 X 3'3 |
| 29 | 1.66 | CABERNET FRANC | 2017 | 6'6 X 3'3 |
| 30 | 2.55 | CABERNET SAUVIGNON | 2017 | 6'6 X 6'6 |
| 31 | 4.78 | CABERNET SAUVIGNON | 1999 | 6'6 X 3'3 |
| 32 | | FUTURE DEVELOPMENT | | |
| TOTAL | 87.92 | | | |

FARM 593 SAN MARCOS ROAD

| 1 | 6.18 | PRIMITIVO | 1997 | 6' X 4 |
|---|---|---|---|---|
| 2 | 16.27 | CABERNET SAUVIGNON | 1998 | 6' X 4 |
| 3 | 11.03 | PRIMITIVO | 1998 | 6' X 4 |

| 4 | 4.19 | SAUVIGNON BLANC | 1997 | 6' X 4 |
|---|---|---|---|---|
| 5 | 4.64 | SAUVIGNON BLANC | 1997 | 6' X 4 |
| 6 | 2.82 | SYRAH | 1998 | 6' X 4 |
| 7 | 8.96 | SAUVIGNON BLANC | 1997 | 6' X 4 |
| 8 | 6.81 | ZINFANDEL | 1997 | 6' X 4 |
| 9 | 4.32 | SYRAH | 1998 | 6' X 4 |
| 10 | 13.14 | PETITE SIRAH | 1997 | 6' X 4 |
| 11 | 2.63 | SYRAH | 1997 | 6' X 4 |
| 12 | 3.58 | ZINFANDEL | 1997 | 6' X 4 |
| 13 | 6.43 | ZINFANDEL | 1997 | 6' X 4 |
|  |  |  |  |  |
| TOTAL | 91 |  |  |  |



# TEXAS GRAPE VARIETAL LIST

## Field #1 (Black)

| | |
|---|---|
| 1. | Merlot (RP) |
| 2. | Merlot (RP) |
| 3 | Merlot (RP) |
| 4. | Merlot (RP) |
| 5 | Merlot (RP) |
| 6. | Merlot (RP) |
| 7. | Merlot (A) / Sangiovese (B) / (RP) |
| 8. | Zinfandel (North) / Merlot (South) / (RP) |
| 9. | Mourvedre |
| 10. | Grenache |

# TEXAS GRAPE VARIETAL LIST

## Field #2 (Red)

| | |
|---|---|
| 1. | Zinfandel |
| 2. | Merlot |
| 3 | Merlot |
| 4. | Merlot |
| 5 | Merlot |

\* (RP) = Ready For Replant

\* (A)= East

\* (B)= West

# TEXAS GRAPE VARIETAL LIST

## Field #3 (Blue)

| | |
|---|---|
| 1. | Zinfandel |
| 2. | Zinfandel (South) / Grenache Blanc (North) |
| 3 | Zinfandel (South) / Grenache Blanc (North) |
| 4. | Zinfandel |
| 5 | Zinfandel |
| 6. | Cabernet |
| 7. | Petit Sirah |
| 8. | Petit Sirah |
| 9. | Primitivo / Zinfandel |
| 10. | Grenache (North  / Viognier (South) |
| 11. | Syrah |
| 12. | Grenache |
| 13. | Mourvedre |

# TEXAS GRAPE VARIETAL LIST

## Field #4 (Green)

| | |
|---|---|
| 1. | Petit Verdot |
| 2. | Petit Verdot |
| 3 | Grenache (South) / Petit Sirah (North) |
| 4. | Petit Sirah (RP) |

* (RP) = Ready For Replant

# SAN MARCOS GRAPE VARIETAL LIST

## Field #1 (Black)

| | |
|---|---|
| 1. | Cabernet (RP) |
| 2. | Sauvignon Blanc / Muscat (RP) |
| 3 | Syrah |
| 4. | Syrah |
| 5 | Zinfandel |
| 6. | Zinfandel |
| 7. | Sauvignon Blanc (RP) |
| 8. | Cabernet (RP |
| 9. | Cabernet (RP) |

# SAN MARCOS GRAPE VARIETAL LIST

## Field #2 (Red)

| | |
|---|---|
| 1. | Petit Sirah (RP) |
| 2. | Petit Sirah (RP) |
| 3 | Petit Sirah (RP) |
| 4. | Syrah (RP) |
| 5 | Zinfandel |
| 6. | Zinfandel |
| 7. | Zinfandel |
| 8. | Zinfandel |

* (RP) = Ready For Replant

# SAN MARCOS GRAPE VARIETAL LIST

## Field #3 (Blue)

| | |
|---|---|
| 1. | Zinfandel |
| 2. | Zinfandel / Primitivo |
| 3 | Zinfandel / Primitivo |
| 4. | Zinfandel / Primitivo |

# SAN MARCOS GRAPE VARIETAL LIST

## Field #4 (Green)

| | |
|---|---|
| 1. | Primitivo / Zinfandel |
| 2. | Primitivo / Zinfandel |
| 3 | Cabernet (RP) |
| 4. | Petit Sirah / Sauvignon Blanc (RP) |
| 5 | Sangiovese (RP) |
| 6. | Cabernet (RP) |
| 7. | Cabernet (RP) |

* (RP) = Ready For Replant

# Texas Breakdown

## Field # 1

| System # | # Vines | Variety/Rootstock |
|---|---|---|
| System 1 | 6,749 | |
| System 2 | 6,626 | |
| System 3 | 6,664 | |
| System 4 | 6,666 | |
| System 5 | 6,666 | |
| System 6 | 6,745 | |
| System 7 | 6,185 | |
| System 8 | 7,265 | |
| **Total** | **53,566** | acres 32 all trellis & irrigation in |

## Row Spacing / Acreage

| | | |
|---|---|---|
| 6.5 x 4 = | 26 | Square feet |
| 43,560 / 26 = | 1,675 | Vines to the acre |
| 184,887 / 1675 = | 110.38 | Total planted acres |
| | 2005 | |
| 6.5x4 | | |
| | 2006 | |
| 6.5x2 | | |
| | 2007 | |
| 6.5x2 | | |

## Field # 2

| System # | # Vines | Variety/Rootstock |
|---|---|---|
| System 1 | 7,468 | |
| System 2 | 6,012 | |
| System 3 | 6,685 | |
| System 4 | 6,390 | |
| System 5 | 4,835 | |
| **Total** | **31,390** | |

## Acreage by Variety

| Variety | Acres | |
|---|---|---|
| Merlot | 18.80 | |
| Zinfandel | 31.00 | |
| Petite Sirah | 11.92 | |
| Petite Verdot | 12.20 | |
| Syrah | 3.60 | |
| Cabernet Sauvignon | 3.96 | |
| **Viognier** | **1.25** | |
| Grenache Blanc | | 4 |
| Grenache 362 | 3.28 | |
| *Mourvedre* | *4* | *6.5 X 2* |
| Grenache | | 4 6.5 X 2 |
| Tuscan Olive Trees | | 5-6 acres? |
| | 98.01 | |

## Field # 3

| System # | # Vines | Variety/Rootstock |
|---|---|---|
| System 1 | 6,701 | |
| System 2 | 6,693 | |
| System 3 | 6,751 | |
| System 4 | 6,662 | |
| System 5 | 6,792 | |
| System 6 | 6,631 | Cabernet Sauvignon 337, 420A |
| System 7 | 6,739 | Petite Sirah 03, 5BB |
| System 8 | 6,756 | Petite Sirah 03, 5BB |
| System 9 | 6,591 | |
| System 10 | 6,735 | |
| System 11 | 5,976 | |
| **Total** | **73,027** | |

## Field # 4

| System # | # Vines | Variety/Rootstock |
|---|---|---|
| System 1 | 6,799 | |
| System 2 | 6,741 | Petite Verdot 400, 420A |
| System 3 | 6,894 | |
| System 4 | 6,470 | |
| **Total** | **26,904** | |
| **Acres** | **16.06** | |

| | | |
|---|---|---|
| **Grand Total** | **184,887** | **PLANTED IN 2003** |



## ENGAGEMENT CONTRACT

Arthur O. Neudek, MAI, AI-GRS                                    Via email Arthur.Neudek@propsci.com
**The Property Sciences Group, Inc.**
395 Taylor Blvd, Ste. 250
Pleasant Hill, CA  94523

Business Loan Capital, Inc. would like to retain you to prepare an appraisal of the property referred to below.  You are authorized to proceed under the following parameters:

| | |
|---|---|
| **Assignment Order Date:** | March 11, 2020 |
| **Assignment Due Date:** | March 31, 2020 |
| **Client:** | Business Loan Capital, Inc. |
| **Intended users:** | Business Loan Capital, Inc. |
| **Purpose:** | Mortgage Lending |
| **Property rights:** | Fee Simple |
| **Approaches to value:** | All relevant approaches are required |
| **Value definitions:** | Market Value - per attached guidelines |
| | Insurable Replacement Cost - per attached guidelines |
| | Liquidation Value – per attached guidelines |
| **Report format:** | Narrative, Complete Appraisal |
| **Fee amount:** | $6,000.00 (50% Up front-50% prior to final release of report) |
| **Number of Report Copies:** | Electronic copy (PDF) |
| **Date of report:** | Date of inspection |
| **Property address:** | 1172 San Marcos Rd, Paso Robles Ca 93446 |
| | San Marcos Vineyard APN#026-104-001 |
| | |
| | 1172 San Marcos Rd, Paso Robles Ca 93446 |
| | Texas Road Vineyard APN# 027-145-022 |
| | |
| | 2380 Live Oak Rd, Paso Robles Ca 93446 |
| | Live Oak Vineyard APN# 026-342-039 |
| **Property type:** | Winery/Vineyard |
| **Name of Borrower:** | TBD/Rabbit Ridge Wine Sales, Inc. |
| **Name of Current Owner:** | Erich Russell |
| **Property contact:** | Lee Codding 952-220-8216 |
| | lecoddingiv@icloud.com  (advisor) |
| **Information provided:** | Business Loan Capital Appraisal Guidelines |

- The report will include an estimate of replacement cost for insurance purposes and a liquidation value.

March 11, 2020
The Property Sciences Group, Inc.
Page Two

- Disclose any sales or listings of the property within the last three years.

- The report will include the remaining economic life of the improvements.

- The site contact is to be contacted within three days of receipt of this contract.

- The appraisal report shall be prepared, and contain one or more statements attesting to the fact that it was prepared, in accordance with the Uniform Standards of Appraisal Practice 2018/19, the Financial Institutions Reform, Recovery and Enforcement Act of 1989, and the Interagency Appraisal and Evaluation Guidelines, 2010 as jointly issued by the OCC, FRB, FDIC and NCUA, as well as Business Loan Capital Appraisal Guidelines.

- The report will be reviewed by Business Loan Capital. It may also undergo a USPAP Standard 3/4 technical review by a certified appraiser retained by the bank. Your cooperation during the review process is considered an integral part of this assignment.

- All reports must include a copy of this contract.

- Appraisal must include a statement that the appraiser has acted in an independent capacity and that the assignment is not based on a requested minimum valuation, specific valuation, or the approval of loan.

- While we have attempted to provide you with the information necessary to commence the assignment, we ask that you assist Business Loan Capital, Inc in completing its files on information on the subject property by providing Business Loan Capital, Inc copies of additional documents pertaining to the subject which you obtained in your investigation but which were not provided to you by Business Loan Capital, Inc (e.g. copies of additional financial statements, permits, listing brochures, plans, etc.).

- The appraisal must include your state appraiser license / certification number.  Please note that you, as the principal approved appraiser, must sign the report.

<u>Confidentiality</u>

All documents furnished to the appraiser from Business Loan Capital, Inc are to be considered confidential information to the appraiser pursuant to the disclosure requirements in the confidentiality section of the ethics provision and Statement on Appraisal Standards Number 5 of USPAP.  You are not authorized to release information pertaining to the appraisal content or conclusions to any other persons without our prior written approval.  Please be aware, however, that the report will be released to the applicant by us upon final disposition of the loan application.

March 11, 2020
The Property Sciences Group, Inc.
Page Three

<u>Fee Payment</u>

~~We will review your submission within ten (10) working days, at which time we will provide you written comments, if any are required.  You will be paid as soon as we review your response and the final report is approved by Business Loan Capital, Inc.  To expedite payment, please include with the final report an invoice which states the amount due, as well as the address of the subject property and borrower's name (provided above).~~ Omitted by BLC

If, during your investigation of the property, you should discover anything that might materially modify the assignment or which would result in a change of terms of this agreement, please contact us immediately.

Business Loan Capital is to be provided one electronic copy (which must be provided in Adobe Acrobat (PDF) format and be text searchable OCR).

Upon receipt and agreement, sign and return this engagement via email to the undersigned.  Should you have any questions or need additional information to complete this appraisal, please do not hesitate to contact me at 949-450-2000 or 877-774-4240.

Sincerely,
**Business Loan Capital, Inc.**

Carrie Beavers
Vice President / Loan Administrator

**Appraiser Acceptance:**

I agree to the terms of this engagement letter.

_____
(Name)

Date: _____3/11/2020_____

**15375 Barranca Parkway, Suite B-202 ● Irvine, CA  92618 ● Phone 877-774-4240 ● Fax 949-450-2010**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

17609 Ventura Blvd., Suite 314, Encino, CA 91316.

A true and correct copy of the foregoing document entitled (*specify*): <u>DEBTORS' OPPOSITION TO MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (2380 Live Oak Road, Paso Robles, CA  93446, 1172 San Marcos Road, Paso Robles, CA 93446 and APN 027-145-022); DECLARATIONS OF LEROY CODDING AND BRANT A. SHEAFFER IN SUPPORT THEREOF</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 11/16/2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On (*date*) 11/16/2020, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 11/16/2020, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11/16/2020 | Ja'Nita Fisher | /s/ Ja'Nita Fisher |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    **F 9013-3.1.PROOF.SERVICE**

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF) [CONTINUED]**:

- *(UST)* **Nancy S Goldenberg    nancy.goldenberg@usdoj.gov**
- *(COUNSEL FOR FARM CREDIT)* **Michael J Gomez    mgomez@frandzel.com, dmoore@frandzel.com**
- *(DEBTOR'S COUNSEL)* **Roksana D. Moradi-Brovia    roksana@rhmfirm.com, matt@rhmfirm.com;janita@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla @rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rh mfirm.com;sloan@rhmfirm.com**
- *(DEBTOR'S COUNSEL)* **Matthew D. Resnik    matt@rhmfirm.com, roksana@rhmfirm.com;janita@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;prisc illa@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@ rhmfirm.com;sloan@rhmfirm.com**
- **United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov**
- *(COUNSEL FOR FARM CREDIT)***Reed S Waddell    rwaddell@frandzel.com, sking@frandzel.com**
- *(COUNSEL FOR FARM CREDIT) TFM* **Gerrick Warrington    gwarrington@frandzel.com, sking@frandzel.com**

**2. SERVED BY UNITED STATES MAIL [CONTINUED]**:

Hon. Mark S. Wallace
U.S. Bankruptcy Court
Central District – S.A. Division
411 West Fourth Street, Suite 6135
Santa Ana, CA 92701-4593

Northern Holding, LLC
13217 Jamboree Rd #429
Tustin CA 92783