D. EDWARD HAYS, #162507
ehays@marshackhays.com
DAVID A. WOOD, #272406
dwood@marshackhays.com
TINHO MANG, #322146
tmang@marshackhays.com
MARSHACK HAYS LLP
870 Roosevelt
Irvine, CA 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Chapter 7 Trustee,
RICHARD A. MARSHACK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| In re | Case No. 8:20-bk-13014-MW |
|---|---|
| NORTHERN HOLDING, LLC, | Chapter 7 |
| Debtor. | SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR ORDER COMPELLING TURNOVER OF ESTATE PROPERTY PURSUANT TO 11 U.S.C. § 542(A) AND FOR DETERMINATION THAT EVICTION MORATORIA DO NOT APPLY TO TURNOVER OF BANKRUPTCY ESTATE PROPERTY; REQUEST FOR JUDICIAL NOTICE |
| | Hearing:<br>Date: August 30, 2021<br>Time: 2:00 p.m.<br>Ctrm: 6C<br>Address: 411 W. Fourth Street, Santa Ana, CA 92701 |

/ / /

/ / /

SUPPLEMENT TO MOTION FOR TURNOVER OF LIVE OAK PROPERTY

1  TO THE HONORABLE MARK S. WALLACE, UNITED STATES BANKRUPTCY JUDGE, THE

2  OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

3      On August 2, 2021, Richard A. Marshack, in his capacity as Chapter 7 Trustee ("Trustee") of

4  the Bankruptcy Estate ("Estate") of Northern Holding, LLC ("Debtor"), filed a motion with the

5  Court for an order (A) compelling turnover of real estate and various personal property assets

6  located at 2380 Live Oak Rd., Paso Robles, CA ("Live Oak Property"); (2) 1172 San Marcos Road,

7  Paso Robles, CA 93446 ("San Marcos Property"), and (3) real property located at APN 027-145-022

8  in Paso Robles, CA ("Texas Road Property," collectively with the Live Oak Property and the San

9  Marcos Property, the "Properties"); and (B) establishing procedures for enforcement of the turnover.

10  The motion was filed as docket no. 163. On August 3, 2021, in an abrupt change of course, the

11  director of the CDC issued a new moratorium on evictions. The Trustee requires a determination that

12  the new CDC moratorium does not apply to the removal of persons from bankruptcy estate property.

13  **1.    Summary of Supplement**

14      Trustee is informed that the United States Marshals Service ("Marshals") also requires a

15  specific finding from the Court that no moratorium on evictions, including a moratorium issued by

16  the director of the Centers for Disease Control and Prevention ("CDC") applies, in the event that a

17  writ of assistance is necessary to enforce the turnover order. One day after filing his turnover motion,

18  the CDC abruptly (and, seemingly due in part to public pressure from Congresspersons) issued a

19  new moratorium on evictions which was substantially similar but also substantially different from

20  the prior moratoria. This new moratorium on evictions issued by the CDC does not apply to

21  bankruptcy turnover proceedings.

22  **2.    Factual Background**

23      Erich Russell, Joanne Russell, and their two children Brice Garrett and Sarah Garrett

24  currently reside at the real property commonly known as 2380 Live Oak Road, Paso Robles, CA

25  ("Live Oak Property"). Collectively, Erich Russell, Joanne Russell, Brice Garrett, and Sarah Garrett

26  shal be referred to as the "Live Oak Occupants."

27      None of the Live Oak Occupants pay any rent. Property taxes for the Debtor's Properties are

28  seriously delinquent – including the property at 1172 San Marcos Road ("San Marcos Property"),

SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR TURNOVER OF PROPERTY
4824-2330-5952,v.1

which is delinquent in property taxes totaling over $3 million. Additionally, secured property taxes for the Live Oak Property are owed in the approximate amount of $36,000. Since his appointment, the Trustee has sought to reach an agreement with the Live Oak Occupants regarding an agreement for the voluntary turnover of the properties they occupy. Instead of providing substantive responses to the proposed stipulated terms (i.e. yes or no), the Live Oak Occupants responded with interminable delays where they claimed to be considering whether to sign the stipulation. After weeks of bad faith delays by the Live Oak Occupants, the Trustee decided to file the Motion.

On August 2, 2021, the Motion was filed and the Live Oak Occupants were served with a copy of the Motion.

## 3.    Legal Argument

### A.    The recently expired CDC Order only applies in limited circumstances and was found unconstitutional by other courts.

On June 24, 2021, Rochelle P. Walensky, the director for the United States Centers for Disease Control and Prevention (previously defined as "CDC") signed an order extending a prior moratorium on evictions due to the COVID-19 global pandemic ("CDC Order"). The CDC Order was published at 86 Fed. Reg. 121, pp. 34010-18 (June 28, 2021), https://www.govinfo.gov/content/pkg/FR-2021-06-28/pdf/2021-13842.pdf, *also available at* https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/CDC_Eviction_Extension_Order_Final_06242021.pdf. References to the CDC Order will reference the pages on the plaintext exhibit document (second link).

The CDC Order provided that "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order." CDC Order at 1. The definition of "evict" means "any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, to remove or cause the removal of a covered person from a residential property." *Id.* at 2.

Additionally, "[t]his Order does not apply in any state, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health

SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR TURNOVER OF PROPERTY
4824-2330-5952,v.1

1  protection than the requirements listed in this Order." *Id.* at 11. Finally, "[n]othing in this Order

2  precludes evictions based on a tenant, lessee, or resident: (1) Engaging in criminal activity while on

3  the premises; (2) threatening the health or safety of other residents; (3) damaging or posing an

4  immediate and significant risk of damage to property; (4) violating any applicable building code,

5  health ordinance, or similar regulation relating to health and safety; or (5) violating any other

6  contractual obligation, other than the timely payment of rent or similar housing-related payment

7  (including non-payment or late payment of fees, penalties, or interest)." *Id.* at 11-12.

8      On May 5, 2021, the District Court for the District of Columbia entered a memorandum

9  opinion reasoning that the CDC Order (in its prior iteration) was unconstitutional in that the

10  Department of Health and Human Services ("HHS") had exceeded its statutory authority by ordering

11  a nationwide moratorium on evictions. *Alabama Association of Realtors v. United States Department*

12  *of Health and Human Services*, 2021 U.S. Dist. LEXIS 85568 at *23 (D.D.C. May 5, 2021). The

13  district court, however, granted a stay of its order pending appeal. The appellees quickly moved to

14  vacate the stay pending appeal in the D.C. Circuit, which denied the request to vacate the stay

15  pending appeal. 2021 U.S. App. LEXIS 16630 (D.C. Cir. June 2, 2021) (unpublished). Thereafter,

16  on June 29, 2021, the U.S. Supreme Court denied a subsequent application to vacate the stay (5-4),

17  with Justice Kavanaugh penning a brief concurrence stating that "I agree with the District Court and

18  the applicants that the Centers for Disease Control and Prevention exceeded its existing statutory

19  authority by issuing a nationwide eviction moratorium," but "[b]ecause the CDC plans to end the

20  moratorium in only a few weeks… I vote at this time to deny the application to vacate the District

21  Court's stay of its order." 2021 U.S. LEXIS 3566 at *1 (June 29, 2021). Based on Justice

22  Kavanaugh's concurrence, it would appear that if the Supreme Court would take up the matter, the

23  CDC Order may be found unconstitutional. Nonetheless, the CDC Order as currently constituted and

24  as stated in the CDC's website, appears to only extend through July 31, 2021, with no further

25  extensions intended. By July 31, 2021, neither the CDC, the President, nor Congress extended the

26  CDC Order. This description is included in an abundance of caution in case there is a sudden course

27  change by either the President or the CDC regarding the extension of the CDC Order.

28

SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR TURNOVER OF PROPERTY
4824-2330-5952,v.1

**B.    The reissued CDC Order on August 3, 2021 is substantially similar to the prior CDC Order.**

On August 3, 2021, the director of the CDC signed a new, revised order restricting the evictions of tenants, set to expire on October 3, 2021, applicable "in United States coutnies experiencing substantial and high levels of community transmission levels of SARS-CoV-2."[1] A true and correct copy of the August 3, 2021 moratorium on evictions issued by the CDC ("Reissued CDC Order") is attached to the Declaration of Tinho Mang ("Mang Declaration") as Exhibit "6."[2] The Reissued CDC Order contains provisions which are substantially similar to the prior, expired CDC Order, except that the Reissued CDC Order only applies in counties with "substantial or high levels of community transmission" of COVID-19. According to the hyperlinked database found in footnote 23 of the Reissued CDC Order, as of August 9, 2021, San Luis Obispo County, California (where the Properties are located) was experiencing a "high" level of COVID-19 transmsission. *See* Mang Declaration, ¶5.

Importantly, the Reissued CDC Order contains the same operative definition of "evict" (*See* Reissued CDC Order at 3), a covered person (*See id.* at 2-3), and the same exclusions from applicability as the expired CDC Order (*see id.* at 13).

**C.    The Reissued CDC Order and applicable state court moratoria on evictions do not apply to turnover proceedings under the Bankruptcy Code.**

The only two bankruptcy court decisions that Trustee could locate deciding whether the CDC Order excuses a debtor's turnover obligations has concluded that the CDC Order does not apply. *See In re Machevsky*, 2021 Bankr. LEXIS 31 (Bankr. C.D. Cal. January 8, 2021) (Kwan, J.); *see also In re Shabanets*, (C.D. Cal. March 26, 2021, Case No. 8:19-bk-14912-TA). In *Machevsky*, the Honorable Robert N. Kwan interpreted a slightly broader, prior order from the CDC, and determined that it does not permit a debtor in bankruptcy from complying with turnover. Because "the trustee is

---

[1] CDC Issues Eviction Moratorium Order in Areas of Substatial and High Transmission, UNITED STATES CENTERS FOR DISEASE CONTROL AND PREVENTION, August 3, 2021, *available at* https://www.cdc.gov/media/releases/2021/s0803-cdc-eviction-order.html.
[2] As a supplement to the Motion, exhibit numbering will be continued from the Motion.

1  attempting to recover the real property that belongs to the bankruptcy estate which he is

2  administering in this case pursuant to the Bankruptcy Code," and "Debtor does not want to cooperate

3  with the trustee and perform his statutory duties under 11 U.S.C. § 521(a)(3) and turnover property

4  of the estate under 11 U.S.C. § 542(a)," the CDC order did not apply. *Id.* at *9-10.

5        Additionally, the *Machevsky* court found that California Assembly Bill 3088, which enacted

6  various temporary provisions in California statutory law to provide protections to tenants and

7  mortgagors, did not apply to a bankruptcy trustee's efforts to recover bankruptcy estate property,

8  because "debtor is not a renter, small business owner or homeowner who is struggling to make rent

9  or mortgage payments due to COVID-19." *Id.* at *10-11.

10        As such, the Properties, the residence, and the vineyards are under the sole jurisdiction of the

11  bankruptcy court. The sole and exclusive representative of the bankruptcy estate is the Trustee. 11

12  U.S.C. § 323. A Chapter 7 debtor has a duty to turn over estate property to the trustee. 11 U.S.C.

13  § 521(a)(3)-(4). Other entities in possession of Estate property also may be compelled to turn such

14  property over to the Trustee.

15        No eviction moratoria apply in this case. First, any applicable state law moratoria on

16  evictions regarding the Live Oak Property and the Live Oak Occupants does not apply because the

17  turnover provisions of the Bankrutpcy Code preempt all state laws with respect to the possession and

18  delivery of bankruptcy estate property to a bankruptcy trustee. As for the Reissued CDC Order, the

19  following exceptions apply: First, none of the Live Oak Occupants have ever qualified or do qualify

20  as "covered persons" within the definition provided in the Reissued CDC Order, as no qualifying

21  declaration has ever been received by the Trustee. Second, the Reissued CDC Order only applies to

22  residential real property, so the Reissued Order would not preclude the U.S. Marshals from

23  enforcing turnover of the San Marcos Property (which is a commercial property) or the Texas Road

24  Property (which is a lot of land). Third, the continued unauthorized occupancy of the Properties

25  including the Live Oak Property by the Live Oak Occupants causes damage and poses an immediate

26  and significant risk of damage to the Estate, because the Live Oak Occupants' refusal to vacate the

27  Live Oak Property is an impediment to the Trustee's administration of the Live Oak Property and his

28  sale efforts to the Riboli parties. Fourth, the Bankruptcy Code imposes a statutory obligation for

SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR TURNOVER OF PROPERTY
4824-2330-5952,v.1

persons in possession or control of bankruptcy estate property to deliver possession to the Trustee. *See* 11 U.S.C. § 542(a). Finally, to the extent that there is any conflict at all between the Reissued CDC Order and the Bankruptcy Code, the Bankruptcy Code preempts any inconsistent law. *See MSR Exploration v. Meridian Oil*, 74 F.3d 910, 912-16 (9th Cir. 1996) (finding "complete preemption" intended by Congress in the field of bankruptcy matters).

## 4.    Conclusion

The Reissued CDC Order does not apply. The Court should, in connection with the Trustee's turnover motion, make and issue a determination that both applicable state law eviction moratoria and the Reissued CDC Order do not apply to the Trustee's possessory rights in the Live Oak Property and all of the other Properties.

Dated: August 9, 2021                    MARSHACK HAYS LLP

                                                    /s/ Tinho Mang
                                        By:_____
                                            D. EDWARD HAYS
                                            DAVID A. WOOD
                                            TINHO MANG
                                            Attorneys for Chapter 7 Trustee
                                            RICHARD A. MARSHACK

SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR TURNOVER OF PROPERTY
4824-2330-5952,v.1

# **Declaration of Tinho Mang**

I, TINHO MANG, state and declare as follows:

1.      I am an individual over 18 years of age and competent to make this declaration.

2.      I am an associate attorney with Marshack Hays LLP, counsel for Richard A. Marshack, in his capacity as the Chapter 7 bankruptcy trustee ("Trustee") of Northern Holding, LLC ("Debtor").

3.      The information and attachments to this declaration are of my personal knowledge.

4.      A true and correct copy of the August 3, 2021 "Reissued CDC Order" as defined in the Motion above is attached as Exhibit "6." I personally retrieved this order from the U.S. Centers for Disease Control and Prevention's website on August 4, 2021, at https://www.cdc.gov/coronavirus/2019-ncov/communication/Signed-CDC-Eviction-Order.pdf.

5.      On August 9, 2021, I visted the CDC website at https://covid.cdc.gov/covid-data-tracker/#county-view and determined that San Luis Obispo County, California was a high transmission county

6.      To the best of my knowledge, neither I nor the Trustee have ever never received any qualifying declaration from Erich Russell, Joanne Russell, Brice Garrett, or Sarah Garrett, who I am informed are occupying the real property located at 2380 Live Oak Road, Paso Robles, CA ("Live Oak Property") without the consent or permission of the Trustee.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 9, 2021.

*/s/ Tinho Mang*
TINHO MANG

SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR TURNOVER OF PROPERTY
4824-2330-5952,v.1

**EXHIBIT 6**

**EXHIBIT 1**

**CENTERS FOR DISEASE CONTROL AND PREVENTION**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**ORDER UNDER SECTION 361**
**OF THE PUBLIC HEALTH SERVICE ACT (42 U.S.C. 264)**
**AND 42 CODE OF FEDERAL REGULATIONS 70.2**

**TEMPORARY HALT IN RESIDENTIAL EVICTIONS IN COMMUNITIES WITH**
**SUBSTANTIAL OR HIGH LEVELS OF COMMUNITY**
**TRANSMISSION OF COVID-19 TO**
**PREVENT THE FURTHER SPREAD OF COVID-19**

SUMMARY

The U.S. Centers for Disease and Control (CDC) is issuing a new order temporarily halting evictions in counties with heightened levels of community transmission in order to respond to recent, unexpected developments in the trajectory of the COVID-19 pandemic, including the rise of the Delta variant. It is intended to target specific areas of the country where cases are rapidly increasing, which likely would be exacerbated by mass evictions. Accordingly, subject to the limitations under "Applicability," a landlord, owner of a residential property, or other person[1] with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any county or U.S. territory while the county or territory is experiencing substantial or high levels of community transmission of SARS-CoV-2.

DEFINITIONS

"*Available government assistance*" means any governmental rental or housing payment benefits available to the individual or any household member.

"*Available housing*" means any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate federal, state, or local occupancy standards and that would not result in an overall increase of housing cost to such individual.

---

[1] For purposes of this Order, "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

1

"*Covered person*"[2] means any tenant, lessee, or resident of a residential property who provides to their landlord, the owner of the residential property, or other person with a legal right to pursue eviction or a possessory action,[3] a declaration[4] under penalty of perjury indicating that:

(1) The individual has used best efforts to obtain all available governmental assistance for rent or housing;

(2) The individual either (i) earned no more than $99,000 (or $198,000 if filing jointly) in Calendar Year 2020 or expects to earn no more than $99,000 in annual income for Calendar Year 2021 (or no more than $198,000 if filing a joint tax return),[5] (ii) was not required to report any income in 2020 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check).[6,7]

---

[2] This definition is based on factors that are known to contribute to evictions and thus increase the need for individuals to move into close quarters in new congregate or shared living arrangements or experience homelessness. Individuals who suffer job loss, have limited financial resources, are low income, or have high out-of-pocket medical expenses are more likely to be evicted for nonpayment of rent than others not experiencing these factors. See Desmond, M., Gershenson, C., Who gets evicted? Assessing individual, neighborhood, and network factors, *Soc Sci Res*. 2017;62:362-377. doi:10.1016/j.ssresearch.2016.08.017, (identifying job loss as a possible predictor of eviction because renters who lose their jobs experience not only a sudden loss of income but also the loss of predictable future income). According to one survey, over one quarter (26%) of respondents also identified job loss as the primary cause of homelessness. See *2019 San Francisco Homeless Count & Survey Comprehensive Report*, Applied Survey Research, at 22, https://hsh.sfgov.org/wp-content/uploads/2020/01/2019HIRDReport_SanFrancisco_FinalDraft-1.pdf. (last viewed Mar. 24, 2021).

[3] As used throughout this Order, this would include, without limitation, an agent or attorney acting on behalf of the landlord or the owner of the residential property.

[4] A person who previously filed a declaration under prior CDC eviction moratoria issued on September 4, 2020, January 29, 2021, March 28, 2021, or June 24, 2021 may be eligible for protection under this Order and does not need to file a new declaration, if they live in a county experiencing substantial or high rates of transmission of community levels of SARS-CoV-2 and meet the definition of a covered person under this Order.

[5] According to one study, the national two-bedroom housing wage in 2020 was $23.96 per hour (approximately, $49,837 annually), meaning that an hourly wage of $23.96 was needed to afford a modest two-bedroom house without spending more than 30% of one's income on rent. The hourly wage needed in Hawaii (the highest cost U.S. State for rent) was $38.76 (approximately $80,621 annually). See *Out of Reach: How Much do you Need to Earn to Afford a Modest Apartment in Your State?*, National Low Income Housing Coalition, https://reports.nlihc.org/oor (last visited Mar. 23, 2021). As further explained herein, because this Order is intended to serve the critical public health goal of preventing evicted individuals from potentially contributing to the interstate spread of COVID-19 through movement into close quarters in new congregate, shared housing settings, or through homelessness, the higher income thresholds listed here have been determined to better serve this goal.

[6] "Stimulus check" includes payments made pursuant to Section 2201 of the CARES Act, to Section 9601 of the American Rescue Plan Act of 2021, or to any similar federally authorized payments made to individual natural persons in 2020 and 2021. Eligibility for the 2020 or 2021 stimulus checks has been based on an income that is equal to or lower than the income thresholds described above and does not change or expand who is a covered person under this Order since it was entered into on September 4, 2020.

[7] A person is likely to qualify for protection under this Order if they receive the following benefits: a) Temporary Assistance for Needy Families (TANF); b) Supplemental Nutrition Assistance Program (SNAP); c) Supplemental Security Income (SSI); or d) Social Security Disability Insurance (SSDI) to the extent that income limits for these programs are less than or equal to the income limits for this Order. However, it is the individual's responsibility to verify that their income is within the income limits described.

(3) The individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary[8] out-of-pocket medical expenses;

(4) The individual is using best efforts to make timely partial rent payments that are as close to the full rent payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses;

(5) Eviction would likely render the individual homeless—or force the individual to move into and reside in close quarters in a new congregate or shared living setting—because the individual has no other available housing options; and

(6) The individual resides in a U.S. county experiencing substantial[9] or high[10] rates of community transmission levels of SARS-CoV-2 as defined by CDC.

"*Evict*" and "*Eviction*" means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, to remove or cause the removal of a covered person from a residential property. This definition also does not prohibit foreclosure on a home mortgage.

"*Residential property*" means any property leased for residential purposes, including any house, building, mobile home or land in a mobile home park,[11] or similar dwelling leased for residential purposes, but shall not include any hotel, motel, or other guest house rented to a temporary guest or seasonal tenant as defined under the laws of the state, territorial, tribal, or local jurisdiction.

"*State*" shall have the same definition as under 42 CFR 70.1, meaning "any of the 50 states, plus the District of Columbia."

"*U.S. territory*" shall have the same definition as under 42 CFR 70.1, meaning "any territory (also known as possessions) of the United States, including American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands."

---

[8] Extraordinary expenses are defined as those that prevented you from paying some or all of your rent or providing for other basic necessities like food security. To qualify as an extraordinary medical expense, the unreimbursed medical expense is one that is likely to exceed 7.5% of one's adjusted gross income for the year.

[9] Counties experiencing substantial transmission levels are experiencing (1) 50.99-99.99 new cases in the county in the past 7 days divided by the population in the county multiplied by 100,000; and (2) 8.00-9.99% positive nucleic acid amplification tests in the past 7 days (number of positive tests in the county during the past 7 days divided by the total number of tests performed in the county during the past 7 days). Christie A, Brooks JT, Hicks LA, et al. Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage. MMWR Morb Mortal Wkly Rep 2021;70:1044–1047. DOI: http://dx.doi.org/10.15585/mmwr.mm7030e2. See COVID-19 Integrated County View, Centers for Disease Control and Prevention; https://covid.cdc.gov/covid-data-tracker/#county-view (last updated August 1, 2021).

[10] *Id.* (defining high transmission levels as (1) ≥ 100 new cases in the county in the past 7 days divided by the population in the county multiplied by 100,000; and (2) ≥10.00% positive nucleic acid amplification tests in the past 7 days (number of positive tests in the county during the past 7 days divided by the total number of tests performed in the county during the past 7 days)).

[11] Mobile home parks may also be referred to as manufactured housing communities.

EXHIBIT 6, PAGE 12

STATEMENT OF INTENT

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

- Mitigating the spread of COVID-19 within crowded, congregate or shared living settings, or through unsheltered homelessness;
- Mitigating the further spread of COVID-19 from one state or territory into any other state or territory;
- Mitigating the further spread of COVID-19 by temporarily suspending the eviction of covered persons from residential property for nonpayment of rent; and
- Supporting response efforts to COVID-19 at the federal, state, local, territorial, and tribal levels.

BACKGROUND

*COVID-19 IN THE UNITED STATES*

Since January 2020, the respiratory disease known as "COVID-19," caused by a novel coronavirus (SARS-COV-2), has spread globally, including cases reported in all fifty states within the United States, plus the District of Columbia and U.S. territories. As of August 3, 2021, there have been almost 200 million cases of COVID-19 globally, resulting in over 4,240,000 deaths.[12] Almost 35,000,000 cases have been identified in the United States, with new cases reported daily, and almost 610,000 deaths have been attributed to the disease.[13] A renewed surge in cases in the United States began in early July 2021; case counts rose from 19,000 cases on July 1, 2021 to 103,000 cases on July 30, 2021. Forecasted case counts predict that cases will continue to rise over the next four weeks.[14]

The virus that causes COVID-19 spreads very easily and sustainably between people, particularly those who are in close contact with one another (within about 6 feet, but occasionally over longer distances), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. Individuals without symptoms can also spread the virus.[15] Among adults, the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. Severe illness means that persons with COVID-19 may require hospitalization, intensive care, or a ventilator to help them breathe, and may be fatal. People of any age with certain

---

[12]*COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last updated August 3, 2021).

[13] *COVID Data Tracker*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated August 1, 2021).

[14] United States Forecasting, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#forecasting_weeklycases (updated July 28, 2021) (citing data an estimated 608,569 weekly COVID-19 cases by early September 2021).

[15] Kimball A, Hatfield KM, Arons M, et al. Asymptomatic and Presymptomatic SARS-CoV-2 Infections in Residents of a Long-Term Care Skilled Nursing Facility — King County, Washington, March 2020. MMWR Morb Mortal Wkly Rep 2020;69:377–381. DOI: http://dx.doi.org/10.15585/mmwr.mm6913e1

EXHIBIT 6, PAGE 13

underlying medical conditions (e.g., cancer, obesity, serious heart conditions, or diabetes) are at increased risk for severe illness from COVID-19.[16]

New variants of SARS-CoV-2 have emerged globally,[17] several of which have been identified as variants of concern,[18] including the Alpha, Beta, Gamma, and Delta variants. These variants of concern have evidence of an increase in transmissibility, which may lead to higher incidence.[19]

Currently, the Delta variant is the predominant SARS-CoV-2 strain circulating in the United States, estimated to account for over 82% of cases as of July 17, 2021.[20] The Delta variant has demonstrated increased levels of transmissibility compared to other variants.[21] Furthermore, early evidence suggests that people who are vaccinated and become infected with the Delta variant may transmit the virus to others.[22]

Transmission of the Delta variant has led to accelerated community transmission in the United States. CDC recommends assessing the level of community transmission using, at a minimum, two metrics: new COVID-19 cases per 100,000 persons in the last 7 days and percentage of positive SARS-CoV-2 diagnostic nucleic acid amplification tests in the last 7 days. For each of these metrics, CDC classifies transmission values as low, moderate, substantial, or high. As of August 1, 2021, over 80% of the U.S. counties were classified as experiencing substantial or high levels of community transmission.[23] In areas of substantial or high transmission, CDC recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies to prevent further spread.

COVID-19 vaccines are now widely available in the United States, and vaccination is recommended for all people 12 years of age and older. Three COVID-19 vaccines are currently authorized by the U.S. Food and Drug Administration (FDA) for emergency use: two mRNA vaccines and one viral vector vaccine, each of which has been determined to be safe and effective against COVID-19. As of July 28, 2021, over 163 million people in the United States

---

[16] Razzaghi H, Wang Y, Lu H, et al. Estimated County-Level Prevalence of Selected Underlying Medical Conditions Associated with Increased Risk for Severe COVID-19 Illness — United States, 2018. MMWR Morb Mortal Wkly Rep 2020;69:945–950. DOI: http://dx.doi.org/10.15585/mmwr.mm6929a1.

[17] Abdool Karim SS, de Oliveira T. New SARS-CoV-2 Variants - Clinical, Public Health, and Vaccine Implications [published online ahead of print, 2021 Mar 24]. *N Engl J Med*. 2021;10.1056/NEJMc2100362. doi:10.1056/NEJMc2100362

[18] *Id.*

[19] Dougherty K, Mannell M, Naqvi O, Matson D, Stone J. SARS-CoV-2 B.1.617.2 (Delta) Variant COVID-19 Outbreak Associated with a Gymnastics Facility — Oklahoma, April–May 2021. MMWR Morb Mortal Wkly Rep 2021;70:1004–1007. DOI: http://dx.doi.org/10.15585/mmwr.mm7028e2 (describing a B.1.617.2 (Delta) Variant COVID-19 outbreak associated with a gymnastics facility and finding that the Delta variant is highly transmissible in indoor sports settings and households, which may lead to increased incidence rates).

[20] *Variant Proportions*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (citing data for the two-week interval ending July 17, 2021).

[21] *About Variants of the Virus that Causes COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html (last updated June 28, 2021).

[22] Riemersma et al. Vaccinated and unvaccinated individuals have similar viral loads in communities with a high prevalence of the SARS-CoV-2 Delta variant. Pre-print. Available at https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v1.

[23] *COVID-19 Integrated County View*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view (last updated July 28, 2021).

EXHIBIT 6, PAGE 14

(57.6% of the population 12 years or older) have been fully vaccinated and over 189 million people in the United States (66.8% of the population 12 years or older) have received at least one dose.[24] Changes in vaccine uptake and the extreme transmissibility of the Delta variant have resulted in rising numbers of COVID-19 cases, primarily and disproportionately affecting the unvaccinated population.

The COVID-19 vaccination effort has a slower rate of penetration among the populations most likely to experience eviction.[25,26] In combination with the continued underlying COVID-19 spread, and the overlapping factors described above, this creates considerable risk for rapid transmission of COVID-19 in high-risk settings.

In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease. Eviction moratoria facilitate self-isolation and self-quarantine by people who become ill or who are at risk of transmitting COVID-19.

Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116-136) to aid individuals and businesses adversely affected by COVID-19 in March 2020. Section 4024 of the CARES Act provided a 120-day moratorium on eviction filings as well as other protections for tenants in certain rental properties with federal assistance or federally related mortgage financing. These protections helped alleviate the public health consequences of tenant displacement during the COVID-19 pandemic. The CARES Act eviction moratorium expired on July 24, 2020. The protections in the CARES Act supplemented temporary eviction moratoria and rent freezes implemented by governors and other local officials using emergency powers.

Researchers estimated that this temporary federal moratorium provided relief to over one-quarter a material portion of the nation's roughly 43 million renters.[27] The CARES act also provided funding streams for emergency rental assistance; surveys estimate that this assistance became available to the public through rental assistance programs by July 2020.[28]

The Federal moratorium provided by the CARES Act, however, did not reach all renters. Many renters who fell outside the scope of the Federal moratorium were instead protected under state and local moratoria. In early March 2021, the Census Household Pulse Survey estimated that 6.4

---

[24] *COVID-19 Vaccinations in the United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last updated July 28, 2021).
[25] Barry V, Dasgupta S, Weller DL, et al. Patterns in COVID-19 Vaccination Coverage, by Social Vulnerability and Urbanicity — United States, December 14, 2020–May 1, 2021. MMWR Morb Mortal Wkly Rep 2021;70:818–824. DOI: http://dx.doi.org/10.15585/mmwr.mm7022e1.
[26] Centers for Disease Control and Prevention. COVID-19 Vaccination Equity. Accessed 8/3/21. Available at: https://covid.cdc.gov/covid-data-tracker/#vaccination-equity
[27] Laurie Goodman, Karan Kaul, and Michael Neal. *The CARES Act Eviction Moratorium Covers All Federally Financed Rentals—That's One in Four US Rental Units*. The Urban Institute. April 2, 2020. https://www.urban.org/urban-wire/cares-act-eviction-moratorium-covers-all-federally-financed-rentals-thats-one-four-us-rental-units
[28] Vincent Reina et al, *COVID-19 Emergency Rental Assistance: Analysis of a National Survey of Programs*, Research Brief, https://nlihc.org/sites/default/files/HIP_NLIHC_Furman_Brief_FINAL.pdf (last visited Mar. 26, 2021).

EXHIBIT 6, PAGE 15

million households were behind on rent and just under half fear imminent eviction.[29] In 2016, research showed that there were 3.6 million eviction filings and 1.5 million eviction judgments over the span of a whole year,[30] meaning that the pandemic would cause a wave of evictions on a scale that would be unprecedented in modern times. A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus becoming at higher risk of COVID-19.

On September 4, 2020, the CDC Director issued an Order temporarily halting evictions in the United States for the reasons described therein. That Order was set to expire on December 31, 2020, subject to further extension, modification, or rescission. Section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 extended the Order until January 31, 2021, and approved the Order as an exercise of the CDC's authority under Section 361 of the Public Health Service Act (42 U.S.C. 264). With the extension of the Order, Congress also provided $25 billion for emergency rental assistance for the payment of rent and rental arrears. Congress later provided an additional $21.55 billion in emergency rental assistance when it passed the American Rescue Plan Act of 2021. The Order was extended multiple times due to the changing public health landscape and expired on July 31, 2021 after what was intended to be the final extension.[31] Absent an unexpected change in the trajectory of the pandemic, CDC did not plan to extend the Order further.

Following the recent surge in cases brought forth by the highly transmissible Delta variant, the CDC Director now issues a new Order temporarily halting evictions for persons in counties experiencing substantial or high rates of transmission, for the reasons described herein. This Order will expire on October 3, 2021, but is subject to further extension, modification, or rescission based on public health circumstances.

Researchers estimate that, in 2020, Federal, state, and local eviction moratoria led to over 1.5 million fewer evictions filings than the previous year.[32] Additional research shows that, despite the CDC eviction moratorium leading to an estimated 50% decrease in eviction filings compared to the historical average,[33] there have still been over 450,000 eviction filings during the pandemic just within approximately 31 cities and six states with more readily available data. This data covers approximately 1 in 4 renter households in the country, suggesting high demand and likelihood of mass evictions nationwide.[34]

*EVICTION, CROWDING, AND INTERSTATE TRANSMISSION OF COVID-19*

---

[29] *Census Household Pulse Survey: Key Phase 3 Housing Payment Findings.* Office of Policy Development and Research, HUDUser (April 26, 2021). https://www.huduser.gov/portal/pdredge/pdr-edge-trending-042621.html
[30] Ashley Gromis. *Eviction: Intersection of Poverty, Inequality, and Housing.* Eviction Lab, Princeton University (May 2019). https://www.un.org/development/desa/dspd/wp-content/uploads/sites/22/2019/05/GROMIS_Ashley_Paper.pdf
[31] The CDC Director renewed the Order until March 31, 2021. On March 28, 2021, the CDC Director modified and extended the Order until June 30, 2021. On June 24, 2021 the CDC Director extended the Order until July 31, 2021.
[32] Hepburn P, Louis R, Fish J, et al. U.S. Eviction Filing Patterns in 2020. Socius. January 2021. doi:10.1177/23780231211009983.
[33] Peter Hepburn and Renee Louis. *Preliminary Analysis: Six Months of the CDC Eviction Moratorium* (March 8, 2021). https://evictionlab.org/six-months-cdc/
[34] Eviction Lab. Accessed 8/2/21. Available at: https://evictionlab.org/eviction-tracking/

EXHIBIT 6, PAGE 16

By February 10, 2021, the U.S. Department of the Treasury had paid all of the $25 billion made available by the Consolidated Appropriations Act, 2021 to states, territories, localities and tribes for the purpose of providing emergency rental assistance to eligible households in their jurisdictions. Additionally, as directed in the Act, Treasury has also made available 40 percent– more than $8.6 billion—of the additional funding to states, territories and localities for emergency rental assistance provided in the American Rescue Plan Act of 2021. While some emergency rental assistance programs were slow to open, every State program had opened by early June. Based on data collected from grantees, Treasury reports that over 85,000 renter households received rental and utility assistance to support their housing stability by the end of March and this number increased to more than 100,000 in April, more than 156,000 in May and over 290,000 in June. Though emergency rental assistance has clearly started to reach increasing numbers of families over recent months, state and local agencies have hundreds of thousands of applications for assistance that currently remain outstanding as programs accelerate their activity. The level of assistance continued to increase in June, with nearly 300,000 households served. Based on analysis of grantee reporting, Treasury believes that the monthly deployment of rental assistance by state and local emergency rental assistance programs will continue to increase from the significant deployment in June. In addition to Emergency Rental Assistance, there are coordinated efforts across Federal agencies to – in partnership with states and localities –promote eviction prevention strategies.

Recent data from the U.S. Census Household Pulse Survey demonstrates that just under half of households behind on rent believe that an eviction is likely in the next two months.[35] A surge in evictions could lead to the immediate and significant movement of large numbers of persons from lower density to higher density housing at a time in the United States when the highly transmissible Delta variant is driving COVID-19 cases at an unprecedented rate.

Evicted renters must move, which leads to multiple outcomes that increase the risk of COVID-19 spread. Specifically, many evicted renters move into close quarters in shared housing or other congregate settings. These moves may require crossing state borders. According to the 2017 Census Bureau American Housing Survey, 32% of renters reported that they would move in with friends or family members upon eviction, which would introduce new household members and potentially increase household crowding. Studies show that COVID-19 transmission occurs readily within households. The secondary attack rate in households has been estimated to be 17%, and household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts.[36] A study of pregnant women in New York City showed that women in large households (greater number of residents per household) were three times as likely to test positive for SARS-CoV-2 than those in smaller households, and those in neighborhoods with greater household crowding (>1 resident per room) were twice as likely to

---

[35] Household Pulse Survey Interactive Tool. U.S. Census Bureau. https://www.census.gov/data-tools/demo/hhp/#/ (last visited June 23, 2021).
[36] Qin-Long Jing, et al. Household secondary attack rate of COVID-19 and associated determinants in Guangzhou, China: a retrospective cohort study. The Lancet.2020 June 17; vol. 20.10; doi: https://doi.org/10.1016/S1473-3099(20)30471-0.

EXHIBIT 6, PAGE 17

test positive.[37] Throughout the United States, counties with the highest proportion of crowded households have experienced COVID-19 mortality rates 2.6 times those of counties with the lowest proportion of crowded households.

Shared housing is not limited to friends and family. It includes a broad range of settings, including transitional housing and domestic violence and abuse shelters. Special considerations exist for such housing because of the challenges of maintaining social distance. Residents often gather closely or use shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators. Residents may have unique needs, such as disabilities, chronic health conditions, cognitive decline, or limited access to technology, and thus may find it more difficult to take actions to protect themselves from COVID-19. CDC recommends that shelters provide new residents with a clean mask, keep them isolated from others, screen for symptoms at entry, or arrange for medical evaluations as needed depending on symptoms. Accordingly, an influx of new residents at facilities that offer support services could potentially overwhelm staff and, if recommendations are not followed, lead to exposures.

Modeling studies and observational data from the pre-vaccine phase of the COVID-19 pandemic comparing incidence between states that implemented and lifted eviction moratoria indicate that evictions substantially contribute to COVID-19 transmission. In mathematical models where eviction led exclusively to sharing housing with friends or family, lifting eviction moratoria led to a 30% increased risk of contracting COVID-19 among people who were evicted and those with whom they shared housing after eviction.[38] Compared to a scenario where no evictions occurred, the models also predicted a 4%-40% increased risk of infection, even for those who did not share housing, as a result of increased overall transmission. The authors estimated that anywhere from 1,000 to 100,000 excess cases per million population could be attributable to evictions depending on the eviction and infection rates.

An analysis of observational data from state-based eviction moratoria in 43 states and the District of Columbia showed significant increases in COVID-19 incidence and mortality approximately 2-3 months after eviction moratoria were lifted.[39] Specifically, the authors compared the COVID-19 incidence and mortality rates in states that lifted their moratoria with the rates in states that maintained their moratoria. In these models, the authors accounted for time-varying indicators of each state's test count as well as major public-health interventions including lifting stay-at-home orders, school closures, and mask mandates. After adjusting for these other changes, they found that the incidence of COVID-19 in states that lifted their moratoria was 1.6 times that of states that did not at 10 weeks post-lifting (95% CI 1.0, 2.3), a ratio that grew to 2.1 at ≥16 weeks (CI 1.1, 3.9). Similarly, they found that mortality in states that lifted their moratoria

---

[37] Ukachi N. Emeruwa, et al. Associations Between Built Environment, Neighborhood Socioeconomic Status, and SARS-CoV-2 Infection Among Pregnant Women in New York City. JAMA. 2020;324(4):390-392. doi:10.1001/jama.2020.11370.

[38] Nande A, Sheen J, Walters EL, Klein B, Chinazzi M, Gheorghe AH, Adlam B, Shinnick J, Tejeda MF, Scarpino SV, Vespignani A, Greenlee AJ, Schneider D, Levy MZ, Hill AL. The effect of eviction moratoria on the transmission of SARS-CoV-2. Nat Commun. 2021 Apr 15;12(1):2274. doi: 10.1038/s41467-021-22521-5. PMID: 33859196; PMCID: PMC8050248.

[39] Leifheit KM, Linton SL, Raifman J, Schwartz GL, Benfer EA, Zimmerman FJ, Pollack CE. Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality. Am J Epidemiol. 2021 Jul 26:kwab196. doi: 10.1093/aje/kwab196. Epub ahead of print. PMID: 34309643.

9

EXHIBIT 6, PAGE 18

was 1.6 times that of states that did not at 7 weeks post-lifting (CI 1.2, 2.3), a ratio that grew to 5.4 at ≥16 weeks (CI 3.1, 9.3). The authors estimated that, nationally, over 433,000 cases of COVID-19 and over 10,000 deaths could be attributed to lifting state moratoria.[40]

Although data are limited, available evidence suggests evictions lead to interstate spread of COVID-19 in two ways. First, an eviction may lead the evicted members of a household to move across state lines. Of the 35 million people in America who move each year, 15% move to a new state. Second, even if a particular eviction, standing alone, would not always result in interstate displacement, the mass evictions that would occur in the absence of this Order would inevitably increase the interstate spread of COVID-19. This Order cannot effectively mitigate interstate transmission of COVID-19 without covering intrastate evictions (evictions occurring within the boundaries of a state or territory), as the level of spread of SARS-CoV-2 resulting from these evictions can lead to SARS-CoV-2 transmission across state borders.

Moreover, intrastate spread facilitates interstate spread in the context of communicable disease spread, given the nature of infectious disease. In the aggregate, the mass-scale evictions that will likely occur in the absence of this Order in areas of substantial or high transmission will inevitably increase interstate spread of COVID-19.

### EVICTION, HOMELESSNESS, AND COVID-19 TRANSMISSION

Evicted individuals without access to support or other assistance options may become homeless, including older adults or those with underlying medical conditions, who are more at risk for severe illness from COVID-19 than the general population. In Seattle-King County, 5-15% of people experiencing homelessness between 2018 and 2020 cited eviction as the primary reason for becoming homeless.[41] Additionally, some individuals and families who are evicted may originally stay with family or friends, but subsequently seek homeless services. Data collection by an emergency shelter in Columbus, Ohio, showed that 35.4% of families and 11.4% of single adults reported an eviction as the primary or secondary reason for their seeking shelter.[42]

Extensive outbreaks of COVID-19 have been identified in homeless shelters. In Seattle, Washington, a network of three related homeless shelters experienced an outbreak that led to 43 cases among residents and staff members. In Boston, Massachusetts, universal COVID-19 testing at a single shelter revealed 147 cases, representing 36% of shelter residents. COVID-19 testing in a single shelter in San Francisco led to the identification of 101 cases (67% of those tested). Data from 634 universal diagnostic testing events at homeless shelters in 21 states show an average of 6% positivity among shelter clients. Data comparing the incidence or severity of COVID-19 among people experiencing homelessness directly to the general population are

---

[40] Leifheit, Kathryn M. and Linton, Sabriya L. and Raifman, Julia and Schwartz, Gabriel and Benfer, Emily and Zimmerman, Frederick J and Pollack, Craig, Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (November 30, 2020). Available at SSRN:
https://ssrn.com/abstract=3739576 or http://dx.doi.org/10.2139/ssrn.3739576.
[41] *Count Us In 2020.* KCRHA (July 2020). https://kcrha.org/wp-content/uploads/2020/07/Count-Us_In-2020-Final_7.29.2020.pdf
[42] Chester Hartman and David Robinson. "Evictions: The Hidden Housing Problem" in *Housing Policy Debate.* 2003.

EXHIBIT 6, PAGE 19

limited. However, during the 15-day period of the outbreak in Boston, MA, researchers estimated a cumulative incidence of 46.3 cases of COVID-19 per 1000 persons experiencing homelessness, as compared to 1.9 cases per 1000 among Massachusetts adults (pre-print).

Among other things, CDC guidance recommends increasing physical distance between beds in homeless shelters, which is likely to decrease capacity, while community transmission of COVID-19 is occurring. To adhere to this guidance, shelters have limited the number of people served throughout the United States. In many places, considerably fewer beds are available to individuals who become homeless. Shelters that do not adhere to the guidance, and operate at ordinary or increased occupancy, are at greater risk for the types of outbreaks described above.

*APPLICATION OF COVID-19 PREVENTION STRATEGIES BASED ON COMMUNITY TRANSMISSION*

CDC recommends strengthening or adding effective COVID-19 mitigation strategies in communities with considerable transmission risk. As discussed above, CDC guidance specifies that everyone, regardless of vaccination status, should wear masks in indoor and public settings in communities experiencing substantial or high rates of community transmission. Similarly, CDC guidance for homeless shelters recommends maintaining layered COVID-19 precautions as long as community transmission is occurring and provides options for scaling back precautions when community transmission is low.[43]

Eviction moratoria represent a COVID-19 transmission prevention measure that can similarly be applied when the epidemiological context is appropriate, for example in communities with substantial or high transmission of COVID-19.[44] Prevention strategies like these should only be relaxed or lifted after two weeks of continuous sustained improvement in the level of community transmission. In areas with low or no SARS-CoV-2 transmission and with testing capacity in place to detect early introduction or increases in spread of the virus, layered prevention strategies might be removed one at a time while monitoring closely for any evidence that COVID-19 cases are increasing. Decisions to add or remove prevention strategies should be based on local data and public health recommendations. The emergence of more transmissible SARS-CoV-2 variants, including Delta, increases the urgency for public health agencies and other organizations to collaboratively monitor the status of the pandemic in their communities and continue to apply layered prevention strategies.

*PERSONS AT HIGHER RISK OF EVICTION MAY ALSO BE AT HIGHER RISK OF BEING UNVACCINATED*

Communities with high rates of eviction have been shown to have lower coverage of COVID-19 vaccination – a focus for current vaccination campaigns. A study in the spring of 2021 showed that counties with high social vulnerability (i.e., social and structural factors associated with

---

[43] Centers for Disease Control and Prevention. Interim Guidance for Homeless Service Providers to Plan and Respond to Coronavirus Disease 2019 (COVID-19). Available at: https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html
[44] Of course, eviction moratoria are only effective to the degree that consumers know about them and to the degree they are complied with by landlords, owners of residential property, others who have a right to evict, or their agents.

EXHIBIT 6, PAGE 20

adverse health outcome inclusive of socioeconomic indicators related to risk of eviction) had lower levels of COVID-19 vaccination.[45]

CDC EVICTION MORATORIUM

The Department of the Treasury has made funding available to states, territories, localities, and Tribal governments, which continue to distribute emergency rental assistance funds that may help mitigate spikes in COVID-19 transmission due to increases in evictions. Alongside other federal and state efforts to prevent evictions, these funds are expected to make a meaningful difference for hundreds of thousands of people who are expected to receive the rental assistance.[46]

On September 4, 2020, the CDC Director issued an Order temporarily halting evictions in the United States for the reasons described therein. That Order was set to expire on December 31, 2020, subject to further extension, modification, or rescission. Section 502 of Title V, Division N of the Consolidated Appropriations Act, 2021 extended the Order until January 31, 2021. With the extension of the Order, Congress also provided $25 billion for emergency rental assistance for the payment of rent and rental arrears. Congress later provided an additional $21.55 billion in emergency rental assistance when it passed the American Rescue Plan.

On January 29, 2021, following an assessment of the ongoing pandemic, the CDC Director renewed the Order until March 31, 2021. On March 28, the CDC Director renewed the Order until June 30, 2021. On June 24, the CDC Director renewed the Order until July 31, 2021 (July Order). The CDC Director indicated that the July Order would be the final extension of the nationwide eviction moratorium absent an unexpected change in the trajectory of the pandemic. Unfortunately, the rise of the Delta variant and corresponding rise in cases in numerous counties in the United States have altered the trajectory of the pandemic. As a result, CDC is issuing this narrower, more targeted Order to temporarily halt evictions in the hardest hit areas. Without this Order, evictions in these areas would likely exacerbate the increase in cases. To the extent any provision of this Order conflicts with prior Orders, this Order is controlling.

APPLICABILITY

This Order applies in U.S. counties[47] experiencing substantial[48] and high[49] levels of community transmission levels of SARS-CoV-2 as defined by CDC, as of August 3, 2021. If a U.S. county that is not covered by this Order as of August 3, 2021 later experiences substantial or high levels of community transmission while this Order is in effect, then that county will become subject to

---

[45] Barry V, Dasgupta S, Weller DL, Kriss JL, Cadwell BL, Rose C, Pingali C, Musial T, Sharpe JD, Flores SA, Greenlund KJ, Patel A, Stewart A, Qualters JR, Harris L, Barbour KE, Black CL. Patterns in COVID-19 Vaccination Coverage, by Social Vulnerability and Urbanicity - United States, December 14, 2020-May 1, 2021. MMWR Morb Mortal Wkly Rep. 2021 Jun 4;70(22):818-824. doi: 10.15585/mmwr.mm7022e1. PMID: 34081685; PMCID: PMC8174677.
[46] *Treasury Emergency Rental Assistance Programs in 2021: Analysis of a National Survey*. National Low Income Housing Coalition. June 2021. https://nlihc.org/sites/default/files/HIP_NLIHC_Furman_2021_6-22_FINAL_v2.pdf
[47] As used in this Order, the term "county" refers to both counties in the United States and U.S. territories.
[48] *Supra* note 7.
[49] *Supra*. note 8.

EXHIBIT 6, PAGE 21

this Order as of the date the county begins experiencing substantial or high levels of community transmission. If a U.S. county that is covered by this Order no longer experiences substantial or high levels of community transmission for 14 consecutive days, then this Order will no longer apply in that county, unless and until the county again experiences substantial or high levels of community transmission while this Order is in effect.

This Order does not apply in any state, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in this Order or to the extent its application is prohibited by Federal court order. In accordance with 42 U.S.C. 264(e), this Order does not preclude state, local, territorial, and tribal authorities from imposing additional requirements that provide greater public-health protection and are more restrictive than the requirements in this Order.

This Order is a temporary eviction moratorium to prevent the further spread of COVID-19. This Order does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract. Nothing in this Order precludes the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

Nothing in this Order precludes evictions based on a tenant, lessee, or resident: (1) Engaging in criminal activity while on the premises; (2) threatening the health or safety of other residents;[50] (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance, or similar regulation relating to health and safety; or (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).

Any evictions for nonpayment of rent initiated prior to issuance of this Order but not yet completed, are subject to this Order. Any tenant, lessee, or resident of a residential property who previously submitted a Declaration, still qualifies as a "Covered Person" and is still present in a rental unit is entitled to protections under this Order. Any eviction that was completed before issuance of this Order including from August 1 through August 3, 2021 is not subject to this Order, as it does not operate retroactively.

Under this Order, covered persons may be evicted for engaging in criminal activity while on the premises. But covered persons may not be evicted on the sole basis that they are alleged to have committed the crime of trespass (or similar state-law offense) where the underlying activity is a covered person remaining in a residential property for nonpayment of rent. Permitting such evictions would result in substantially more evictions overall, thus increasing the risk of disease transmission as otherwise covered persons move into congregate settings or experience homelessness. This result would be contrary to the stated objectives of this Order, and therefore

---

[50] Individuals who might have COVID-19 are advised to stay home except to get medical care. Accordingly, individuals who might have COVID-19 and take reasonable precautions to not spread the disease should not be evicted on the ground that they may pose a health or safety threat to other residents. See *What to Do if You are Sick,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (last updated Mar. 17, 2021).

would diminish their effectiveness. Moreover, to the extent such criminal trespass laws are invoked to establish criminal activity solely based on a tenant, lessee, or resident of a residential property remaining in a residential property despite the nonpayment of rent, such invocation conflicts with this Order and is preempted pursuant to 42 U.S.C. 264(e).

Individuals who are confirmed to have, who have been exposed to, or who might have COVID-19 and take reasonable precautions to not spread the disease may not be evicted on grounds that they may pose a health or safety threat to other residents.

This Order is in effect through October 3, 2021, based on the current and projected epidemiological context of SARS-CoV-2 transmission throughout the United States. This timeframe will allow the assessment of natural changes to COVID-19 incidence, the influences of new variants, additional distribution of emergency rental assistance funds, and the expansion of COVID-19 vaccine uptake.

DECLARATION FORMS

To qualify for the protections of this Order, a tenant, lessee, or resident of a residential property must provide a completed and signed copy of a declaration with the elements listed in the definition of "Covered person" to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed from where they live. To assist tenants and landlords, the CDC created a standardized declaration form that can be downloaded here: https://www.cdc.gov/coronavirus/2019-ncov/downloads/declaration-form.pdf.

Tenants, lessees, and residents of residential property are not obligated to use the CDC form. Any written document that an eligible tenant, lessee, or resident of residential property presents to their landlord will comply with this Order, as long as it contains the required elements of "Covered person" as described in this Order. In addition, tenants, lessees, and residents of residential property are allowed to declare in writing that they meet the elements of "Covered person" in other languages.

All declarations, regardless of form used, must be signed, and must include a statement that the tenant, lessee, or resident of a residential property understands that they could be liable for perjury for any false or misleading statements or omissions in the declaration. This Order does not preclude a landlord challenging the truthfulness of a tenant's, lessee's, or resident's declaration in court, as permitted under state or local law.

In certain circumstances, such as individuals filing a joint tax return, it may be appropriate for one member of the residence to provide an executed declaration on behalf of the other adult residents party to the lease, rental agreement, or housing contract. The declaration may be signed and transmitted either electronically or by hard copy.

As long as the information in a previously signed declaration submitted under a previous order remains truthful and accurate, covered persons do not need to submit a new declaration under this Order. However, eligibility for protection will be based on the terms of this Order.

## FINDINGS AND ACTION

### *DETERMINATION*

For the reasons described herein, I have determined based on the information below that issuing a temporary halt in evictions in counties experiencing substantial or high levels of COVID-19 transmission constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID-19 throughout the United States. I have further determined that measures by states, localities, or territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19.

State and local jurisdictions continue to distribute emergency rental assistance funds, provided by the Department of Treasury, that will help avert a spate of evictions and thus mitigate corresponding spikes in COVID-19 transmission. Trends have dramatically worsened since June 2021 and transmission is rapidly accelerating in the United States.[51]

Congress has appropriated approximately $46 billion—of which almost three-quarters is currently available to state and local grantees—to help pay rent and rental arrears for tenants who may otherwise be at high risk of eviction. According to estimates based on the U.S. Census Household Pulse Survey, approximately 6.9 million renter households were behind on their rent in late June. At that time, about 4.6 million renter households were concerned that they could not pay next month's rent. The successful delivery of those funds by states and localities should greatly reduce the incidence of eviction that would occur in the absence of that support. However, many states and localities are still ramping up the collection and processing of applications and the delivery of assistance and putting in place other eviction prevention strategies. It was only in the beginning of June that all state-run emergency rental assistance programs had opened for applications. If the moratorium is not in place, a wave of evictions, on the order of hundreds of thousands, could occur in late summer and early fall, exacerbating the spread of COVID-19 among the significant percentage of the population that remains unvaccinated. In appropriating these emergency rental assistance funds, Congress intended that the funding would work in concert with the eviction moratorium, providing time for rental assistance to reach eligible tenants and landlords to sustainably reduce the threat of an eviction wave after an eviction moratorium was no longer in effect. While the pace of assistance is continuing to increase, without additional time for states and localities to deliver this needed relief and engage in other efforts to prevent evictions, a surge of evictions would occur upon the conclusion of the national moratorium. A surge in evictions would lead to immediate movement, crowding, and increased stress on the homeless service system. In combination with surging COVID-19 rates across the country, and the overlapping factors described above, this would create considerable risk for the rapid transmission of COVID-19 in high-risk settings.

Based on the convergence of these issues, I have determined that issuing a new Order temporarily halting evictions is appropriate.

---

[51] COVID Data Tracker, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (last updated June 22, 2021).

EXHIBIT 6, PAGE 24

Accordingly, a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any county or U.S. territory while COVID-19 transmission is substantial or high and the relevant state, county, locality, or territory has provided a level of public-health protections below the requirements listed in this Order.

This Order is not a rule within the meaning of the Administrative Procedure Act (APA) but rather an emergency action taken under the existing authority of 42 CFR 70.2. The purpose of section 70.2, which was promulgated through notice-and-comment rulemaking, is to enable CDC to take swift steps to prevent contagion without having to seek a second round of public comments and without a delay in effective date.[52]

*GOOD CAUSE*

In the event this Order qualifies as a rule under the APA, there is good cause to dispense with prior public notice and comment and a delay in effective date. See 5 U.S.C. 553(b)(B), (d)(3). Good cause exists, in sum, because the public health emergency caused by the COVID-19 pandemic and the unpredictability of the trajectory of the pandemic make it impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of this Order.

I have determined that good cause exists because the public health emergency caused by COVID-19 makes it impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of the Order. A delay in the effective date of the Order would permit the occurrence of evictions—potentially on a mass scale—that would have potentially significant public health consequences. I conclude that the delay in the effective date of the Order would defeat the purpose of the Order and endanger the public health and, therefore, determine that immediate action is necessary.

The rapidly changing nature of the pandemic requires not only that CDC act swiftly, but also deftly to ensure that its actions are commensurate with the threat. This necessarily involves assessing evolving conditions that inform CDC's determinations. Despite promising trends in the spring of 2021, the surge of cases spurred by the Delta variant has confirmed that the fundamental public health threat—of the risk of large numbers of residential evictions contributing to the spread of COVID-19 throughout the United States—continues to exist. Without this Order, there is every reason to expect that evictions will increase dramatically at a time when COVID-19 infections in the United States are increasing sharply. It is imperative that public health authorities act quickly to mitigate such an increase of evictions, which could increase the likelihood of new spikes in SARS-CoV-2 transmission. Such mass evictions and the attendant public health consequences would be very difficult to reverse.

For all of these reasons, I hereby conclude that immediate action is again necessary and that notice-and-comment rulemaking and a delay in effective date would be impracticable and contrary to the public interest.

---

[52] *Chambless Enters., LLC v. Redfield,* No. 20-1455, 2020 WL 7588849 (W.D. La. 2020).

EXHIBIT 6, PAGE 25

*MISCELLANEOUS*

Similarly, if this Order qualifies as a rule under the APA, the Office of Information and Regulatory Affairs (OIRA) has determined that it would be an economically significant regulatory action pursuant to Executive Order 12866 and a major rule under Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (the Congressional Review Act or CRA), 5 U.S.C. 804(2). Thus, this action has been reviewed by OIRA. CDC has determined that for the same reasons given above, there would be good cause under the CRA to make the requirements herein effective immediately. 5 U.S.C. 808(2).

If any provision of this Order, or the application of any provision to any persons, entities, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any persons, entities, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

This Order shall be enforced by federal authorities and cooperating state and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18. However, this Order has no effect on the contractual obligations of renters to pay rent and shall not preclude charging or collecting fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

CRIMINAL PENALTIES

Under 18 U.S.C. 3559, 3571; 42 U.S.C. 271; and 42 CFR 70.18, a person violating this Order may be subject to a fine of no more than $100,000 or one year in jail, or both, if the violation does not result in a death, or a fine of no more than $250,000 or one year in jail, or both if the violation results in a death, or as otherwise provided by law. An organization violating this Order may be subject to a fine of no more than $200,000 per event if the violation does not result in a death or $500,000 per event if the violation results in a death or as otherwise provided by law. The U.S. Department of Justice may initiate criminal proceedings as appropriate seeking imposition of these criminal penalties.

NOTICE TO COOPERATING STATE AND LOCAL OFFICIALS

Under 42 U.S.C. 243, the U.S. Department of Health and Human Services is authorized to cooperate with and aid state and local authorities in the enforcement of their quarantine and other health regulations and to accept state and local assistance in the enforcement of Federal quarantine rules and regulations, including in the enforcement of this Order.

NOTICE OF AVAILABLE FEDERAL RESOURCES

While this Order to prevent eviction is effectuated to protect the public health, the states and units of local government are reminded that the Federal Government has deployed unprecedented resources to address the pandemic, including housing assistance.

EXHIBIT 6, PAGE 26

The Department of Housing and Urban Development (HUD), the Department of Agriculture, and the Department of the Treasury have informed CDC that unprecedented emergency resources have been appropriated through various Federal agencies that assist renters and landlords during the pandemic, including $46.55 billion to the Treasury through the Consolidated Appropriations Act of 2021 and the American Rescue Plan (ARP). Furthermore, in 2020 44 states and 310 local jurisdictions allocated about $3.9 billion toward emergency rental assistance, largely from funds appropriated to HUD from the Coronavirus Aid, Relief, and Economic Security (CARES).[53] These three rounds of federal appropriations also provided substantial resources for homeless services, homeowner assistance, and supplemental stimulus and unemployment benefits that low-income renters used to pay rent.

Visit https://covid.cdc.gov/covid-data-tracker/#county-view for an integrated, county view of levels of community transmission for monitoring the COVID-19 pandemic in the United States. Visit https://home.treasury.gov/policy-issues/cares/state-and-local-governments for more information about the Coronavirus Relief Fund and https://home.treasury.gov/policy-issues/cares/emergency-rental-assistance-program for more information about the Emergency Rental Assistance Program. Visit www.consumerfinance.gov/renthelp to access the Rental Assistance Finder that connects renters and landlords with the state and local programs that are distributing billions of dollars in federal assistance. Relevant agencies have informed CDC that forbearance policies for mortgages backed by the federal government provide many landlords, especially smaller landlords, with temporary relief as new emergency rental assistance programs are deployed.

Treasury, HUD, and USDA grantees and program participants play a critical role in prioritizing efforts to support this goal. All communities should assess what resources have already been allocated to prevent evictions and homelessness through temporary rental assistance and homelessness prevention, particularly to the most vulnerable households.

Treasury, HUD, and USDA stand at the ready to support American communities in taking these steps to reduce the spread of COVID-19 and maintain economic prosperity.

For program support, including technical assistance, please visit www.hudexchange.info/program-support. For further information on HUD resources, tools, and guidance available to respond to the COVID-19 pandemic, state and local officials are directed to visit https://www.hud.gov/coronavirus. These tools include toolkits for Public Housing Authorities and Housing Choice Voucher landlords related to housing stability and eviction prevention, as well as similar guidance for owners and renters in HUD-assisted multifamily properties. Furthermore, tenants can visit consumerfinance.gov/housing for up-to-date information on rent relief options, protections, and key deadlines.

---

[53] Vincent Reina et al, *COVID-19 Emergency Rental Assistance: Analysis of a National Survey of Programs*, Research Brief, https://nlihc.org/sites/default/files/HIP_NLIHC_Furman_Brief_FINAL.pdf (last visited Mar. 26, 2021).

EXHIBIT 6, PAGE 27

EFFECTIVE DATE
This Order is effective on August 3, 2021 and will remain in effect through October 3, 2021, subject to revision based on the changing public health landscape.

In testimony whereof, the Director, Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, has hereunto set her hand at Atlanta, Georgia, this 3rd day of August 2021.

_____
Rochelle P. Walensky, M.D., M.P.H.
Director,
Centers for Disease Control and Prevention

19

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
870 Roosevelt, Irvine, CA 92620

A TRUE AND CORRECT COPY OF THE FOREGOING DOCUMENT ENTITLED: SUPPLEMENT TO CHAPTER 7 TRUSTEE'S MOTION FOR ORDER COMPELLING TURNOVER OF ESTATE PROPERTY PURSUANT TO 11 U.S.C. § 542(A) AND FOR DETERMINATION THAT EVICTION MORATORIA DO NOT APPLY TO TURNOVER OF BANKRUPTCY ESTATE PROPERTY; REQUEST FOR JUDICIAL NOTICE
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 9, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **August 9, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**DEBTOR**
NORTHERN HOLDING, LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT,
OR TO ANY OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE SERVICE
13217 JAMBOREE RD #429
TUSTIN, CA 92782

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 9, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY: PRESIDING JUDGE'S COPY**
HONORABLE MARK S. WALLACE
UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA
RONALD REAGAN FEDERAL BUILDING AND COURTHOUSE
411 WEST FOURTH STREET, SUITE 6135 / COURTROOM 6C
SANTA ANA, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 9, 2021 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:

- **ATTORNEY FOR U.S. TRUSTEE (SA):** Nancy S Goldenberg nancy.goldenberg@usdoj.gov
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Michael J Gomez mgomez@frandzel.com, dmoore@frandzel.com
- **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** Tinho Mang tmang@marshackhays.com, tmang@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@ecf.courtdrive.com
- **TRUSTEE RICHARD A MARSHACK (TR):** Richard A Marshack (TR) pkraus@marshackhays.com, rmarshack@iq7technology.com; ecf.alert+Marshack@titlexi.com
- **ATTORNEY FOR INTERESTED PARTY BANK DIRECT CAPITAL FINANCE:** Elissa Miller emiller@sulmeyerlaw.com, emillersk@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
- **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Roksana D. Moradi-Brovia roksana@rhmfirm.com, matt@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
- **ATTORNEY FOR CREDITOR ADLER BELMONT GROUP, INC.:** Paul F Ready tamara@farmerandready.com
- **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Matthew D. Resnik matt@rhmfirm.com, roksana@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
- **UNITED STATES TRUSTEE (SA):** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Reed S Waddell rwaddell@frandzel.com, sking@frandzel.com
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Gerrick Warrington gwarrington@frandzel.com, sking@frandzel.com
- **INTERESTED PARTY COURTESY NEF:** David Wood dwood@marshackhays.com, dwood@ecf.courtdrive.com; lbuchananmh@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com

2. **SERVED BY UNITED STATES MAIL**: CONTINUED:

| **INTERESTED PARTY** | **INTERESTED PARTY** | **INTERESTED PARTY** |
|---|---|---|
| ERICH RUSSELL<br>C/O KARI L. LEY, ATTORNEY AT LAW<br>264 CLOVIS AVENUE, SUITE 208<br>CLOVIS, CA 93612 | ERICH RUSSELL<br>2380 LIVE OAK ROAD<br>PASO ROBLES, CA 93446-9693 | JOANNE RUSSELL<br>2380 LIVE OAK ROAD<br>PASO ROBLES, CA 93446-9693 |
| **INTERESTED PARTY** | **INTERESTED PARTY** | **INTERESTED PARTY** |
| BRICE GARRETT<br>2380 LIVE OAK RD.<br>PASO ROBLES, CA | SARAH GARRETT<br>2380 LIVE OAK RD.<br>PASO ROBLES, CA | ALL OCCUPANTS OF<br>1172 SAN MARCOS ROAD<br>PASO ROBLES, CA 93466 |
| **INTERESTED PARTY** | | |
| ALL OCCUPANTS OF<br>2380 LIVE OAK RD.<br>PASO ROBLES, CA CA 93446-9693 | | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**