D. EDWARD HAYS, #162507
ehays@marshackhays.com
TINHO MANG, #322146
tmang@marshackhays.com
MARSHACK HAYS LLP
870 Roosevelt
Irvine, California 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Chapter 7 Trustee,
RICHARD A. MARSHACK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| In re | Case No. 8:20-bk-13014-ES |
|---|---|
| NORTHERN HOLDING, LLC, | Chapter 7 (converted) |
| Debtor. | NOTICE AND APPLICATION FOR ISSUANCE OF AN ORDER TO SHOW CAUSE RE: CIVIL CONTEMPT FOR WILLFUL VIOLATION OF AUTOMATIC STAY AND THE COURT'S FARM OPERATOR ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RICHARD A. MARSHACK, TINHO MANG, AND LORI ENSLEY; REQUEST FOR JUDICIAL NOTICE |
|  | [HEARING NOT REQUIRED – LBR 9020-1(D)] |

TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE

OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

PLEASE TAKE NOTICE that Richard A. Marshack, the duly-appointed and acting chapter 7

trustee ("Trustee") of the bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor")

respectfully submits this application for issuance of an order to show cause re: civil contempt

pursuant to Local Bankruptcy Rule 9020-1. The alleged contemnor is LeRoy E. Codding IV

("Codding"), in his individual capacity and as the manager of any other entity including Rabbit

Ridge Wine Sales, Inc. ("RR") unlawfully receiving money constituting cash collateral and property

of the Estate. On September 7, 2021, as Dk. No. 211, the Court entered a Farm Operator Order

authorizing Trustee to conduct a limited scope farming operation to cultivate and harvest wine grape crops growing on Estate properties through an authorized farm operator, Codding, in his individual capacity. The order provided that all proceeds of crops sold would be "paid directly to the Estate" and Codding agreed to cancel all existing grape purchase agreements and direct the funds to be paid to Trustee. Rather than obey the Court's order, Codding engaged in a pattern of deceiving Trustee and concealing at least a half-dozen known contracts, and – only after a confused customer contacted Trustee to ask why Codding was demanding payment be made to him – ultimately admitted to receiving no less than $140,000 in diverted grape proceeds. Based on Codding's conversion of Estate property, he violated a specific and definite order of the Court and violated the automatic stay of 11 U.S.C. § 362 (which also forms the basis for a finding of contempt). As such, Codding is not entitled to any claim whatsoever against the Estate pursuant to 11 U.S.C. § 502(d). Codding must be required to appear before the Court and show cause why he, intentionally and with full knowledge of the existence of the automatic stay and the Farm Operator Order, chose to ignore the orders and convert money for his own personal benefit. Codding must also be ordered to account for all Estate property and proceeds to ensure that no further conversion has occurred.

NOTICE IS FURTHER GIVEN that any opposition to the issuance of the requested order to show cause and other requested relief must be filed within seven days after service of the motion for order to show cause. LBR 9020-1(b). Failure to timely file a response may be treated by the Court as consent to the issuance of the order to show cause. *See* LBR 9020-1(d)(1). Additionally, the Court may enter an order to show cause at any time under its inherent sanctions authority and in its broad discretion, notwithstanding the opposition period for a motion for order to show cause contained in the Local Rules.

NOTICE IS FURTHER GIVEN that the Motion requests the issuance of an order to show cause which shall be lodged concurrently with the Motion.

NOTICE IS FURTHER GIVEN that the Application requests the issuance of appropriate sanctions against any party found in contempt including, but not limited to: Imposition of compensatory damages incurred by the Estate, including the actual unlawful receipt of proceeds constituting property of the Estate, attorneys' fees and costs incurred by Trustee in connection with

1  addressing Codding's contumacious conduct, disallowance of any claim for reimbursement by

2  Codding against the Estate for services rendered or costs incurred, and requests for entry of further

3  orders regarding Codding's breaches of the Court's existing orders. Since his theft was discovered,

4  Trustee sought to amicably negotiate with Codding to provide an accounting and turnover of the

5  money and to determine whether Codding was in fact entitled to any reimbursements. Rather than

6  cooperate, Codding has now threatened to sue, discredit, and report Trustee to state, local, and

7  federal authorities. No action may be taken against Trustee for his administration of the Estate

8  except through leave of the Court pursuant to the *Barton* doctrine.

9

10  Dated: April 1, 2022                    MARSHACK HAYS LLP

11

12  By: */s/ D. Edward Hays*
                                            D. EDWARD HAYS
                                            TINHO MANG
13                                          Attorneys for Chapter 7 Trustee,
                                            RICHARD A. MARSHACK

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

# TABLE OF CONTENTS

1.    Summary of Argument ............................................................................................4

2.    Factual Background ...............................................................................................7

    A.    Pre-Petition ...............................................................................................7

    B.    The Bankruptcy Case ................................................................................7

    C.    Farm Operator Agreement & Drilling Motion.............................................9

    D.    Trustee's Discovery and Investigation of Codding's Contempt..................11

    E.    Known Unpaid Vendors ...........................................................................15

3.    Legal Argument ...................................................................................................16

    A.    All proceeds of grape crops grown on Estate property are property of the
Estate.........................................................................................................16

    B.    Codding willfully violated the Operate Order. ..........................................16

    C.    Codding willfully violated the Turnover Order. ........................................17

    D.    Codding's misappropriation of funds also violates the automatic stay. ......18

    E.    A responding party must raise a fair ground of doubt in order to avoid liability
for civil contempt. .....................................................................................19

    F.    Trustee may recover compensatory damages and the Court may issue
appropriate coercive sanctions including compensatory damages. .............19

    G.    Any claim for reimbursement by Codding must be disallowed under 11 U.S.C.
§ 502(d) unless and until he has returned all diverted Estate property.......20

    H.    Further Court Orders are appropriate in light of Codding's litigation threats. ............21

4.    Conclusion ..........................................................................................................22

Declaration of Richard A. Marshack ................................................................................24

Declaration of Tinho Mang...............................................................................................29

Declaration of Lori J. Ensley ...........................................................................................32

REQUEST FOR JUDICIAL NOTICE ..............................................................................33

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

# TABLE OF AUTHORITIES

**Cases**

*America's Servicing Co. v. Schwartz-Tallard (In re Schwartz-Tallard),*

   803 F.3d 1095, 1100-01 (9th Cir. 2015 ........................................................... 19

*Barton v. Barbour,*

   104 U.S. 126 (1886)] ..................................................................................... 21

*Brace v. Speier (In re Brace),*

   2019 Bankr. LEXIS 80 at *21 (B.A.P. 9th Cir. 2019)..................................... 20

*California Artificial Stone Paving Co. v. Molitor,*

   113 U.S. 609, 618 (1885) ............................................................................... 19

*Chambers v. NASCO, Inc.,*

   501 U.S. 32, 44 (1991) ................................................................................... 20

*City of Chicago v. Fulton,*

   141 S.Ct. 585, 589 (2021) .............................................................................. 18

*Dyer,*

   322 F.3d at 1192 ....................................................................................... 19, 20

*Eaconomy, LLC v. Auvoria Prime, LLC,*

   482 F.Supp.3d 1030, 1032 (E.D. Cal. 2020) ................................................. 16

*Fulton,*

   141 S.Ct. 585, 589-90 (2021) ........................................................................ 18

*Go-Video v. Motion Picture Association of America (In re Dual-Deck Video Cassette Recorder Antitrust Litigation),*

   10 F.3d 693, 695 (9th Cir. 1993) ................................................................... 16

*In re Crown Vantage,*

   421 F.3d at 970 ........................................................................................ 21, 22

*In re Hofstee,*

   1991 Bankr. LEXIS 914 at *12-13 (B.A.P. 9th Cir. January 25, 1991)........... 16

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

*In re Yellowstone Mountain Club, LLC,*

   841 F.3d 1090, 1094 (9th Cir. 2016) ............................................................. 21

*Labor/Community Strategy Ctr. v. Los Angeles County Metropolitan Transportation Authority,*

   564 F.3d 1115, 1123 (9th Cir. 2009) ............................................................. 16

*MicroAge, Inc. v. Viewsonic Corp. (In re MicroAge, Inc.),*

   291 B.R. 503, 514 (B.A.P. 9th Cir. 2002) ..................................................... 21

*Movitz v. Baker (In re Triple Star Welding, Inc.),*

   324 B.R. 778, 794 (B.A.P. 9th Cir. 2005) ..................................................... 21

*Price v. Lehtinen (In re Lehtinen),*

   564 F.3d 1052, 1058-59 (9th Cir. 2009 .......................................................... 20

*Satterfield v. Malloy,*

   700 F.3d 1231, 1234 (10th Cir. 2012) ........................................................... 21

*Stuart v. City of Scottsdale (In re Stuart),*

   632 B.R. 531, 543 (B.A.P. 9th Cir. 2021) ..................................................... 18

*Taggart v. Lorenzen,*

   139 S.Ct. 1795, 1801-02 (2019 ....................................................................... 19

*Taggart,*

   139 S.Ct. at 1802 ............................................................................................... 19

**Statutes**

11 U.S.C. § 362(a)(3).................................................................................................. 18

11 U.S.C. § 502(d)...................................................................................................... 21

11 U.S.C. § 503(b)(1)(A)............................................................................................ 21

11 U.S.C. § 522(f)....................................................................................................... 20

11 U.S.C. § 522(h)...................................................................................................... 20

11 U.S.C. § 522(i)....................................................................................................... 21

11 U.S.C. § 541(a) ...................................................................................................... 16

11 U.S.C. § 541(a)(1).................................................................................................. 16

11 U.S.C. § 541(a)(6).................................................................................................. 16

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

11 U.S.C. § 542 ............................................................................................. 18, 20, 21

11 U.S.C. § 543 ..................................................................................................... 20, 21

11 U.S.C. § 544 ........................................................................................................... 20

11 U.S.C. § 545 ........................................................................................................... 20

11 U.S.C. § 547 ........................................................................................................... 20

11 U.S.C. § 548 ........................................................................................................... 20

11 U.S.C. § 549 ..................................................................................................... 20, 21

11 U.S.C. § 550 ..................................................................................................... 20, 21

11 U.S.C. § 553 ..................................................................................................... 20, 21

11 U.S.C. § 724(a) ....................................................................................................... 20

**Rules**

LBR 9020-1(b) .............................................................................................................. 2

LBR 9020-1(d)(1) ......................................................................................................... 2

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

## Memorandum of Points and Authorities

## 1.     Summary of Argument

A bankruptcy court has inherent and civil contempt powers to enforce compliance with its orders. In this case, Trustee was appointed upon conversion of a Chapter 11 case in the middle of the growing season for hundreds of acres of vineyard crops in Paso Robles, California. Left with no other viable options, and the refusal of the secured creditor Farm Credit West, FCLA ("FCW") to fund any farming operations to preserve the value of the crops, Trustee negotiated an agreement with Codding, individually, for Codding to serve as the temporary farm operator and to advance all direct farming expenses. Codding was the pre-conversion managing member of Debtor and was intimately familiar with the farming operations.

Unfortunately, Codding abused his position of trust and confidence, and directly violated the Court's order directing all proceeds of crop to be deposited with Trustee. Codding intentionally concealed his diversion of funds and has thus far refused to provide a complete accounting to Trustee. Trustee must preserve and enforce the Estate's rights to the diverted funds of approximately $140,000 or more and respectfully requests issuance of an order to show cause. Under the Farm Operator Order, Trustee had the right to reimburse Codding for his actual services and expenditures. But, despite Trustee's requests, Codding has not yet provided sufficient information to determine at this time the amount of his alleged administrative claim. Pursuant to a written agreement signed by Codding after the unauthorized diversion was discovered by Trustee, Codding claimed up to $232,000 in advanced expenses as reimbursements. In the event Codding is allowed any administrative claim, Trustee retains the right to offset or reduce such claim by the funds already taken by Codding.

The Court's order approving limited operations under 11 U.S.C. § 721 and a farm operator agreement between Trustee and Codding individually, entered on September 7, 2021, as Docket No. 211 (defined below as "Operate Order") specifically contained the following language:

- Trustee is authorized to operate the Debtor's business through Leroy Codding for the limited purpose of completing the Fall 2021 harvest pursuant to 11 U.S.C. § 721 to the

extent necessary to complete the fall 2021 harvest, with such authorization to terminate at the earliest of: (a) completion of the fall 2021 harvest; or (b) October 31, 2021;

- Trustee is authorized to cancel all currently existing grape sales agreements and to renegotiate all such agreements, including entering into and executing any reasonably prudent subsequent grape sales agreements without further order of the Court;

- The proceeds of all sales of agricultural products ("Crop") grown on: (1) 2380 Live Oak Road, Paso Robles, CA; (2) 1172 San Marcos Road, Paso Robles, CA; and (3) APN 027-145-022 (collectively, the "Properties") shall be paid directly to the Estate and the Trustee is authorized to receive and hold all gross proceeds of the sale of any Crop…

Codding breached the farm operator agreement,[1] and violated the Operate Order and the automatic stay of 11 U.S.C. § 362 by, among other things:

- Entering into contracts to sell grapes where the listed seller to the contract was an entity other than the Trustee, such as Rabbit Ridge Wine Sales, Inc. (a company owned by Codding) and failing to disclose both the contract and the receipt of the proceeds, which he kept and placed into his or his entities' bank accounts

- Failing to disclose all existing grape purchase agreements to Trustee, and failing to cancel all existing grape purchase agreements (Agreement, ¶ 6) and present for review to Trustee such that Trustee could negotiate the terms of such agreements

- Failing to provide proof of workers compensation insurance and compliance with tax withholding obligations (Agreement, ¶ 8)

- Failing to provide Trustee with a weekly list of expenses (Agreement, ¶ 10)

- Failing to provide Trustee with documentation sufficient to substantiate his demands for reimbursement of expenses during the period of authorized operations (Agreement, ¶ 10)

- Exceeding the access authorization paragraphs by processing and bottling wine on Estate property and using winemaking equipment and, upon information and belief, selling wine inventory. (Agreement pg. 2 – "Access" paragraphs)

---

[1] As discussed below, attached to the Request for Judicial Notice as Exhibit "3" and the approved, executed agreement can be found on internal Exhibit 1, starting on page 19 of 70.

- Diverting and concealing as many as 80 tons (160,000 pounds) or more of grape crop which were delivered to third-party purchasers without the knowledge and consent of Trustee. (11 U.S.C. § 362(a)(3)). To be clear, Codding took grapes constituting Estate property, sold such Estate property, pocketed the proceeds, and did not disclose any of the above to the Trustee. Trustee only learned of this conversion several months later when a third-party purchaser contacted Trustee directly

- Receiving and retaining payments from third-party purchasers of at least $140,000 derived from the sale of the Estate's Crops without disclosing such payments to Trustee and without any intent of remitting such funds to the Estate consistent with the Court's order. (Operate Order, ¶ 5; 11 U.S.C. § 362(a)(3))

- Without the knowledge and consent of Trustee, personally negotiating grape purchase agreements with third-party purchasers and seeking to collect such monies for the benefit of himself or his related entities to the detriment of the Estate. (Operate Order, ¶ 5; 11 U.S.C. § 362(a)(3))

Codding's actions severely damaged the Estate and he abused his position of trust with the Court and Trustee. To date, it remains unknown whether Codding diverted or concealed any more grape sales than have been discovered to date because he continually disclosed that the crop was worth in excess of $700,000 but Trustee has only received gross proceeds of around $240,000 with no expectation of any further payments from known third-party purchasers. Between the funds received by Trustee and the funds Codding admitted to receiving, there remains a discrepancy of $300,000 or more which has never been sufficiently explained to Trustee. Because Codding has refused to provide Trustee with information sufficient for him to make any distributions from the cash collateral grape proceeds, Trustee has no choice but to seek an order compelling Codding to appear and show cause why he has violated the Court's order and Section 362(a)(3).

Furthermore, because Codding has threatened to assert an administrative priority claim or file lawsuits against Trustee for the alleged non-payment of demanded reimbursements, Trustee seeks a determination that Section 502(d) of the Bankruptcy Code automatically disallows any potential claim for reimbursement by Codding unless and until he returns all misappropriated funds to the

1 Estate and fully accounts for the disposition of all estate property. Finally, Trustee seeks entry of a

2 further court order prohibiting him from taking any further actions to damage the Estate, exercise

3 control over estate property, or file litigation in non-bankruptcy forums.

4 **2.    Factual Background**

5     **A.    Pre-Petition**

6     Erich Russell was the former owner and operator of Rabbit Ridge Winery ("Rabbit Ridge"),

7 which was as of October 2020 located at 1172 San Marcos Road, Paso Robles, CA ("San Marcos

8 Property"). To finance his business operations, Mr. Russell borrowed substantial sums of money

9 from Farm Credit West, FLCA (previously defined as "FCW"), and these loans were secured by

10 certain assets including substantially all assets of Rabbit Ridge and three real properties.[2]

11     Mr. Russell defaulted on the loan obligations and, to stave off foreclosure, filed an individual

12 Chapter 11 case, initiating bankruptcy case number 9:20-bk-10035-DS ("Individual Case"). On June

13 19, 2020, the Individual Case was dismissed for cause.

14     A subsequent foreclosure sale for the Properties was scheduled by FCW for October 29,

15 2020. Prior to the foreclosure date, Mr. Russell and FCW continued to discuss a possible forbearance

16 and an extension of the foreclosure date.

17     On or about October 28, 2020, Mr. Russell signed quitclaim deeds transferring the Properties

18 to Debtor. These quitclaim deeds were recorded on the same date. Additionally, ownership and

19 control of Rabbit Ridge passed to LeRoy Codding (previously defined as "Codding"). The

20 bankruptcy petition was filed the same day.

21     **B.    The Bankruptcy Case**

22     On October 28, 2020 ("Petition Date"), Northern Holding, LLC, a Minnesota limited liability

23 company (previously defined as "Debtor") filed a voluntary petition under Chapter 11 of Title 11 of

24

25 ——————————————

26 [2] These three real properties are: (1) the San Marcos Property; (2) 2380 Live Oak Road, Paso Robles, CA
("Live Oak Property"), and (3) real property identified as APN 027-145-022 in Paso Robles, CA ("Texas

27 Road Property"). The Live Oak Property, San Marcos Property and Texas Road Property are collectively
referred to as "Properties." The Live Oak Property included approximately 170 acres of vineyards and a

28 manor-style residence. The San Marcos Property includes approximately 150 acres of vineyards and a 45,000
square foot winery facility. The Texas Road Property consists of approximately 150 acres of vineyards and is
adjoining to the San Marcos Property.

1    the United States Code. Debtor's managing member was Codding. A true and correct copy of the

2    bankruptcy petition is attached to the Request for Judicial Notice ("RJN") as Exhibit "1."

3        On October 29, 2020, as Dk. No. 5, FCW filed a notice of continuation of perfection of

4    security interest and demand to sequester cash collateral. No motion or stipulation for the use of cash

5    collateral was ever filed by Debtor. Trustee is informed by FCW that no consent to use cash

6    collateral was even given to Debtor by FCW.

7        On November 6, 2020, as Dk. No. 11, FCW filed a motion for relief from the automatic stay

8    regarding the Properties.

9        On March 18, 2021, a proof of claim was filed on behalf of the County of San Luis Obispo

10   related to unpaid property taxes. The majority of the claim in excess of $3 million relates to the San

11   Marcos Property.

12       On June 15, 2021, the case was converted to Chapter 7. Richard A. Marshack was appointed

13   as the Chapter 7 trustee.

14       On July 28, 2021, as Dk. No. 159, Trustee filed a notice of assets. The Court set a claims bar

15   date of November 1, 2021 ("Bar Date"). By the Bar Date, only eight proofs of claim had been filed,

16   and only one proof of claim was filed as a partial general unsecured claim – the claim by the

17   Franchise Tax Board in the amount of $10,297.92 (priority claim: $3,529.47). All other claims were

18   filed as secured claims.

19       On August 9, 2021, as Dk. No. 184, Trustee filed a stipulation signed by Codding in his

20   capacity as "Chief Executive Officer of RABBIT RIDGE WINE SALES, INC." regarding turnover

21   of the Properties and the cancellation of day-of-petition lease agreements entered into between

22   Debtor and Rabbit Ridge ("Turnover Stipulation"). A true and correct copy of the Turnover

23   Stipulation is attached to the RJN as Exhibit "2."

24       On August 23, 2021, as Dk. No. 196, the Court entered an order approving the Turnover

25   Stipulation ("Turnover Order"). A true and correct copy of the Turnover Order is attached to the

26   RJN as Exhibit "3."

27       Among other things, the Turnover Order provided that: "Rabbit Ridge shall vacate and turn

28   over possession of the [San Marcos] Property and all keys, gate openers, and all other methods of

access to the Property to the Trustee on or before midnight on July 31, 2021." *See* Turnover Order [Dk. 196] at 2, ¶ 2. Additionally, the Turnover Order provided that "Rabbit Ridge shall not remove, destroy, disturb, or tamper with any of the following: furniture, fixtures including trade fixtures, inventory, agricultural assets such as crops, vines, seeds, and raw and unfinished products, wine barrels and casks, machinery and equipment (including but not limited to bottling and processing equipment), materials, and ingredients of any kind." *Id*. at ¶ 6.[3]

On December 20, 2021, as Dk. No. 264, Trustee filed a motion to approve settlement and partial subordination agreement with FCW, where FCW consented to certain terms for the sale of the Properties and to resolve issues under 11 U.S.C. § 506(c) regarding preservation of its collateral ("Compromise Motion").

On January 14, 2022, as Dk. No. 276, the Court entered an order granting the Compromise Motion.

On January 19, 2022, as Dk. No. 278, Trustee filed a motion seeking authorization to sell the Live Oak Property to Riboli Paso Robles, LLC, for the initial bid price of $9,100,000 ("Live Oak Sale Motion").

On March 4, 2022, as Dk. No. 292, the Court entered an order granting the Live Oak Sale Motion.

The Court-approved sale of the Live Oak Property closed on March 15, 2022.

## C.    Farm Operator Agreement & Drilling Motion

Upon Trustee's appointment, he was presented with a growing problem. Specifically, on the hundreds of acres of Debtor's farmland, thousands of grape vines were growing without any consent to use cash collateral, no debtor-in-possession financing, and no institutional knowledge at the Trustee's office regarding how to cultivate, maintain, harvest, and sell agricultural goods, especially

---

[3] On December 15, 2021, a demand letter was sent on behalf of Rabbit Ridge claiming that it "was, and has been for quite some time, lawfully in possession of the [San Marcos Property]" and falsely claiming that FCW locked Rabbit Ridge out of the San Marcos Property. A true and correct copy of the December 15, 2021 demand letter is attached to the Mang Declaration as Exhibit "10." After receipt of the letter, Trustee's counsel contacted Mr. Lambirth, the attorney sending the letter, and informed Mr. Lambirth that FCW was not in control of the property, but the Trustee, enforcing the Turnover Order. Mr. Lambirth appears to have immediately withdrawn as counsel for Rabbit Ridge as a result.

1   within the Paso Robles area. Without any interest from FCW to fund any collateral preservation

2   efforts, Trustee negotiated a farm operator agreement ("Farm Operator Agreement") with Codding

3   where Codding agreed to advance all cultivation costs in exchange for reimbursement and

4   compensation upon a successful harvest. The Farm Operator Agreement was negotiated by Trustee

5   based, in large part, on repeated representations from Codding that he was solvent, could fund

6   operations, and was willing to work and comply with the terms stated in the Farm Operator

7   Agreement. Trustee would later come to learn that these representations were false and Codding

8   probably never had any intent to abide by the terms of the Farm Operator Agreement.

9        On August 9, 2021, as Dk. No. 186, Trustee filed a motion to approve the Farm Operator

10   Agreement and to authorize operations at the Properties for the limited purpose and scope of

11   completing the Fall 2021 harvest with the assistance of a farm operator ("Operate Motion"). The

12   Operate Motion acknowledged that FCW had a blanket lien on all collateral and proceeds of crop.

13   *See* Operate Motion [Dk. 186] at 10-11. Because the proceeds of crop constituted FCW's cash

14   collateral, as discussed in the Operate Motion, it was imperative that all proceeds be deposited

15   directly with Trustee and any expense reimbursements be subject to the oversight of the Court.

16        In connection with the filing of the Operate Motion, Trustee negotiated a stipulation with

17   FCW where FCW consented to the expenditure and use of its cash collateral in order to reimburse

18   operating expenses, which terms were read into the record at the hearing on the Operate Motion and

19   incorporated into the order approving the Operate Motion.

20        On September 7, 2021, as Dk. No. 211, the Court entered an order approving the Operate

21   Motion ("Operate Order"). The Operate Order included, *inter alia*, the following directives:

22   •   Trustee is authorized to cancel all currently existing grape sales agreements and to

23       renegotiate all such agreements, including entering into and executing any reasonably

24       prudent subsequent grape sales agreements without further order of the Court;

25   •   The proceeds of all sales of agricultural products ("Crop") grown on: (1) 2380 Live Oak

26       Road, Paso Robles, CA; (2) 1172 San Marcos Road, Paso Robles, CA; and (3) APN 027-

27       145-022… shall be paid directly to the Estate and the Trustee is authorized to receive and

28       hold all gross proceeds of the sale of any Crop from the Properties to be disbursed…

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

1   Operate Order, ¶¶ 4-5. A copy of the Operate Order was provided to Codding and he was directed to

2   cancel all existing grape contracts and rewrite them in favor of payment to the Estate, as required by

3   the Operate Order. As discussed below, Trustee later discovered that Codding knowingly and

4   intentionally disobeyed the Operate Order and diverted Estate funds to his own entities until he was

5   caught red-handed.

6       **D.    Trustee's Discovery and Investigation of Codding's Contempt.**

7           Initially, after entry of the Operate Order, Codding failed to provide the Trustee with any

8   information on outstanding grape purchase contracts. On October 5, 2021, Trustee sent an e-mail to

9   Codding memorializing a conversation between himself and Codding where Codding admitted to

10  shipping out grapes without Trustee's authorization and without a signed contract by Trustee for sale

11  of those grapes. A true and correct copy of the email dated October 5, 2021, is attached to the

12  Declaration of Richard A. Marshack ("Marshack Declaration") as Exhibit "6."

13          Following the transmission of the October 5, 2021, email from Trustee to Codding, Trustee

14  received five grape purchase contracts from Codding. All five of these purchase contracts failed to

15  disclose Trustee as the seller of the grapes and the correct payee. Codding represented to Trustee that

16  these five contracts were all of the contracts for the purchase of grapes from Estate properties. A true

17  and correct copy of an e-mail dated November 15, 2021, from Codding to Trustee's counsel stating

18  that there were only five grape purchase contracts[4] is attached to the Declaration of Tinho Mang

19  ("Mang Declaration") as Exhibit "7." This representation was, once again, false.

20          On or about December 8, 2021, Trustee was contacted by Don Brady, an employee of

21  O'Neill Vineyards and a personal small-time wine producer, regarding his confusion with the correct

22  party to pay for the ten tons of grapes that he purchased. Mr. Brady informed the Trustee that he was

23  being told by Codding and Codding's CFO Steven Jones that payment should be made to Humanity

24  Wine Company, LLC[5] in the amount of $17,000 for the grapes purchased by Mr. Brady. Mr. Brady

25

26  _____
    [4] These contracts contain handwritten interlineations from Trustee which were inserted with full knowledge
27  by Codding such that there is no reasonable possibility that he had any misunderstanding that the grapes sold
    were property of the bankruptcy estate under the sole control and authority of the Trustee. Nonetheless, it
28  appears that Codding may have maintained and concealed contracts from Trustee to receive direct payments,
    at the Estate's detriment.
    [5] A true and correct copy of the filed Secretary of State statement of information for Humanity Wine

1  informed Trustee that the grapes had been harvested from Estate properties and he was aware of the

2  bankruptcy. Consequently, he was confused by the demands for payment to an entity other than the

3  Trustee, did not want to get involved with a dispute and violate federal law, and sought guidance

4  from Trustee regarding the correct payee. Trustee immediately contacted Mr. Brady and directed the

5  payment of the $17,000 to the Estate, and received a copy of a grape purchase agreement dated

6  August 27, 2021, which was over one month after entry of the Operate Order. A true and correct

7  copy of the Brady grape purchase agreement is attached to the Mang Declaration as Exhibit "9."

8         After discovery of the diversion of at least ten tons of grapes from the Estate to Codding and

9  entities controlled by Codding, Trustee mobilized an investigation of Codding and demanded that

10  Codding provide a full accounting of grapes grown, harvested, sold, processed, and wasted from the

11  Fall 2021 harvest. Codding has never provided a full accounting and explanation of the Fall 2021

12  harvest to Trustee. Instead, Trustee and his professionals (including his field agent Lori Ensley) have

13  had to attempt to piece together from other documents the extent of grapes grown, harvested, and

14  sold.

15         On December 17, 2021, Codding sent an e-mail to Trustee explaining that he had diverted

16  the following amounts derived from the sale of Estate property: $30,000 from "Anarchist," $3,285

17  from "Graveyard," $44,000 from "Nicora," $22,297.89 from "Oniell," $30,877.52 from "Pali,"

18  $7,752 from "Rangeland," and $2,747.90 from "Sycamore." A true and correct copy of the e-mail

19  sent by Codding on December 17, 2021, is attached to the Marshack Declaration as Exhibit "11." In

20  total, Codding admitted to the diversion of approximately $140,000 in proceeds which the Court

21  required to be paid directly to Trustee. Trustee immediately demanded documentation for this

22  diversion, including purchase contracts, checks received, and invoices, but Codding failed to provide

23  any documents after paying lip service to his intent to produce documents.

24         Trustee immediately also drafted and personally negotiated a memorandum of understanding

25  between himself and Codding, and Codding's related entities, regarding Codding's diversion of

26  funds and entitlement to reimbursement from all other proceeds received by Trustee. A true and

27

28  ───────────────

Company, LLC is attached to the RJN as Exhibit "8."

1    correct, executed copy of the memorandum of understanding dated December 20, 2021 ("MOU") is

2    attached to the Marshack Declaration as Exhibit "12." Under the MOU, Trustee reserved the right to

3    allocate the diverted proceeds as a setoff against any claim for reimbursement by Codding, and

4    Codding agreed that he would not seek reimbursement of any amount over $232,000 (less the setoff

5    rights of $140,960.31). In other words, under the MOU, Codding and his entities agreed that at most,

6    the Estate would further reimburse him $91,039.69, if he provided documentation to substantiate at

7    least $232,000 in farming reimbursements.

8        The MOU also provided that Codding was required to submit documentation to substantiate

9    his reimbursements no later than January 5, 2022. Trustee's counsel did not receive any

10   documentation until January 25, 2022, although Codding claimed that invoices and documentation

11   had been previously sent on December 30, 2021. A true and correct copy of the invoices and

12   attachments received by Trustee's counsel on January 25, 2022, are collectively attached to the

13   Mang Declaration as Exhibit "13."

14       On February 1, 2022, Codding agreed to participate in a voluntary examination under oath

15   regarding his diversion of funds.

16       On February 8, 2022, Codding appeared and testified at the continued meeting of creditors

17   under 11 U.S.C. § 341(a) in both his capacity as manager of Debtor and in his individual capacity,

18   and voluntarily answered questions under oath. A true and correct copy of the transcript of the

19   February 8, 2022, meeting of creditors is attached to the Mang Declaration as Exhibit "14." Among

20   other things, Codding testified that "The trustee didn't know because [the contracts were] in place

21   before he was involved. I didn't disclose it because we would have lost the contracts." *See* 2/8/2022

22   Transcript at 38:1-4. Codding provided and has never provided any explanation for why he did not

23   comply with the Operate Order and immediately direct the proceeds he or his entities directly

24   received, to Trustee, as required by the Operate Order.

25       On February 11, 2022, Codding appeared at the law offices of Marshack Hays LLP in Irvine

26   and demanded, under false pretenses, that the receptionist release to him a reimbursement check in

27   the amount of $120,000. Because no such reimbursement check existed or was ever authorized by

28   Trustee, Codding left empty-handed but sent a follow-up demand to Trustee via e-mail. A true and

1    correct copy of the February 11, 2022, demand email is attached to the Marshack Declaration as

2    Exhibit "15."

3        On February 23, 2022, Trustee's office received a letter via certified mail demanding

4    payment of $262,332.00 from Codding. A true and correct copy of the certified mail letter dated

5    February 17, 2022, is attached to the Marshack Declaration as Exhibit "16."

6        On February 25, 2022, Trustee sent a detailed letter to Codding explaining the circumstances

7    under which Codding's ever-increasing demands for reimbursement were being rejected, and the

8    necessity of a court order to authorize Trustee to pay any reimbursements at all, in light of the

9    knowing and willful diversion of Estate funds by Codding. A true and correct copy of Trustee's

10   response letter is attached to the Marshack Declaration as Exhibit "17." In response, Codding

11   unleashed a barrage of written vulgarities, obscenities, and threats to Trustee and Trustee's counsel,

12   none of which will be reproduced in the record unless such communications come at issue.

13       On March 17, 2022, Trustee received for the first time a copy of a grape purchase agreement

14   which was never cancelled, between Rabbit Ridge Wine Sales, Inc. and John Anthony Vineyards.

15   This agreement was dated April 30, 2021, and had never been previously provided to Trustee despite

16   multiple written requests to Codding from Trustee, Trustee's field agent, and counsel – and the

17   buyer was the one who provided the contract. A true and correct copy of the previously undisclosed

18   grape purchase contract with John Anthony Vineyards is attached to the Mang Declaration as

19   Exhibit "19."[6] It appeared that this agreement had been negotiated during the pendency of the

20   Chapter 11 case while Codding was operating Debtor as a debtor-in-possession.

21       In addition to threats regarding the personal safety of Trustee, Codding has also threatened

22   legal action against Trustee and the Estate, including filing liens and regulatory complaints against

23   either Trustee or the Estate. The complete breakdown in Trustee's attempts to resolve this dispute

24   without litigation results in the filing of this motion. Trustee is informed that Codding has engaged

25   counsel to represent him in connection with this dispute, who will be served with a copy of this

26   Motion.

27

28

---

[6] On March 28, 2022, Trustee received payment on account of the grapes purchased under this contract, after
the prior payment issued to Rabbit Ridge was cancelled upon Trustee's demand.

## E.    Known Unpaid Vendors

According to the records pieced together by Trustee, it appears that perhaps around 200 tons of grapes were grown and harvested in Fall 2021. The exact tonnage of grapes is unknown because no detailed reports were ever provided to Trustee. In total, Trustee has received weight tags totaling approximately 128.6895 tons of grapes sold to known purchasers. Trustee has never received any documentation from Codding regarding the cost of picking or shipping 130 tons of grapes (although an estimate of $350/ton was provided in connection with the Operate Motion – for 130 tons, this is a labor cost of $45,500).[7] Trustee has been informed, however, that the farm labor for the pre-harvest work was left substantially unpaid.

Specifically, Trustee was informed on March 23, 2022, that the farm labor was provided by Nevarez Farm Labor and on March 27-28, 2022, Trustee received a large number of invoices for Nevarez Farm Labor for work performed prior to June 9, 2021, which was left unpaid in the principal amount of $56,803.97. These invoices, in addition to an explanatory e-mail from Juan Nevarez on March 28, 2022, are collectively attached to the Mang Declaration as Exhibit "20."

Trustee was informed that Miller Drilling Company had been solicited by Codding to provide water well maintenance services during the period of farming operations, and had been left unpaid by Codding in the amount of $6,899.03.

On March 16, 2022, Trustee received an invoice and attachments on behalf of Wayne Cooper Ag Services, who rendered (unbeknownst to Trustee) water pump test services on the Live Oak Property and were left unpaid by Codding. A true and correct copy of the e-mail correspondence, invoice, and attached email and text conversations received from Wayne Cooper are collectively attached to the Mang Declaration as Exhibit "18."

---

[7] Trustee was also informed after the fact (and without any opportunity to negotiate this provision) that buyers may have paid for the cost of their own shipping and harvesting, which is reflected in a lower purchase price per ton for grapes. For example, the contract with John Anthony Vineyards dated April 30, 2021 (i.e. pre-conversion) shows a purchase price of $4,000 per ton for Cabernet Sauvignon grapes, but other subsequent contracts show a purchase price of only $3,350 per ton for Cabernet Sauvignon grapes. *Compare* JAM Agreement, Mang Declaration Exh. 19 (showing purchase price of Cabernet Sauvignon at $4,000/ton), *with* Daou Agreement, Mang Declaration Exh. 7, pgs.157-165 (showing purchase price of Cabernet Sauvignon at $3,350/ton)). This discrepancy has never been explained by Codding.

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

**3.    Legal Argument**

    **A.    All proceeds of grape crops grown on Estate property are property of the Estate.**

    As of the filing of a bankruptcy petition, "all legal or equitable interests of the debtor in property" become property of the bankruptcy estate. 11 U.S.C. § 541(a)(1). Additionally, "[p]roceeds, product, offspring, rents, or profits of or from property of the estate" also constitute property of the estate. 11 U.S.C. § 541(a)(6); *see In re Hofstee*, 1991 Bankr. LEXIS 914 at *12-13 (B.A.P. 9th Cir. January 25, 1991) (milk from collateralized cow herds was also property of the estate).

    Under applicable authorities cited above, the grape crops and their proceeds would be considered property of the bankruptcy estate subject to the bankruptcy court's jurisdiction and, necessarily, the automatic stay.

    **B.    Codding willfully violated the Operate Order.**

    Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply… there is no good faith exception to the requirement of obedience to a court order." *Go-Video v. Motion Picture Association of America (In re Dual-Deck Video Cassette Recorder Antitrust Litigation)*, 10 F.3d 693, 695 (9th Cir. 1993). Four elements must be established: (1) the party "violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Labor/Community Strategy Ctr. v. Los Angeles County Metropolitan Transportation Authority*, 564 F.3d 1115, 1123 (9th Cir. 2009); *see, e.g., Eaconomy, LLC v. Auvoria Prime, LLC*, 482 F.Supp.3d 1030, 1032 (E.D. Cal. 2020).

    Here, all four elements are plainly met. As cited above, the Operate Order required all proceeds of crop to be directed to Trustee (*See* Operate Order [Dk. 211], ¶ 5 "The proceeds of all sales of agricultural products… shall be paid directly to the Estate") and the approved farm operator agreement required Codding to cancel all existing grape purchase agreements. Rather than comply with the Operate Order, Codding entered into further contracts without informing Trustee and directed funds to be paid directly to himself or other entities under his control, rather than the Estate.

1  The first and second elements, therefore, are plainly met. As for the third element, there is no good

2  faith and reasonable interpretation of the Operate Order under which Codding was authorized to

3  direct any grape proceeds to be received directly by himself or his related entities. Finally, the signed

4  and sworn statements from Codding himself admitting to his unauthorized receipt of funds, and the

5  Don Brady contract dated one month after the Operate Order both show by clear and convincing

6  evidence that Codding violated the Operate Order. Codding should be directed to appear and show

7  cause why he willfully and intentionally disobeyed the Operate Order and the automatic stay.

8  ## C.   Codding willfully violated the Turnover Order.

9  Regarding the Turnover Order, all four elements are also plainly met. Codding, on behalf of

10  Rabbit Ridge, signed a stipulation for turnover which was reduced to an order of the Court, Docket

11  No. 196. The Turnover Order provided, among other things, that "Rabbit Ridge shall vacate and turn

12  over possession of the [San Marcos] Property and all keys, gate openers, and all other methods of

13  access to the [San Marcos] Property on or before midnight on July 31, 2021." Turnover Order [Dk.

14  196] at ¶ 2. Also, the Turnover Order directed Rabbit Ridge not to "remove, destroy, disturb, or

15  tamper with any of the following: furniture, fixtures including trade fixtures, inventory, agricultural

16  assets such as crops, vines, seeds, and raw and unfinished products, wine barrels and casks,

17  machinery and equipment (including but not limited to bottling and processing equipment),

18  materials, and ingredients of any kind." *Id.* at ¶ 6.

19  On December 9, 2021, Trustee's agent Lori Ensley appeared unannounced at the San Marcos

20  Property (all prior visits had been notified to Codding) and, for the first time, found a crew of

21  workers from Rabbit Ridge processing wine using the equipment at the San Marcos Property.

22  Declaration of Lori Ensley ("Ensley Declaration"), ¶ 6. Trustee's agent verbally demanded that these

23  workers leave the San Marcos Property, as they were not authorized to be there, and secured the San

24  Marcos Property with the assistance of agents from the secured creditor FCW. *Id.* at ¶ 7. Following

25  the discovery of unauthorized winemaking at the San Marcos Property, it became obvious that

26  Codding had likely continued to access and use the equipment at the San Marcos Property without

27  authorization from Trustee and in express violation of the Turnover Order. *See* 2/8/2022 Transcript

28  at 47:15-24 (CODDING: "…And there was a limited number of gallons that were processed…").

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

1  Trustee's agent also discovered a number of wine barrels marked with a 2021 vintage year which

2  were absolutely unauthorized. It is unknown what quantity of grapes were misappropriated and used

3  by Codding to make wines at the San Marcos Property. Codding's direct involvement with the

4  unauthorized access of the San Marcos Property is further demonstrated by clear and convincing

5  evidence by the transmission of the December 15, 2021, letter on behalf of Rabbit Ridge falsely

6  claiming that it was in lawful possession of the San Marcos Property. The Court should direct

7  Codding and any qualified representative from Rabbit Ridge to appear and show cause why Rabbit

8  Ridge willfully violated the Turnover Order.

9        **D.    Codding's misappropriation of funds also violates the automatic**

10           **stay.**

11        "§ 542 provides, with just a few exceptions, that an entity … in possession of property of the

12  bankruptcy estate 'shall deliver to the trustee, and account for' that property." *City of Chicago v.*

13  *Fulton*, 141 S.Ct. 585, 589 (2021). The automatic stay applies to "any act to obtain possession of

14  property of the estate or of property from the estate or to exercise control over property of the

15  estate." 11 U.S.C. § 362(a)(3).  While "mere retention of property does not violate § 362(a)(3)", the

16  automatic stay "prohibits affirmative acts that would disturb the status quo of estate property…"

17  *Fulton*, 141 S.Ct. 585, 589-90 (2021); *see Stuart v. City of Scottsdale (In re Stuart)*, 632 B.R. 531,

18  543 (B.A.P. 9th Cir. 2021) (discussing effect of *Fulton*).

19        Here, Codding did not merely retain or passively receive any funds constituting property of

20  the Estate. Instead, Codding took a series of affirmative acts to exercise control over Estate property

21  *outside the scope of his authorized limited-scope farming operations*. Codding was never authorized

22  to sell estate property or receive the proceeds from estate property for any reason including to pay

23  himself for services rendered or costs incurred. Instead, he was directed to seek any reimbursement

24  from Trustee pursuant to the terms of the Court's Order. Rather than comply with the Operate Order,

25  Codding entered into at least a half-dozen undisclosed grape purchase contracts for at least 50 tons

26  (100,000 pounds) of grape crops grown on Estate properties, and willingly received the proceeds of

27  such sales directly into his own bank accounts. This is an egregious violation of the Court's Order

28

1  and the automatic stay. The issuance of an order to show cause regarding civil contempt is

2  appropriate.

3  ### E.  A responding party must raise a fair ground of doubt in order to

4  ### avoid liability for civil contempt.

5  "[C]ivil contempt should not be resorted to where there is a fair ground of doubt as to the

6  wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801-02 (2019)

7  (citing *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885) (internal

8  quotations, brackets, and italics omitted). A "fair ground of doubt" is an "objective" standard.

9  *Taggart*, 139 S.Ct. at 1802. "[A] party's subjective belief that she was complying with an order

10  ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Id.*

11  Codding has explained in the past to Trustee that he believed that his direct receipt of funds

12  was necessary and appropriate. Codding explained to Trustee that the undisclosed contracts were

13  preexisting contracts and the purchasers of such grapes would be unwilling to modify the

14  preexisting contracts and therefore be lost. Because the undisclosed contracts were never provided

15  to Trustee, this claim cannot be fairly evaluated by Trustee. However, even if the contracts were

16  unable to be modified (a claim which Trustee is seriously skeptical), Codding has never explained

17  any reason that he could not comply with the Operate Order and immediately disclose the existence

18  of such contracts and direct that all sales proceeds be paid directly to Trustee. Instead, Codding

19  concealed the existence of these contracts, concealed his unauthorized receipt of payments, and

20  adopted a belligerent posture demanding immediate, undocumented reimbursements from Trustee

21  with threats of violence and litigation. Codding has no objectively reasonable fair ground of doubt.

22  ### F.  Trustee may recover compensatory damages and the Court may

23  ### issue appropriate coercive sanctions including compensatory

24  ### damages.

25  "Civil penalties must either be compensatory or designed to coerce compliance." *Dyer*, 322

26  F.3d at 1192. The extent of compensatory sanctions includes attorneys' fees and costs for preparing

27  and litigating a contempt motion. *See America's Servicing Co. v. Schwartz-Tallard (In re Schwartz-*

28  *Tallard)*, 803 F.3d 1095, 1100-01 (9th Cir. 2015) (*en banc*). Additionally, "The bankruptcy court's

1   civil contempt authority also permits it to order the contemnor as a sanction to coerce compliance

2   with the court's orders, so long as compliance with the orders will cure the contempt." *Brace v.*

3   *Speier (In re Brace)*, 2019 Bankr. LEXIS 80 at *22 (B.A.P. 9th Cir. 2019) (unpub.). Additionally,

4   the bankruptcy court has "inherent power" to sanction "bad faith" or "willful misconduct." *Price v.*

5   *Lehtinen (In re Lehtinen)*, 564 F.3d 1052, 1058-59 (9th Cir. 2009). But the bankruptcy court's

6   inherent powers "must be exercised with restraint and discretion." *Id.* at 1059 (quoting *Chambers v.*

7   *NASCO, Inc.*, 501 U.S. 32, 44 (1991)). To impose sanctions under its inherent authority, the

8   bankruptcy court "must make an explicit finding of bad faith or willful misconduct." *Id.* at 1058.

9   Again, civil sanctions "must either be compensatory or designed to coerce compliance." *Id.* at 1059

10  (quoting *Dyer*, 322 F.3d at 1192 (9th Cir. 2003)); *Brace v. Speier (In re Brace)*, 2019 Bankr. LEXIS

11  80 at *21 (B.A.P. 9th Cir. 2019).

12      If the Court finds good cause to enter an order to show cause re: civil contempt, Trustee

13  requests that all compensatory damages be considered as a sanction against Codding and his related

14  entities, in the full amount of any funds diverted from the Estate including the $140,960.31 admitted

15  to have been received by Codding, and any other (if any) subsequently-discovered transfers to

16  Codding or other entities derived  from the sale of crop from Estate properties. Additionally, Trustee

17  requests imposition of compensatory sanctions in an amount equal to the attorneys' fees expended to

18  seek to investigate and discover Codding's violations of Court orders and the automatic stay.

19  Although Trustee has a stipulated agreement with FCW regarding the payment of administrative fees

20  from its cash collateral, it is unfair for FCW and the general unsecured creditor body to be

21  prejudiced by Codding's unlawful actions.

22      **G.    Any claim for reimbursement by Codding must be disallowed under**

23          **11 U.S.C. § 502(d) unless and until he has returned all diverted**

24          **Estate property.**

25      "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of

26  any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that

27  is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a)

28  of this title, unless such entity or transferee has paid the amount, or turned over any such property,

1   for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."

2   11 U.S.C. § 502(d). Section 502(d) specifically applies to disallow claims which could be asserted

3   by administrative creditors, if such creditor receives a recoverable transfer. *See, e.g., MicroAge, Inc.*

4   *v. Viewsonic Corp. (In re MicroAge, Inc.)*, 291 B.R. 503, 514 (B.A.P. 9th Cir. 2002) ("§ 502(d)

5   should be interpreted in a manner consistent with case law decided under the Bankruptcy Act and

6   should be applied to administrative claims."); *see also Movitz v. Baker (In re Triple Star Welding,*

7   *Inc.)*, 324 B.R. 778, 794 (B.A.P. 9th Cir. 2005) ("if Baker actually did receive an avoidable

8   preference then he would be ineligible to be paid anything from the estate unless and until he returns

9   that preference.").

10       Codding received post-petition proceeds of property of the Estate which was, in turn,

11   property of the Estate. These transfers are recoverable by Trustee either pursuant to turnover under

12   11 U.S.C. § 542 or the transfer is avoidable under 11 U.S.C. § 549. Because such theft of estate

13   property was in violation of the Court's orders and the automatic say, no separate motion or

14   adversary proceeding will be filed. Nonetheless, as the BAP held in both *MicroAge* and *Triple Star*

15   *Welding*, *supra*, the establishment of an avoidable transfer or recoverable Estate property from an

16   administrative claimant constitutes a statutory bar to such claimant from receiving anything

17   whatsoever from the Estate. While Codding may claim that he advanced funds to preserve the value

18   of the Estate and is therefore entitled to an administrative claim under 11 U.S.C. § 503(b)(1)(A), any

19   such claim is automatically disallowed under 11 U.S.C. § 502(d) because he has received and

20   refused to return property of the Estate (i.e. the $140k in grape proceeds).

21   ## H.    Further Court Orders are appropriate in light of Codding's
22   ##        litigation threats.

23       "Under *Barton* [*v. Barbour*, 104 U.S. 126 (1886)], plaintiffs must obtain authorization from

24   the bankruptcy court before 'initiat[ing] an action in another forum' against certain officers

25   appointed by the bankruptcy court for actions the officers have taken in their official capacities." *In*

26   *re Yellowstone Mountain Club, LLC*, 841 F.3d 1090, 1094 (9th Cir. 2016), quoting *Beck v. Fort*

27   *James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 970 (9th Cir. 2005) (brackets in original).

28   *Barton* issues are jurisdictional. *Barton*, 104 U.S. at 131. The *Barton* doctrine applies in bankruptcy

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

in favor of the bankruptcy trustee. *Crown Vantage*, 421 F.3d at 971. Failure to obtain leave of court

consistent with the *Barton* doctrine renders the other forum without subject matter jurisdiction. *See,*

*e.g., In re Eagan Avenatti, LLP*, 2022 Bankr. LEXIS 552 at *6-7 (Bankr. C.D. Cal. March 3, 2022)

(publication forthcoming).

Codding has threatened in writing to file liens, claims, or complaints with nonbankruptcy

authorities in order to enforce his believed right of reimbursement from the Estate. While Trustee's

investigation of Codding's right to reimbursement is continuing, and will likely be expanded by any

documents or information obtained in connection with this Motion, if the Court finds good cause to

issue an order to show cause, Trustee believes that an order requiring compliance with the Barton

Doctrine is appropriate. In other words, the estate should not be subjected to seeking dismissal of

any non-bankruptcy litigation filed by Codding without leave of this Court.

## 4.    Conclusion

Codding has, by clear and convincing evidence including his own statements and testimony,

violated the Court's express orders, and he has unlawfully received $140,960.31 constituting

bankruptcy estate property and refused to turn over such funds to the Trustee. While Codding may

have once had a right to reimbursement (and Trustee preserve the Estate's rights regarding setoff),

Codding has to date failed and refused to produce documentation showing that he has an entitlement

to the extent of reimbursements that he claims. Absent such proof, Trustee cannot permit Codding to

retain the $140,000 in diverted funds and Codding must return all such funds to be distributed by

Trustee according to 11 U.S.C. § 726 and the consent of the secured creditor Farm Credit West,

which holds a lien on such proceeds. The Court should issue an order to show cause re: civil

contempt and direct Codding to appear and show cause why he should not be held in civil contempt

for his violation of the Operate Order, Turnover Order, and automatic stay and be required to fully

compensate the Estate for damages caused by his contumacious conduct. The order to show cause

should also require Codding to show why the Court should not order him to fully account for the

receipt and disbursement of all estate property, to produce all documents necessary to establish the

disposition of all estate property and its proceeds, and to turn over to Trustee all estate funds

1  received. Lastly, the order to show cause should require Codding to prove why any alleged

2  administrative claim should not be disallowed pursuant to Section 502(d).

3

4  Dated: April 1, 2022                    MARSHACK HAYS LLP

5

                                          By: /s/ D. Edward Hays
6                                              D. EDWARD HAYS
                                               TINHO MANG
7                                              Attorneys for Chapter 7 Trustee,
                                               RICHARD A. MARSHACK
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

# Declaration of Richard A. Marshack

I, RICHARD A. MARSHACK, declare as follows:

1.      I am an individual over 18 years of age and competent to make this Declaration.

2.      If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.      I am the duly-appointed and acting Chapter 7 trustee ("Trustee") for the bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor").

4.      I have personal knowledge of some of the terms set forth in this Declaration, and if called upon to do so, I could and would competently testify to these facts, as to other matters I have knowledge based on information and belief.

5.      All terms not defined herein are used as they are defined in the Motion.

6.      Upon my appointment as the Chapter 7 trustee in this case, I was presented with the problem of hundreds of acres of vineyards and no consent from the lender Farm Credit West ("FCW") to fund any farming operations. I discussed the issues with the Debtor's principal LeRoy Codding ("Codding") and he offered to advance the cost of farming and bringing in the crop to generate money for the Estate and to preserve the value of the real properties, which were to be sold as going concerns. Codding represented to me that he had sufficient funds to pay all ongoing costs of operations and was committed to ensuring the success of the vineyards. At the beginning, Codding was also generally helpful and informative in assisting me with understanding the case and showing the properties to buyers. However, I made it very clear that Rabbit Ridge was not permitted to operate any winemaking business on any property of the Estate, including negotiating the stipulation for turnover which Codding signed on behalf of Rabbit Ridge.

7.      I personally negotiated, drafted, and revised the Farm Operator Agreement which was attached to the Operate Motion. Codding told me that there were existing customer relationships and outstanding grape contracts. As part of the Farm Operator Agreement (which Codding signed), the agreement provided that Codding would cancel all contracts, provide me with regular reports, and direct all funds to be paid to me on behalf of the Estate. I would later

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

1  learn that Codding breached most provisions of the Farm Operator Agreement.

2      8.    I was informed by Codding that the harvest of the grapes would occur in

3  September to October 2021. During this time, Codding provided me with little to no information

4  on the status of harvest and I was never given a copy of any grape purchase contract until late

5  September 2021 – the first contract executed was dated September 27, 2021. On or around

6  October 5, 2021, Codding told me over the telephone that he had shipped grapes without my

7  knowledge, consent, or a contract countersigned by me on behalf of the Estate. A true and

8  correct copy of the e-mail dated October 5, 2021 memorializing our conversation is attached as

9  Exhibit "6."

10      9.    From my numerous conversations with him, it was clear to me that Codding knew

11  the rules and requirements under which he was to serve as the Estate's farm operator. He knew

12  that Richard Marshack, Chapter 7 Trustee, was to be listed as the seller, and he knew that all

13  payments must be delivered to 870 Roosevelt, Irvine, California. Codding presented me with no

14  less than five contracts, and I spent hours over the phone with him negotiating and inserting

15  interlineated handwritten revisions to ensure that the seller was the bankruptcy estate, the

16  payable party was Richard Marshack, Chapter 7 Trustee, and payments were to be made to 870

17  Roosevelt. Once these provisions were inserted into the agreements, I executed the agreements

18  with an electronic pencil and the purchaser would countersign.

19      10.    After October 5, 2021, Codding provided me with some other contracts which

20  were not countersigned by me and which I had to personally interlineate and sign on behalf of

21  the Estate to ensure that payment was received by the Estate. In total, there were five contracts

22  executed for the purchase of grapes that I was involved with. Codding affirmed to me over the

23  telephone and in writing that all five of the contracts (in total) that he provided to me constituted

24  the entire universe of grape purchase contracts for the sale of grapes from Estate property. These

25  five contracts are reproduced in the declaration of my attorney below attached as Exhibit "7."

26  These representations proved to be false.

27      11.    On or about December 8, 2021, I was informed that Codding had apparently sold

28  grapes constituting property of the Estate to other, previously unknown third parties for which

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

there was no contract which provided that the Estate was the seller, funds were to be made payable to Richard Marshack, Bankruptcy Trustee, and provided that the funds were to be mailed to 870 Roosevelt, Irvine, California. I was informed that this third party was Don Brady of Brady Vineyards.

12. On December 17, 2021, after I confronted Codding about his concealment and diversion of grapes to Don Brady, Codding sent an e-mail to me with a lengthy explanation of the extent of his diversion of funds and grapes from the Estate. A true and correct copy of this e-mail is attached as Exhibit "11." Specifically, Codding admitted to having sold grapes owned by Northern Holding, LLC for the benefit of his company Rabbit Ridge, in the following amounts totaling $140,960.31:

- Anarchist $30,000 (I am informed the corporate name is Cathartes Aura LLC)

- Graveyard $3,285

- Nicora $44,000

- O'Neill $22,297.89

- Pali $30,877.52

- Rangeland $7,752

- Sycamore $2,747.90

13. In response to the written admissions from Codding, I negotiated, drafted, and revised a memorandum of understanding between Codding, his entities, and the Estate regarding the extent and effect of his unauthorized receipt of funds. Codding informed me that he had expended around $400,000 in connection with farming operations but would agree to cap his reimbursement requests to $232,000, with the Estate retaining an offset right for any funds directly received by Codding. As a result, assuming that Codding was entitled to the contractual maximum of $232,000 in reimbursements, the Estate would only need to pay an additional approximate $92,000 in further reimbursements over and above what Codding had directly received. By negotiating the memorandum of understanding, I minimized the Estate's potential liability and provided conditions for Codding to request and receive reimbursements through establishing a deadline for providing documentation, and preserving the Estate's possible setoff

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

1   rights (but no obligation for a setoff). A true and correct copy of the executed memorandum of

2   understanding is attached as Exhibit "12."

3        14.    Even after my sudden discovery of Codding's concealment and diversion of funds

4   from the Estate, Codding continued to insist on receiving unproven reimbursements from the

5   Estate. In response to these demands, I replied that I needed further information and testimony in

6   order to make any reimbursement payments. On February 1, 2022, I and my attorneys conducted

7   a voluntary recorded examination under oath of Codding.

8        15.    On February 8, 2022, I conducted a meeting of creditors under 11 U.S.C. § 341(a)

9   where Codding answered questions under oath, including answers to questions in his individual

10  capacity as farm manager and also in his capacity as managing member of Debtor.

11       16.    On February 11, 2022, Codding showed up unannounced at my law office in

12  Irvine and I am informed he demanded that the receptionist surrender to him a check for

13  reimbursements. After leaving without any check, he sent an e-mail to me demanding payment

14  of $120,000 and promising to be back the next business day. A true and correct copy of the

15  February 11, 2022 e-mail is attached as Exhibit "15." To be clear, I also received several text

16  messages which were threatening and contain obscenities. These will be provided to the Court

17  upon request.

18       17.    On February 23, 2022, my office received a letter via certified mail where

19  Codding again demanded to be paid and claiming to be owed $400,000. A true and correct copy

20  of a certified mail letter dated February 17, 2022 is attached as Exhibit "16."

21       18.    In response, I drafted and transmitted a letter to Codding detailing the reasons that

22  his request for reimbursement could not be granted. A true and correct copy of the detailed

23  response letter sent to Codding is attached as Exhibit "17."

24       19.    In addition to the exhibits above, Codding has sent a number of written threats,

25  including threats of litigation, regarding his demands for payment. As a result, I believe that

26  injunctive and declaratory relief may be appropriate, if the Court finds good cause to enter an

27  order to show cause.

28  / / /

20.     I was informed by representatives from Miller Drilling Company that Codding had requested water well maintenance services on Estate properties during the farming period and had been left unpaid in the amount of $6,899.03. Codding's nonpayment of Miller may have negatively impacted the sale process for the Live Oak Property.

21.     To be clear, I wholly acknowledge that without the assistance of a farm operator such as Codding, I would not have been able to successfully complete the harvest of nearly 200 tons of grapes and receive around $240,000 in proceeds from the sale of crop. I was not presented with any other reasonable option by the secured credit Farm Credit West who opined that the grape harvest was valueless – this proved to be an inaccurate assessment of the facts. Codding's employment was necessary and appropriate to effectuate the harvest, and his services provided significant value to the Estate. The value included that there were no funds in the Estate to maintain farming operations, and he agreed to advance funds to ensure the success of the harvest, with reimbursement to occur after the harvest was completed and the crops were sold. However, on the other hand, Codding's diversion and concealment of approximately one-third of the known crop proceeds has caused severe damage to the Estate, especially since he now refuses to provide documentation for his operating expenses to allow me to evaluate his requests for reimbursement. Although I investigated and tried to convince Codding to cooperate with providing the necessary documentation to substantiate his expenses, his threats of litigation and failure to provide documentation has left me with no choice but to seek an order of the Court to preserve the rights of the Estate.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 1, 2022.

RICHARD A. MARSHACK

# Declaration of Tinho Mang

I, TINHO MANG, declare as follows:

1.      I am an individual over 18 years of age and competent to make this Declaration.

2.      If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.      I am an associate attorney with Marshack Hays LLP, counsel of record for Richard A. Marshack, in his capacity as the duly-appointed and acting Chapter 7 trustee ("Trustee") for the bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor").

4.      I have personal knowledge of some of the terms set forth in this Declaration, and if called upon to do so, I could and would competently testify to these facts.

5.      All terms not defined herein are used as they are defined in the Motion.

6.      I have been working closely with the Trustee in the course of his administration and investigations in this case. In support of these efforts, I have personally communicated with Mr. LeRoy Codding ("Codding") for the period during which he was an unrepresented party in his individual capacity. I am informed that Codding is now represented by the law firm of Goe Forsythe & Hodges LLP.

7.      On November 15, 2021, I sent an e-mail to Codding requesting confirmation that all five of the grape purchase contracts attached to such e-mail were all of the outstanding grape purchase contracts for grapes. Codding replied with copy of the five contracts, representing that "This looks to be complete." A true and correct copy of this November 15, 2021 e-mail is attached as Exhibit "7."

8.      On December 8, 2021, I was contacted by Don Brady, who informed me that he was an employee of O'Neill Vineyards and also processes wines for himself. Mr. Brady told me over the phone that he and his employer had received a truck full of grapes in the approximate amount of 20 tons, and that he was confused by the existence of the bankruptcy case. Mr. Brady told me that he simply wanted to ensure that payment for the grapes reached the correct party, and provided me with a copy of a grape purchase agreement dated August 27, 2021 signed by himself and Codding. A true and correct copy of the Brady/Codding grape purchase contract is

attached as Exhibit "9."

9.      On December 15, 2021, I received via e-mail a courtesy copy of a demand letter from a lawyer representing Rabbit Ridge Wine Sales, Inc. A true and correct copy of this demand letter is attached as Exhibit "10." Upon receipt of the letter, which contained various inaccurate factual statements, I contacted the attorney Tim Lambirth and discussed the various inaccuracies with him over telephone including that a turnover stipulation and order had been previously entered by the Court. After this conversation I understand that Mr. Lambirth withdrew from further representation.

10.     According to the Memorandum of Understanding executed by Codding on behalf of himself and his related entities (and Steven Jones and his related entities), Codding had a deadline of January 5, 2022 to provide documentation and invoices to the Trustee for reimbursement. I never received any such documentation or invoices until January 25, 2022. Although Codding claims that he first sent such documentation in December 2021, no one has any record of receiving such documentation. Collectively, all invoices and documentation attached to Codding's January 25, 2022 e-mail to me is attached as Exhibit "13."

11.     On February 1, 2022, Codding agreed at the request of the Trustee to appear and testify under oath regarding his farm operations. I and the Trustee together conducted the examination.

12.     On February 8, 2022, Codding appeared at the continued meeting of creditors and again agreed to testify in his individual capacity as farm manager and on behalf of the Debtor. At this meeting, counsel for Farm Credit West ("FCW") was also present and asked questions. A true and correct copy of the transcript for February 8, 2022 is attached as Exhibit "14."

13.     I along with the Trustee was informed on or around March 21, 2022 that a farm labor provider, Nevarez Farm Labor, was left unpaid by Codding for work performed on Estate properties. I spoke with a representative of Nevarez Farm Labor over the telephone and was informed that the outstanding invoices for Nevarez Farm Labor are in excess of $70,000.

14.     On March 16, 2022, I received an e-mail from representatives of Wayne Cooper Ag Services who informed me separately over the telephone that they had been asked by

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

1  Codding to perform water pump test services at the Live Oak Property and, after performing

2  such services, had been left unpaid and ignored by Codding. A true and correct copy of the e-

3  mail and attachments is collectively attached as Exhibit "18."

4        15.      On March 17, 2022, I received an e-mail from representatives of John Anthony

5  Vineyards attaching two previously-undisclosed grape purchase contracts dated April 30, 2021.

6  No reason has ever been provided that these contracts were left undisclosed to the Trustee. It is

7  notable that the pre-conversion negotiated rate for one ton of grapes was $4,000 but the post-

8  conversion negotiated rate for one ton of grapes of the same type was approximately $3,350. A

9  true and correct copy of the two purchase contracts from John Anthony is attached as Exhibit

10  "19."

11        16.      On March 27-28, 2022, I received e-mail correspondences from Nevarez Farm

12  Labor showing an unpaid principal balance of $56,803.97 for farm labor performed at Estate

13  properties prior to June 15, 2021. A true and correct copy of the explanatory e-mail

14  correspondence from Juan Nevarez and all of the pre-correction invoices received are

15  collectively attached as Exhibit "20."

16

17        I declare under penalty of perjury that the foregoing is true and correct. Executed on April 1,

18  2022.

19                                                   _____

20                                                   TINHO MANG

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

### Declaration of Lori J. Ensley

I, LORI J. ENSLEY, declare as follows:

1.       I am an individual over 18 years of age and competent to make this Declaration.

2.       If called upon to do so, I could and would competently testify as to the facts set forth in this Declaration.

3.       I am the Trustee's employed and authorized field agent for Northern Holding, LLC ("Debtor").

4.       I have personal knowledge of some of the terms set forth in this Declaration, and if called upon to do so, I could and would competently testify to these facts.

5.       All terms not defined herein are used as they are defined in the Motion.

6.       On December 9, 2022, I personally visited the property located at 1172 San Marcos Road, Paso Robles, CA ("San Marcos Property") and observed a number of unidentified individuals at the San Marcos Property appearing to be using the machinery at the San Marcos Property to process wine. I verbally informed these individuals to leave the San Marcos Property and they complied.

7.       From December 9-10, 2022, I supervised the re-key and re-securing of the properties of the Estate with the assistance of a locksmith funded by the secured creditor Farm Credit West, FCLA.

8.       I never authorized Mr. Codding or any other individual to process wine or to access any property of the Estate and was never informed by Mr. Marshack to grant access for those purposes. On all of my prior visits, I made an appointment with Mr. Codding and never observed any wine processing occurring. However, on December 9, 2022, I did not announce my intent to visit.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 1, 2022.

_____
LORI ENSLEY

NOTICE OF MOTION AND MOTION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE CIVIL CONTEMPT

# REQUEST FOR JUDICIAL NOTICE

Richard A. Marshack, the duly-appointed and acting chapter 7 trustee ("Trustee") of the

bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor"), hereby requests pursuant to

Federal Rule of Evidence 201, that this Court take judicial notice of the following documents to be

considered in connection with Trustee's application for issuance of an order to show cause re: civil

contempt pursuant to Local Bankruptcy Rule 9020-1:

| EXHIBIT | JUDICIALLY NOTICED DOCUMENTS |
|---------|------------------------------|
| 1. | Petition filed by Debtor on October 28, 2020, Dk. No. 1, Case No. 8:20-bk-13014-MW. |
| 2. | Stipulation for Turnover of Real Property Located at 1172 San Marcos Road, Paso Robles, CA filed on August 9, 2021, as Dk. No. 184. |
| 3 | Order Approving Stipulation for Turnover of Real Property Located at 1172 San Marcos Road, Paso Robles, CA, filed August 23, 2021, as Dk. No. 196. |
| 4 | Chapter 7 Trustee's Motion to Approve Farm Operator Agreement and for Order to Operate Debtor's Business for the Limited Purpose of Completing Fall 2021 Harvest of Current Crop of Fruit, filed August 9, 2021, as Dk. No. 186. |
| 5 | Order Granting Chapter 7 Trustee's Motion to Approve Farm Operator Agreement and for Order to Operate Debtor's Business for the Limited Purpose of Completing Fall 2021 Harvest of Current Crop of Fruit, filed September 7, 2021, as Dk. No. 211. |
| 8 | California Secretary of State – October 26, 2021 Statement of Information for Humanity Wine Company, LLC |

Additionally, pursuant to Local Bankruptcy Rule 9020-1(a), a proposed order to show cause

is being lodged concurrently with this Motion. A true and correct copy of the proposed order to show

cause is attached as Exhibit "21."


Dated: April 1, 2022                          MARSHACK HAYS LLP


                                              By: /s/ D. Edward Hays
                                                  D. EDWARD HAYS
                                                  TINHO MANG
                                                  Attorneys for Chapter 7 Trustee,
                                                  RICHARD A. MARSHACK

**EXHIBIT 1**

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

CENTRAL DISTRICT OF CALIFORNIA

Case number *(if known)* _____    Chapter    11

☐ Check if this an
amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy          04/20

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | Northern Holdings, LLC |
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 45-5164440 |

4.    **Debtor's address**

| **Principal place of business** | **Mailing address, if different from principal place of business** |
|---|---|
| 143 1/2 S. Olive Street<br>Orange, CA 92866<br>Number, Street, City, State & ZIP Code | 13217 Jamboree Road, #429<br>Tustin, CA 92782<br>P.O. Box, Number, Street, City, State & ZIP Code |
| Orange<br>County | **Location of principal assets, if different from principal place of business**<br>1172 San Marcos Road Paso Robles, CA 93446<br>Number, Street, City, State & ZIP Code |

5.    **Debtor's website** (URL) _____

6.    **Type of debtor**

☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

EXHIBIT 1
PAGE 35

Debtor    Northern Holdings, LLC

Name

Case number (if known) _____

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.
_____

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply*:

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| District _____ | When _____ | Case number _____ |
| District _____ | When _____ | Case number _____ |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

■ No

☐ Yes.

| Debtor _____ | | Relationship _____ |
| District _____ | When _____ | Case number, if known _____ |

EXHIBIT 1
PAGE 36

| Debtor | Northern Holdings, LLC | | Case number (*if known*) | |
|--------|----------------------|---|-----------------------|---|
| | Name | | | |

---

**11. Why is the case filed in this district?**

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes.  Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?** _____

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency _____

Contact name _____

Phone _____

---

**■ Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

---

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

---

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50  million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50  million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

**EXHIBIT 1
PAGE 37**

| Debtor | Northern Holdings, LLC | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

---

### Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    October 28, 2020
                MM / DD / YYYY

X _____    Leroy Codding
Signature of authorized representative of debtor    Printed name

Title    Managing Member

---

**18. Signature of attorney**

X    /s/ Matthew D. Resnik    Date    October 28, 2020
Signature of attorney for debtor                    MM / DD / YYYY

Matthew D. Resnik
Printed name

RESNIK HAYES MORADI, LLP.
Firm name

17609 Ventura Blvd.
Ste 314
Encino, CA 91316
Number, Street, City, State & ZIP Code

Contact phone    (818) 285-0100    Email address    matt@rhmfirm.com

(SBN 182562) CA
Bar number and State

EXHIBIT 1
PAGE 38

| Fill in this information to identify the case: | | |
|---|---|---|
| Debtor name | Northern Holdings, LLC | |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA | ☐ Check if this is an |
| Case number (if known): | _____ | amended filing |

# Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Bank of America PO Box 15019 Wilmington, DE 19850 | | | | | | $21,533.55 |
| Capital One P.O. Box 60599 City Of Industry, CA 91716 | | | | | | $3,039.97 |
| Electro-Steam Generator Corp. 50 Indel Avenue Rancocas, NJ 08073 | | | | | | $5,382.00 |
| Erich Russell 2380 Live Oak Road Paso Robles, CA 93446 | | | | | | $6,400,000.00 |
| PG&E P.O. Box 99700 Sacramento, CA 95899-7300 | | | | | | $27,346.20 |
| Sunbelt Rentals P.O. Box 409211 Atlanta, GA 30384 | | | | | | $12,894.68 |
| West Coast Wine Partners 134 Church Street Sonoma, CA 95476 | | | | | | $13,630.00 |

Software Copyright (c) 1996-2020 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

EXHIBIT 1
PAGE 39

## United States Bankruptcy Court
### Central District of California

In re    Northern Holdings, LLC                                          Case No.
                                        Debtor(s)                       Chapter        11

### LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| Leroy Codding | | 100% | |

### DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

I, the Managing Member of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing List of Equity Security Holders and that it is true and correct to the best of my information and belief.

Date    October 28, 2020                          Signature
                                                                Leroy Codding

*Penalty for making a false statement of concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

EXHIBIT 1
PAGE 40

## STATEMENT OF RELATED CASES
## INFORMATION REQUIRED BY LBR 1015-2
## UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA

1.  A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, his or her current or former domestic partner, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of each such of prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

None
_____

2.  (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

None
_____

3.  (If petitioner is a corporation) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

None
_____

4.  (If petitioner is an individual) A petition under the Bankruptcy Reform Act of 1978, including amendments thereof, has been filed by or against the debtor within the last 180 days: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

None
_____

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at _____ Orange _____ , California.

Date: _____ October 28, 2020 _____

Leroy Codding
Signature of Debtor 1

_____

Signature of Debtor 2

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

October 2018                                    Page 1        **F 1015-2.1.STMT.RELATED.CASES**

EXHIBIT 1
PAGE 41

<u>UNANIMOUS WRITTEN CONSENT OF</u>

<u>THE MANAGING MEMBERS</u>

<u>NORTHERN HOLDINGS, LLC.</u>

<u>DATED: October 28, 2020</u>

Pursuant to §307(b) of the California Corporations Code and the operating agreement of the LLC, the undersigned, being the Managing Member of the LLC, and in lieu of a meeting, hereby unanimously adopts the following recitals and resolutions:

WHEREAS, the Managing Member has determined that the LLC needs to take advantage of the benefits of Chapter 11 of the Bankruptcy Code to reorganize the debt structure of the LLC; and,

THEREFORE IT IS RESOLVED, that the LLC is authorized to file a Voluntary Petition under Chapter 11 of the Bankruptcy Code and attempt to reorganize thereunder; and,

IT IS FURTHER RESOLVED, that, Leroy Codding, Managing Member, is hereby authorized and instructed to take whatever actions he deems appropriate to file the Chapter 11 petition and see the case to complete reorganization.

Managing Member

_____
Leroy Codding

EXHIBIT 1
PAGE 42

| Attorney or Party Name, Address, Telephone & FAX Nos., and State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Matthew D. Resnik<br>17609 Ventura Blvd.<br>Ste 314<br>Encino, CA 91316<br>(818) 285-0100 Fax: (818) 855-7013<br>California State Bar Number: (SBN 182562) CA<br>matt@rhmfirm.com | |

☑ *Attorney for:  Debtor*

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>         Northern Holdings, LLC<br><br>                                        Debtor(s),<br><br>                                        Plaintiff(s),<br><br><br><br><br>                                        Defendant(s). | CASE NO.:<br>ADVERSARY NO.:<br>CHAPTER:    11 |
|---|---|
| | **CORPORATE OWNERSHIP STATEMENT<br>PURSUANT TO  FRBP 1007(a)(1)<br>and 7007.1, and LBR 1007-4**<br><br>[No hearing] |

*Pursuant to FRBP 1007(a)(1) and 7007.1, and LBR 1007-4, any corporation, other than a governmental unit, that is a debtor in a voluntary case or a party to an adversary proceeding or a contested matter shall file this Statement identifying all its parent corporations and listing any publicly held company, other than a governmental unit, that directly or indirectly own 10% or more of any class of the corporation's equity interest, or state that there are no entities to report. This Corporate Ownership Statement must be filed with the initial pleading filed by a corporate entity in a case or adversary proceeding. A supplemental statement must promptly be filed upon any change in circumstances that renders this Corporate Ownership Statement inaccurate.*

I,    Leroy Codding                                          , the undersigned in the above-captioned case, hereby declare
                *(Print Name of Attorney or Declarant)*
under penalty of perjury under the laws of the United States of America that the following is true and correct:

This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                                                **F 1007-4.CORP.OWNERSHIP.STMT**

EXHIBIT 1
PAGE 43

**[Check the appropriate boxes and, if applicable, provide the required information.]**

1.       I have personal knowledge of the matters set forth in this Statement because:
         ☑ I am the president or other officer or an authorized agent of the Debtor corporation
         ☐ I am a party to an adversary proceeding
         ☐ I am a party to a contested matter
         ☐ I am the attorney for the Debtor corporation

2.a.     ☐ The following entities, other than the debtor or a governmental unit, directly or indirectly own 10% or more of any class of the corporation's(s') equity interests:
         *[For additional names, attach an addendum to this form.]*

  b.     ☑ There are no entities that directly or indirectly own 10% or more of any class of the corporation's equity interest.

October 28, 2020 _____            By: _____
Date                                                     Signature of Debtor, or attorney for Debtor

                                                    Name:   Leroy Codding,  Managing Member
                                                            Printed name of Debtor, or attorney for
                                                            Debtor

_____
             This form is optional. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2012                                                            **F 1007-4.CORP.OWNERSHIP.STMT**

EXHIBIT 1
PAGE 44

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Matthew D. Resnik<br>17609 Ventura Blvd.<br>Ste 314<br>Encino, CA 91316<br>(818) 285-0100 Fax: (818) 855-7013<br>California State Bar Number: (SBN 182562) CA<br>matt@rhmfirm.com | |

☐  *Debtor(s) appearing without an attorney*

■  *Attorney for Debtor*

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| In re:<br><br>    Northern Holdings, LLC | CASE NO.:<br>CHAPTER: 11 |
|---|---|
|  | **VERIFICATION OF MASTER<br>MAILING LIST OF CREDITORS**<br><br>**[LBR 1007-1(a)]** |
| Debtor(s). | |

Pursuant to LBR 1007-1(a), the Debtor, or the Debtor's attorney if applicable, certifies under penalty of perjury that the master mailing list of creditors filed in this bankruptcy case, consisting of __2__ sheet(s) is complete, correct, and consistent with the Debtor's schedules and I/we assume all responsibility for errors and omissions.

Date: __October 28, 2020_____

_____
Signature of Debtor 1

Date: _____

_____
Signature of Debtor 2 (joint debtor) ) (if applicable)

Date: __October 28, 2020_____

_____
Signature of Attorney for Debtor (if applicable)

This form is optional. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2015*                                    **F 1007-1.MAILING.LIST.VERIFICATION**

EXHIBIT 1
PAGE 45

Northern Holdings, LLC
13217 Jamboree Road, #429
Tustin, CA 92782

Matthew D. Resnik
RESNIK HAYES MORADI, LLP.
17609 Ventura Blvd.
Ste 314
Encino, CA 91316

Bank of America
PO Box 15019
Wilmington, DE 19850

California Dept of Tax and Fee Admi
Special Ops, MIC 29
PO Box 942879
Sacramento, CA 94279-0005

Capital One
P.O. Box 60599
City Of Industry, CA 91716

Electro-Steam Generator Corp.
50 Indel Avenue
Rancocas, NJ 08073

Erich Russell
2380 Live Oak Road
Paso Robles, CA 93446

Farm Credit West
3755 Atherton Rd
11707 Fair Oaks Blvd
Rocklin, CA 95765

EXHIBIT 1
PAGE 46

Franchise Tax Board
Attn: Bankruptcy Unit
P.O. Box 2952
Sacramento, CA 95812-2952


Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346


Mortgage Lender Services as Agent
Farm Credit West, FLCA, as Trustee
11707 Fair Oaks Blvd
Fair Oaks, CA 95628


PG&E
P.O. Box 99700
Sacramento, CA 95899-7300


San Luis Obispo Tax Collector
1055 Monterey St Room D290
San Luis Obispo, CA 93408


Sunbelt Rentals
P.O. Box 409211
Atlanta, GA 30384


West Coast Wine Partners
134 Church Street
Sonoma, CA 95476


EXHIBIT 1
PAGE 47

**EXHIBIT 2**

D. EDWARD HAYS, #162507
ehays@marshackhays.com
DAVID A. WOOD, #272406
dwood@marshackhays.com
TINHO MANG, #322146
tmang@marshackhays.com
MARSHACK HAYS LLP
870 Roosevelt Avenue
Irvine, CA 92620
Telephone: (949) 333-7777
Facsimile: (949) 333-7778

Attorneys for Chapter 7 Trustee,
RICHARD A. MARSHACK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>NORTHERN HOLDING, LLC,<br><br>Debtor. | Case No. 8:20-bk-13014-MW<br><br>Chapter 7<br><br>STIPULATION FOR TURNOVER OF REAL PROPERTY LOCATED AT 1172 SAN MARCOS ROAD, PASO ROBLES, CA<br><br>[NO HEARING REQUIRED] |

TO THE HONORABLE MARK S. WALLACE, UNITED STATES BANKRUPTCY JUDGE, THE

OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

This stipulation is entered into between Richard A. Marshack, in his capacity as Chapter 7

Trustee ("Trustee") of the Bankruptcy Estate ("Estate") of Northern Holding, LLC ("Debtor"), on

one hand, and Rabbit Ridge Wine Sales, Inc. ("Rabbit Ridge"), on the other hand, with regard to

turnover of real property commonly known as 1172 San Marcos Road, Paso Robles, CA, APN Nos.

026-104-001, 027-145-022 ("Property"). Collectively, Trustee and Rabbit Ridge shall be referred to

as the "Parties."

### Recitals

A.     On October 28, 2020, Debtor filed a voluntary petition for bankruptcy under Chapter

11 of Title 11 of the United States Code.

EXHIBIT 2
PAGE 49

B.      Rabbit Ridge asserts that it entered into a lease/rental agreement between Debtor and Rabbit Ridge regarding the Property, which is dated October 27, 2020 ("San Marcos Lease").

C.      The San Marcos Lease states that Rabbit Ridge agreed to pay $15,000 per month to Debtor and the term of the San Marcos Lease expired on January 1, 2022. Additionally, paragraph 30 of the San Marcos Lease states that "Tennant will pay 20% custom crush revenue to NHC on top of basis rate – billed in arrears monthly."

D.      No cash payments have been made to Debtor by Rabbit Ridge on account of the San Marcos Lease.

E.      On June 15, 2021, as Dk. No. 116, the Court entered an order converting the case to Chapter 7. Richard A. Marshack is the duly-appointed and acting Chapter 7 trustee.

F.      The Trustee requires possession and control of the Property to administer for the benefit of the Estate.

G.      The Trustee has requested, and Rabbit Ridge agrees to turnover of the Property to the Trustee upon the terms stated below and Rabbit Ridge agrees, to the extent that the San Marcos Lease may be valid, that the San Marcos Lease is terminated in its entirety.

The Parties agree and STIPULATE as follows:

1.      Rabbit Ridge agrees that the San Marcos Lease, to the extent that it is valid, shall be voluntarily and mutually terminated and any and all interests of Rabbit Ridge in the San Marcos Lease shall be terminated, including but not limited to any leasehold or possessory interest in the Property and any right to use the production facilities at the Property. The termination of the San Marcos Lease shall be effective upon mutual execution of this stipulation.

2.      Rabbit Ridge agrees that it will vacate and turn over possession of the Property and all keys, gate openers, and all other methods of access to the Property to the Trustee on or before midnight on July 31, 2021 ("Turnover Deadline").

3.      To the extent that any such rights exist, it is the intent of this Stipulation to extinguish any occupancy, possessory, and rights of use of Rabbit Ridge at the Property.

EXHIBIT 2
PAGE 50

4.    In the event Rabbit Ridge does not vacate and turn over possession of the Property by the Turnover Deadline, and upon Trustee's request, the Clerk may issue a writ of assistance authorizing the United States Marshals Service to remove and lock Rabbit Ridge out of the Property.

5.    Trustee may seek all necessary and appropriate court orders to enforce the terms and purpose of this Stipulation.

6.    In the course of vacating the Property and turnover to the Trustee, Rabbit Ridge shall not remove, destroy, disturb, or tamper with any of the following: furniture, fixtures including trade fixtures, inventory, agricultural assets such as crops, vines, seeds, and raw and unfinished products, wine barrels and casks, machinery and equipment (including but not limited to bottling and processing equipment), materials, and ingredients of any kind.

7.    This stipulation may be executed in one or more counterparts and facsimile or electronic signatures may be used in filing this document with the Court.

Dated: July 27, 2021

By: _____
RICHARD A. MARSHACK
Chapter 7 Trustee for NORTHERN HOLDING
LLC

Dated: July 27, 2021

By: _____
LEROY CODDING
Chief Executive Officer of RABBIT RIDGE
WINE SALES, INC.

Presented by:

MARSHACK HAYS LLP

Dated: July 27, 2021

By: _/s/ D. Edward Hays_____
D. EDWARD HAYS
TINHO MANG
Attorneys for RICHARD A. MARSHACK

EXHIBIT 2
PAGE 51

# oPROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled: **STIPULATION FOR TURNOVER OF REAL PROPERTY LOCATED AT 1172 SAN MARCOS ROAD, PASO ROBLES, CA**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 9, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

⊠  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **August 9, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**DEBTOR**
NORTHERN HOLDING, LLC
ATTN: OFFICER, A MANAGING OR
GENERAL AGENT, OR TO ANY OTHER
AGENT AUTHORIZED BY APPOINTMENT
OR LAW TO RECEIVE SERVICE
13217 JAMBOREE RD #429
TUSTIN, CA 92782

**INTERESTED PARTY**
LEE CODDING
13217 JAMBOREE RD #429
TUSTIN, CA 92782

⊠  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 9, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY: PRESIDING JUDGE'S COPY**
HONORABLE MARK S. WALLACE
UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA
RONALD REAGAN FEDERAL BUILDING AND COURTHOUSE
411 WEST FOURTH STREET, SUITE 6135 / COURTROOM 6C
SANTA ANA, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 9, 2021 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 2
PAGE 52

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:

- **ATTORNEY FOR U.S. TRUSTEE (SA):** Nancy S Goldenberg nancy.goldenberg@usdoj.gov
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Michael J Gomez mgomez@frandzel.com, dmoore@frandzel.com
- **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** Tinho Mang tmang@marshackhays.com, tmang@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@ecf.courtdrive.com
- **TRUSTEE RICHARD A MARSHACK (TR):** Richard A Marshack (TR) pkraus@marshackhays.com, rmarshack@iq7technology.com; ecf.alert+Marshack@titlexi.com
- **ATTORNEY FOR INTERESTED PARTY BANK DIRECT CAPITAL FINANCE:** Elissa Miller emiller@sulmeyerlaw.com, emillersk@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
- **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Roksana D. Moradi-Brovia roksana@rhmfirm.com, matt@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
- **ATTORNEY FOR CREDITOR ADLER BELMONT GROUP, INC.:** Paul F Ready tamara@farmerandready.com
- **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Matthew D. Resnik matt@rhmfirm.com, roksana@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
- **UNITED STATES TRUSTEE (SA):** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Reed S Waddell rwaddell@frandzel.com, sking@frandzel.com
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Gerrick Warrington gwarrington@frandzel.com, sking@frandzel.com
- **INTERESTED PARTY COURTESY NEF:** David Wood dwood@marshackhays.com, dwood@ecf.courtdrive.com; lbuchananmh@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com

2. **SERVED BY UNITED STATES MAIL**: CONTINUED:

| SECURED CREDITOR / POC ADDRESS | SECURED CREDITOR / POC ADDRESS | SECURED CREDITOR |
|---|---|---|
| ELRICH RUSSELL<br>C/O KARI L. LEY, ATTORNEY AT LAW<br>264 CLOVIS AVENUE, SUITE 208<br>CLOVIS, CA 93612 | ERICH RUSSELL<br>2380 LIVE OAK ROAD<br>PASO ROBLES, CA 93446-9693 | FARM CREDIT WEST<br>3755 ATHERTON RD<br>11707 FAIR OAKS BLVD<br>ROCKLIN, CA 95765 |

| SECURED CREDITOR / POC ADDRESS | SECURED CREDITOR / POC ADDRESS | SECURED CREDITOR / POC ADDRESS |
|---|---|---|
| FARM CREDIT WEST, FLCA<br>C/O MICHAEL J. GOMEZ<br>FRANDZEL ROBINS BLOOM & CSATO, L.C.<br>1000 WILSHIRE BOULEVARD, 19TH FLOOR<br>LOS ANGELES, CA 90017-2457 | FARM CREDIT WEST, FLCA<br>ATTN: KEVIN E. RALPH<br>3755 ATHERTON DRIVE<br>ROCKLIN CA 95765-3701 | JAMES W. HAMILTON ACTTC<br>SAN LUIS OBISPO TAX COLLECTOR<br>1055 MONTEREY STREET<br>SUITE D-290<br>SAN LUIS OBISPO CA 93408-1003 |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

EXHIBIT 2
PAGE 53

**SECURED CREDITOR**
MORTGAGE LENDER SERVICES
AS AGENT
FARM CREDIT WEST, FLCA, AS
TRUSTEE
11707 FAIR OAKS BLVD
FAIR OAKS, CA 95628-2816

**CREDITOR**
BANK OF AMERICA
PO BOX 15019
WILMINGTON, DE 19850-5019

**CREDITOR**
CIVIL PROCESS CLERK
UNITED STATES ATTORNEY'S
OFFICE
FEDERAL BUILDING, ROOM 7516
300 NORTH LOS ANGELES
STREET
LOS ANGELES, CA 90012

**CREDITOR**
HILCO REAL ESTATE, LLC
5 REVERE DRIVE, SUITE 320
NORTHBROOK, IL 60062

**CREDITOR**
RABBIT RIDGE WINE SALES, INC.
179 NIBLICK RD, #406
PASO ROBLES, CA 93446-9693

**CREDITOR**
WEST COAST WINE PARTNERS
134 CHURCH STREET
SONOMA, CA 95476-6612

**CREDITOR**
ATTORNEY GENERAL
UNITED STATES DEPARTMENT OF
JUSTICE
BEN FRANKLIN STATION
P.O. BOX 683
WASHINGTON, DC 20044

**CREDITOR**
CALIFORNIA DEPT OF TAX AND FEE
ADMI
SPECIAL OPS, MIC 29
PO BOX 942879
SACRAMENTO, CA 94279-0005

**CREDITOR**
ELECTRO-STEAM GENERATOR CORP.
50 INDEL AVENUE
RANCOCAS, NJ 08073

**CREDITOR / POC ADDRESS**
INTERNAL REVENUE SERVICE
P.O. BOX 7346
PHILADELPHIA, PA 19101-7346

**CREDITOR**
SUNBELT RENTALS
P.O. BOX 409211
ATLANTA, GA 30384-9211

**CREDITOR / POC ADDRESS**
ADLER BELMONT GROUP, INC.
C/O PAUL F. READY
FARMER & READY
1254 MARSH STREET
SAN LUIS OBISPO CA 93401

**CREDITOR**
CAPITAL ONE
P.O. BOX 60599
CITY OF INDUSTRY, CA 91716-0599

**CREDITOR / POC ADDRESS**
FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

**CREDITOR**
PG&E
P.O. BOX 99700
SACRAMENTO, CA 95899-7300

**CREDITOR**
THOMAS K RACKERBY
C/O TOM PROUNTZOS
GOODMAN NEUMAN HAMILTON
LLP
ONE POST STREET, SUITE 2100
SAN FRANCISCO, CA 94104

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 2
PAGE 54

# EXHIBIT 3

1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  DAVID A. WOOD, #272406
   dwood@marshackhays.com
3  TINHO MANG, #322146
   tmang@marshackhays.com
4  MARSHACK HAYS LLP
   870 Roosevelt Avenue
5  Irvine, CA 92620
   Telephone: (949) 333-7777
6  Facsimile: (949) 333-7778

7  Attorneys for Chapter 7 Trustee,
   RICHARD A. MARSHACK

**FILED & ENTERED**

**AUG 23 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY jle          DEPUTY CLERK

**CHANGES MADE BY COURT**

8

9              UNITED STATES BANKRUPTCY COURT

10        CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

11

12 | In re | Case No. 8:20-bk-13014-MW

13 | NORTHERN HOLDING, LLC, | Chapter 7

14 |              Debtor. | ORDER APPROVING STIPULATION
                          FOR TURNOVER OF REAL PROPERTY
15 |                      | LOCATED AT
                          1172 SAN MARCOS ROAD, PASO
16 |                      | ROBLES, CA

17 |                      | [NO HEARING REQUIRED]

18        The court having reviewed and considered the *Stipulation for Turnover of Real Property*

19 *Located at 1172 San Marcos Road, Paso Robles, CA,* APN Nos. 026-104-001, 027-145-022 (the

20 "Stipulation", Docket No. 184),[1] and good cause appearing,

21        IT IS HEREBY ORDERED that the Stipulation is approved as follows:

22        1.        The San Marcos Lease, to the extent that it is valid, is voluntarily and mutually

23 terminated and any and all interests of Rabbit Ridge in the San Marcos Lease is terminated,

24 including but not limited to any leasehold, occupancy, or possessory interest in the property and

25 facilities located at 1172 San Marcos Road, Paso Robles, CA, APN Nos. 026-104-001 and 027-145-

26 022 ("Property"), and any right to use the production facilities at the Property.

27

28

[1] All terms not defined herein are used as they are defined in the Stipulation.

1

4816-7517-2594v.1-1015.146

EXHIBIT 3
PAGE 56

2.    Rabbit Ridge shall vacate and turn over possession of the Property and all keys, gate openers, and all other methods of access to the Property to the Trustee on or before midnight on July 31, 2021 ("Turnover Deadline").

3.    To the extent that any such rights exist, any occupancy, possessory, and rights of use of Rabbit Ridge at the Property are extinguished.

4.    In the event Rabbit Ridge does not vacate and turn over possession of the Property by the Turnover Deadline, and upon Trustee's request, the Clerk may issue a writ of assistance authorizing the United States Marshals Service to remove and lock Rabbit Ridge out of the Property.

5.    Trustee may seek all necessary and appropriate court orders to enforce the terms and purpose of this Order.

6.    In the course of vacating the Property and turnover to the Trustee, Rabbit Ridge shall not remove, destroy, disturb, or tamper with any of the following: furniture, fixtures including trade fixtures, inventory, agricultural assets such as crops, vines, seeds, and raw and unfinished products, wine barrels and casks, machinery and equipment (including but not limited to bottling and processing equipment), materials, and ingredients of any kind.

IT IS SO ORDERED.

### 

Date: August 23, 2021

Mark S. Wallace
United States Bankruptcy Judge

4816-7517-2594v.1-1015.146

2

EXHIBIT 3
PAGE 57

**EXHIBIT 4**

1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  DAVID A. WOOD, #272406
   dwood@marshackhays.com
3  TINHO MANG, #322146
   tmang@marshackhays.com
4  MARSHACK HAYS LLP
   870 Roosevelt
5  Irvine, CA 92620
   Telephone: (949) 333-7777
6  Facsimile: (949) 333-7778

7  Attorneys for Chapter 7 Trustee,
   RICHARD A. MARSHACK
8

9              UNITED STATES BANKRUPTCY COURT

10       CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| 11 | In re | Case No. 8:20-bk-13014-MW |
|---|---|---|
| 12 | NORTHERN HOLDING, LLC, | Chapter 7 |
| 13 | Debtor. | CHAPTER 7 TRUSTEE'S MOTION TO APPROVE FARM OPERATOR AGREEMENT AND FOR ORDER TO OPERATE DEBTOR'S BUSINESS FOR THE LIMITED PURPOSE OF COMPLETING FALL 2021 HARVEST OF CURRENT CROP OF FRUIT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RICHARD A. MARSHACK AND LEROY CODDING IN SUPPORT |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | Date: August 30, 2021 |
| 20 | | Time: 2:00 p.m. |
| 21 | | Ctrm: 6C Address: 411 W. Fourth Street, Santa Ana, CA 92701 |

22  TO THE HONORABLE MARK S. WALLACE, UNITED STATES BANKRUPTCY JUDGE, THE

23  OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

24        RICHARD A. MARSHACK, in his capacity as Chapter 7 Trustee ("Trustee") of the

25  Bankruptcy Estate ("Estate") of Northern Holding, LLC ("Debtor"), brings this motion to approve a

26  farm operator agreement and for an order authorizing the Trustee to operate the Debtor's business

27  for the limited period of time and for the sole purpose of completing the harvest of the current crop

28  of fruit growing on Debtor's land. In support thereof, the Trustee respectfully represents as follows:

1

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 59

1    **1.**     **Summary of Argument**

2       Debtor is the title owner of approximately 450 acres of land suitable for vineyards across two

3 separate parcels of real property, located at 1172 San Marcos Road, Paso Robles, CA ("San Marcos

4 Property"), which includes a turnkey winery production facility, real property located at APN 027-

5 145-022 in Paso Robles, CA ("Texas Road Property") and 2380 Live Oak Road, Paso Robles, CA

6 ("Live Oak Property") (collectively, "Properties"). Around 135 acres are currently planted with

7 crops that are anticipated to be ready for harvest in late September or early October of this year, with

8 an estimated yield of 253.5 tons. Based on the Trustee's personal visual inspection of the Properties,

9 it would be an enormous waste if all of these crops were allowed to wither and die – the current crop

10 should be brought to fruition and sold for the benefit of the Estate. To accomplish this goal, the

11 Trustee personally drafted and negotiated an agreement with LeRoy Codding ("Mr. Codding" or

12 "Operator") where the Debtor's principal and person in charge of farm operations would personally

13 advance all operational costs for tending, maintaining, cultivating, and harvesting existing crops,

14 with all proceeds to be delivered to the Trustee. Thereafter, Operator would be allowed to be

15 reimbursed all reasonable expenses of harvest from the proceeds of the sale. The crops are currently

16 being tended and require regular care and supervision under a person with knowledge and expertise

17 regarding the cultivation of the types of crops on the land. Thus, continuity is crucial for this year's

18 harvest.

19       The Trustee respectfully requests that the Court approve the farm management agreement

20 with Mr. Codding ("Agreement") and enter an order pursuant to 11 U.S.C. § 721 to allow him to

21 permit operations on the Properties for the sole and limited purpose of completing the fall 2021

22 harvest of crop, selling the crop, and holding the proceeds pending further order of the Court

23 (recognizing that all such proceeds would be subject to the lien asserted by Farm Credit West,

24 FCLA).

25    **2.**     **Procedural Background**

26       Erich Russell was the former owner and operator of Rabbit Ridge Winery ("Rabbit Ridge"),

27 which was as of October 2020 located at 1172 San Marcos Road, Paso Robles, CA (previously

28 defined as "San Marcos Property"). To finance his business operations, Mr. Russell borrowed

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

**EXHIBIT 4**
**PAGE 60**

1  substantial sums of money from Farm Credit West, FLCA ("FCW"), which were secured certain

2  assets including substantially all assets of Rabbit Ridge and Properties.

3      Prior to a foreclosure of the Properties by FCW, Mr. Russell filed an individual Chapter 11

4  case, initiating bankruptcy case number 9:20-bk-10035-DS ("Individual Case"). On June 19, 2020,

5  the Individual Case was dismissed for cause.

6      A subsequent foreclosure sale for the Properties was scheduled by FCW for October 29,

7  2020. Prior to the foreclosure date, Mr. Russell and FCW continued to discuss a possible forbearance

8  and an extension of the foreclosure date.

9      On or about October 28, 2020, Mr. Russell signed quitclaim deeds transferring the Properties

10 to Debtor. These quitclaim deeds were recorded on the same date. Additionally, ownership and

11 control of Rabbit Ridge passed to LeRoy Codding, who operated as a *de facto* chief restructuring

12 officer.

13     On October 28, 2020, Debtor filed a voluntary petition for bankruptcy under Chapter 11 of

14 Title 11 of the United States Code, initiating the above-captioned bankruptcy proceeding.

15     On October 29, 2020, as Dk. No. 5, FCW filed a notice of continuation of perfection of

16 security interest and demand to sequester cash collateral. No motion or stipulation to use cash

17 collateral has ever been filed in this case. To the best of the Trustee's knowledge, FCW has not

18 agreed to the use of its cash collateral for any purpose, although the Trustee has been in extensive

19 negotiations with FCW regarding his proposed course of administration of the case.

20     On November 5, 2020, Debtor filed its registration as a limited liability company in

21 California, file no. 202031410753. Prior to this date, Debtor was not a registered limited liability

22 company in California. Northern Holding, LLC was registered as of April 30, 2012 with the

23 Minnesota Secretary of State, file number 486524600029. A true and correct copy of the LLC filing

24 statement for the Debtor as a Minnesota LLC is attached to the request for judicial notice ("RJN") as

25 Exhibit " 5 ."

26     On November 6, 2020, as Dk. No. 11, FCW filed a motion for relief from the automatic stay

27 regarding the Properties ("Stay Relief Motion"). The hearing on the Stay Relief Motion has been

28 trailed and is currently set for August 2, 2021, with interim partial relief granted by the Court.

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 61

1    On February 16, 2021, as Dk. No. 60, the Office of the United States Trustee ("OUST") filed

2  a motion to dismiss or convert the case for cause pursuant to 11 U.S.C. § 1112(b).

3    On March 31, 2021, as Dk. No. 104, Debtor filed a monthly operating report for the month of

4  February ("February MOR"). This was the last monthly operating report ever filed by Debtor. The

5  February MOR showed that in that month, Debtor was entitled to receive rental and operating

6  income – but the Trustee is informed that no rental and operating income was ever received by

7  Debtor based on what was alleged to be offsetting debts arising from oral consulting agreements.

8  The Trustee has never been provided with any copy of any consulting agreement and disputes the

9  validity of such agreements, if they even exist.

10    On June 15, 2021, as Dk. No. 116, the Court entered an order converting the case to Chapter

11  7. Richard A. Marshack (previously defined as "Trustee") was appointed as the Chapter 7 trustee.

12    Upon the Trustee's appointment, he was informed that Debtor's insurance premium finance

13  company and insurance broker had not been paid in full and that the Debtor's insurance policies

14  were at risk of cancellation.

15    The Trustee has requested that the Debtor immediately produce a report pursuant to FRBP

16  1019 regarding post-petition debts. On June 25, 2021, as Dk. No. 126, the FRBP 1019 report was

17  filed by Debtor.

18    In the course of the Chapter 11 case, Debtor as a debtor-in-possession sought to market and

19  sell the Properties. No sale motion was ever filed. The Trustee is investigating whether a sale of the

20  Properties is feasible at this point and whether and to what extent to pursue marketing and sale

21  efforts for the Properties. There are currently parties expressing interest in the Properties including

22  the Riboli family (owners of the San Antonio Winery) who are conducting extensive due diligence at

23  the Live Oak Property.

24    **A.    Farm Management Agreement and Proposed Operations**

25    On July 27, 2021, the Trustee personally visited and toured the Properties with Mr. Codding.

26  The Trustee personally discussed options with Mr. Codding regarding the continued maintenance of

27

28

4

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 62

1   the Properties and the crops growing on the Properties.[1] The Trustee concluded in his business

2   judgment that while Mr. Codding may not have understood all of the best practices in connection

3   with a Chapter 11 bankruptcy case but now believes that Mr. Codding will work in earnest for the

4   benefit of the Estate. The Trustee believes that Mr. Codding is the best situated person to supervise

5   the Fall 2021 harvest of the currently-growing crop, because he has the most institutional knowledge

6   of the current crop. A true and correct copy of the crop estimated yields as of August 5, 2021

7   prepared by Mr. Codding is attached to the Declaration of LeRoy Codding ("Codding Declaration")

8   as Exhibit "3."

9           Furthermore, pursuant to the farm management agreement (previously defined as

10  "Agreement") personally drafted, edited, and negotiated by the Trustee, Mr. Codding agreed to pay

11  for all operating expenses up front at no expense to the Estate. Thus, all of the financial risk in

12  continued operations will be borne by Mr. Codding. A true and correct, executed copy of the

13  Agreement is attached to the Declaration of Richard A. Marshack ("Marshack Declaration") as

14  Exhibit "1."

15          If Operator fails to procure and maintain adequate insurance, or fails in any other way to

16  properly maintain and cultivate the crops, the Trustee will terminate the Agreement and remove

17  Operator.

18          Also on July 27, 2021, Mr. Codding signed (on behalf of Rabbit Ridge) a stipulation for

19  turnover of the San Marcos Property acknowledging the Trustee's sole right of possession and

20  control. A separate copy of the turnover stipulation will be filed by the Trustee.

21          As stated in the Agreement, Operator projects that gross revenue from the sale of the current

22  crop is $723,000 and projects that expenses will be $400,000. The Agreement provides that Operator

23  will be entitled to 5% of the net profit (discussed as the difference between the gross revenue and

24  only the direct expenses incurred to complete the harvest such as utilities, labor, and supplies).

25  Operator will not be compensated other than through a percentage of the net proceeds – Operator

26  shall not collect any salary.

27  _____

28  [1] Pictures of the crop currently growing on the Properties which were taken by Mr. Codding and a
    diagram of the crop locations are collectively attached to the Codding Declaration as Exhibit "2."

5

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 63

3. **Legal Argument**

"The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." 11 U.S.C. § 721.

A. **There is good cause for the Court to allow continued operation of the Debtor's business.**

Under Section 721, the bankruptcy court may authorize the debtor's business to be operated in a Chapter 7 case "where the interim operation of the debtor's business is in the best interest of the estate and consistent with the orderly liquidation of the estate." COLLIER ON BANKRUPTCY ¶ 721.02 (16th ed. 2020) (citing *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1342 n.7 (5th Cir. 1984)); *see, e.g., In re Quarter Moon Livestock Co. Inc.*, 116 B.R. 775, 782 (Bankr. D. Idaho 1990) (trustee's request to operate cattle ranch business until autumn to "roundup and sell the cattle herd" granted); *see also Nakhuda v. Mansdorf (In re Nakhuda)*, 2015 Bankr. LEXIS 649 at *5-7 (B.A.P. 9th Cir. 2015). Additionally, "if the sudden termination of the debtor's business would cause great hardship to the general public or innocent third parties, authorization of the chapter 7 trustee to operate the debtor's business at a loss might be appropriate." COLLIER ON BANKRUPTCY ¶ 721.02 (16th ed. 2020).

The Office of the United States Trustee has set forth the following five factors which a trustee must consider when determining whether continued operation is in the best interest of the Estate:

"1.    Whether operating the business will result in an operating loss;

2.    The tax consequences of operating the business;

3.    The costs necessary to bring the business within compliance of local laws to the extent local laws do not conflict with the Bankruptcy Code;

4.    Potential liabilities and claims against the estate and the trustee which may arise from the operation of the business; and

5.    The length of time the business will be operated."

United States Dep't of Justice, Handbook for Chapter 7 Trustees page 4-30 (eff. October 1, 2012).

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 64

Each of these factors will be addressed in turn. After analysis of all options and the relative benefit and liabilities to the Estate, there is good cause for the Court to authorize the Trustee to operate the Debtor's business for a limited time and as set forth in this motion.

### i.    There is no anticipated operating loss for the operation of the Debtor's business.

The Trustee in this case is relying heavily on the projections of Operator regarding the estimated revenues and expenses for completing the harvest. Operator is best-situated as the prior management of the Debtor and the farmland to project the anticipated revenue, expense, and profit to complete the growing process and harvest the current crop. A true and correct copy of the projected operating budget through October 2021 is attached to the Declaration of LeRoy Codding ("Codding Declaration") as Exhibit "2."

The operating budget is reproduced below in full:

| Cost item | Amount | Running total |
|---|---|---|
| Farm Labor<br><br>- $12,000/month for tending vineyards<br>- $350/ton labor contractor to harvest | $123,500 | $123,500 |
| Workers' compensation insurance | $6,000 | $129,500 |
| Power & Water Utilities | $22,000 | $151,500 |
| Well service & maintenance | $20,000 | $171,500 |
| Nutrients | $8,000 | $179,500 |
| Licensing | $1,200 | $180,700 |
| Equipment maintenance | $10,000 | $190,700 |
| Previously expended cultivation costs[2] | $284,000 | $474,700 |

All of the expenses in the operating budget will be borne solely by Operator. Also, pursuant to the Agreement, Operator has agreed to cap his reimbursements for expenses at $400,000. Thus,

---

[2] To be clear, the Trustee has not approved of payment of, or the amount of, costs expended prior to the Agreement. This is an open issue.

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 65

based on Operator's own projections, he may be personally absorbing a substantial loss in order to complete the harvest and generate anticipated gross proceeds of $811,700. Thus, there is an anticipated net benefit of $411,700 over reimbursed expenses to the Estate. Operator shall only be reimbursed any expense if and when the crop is sold and only from crop proceeds.

### ii. There are no additional anticipated tax consequences for operating the business which would render operations prohibitive.

Debtor merely owns real properties. As such, there are property taxes which are accruing on the Properties and must be paid from the Estate. Also, when selling the crop, the Trustee is informed that there are no sales taxes or duties on the sale of the crop. Therefore, there are no tax consequences associated with and flowing from the Trustee's proposed operation of the farming business.

### iii. No known regulatory issues exist which would result in extraordinary costs to comply with local laws – ordinary operating expenses will include regulatory fees.

Operator has informed the Trustee that the only regulatory requirements for farming the land are to obtain a grower's license and a pest control application license from local or state authorities. The Trustee is informed that these licenses have already been obtained by Operator and will be maintained by Operator for the duration of the engagement.

### iv. Potential and reasonably anticipated liabilities and claims against the Estate and Trustee which may arise from the limited operation of the business do not exceed operating income.

As an operating business with farm laborers, there will be an inherent risk of workers' compensation issues and injuries. The business of farming this particular type of crop is not particularly dangerous and Operator has committed to obtaining satisfactory insurance which will insure and cover any incidence of foreseeable injury. Included in Operator's budget is worker's compensation insurance which will provide coverage for the laborers.

8

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 66

1
2
3

**v.    The proposed length of operation for farming operations on the Properties is limited to an approximate three-month period to complete the Fall 2021 harvest.**

4    The Trustee does not request authorization to operate for an extended period of time.

5    Authorization to operate is only requested through the end of the Fall 2021 harvest, which is

6    anticipated to be completed by end of October 2021. The requested relief is appropriate and

7    consistent with the Trustee's statutory duty to maximize the value of the Estate. *See, e.g., In re*

8    *Quarter Moon Livestock Co.*, 116 B.R. 775, 782 (Bankr. D. Idaho 1990) (trustee authorized to

9    operate "until fall to roundup and sell the cattle herd, and to maintain the livestock until that time.").

10    Because proceeds of the crops will be used to substantially pay down the debt owed to FCW,

11    completing this year's harvest is necessary and appropriate in the Trustee's business judgment.

12
13

**B.    The Trustee's Operation of the Properties is Consistent with their Orderly Liquidation.**

14    Because the Properties are marketed to buyers in the winery industry, the proof of concept

15    that grapes can actually be successfully grown on the Properties is crucial to the Trustee's marketing

16    efforts, especially with regard to the Live Oak Property. In fact, vines are currently being grown on

17    each of the three Properties and must be maintained on a regular basis to prevent the vines from

18    withering and dying, and the crops being ruined by neglect. Operator's maintenance of the current

19    vines will facilitate the sale to any interest buyer, because the soil will be maintained and will not be

20    subject to simply eroding away with the wind. In addition to Operator's maintenance of the crops, he

21    has been extremely cooperative with the Trustee's administration and has been instrumental in

22    facilitating the due diligence of various buyers on the Properties. The Trustee considers Operator's

23    expertise and availability to be crucial to his successful administration of Estate assets. Finally,

24    constant maintenance of the crops will reduce the fire risk to the Properties because the vines will

25    not be dry, dead and flammable.

26
27
28

9

EXHIBIT 4
PAGE 67

**C.    All income, which constitutes FCW's cash collateral, will be segregated and shall not be used absent consent or further court order.**

"The trustee may not use, sell, or lease cash collateral… unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c); *see United States Dep't of Agriculture v. Hopper (In re Colusa Regional Medical Center)*, 604 B.R. 839, 859-61 (B.A.P. 9th Cir. 2019) (discussing implied consent to use of cash collateral). After-acquired assets and proceeds traceable to collateral may also be subject to a secured creditor's duly perfected lien. *See* Cal. Comm. Code § 9204; *see also, e.g., Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 686-87 (N.D. Cal. 2007). "[T]he key consideration in deciding whether to allow the use of cash collateral is whether the secured creditor's interest is adequately protected." *Security Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 444 (B.A.P. 9th Cir. 2004).

In this case, FCW has not expressly consented to the use of its collateral or cash collateral to pay for any operating expenses whatsoever. Before the crop is finally harvested and the benefit to FCW is determined, the Court may not have all of the facts it needs to determine whether any expenses can be charged against FCW's collateral (including the proceeds of crop, which are cash collateral). Provided that Mr. Codding's projections are correct and there is a substantial amount of proceeds resulting from the harvest and sale of the current crop, the proceeds will not be disbursed unless either: (1) FCW consents, or (2) the Court enters an order specifically authorizing any disbursements over FCW's objection. Pursuant to the Agreement, all gross proceeds must be paid directly to the Trustee without deduction.

Here, the value of FCW's collateral will be greatly diminished in value if the Properties are completely abandoned and all of the crops are allowed to wither and die. It is not subject to reasonable dispute that dead, dry plants are at the greatest risk of fire, and that dead plants will result in great waste and removal costs to any eventual purchaser of the Properties. Furthermore, as shown in the pictures and projections from Operator, there is currently over two hundred tons of grapes

10

4824-2330-5952,v.1

EXHIBIT 4
PAGE 68

1  growing on the Properties which would be completely wasted if they were not being maintained. The

2  Debtor has no money to fund operations and unless the Court enters an order authorizing operations

3  pursuant to 11 U.S.C. § 721, with reimbursement of actual, reasonable expenses, FCW's collateral

4  will drastically decrease in value. Thus, the Court should enter an order authorizing the use of cash

5  collateral solely to pay and reimburse expenses from the proceeds of crop.

6  **4.    Conclusion**

7      Based upon the foregoing, the Trustee respectfully submits that good cause exists for

8  granting the Motion and respectfully requests that the Court enter an order as follows:

9      1.    Approving the farm operator agreement attached to the Marshack Declaration as

10  Exhibit "1" and authorizing the Trustee to operate the Debtor's business for the limited purpose of

11  completing the Fall 2021 harvest pursuant to 11 U.S.C. § 721;

12      2.    Authorizing the Trustee to operate the Properties to the extent necessary to complete

13  the fall 2021 harvest, with such authorization to terminate at the earliest of: (a) the completion of the

14  fall 2021 harvest October 31, 2021;

15      3.    Authorizing the Trustee to cancel all currently existing grape sales agreements and to

16  renegotiate all such agreements;

17      4.    Directing the proceeds of all sales of crop to be paid directly to the Estate and

18  authorizing the Trustee to receive and hold all gross proceeds of the sale of any crop from the

19  Properties pending further order of the Court;

20      5.    Authorizing the Trustee to, upon receipt of proceeds from the sale of crop, use cash

21  collateral to pay and reimburse actual and reasonable expenses incurred for harvesting and selling

22  the grapes, and including any utility payments and insurance costs for the three Properties; and

23  For such other and further relief as the Court deems just and proper.

24  DATED: August __9__, 2021          MARSHACK HAYS LLP

25                                          /s/ Tinho Mang
                                    By:_____
26                                          D. EDWARD HAYS
                                          TINHO MANG
27                                          Attorneys for Chapter 7 Trustee
                                          RICHARD A. MARSHACK
28

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 69

# Declaration of Richard A. Marshack

I, RICHARD A. MARSHACK, declare and state as follows:

1.     I am the Chapter 7 trustee ("Trustee") for the bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor").

2.     I am an individual over 18 years of age and competent to make this declaration. Except as set forth as matters of judicial notice, I have personal knowledge of the matters set forth in this Declaration, and if called upon to do so I could and would competently testify to these facts.

3.     All terms not defined herein are used as they are defined in the Motion.

4.     I conducted the meeting of creditors pursuant to 11 U.S.C. § 341(a) on July 13, 2021. At this meeting, Lee Codding appeared as the representative for the Debtor and testified on behalf of the Debtor.

5.     Because the Properties and the crops growing there require daily maintenance, Mr. Codding has been supervising the tending of the crops without prior expectation of reimbursement and I am informed that he also has advanced over $280,000 in costs to date without any revenues. I have been coordinating my marketing efforts in part through Mr. Codding, who has been instrumental in answering questions from the interested buyer parties and showing the Properties to the buyers, along with my brokers. Based on my conversations with Mr. Codding, I believe that he is motivated to see the fall 2021 harvest completed and he has committed to advancing all expenses to complete the harvest. I personally drafted, revised, and negotiated the farm operator agreement with Mr. Codding and he signed the operator agreement in my presence. A true and correct copy of the farm operator agreement is attached as Exhibit "1."

6.     On July 27, 2021, I personally toured the Properties along with my proposed farm operator Lee Codding (who acted as my tour guide and provided me with all information related to crop cultivation and production). Mr. Codding had deep knowledge and expertise regarding the Properties and the crops growing on the Properties. I believe that his familiarity with the crops on the Properties is essential to a successful harvest this year. No other party or secured or unsecured creditor has proposed an alternative to retaining prior management to complete the harvest. Additionally, the Riboli parties are not interested in taking over current farming operations, which I

12

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 70

1  am informed are substantially different from the method by which the Riboli parties would grow

2  crop. I am informed that the harvest will begin in September and will end in October. The Estate has

3  no reasonable alternative to hiring Mr. Codding if we are to complete the harvest this year.

4          7.      When I toured the Properties, a significant amount of the vines appeared to be

5  healthy, but a substantial portion also appeared somewhat less healthy, which I am informed was due

6  to a lack of funds available to properly maintain the crops. In my business judgment, it is extremely

7  important that the crops be adequately maintained.

8          8.      Mr. Codding informed me that he expects and projects the crops to result in gross

9  revenues of around $800,000 by the end of harvest, and agreed to be reimbursed expenses. Thus,

10  according to Mr. Codding, the harvest of crop is anticipated to generate proceeds of at least double

11  the expenses. Because Mr. Codding as the operator has agreed to advance all costs of farming and to

12  procure and maintain adequate insurance, the Estate will not be bearing the financial risk of the

13  farming operations.

14          9.      Provided that the harvest generates substantial revenues in excess of expenditures, I

15  believe that it is necessary and appropriate for the harvest to be completed in order to pay down the

16  secured debt owed to Farm Credit West.

17

18          I declare under penalty of perjury that the foregoing is true and correct. Executed on

19  August 9, 2021.

20                                                  _____

21                                                  RICHARD A. MARSHACK

22

23

24

25

26

27

28

---

13

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS

4824-2330-5952,v.1

EXHIBIT 4
PAGE 71

### Declaration of Leroy Codding

I, LEROY "LEE" CODDING, declare and state as follows:

1.      I am the managing member of Northern Holding, LLC ("Debtor").

2.      I am an individual over 18 years of age and competent to make this declaration. Except as set forth as matters of judicial notice, I have personal knowledge of the matters set forth in this Declaration, and if called upon to do so I could and would competently testify to these facts.

3.      All terms not defined herein are used as they are defined in the Motion.

4.      I am the Trustee's chosen operator for to complete the cultivation and harvest of crops at the Debtor's properties, including the Live Oak Property, the San Marcos Property, and the Texas Road Property. There are crops growing on all three properties, but the majority of the crops are currently being grown at Live Oak.

5.      Below is a table showing all my estimated expenses for the successful completion of the harvest. Prior to entering into the Agreement and termination of the lease between Debtor and Rabbit Ridge, I expended an additional $284,000 for costs of cultivation and crop maintenance.

| Cost item | Amount | Running total |
|---|---|---|
| Farm Labor<br><br>-    $12,000/month for tending vineyards<br><br>-    $350/ton labor contractor to harvest | $123,500 | $123,500 |
| Workers' compensation insurance | $6,000 | $129,500 |
| Power & Water Utilities | $22,000 | $151,500 |
| Well service & maintenance | $20,000 | $171,500 |
| Nutrients | $8,000 | $179,500 |
| Licensing | $1,200 | $180,700 |
| Equipment maintenance | $10,000 | $190,700 |

/ / /

/ / /

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

**EXHIBIT 4**
**PAGE 72**

1      6.      A true and correct copy of pictures that I took of the currently growing crop as of

2  August 2021, and a diagram of the growing areas that I personally prepared is attached as Exhibit

3  "2."

4      7.      A true and correct copy of my crop yield estimates as of August 5, 2021 is attached as

5  Exhibit "3."

6      8.      I have over 28 years of experience in the wine business. I graduated in 1993 from Cal

7  Poly with a degree in agricultural business and a concentration in wine marketing. I grew up in a

8  farming family and have been involved in farming for nearly my entire life. I am well-qualified to

9  supervise the cultivation and harvest of the crop currently growing on the Properties. The estimates

10  that I have provided to the Trustee are based on my 28 years' expertise and education in the wine

11  production industry, and I believe that they are accurate to a high degree. A true and correct copy of

12  my resume is attached as Exhibit "4."

13      9.      I personally discussed and negotiated with the Trustee regarding the farm

14  management agreement which is attached to Mr. Marshack's declaration as Exhibit "1." I am

15  committed to completing the Fall 2021 harvest and advancing all costs, provided that I am

16  reimbursed pursuant to the terms of the Agreement. If I am permitted to receive reimbursement of

17  reasonable expenses incurred, I have agreed that the total amount of reimbursed expenses will be

18  limited to $400,000, which includes the $190,700 in projected future expenses. I have also agreed to

19  compensation to me pursuant to the Agreement of 5% of the net revenue. I understand that all

20  proceeds from the sale of crop must be directed to and turned over to the Trustee.

21      10.      I have been intimately involved in the daily farming operations of the Debtor since

22  the bankruptcy filing, including that I have rented housing in the local area so I can be more

23  accessible to the Properties and supervise them daily. I am deeply committed to seeing that the

24  harvest is completed and I fully support the Trustee's marketing efforts and I will continue to do so,

25  including providing information to interested purchasers upon request. I also provided a tour of the

26  Properties to the Trustee on July 27, 2021 and have been personally involved with negotiating with

27  Erich Russell and his family to secure a voluntary turnover of the Live Oak Property.

28

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 73

1      11.    I have obtained a grower's license and a pest control application license and will

2  maintain such licensing. I will procure and maintain adequate workers' compensation insurance.

3      12.    In October 2020, I on behalf of Rabbit Ridge Wine Sales, Inc. executed a document

4  entitled "Scope of Work: Russell/Rabbit Ridge: Founder Roles" where Mr. Erich Russell and Mrs.

5  Joanne Russell were contracted by Rabbit Ridge for consulting services in exchange for a consulting

6  fee of $15,000 per month in cash and "12,000 value of residential lease on Russell Live Oak Villa."

7  The only parties to that agreement were Rabbit Ridge, Erich Russell, and Joanne Russell. To be

8  clear, none of the proceeds that will be received from the harvest and sale of the grapes discussed in

9  the motion and budget will be used to fund any obligation or reimburse any expense owed to Mr.

10  Erich Russell or Mrs. Joanne Russell.

11

12      I declare under penalty of perjury that the foregoing is true and correct. Executed on August

13   _9_, 2021.

14                                   _____

                                      LEROY CODDING

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4824-2330-5952,v.1

EXHIBIT 4
PAGE 74

REQUEST FOR JUDICIAL NOTICE

RICHARD A. MARSHACK, in his capacity as Chapter 7 Trustee ("Trustee") of the

Bankruptcy Estate ("Estate") of Northern Holding, LLC ("Debtor"), through his attorneys, Marshack

Hays LLP, hereby requests pursuant to Federal Rule of Evidence 201, that this Court take judicial

notice of the following documents to be considered in connection with Trustee's motion to approve a

farm operator agreement and for an order authorizing the Trustee to operate the Debtor's business

for the limited period of time and for the sole purpose of completing the harvest of the current crop

of fruit growing on Debtor's land:

| | JUDICIALLY NOTICED DOCUMENT |
|---|---|
| 5 | A true and correct copy of LLC filing statement for Debtor as a Minnesota LLC – Minnesota Secretary of State file number 486524600029. |

DATED: August 9, 2021              MARSHACK HAYS LLP

                                              /s/ Tinho Mang
                                   By:_____
                                          D. EDWARD HAYS
                                          TINHO MANG
                                          Attorneys for Chapter 7 Trustee
                                          RICHARD A. MARSHACK

17
MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
4837-0183-4931, v. 1

EXHIBIT 4
PAGE 75

# EXHIBIT 1

EXHIBIT 4
PAGE 76

# Farm Operator Agreement 2021

## July 26, 2021

Richard Marshack, Bankruptcy Trustee and Leroy Codding) agree to the following terms whereby the estate retains Codding to manage certain operations  relating to Northern Holding, LLC assets now in possession of Richard A. Marshack, Chapter 7 Trustee ("Trustee") for Northern Holding, LLC ("Debtor"). The parties to this agreement are the Trustee, on the one hand, solely in his capacity as the Chapter 7 trustee, and Leroy Codding ("Operator or Codding"), on the other hand.

Term: August 1, 2021 to **October 10,** 2021. Term may be extended only by mutual agreement by the parties for no more than 30 days.

<u>Scope of Retention:</u>
Codding is retained by Trustee for the following purposes:

1. To maintain the crops including watering, fertilizing and otherwise caring for the crop as a good and prudent operator trying to cost efficiently maximize production of grapes.
2.  Take all steps which are reasonable to maintain and increase the value of the soil and the crops.
3.  Keep all irrigation systems working and fully functional.
4. Harvest (pick) grapes when timing is appropriate to receive maximum value but no later than termination of this agreement.
5. Maintain good and proper practices including taking prudent care of the orchard/soil/vines including pest control and irrigation and maintain perimeter fencing.
6. Cancel any and all existing purchase contracts for the grapes and present new contracts to Trustee for execution.  New contracts shall be at fair market value and the seller shall be "Richard Marshack, Bankruptcy Trustee".
7. All revenue shall be made payable solely to "Richard Marshack, Bankruptcy Trustee".
8.  Codding shall be permitted to subcontract the labor from employees of Rabbit Ridge Wine Sales Inc.  Codding to provide proof of workers compensation insurance and other required insurances and compliance with tax withholdings obligations.
9. At harvest Codding, if permitted by law and in accordance with the law, may retain outside labor contractor to pick the crop.
10.  Codding to advance all costs and expenses necessary to carry out the terms of this contract and will be reimbursed reasonable expenses from the proceeds of the crop. Codding to provide Trustee a weekly list of expenses.
11.  Codding estimates that gross revenue will be $723,000 and estimates the expenses to be approximately $400,000.  Codding to receive compensation of 5% of the net profit.
12.  Codding to comply with all state and federal and municipal laws including labor laws, taxation laws, permits and licensing laws.

EXHIBIT 4
PAGE 77

<u>Access</u>

Trustee grants Operator limited access (as described below) to and use of Debtor's vineyards and other assets set forth in Exhibit "A" solely for the purpose of growing, tending, and harvesting grapes and carrying out the obligations set forth above.

Operator agrees and understands they are not to remove or work with any casks or bottles or cases of wines or any other personal property.  Further Operator shall not use any equipment or inventory.

Trustee allows Operator reasonable access to and use of Debtor's vineyards located at 1172 San Marcos Rd., 2380 Live Oak Rd., and Texas Road (APN No. 027-0145-022) in Paso Robles, California, solely to the extent carry out the above obligations on the permitted land. No access shall be allowed to Operator for any other reason and no access shall be allowed to Operator to any other asset or aspect of the real properties except with express written permission of the Trustee.

Access does not equate to possession. Trustee has possession and authority over of all assets of the Debtor, including real estate, improvements and equipment. Access may be revoked upon written notice from the Trustee. Operator will bear cost outlay for all farming expenses including labor, cultural costs etc. Operator shall maintain satisfactory and adequate insurance at all times for operations and provide proof of insurance to the Trustee, at Operator's own expense. Operator shall procure and maintain at his own cost all insurance contracts which are customary for the type and extent of work contemplated in this agreement.

<u>Miscellaneous Terms</u>

Operator shall cancel all existing grape sales agreements including any grape sale agreements between Rabbit Ridge Corporation and third-party purchasers and shall reissue such agreements for the benefit of the Estate, payable to the Trustee. In other words, all gross proceeds from the sale of crops grown on the Properties shall be paid directly to the Trustee. All crop sale agreements are subject to review and recommendation by Kevin Otus, and approval of the Bankruptcy Court, if necessary. The Parties acknowledge that all crops and their proceeds may be subject to the lien rights of Farm Credit West, FCLA.

Trustee may terminate this agreement or assignment of the rights created under this agreement at any time and for any reason and without any notice.

This agreement does not establish or constitute any ongoing obligation between the parties beyond the successful completion of 2021 harvest.

This agreement is subject to approval of the United States Bankruptcy Court. In the event of any inconsistency between an order of the Court and this agreement, the Court's order shall control.



EXHIBIT 4
PAGE 78

The written terms of this agreement constitute the entire agreement between the parties. All prior oral statements, discussions, and written communications have been incorporated into this agreement and there is no agreement other than what is stated herein.  If a term is missing or needs to be modified or there is a material issue that is prudent to add or delete, then either party may petition the court by motion and the court may supplement this agreement for good cause shown and if beneficial to the bankruptcy estate.  All parties agree that if there is a dispute it can be raised with the court and addressed by motion under rules established by the court to insure fairness.

Dated: July 27, 2021

_____
**Richard Marshack,
In his capacity as the Chapter 7 Trustee
of Northern Holdings, LLC.
c/o MARSHACK HAYS LLP**

**870 Roosevelt
Irvine, CA 92620**

Dated: July 27, 2021

_____
**Leroy "Lee" Codding
179 Niblick Rd. Box 406
Paso Robles CA 93446**

EXHIBIT 4
PAGE 79

# EXHIBIT 2

EXHIBIT 4
PAGE 80



EXHIBIT 4
PAGE 81



EXHIBIT 4
PAGE 82



EXHIBIT 4
PAGE 83



EXHIBIT 4
PAGE 84



EXHIBIT 4
PAGE 85



EXHIBIT 4
PAGE 86



EXHIBIT 4
PAGE 87



EXHIBIT 4
PAGE 88



EXHIBIT 4
PAGE 89



EXHIBIT 4
PAGE 90



EXHIBIT 4
PAGE 91

EXHIBIT 4
PAGE 92



EXHIBIT 4
PAGE 93



EXHIBIT 4
PAGE 94



EXHIBIT 4
PAGE 95



EXHIBIT 4
PAGE 96



EXHIBIT 4
PAGE 97



EXHIBIT 4
PAGE 98



EXHIBIT 4
PAGE 99



EXHIBIT 4
PAGE 100

EXHIBIT 4
PAGE 101



EXHIBIT 4
PAGE 102



EXHIBIT 4
PAGE 103



EXHIBIT 4
PAGE 104

EXHIBIT 4
PAGE 105



EXHIBIT 4
PAGE 106



EXHIBIT 4
PAGE 107



EXHIBIT 4
PAGE 108



EXHIBIT 4
PAGE 109



EXHIBIT 4
PAGE 110



EXHIBIT 4
PAGE 111



EXHIBIT 4
PAGE 112

## TEXAS GRAPE VARIETAL LIST

### Field #1 (Black)

| | |
|---|---|
| 1. | Merlot (RP) |
| 2. | Merlot (RP) |
| 3 | Merlot (RP) |
| 4. | Merlot (RP) |
| 5 | Merlot (RP) |
| 6. | Merlot (RP) |
| 7. | Merlot (A) / Sangiovese (B) / (RP) |
| 8. | Zinfandel (North) / Merlot (South) / (RP) |
| 9. | Mourvedre |
| 10. | Grenache |

## TEXAS GRAPE VARIETAL LIST

### Field #2 (Red)

| | |
|---|---|
| 1. | Zinfandel |
| 2. | Merlot |
| 3 | Merlot |
| 4. | Merlot |
| 5 | Merlot |

* (RP) = Ready For Replant

* (A)= East

* (B)= West

EXHIBIT 4
PAGE 113

## TEXAS GRAPE VARIETAL LIST

### Field #3 (Blue)

1.  Zinfandel
2.  Zinfandel (South) / Grenache Blanc (North)
3   Zinfandel (South) / Grenache Blanc (North)
4.  Zinfandel
5   Zinfandel
6.  Cabernet
7.  Petit Sirah
8.  Petit Sirah
9.  Primitivo / Zinfandel
10. Grenache (North  / Viognier (South)
11. Syrah
12. Grenache
13.  Mourvedre

## TEXAS GRAPE VARIETAL LIST

### Field #4 (Green)

1.  Petit Verdot
2.  Petit Verdot
3   Grenache (South) / Petit Sirah (North)
4.  Petit Sirah (RP)

* (RP) = Ready For Replant

EXHIBIT 4
PAGE 114

## SAN MARCOS GRAPE VARIETAL LIST

### Field #1 (Black)

| | |
|---|---|
| 1. | Cabernet (RP) |
| 2. | Sauvignon Blanc / Muscat (RP) |
| 3 | Syrah |
| 4. | Syrah |
| 5 | Zinfandel |
| 6. | Zinfandel |
| 7. | Sauvignon Blanc (RP) |
| 8. | Cabernet (RP |
| 9. | Cabernet (RP) |

## SAN MARCOS GRAPE VARIETAL LIST

### Field #2 (Red)

| | |
|---|---|
| 1. | Petit Sirah (RP) |
| 2. | Petit Sirah (RP) |
| 3 | Petit Sirah (RP) |
| 4. | Syrah (RP) |
| 5 | Zinfandel |
| 6. | Zinfandel |
| 7. | Zinfandel |
| 8. | Zinfandel |

* (RP) = Ready For Replant

EXHIBIT 4
PAGE 115

## SAN MARCOS GRAPE VARIETAL LIST

### Field #3 (Blue)

| | |
|---|---|
| 1. | Zinfandel |
| 2. | Zinfandel / Primitivo |
| 3 | Zinfandel / Primitivo |
| 4. | Zinfandel / Primitivo |

## SAN MARCOS GRAPE VARIETAL LIST

### Field #4 (Green)

| | |
|---|---|
| 1. | Primitivo / Zinfandel |
| 2. | Primitivo / Zinfandel |
| 3 | Cabernet (RP) |
| 4. | Petit Sirah / Sauvignon Blanc (RP) |
| 5 | Sangiovese (RP) |
| 6. | Cabernet (RP) |
| 7. | Cabernet (RP) |

\* (RP) = Ready For Replant

EXHIBIT 4
PAGE 116

EXHIBIT 4
PAGE 117



EXHIBIT 4
PAGE 118

# EXHIBIT 3

EXHIBIT 4
PAGE 119

NHC Crop Estimates 2021

| Blocks | 2021 | | | Updated 8-5 LC | | |
|---|---|---|---|---|---|---|
| | Yield | Price/ Ton | | | | |
| | | | | | | |
| **Texas Road** | Tons (Estimated) | Anticipated | Extended Gross | | Tons "committed" 7/30 | Tons "committed"8/5 |
| Cabernet | 25 | $2,800 | $70,000 | | 0 | 12 |
| Petite Sirah | 15 | $2,200 | $33,000 | | all | all |
| Zinfandel | 18 | $2,000 | $36,000 | | 0 | 0 |
| | | | | | | |
| San Marcos | | | | | | |
| Zinfandel | 40 | $2,200 | $88,000 | | 0 | 0 |
| Primitivo | 19 | $1,800 | $34,200 | | 0 | 20 |
| | | | $261,200 | | | |
| | | | | | | |
| Live Oak | | | | | | |
| Chardonnay | 5 | $3,500 | $17,500 | | 5 | 5 |
| Cabernet (new) | 0 | $5,000 | $0 | | n/a | n/a |
| Rousanne | 5 | $3,500 | $17,500 | | 3 | 3 |
| Viognier | 4.5 | $3,500 | $15,750 | | 3 | 3 |
| Syrah (producing) | 38 | $5,000 | $190,000 | | 20 | 20 |
| Cabernet Franc | 5 | $5,000 | $25,000 | | 3 | 5 |
| Mourvèdre | 3 | $5,000 | $15,000 | | 3 | 3 |
| Petite Verdot | 6 | $5,000 | $30,000 | | 5 | 5 |
| Tempranillo | 2 | $5,000 | $10,000 | | | 2 |
| Petit Sirah | 3 | $4,000 | $12,000 | | 3 | 3 |
| Cabernet Sauvignon (producing) | 65 | $3,350 | $217,750 | | 50 | 60 |
| **Total Yield** | 253.5 | | $550,500 | | | |
| | | | | | | |
| **Revenue** | | | $811,700 | | | |
| | | | | | | |
| | | | | | | |

1

EXHIBIT 4
PAGE 120

# EXHIBIT 4

EXHIBIT 4
PAGE 121

# Lee Codding

Orange, Calif                                    e lecoddingiv@icloud.com        m 952/220-8216

**Objective**: To provide cross-functional leadership and collaboration for management teams of dynamic wine business ventures with a focus on asset optimization and brand development to build value, return on investment and successfully realized vision for ownership.

**Founder/ Managing Partner/ Chief Strategist/ GM**, Fluid Advisors, LLC 2012-present
- Managing partner of Fluid Wine Advisors; strategic and finance innovation for the wine trade.
- Client-based finance, facility planning, finance and marketing for clients such as Loring, Sanger Wines, Alma Rosa Vineyard, Metro Wine Marketing, REPAMI S.A. de C.V. and WarRoom Ventures among others.
- Fractional General Manager- interim project basis:
  - Restructuring production, vineyard cap-ex plan and budgets.
  - Revision and implementation of channel plan and staffing plan for Wholesale, Export and DTC.
  - Concept and execution of strategic plans for sustainable profitability.
  - Perform CFO duties and manage assignment to network of outsourced third party specialists.
- Development of business plans, third party funding (equity and debt) and capital expenditure budgets.
- Built international portfolio with partners, including marketing and pricing plans for EU, ZA and South America.

**General Manager/ Senior Vice President**, World Class Wines, Inc. 2007-2012
- Lead senior multi-disciplinary management team for business strategy, sales, finance and operations.
- Managed portfolio team to optimize sales (up 30% in 3 years) and best on record GP.
- Ran supplier relations including Eurpoevin, Winebow, CIV, Cristalino, small wineries and DI (Spain, Italy, France).
- Responsible for direct reports running departments of sales, portfolio, operations, administration.
- Spearheaded positioning for sale of business and guided M&A process/ cross-functional integration team.

**Vice President/ Director of Marketing & Sales**, Talbott Vineyards 2001-2007
- Ran national and international sales for distributor network in USA and export markets.
- Responsible for production planning, vineyard P&L, costing, forecasting and financial returns.
- Served on cross-functional executive management team of Robert Talbott, Inc.
- Responsible for all aspects of marketing and PR agency relationship management.
- Managed direct-to-consumer sales team, marketing plan and implementation.
- Winery trade channel sales grew 300% during this period.

**Director, Trade Development**, Wine.com 1999-2001
- Responsible for department running portfolio management for all suppliers both import and domestic.
- Developed structure, hired, and ran department of 24 in entrepreneurial environment.

**Regional Manager**, Frederick Wildman and Sons, Ltd. 1998-1999
- Responsible for distributor management relationships in 3 western states.
- Primary responsibility for programming, pricing, inventory and management.

**Field Market Manager**, E&J Gallo Winery 1997-1998
- Ran field sales territory in San Francisco Bay Area with Wine Warehouse sales team.
- Helped integrate distinct sales efforts and cultures.

**Wine Sales Consultant**, Wine Warehouse 1994-1997
- Ran sales territory in San Francisco on/off trade including key accounts.
- Developed sales, service and fine wine knowledge via formal training and personal interest.

**Interests**: Attending and contributing at children's sports and activities, PTO executive committee, Women's LAX Board, Cub Scout executive committee, various charitable fundraising efforts, alpine skiing, fine wine and spirits appreciation, fishing, boating, travel, hiking, gardening, writing, food, cooking, music.

**Education**: California Polytechnic State University, San Luis Obispo
BS; Agricultural Business, Marketing/ Minor; Speech Communication/ Honors Graduate
Harvard Business School Extension -  Business Analytics Program (WIP)

EXHIBIT 4
PAGE 122

# EXHIBIT 5

EXHIBIT 4
PAGE 123

# Office of the Minnesota Secretary of State
## Certificate of Organization

    I, Mark Ritchie, Secretary of State of Minnesota, do certify that:  The following business entity has duly complied with the relevant provisions of Minnesota Statutes listed below, and is formed or authorized to do business in Minnesota on and after this date with all the powers, rights and privileges, and subject to the limitations, duties and restrictions, set forth in that chapter.

The business entity is now legally registered under the laws of Minnesota.

Name:                                   Northern Holding LLC

File Number:                        486524600029

Minnesota Statutes, Chapter:     322B

This certificate has been issued on:     04/30/2012

*Mark Ritchie*

Mark Ritchie
Secretary of State
State of Minnesota

EXHIBIT 4
PAGE 124

# Office of the Minnesota Secretary of State

**Minnesota Limited Liability Company/Articles of Organization**

*Minnesota Statutes 322B*



**The individual(s) listed below who is (are each) 18 years of age or older, hereby adopt(s) the following Articles of Organization:**

ARTICLE 1 - LIMITED LIABILITY COMPANY NAME:

> **Northern Holding LLC**

ARTICLE 2 -  REGISTERED OFFICE and AGENT:

> Name:              Address:
>
> **Leroy  E Codding**
>
> **5309 Wooddale Ave  Edina MN 55424  USA**

ARTICLE 3 - DURATION:  **PERPETUAL**

ARTICLE 4 - ORGANIZERS:

> Name:              Address:
>
> **Leroy E Codding**      **5309 Wooddale Ave  Edina MN 55424  USA**

If you submit an attachment, it will be incorporated into this document. If the attachment conflicts with the information specifically set forth in this document, this document supersedes the data referenced in the attachment.

*By typing my name, I, the undersigned, certify that I am signing this document as the person whose signature is required, or as agent of the person(s) whose signature would be required who has authorized me to sign this document on his/her behalf, or in both capacities.  I further certify that I have completed all required fields, and that the information in this document is true and correct and in compliance with the applicable chapter of Minnesota Statutes.  I understand that by signing this document I am subject to the penalties of perjury as set forth in Section 609.48 as if I had signed this document under oath.*

SIGNED BY:  **Leroy E. Codding**

MAILING ADDRESS:  **None Provided**

EMAIL FOR OFFICIAL NOTICES:

> **lecoddingiv@gmail.com**

EXHIBIT 4
PAGE 125



**Work Item 486524600029**
**Original File Number 486524600029**

STATE OF MINNESOTA
OFFICE OF THE SECRETARY OF STATE
FILED
**04/30/2012 11:59 PM**

Mark Ritchie
Secretary of State

EXHIBIT 4
PAGE 126

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled: **CHAPTER 7 TRUSTEE'S MOTION TO APPROVE FARM OPERATOR AGREEMENT AND FOR ORDER TO OPERATE DEBTOR'S BUSINESS FOR THE LIMITED PURPOSE OF COMPLETING FALL 2021 HARVEST OF CURRENT CROP OF FRUIT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RICHARD A. MARSHACK AND LEROY CODDING IN SUPPORT; REQUEST FOR JUDICIAL NOTICE**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 9, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **August 9, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

| **DEBTOR** | **INTERESTED PARTY** | **U.S. TRUSTEE** |
|---|---|---|
| NORTHERN HOLDING, LLC | LEE CODDING | UNITED STATES TRUSTEE (SA) |
| ATTN: OFFICER, A MANAGING OR | 13217 JAMBOREE RD #429 | 411 W FOURTH ST., SUITE 7160 |
| GENERAL AGENT, OR TO ANY OTHER | TUSTIN, CA 92782 | SANTA ANA, CA 92701-4593 |
| AGENT AUTHORIZED BY APPOINTMENT | | |
| OR LAW TO RECEIVE SERVICE | | |
| 13217 JAMBOREE RD #429 | | |
| TUSTIN, CA 92782 | | |

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 9, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>**VIA PERSONAL DELIVERY:** **PRESIDING JUDGE'S COPY**</u>
HONORABLE MARK S. WALLACE
UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA
RONALD REAGAN FEDERAL BUILDING AND COURTHOUSE
411 WEST FOURTH STREET, SUITE 6135 / COURTROOM 6C
SANTA ANA, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 9, 2021 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    **F 9013-3.1.PROOF.SERVICE**

EXHIBIT 4
PAGE 127

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>: CONTINUED:

- **ATTORNEY FOR U.S. TRUSTEE (SA):** Nancy S Goldenberg nancy.goldenberg@usdoj.gov
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Michael J Gomez mgomez@frandzel.com, dmoore@frandzel.com
- **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
- **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** Tinho Mang tmang@marshackhays.com, tmang@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@ecf.courtdrive.com
- **TRUSTEE RICHARD A MARSHACK (TR):** Richard A Marshack (TR) pkraus@marshackhays.com, rmarshack@iq7technology.com; ecf.alert+Marshack@titlexi.com
- **ATTORNEY FOR INTERESTED PARTY BANK DIRECT CAPITAL FINANCE:** Elissa Miller emiller@sulmeyerlaw.com, emillersk@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
- **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Roksana D. Moradi-Brovia roksana@rhmfirm.com, matt@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
- **ATTORNEY FOR CREDITOR ADLER BELMONT GROUP, INC.:** Paul F Ready tamara@farmerandready.com
- **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Matthew D. Resnik matt@rhmfirm.com, roksana@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
- **UNITED STATES TRUSTEE (SA):** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Reed S Waddell rwaddell@frandzel.com, sking@frandzel.com
- **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Gerrick Warrington gwarrington@frandzel.com, sking@frandzel.com
- **INTERESTED PARTY COURTESY NEF:** David Wood dwood@marshackhays.com, dwood@ecf.courtdrive.com; lbuchananmh@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 4
PAGE 128

**EXHIBIT 5**

1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  DAVID A. WOOD, #272406
   dwood@marshackhays.com
3  TINHO MANG, #322146
   tmang@marshackhays.com
4  MARSHACK HAYS LLP
   870 Roosevelt
5  Irvine, CA 92620
   Telephone: (949) 333-7777
6  Facsimile: (949) 333-7778

7  Attorneys for Chapter 7 Trustee,
   RICHARD A. MARSHACK
8

9          UNITED STATES BANKRUPTCY COURT

10    CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

11

12  In re                          | Case No. 8:20-bk-13014-MW

13  NORTHERN HOLDING, LLC,          | Chapter 7

14                                  | ORDER GRANTING CHAPTER 7
                                    | TRUSTEE'S MOTION TO APPROVE
15          Debtor.                 | FARM OPERATOR AGREEMENT
                                    | AND FOR ORDER TO OPERATE
16                                  | DEBTOR'S BUSINESS FOR THE
                                    | LIMITED PURPOSE OF
17                                  | COMPLETING FALL 2021 HARVEST
                                    | OF CURRENT CROP OF FRUIT
18
                                    |   ▪  EXHIBIT ATTACHED
19                                  |      (SIGNATURE PAGE)
                                    | Hearing:
20                                  | Date:   August 30, 2021
                                    | Time:   2:00 p.m.
21                                  | Place:  Courtroom 6C[1]
                                    |         411 W. Fourth Street
22                                  |         Santa Ana, CA 92701

23          On August 30, 2021, at 2:00 p.m., the unopposed motion (the "Motion") for entry of an

24  order approving motion to approve a farm operator agreement and for an order authorizing the

25  Trustee to operate the Debtor's business for the limited period of time and for the sole purpose

26  of completing the harvest of the current crop of fruit growing on Debtor's land, filed by

27

28  _____
   [1] Effective as of July 19, 2021, in-person hearing appearances are allowed before Judge
   Wallace. Otherwise, telephonic appearances are permitted pursuant to the Court's procedures.

                                    1

**FILED & ENTERED**

SEP 07 2021

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY jle        DEPUTY CLERK**

EXHIBIT 5
PAGE 130

1   Richard A. Marshack, in his capacity as Chapter 7 Trustee ("Trustee") of the Bankruptcy

2   Estate ("Estate") of Northern Holding, LLC ("Debtor"), on August 9, 2021, as Dk. No. 186,

3   was heard before the Honorable Mark S. Wallace, United States Bankruptcy Judge. No

4   opposition to the Motion was filed. At the hearing, Tinho Mang appeared on behalf of the

5   Trustee. Reed S. Waddell appeared on behalf of Farm Credit West, FCLA ("FCW"), and the

6   stipulated terms for the use of cash collateral were read into the record and confirmed by

7   FCW. For the reasons set forth in the Motion, and stated on the record, the Court enters its

8   order as follows:

9        IT IS ORDERED that:

10       1.    The Motion is granted;

11       2.    The farm operator agreement attached to the Motion as Exhibit "1" is approved;

12       3.    The Trustee is authorized to operate the Debtor's business through Leroy

13   Codding for the limited purpose of completing the Fall 2021 harvest pursuant to 11 U.S.C. §

14   721 to the extent necessary to complete the fall 2021 harvest, with such authorization to

15   terminate at the earliest of: (a) the completion of the fall 2021 harvest; or (b) October 31, 2021;

16       4.    Trustee is authorized to cancel all currently existing grape sales agreements and

17   to renegotiate all such agreements, including entering into and executing any reasonably

18   prudent subsequent grape sales agreements without further order of the Court;

19       5.    The proceeds of all sales of agricultural products ("Crop") grown on: (1) 2380

20   Live Oak Road, Paso Robles, CA; (2) 1172 San Marcos Road, Paso Robles, CA; and (3) APN

21   027-145-022 (collectively, the "Properties") shall be paid directly to the Estate and the Trustee

22   is authorized to receive and hold all gross proceeds of the sale of any Crop from the Properties

23   to be disbursed as stated below without further order of the Court;

24       6.    As FCW has consented to such use, Trustee is authorized to, upon receipt of

25   proceeds from the sale of Crop, use cash collateral to pay and reimburse actual and reasonable

26   expenses incurred for harvesting and selling the crops. As stated on the record, the following

27   stipulated provisions are approved:

28   //

2

EXHIBIT 5
PAGE 131

    a.  All Crops constitute the collateral of FCW and all proceeds of the sale of

       Crops constitutes FCW's cash collateral;

    b.  Pursuant to the consent of FCW, the Trustee may pay and use FCW's cash

       collateral for the following line items ONLY:

        i.  Reasonable reimbursement of farming expenses incurred and actually

           paid by the Trustee's operator but in no event shall expense

           reimbursements exceed $400,000;

        ii.  All professional expenses of the Trustee reasonably related to the

           farming operations of the Debtor, including attorneys' fees, the

           Trustee's compensation pursuant to 11 U.S.C. § 326, and the proposed

           5% compensation for the Operator, which amounts shall be segregated

           by the Trustee and held pending final approval of compensation;

      iii.  50% of all net proceeds over and above the reimbursements listed in

           paragraphs 6(b)(i)-(ii) may be held by the Trustee as a reserve for the

           Estate to pay any other unsecured creditor;

      iv.  The remaining 50% of net proceeds shall be immediately remitted to

           FCW without further court order.

###

Date: September 7, 2021

*Mark S. Wallace*

Mark S. Wallace
United States Bankruptcy Judge

3

EXHIBIT 5
PAGE 132

1    SIGNATURE PAGE TO ORDER GRANTING CHAPTER 7 TRUSTEE'S MOTION TO
     APPROVE FARM OPERATOR AGREEMENT AND FOR ORDER TO OPERATE DEBTOR'S
2    BUSINESS FOR THE LIMITED PURPOSE OF COMPLETING FALL 2021 HARVEST OF
                          CURRENT CROP OF FRUIT
3
     Approved as to Form:
4

5
     FRANDZEL ROBINS BLOOM &
6    CSATO, L.C.

7

8    _____
     REED S. WADDELL, Counsel for
9    FARM CREDIT WEST, FLCA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

EXHIBIT 5
PAGE 133

1    SIGNATURE PAGE TO ORDER GRANTING CHAPTER 7 TRUSTEE'S MOTION TO
     APPROVE FARM OPERATOR AGREEMENT AND FOR ORDER TO OPERATE
2    DEBTOR'S BUSINESS FOR THE LIMITED PURPOSE OF COMPLETING FALL 2021
     HARVEST OF CURRENT CROP OF FRUIT
3
     Approved as to Form:
4

5

6    FRANDZEL ROBINS BLOOM &
     CSATO, L.C.
7

8    [*See attached signature page*]

9    _____
     REED S. WADDELL, Counsel for
10   FARM CREDIT WEST, FLCA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

EXHIBIT 5
PAGE 134

**EXHIBIT 6**

**From:** Richard Marshack <RMarshack@MarshackHays.com>
**Sent:** Tuesday, October 5, 2021 1:36 PM
**To:** Lee Codding <lecoddingiv@icloud.com>
**Cc:** Pam Kraus <pkraus@marshackhays.com>; Kevin Otus <kotus@thinkonyx.com>; Tinho Mang <tmang@marshackhays.com>; Lori Ensley <ljensley@aol.com>; Richard Marshack <RMarshack@MarshackHays.com>
**Subject:** Northern

Dear Lee

This is to notify you that you are in breach of the Farm Management Agreement.  Today for the first time you told me that you have shipped out our grapes without my approval and without contracts signed by me.  This is not only a breach of contract but a breach of a court order.

You are hereby instructed to not ship anymore grapes or products or otherwise transfer any assets of Northern unless and until you get my written approval.

You were asked for and accepted a position of trust by the Federal Court and you are not living up to the agreement that was approved by the Federal Court.  This is really serious.  I told you over a month ago to get contracts in order.  I will be deciding whether to terminate the agreement.  I have a unilateral right to do so.

Richard Marshack

Richard Marshack
MARSHACK HAYS LLP
870 Roosevelt
Irvine, CA 92620
Telephone: (949) 333-7777

(Sent from my iPad)

EXHIBIT 6
PAGE 136

**EXHIBIT 7**

**From:** Lee Codding <lecoddingiv@icloud.com>
**Sent:** Monday, November 15, 2021 1:15 PM
**To:** Tinho Mang <tmang@marshackhays.com>
**Cc:** Pam Kraus <pkraus@marshackhays.com>; Lori Ensley <LEnsley@leaaccountancy.com>
**Subject:** Re: Northern Holding - Grape Agreements

Tinho,

This looks to be complete. Buyers will pay from contracts. Nevertheless, I will be sending reminder invoices and statements as initial payments are coming due later on in November.

Will keep Pam and Lori and copy on those.

Thank you,
Lee

Lee Codding
Managing Partner
Fluid Advisors, LLC |  Strategy for Wine
952/220-8216 / lecoddingiv@icloud.com

> On Nov 15, 2021, at 11:30 AM, Tinho Mang <tmang@marshackhays.com> wrote:
>
>
> Lee:
>
> Are these five the only grape purchase/sale agreements for this year's harvest?
>
> Second, I am told the harvest is done. Is there anything else that needs to be done other than wait for the buyers to pay?
>
> If there are any more please let me know now.
>
> Tinho

1

EXHIBIT 7

PAGE 138

## GRAPE PURCHASE AGREEMENT

*(1)*

This Agreement is made the 29th day of September, between Rabbit Ridge Wine Sales, Inc. ("Grower") and WarRoom Ventures, LLC, a California limited liability company, ("Winery").

1. **SALE AND PURCHASE.** On the terms and subject to the conditions of this Agreement, Grower shall sell and Winery shall purchase approximately <u>60 tons</u> of the Grower's production, in each year that this Agreement is in effect of the grape varieties designated on Exhibit A attached hereto and incorporated by reference as if set forth fully herein. Grower warrants to Winery the accuracy of the information on Exhibit A. Grower shall not deliver any grape varieties to Winery except as specified, or which were not produced from the vineyard and blocks named in Exhibit A. Grower warrants that Grower is the sole owner of all grapes to be delivered to Winery that Grower has and will have good title to all grapes (including grapes grown on leased land) and that Grower has not sold or contracted to sell such grapes to anyone other than Winery. During the term of this Agreement, Grower shall use the property described in Exhibit A only for the purpose of growing the grapes to be delivered hereunder to Winery. <u>Winery will compensate broker, Bill Tolar for sale commission.</u>

2. **PRICE AND PAYMENT TERMS.** For grapes which meet the quality and delivery standards of this Agreement, Winery shall pay to grower a price of per ton as set forth in Exhibit A and delivered to Winery's facilities located in within Monterey County and/or San Luis Obispo County. Grapes shall be weighed on certified scales at or near the point of delivery and payment shall be made on a load-by-load basis pursuant to weigh tags. Grower will bear the cost of delivery of the Grapes to Winery's facility located within Monterey County or San Luis Obispo County. Title and risk of loss of any load of grapes shall pass to the Winery only upon delivery to and acceptance by the Winery, at the Winery premises or such other designated delivery location if delivered to Winery (or other designated location) by Grower. If Winery undertakes to transport the grapes from Grower's vineyard, then Winery shall bear the risk of loss when the grapes have been loaded onto its trucks. Payment will be net cash due in two (2) equal payments, 50% to be paid on or before December 15th and the remainder 50% balance due on or before ~~March~~ 15th following the harvest year, each year of this agreement. *2021 RᴀM*  *January 2022 RᴀM*

3. *(2)* The fixed term of this Agreement is for harvest (s) of <u>2021</u>

4. **QUALITY STANDARDS.** Winery shall have the right to reject any container of grapes which do not meet all of the quality standards contained in Exhibit B, attached hereto and incorporated by reference as if set forth fully herein.

5. **GRAPE DELIVERIES.** Grapes will be hand harvested. Grower shall incentivize the harvest crew to avoid raisins in the clusters. If the winery needs to sort fruit at the facility due to excessive raisins, Winery will deduct 20% off the purchase price to the Grower. The grapes will be transported at Grower's expense to the Winery. The grapes shall be delivered as soon as reasonably possible following the harvest. Grower agrees to contact Winery's representative 48 hours prior to harvesting of grapes so that Winery may elect to inspect harvesting and enter vineyards for purpose of ensuring quality of grapes. No container of grapes shall contain more than one variety. At Winery's request, Grower shall make available appropriate documentation to verify to Winery's satisfaction the variety of each container, failure to do so shall be grounds to reject the delivery. Winery's acceptance of a delivery without supporting documentation shall not be deemed a waiver of Grower's obligation to provide the documentation. Grower agrees to accurately maintain and

*(1) As the agent of Northen Holding LLC.*
*(2) Payment to be made payable to "Richard Marshack, Bankruptcy Trustee of Northern Holdings LLC" and mailed to Richard Marshack 870 Roosevelt Irvine, Ca 92620*
*RᴀM*

**EXHIBIT 7**

**PAGE 139**

make available to Winery or applicable regulatory inspectors these records for a period of three (3) years after each shipment.

6. <u>CULTURAL PRACTICES.</u> Grower will make its best efforts to use farming practices and procedures consistent with premium wine grape production standards which would result in premium quality wine grape production within the maximum yield shown in Exhibit A. Winery may inspect Grower's vineyards at any reasonable time, upon reasonable notice.

7. <u>FORCE MAJEURE</u>. In the event the business of Winery or Grower shall be interfered with by any cause beyond its control, including, but not limited to fire, storm, floods, earthquake, action of the elements, pestilence, crop failure, labor disputes, or shortage of labor, raw materials or supplies, then the parties shall make a joint determination of that portion of the grapes that are not available for harvest or that fail to meet the quality standards by reason thereof. If the portion of the grapes that are unavailable for harvest or that do not meet the quality standards exceeds <u>50%</u> of the tons to be purchased that harvest year, then the entire purchase may be canceled by either party and neither party will have any objection to the other under the agreement for that harvest year. If that portion of the grapes that has been rendered unavailable for harvest or that fails to meet the quality standards is less than <u>50%</u>, then this Agreement shall remain in effect for that harvest year to the extent of the unaffected grapes. Such cancellation shall release Winery or Grower from all claims with respect to such undelivered grapes. In the event performance by either party of its obligations under this Agreement is prevented as set forth in this paragraph, Winery or Grower, as the case may be, shall use its best efforts to remove the disability and resume full performance hereunder at the earliest possible date.

8. <u>SUCCESSORS AND ASSIGNS.</u> This Agreement and all of the covenants herein shall run with the land and shall bind and inure to the benefit of the parties hereto and their respective **heirs, executors, administrators, grantees, vendees, transferees, assignees, legatees, devisees** and other successors in interest whether partial or entire.

9. <u>NON-ASSIGNABILITY</u>. Without prior consent of Winery, which in its sole discretion may be withheld for any reason, this Agreement shall not be assigned by Grower.

JO. <u>ATTORNEY'S FEES</u>. If legal proceedings are initiated to enforce or interpret this Agreement or any portion thereof, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs in addition to any other available relief or remedy.

11. <u>WAIVERS.</u> No waiver shall result from any failure or omission by either party to insist upon or enforce any of the terms of this Agreement, unless the waiver shall be in writing and signed by the waiving party. Waiver of any provision of this Agreement in one instance shall not constitute a waiver of that provision in any other instance or a waiver of any other provision hereof.

12. <u>NOTICES.</u> Any notices required to be given under this Agreement shall be given to the parties at their respective addresses shown on the signature page, provided that a party may change its address by serving written notice thereof on the other party.

13. <u>SETTLEMENT AND MEDIATION.</u> The parties will attempt to settle any dispute in a mutually agreeable manner. If a dispute, controversy or claim arises out of or relates to this contract or the breach thereof and if the dispute is not settled through negotiation, the parties

EXHIBIT 7

PAGE 140

agree to try in good faith to settle the dispute by mediation, before a mutually agreed neutral mediator. Any mediation will be venued in San Luis Obispo County.

14. <u>MISCELLANEOUS</u>.
(a) Time is of the essence of this Agreement and each provision hereof.
(b) This Agreement shall be governed by the laws of the State of California.
(c) This Agreement and the Exhibits hereto constitute the complete agreement for sale and purchase of grapes between the parties hereto. and no representations or understandings other than those herein expressed shall add to, vary or modify the agreement between the parties unless in writing and signed by the parties hereto. This Agreement may not be amended by the parties' course of dealing. but only by a written signed by the party against whom the amendment is sought to be enforced.
(d) ~~Venue for any proceeding relating to or arising out of this agreement shall be the County of San Luis Obispo, State of California~~. All dispute shall be heard in the United State Bankruptcy court Central District of California. *RAN*

15. <u>ASSESSMENTS</u>.
Pierce' s Disease Control Program - Winery may deduct Grower's contribution of $2/$1,000 with the second or final payment. If other assessments come forth, these assessments will be addressed separately as an addendum to this original Grape Purchase Agreement.

IN WITNESS WHEREOF, the parties have executed this Grape Purchase Agreement.

GROWER: Rabbit Ridge Wine Sales, I█████

By: _____

Title: _____

Signed: _____

Date: _____

Tax ID#: _____

WINERY: WarRoom Ventures, LLC

By: Andrew Nelson

Title: President

Signed: _____

Date: 9/30/21

EXHIBIT 7

PAGE 141

EXHIBIT A

<u>CALIFORNIA GRAPE CRUSH REPORTING DISTRICT</u>

Grape Variety:                Primitivo Zinfandel        Block fli Primitivo

<u>Maximum Contract Tons:</u>                                22 tons

<u>Brix Range:</u>                                          26.5-27.0

<u>Price:</u>                                              $1,200/ton


Grape Variety:                Zinfandel                  Block fli-F2

<u>Maximum Contract Tons:</u>                                22 tons

<u>Brix Range:</u>                                          24.5-26.0

<u>Price:</u>                                              $1,200/ton

Grape Variety:                Zinfandel                  Block fli-TX Zin

<u>Maximum Contract Tons:</u>                                22 tons

<u>Brix Range:</u>                                          24.5-26.0

<u>Price:</u>                                              $1,200/ton


GROWER: Rabbit Ridge Wine Sales, Inc.        WINERY: WarRoom Ventures, LLC

By: ███████                                   By: Andrew Nelson

Title: ███████                                Title: *President*

Signed: _____                           Signed: _____

Date: ███████                                 Date: 9/30/21

Tax ID#: ███████

EXHIBIT 7

PAGE 142

# EXHIBIT B
QUALITY STANDARDS

1.  All grapes shall be whole, sound, fully matured and in merchantable condition, free from defects including, but not limited to, decomposition or decay induced by fungi, bacteria or delay in delivery. In the case of red varieties, grapes shall have fully developed color. Grapes shall comply with all applicable federal and state laws, regulations and ordinances and shall be free from levels of residues or applications that would be detrimental to the wine quality, character and healthfulness. They shall have a sugar, acid and pH content and all other properties which are suitable for crushing into premium varietal wines of the quality sold in case goods form under the Winery label or as assigned or a replacement.

2.  No container of grapes shall contain: (i) two percent (2%) or more of material other than grapes ("MOG"); (ii) two percent (2%) or more of defects such as mildew, or rot; (iii) two percent (2%) or more of second or third crop grapes; or (iv) three percent (3%) or more in the aggregate of any of the foregoing. If Winery voluntarily accepts any container of gapes with MOG in excess of two percent (2%), then two times (2 x) the total amount of MOG, as determined by third party inspection, will be deducted by weight for purposes of payment.

3.  Grower shall grow, cultivate, mature and harvest the grapes in accordance with current, sound vineyard practices conducive to the highest obtainable grape quality. Winery may inspect Grower's vineyard at any reasonable time and may consult with and make recommendations to Grower concerning vineyard practices. If Winery notifies Grower of a practice by Grower which, in Winery's reasonable judgment, is materially detrimental to grape quality, the practice shall be rectified within a time that is reasonable in the circumstances or Winery may reject each container affected thereby. Grower shall not remove any healthy vines without Winery's prior written consent, which shall not be unreasonably withheld. Grower shall not deliver grapes harvested from diseased vines if the disease has affected grape quality, flavor, maturity or color.

4.  Grower shall not apply and grapes will not bear or contain pesticide residue prohibited or in excess of the tolerances established under the Federal Food, Drug and Cosmetic Act. Grapes will meet all applicable standards of the Sherman Food, Drug and Cosmetic law of the State of California. No pesticide shall be used which is not registered for use on wine grapes under applicable state and federal regulations. No substance on California's "Prop. 65" list shall be used without prior notice to and approval by Winery.

5.  Harvest maturity is to be mutually agreed upon by Winery and Grower, however in the event of disagreement the Winery shall direct when to harvest. In the event the grapes do not otherwise meet the quality standards set forth in this Agreement, Winery shall have the right to reject the grapes on, a load-by-load basis, or accept such grapes on a load-by-load basis at a price per ton mutually agreed upon in writing by Grower and Winery. The right of rejection shall be exercisable on a Load by Load basis and prior to unloading of Grapes. In the event Winery elects to reject any Load of Non-Acceptable Grapes, Winery shall immediately notify Grower of such election. If such election is made due to MOG in excess of two percent (2%), Grower will be given the opportunity to remove such MOG and the Load shall be re-tested. Rejection or acceptance of any Non-Acceptable Grapes by Winery does not relieve Grower from obligations under this Agreement for delivering the remaining Grapes to Winery.

EXHIBIT 7

PAGE 143

6.  Grapes shall be inspected and graded at the Winery or other inspection site which may be designated by Winery. Winery and Grower agree to accept and be bound by the methods utilized in such inspections for sampling, testing. and grading for establishing sugar ("Brix") content to the nearest tenth of a degree. the presence of material other than grapes (MOG). rot and other defects. When a load or container of grapes is tested for MOG. rot sugar or defects. Winery shall provide Grower with a Weighmaster Certificate as administered by the Secretary of the State Department of Food and Agriculture setting forth the results. and the facts and findings contained in said Certificate shall be conclusive in any legal or administrative proceedings. Winery has the right to reject grapes for quality standards and defects that are not currently measured by third party inspection until such time as mandatory. accurate measuring procedures are adopted by law. If additional grape quality standards later become measurable and are used generally in the California wine industry. then they shall be deemed incorporated in this Agreement.

7.  All deliveries shall be in containers as have been approved in advance by Winery. Grower agrees that containers for harvesting and delivering grapes will be clean and free from exposed metal, rust, leaks. chipped or peeling paint and must be coated or produced from food grade materials. Grower agrees that the use of containers other than as described will subject the grapes. on a load- by-load basis, to penalties or rejection.

GROWER: Rabbit Ridge Wine Sales, Inc.          WINERY: WarRoom Ventures, LLC

By: ▇▇▇▇▇▇▇                                    By: Andrew Nelson

Title: ▇▇▇▇▇▇▇                                 Title: *President*

Signed: *[signature]*                          Signed: *[signature]*

Date: ▇▇▇▇▇▇▇                                  Date: 9/30/21

Tax ID#: ▇▇▇▇▇▇▇

Northern Holdings LLC
By Richard Marshack ⊛
Bankruptcy Trustee
RAMIK, Trustee
10-6-21

⊛  All parties agree that Northern Holdings LLC and Richard Marshack as its Bankruptcy Trustee is a party to this agreement. No liability shall be sought or obtained against Richard Marshack in his personal capacity

⊛⊛  Subject to terms of separate addendum. This contract is entered into subject to and in accordance with the Bankruptcy Court order which Winery acknowledges receiving.

EXHIBIT 7

PAGE 144

## SALES MEMO

*- This agreement includes an addendum -*

**SELLER:** — *As agent of Northern Holding LLC*

Mr. Lee Codding
Rabbit Ridge Wine sales, Inc.
1172 San Marcos Road
Paso Robles, California 93446
Contact: Mr. Lee Codding
Cell Phone: 1-925-220-8216
E-Mail: lecoddingin@icloud.com

**BUYER:**

Mr. Eric Jensen, Managing Member
My Favorite Neighbor, LLC
2640 Andersen Road
Paso Robles, California 93446
Contact: Mr. Eric Jensen
Cell Phone: 1-805-610-2272
E-Mail: eric@bookerwines.com

### Commodity and Description

| | |
|---|---|
| Grapes: | Petite Verdot |
| AVA: | Paso Robles-Willow Creek District |
| Block: | 16 Bottom (3 Acres) |
| Brix at Harvest: | Minimum: 25.0 Brix, Maximum: 27 Brix Optimum: 26 Brix |
| Minimum T. A.: | |
| Maximum pH: | |
| Approximate Quantity: | Product of the Block (8-10 Tons) |
| One half Ton Macro Bins: | Supplied by the Buyer |
| Harvest: | By Hand at Sellers Expense |
| Determination of Harvest | The determination of the date of harvest shall be at the mutual Agreement of the buyer and the Seller. |
| Freight: | Buyer to deliver grapes to Buyers processing facility at Buyers expense. |
| Vineyard Address: | 2380 Live oak Road Paso Robles, California 93446 |
| Unit Price: | $2,750.00 |
| Contract Term: | The term of this Agreement shall be for the grape crop year 2021. |
| Payment Terms: | Payment in full within 30 days of the harvest of the Petite Verdot wine grapes described in this Agreement Seller to Invoice Buyer. |

*\* Payment to be made to "Richard warshack, Bankruptcy Trustee of Northern Holding LLC and Shall be mailed to Richard warshack 200 870 Roosevelt Dr Irvine Ca 92620*

*Roosevelt Irvine, Ca 92620*

*note:*

*See Addendum*

*Dispute Resolution: Any dispute to be addressed in Bk court. From Orange County, CA*

# EXHIBIT 7

Signatory for Rabbit Ridge
Wine Sales, Inc.              Mr. Lee Codding
Mailing Address:             Rabbit Ridge Wine Sales, Inc.
Vineyard Manager:            Mr. Lee Codding
Cell Phone:                  1-925-220-8216
Sales Commission to
Vino Tinto Consulting:       3% from the Seller.

*See Addendum*

*RA MIK Bankruptcy Trustee*

*Richard overback Trustee for Norther Holly LLC*

Agreed to by:

For: Rabbit Ridge Wine Sales, Inc.          For: My Favorite Neighbor, LLC

Signature:  _____            _____

Print Name:  __Lee Codding__               ERIC JENSEN

Title:  __President & GM__                  PRESIDENT

Date:  __10/18/2021__                       10/19/2021

# EXHIBIT 7

PAGE 146

## Addendum

The attached contract dated 10/18/2021 _____ between My Favorite Neighbor and Rabbit Ridge Wine Sales Inc. is hereby amended as follows:

All parties agree that all payments due under the attached contract are to be made payable to

Richard Marshack, Bankruptcy Trustee of Northern Holdings LLC
and

Said payments shall be made by check or cashiers check and shall be mailed to the following address:
870 Roosevelt
Irvine, Ca 92620

Buyer agrees that Northern Holdings LLC and Richard Marshack, as it Bankruptcy Trustee are parties to the attached agreement and that they will comply with this amendment.

Trustee enters into this agreement pursuant to the order attached hereto.

So Agreed:

Buyer, n            *ERIC JENSEN, MY FAVORITE NEIGHBOR*

Lee Codding, personally and in his representative capacity on behalf of Rabbit Ridge Inc. (Bonded Winery-CA 6674)

Richard Marshack
Trustee of Northern Holdings LLC

*Any & all disputes to be heard by the U.S. Bankruptcy Court & no other court except any appeals of bankruptcy court order.*

*RDM*

*Parties acknowledge that Richard Marshack is acting as a Bankruptcy Trustee and there shall be no recourse as to him personally. Recourse only to the Bankruptcy Estate*

*RDM*

**EXHIBIT 7**

**PAGE 147**

DocuSign Envelope ID: 7DC99906-F398-4CAD-8861-AF4A774086AA

## Addendum

The attached contract dated ___9/27/2021___ between Northern Holding LLC and Corbett Vineyards LLC is hereby amended as follows:

All parties agree that all payments due under the attached contract are to be made payable to:

Richard Marshack, Bankruptcy Trustee of Northern Holding  LLC
and

Said payments shall be made by check or cashiers check and shall be mailed to the following address:
870 Roosevelt
Irvine, Ca 92620

Buyer agrees that Northern Holding  LLC and Richard Marshack, as it Bankruptcy Trustee are parties to the attached agreement and that they will comply with this amendment.

So Agreed:

Buyer, Nathan R. Carlson, General Manager, Corbett Vineyards LLC

Lee Codding, personally and in his representative capacity on behalf of
 (Bonded Winery-CA 6674)

X _____ Bankruptcy Trustee
+ not in his personal capacity
Richard Marshack
Trustee of Northern Holding  LLC

EXHIBIT 7

PAGE 148

DocuSign Envelope ID: 7DC99906-F368-4CAD-8861-AF4A774086AA

## AGREEMENT FOR THE PURCHASE AND SALE OF GRAPES

THIS AGREEMENT FOR THE PURCHASE AND SALE OF GRAPES ("Agreement") is effective __9/27/2021__ by and between Northern Holding LLC, a California limited liability company ("Seller") and Corbett Vineyards, LLC, a California limited liability company ("Buyer").

WHEREAS, Seller desires to sell and Buyer desires to buy the Grapes of Seller described in this Agreement, all according to the terms and subject to the conditions contained herein.

NOW, THEREFORE, in consideration of these premises and the mutual covenants, agreements, representations and warranties in this Agreement, the parties hereto agree as follows:

*through its Bankruptcy Trustee Richard Marshack*

1.  **Purchase and Sale of Grapes**. Buyer agrees to purchase and Seller agrees to sell grapes in the following amounts and specifications ("Grapes"):

| Vineyard Name | San Marcos Vineyard |
|---|---|
| Vineyard Address | 1172 San Marcos Road, Paso Robles CA 93446 |
| County | San Luis Obispo County |
| AVA(s) | San Miguel District, Paso Robles |
| Pricing District | District 8 |
| Varietal, Tons | Zinfandel, 24 tons – Field 2 Sub-block TBD by Sharon Weeks |

Delivery location shall be to: 2195 Corbett Canyon Road, Arroyo Grande, CA 93420.

1.  **Price**. The base price ("the Price") for Grapes shall be $1,800 per ton, as adjusted as provided herein.

2.  **Payment**. Buyer agrees that the Seller's performance obligation has been satisfied at the time the Buyer has inspected and taken possession of the Grapes on the specified delivery location. Payment will be due in two equal payments as follows: the first on or before 15 December 2021, and the net due on or before 1 March 2022, remitted to the following address: 870 Roosevelt, Irvine, CA 92620.

3.  **Term and Termination**. The term of this Agreement will be for one (1) crop year, beginning and ending with the harvest 2021.

4.  **Quality Of Grapes**. The purpose of this Agreement is to ensure the Buyer of consistent supply of high-quality grapes with a given sugar content and in sound condition. Seller will use cultural practices consistent with commonly accepted methods of producing grapes for high quality table wines. Buyer reserves the privilege of inspecting the vineyards and Grapes at any reasonable time. Seller shall remain solely responsible for the condition of the vineyard and for delivering Grapes that meet the requirements, conditions, and terms of this Agreement. Seller shall retain all risk of loss, depreciation and damage to Grapes until they have been accepted by Buyer.

    a.  **Brix**. Buyer shall pay the applicable Price for Grapes, which have an average sugar content which is equal to or greater than 24.0 degrees Brix and with a target of 25.0 degrees Brix. If an individual bin of Grapes has an average sugar content which is less than 23.0 Brix or more than 26.0 Brix, then the Buyer may reject that bin of Grapes, however, if Buyer does

1

EXHIBIT 7

PAGE 149

DocuSign Envelope ID: 7DC99906-F396-4CAD-8361-AF4A774086AA

not reject the Grapes then Buyer shall pay the applicable Price for the Grapes. All determinations concerning acceptance or rejection of such Grapes shall be made on a bin-by-bin basis.

As used in this Agreement, the term "sugar content" refers to soluble solids and is expressed in degrees Brix. The "average sugar content" of Grapes shall be the weighted average degrees Brix of each bin of such Grapes. If the "average sugar content" falls below the minimum degrees Brix or is above the maximum degrees Brix, and the Buyer chooses not to reject the bin of Grapes, the Price for the Grapes will be reduced in each case by one percent (1%) for each 1/10th degree Brix below the minimum or above the maximum degrees Brix.

b.  Mixed Loads. All grapes delivered hereunder shall be delivered in bins containing only one (1) grape variety. Any bins containing more than one (1) variety may be rejected by Buyer.

c.  Defects. Any bins containing Grapes with defects may be rejected by Buyer. As used herein, "defect" refers to grapes which are defective in accordance with standards established by the custom of the grape industry and the practice of the Grape Inspection Service of the California Department of Food and Agriculture. Without limiting the foregoing, defects shall include grape berries affected by mold or rot and broken grape berries. If there are defects in any bins and Buyer chooses not to reject any such bins of Grapes, the Price for the Grapes will be reduced as follows:

| Amount of Defect | Penalty |
| --- | --- |
| 0 – 3% | No Penalty |
| 3.1 – 4% | 1% of Base Price |
| Over 4% | Rejection |

d.  Material Other than Grapes. Material other than grapes shall be determined for each bin on the basis of weight. Bins with MOG greater equal to or greater than 2% may be rejected by Buyer, or if Buyer chooses to accept such Grapes, the Price for the Grapes shall be reduced as follows:

| Amount of Defect | Penalty |
| --- | --- |
| 0 - 2% | No Penalty |
| 2.1 – 2.5% | 1.5% Penalty |
| Over 2.6% | Rejection |

e.  Smoke Exposure. In the event that the Grapes are exposed to smoke during the growing season, Buyer shall have the option to evaluate the impact of the smoke exposure on the Grapes by doing the following:

   i.  Collecting berry samples from a minimum of twenty (20) vines and fermenting such berries in accordance with Buyer's normal processing procedures for the specific varietal, a description of which procedures will be made available to Seller upon request, and upon completion of fermentation, submitting the sample to an independent third party laboratory, such as ETS Laboratories, to be analyzed for guaiacol and 4-methylguaiacol and any other smoke markers that can be reliably

2



EXHIBIT 7

PAGE 150

DocuSign Envelope ID: 7DC99906-F398-4CAD-8861-AF4A774080AA

detected by the third party laboratory processes.

ii.   Buyer shall initiate third party testing procedures in sufficient amount of time to obtain results prior to harvest. If, after receiving the testing results, the Grapes test higher than 2.1 ppb guaiacol and 4- methyl guaiacol, which is a marker for Smoke Taint, Buyer shall have the right to reject the Grapes and must provide written notice of rejection to Seller within twenty-four (24) hours of receiving test results. In the event of timely rejection, Buyer shall be relieved of its obligation to accept and pay for the Grapes and Seller shall be relieved of its obligation to sell the Grapes to the Buyer. If Buyer fails to provide timely notice of rejection, Buyer shall be deemed to have waived any right to reject Grapes as a result of a smoke-related defect, damage or impact.

iii.  If third party test results are not received prior to the date of harvest, unless there is another basis for rejection set forth herein, Buyer must accept delivery of the grapes and continue to process the grapes in accordance with Buyer's standard operating procedures. To the extent the test results reveal Smoke Taint higher than 2.1 ppb, Buyer shall still be entitled to reject the fruit within twenty-four (24) hours of receiving test results and the parties shall mutually agree upon disposal of the resulting juice/wine. Buyer agrees to pay Seller for all harvesting costs. To the extent Seller desires to take possession of the juice/wine, Buyer shall release such juice/wine to Seller upon payment to Buyer of $300.00 per ton processing fee and Buyer shall be relieved of all obligations hereunder including any payment of the Price.

iv.   To the extent Buyer rejects Grapes for Smoke Taint, Buyer shall assist and cooperate with Seller in the filing and processing of any related insurance claims, including providing any requested samples, documentation photographs paperwork and/or statements that may be requested by Seller's insurance carrier.

5.   **Harvest.** It is the intent that these Grapes will be hand harvested into 5-ton gondolas to be provided by Seller, in cooperation with Seller and Seller's Vineyard Manager. All harvesting of Grapes must coincide with the Buyer's delivery schedules within reason. The Buyer will make every attempt to satisfy both the Seller and the Buyer with regard to scheduling convenient delivery times. Seller will cause the Grapes to be promptly transported in accordance with applicable State and County rules and regulations for delivery to a facility as directed by Buyer on the same day as the Grapes were picked.

6.   **Delivery Scheduling and Charges.** Delivery and transportation of the Grapes will be scheduled by the Seller and will be transported to the delivery location indicated in Section 1 of this Agreement. Charges for the transportation and delivery of the Grapes to the winery will be the responsibility of the Seller. ~~Seller~~ *Buyer* agrees to insure or cause to be insured, at its own expense, any vehicles used to deliver grapes owned, rented, leased, or operated by Seller or any independent contractor employed by Seller, for automobile liability in an amount not less than $1,000,000 per occurrence.* *Buyer may deduct cost of insurance from the sale price.*

7.   **Certificate of Weighmaster.** Buyer will provide for the weighing of each load of Grapes and will provide Seller with Weighmaster's Certificate of Weights and Measure for each such load. If Buyer's weights will be used, Buyer will provide a copy of the Buyer's current Weighmaster License issued by the Department of Food and Agriculture, County Weights and Measures Registration Certificate, and a copy of Buyer's Common Tare Weights if applicable. Any payment

3

EXHIBIT 7

PAGE 151

DocuSign Envelope ID: 7DC98906-F398-4CAD-8861-AF4A774086AA

to Seller shall be based on such weight.

8. **Notices**. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below (or to such other address that may be designated by the receiving party from time to time in accordance with this Section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Except as otherwise provided in this Agreement, a Notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

| Notice to "Buyer" | Notice to "Seller" |
|---|---|
| Corbett Vineyards, LLC dba Center of Effort | Northern Holding, LLC |
| Nathan R. Carlson | Mr. Lee Codding |
| 2195 Corbett Canyon Road | 13217 Jamboree Rd Ste 429 |
| Arroyo Grande, CA 93420 | Tustin, CA 92782 |
| Phone: (805) 712-0735 | Phone: (925) 220 8216 |
| Email: nathan@centerofeffortwine.com | |
| | Copy to: |
| | Richard A. Marshack, Bankruptcy Trustee |
| | 870 Roosevelt, Irvine CA 92620 |
| | Phone: (952) 220 8216 |
| | Email: rmarshack@marshackhays.com |
| | |
| | Copy to: Vino Tinto Consulting |
| | vinotintocons@aol.com |

1. **Lien Notice**. The sale of the Grapes under this Agreement are subject to a Seller's Lien under the California Food and Agriculture Code section 55631, et seq. In addition, the Seller intends to preserve its trust benefits under the Perishable Agricultural Commodities Act pursuant to 7 U.S.C. section 499, et seq, (PACA Lien). Buyer shall not commingle the Grapes or juice from the Grapes with any other grower's grapes or juice until payment is made in full. Buyer grants Seller the right to file a UCC-1 financing statement reflecting Seller's lien rights.

2. **Use of Vineyard Name**. Buyer may wish to place the name of the Vineyard on the wine produced by Buyer. The name of the Seller, or name of the Vineyard, can be used on the label of Buyer only upon obtaining prior written consent of Seller, which may withhold in its sole discretion. — OK.

3. **Indemnity**. To the fullest extent allowed under California law, Seller shall hold harmless and indemnify and defend Buyer against any claims, demands, damages, costs, liability, loss, attorney fees or expenses caused by Seller's breach or alleged breach of any provision of this agreement, including, without limitation, breach of any warranty or quality standard. Seller agrees to accept and assume full liability and reimburse Buyer one hundred percent (100%) for any and all direct loss or damage caused by the presence of any materials other than grapes (MOG) in bins of Grapes delivered by Seller to Buyer. Such direct loss or damage shall include, without limitation, any damages incurred as a result of the downtime or diminished ability to use any equipment damaged by the presence of MOG in bins of Grapes delivered by Seller. In the event that said MOG causes damage, the cost of repairing any winery equipment and any other losses may be deducted and withheld from any payment due to Seller for the Grapes delivered hereunder, in addition to any

4

EXHIBIT 7

PAGE 152

DocuSign Envelope ID: 7DC99906-F398-4CAD-8861-AF4A774086AA

*ok 9/28*

other rights the Buyer may have. Buyer agrees to promptly notify Seller and provide Seller with a description of the nature and extent of any such damages and the estimated cost of repairs. To the fullest extent allowed under California law, Buyer shall hold harmless and indemnify and defend Seller against any claims, demands, damages, costs, liability, loss, attorney fees or expenses caused by Buyer's breach or alleged breach of any provision of this agreement.

4.  **Compliance With Laws.** Seller warrants that the Grapes shall not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (21 U.S.C.> Section 310, et seq. (the "Act") nor will there be any article which may not, under the provisions of Section 404 and Section 405 of the Act, be introduced into interstate commerce. Seller further warrants that Grapes will not contain pesticide residue prohibited by or in excess of tolerances established by the Act or by any state regulatory authority, and that the Grapes shall meet all standards of the Act and the Sherman Food, Drug and Cosmetic Law, California Health and Safety Code Section 26,000 et seq. If Buyer timely requests Seller to eliminate the application of certain pesticides or chemicals to comply with residue prohibited by or in excess of tolerances established outside of the United States, Seller agrees to use all best efforts to eliminate such use. Seller further represents and warrants that the Grapes sold to Buyer by this Agreement are Seller's property and Seller has not contracted to sell nor sold them to others and that Seller will not sell them to others unless (prior to said sale) Buyer consents in writing. Seller further represents and warrants that except as approved in writing by Buyer, there is no and shall be no crop lien, security interest, claim, or any other encumbrance, sale or delivery restriction on the Grapes covered by this Agreement or any portion of those Grapes or their proceeds. Seller agrees to defend and indemnify Buyer against any and all liability, claims, demands, losses, damages, costs, attorneys' fees and expenses resulting from any breach of the representations and warranties contained in this paragraph, or arising out of any such non-permitted lien, interest, claim or encumbrance described herein. If Seller should breach any of the provisions of this paragraph, Buyer (in addition to all other remedies available) shall not be obligated to accept any Grapes under this Agreement.

5.  **Right to Resell.** If Buyer rejects or refuses to accept Grapes in violation of this Agreement, Seller shall be entitled to resell such Grapes and recover all damages suffered, including but not limited to all costs of resale and the difference between the purchase price for such Grapes and the resale price; provided that in the event Seller cannot resell such Grapes after making reasonable efforts to do so, Seller shall be entitled to recover the reasonable costs and expenses incurred in effecting a resale or otherwise mitigating damages, in addition to any other available remedies.

6.  **Force Majeure.** In the event the business of either party is interrupted or interfered with by reason of any cause beyond its reasonable control, including but not limited to fire, flood, storm, low or freezing temperatures, high temperatures, earthquake, explosion, war, rebellion, insurrection, insects, other pests, pestilence, quarantine, act of God, boycott, embargo, strike, riot or any governmental law, directive or regulation affecting any part of such party's business, then such party at its option may cancel this Agreement with respect to any or all of the undelivered Grapes in any particular year which are affected by such cause; provided that Buyer may not cancel this Agreement with respect to any Grapes after Buyer has accepted a bin of Grapes. If Buyer is the party affected by such cause, Buyer shall use its best efforts to find alternative delivery sites for the Grapes. If Buyer does designate such sites, Buyer shall pay all additional costs incurred by Seller in delivering the Grapes to such sites. If Buyer is the party affected by such cause and elects to cancel this Agreement in any particular year with respect to less than all of the Grapes in such year, then Seller, at its sole option, may elect to cancel this Agreement as to all or any portion of the Grapes in such year with respect to which Buyer did not elect to cancel this Agreement. Any cancellation of this Agreement for a particular year shall not affect the obligations of the parties for subsequent years.

5

EXHIBIT 7

PAGE 153

DocuSign Envelope ID: 7DC99906-F398-4CAD-8861-AF4A774086AA

7. **Expenses**. All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

8. **Attorneys' Fees**. In the event that any party institutes any legal suit, action, or proceeding, including arbitration, against the other party to enforce the covenants contained in this Agreement (or obtain any other remedy in respect of any breach of this Agreement), the prevailing party in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

9. **Further Assurances**. Each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

10. **Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

11. **Severability**. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

12. **Entire Agreement**. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. *OK. JC*

13. **Amendment and Modification**. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. *See attached addendum*

14. **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

15. **Assignment**. Neither party may assign any of its rights hereunder without the prior written consent of the other party. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

16. **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

17. **No Third-Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their respective successors and assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

6

EXHIBIT 7

PAGE 154

DocuSign Envelope ID: 7DC99906-F398-4CAD-8861-AF4A774086AA

18. **Governing Law**. This Agreement and all related documents, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of California.

19. **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. *Buyer acknowledges that seller is operating as a Bankruptcy Trustee and there shall be no claims or liability against* — OK

20. **Relationship of the Parties**. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer or agency relationship.

21. **Time of the Essence**. Time shall be of the essence in this Agreement *Richard Marshack in his personal capacity* — OK

22. ~~**Arbitration**~~. The parties will attempt to settle any dispute in a mutually agreeable manner. Any controversy or claim arising out of or relating to this Agreement or any breach thereof that is not settled by the parties, shall be determined by ~~arbitration in San Luis Obispo, California (or such other location in California as the parties may agree upon) before a panel of arbitrators in accordance with the Comprehensive Arbitration Rules and Procedures of the Judicial Arbitration and Mediation Service, administered out of Los Angeles. Any arbitration shall be venued in San Luis Obispo, California.~~ *U.S. Bankruptcy Court, Central District of California* — OK

23. **Confidential**. This Agreement and its terms are confidential. Neither party will disclose any aspect of this Agreement without the written consent of the other. Consent is given to disclose the terms of this Agreement to a financial institution lending on the vineyards, which are the subject of this Agreement. *Seller may disclose terms of the agreement or filings with the Bankruptcy Court* — OK

**Authorized Signature**: Each of the undersigned signing on behalf of a legal entity represent and warrant that he/she is authorized to execute and deliver this Agreement without any further action or the consent of any other person, and that on delivery this shall be a binding and valid obligation of the party for which he/she has executed this Agreement.

Seller                                                    Buyer

Northern Holding, LLC                         Corbett Vineyards LLC

By: X _____ Bankruptcy Trustee      By: _____
Richard A. Marshack, Bankruptcy Trustee      Nathan R. Carlson, ~~General Manager~~

By: _____ 9/24/2021                 *solely as a Bankruptcy Trustee and not in his personal capacity*
Lee Codding, Managing Member

7

EXHIBIT 7

PAGE 155

## Addendum

The attached contract dated 10/6/2021 between Rabbit Ridge Wine Sales Inc. and Daou Vineyads is hereby amended as follows:

All parties agree that all payments due under the attached contract are to be made payable to:

Richard Marshack, Bankruptcy Trustee of Northern Holdings LLC
and

Said payments shall be made by check or cashiers check and shall be mailed to the following address:
870 Roosevelt
Irvine, Ca 92620

Buyer agrees that Northern Holdings LLC and Richard Marshack, as it Bankruptcy Trustee are parties to the attached agreement and that they will comply with this amendment.

Trustee enters into this agreement pursuant to the order attached hereto.

So Agreed:

Buyer, Daniel Daou_____

Lee Codding, personally and in his representative capacity on behalf of Rabbit Ridge Inc. (Bonded Winery-CA 6674)

Richard Marshack
Trustee of Northern Holdings LLC

*( Subject to handwritten changes on the agreement entitled "Grape Purchase Agreement")*

**EXHIBIT 7**

*as agent of Northern Holdings LLC*

## GRAPE PURCHASE AGREEMENT

THIS GRAPE PURCHASE AGREEMENT (this "Agreement") is made and executed as of August 3, 2021 ("Effective Date"), by and between DAOU FAMILY ESTATES, LLC, a California limited liability company ("Winery"), and Rabbit Ridge Vineyards *(Live Oak Rd)* ("Grower"). This Agreement constitutes the complete agreement between the parties with respect to the subject matter contained herein, and no representation or understanding other than those expressed in it shall add to, vary, or modify the Agreement unless the addition, variance or modification is made in writing and signed by the Parties. This Agreement supersedes and replaces any and all agreements relating to the subject matter of this Agreement that were previously entered by the Parties. *This agreement includes an addendum*

### RECITALS

*agent of the*

A.    Grower is the owner of a vineyard located at 2380 Live Oak Rd, Paso Robles, CA 93446 ("the Vineyard").

B.    Winery and Grower desire to enter into this Agreement for the purchase and sale of grapes from the Vineyard.

### AGREEMENT

1.    Purchase and Sale. Subject to the terms and conditions of this Agreement, Winery hereby agrees to purchase and accept, and Grower agrees to sell and make available for transport, all of the grapes harvested from the parcel, block and rows identified in Section 3 below, in compliance with the quality standards and according to the payment terms set forth herein.

2.    Term.  The term of this Agreement is one-year and for the fruit produced in 2021. This contract can be voided if both Winery and Grower agree to terminate the agreement upon delivery of termination notice and signature of both parties. Such cancelation would be effective immediately.

3.    Grapes; Price Per Ton.  The grapes to be purchased and sold pursuant to this Agreement are described as follows:

| Varietal | Block/ Rows | Price Per Ton |
|---|---|---|
| Cabernet Sauvignon Clone 337 | 60 tons<br>9.64 Acres<br>Blks: 11, 13, & 17 | $3,350.00 |

4.    Purchase Price and Payment.

4.1    The "Purchase Price" shall be the product of (a) the number of tons delivered to and accepted by Winery multiplied by (b) the Price Per Ton set forth in Section 3 above.

4.2    The Purchase Price shall be calculated based on weigh tags generated from a State of California-certified scale and a licensed weighmaster or deputy weighmaster.  Winery shall be responsible for obtaining or preparing weigh tags, which shall be provided to Grower within 5 business days of delivery of the grapes.

1

EXHIBIT 7

PAGE 157

① Payment to be made payable to "Richard Marshack, Bankruptcy Trustee of Northern Holdings LLC" and shall be mailed to Richard Marshack 870 Roosevelt Irvine, Ca 92620

4.3     Grower shall prepare and send an invoice to Winery at the address listed in the signature block below. Winery shall pay the Purchase Price in accordance with the following schedule: (i) one-third on or before December 15, following each annual harvest; (ii) one-third on or before January 15, following each annual harvest; and (iii) one-third on or before ~~March~~ 15, following each annual harvest. ①                                      February                            IC

5.     Viticultural Practices. Grower recognizes that Winery is the producer of premium wines whose long-term success is based on Winery's ability to secure a supply of grapes which closely corresponds to Winery's quality standards. Accordingly, Grower and Winery shall cooperate in a mutual effort to obtain the highest quality grapes. During the growing season, Grower and Winery shall consult on a regular basis on viticultural practices, including, but not limited to, cultivation, pruning, thinning, irrigation, and pest management to be implemented by Grower. Grower shall allow Winery's representative periodic access to the Vineyard during the growing season for the purpose of evaluating grape quality. Grower agrees not to change any Major Cultural Practice that might affect quality of grapes subject to this Agreement without consulting Winery. For purposes of this provision, "Major Cultural Practices" include, but are not limited to, changes in vineyard ownership or management, changes in trellis configuration, vine training methods, row and vine spacing, vine grafting or T-budding or pruning methods. Winery has requested, and Grower has agreed to, the specific viticultural practices set forth on Exhibit A attached hereto.

6.     Picking and Delivery.

6.1     Picking. Winery and Grower shall in good faith discuss and agree upon a time for harvest during the regular harvest season and establish general guidelines for optimum levels of sugar, acid, pH and crop size. "Target Brix" for the grapes sold pursuant to this Agreement shall be approximately 27.5 degrees Brix, but under no circumstances shall the grapes be harvested until they achieve a minimum of 25.5 degrees Brix ("Minimum Brix") or after they have exceeded 30 degrees Brix ("Maximum Brix"). Brix shall be measured using a Digital Density Meter. Winery may make the final decision to set the harvest date by providing prior notice to Grower of no less than 48 hours.  Grower shall pay all costs associated with harvesting.

6.2     Delivery.  All grapes will be hand harvested into half-ton macro bins, which will be provided by Winery. Delivery shall take place on the same day as harvest. Grower shall make the harvested grapes available for transport to Winery's facility located at 2777 Hidden Mountain Road, Paso Robles, California unless another location is otherwise designated by Winery. Grower and Winery shall cooperate to minimize the inconvenience to one another with respect to truck waits at Winery's facility, deliveries late in the day, and other scheduling problems. Winery shall bear all costs and expenses for delivery of grapes to Winery's facility.

6.3     Risk of Loss and Title. Grower shall assume all risk of loss and damage of any kind for each container of grapes until title has passed to the Winery. Title to and risk of loss for each container of grapes shall pass to Winery upon delivery to and acceptance of each container by Winery at Winery's facility.

7.     Grape Quality. All grapes delivered by Grower shall be sound, merchantable and suitable for the making of premium wine, and shall satisfy the following specific standards:

2

EXHIBIT 7

PAGE 158

7.1     Sugar Content. The grapes shall be harvested when they have achieved Target Brix. Winery may, in its discretion, reject any container of grapes whose sugar levels are below the Minimum Brix or exceed the Maximum Brix.

7.2     Defects. The grapes shall be free from Defects. As used herein, "Defects" shall refer to grapes which are defective in accordance with standards established by the custom of the grape industry and the practice of the Grape Inspection Service of the California Department of Food and Agriculture and include, but are not limited to, grapes affected by mildew, rot, insect infestation, raisining, smoke taint, sulfur or that are in the process of fermenting. Defects shall be determined for each container on the basis of weight. Winery may, at its sole discretion, reject any container which has Defects exceeding 2% by weight.

7.3     Material Other Than Grapes. Material other than grapes ("MOG") shall be determined for each container on the basis of weight. Winery may, in its sole discretion, reject any container which has MOG exceeding 2% by weight.

7.4     Second Crop. Consistent with the viticultural practices set forth in Exhibit A, the grapes delivered hereunder shall be first crop. Second crops are expressly prohibited.

7.5     No Mixed Containers. All grapes shall be delivered in containers containing only one grape variety, unless otherwise expressly agreed by Grower and Winery.

7.6     Pesticides. As of the Effective Date, Winery shall not be obligated to accept any grapes which have been treated with any pesticide, herbicide such as Roundup, fungicide (including, but not limited to, sulfur and sulfur-based compounds), insecticide or miticide, the application of which does not conform to all local, state and federal laws and regulations. Grower shall maintain complete and accurate written records with respect to all chemical applications. At the reasonable request of Winery, Grower shall prepare and deliver no later than 14 days prior to commencement of harvest a written report each year showing all chemical treatments, soil amendments and other materials applied to the Vineyard during the one-year period preceding the harvest.

7.7     Inspection and Compliance. In the event that Winery rejects a particular container based on sugar content, Defects, MOG or second crop, and Grower does not agree to such rejection, then such container shall be referred in a timely manner to a qualified independent third party for inspection and a conclusive determination as to the quality standards. An inspector from the Grape Inspection Service of the California Department of Food and Agriculture shall be deemed to be a qualified independent third party for such purposes, and his or her findings shall be conclusive and binding on the parties. Winery and Grower shall share the cost of such inspection equally.

7.8     Rejection. The rejection by Winery of any containers of grapes tendered by Grower shall not relieve Grower of his obligation to pick and deliver all other grapes covered by this Agreement and shall not relieve Winery of its obligation to purchase all other grapes tendered by Grower and otherwise acceptable. The failure by Winery to reject any grapes that Winery has the right to reject pursuant to the terms of this Agreement does not constitute a waiver of any right of Winery or obligation of Grower.

8.      Representations and Warranties. For purposes of this section 8 Grower is not the agent of Northern Holdings LLC. Grower makes the representations and warranties but not as an [3] agent of Northern Holdings LLC

EXHIBIT 7

PAGE 159

8.1    By Grower. Grower warrants to Winery that as of the Effective Date and at the time of each delivery of grapes to Winery:

(a)    Adulteration. None of the grapes shall be adulterated, mislabeled or misbranded within the meaning of the federal Food, Drug and Cosmetic Act, as amended, the California Pure Food Act, as amended, and the regulations issued pursuant thereto.

(b)    Clear Title. The grapes shall be free of all liens, claims and encumbrances.

(c)    Quality. The grapes shall comply with the quality standards set forth in this Agreement.

(d)    Authority. The signatory to this Agreement on behalf of Grower has the full power and authority to enter into this Agreement and to bind Grower to the terms and conditions contained herein.

8.2    By Winery. Winery warrants to Grower that as of the Effective Date and at all time during the Term:

(a)    Licenses. It is the named licensee on all federal and state permits and licenses necessary to engage in winemaking and grape sales.

(b)    Clear Title. After delivery of the grapes to Winery and before payment in full of the Purchase Price, Winery shall keep all of the grapes delivered pursuant to the terms of this Agreement free and clear of any lien or security interest superior to Grower's lien described in Section 10 below.

(c)    Authority. The signatory to this Agreement on behalf of Winery has the full power and authority to enter into this Agreement and to bind Winery to the terms and conditions contained herein.

8.3    Survival. The warranties contained in this Section 8 shall survive termination or expiration of this Agreement.

9.    Termination. Upon the occurrence of any of the following (each a "Termination Event"), and upon written notice to the other party describing the Termination Event, either party may terminate this Agreement and shall be released from all future obligations hereunder: The commencement by or against the other party of a voluntary or involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or another applicable federal or state bankruptcy, insolvency or similar law; or the consent by the other party to the appointment of or the taking possession with or without the other party's consent of a receiver, liquidator, assignee, trustee, custodian, or other similar official for said party or for any substantial part of its property; the making by said party of any assignment for the benefit of its creditors; the failure by the other party generally to pay its debts as they become due; or the taking of any action by or on behalf of party in furtherance of any of the foregoing.

10.    Security. Winery acknowledges that:

4

EXHIBIT 7

PAGE 160

10.1    Grower is the beneficiary of a producer's lien pursuant to California Food & Agriculture Code §§55631 et seq. which attaches to the wine produced from the grapes sold by Grower to Winery pursuant to this Agreement; and

10.2    Pursuant to California Food & Agriculture Code §55638, Winery may not sell or transfer the wine produced from grapes purchased from Grower to any third party without using the sale proceeds to pay to Grower the amount due for the grapes so purchased.

11.    Marketing.  Winery may advertise its association and partnership with Grower and may, upon reasonable notice to Grower, bring Winery's customers or sales force to the Vineyard for tours. Grower shall cooperate with Winery in its marketing and advertising of the wine produced from the grapes sold pursuant to this Agreement.

12.    Use of Vineyard Designate.  Grower expressly reserves all rights related to the name **Rabbit Ridge Vineyard**. Should Winery desire to use such name as a vineyard designate, Grower hereby grants Winery a royalty-free, non-exclusive license to use such name as a vineyard designate on premium quality wine made from the grapes sold pursuant to this Agreement. Winery shall deliver to Grower one (1) bottle of such vineyard designated wine per vintage within ten (10) days of its release for purposes of quality control.  If the wine does not meet Grower's quality expectations, Grower shall have the right to revoke the license granted herein.

13.    General Provisions.

13.1    Successors and Assigns.  Neither party may assign its rights and obligations under this Agreement without the prior written consent of the non-assigning party, except as provided in this Section 13.1. If at any time Grower ceases to be fully in charge of grape production in the Vineyard, whether because of sale, lease, foreclosure, or any other reason, or if there is a sale or transfer of a controlling interest in the Grower or a significant change in the management of Grower or the Vineyard, then Grower shall notify Winery within 30 days of any such event and Winery shall have the right to terminate this Agreement effective as of the last day of any year remaining in the Term.  Unless Winery elects to terminate this Agreement pursuant to the preceding sentence, this Agreement shall bind Grower's successors.  If, at any time, there is a sale or other transfer of a controlling interest in Winery to a third party ("the Buyer"), and such sale includes an assignment of this Agreement, Winery shall notify Grower, within 30 days of such sale or transfer and, upon Grower's request, Winery shall furnish Grower information regarding the Buyer's ability to assume Winery's financial obligations under this Agreement. Such information shall be prepared by the Buyer and Winery does not warrant the validly of the information. All notices required by this section 13.1 shall be given in accordance with Section 13.8. Except as otherwise specifically provided in this Agreement, the terms and conditions of this Agreement shall be binding on and shall inure to the benefit of the heirs, successors, executors, administrators, assigns and personal representatives of the respective parties.

13.2    Force Majeure.  In the event either party is compelled to reduce or suspend its operations or to cease performance of its obligations hereunder because of the passage hereafter of any laws or regulations, or because of any legal or administrative proceedings of any government or governmental agency, court or administrative agency order, strikes, boycotts, lockouts, other labor disturbances, interruption of power, either parties' temporary or permanent inability to operate for reasons outside that parties' reasonable control, fire, explosion, catastrophe, crop failure or shortage as a result of uncontrollable actions of the elements, or other Act of God, then such party shall, while to the extent so effected, be relieved to the extent thus prevented from performing its obligations hereunder.

EXHIBIT 7

PAGE 161

In such event, the effected party shall take all reasonable measures to remove the disability, if possible, and resume full performance hereunder as soon as reasonably possible. If the inability to perform continues for more than ten days during harvest, or for more than 30 days at any other time, either party may terminate this Agreement upon five days' written notice to the other party.

13.3    Confidentiality.  The parties acknowledge and agree that the terms of this Agreement, including the Purchase Price, shall remain confidential at all times.

13.4    Entire Agreement: Joint Preparation.  This Agreement contains the entire agreement between the parties, and supersedes all prior negotiations, drafts, and other understandings which the parties may have had concerning the subject matter hereof. The Agreement has been prepared jointly by the parties after arm-length negotiations. Any uncertain or ambiguity existing hereunder shall not be construed against any party, but rather shall be interpreted in accordance with general contract principals and applicable law.

13.5    Amendments. This Agreement may not be amended or modified except in a writing signed by both parties.

13.6    Severability. Whenever possible, each provision of this Agreement shall be interpreted so as to be effective and valid under applicable law. If any provision of this Agreement is held to be prohibited by, or invalid under, applicable law, the remainder of this Agreement and any other application of such provision shall not be affected thereby.

13.7    Counterparts; Electronic Transmission. This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument.  All such counterparts together shall constitute one and the same Agreement. The facsimile or electronic mail transmission of a signed copy of this Agreement or any amendment thereto to the other party or his agent, followed by acknowledgment of receipt, shall constitute delivery of such document.

13.8    Notice. All notices and statements required or permitted under this Agreement shall be in writing and shall be personally delivered or sent to the address, electronic mail address or facsimile number of the party being notified as set forth on the signature page hereto via an express delivery service, electronic mail, facsimile, or first class U.S. mail, and such notice shall be deemed to have been given when received or, if earlier: (i) if sent by express delivery service, on date delivery is guaranteed by such service; (ii) if by facsimile or electronic mail, on the date it is sent if sent during normal business hours, otherwise on the next business day; or (iii) if mailed, three days after deposit with the U.S. Postal Service with postage prepaid.  Contact information for notice purposes shall be as set forth beneath the signature lines below until changed by notice given as provided herein.

13.9    Dispute Resolution. With respect to any dispute arising out of or related to this Agreement, the parties shall first make a good-faith endeavor to resolve the dispute without resort to litigation.  In the event of a dispute, the parties agree to meet informally within 15 days after notice from a party requesting such a meeting.  Should the dispute not be resolved by said informal discussions, the parties agree to attempt in good faith to resolve their differences in confidential, non-binding mediation, using an experienced mediator who is a retired judge or attorney with at least ten years of experience in the wine industry and who is mutually agreed upon by the parties.  A mediation session shall be scheduled within 30 days after the failure of informal discussions to resolve the dispute, or as soon after said 30-day period as the selected mediator's schedule will allow.  The requirement of good faith shall be satisfied by each party preparing a brief, written statement of that party's position to be submitted in advance to the

6

EXHIBIT 7

PAGE 162

mediator and to the other party and by attending at least one mediation session of at least six hours' duration. Costs of the mediation shall be borne equally by the parties. The parties may be represented by counsel at both the informal discussions and the mediation session. If any party commences a court action based on a dispute to which this Section 13.9 applies without first attempting to resolve the matter through informal discussions and mediation, that party shall not be entitled to recover attorneys' fees, even if attorneys' fees would otherwise have been available to that party in any such court action. The following matters are excluded from the meet and confer and mediation requirements: (i) the filing of a court action for order of attachment, receivership, injunction, or other provisional remedies, and (ii) any matter which is within the jurisdiction of a probate, bankruptcy, or small claims court.

13.10    Attorneys' Fees. In the event any party shall maintain or commence any action or proceeding against any other party to enforce the terms of this Agreement or any provision thereof, the prevailing party therein shall be entitled to recover reasonable attorneys' fees and costs therein incurred.

13.11    Headings. The titles and headings of the various sections of this Agreement have been inserted only for convenience of reference. They are not part of this Agreement and may not be used to construe or interpret any of the terms hereof.

13.12    Governing Law. This Agreement shall be governed by, and construed in accordance with, the law of the State of California, without giving effect to principles of conflict of laws. *All disputes shall be heard in the United States Bankruptcy Court Central District of California*

14.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the law of the State of California, without giving effect to principles of conflict of laws. Sales Commission to Vino Tinto Consulting. 3% of the gross value of the agreement from the seller for the first year of the agreement no later than 30 days after the final payment by the Winery to the Grower as provided in Section. 2% commission no later than 30 days after the final payment by the Winery to the Grower for each subsequent year until terminated by the parties. Vino Tinto Consulting to Invoice Seller.

14.1    Sellers Warranties: The Seller warranties that #1. The Seller is the sole owner of the grapes described in this Agreement. #2. The Seller has the full right and authority to enter into this Agreement. #3. The Seller will deliver the grapes described in this Agreement to the Buyer free of any and all crop mortgages, liens, security interests and other encumbrances except as notified in writing.

*(Signatures to Follow)*

7

EXHIBIT 7

PAGE 163

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**GROWER:**

Lee Codding / Rabbit Ridge Vineyard
Live Oak

By: Leroy "Lee" Codding
Title: Manager, FWFI
Date: 6/6/2021

Address for Notice:

179 Niblick Rd no 406
Paso Robles, CA 93446

Contact Name: Lee Codding
Email: lecoddingiv@icloud.com
Phone: 805-468-3331
Fax: N/A

**WINERY:**

DAOU FAMILY ESTATES, LLC, a California limited
liability company:

By: DAOU Vineyards, LLC, a California limited liability
company

Daniel J Daou

By: Daniel J. Daou, Manager

Date: 08/09/21

Address for Notice:

DAOU FAMILY ESTATES, LLC
ATTN: Daniel J. Daou
2777 Hidden Mountain Road
Paso Robles, CA 93446
Phone: (805) 226-5460 x206
daniel@daouvineyards.com

Northern Holdings LLC
by Richard A. Marshack, Bankruptcy Trustee

RA Mk, Trustee
870 Roosevelt, Irvine, Ca 92620
949-333-7777   rmarshack@marshackhays.com

(*) All parties agree that Northern Holdings LLC
and Richard Marshack as its Bankruptcy Trustee
is a party to this agreement. No liability
shall be sought or obtained against Richard
Marshack in his personal capacity. Any claims
Winery shall have against Northern Holdings LLC shall
be a general unsecured claim and not an administrative
claim. This contract is entered into subject to
and in accordance with the Bankruptcy Court order
which Winery acknowledges receiving.

EXHIBIT 7

PAGE 164

EXHIBIT A

VITICULTURAL PRACTICES

- Based on row spacing and vines per acre, crop load to be no more than 4.5 tons per acre.
- Grower shall prune, thin and drop fruit, including a green drop, as required to achieve this level of yield. Winery shall work with Grower's viticulture team with regards to each of these critical yield actions.
- Grower agrees that the vines shall bear only one crop per year; second crops are expressly prohibited.
- Grower agrees to maintain watering at minimal levels to "stress" the vines enough to maintain concentrated berries, but not so much as to shut down the vines and lose the fruit.
- Grower commits to consistent monitoring of the vines to insure proper pest control, irrigation and nutrient management.
- As of the Effective Date, Grower agrees that the Roundup herbicide is forbidden from the vineyard and acknowledges that if the product is applied the Winery holds the right to reject the grapes due to contamination.
- Winery will measure pH, Brix and TA of the grapes by random sample and provide said data to Grower. Most importantly, Grower agrees to harvest when the grapes are physiologically ready and the seeds have totally turned brown indicating readiness. The parties agree that Winery will determine the actual date of harvest based on Winery samples.
- Grower agrees that all grapes will be picked by hand and green/not mature or "unfit" clusters will be thrown away as to minimize damaging quality.

9

EXHIBIT 7

PAGE 165

October 4, 2021

Buyer
San Antonio Winery, Inc.
Attn: Anthony Ribolt
737 Lamar Street
Los Angeles, CA 90031
323-223-1401, Fax 323-221-7261

Seller
Rabbit Ridge Winery    As Agent for Northern
Attn: Lee Codding      Holdings LLC under the
2380 Live Oak Road
Paso Robles, CA 93446
952-220-3216

Payee is US Trustee Richard Marshack for Northern Holding Estate -

Cabernet Franc         Approx. 5 tons     Payment to be made payable to
Cabernet Sauvignon     Approx. 5 tons     follows:

Pricing Terms                             Richard Marshack, Bankruptcy Trustee
                                          of Northern Holdings LLC
*  Price per ton:                         Payment to be sent to Richard Marshack
   *  $3,350 in 2021                      @ 870 Roosevelt, Irvine, Ca 92620

*  Any controversy, dispute, or claim arising out of or relating to this agreement, or the
   breach thereof, shall be settled by ~~arbitration in accordance with the Commercial
   Arbitration Rules of the American Arbitration Association. The award rendered by the
   arbitrators shall be final and binding and judgement on said award may be entered in any
   court having jurisdiction thereof. Arbitration process to be completed in 90 days.~~
   United State Bankruptcy Court for the Central Dist. of California

Duration
The duration of this contract is one (1) year beginning with crop year 2021. After contract
expires, Buyer has first right to sign a new contract.

County
San Luis Obispo.

Payment Terms
100% within 30 days of harvest.

# All parties agree that Northern Holdings LLC and Richard
Marshack as its Bankruptcy Trustee is a party to this
agreement. No liability shall be sought or obtained against
Richard Marshack in his personal capacity.        P. 2

EXHIBIT 7

PAGE 166

Conditions

1. Crop Level
   Target crop level is 3 tons/acre.

2. Sugar
   Brix levels 25-26.5 degrees.
   Target Brix: 25.5 degrees.

   Seller will make every effort to achieve the Target Brix.   The high and low of the
   inclusive range degrees Brix are listed only for impending weather conditions, and must
   be discussed with winery in any given year.

3. Consulting: Lee Alegre will consult with Seller for the duration of the contract.   Any
   termination of Lee Alegre will be discussed with Buyer prior to completion.

4. Seller will install bird nets only after prior approval of the Buyer.

5. Hand Harvesting: Buyer requires hand harvesting.

6. Mildew, molds, rot, and/or MOG: must be less than 1.5% by weight or else buyer can
   reject.

7. Required cultural Practices for all San Antonio Winery vineyards:

   Vines will be "crown suckered."   This is the removal of all shoots not from the spur
   positions.

   Double shoots will be removed.  If a bud pushes two shoots, one will be removed.  This
   can be done early or after set, at the grower's discretion.

   All second (and third) crop will be removed to insure evenness of ripening of the fruit.

P. 3

EXHIBIT 7

PAGE 167

Green and mostly green clusters will be removed at 90% veraison to insure an even ripening.

Leaf pulling around the clusters will be performed to aid color development and air circulation.

Crop may be removed if it appears that there is too large a crop for the vines to support and ripen.

8. Seller's Duties and Responsibilities:

* Buyer determines the harvest date(s). Seller must harvest within 48 hours of the time set.

* Seller must furnish Buyer with pesticide reports before each harvest. Buyer may refuse grapes treated with chemicals not approved by state or federal regulators.

* Seller must warrant that Seller has full and unencumbered title to the grapes delivered. Seller may not assign this contract without Buyer's written consent.

* Seller must also warrant that the grapes provided under this contract are strictly first crop grapes.

* The prices set out above are F.O.B. winery: Seller assumes all responsibility for delivery.

* Term is for 1 year beginning with 2021 harvest. Contract is binding on all heirs and successors.

San Antonio Winery, Inc.                          Date
By: Anthony Riboli

Rabbit Ridge Winery                              10/4/2021
By: Lee Codding                                  Date

**ADDENDUM TO GRAPE PURCHASE AGREEMENT DATED October 4, 2021**
　　1.　　Assignment. This agreement shall be binding on and inure to the benefit of the parties'
successors and assigns. However, Seller shall not assign this agreement nor delegate any obligations
hereunder (whether to a prospective purchaser of Seller's vineyard property or otherwise) without Buyer's

EXHIBIT 7

PAGE 168

*[handwritten: Ram — In no event may Buyers damages and right to claim costs and attorneys fee exceed 25% of]*

advance written approval in Buyer's reasonable discretion, which may be conditioned on, among other things, the assignee having the experience and resources needed to perform Seller's obligations. Seller shall give the Buyer at least 45 days' advance notice of any proposed assignment or delegation and shall promptly provide *content* to Buyer any information Buyer reasonably requests regarding the assignee's ability to perform Seller's obligations. If Buyer approves such assignment or delegation, such approval shall be deemed conditioned on *consent* the assignee assuming the Seller's obligations in a writing reasonably approved by Buyer, and Seller agrees to require any purchaser of the vineyard or other assignee to provide such a written assumption. Buyer's approval under this paragraph shall not be deemed to release Seller from liability for Seller's obligations if they are not performed in a timely manner.

2.     Buyer's Remedies.    Without limiting any other remedies available to Buyer under this agreement or applicable law, if Seller defaults in any obligations (including but not limited to obligations to plant, harvest and deliver the grapes), Buyer shall have the right (but not the obligation) (a) to advance funds to Seller for the performance of such obligations, and/or (b) to the extent permitted by applicable law and licensing requirements, to directly retain and/or pay appropriate personnel (and to take such other actions) as needed in Buyer's judgment to perform such obligations. Buyer shall have the right to deduct from the purchase price owed to Seller any funds so advanced or any costs so incurred by Buyer, together with interest at 10% per annum. Seller hereby agrees to provide access to Buyer and any personnel retained by Buyer for this purpose to enter Seller's vineyard property to perform such obligations of Seller that are in default. Seller hereby waives, and agrees to indemnify, defend and hold Buyer harmless against, any claims, demands, actions, losses, liabilities and expenses (including but not limited to reasonable attorney fees) arising out of Buyer's exercise of its rights in this paragraph. Seller warrants to Buyer that the remedies in this paragraph do not and will not conflict with the rights of any lenders or other third parties.

*[handwritten: Ram — United States Bankruptcy Court presiding over the Northern Holdings]*

3.     Disputes Resolution; Venue; Attorney Fees.    To the greatest extent permitted by law, any *Case* controversy, dispute or claim arising out of or relating to this agreement, or the breach thereof, shall be determined by the ~~Superior Court in Los Angeles County, California (or other court with proper jurisdiction in Los Angeles County)~~, and both parties agree to submit to the jurisdiction of that court for this purpose. In the event of any lawsuit or other legal action or proceeding between the parties arising out of or relating to this agreement, the prevailing party shall be entitled to an award against the other party for the prevailing party's reasonable attorney fees and costs incurred in or relating to such suit, action or proceeding.

4.     Miscellaneous.    This agreement shall be governed by and construed in accordance with California law. This agreement constitutes the entire agreement of the parties relating to its subject matter, and any changes or amendments to the agreement must be in writing and signed by the parties. Similarly, any waiver of rights under this agreement must be in writing and signed by the party giving the waiver. If any provision of this contract is determined to be invalid, the balance of the contract shall be enforced to the extent permitted by applicable law. The parties may sign this agreement in counterparts which, taken together, shall constitute one agreement. Similarly, the parties may bind themselves to this agreement or any amendment by faxed (or scanned and emailed) signatures in the same manner as by original signatures. However, for convenience and record-keeping purposes, any party becoming bound by faxed (or scanned and emailed) signatures shall provide to the other party an ink-signed original of the agreement for the other party's records within ten days thereafter.

BUYER *[signature]*

- San Antonio Winery, Inc.
- By: Anthony Riboli
- Title:
- Date:

SELLER *[signature]*

- Rabbit Ridge Winery
- By: Lee Codding
- Title: President
- Date: 10/4/2021

*[handwritten: Buyer acknowledges that Richard Marshack is operating as a Bankruptcy Trustee and there shall be no claims or liability against Richard Marshack in his personal capacity]*

*[handwritten signature] Ram*

Richard Marshack

EXHIBIT 7

PAGE 169

**EXHIBIT 8**

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

21-F60185

# FILED

In the office of the Secretary of State
of the State of California

**OCT 26, 2021**

This Space For Office Use Only

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

HUMANITY WINE COMPANY LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201829110297 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>2814 Cottage Lane | Paso Robles | CA | 93446 |
| b. Mailing Address of LLC, if different than item 4a<br>179 Niblick Road, Suite 326 | Paso Robles | CA | 93446 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>2814 Cottage Lane | Paso Robles | CA | 93446 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Steven | | Jones | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2814 Cottage Lane | Paso Robles | CA | 93446 |

**6. Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Steven | | Jones | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2814 Cottage Lane | Paso Robles | CA | 93446 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| Wine Business Marketing |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 10/26/2021 | Steven Jones | Managing Member | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

LLC-12 (REV 01/2017)

Page 1 of 2

2017 California Secretary of State
www.sos.ca.gov/business/be

**EXHIBIT 8**
**PAGE 171**

| | | |
|---|---|---|
| **Attachment to Statement of Information** (Limited Liability Company) | **LLC-12A Attachment** | **21-F60185** |

**A.  Limited Liability Company Name**

HUMANITY WINE COMPANY LLC

This Space For Office Use Only

| **B.  12-Digit Secretary of State File Number** | **C.  State or Place of Organization** (only if formed outside of California) |
|---|---|
| 201829110297 | CALIFORNIA |

**D.  List of Additional Manager(s) or Member(s) -**  If the manager/member is an individual, enter the individual's name and address.   If the manager/member is an entity, enter the entity's name and address.  Note:  The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Kelly | | Jones | |
| **Entity Name** | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| 2814 Cottage Lane | Paso Robles | CA | 93446 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| **Entity Name** | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| **Entity Name** | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| **Entity Name** | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| **Entity Name** | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| **Entity Name** | | | |
| | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

**EXHIBIT 8
PAGE 172**

**EXHIBIT 9**

# VINO TINTO CONSULTING

Office Phone: 1-909-391-1582 Cell Phone: 1-909-855-7235 CDFA License #: M17416

E-Mail: vinotintocons@aol.com  /536 N. Cucamonga Ontario, Calif. 91764

## WINE GRAPE PURCHASE AGREEMENT

This Agreement is made and entered into this 27th day of August, 2021. By and between Rabbit Ridge Wine Sales, Inc., referred to herein as the "Seller" and Brady Vineyard 2489 Harvest Meadow Place Paso Robles, California 93446, herein referred to as the "Buyer".

**THE GRAPES REFERRED TO IN THIS AGREEMENT ARE AS DESCRIBED BELOW:**

| AVA | VARIETY | VINEYARD ADDRESS | RANCH | BLOCK | ACRES | TONNAGE |
|-----|---------|------------------|-------|-------|-------|---------|
| Paso Robles | Zinfandel | 1172 San Marcos Road Paso Robles, Cal. 93446 | San Marcos | Field 1 | 9 | 10 |

1. **PURCHASE QUANTITY:**  Seller shall not be liable or obligated to supply grapes Buyer beyond the actual yields of the vineyard (s) described in this Agreement. The weight for payment of the grapes will be determined by a licensed winery weigh master on a certified scale. Actual tonnage delivered to the Buyer may vary from year to year given the variations of the yield in the vineyard described herein. The minimum acceptable tonnage per acre shall be 2 tons per acre and the maximum 4 tons to the acre. The Seller shall perform a minimum of one green drop prior to harvest.

2. **QUALITY/CHEMISTRY:** The minimum Brix acceptable to the Buyer shall be 25 Brix and the Maximum Brix level being 27 Brix with a target of 26 Brix at harvest. The determination of picking date shall be at the discretion of the Buyer with reasonable consideration to the Seller as to the overall quality of the crop at harvest.

3. **HARVEST AND DELIVERY:** The grapes shall be harvested by hand in the early morning hours into five ton Gondolas ~~supplied by the Buyer. Said Gondolas shall be delivered at the cost of the Buyer in a timely manner and in sufficient quantity to harvest and transport the grapes described in this Agreement.~~ The costs of arranging for and the harvest of the grapes shall be paid by the Seller. The cost of arranging for and the delivery of the grapes to the Buyers processing facility shall be paid by the

EXHIBIT 9
PAGE 174

Seller. The Seller shall inform the Buyer in a timely manner of the type of transport in which the Seller will make delivery of the grapes as well as any special equipment that may be required. Neither party shall cause unreasonable delay in the delivery of the grapes to the Buyers processing facility.

**4. TERM.** The term of this Agreement which shall commence on the date thereof, shall be for the grape crop year of 2021 (A one year Agreement)

**5. COMPLIANCE WITH LAWS:** Seller warrants that in compliance with any and all laws and regulations that all grapes under this contract, at the point of delivery to buyer, shall not be adulterated or misbranded within the meaning of any law including the Federal Food, Drug and Cosmetics Act as amended (21 U.S.C Section 301, et seq. - the "Act") nor will they be an article which may not, under the Provisions of Section 404 and 405 of the Act be introduced to Interstate commerce. Seller further warrants that grapes will not contain pesticide residue prohibited by or in excess of tolerances established by any state and/or federal regulatory authority and that the grapes shall meet all standards of the Act and the Sherman Food, Drug and Cosmetics Law, California Health and Safety Code, Section 26,000 et seq.

**6. QUALITY STANDARDS:** Buyer will accept for purchase from the seller only those grapes meeting the following minimum quality standards. All grapes, at the point of delivery to buyer, shall be sound, fully matured, ripe and in merchandisable condition with all containers, at the point of delivery to buyer, having less than 2% defects by weight and not more than 2% material other than grapes (MOG). At the time of delivery all grapes shall be in suitable condition for processing by the buyer. For the purpose of this agreement the term "Defects" shall include, but not be limited to, decomposition of decay induced by Fungi or Bacteria, damage caused by exposure to sub-freezing temperatures and breaks in grape skins not caused by mechanical harvest. For the purpose of this agreement, materials other than grapes shall include, but not limited to, leaves, leaf stems, grape canes, trellis, or irrigation construction materials and any other non grape material.

**7. PRICE PER TON:** The purchase price for the Zinfandel wine grapes described above shall be $1,700.00 per ton.

**8. PAYMENT TERMS:** Payment in full for the Zinfandel wine grapes described in this Agreement shall be made in two equal payments. The first on or before November 1 of the crop year in which the grapes were harvested and the second on or before

EXHIBIT 9
PAGE 175

December 15 of the grape crop year in which the grapes were harvested. Seller to Invoice Buyer.

**9. SALES COMMISION TO VINO TINTO CONSULTING:** 3% of the gross value of the Agreement from the Seller. Vino Tinto Consulting to Invoice Seller.

**10. SELLERS WARRANTIES:** The Seller warranties that #1. The Seller is the sole owner of the grapes described in this agreement. #2. The Seller has the full right and authority to enter into this Agreement. #3. The Seller will deliver the Grapes described in this Agreement to the Buyer free of any and all crop mortgages, liens, security interests and other encumbrances except as notified in writing.

**11. LITIGATION OF DISAGREEMENTS:** In the event of a disagreement between the parties arising as a result of this Agreement. The parties reserve the right to seek relief in the Superior Court of the State of California, County of San Luis Obispo. Or upon the agreement of the parties, Binding Arbitration. A single Arbitrator, agreed upon by the parties, with sufficient knowledge of the wine grape and or wine industry shall be chosen to conduct the proceeding. The costs of which to be borne by the losing party.

**12. NOTICES:**  All contacts regarding this Agreement should be forwarded:

**If to Seller:**
Mr. Lee Codding
Rabbit Ridge Wine Sales, Inc.
1172 San Marcos Road
Paso Robles, California 93446
Cell Phone: 1-925-220-8216
E-Mail: lecoddiongiv@icloud.com

**If to Buyer:**
Mr. Don Brady
Brady Vineyard
2489 Harvest Meadow Place
Paso Robles, California 93446
Cell Phone: 1-805-423-1742
E-Mail: dbrady@roberthallwinery.com

**AFTER CAREFULLY READING AND FULLY UNDERSTANDING THE AGREEMENT AS SET FORTH**

EXHIBIT 9
PAGE 176

ABOVE. THE UNDERSIGNED PARTIES DO WITH OUR AUTHORIZED SIGNATURES BELOW DO
HEREBY AGREE TO THE TERMS CONDITIONS AND SPIRIT OF THE GRAPE SALES
AGREEMENT.

**Agreed to by:**

For: Rabbit Ridge Wine Sales, Inc.        For: Brady Vineyard

Signature:  _____        _____

Print Name:  _____        Don M. Brady

Title:  _____        Owner

Date:  _____        8-24-21

EXHIBIT 9
PAGE 177

**EXHIBIT 10**

# Timothy A. Lambirth

### Attorney At Law

25350 Magic Mountain Pkwy-3rd Floor
Valencia, CA 91355
Phone 661 481-2225
Fax 661 481-2001
tal@lambirthlaw.com

December 15, 2021

**Via Email, Fax and U.S. Priority Mail**

Michael J. Gomez, Esq.                    Reed Waddell, Esq.
Frandzel Robins Bloom & Csato, LC         Frandzel Robins Bloom & Csato, LC
516 West Shaw, Ste. 200                   1000 Wilshire Blvd., 19th Floor
Fresno, CA 93704                          Los Angeles, CA 90017
Fax: (559) 221-2660                       Fax: (323) 651-2577
MGomez@frandzel.com                       FWaddell@frandzel.com

Re:   *In re Northern Holding, LLC*
      US Bankruptcy Case Number: 8-20-bk-13014-MW

Dear Mr. Gomez and Mr. Waddell:

Please be advised that I represent Rabbit Ridge Wine Sales, Inc. ("RRWSI").  It has been brought to my attention that your client, Farm Credit and its agents have locked RRWSI out of the winery facility located at 1172 San Marcos Road, Paso Robles, CA 93446 ("Premises").

RRWSI was, and has been for quite some time, lawfully in possession of the Premises.  Thousands of cases of its wine, and wine under its custody and control, is now beyond its control due to your client wrongfully locking them out of the Premises and thereafter continuing to deny them reasonable access.

Your client's conduct is unlawful for several reasons, including but not limited to, its failure to provide my clients with due process, by providing them notice and an opportunity to respond.  Your client failed to provide any notice whatsoever, not even a three-day notice, a five-day notice, ten-day notice or thirty-day notice!

Your client is also liable to my clients for damages caused by them committing conversion, trespass to chattels, interference with prospective economic advantage and forcible detainer.

Demand is hereby made upon your client that it immediately make arrangements with RRWSI to afford them access to the Premises, and further that RRWSI be permitted to remove its personal property from that facility.

EXHIBIT 10
PAGE 179

Michael J. Gomez, Esq.
Reed Waddell, Esq.
December 15, 2021
Page 2 of 2

     My clients are incurring damages on a daily basis as a result of lost sales and other business opportunities. Thus, your client's immediate attention to this problem, which they have created, is required.

     Should this matter not be resolved <u>immediately</u>, my clients will be considering all legal options available to it, including filing a motion in the Northern Holding bankruptcy or seeking relief in the Superior Court.

     Please call me to discuss as soon as possible at 661 644-5525, as time is of the essence.

     Very truly yours,

     Timothy A. Lambirth

cc: Marshack Hays, LLP (via email and fax)
Counsel for Trustee, Richard A. Marshack
ehays@marshackhays.com
dwood@marshackhays.com
tmang@marshackhays.com

EXHIBIT 10
PAGE 180

# EXHIBIT 11

**Subject:**                FW: True-Up Grape Revenue

Begin forwarded message:

> **From:** Lee Codding <lecoddingiv@icloud.com>
> **Date:** December 17, 2021 at 1:03:41 PM PST
> **To:** Richard Marshack <RMarshack@marshackhays.com>, Lori Ensley <LJENSLEY@aol.com>, Pam Kraus <pkraus@marshackhays.com>
> **Subject: True-Up Grape Revenue**

All,

True-up details below. First some data points. Please give this a thorough read. Thanks in advance.

Harvest is intense and time sensitive. All the grape sales negotiations had to be pursued well in advance of the farm agreement. As well in advance of court approval of the agreement. Otherwise we wouldn't have had any customers. I had to proceed with the best practical basis to get everything we could sold.

We had a handful of grape customers that either due to legacy issues, urgency, customary payment remittance practices or discomfort/unwillingness to go along with the BK entity paperwork needed to be handled on a practical basis.

This was done with good reason: to maximize value. The intent was always and still is to reconcile everything against cost recovery in a true-up. That's the reason I had already set the anticipated cost recovery submission at $232,000 instead of the $400,000 allowed in the farming agreement. As we've discussed is time for that true-up now.

There's what's correct according to the letter of the law and there's what's right. They aren't always the same thing. In this case dealing with customers on a reality basis and preserving the income for the estate was the right thing to do. If official procedure had been adhered to we would have lost these customers and this fruit revenue for the estate. The fruit doesn't wait.

Please find a recap below. Documentation to Lori will follow under separate covers.
Anarchist $30,000
Graveyard $3,285
Nicora $44,000 less
Oniell $22,297.89
Pali $30,877.52
Rangeland $7,752
Sycamore $2,747.90


To reiterate, in preparation for this true up I had long ago set the cost recovery submission at $232,000 instead of the $400,000 allowed in the farming agreement. In excess of this $400,000 limit was spent in farming operations.

1

EXHIBIT 11
PAGE 182

Let's get this put to bed.

Best regards,
Lee


Lee Codding
952/220-8216 / lecoddingiv@icloud.com

EXHIBIT 11
PAGE 183

# EXHIBIT 12

Memorandum of Understanding between Lee Codding and Related Entities as more specifically defined below and Richard Marshack, Bankruptcy Trustee of Northern Holding LLC ("Trustee"), bankruptcy case number 8:20-bk-13014-MW. Dated December 20, 2021.

**Recitals**:

1. Lee Codding ("Mr. Codding") and Trustee entered into that certain agreement entitled "Farm Operator Agreement 2021" ("Farm Agreement") and the presiding Bankruptcy Judge caused an order to be entered on September 7, 2021, as Docket No. 211 approving the Farm Agreement.
2. Pursuant to the Farm Agreement, all proceeds of assets that are permitted to be liquidated (grapes) were to be paid directly to the Trustee.  Further certain expenses as outlined in the Farm Agreement would be advanced by Mr. Codding and after receipt of an accounting and approval of the accounting by the Trustee, the Bankruptcy Estate would reimburse Mr. Codding from proceeds of the assets sold.
3. Mr. Codding and/or Fluid Wine Fund I LLC, Rabbit Ridge Wine Sales, Inc., and Humanity Wine Company LLC (Collectively "Related Entities") received proceeds of sale of grapes.
4. This Farm Agreement is without prejudice to other rights and remedies Trustee or the Bankruptcy Estate may have.

**Agreement**

1. Mr. Codding and Related Entities agree that the total amount of funds due to him and Related Entities, under the Farm Agreement or any transactions or agreements do not collectively exceed $232,000.
2. Mr. Codding and Related Entities agree that the Trustee, on behalf of the Bankruptcy Estate of Northern Holding LLC, may offset or deduct from any money owed to Mr. Codding or to Related Entities the sum of no less than $140,960.31.
3. Mr. Codding and the Related Entities represent and warrant that all funds that they have received that are or once were proceeds from assets of the Bankruptcy Estate, or that are or were assets of the Debtor, or that are proceeds from sales of grapes that were grown on the real estate owned by the Debtor (Northern Holding LLC), have been fully disclosed and are fully outlined in that certain e mail dated December 17, 2021 and attached hereto as exhibit A.
4. To the extent Mr. Codding or Related Entities seeks reimbursement, backup documentation including paid invoices and cleared checks to support the requested reimbursements no later than January 5, 2022. All parties agree that any invoices or requests for reimbursement submitted after January 5, 2022 will not and do not have to be paid.

Agreed

_Richard Marshack, Trustee_

Richard Marshack
Bankruptcy Trustee

Lee Codding
Individually

EXHIBIT 12
PAGE 185

Rabbit Ridge Wine Sales Inc
By: Steve Jones

Rabbit Ridge Wine Sales Inc
By: Lee Codding
It'

Fluid Wine Fund I LLC
By: Steve Jones
It's:

Fluid Wine Fund I LLC
By: Lee Codding
It's: _____

Humanity Wine Company LLC
By: Steve Jones
It's:

Humanity Wine Company LLC
By: Lee Codding
It's:

EXHIBIT 12
PAGE 186

# EXHIBIT 13



## LEROY CODDING

# INVOICE

13217 Jamboree Rd. St 429
Tustin CA 92782

Attention: Richard Marshack, US Trustee
Northern Holding Chapter 7 Estate
Via email
Date: 12/30/2021

Project Title: Northern Holding Grapes farmed by agreement w/ L. Codding
Project Description: Wine Grapes from 2021 Harvest
Invoice Number: 1257.3
Terms: Due Upon Receipt/ Progress Payments Accepted as Collections Occur

Please note - partial remittance as funds are collected from crop revenue by check
or cashiers check to:

Leroy Codding 13217 Jamboree Rd. Ste. 429 Tustin, CA 92782

Progress payments requested as collections occur. Thank you!

| Description | | Extend |
|---|---|---|
| Vineyard Direct Labor Cost Recovery (non BK owned entity) | | $242,855 |
| Vineyard Nutrient, Equip Maintenance Cost Recovery | | $47,649.39 |
| Vineyard Analysis Cost Recovery | | $4,215.60 |
| Power- wells | | $56,363 |
| Vineyard Labor - outside entity | | Pending |
| Other | | Pending |
| Insurance - property and estate forced property coverage | | $10,983 |
| **Due** | Subtotal | $ 372,066.28 |
| **Progress payments to date** | | $    0.00 |
| **Due 12/30/2021** | Total USD | $ 372,066.28 |

EXHIBIT 13
PAGE 188

## Payroll Advanced by Farming Entity for Northern Crop

**Payroll summary by employee report**

**From Jan 01, 2021 to Dec 01, 2021 for all employees from all locations**

| Name | Hours - total | Hours - Vinyard Hourly |
|------|---------------|------------------------|
| ▓▓▓▓ David H | 1401.5 | 416.5 |
| ▓▓▓▓ JESUS T | 2260 | 604 |
| ▓▓▓▓ Jose R | 535 | 135 |
| ▓▓▓▓ UAN | 3278 | 1452.5 |
| ▓▓▓▓ Gustavo Hernandez | 2473.5 | 646.5 |
| ▓▓▓▓ MICHAEL J | 1906.74 | |
| **Total** | **11854.74** | **3254.5** |

1

EXHIBIT 13
PAGE 189

| Hours - Regular | Hours - Sal | Gross pay - total |
|---|---|---|
| | | $ 20,321.75 |
| 99 | | $ 33,025.50 |
| | | $ 7,757.50 |
| 105.5 | | $ 52,397.50 |
| 99 | | $ 42,486.50 |
| | 1906.74 | $ 68,750.00 |
| **303.5** | **1906.74** | **$ 224,738.75** |

2

EXHIBIT 13
PAGE 190

| Gross pay - PAID TIME OFF-Hourly | Gross pay - Vinyard Hourly |
|---|---|
| $ 522.00 | $ 6,039.25 |
| $ 480.00 | $ 8,903.50 |
| | $ 1,957.50 |
| | $ 23,240.00 |
| $ 136.00 | $ 11,107.50 |
| | |
| **$ 1,138.00** | **$ 51,247.75** |

3

EXHIBIT 13
PAGE 191

| Gross pay - TIPS | Gross pay - Regular | Gross pay - Sal |
|---|---|---|
|  |  |  |
|  | $ 1,287.00 |  |
|  |  |  |
|  | $ 1,637.50 |  |
|  | $ 1,683.00 |  |
|  |  | $ 68,750.00 |
| 0 | $ 4,607.50 | $68,750.00 |

4

EXHIBIT 13
PAGE 192

| Gross pay - Holiday | Adjusted gross | Other pay - total |
|---|---|---|
| | $ 20,321.75 | |
| | $ 33,025.50 | |
| | $ 7,757.50 | |
| | $ 52,397.50 | |
| | $ 42,486.50 | |
| | $ 68,750.00 | |
| **0** | **$ 224,738.75** | **0** |

5

EXHIBIT 13
PAGE 193

| Employee taxes - total | Employee taxes - SS | Employee taxes - Med |
|---|---|---|
| -$ 1,935.83 | -$ 1,259.95 | -$ 294.67 |
| -$ 4,583.30 | -$ 2,047.58 | -$ 478.87 |
| -$ 842.70 | -$ 480.97 | -$ 112.48 |
| -$ 7,492.47 | -$ 3,248.65 | -$ 759.76 |
| -$ 4,744.76 | -$ 2,634.16 | -$ 616.05 |
| -$ 13,906.48 | -$ 4,262.50 | -$ 996.88 |
| **-$ 33,505.54** | **-$ 13,933.81** | **-$ 3,258.71** |

6

EXHIBIT 13
PAGE 194

| Employee taxes - CA PIT | Employee taxes - CA SDI | Employee taxes - FIT |
|---|---|---|
| -$ 137.35 | -$ 243.86 | |
| -$ 963.78 | -$ 396.31 | -$ 696.76 |
| -$ 156.16 | -$ 93.09 | |
| -$ 252.08 | -$ 628.77 | -$ 2,603.21 |
| -$ 19.57 | -$ 509.85 | -$ 965.13 |
| -$ 1,751.86 | -$ 825.00 | -$ 6,070.24 |
| **-$ 3,280.80** | **-$ 2,696.88** | **-$ 10,335.34** |

7

EXHIBIT 13
PAGE 195

| Net pay | Employer taxes & contributions - total |
|---|---|
| $ 18,385.92 | $ 1,708.62 |
| $ 28,442.20 | $ 2,680.45 |
| $ 6,914.80 | $ 747.45 |
| $ 44,905.03 | $ 4,162.41 |
| $ 37,741.74 | $ 3,404.21 |
| $ 54,843.52 | $ 5,413.38 |
| **$ 191,233.21** | **$ 18,116.52** |

8

EXHIBIT 13
PAGE 196

| Employer taxes - total | Employer taxes - FUTA | Employer taxes - SS |
|---|---|---|
| $ 1,708.62 | $ 42.00 | $ 1,259.95 |
| $ 2,680.45 | $ 42.00 | $ 2,047.58 |
| $ 747.45 | $ 42.00 | $ 480.97 |
| $ 4,162.41 | $ 42.00 | $ 3,248.65 |
| $ 3,404.21 | $ 42.00 | $ 2,634.16 |
| $ 5,413.38 | $ 42.00 | $ 4,262.50 |
| **$ 18,116.52** | **$ 252.00** | **$ 13,933.81** |

9

EXHIBIT 13
PAGE 197

| Employer taxes - Med | Employer taxes - CA ETT | Employer taxes - CA SUI |
|---|---|---|
| $ 294.67 | $ 7.00 | $ 105.00 |
| $ 478.87 | $ 7.00 | $ 105.00 |
| $ 112.48 | $ 7.00 | $ 105.00 |
| $ 759.76 | $ 7.00 | $ 105.00 |
| $ 616.05 | $ 7.00 | $ 105.00 |
| $ 996.88 | $ 7.00 | $ 105.00 |
| **$ 3,258.71** | **$ 42.00** | **$ 630.00** |

10

EXHIBIT 13
PAGE 198

| Total payroll cost |
| --- |
| $ 22,030.37 |
| $ 35,705.95 |
| $ 8,504.95 |
| $ 56,559.91 |
| $ 45,890.71 |
| $ 74,163.38 |
| **$ 242,855.27** |

11

EXHIBIT 13
PAGE 199

2:18 PM  Mon Dec 13

Done

20210317-statements-1563- (1).pdf



| Date | Description | Amount |
|---|---|---|
| 03/03 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 2,601.24 |
| 03/05 | Amazon.com*9B6CF3FJ3 Amzn.com/bill WA | 90.06 |
| 03/05 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 5,202.48 |
| 03/05 | 76 - TEMPLETON MARKET TEMPLETON CA | 38.58 |
| 03/08 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 748.07 |
| 03/08 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 4,954.95 |
| 03/08 | CHEVRON 0212458 PASO ROBLES CA | 70.00 |
| 03/09 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 748.07 |
| 03/09 | TRACTOR SUPPLY CO #1609 PASO ROBLES CA | 80.78 |
| 03/10 | SAN PASO TRUCK STOP PASO ROBLES CA | 44.00 |
| 03/10 | SAN JOAQUIN TRACTOR CO BAKERSFIELD CA | 165.09 |
| 03/12 | SAN PASO TRUCK STOP PASO ROBLES CA | 125.00 |
| 03/12 | CARQUEST OF TEMPLETON TEMPLETON CA | 1,831.25 |
| | STEVEN JONES | |
| | TRANSACTIONS THIS CYCLE (CARD  5551) $16699.57 | |
| 03/12 | TEMPLETON AUTO PARTS & SE 805-4342177 CA | 60.00 |
| | STEVEN JONES | |
| | TRANSACTIONS THIS CYCLE (CARD  0959) $60.00 | |

$ 14,335 52
Farming Cap

**2021  Totals Year-to-Date**

Total fees charged in 2021                    $99.00
Total interest charged in 2021                $0.00

Year-to-date totals do not reflect any fee or interest refunds
you may have received.

# INTEREST CHARGES

Your **Annual Percentage Rate (APR)**  is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate | Balance Subject To | Interest |
|---|---|---|---|

EXHIBIT 13
PAGE 200



2:18 PM  Mon Dec 13

Done

20210917-statements-1563-.pdf

| 08/20 | SAN PASO TRUCK STOP PASO ROBLES CA | 108.46 |
| 08/20 | MATHESON TRI-GAS 766 PASO ROBLES CA | 103.20 |
| 08/19 | SAN PASO TRUCK STOP PASO ROBLES CA | 76.18 |
| 08/19 | SAN PASO TRUCK STOP PASO ROBLES CA | 51.25 |

STEVEN JONES
TRANSACTIONS THIS CYCLE (CARD  5551) $339.09

| 2021 Totals Year-to-Date | |
| --- | --- |
| Total fees charged in 2021 | $138.00 |
| Total interest charged in 2021 | $1,297.51 |

Year-to-date totals do not reflect any fee or interest refunds you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Balance Type | Annual Percentage Rate (APR) | Balance Subject To Interest Rate | Interest Charges |
| --- | --- | --- | --- |
| **PURCHASES** | | | |
| Purchases | 20.49%(v)(d) | $23,586.46 | $410.48 |
| **CASH ADVANCES** | | | |
| Cash Advances | 24.99%(v)(d) | - 0 - | - 0 - |
| **BALANCE TRANSFERS** | | | |
| Balance Transfer | 20.49%(v)(d) | - 0 - | - 0 - |

**31 Days in Billing Period**

(v) = Variable Rate
(d) = Daily Balance Method (including new transactions)
(a) = Average Daily Balance Method (including new transactions)
Please see Information About Your Account section for the Calculation of Balance Subject to Interest Rate, Annual Renewal Notice,
How to Avoid Interest on Purchases, and other important information, as applicable.

EXHIBIT 13
PAGE 201



2:19 PM  Mon Dec 13                                                      .ıll LTE ⊠ 9%

Done                        20210817-statements-1563.pdf

| Date | Description | Amount |
|---|---|---|
| 07/16 | SAN PASO TRUCK STOP PASO ROBLES CA | 59.61 |
| 07/15 | SAN PASO TRUCK STOP PASO ROBLES CA | 60.04 |
| 07/23 | 76 - GOLDEN HILL 76 PASO ROBLES CA | 95.00 |
| 07/26 | SAN PASO TRUCK STOP PASO ROBLES CA | 50.57 |
| 07/30 | SAN PASO TRUCK STOP PASO ROBLES CA | 72.73 |
| 07/29 | SAN PASO TRUCK STOP PASO ROBLES CA | 97.02 |
| 08/03 | AMZN Mktp US*2P7YP0BM1 Amzn.com/bill WA | 17.69 |
| 08/04 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 475.00 |
| 08/06 | SAN PASO TRUCK STOP PASO ROBLES CA | 92.28 |
| 08/10 | SAN PASO TRUCK STOP PASO ROBLES CA | 54.84 |
| 08/12 | HEWITT HDWE, INC. TEMPLETON CA | 172.08 |
| 08/13 | SAN PASO TRUCK STOP PASO ROBLES CA | 51.68 |
| 08/13 | SAN PASO TRUCK STOP PASO ROBLES CA | 87.08 |

STEVEN JONES
TRANSACTIONS THIS CYCLE (CARD  5551) $1385.62

| 07/29 | GLS US 800 322 5555 800-322-5555 CA | 374.68 |
| 08/01 | PP*HUMANITYWINECO PASO ROBLES CA | 2,413.58 |

STEVEN JONES
TRANSACTIONS THIS CYCLE (CARD  0959) $2788.26

**2021  Totals Year-to-Date**

Total fees charged in 2021            $99.00
Total interest charged in 2021        $887.03

Year-to-date totals do not reflect any fee or interest refunds
you may have received.

## INTEREST CHARGES

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

$475—
(handwritten)
Farming expense

EXHIBIT 13
PAGE 202



2:19 PM  Mon Dec 13

Done

20210717-statements-1563-.pdf

| Date | Description | Amount |
|---|---|---|
| 06/16 | HEWITT HDWE, INC. TEMPLETON CA | 182.66 |
| 06/18 | 76 - GOLDEN HILL 76 PASO ROBLES CA | 61.79 |
| 06/18 | GOLDEN HILL COUNTRY STOR PASO ROBLES CA | 75.00 |
| 06/21 | SAN PASO TRUCK STOP PASO ROBLES CA | 52.89 |
| 06/21 | SAN PASO TRUCK STOP PASO ROBLES CA | 49.23 |
| 06/23 | FARM SUPPLY COMPANY  PR PASO ROBLES CA | 55.28 |
| 06/24 | IN 'ABALONE COAST ANALYTI 805-5951080 CA | 136.00 |
| 06/24 | COASTAL TRACTOR - PASO R SALINAS CA | 606.51 |
| 06/25 | COASTAL TRACTOR - PASO R SALINAS CA | 41.39 |
| 06/26 | 76 - GOLDEN HILL 76 PASO ROBLES CA | 77.38 |
| 06/29 | WILSON O & V SUPPLY, LLC YAKIMA WA | 1,053.18 |
| 06/29 | COASTAL TRACTOR - PASO R SALINAS CA | 91.43 |
| 06/30 | CAL-COAST MACHINERY INC PASO ROBLES CA | 158.04 |
| 06/30 | SES PIONEER MART PASO ROBLES CA | 59.52 |
| 07/01 | MATHESON TRI-GAS 766 PASO ROBLES CA | 58.19 |
| 07/02 | SAN PASO TRUCK STOP PASO ROBLES CA | 124.36 |
| 07/02 | SAN PASO TRUCK STOP PASO ROBLES CA | 69.26 |
| 07/02 | MARK S TIRE SERVICE PASO ROBLES CA | 291.31 |
| 07/09 | HEWITT HDWE, INC. TEMPLETON CA | . 43.07 |
| 07/09 | 76 - TEMPLETON MARKET TEMPLETON CA | 94.83 |
| 07/13 | IN *BUCHER VASLIN NORTHAM 707-8232883 CA | 798.76 |
| 07/13 | AMZN Mktp US*2E0J84TY1 Amzn.com/bill WA | 29.49 |
| 07/13 | 76 - GOLDEN HILL 76 PASO ROBLES CA | 74.25 |
| 07/13 | SAN PASO TRUCK STOP PASO ROBLES CA | 87.76 |
|  | STEVEN JONES |  |
|  | TRANSACTIONS THIS CYCLE (CARD  5551) $4371.55 |  |
| 07/08 | Amazon.com Amzn.com/bill WA | -76.11 |
| 06/22 | SCHWARTZ SCHWARTZ AND AS 5168676603 NY | 500.00 |
| 06/23 | AMZN Mktp US*210905PL2 Amzn.com/bill WA | 38.05 |
| 06/26 | Amazon.com*213GV4K30 Amzn.com/bill WA | 76.11 |

$1837.32
Perm Cept

EXHIBIT 13
PAGE 203

2:20 PM  Mon Dec 13

Done

20210617-statements-1563-.pdf



| 05/17 | Amazon.com*2L4EH8DK2 Amzn.com/bill WA | 63.80 |
| 05/25 | IN *PASO ROBLES BEARING & PASO ROBLES CA | 45.35 |
| 05/27 | BUTTONWILLOW WAREHOUSE CO 661-695-6500 CA | 7,300.00 |
| 05/27 | SAN PASO TRUCK STOP PASO ROBLES CA | 59.26 |
| 05/28 | SAN PASO TRUCK STOP PASO ROBLES CA | 125.00 |
| 06/01 | HEWITT HDWE, INC. 805-434-1430 CA | 241.16 |
| 06/01 | COASTAL TRACTOR - PASO R SALINAS CA | 463.44 |
| 06/02 | CAL COAST IRRIGATION 805-2382800 CA | 448.77 |
| 06/03 | SAN PASO TRUCK STOP PASO ROBLES CA | 19.21 |
| 06/04 | SAN PASO TRUCK STOP PASO ROBLES CA | 57.85 |
| 06/03 | SAN PASO TRUCK STOP PASO ROBLES CA | 125.00 |
| 06/07 | RITE AID 05832 PASO ROBLES CA | 46.00 |
| 06/07 | SAN PASO TRUCK STOP PASO ROBLES CA | 70.03 |
| 06/09 | 76 - GOLDEN HILL 76 PASO ROBLES CA | 70.34 |
| 06/08 | HEWITT HDWE, INC. TEMPLETON CA | 96.65 |
| 06/15 | SAN PASO TRUCK STOP PASO ROBLES CA | 57.03 |
| 06/15 | SAN PASO TRUCK STOP PASO ROBLES CA | 84.09 |
| | STEVEN JONES | |
| | TRANSACTIONS THIS CYCLE (CARD  5551) $9372.92 | |

$8550 06
Farm expense

| 05/17 | AMZN Mktp US*2R1J15NQ1 Amzn.com/bill WA | 41.22 |
| 05/17 | AMZN Mktp US*2L69969X0 Amzn.com/bill WA | 119.58 |
| 05/27 | YANAGI SUSHI INC PASO ROBLES CA | 82.91 |
| 05/28 | AMZN Mktp US*2X7AZ9F01 Amzn.com/bill WA | 24.47 |
| 05/27 | AMZN Mktp US*2R08C6HU0 Amzn.com/bill WA | 31.00 |
| 05/29 | AMZN Mktp US*2R09H5D00 Amzn.com/bill WA | 59.80 |
| 06/01 | Prime Video*2R0FP4SX2 888-802-3080 WA | 5.99 |
| 06/01 | GLS US 800 322 5555 800-322-5555 CA | 424.96 |
| 06/02 | AMZN Mktp US*2R0BI8R20 Amzn.com/bill WA | 38.05 |
| 06/05 | Prime Video*2X8E76MC1 888-802-3080 WA | 17.99 |
| 06/07 | PAYPAL *INWC 402-935-7733 CA | 372.24 |

EXHIBIT 13
PAGE 204

2:20 PM  Mon Dec 13

Done

20210517-statements-1563- (1).pdf



| Date | Description | Amount |
|---|---|---|
| 05/06 | C & N TRACTORS PASO ROBLES CA | -53.63 |
| 04/20 | AMZN Mktp US*3E0BW5P43 Amzn.com/bill WA | 58.92 |
| 04/20 | AMZN Mktp US*JS60D5JI3 Amzn.com/bill WA | 30.81 |
| 04/22 | SAN PASO TRUCK STOP PASO ROBLES CA | 73.74 |
| 04/23 | SAN PASO TRUCK STOP PASO ROBLES CA | 50.85 |
| 04/26 | FARM SUPPLY COMPANY  PR PASO ROBLES CA | 343.48 |
| 04/26 | AMZN Mktp US*SB1Q13ME3 Amzn.com/bill WA | 96.93 |
| 04/26 | HEWITT HDWE, INC. TEMPLETON CA | 217.78 |
| 04/26 | SAN JOAQUIN TRACTOR CO BAKERSFIELD CA | 44.69 |
| 04/28 | HEWITT HDWE, INC. TEMPLETON CA | 23.14 |
| 04/28 | C & N TRACTORS PASO ROBLES CA | 237.45 |
| 04/28 | SAN PASO TRUCK STOP PASO ROBLES CA | 85.08 |
| 04/28 | SAN PASO TRUCK STOP PASO ROBLES CA | 55.00 |
| 04/30 | HEWITT HDWE, INC. TEMPLETON CA | 122.55 |
| 05/03 | C & N TRACTORS PASO ROBLES CA | 730.53 |
| 05/04 | HEWITT HDWE, INC. TEMPLETON CA | 123.89 |
| 05/05 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 2,493.56 |
| 05/04 | SAN PASO TRUCK STOP PASO ROBLES CA | 50.99 |
| 05/06 | HEWITT HDWE, INC. TEMPLETON CA | 45.05 |
| 05/05 | SAN PASO TRUCK STOP PASO ROBLES CA | 68.03 |
| 05/06 | C & N TRACTORS PASO ROBLES CA | 37.95 |
| 05/07 | SAN PASO TRUCK STOP PASO ROBLES CA | 44.38 |
| 05/07 | SAN PASO TRUCK STOP PASO ROBLES CA | 94.09 |
| 05/10 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 2,928.09 |
| 05/10 | SES PIONEER MART PASO ROBLES CA | 50.17 |
| 05/12 | HEWITT HDWE, INC. TEMPLETON CA | 120.03 |
| 05/12 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 4,948.00 |
| 05/12 | C & N TRACTORS PASO ROBLES CA | 25.68 |
| 05/12 | C & N TRACTORS PASO ROBLES CA | 171.60 |
| 05/14 | SAN PASO TRUCK STOP PASO ROBLES CA | 48.97 |

$11,168³⁶
From expense

EXHIBIT 13
PAGE 205



| Date | Description | Amount |
|---|---|---|
| 03/18 | SES PIONEER MART PASO ROBLES CA | 70.65 |
| 03/19 | SAN PASO TRUCK STOP PASO ROBLES CA | 85.13 |
| 03/22 | COASTAL TRACTOR - PASO R SALINAS CA | 104.56 |
| 03/23 | SES PIONEER MART PASO ROBLES CA | 39.99 |
| 03/26 | CAL-COAST MACHINERY INC PASO ROBLES CA | 637.38 |
| 03/29 | HEWITT HDWE, INC. TEMPLETON CA | 30.99 |
| 03/29 | SAN PASO TRUCK STOP PASO ROBLES CA | 70.72 |
| 03/31 | CAL-COAST MACHINERY INC PASO ROBLES CA | 26.08 |
| 03/31 | SAN PASO TRUCK STOP PASO ROBLES CA | 61.79 |
| 04/02 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 6,375.00 |
| 04/02 | SES PIONEER MART PASO ROBLES CA | 75.00 |
| 04/02 | HEWITT HDWE, INC. TEMPLETON CA | 36.44 |
| 04/02 | FARM SUPPLY COMPANY  PR PASO ROBLES CA | 240.51 |
| 04/05 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 4,048.69 |
| 04/06 | HEWITT HDWE, INC. TEMPLETON CA | 116.90 |
| 04/05 | COASTAL TRACTOR - PASO R SALINAS CA | 79.24 |
| 04/07 | FARM SUPPLY COMPANY  PR PASO ROBLES CA | 80.38 |
| 04/06 | SES PIONEER MART PASO ROBLES CA | 71.87 |
| 04/07 | BUTTONWILLOW WAREHOUSE CO PASO ROBLES CA | 36.06 |
| 04/07 | HEWITT HDWE, INC. TEMPLETON CA | 80.83 |
| 04/08 | SAN JOAQUIN TRACTOR CO BAKERSFIELD CA | 100.21 |
| 04/08 | HEWITT HDWE, INC. TEMPLETON CA | 82.51 |
| 04/09 | LOWES #02730* PASO ROBLES CA | 65.21 |
| 04/09 | SAN PASO TRUCK STOP PASO ROBLES CA | 80.85 |
| 04/12 | SAN PASO TRUCK STOP PASO ROBLES CA | 31.87 |
| 04/15 | 76 - GOLDEN HILL 76 PASO ROBLES CA | 94.64 |
| | STEVEN JONES | |
| | TRANSACTIONS THIS CYCLE (CARD  5551) $12823.50 | |
| 03/24 | CKE*STREET SIDE ALE HOUSE PASO ROBLES CA | 130.76 |

$ 11,282.53
Fuar expense

2:20 PM  Mon Dec 13
Done
20210417-statements-1563- (1).pdf

EXHIBIT 13
PAGE 206

| Type: All transactions &middot; Status: All statuses &middot; Delivery method: Any &middot; Name: Baker Wine & Grape Analysis, Inc. | | | | | | |
|---|---|---|---|---|---|---|
| Date | Type | No. | Payee | Category | Memo | Total |
| 11/03/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPASO ROBLES CA XXXX-XXXXXX-61 017 - LEROY CODDING | 30.00 |
| 10/27/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPASO ROBLES CA XXXX-XXXXXX-61 017 - LEROY CODDING | 30.00 |
| 10/20/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPASO ROBLES CA XXXX-XXXXXX-61 017 - LEROY CODDING | 150.00 |
| 10/07/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPASO ROBLES CA XXXX-XXXXXX-61 017 - LEROY CODDING | 150.00 |
| 09/29/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPASO ROBLES CA XXXX-XXXXXX-61 017 - LEROY CODDING | 90.00 |
| 09/20/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPASO ROBLES CA XXXX-XXXXXX-61 017 - LEROY CODDING | 240.00 |
| 08/19/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 36.00 |
| 08/12/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 50.00 |
| 07/21/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 25.00 |
| 07/14/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 183.00 |
| 06/03/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 112.00 |

1

EXHIBIT 13
PAGE 207

| | | | | | | |
|---|---|---|---|---|---|---|
| 06/03/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 108.00 |
| 06/03/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 128.00 |
| 06/03/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 100.00 |
| 05/05/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 100.00 |
| 04/14/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 144.00 |
| 03/17/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 100.00 |
| 02/26/2021 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE | 240.00 |
| 12/24/2020 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 304.00 |
| 12/24/2020 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 198.00 |
| 12/10/2020 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 831.00 |
| 11/19/2020 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 459.10 |
| 11/11/2020 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 190.00 |
| 11/05/2020 | Expense | | Baker Wine & Grape Analysis, Inc. | Grapes | IN *BAKER WINE & GRAPE AN | 217.50 |
| | | | | | | 4,215.60 |

2

EXHIBIT 13
PAGE 208

| Type: All transactions &middot; Status: All statuses &middot; Delivery method: Any &middot; Name: PG&E | | | | | | |
|---|---|---|---|---|---|---|
| Date | Type | No. | Payee | Category | Memo | Total |
| 06/29/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE JUN 21 8823982306 2821 RABBIT RIDGE WINE SALE | 839.76 |
| 06/04/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE JUN 21 8606206906 0321 RABBIT RIDGE WINE SALE | 1,001.30 |
| 06/04/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE JUN 21 8606209306 0321 RABBIT RIDGE WINE SALE | 841.07 |
| 05/14/2021 | Expense | | PG&E | Utilities Expense | PG&E/EZ-PAY | 637.00 |
| 05/04/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE MAY 21 8338620005 0321 RABBIT RIDGE WINE SALE | 4,872.60 |
| 05/04/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE MAY 21 8338625705 0321 RABBIT RIDGE WINE SALE | 332.05 |
| 04/28/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE APR 21 8282949804 2721 RABBIT RIDGE WINE SALE | 717.77 |
| 04/20/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE APR 21 8219433104 1921 RABBIT RIDGE WINE SALE | 673.45 |

1

EXHIBIT 13
PAGE 209

| | | | | | | |
|---|---|---|---|---|---|---|
| 04/14/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE APR 21 8173169504 1321 RABBIT RIDGE WINE SALE | 3,646.00 |
| 04/01/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE MAR 21 8045894003 3021 RABBIT RIDGE WINE SALE | 2,558.30 |
| 04/01/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE MAR 21 8045891003 3021 RABBIT RIDGE WINE SALE | 326.62 |
| 03/15/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE MAR 21 7889325403 1221 RABBIT RIDGE WINE SALE | 3,646.00 |
| 03/03/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE MAR 21 7787039103 0221 RABBIT RIDGE WINE SALE | 3,876.28 |
| 02/26/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE FEB 21 7741832302 2521 RABBIT RIDGE WINE SALE | 358.18 |
| 02/16/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE FEB 21 7664800502 1321 RABBIT RIDGE WINE SALE | 3,646.00 |

EXHIBIT 13
PAGE 210

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/26/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE JAN 21 7466974201 2521 RABBIT RIDGE WINE SALE | 231.14 |
| 01/26/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE JAN 21 7466971201 2521 RABBIT RIDGE WINE SALE | 3,349.16 |
| 01/11/2021 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE JAN 21 7320762801 0821 RABBIT RIDGE WINE SALE | 3,647.20 |
| 12/29/2020 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE DEC 20 7214239612 2820 RABBIT RIDGE WINE SALE | 229.21 |
| 12/29/2020 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE DEC 20 7214244612 2820 RABBIT RIDGE WINE SALE | 3,861.95 |
| 12/10/2020 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE DEC 20 7057144412 0920 RABBIT RIDGE WINE SALE | 5,469.00 |
| 12/10/2020 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE DEC 20 7058286212 0920 RABBIT RIDGE WINE SALE | 3,404.14 |

3

EXHIBIT 13
PAGE 211

| 11/30/2020 | Expense | | PG&E | Utilities Expense | PGANDE WEB ONLINE NOV 20 6957062011 2720 RABBIT RIDGE WINE SALE | 8,198.49 |
|---|---|---|---|---|---|---|
| | | | | | | 56,362.67 |

EXHIBIT 13
PAGE 212

| Date | Type | No. | Payee | Category | Memo | Total |
|------|------|-----|-------|----------|------|-------|
|  | Type: All transactions &middot; Status: All statuses &middot; Delivery method: Any &middot; Name: Zenith Insurance Company |
| 09/17/2021 | Expense | | Zenith Insurance Company | General Liability Insurance | ZENITH INSURANCE AGT_PYMNT XXXXX8282 Russell Erich | 673.65 |
| 07/02/2021 | Expense | | Zenith Insurance Company | General Liability Insurance | ZENITH INSURANCE AGT_PYMNT XXXXX4932 Russell Erich | 1,715.80 |
| 06/04/2021 | Expense | | Zenith Insurance Company | General Liability Insurance | BUSINESS TO BUSINESS ACH Zenith Insurance E-CHECK 060321 1999-271089 9-06 Rabbit Ridge Wine Sale | 2,786.00 |
| 04/06/2021 | Expense | | Zenith Insurance Company | General Liability Insurance | PQ *ZENITH INSURANCE COMP | 1,432.70 |
| 02/25/2021 | Check | 2041 | Zenith Insurance Company | General Liability Insurance | Invoice # DP13400660 5001 | 1,393.00 |
| 11/09/2020 | Expense | | Zenith Insurance Company | General Liability Insurance | Withdrawal Zenith eChecks TYPE: E-CHECK CO: Zenith eChecks | 2,982.00 |
| | | | | | | 10,983.15 |

EXHIBIT 13
PAGE 213

# EXHIBIT 14

1

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                      -oOo-

4   In Re:                      ) Case No. 8:20-Bk-13014-MW
                                ) Chapter 7
5   NORTHERN HOLDING, LLC       )
                                ) Santa Ana, California
6                   Debtor.     ) Tuesday, February 8, 2022
    _____ ) 2:00 PM
7
                                 341(A) MEETING OF CREDITORS
8
                     TRANSCRIPT OF PROCEEDINGS
9                  BEFORE RICHARD MARSHACK
                      CHAPTER 7 TRUSTEE
10
    APPEARANCES (All present by video or telephone):
11  For the Chapter 7 Trustee:  TINHO MANG, ESQ.
                                Marshack Hays LLP
12                              870 Roosevelt
                                Irvine, CA 92620
13                              (949)333-7777

14  For Farm Credit West,       MICHAEL J. GOMEZ, ESQ.
    FLCA:                       FRANDZEL ROBINS BLOOM & CSATO,
15                              L.C.
                                1000 Wilshire Boulevard
16                              19th Floor
                                Los Angeles, CA 90017
17                              (323)852-1000

18  Also Present:               Leroy Codding
                                Northern Holding, LLC
19

20

21  Transcriber:                MICHAEL DRAKE
                                eScribers, LLC
22                              7227 N. 16th Street
                                Suite #207
23                              Phoenix, AZ 85020
                                (973)406-2250
24
    Proceedings recorded by electronic sound recording;
25  transcript provided by transcription service.

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 215

2

Northern Holding, LLC

1      SANTA ANA, CALIFORNIA, TUESDAY, FEBRUARY 8, 2022, 2:08 PM

2                              -oOo-

3      (Call to order of the Court.)

4           MR. MARSHACK:  Today's date is February 8th, 2022.  It

5  is now 2 -- we're in the 2 o'clock hour, 2:08.  And this is

6  the -- hopefully the final 341(a) examination in Northern

7  Holdings.

8           Mr. Codding, good afternoon.  Nice to see you.

9           MR. CODDING:  Mr. Marshack, good afternoon.  Good to

10  see you too.

11           MR. MARSHACK:  Speak up a little bit more.

12           MR. CODDING:  Oh, sorry.  Nice to see you too.

13           MR. MARSHACK:  Thank you.  I don't think anyone has

14  ever said that to me before.

15           MR. MANG:  Mr. Marshack, I think debtor's counsel,

16  Russ Stong, was expected to join.  I don't know how long you

17  want to wait for debtor's counsel before you proceed.

18           MR. CODDING:  And I was told that last week.  I'm

19  perfectly fine proceeding.  And he can joint when he joins.

20  It's -- we've got a quorum certainly.  So --

21           MR. MARSHACK:  Okay.  Let me see if I have this -- how

22  do you spell his last name?

23           MR. MANG:  S-T-O-N-G.

24           MR. CODDING:  Yeah.  Like strong without the R.

25           MR. MARSHACK:  Do you want to take a minute and try to

EXHIBIT 14
PAGE 216

Northern Holding, LLC

1    contact him?  Let me see if I have his number.  All right.

2    Well, let me swear you in.

3              MR. CODDING:  Okay.

4              THE COURT:  Mr. Codding, we're here on -- we're here

5    at the 341(a) for Northern Holdings.  It's also in large part a

6    follow-up to our conversation we had last week.

7              To be clear, for the record, Mr. Codding previously

8    made a request for money.  Mr. Codding is serving as my farm --

9    he's enter into a farm management agreement with the bankruptcy

10   estate, Northern.

11             MR. CODDING:  Right.

12             THE COURT:  He has made a request for a distribution

13   of funds.  I need -- part of the reason for him appearing

14   today, frankly, is so that we can answer some final questions

15   on that so I could evaluate what my answers are with regard to

16   that.

17             And so today's 341(a) is a -- hopefully a final

18   341(a).  And it also is -- let me see.  And it also is our

19   chance just to clean up a couple questions that we may have

20   lingering from last week.

21             So last week we did oral statement.  We asked him

22   questions.  He consented to the process.  And he gave us his --

23   gave us information under oath to help us make an answer, come

24   to an answer.

25             So today we have a little bit of a follow-up on that.

EXHIBIT 14
PAGE 217

4

Northern Holding, LLC

1  And so with that being part of the agenda, Mr. Codding, are you

2  okay proceeding with that being part of the agenda --

3          MR. CODDING:  Yes.

4          MR. MARSHACK:  -- in addition to the 341(a)?

5          MR. CODDING:  Yes.

6          MR. MARSHACK:  Okay.  And do you want to take a minute

7  out to try to find counsel or -- I gather you haven't had much

8  contact with your counsel for the duration of this case; is

9  that accurate?

10          MR. CODDING:  Well, quite a bit before the conversion.

11 But yes, after the 7, not a whole lot.

12          MR. MARSHACK:  Okay.  It's completely up to you.  If

13 you would like to spend a few minutes and go talk to people --

14 spend a few minutes to try to find him, that's fine.

15 Otherwise, we could just get going.

16          MR. CODDING:  I think let's get going.  We've got a

17 quorum.  And this is all on the record.  So, you know, if

18 there's anything that has to get revisited, we could do that if

19 it needs to be.

20          MR. MARSHACK:  Mr. Codding, what is your position with

21 Northern?

22          MR. CODDING:  Well, the retired managing director.

23     (Witness sworn.)

24          MR. MARSHACK:  And are you in Paso Robles these days,

25 today?

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 218

5

Northern Holding, LLC

1          MR. CODDING:  Yes.  At the moment I am.

2          MR. MARSHACK:  Good.  Please proceed, Mr. Mang.

3          MR. MANG:  Good afternoon, Mr. Codding, Mr. Marshack.

4    Thank you very much.  My name is Tinho Mang.  I am counsel of

5    record for Mr. Marshack.  I'm with the law firm of Marshack

6    Hays LLP.  And I'll be asking a couple of questions of Mr.

7    Codding today just for the record.

8          MR. CODDING:  Okay.  Hi, Mr. Mang.

9          MR. MANG:  Hello.  Good afternoon.

10          MR. CODDING:  Good afternoon.  Is my audio okay now?

11          MR. MANG:  Your audio is okay.  Is my audio fine for

12    you too?  Can you hear me clearly?

13          MR. CODDING:  Yeah, you're great.  Yeah, you're great.

14          MR. MANG:  Great.  Okay.  So Mr. Marshack just asked

15    you what your position was.  You said retired managing member.

16    Is there anybody else who held an office or position with

17    Northern Holding, of the debtor?

18          MR. CODDING:  No, no.

19          MR. MANG:  What about Mr. Steven Jones?

20          MR. CODDING:  No.  he never had a position with

21    Northern Holding, nor did he have ownership interest in the

22    LLC.  And I said retired kind of as a tongue-in-cheek in a way

23    because, of course, the estate is run by the trustee.  So it's

24    not my deal anymore.

25          MR. MANG:  Of course.  How about a Bill Tolar?  Did

EXHIBIT 14
PAGE 219

6

Northern Holding, LLC

1    Mr. --

2            MR. CODDING:  No.

3            MR. MANG:  -- Tolar have any position?

4            MR. CODDING:  No.

5            MR. MANG:  Were there ever any other managing members

6    of Northern Holding?

7            MR. CODDING:  No, it's --

8            MR. MANG:  How long have you been the managing member

9    or were you the managing member of the debtor?

10           MR. CODDING:  Until the conversion, I was the managing

11   member since its inception in 2012.  I think it was February.

12           MR. MANG:  And what kind of business was the debtor?

13           MR. CODDING:  It was -- or is a holding company.  So

14   it was formed for the purposes of owning at the time membership

15   interest in a distribution and import company.  And then it

16   owned a piece of an import company.  And then it didn't do much

17   after that was -- was -- position was liquidated.  And Northern

18   was just dormant for a few years there until the acquisition of

19   the Russell assets.

20           MR. MANG:  Okay.  And when was the acquisition of the

21   Russell assets?

22           MR. CODDING:  October 2020.

23           MR. MANG:  Can you just briefly describe what those

24   assets were?

25           MR. CODDING:  Real estate in three parcels.  I don't

EXHIBIT 14
PAGE 220

7

Northern Holding, LLC

1  have the APNs handy, but we all know what I'm talking:  Live

2  Oak Road, San Marcos and Texas Road.

3      MR. MANG:  And what about buildings, equipment, other

4  assets?

5      MR. CODDING:  Yeah.  Equipment --

6      MR. MANG:  Any financial assets?

7      MR. CODDING:  No financial assets.  But equipment,

8  improvements, yeah, tractors and all the usual stuff you run a

9  vineyard with.

10      MR. MANG:  Okay.

11      MR. CODDING:  And -- and, yes, the improvements as

12  well, like wells, buildings, that kind of stuff.

13      MR. MANG:  Okay.  And what -- what is your personal

14  experience with running vineyards or wineries that led you to

15  acquire these assets?

16      MR. CODDING:  I've been either an executive member or

17  general manager for different wineries.  The largest and most

18  applicable to this was Talbott Vineyards before it was bought

19  by Gallo.  There we farmed 1,400 acres and produced -- well,

20  under my tenure, we went from producing 15,000 cases a year to

21  producing 105,000 cases a year of wines in the price range from

22  twelve dollars a bottle up to a hundred dollars a bottle.  And

23  I was in charge of the teams that ran production and

24  operations, sales and marketing, the whole deal.  And I had

25  done that as well for a couple other wineries, one of which

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 221

8

Northern Holding, LLC

1  didn't have its own owned acreage.  So that was more of a

2  managing the contract, sourcing role.  Anyhow, yes, I had done

3  this over decades.

4      MR. MANG:  Would you say twenty years, more?

5      MR. CODDING:  Well, more in --

6      MR. MANG:  How many years?

7      MR. CODDING:  -- the wine business.  More in the wine

8  business and operations, vineyard operations for about twenty

9  years, yeah, off and on.  There was a time where I was doing

10  import in between Talbott and the Santa Cruz winery I ran.  But

11  yes, for the better part of twenty years.

12      MR. MANG:  Okay.  So is it fair to say that you are

13  very well experienced in running a vineyard and a winery and

14  you'd be generally familiar with the common practices for

15  running a vineyard and winery?

16      MR. CODDING:  I would.  I would.  Without getting too

17  far afield, I mentioned that this experience is outside common

18  practices.  But yeah, generally, yes, I would be very familiar.

19  And like I said, at Talbott, we had, I don't know, what is

20  1,400 divided by 100 -- we had, like, ten times the acreage

21  under vine.  So I've done this before, except there we had

22  proper research.  But anyway, yeah.

23      MR. MANG:  Okay.  And have you filed for bankruptcy

24  before?

25      MR. CODDING:  I have not.



EXHIBIT 14
PAGE 222

9

Northern Holding, LLC

1      MR. MANG:  Did you file a Chapter 13 bankruptcy case

2  in 2016 in the Central District of California?

3      MR. CODDING:  Not to my knowledge, no.

4      MR. MANG:  Okay.  It doesn't ring any bells,

5  bankruptcy case, debtor's name is Leroy Codding, IV?

6      MR. CODDING:  I don't believe that was ever filed, no.

7      MR. MANG:  Case Number 8:16-bk-10964-ES?

8      MR. CODDING:  As I said, I don't believe it was ever

9  filed.

10      MR. MANG:  So I suppose it would surprise you to know

11  that that case was dismissed shortly after it was filed?

12      MR. CODDING:  It surprises me to learn that it's been

13  filed.  The fact that nothing ever happened with it is not a

14  surprise because I never pursued it.

15      MR. MANG:  Okay.  Prior to the bankruptcy filing for

16  Northern Holding, had you had any prior experience with the

17  bankruptcy process?

18      MR. CODDING:  No.

19      MR. MANG:  You filed this case with counsel though; is

20  that correct?

21      MR. CODDING:  Correct, yes.  They had experience.

22      MR. MANG:  Okay.  And you were aware that on October

23  29th, 2020, Farm Credit West, the secured creditor, filed a

24  demand for sequestration of cash collateral?

25      MR. CODDING:  Well, maybe we need to get Russ on here.

EXHIBIT 14
PAGE 223

Northern Holding, LLC

1    No, I'm not aware of the distinction.  And I don't know what

2    you're talking about.

3          MR. MANG:  Okay.  So you are not aware that such a

4    demand was filed, or you did not understand what that -- what I

5    just said?

6          MR. CODDING:  I -- I'm not aware that such a demand

7    was filed.

8          MR. MANG:  Okay.

9          MR. CODDING:  But -- but the Northern assets all went

10   into the BK process.  And it didn't have cash at the time

11   because it hadn't been -- it had been a dormant company.  But

12   then it just started collecting cash, which it did on rents and

13   stuff like that.  Those all went into the -- the -- what are

14   they called, the collateral accounts.

15         MR. MANG:  Okay.  How much cash and rents went into

16   those collateral accounts?

17         MR. CODDING:  It's all in the MORs.  I don't remember

18   off the top of my head.

19         MR. MANG:  Was money ever spent out of those

20   collateral accounts?

21         MR. CODDING:  Money was spent in a structure that was

22   sanction and approved.  And it was related to the operation of

23   the entity.

24         MR. MANG:  So the answer is yes, money was spent?

25         MR. CODDING:  Well, there's the general account.



EXHIBIT 14
PAGE 224

11

Northern Holding, LLC

1   Money got spent out of there.  I don't think from the

2   collateral accounts, no.  The general account, yes.

3          MR. MANG:  Okay.  So money was spent out of the

4   general account and not out of the collateral accounts is what

5   you're saying?

6          MR. CODDING:  That's -- to my recollection, yes.

7          MR. MANG:  And you said that the expenditures were

8   sanctioned and approved.  Who sanctioned and approved those

9   expenditures?

10          MR. CODDING:  The court and counsel, to my knowledge.

11          MR. MANG:  Did you ever -- counsel -- which counsel?

12          MR. CODDING:  My own counsel.

13          MR. MANG:  Did Farm Credit ever consent to the

14   expenditure of any money out of this estate?

15          MR. CODDING:  I don't know.

16          MR. MANG:  So to your knowledge, they never consented

17   to the expenditure of any funds?

18          MR. CODDING:  The answer is I don't know whether they

19   did or didn't.  What I -- what I recollect from those days is

20   that it was okay to spend on certain -- certain expenditures

21   out of the general account were sanctioned by the powers that

22   be.  So that was my understanding.

23          MR. MANG:  And of the money in the general account,

24   that all came from rents and proceeds of the business

25   operations?

EXHIBIT 14
PAGE 225

12

Northern Holding, LLC

1    MR. CODDING:  Right.

2    MR. MANG:  Okay.  Did you ever get an order approving

3  the use of cash collateral from the Court?

4    MR. CODDING:  I don't recall.  Everything that was

5  done, as far as I'm concerned and as far as I was aware, was

6  done properly and with the proper authorities, the proper

7  ratifications, whatever you call them.  So I think we're -- I

8  think we're done with that line of questioning.

9    MR. MANG:  I was looking back at that purchase

10  agreement in October 2020 between Northern and the Russells.

11  And it says the cash amount of 163,050 dollars shall be left in

12  company to cover short-term operating expenses.  Now, where is

13  that money?

14    MR. CODDING:  That was not to be part of Northern.

15  That was to be part of the Rabbit Ridge, Inc. operating

16  company, which is not part of Northern.

17    MR. MANG:  So that was money that was left with Rabbit

18  Ridge Wine Sales, Inc.?

19    MR. CODDING:  Right, because it was bearing the

20  expenses of operations.  It was the one that was going to be

21  paying rents and so on and so forth for what it was doing.

22  Northern is just a holding company.

23    MR. MANG:  And in exchange for leaving that 163,000 in

24  Rabbit Ridge, Northern Holding received a promissory note for

25  the same amount with interest at 5.5 percent; is that right?



EXHIBIT 14
PAGE 226

13

Northern Holding, LLC

1          MR. CODDING:  I'd have to look back, but that

2     sounds -- sounds right, yeah.

3          MR. MANG:  Okay.  And were there ever any payments

4     made from Rabbit Ridge to Northern on account of this

5     promissory note?

6          MR. CODDING:  There were quite a number of payments

7     made from Rabbit Ridge to Northern.  We can do a full recap of

8     those, if you wish, but I don't have that in front of me.

9          MR. MANG:  Well, to the best of your recollection, by

10    the time the trustee was appointed, how much of that 163,000

11    promissory note had been paid back?

12         MR. CODDING:  I don't recall.  I'd have to look back

13    at the records.

14         MR. MANG:  Okay.  If you could, you know, try and

15    figure that number, that would be very helpful to us.

16         MR. CODDING:  Yeah.  I'd be happy to do that and any

17    other follow-up questions as well.  Not to worry.

18         MR. MANG:  All right.  And I'm going to move on to

19    talking about the continuation of what we discussed last

20    week --

21         MR. CODDING:  Sure.

22         MR. MANG:  -- at the (indiscernible).

23         MR. CODDING:  Yes, sir.

24         MR. MANG:  Just to, you know, have a foundation, you

25    were hired by the trustee to operate the farming operations for

EXHIBIT 14
PAGE 227

14

Northern Holding, LLC

1   2021 fall, correct?

2        MR. CODDING:  The growing season, yes.  And that was

3   outside of my former scope as the manager of Northern.

4        MR. MANG:  Yes.  And was that in your individual

5   capacity or in some other capacity?

6        MR. CODDING:  It was in my individual capacity, but I

7   have the authority to hire third-party entities as I saw fit

8   and necessary to conduct that business.

9        MR. MANG:  And you're aware that the Bankruptcy Court

10  specifically approved the operations pursuant to the consent of

11  the secured creditor Farm Credit West, yes?

12       MR. CODDING:  That's my understanding.  I believe that

13  happened -- the court approval was quite a bit later.  We were

14  well into the farming season by the time the wheels turned and

15  things got officially stamped.  But yeah, it was something

16  signed between the trustee and me back in July, July I think,

17  late July.

18       MR. MANG:  And the agreement signed between you and

19  the trustee specifically provides that only the trustee is

20  authorized to enter into purchase agreements for grapes; is

21  that correct?

22       MR. CODDING:  That's what I recall, yes.

23       MR. MANG:  And despite this, were there ever any

24  agreements that were entered into for the purchase and sale of

25  grapes that the trustee did not sign off?



EXHIBIT 14
PAGE 228

15

Northern Holding, LLC

1    MR. CODDING:  There were agreements that were already

2  in place.  And in order to not run the risk of losing that

3  business, I let those agreements remain in place and put a

4  proposal or an accounting together to deduct the revenue

5  associated with those agreements from the farm cost recovery,

6  which is why it went from 400,000 cap down to 2- -- whatever it

7  was, 260-.  I can't remember exactly.  But yes, I did that to

8  preserve value for the estate because -- for a variety of

9  reasons.  And we've gone through this many, many times over the

10  last few months.  For a variety of reasons, those producers

11  would have either not -- or been spooked off or not been able

12  to uphold their end of the agreement.

13      We walk into a situation in mid-stream where the question

14  was do we farm at all.  What I inherited was not a clean

15  handoff by any means.  And the decision was made to go ahead

16  and farm but to sell the fruit in order to gain value.  I

17  voluntarily gave farm credit (indiscernible) a UCC filing that

18  cropped in March with the hope and understanding that there'd

19  be some kind of cost recovery.  And that's what was

20  memorialized with the agreement with the trustee.  So --

21    MR. MANG:  So the --

22    MR. CODDING:  Everything that was done was done in

23  order to preserve value and with the correct outcome in mind,

24  although it might not all have been perfect according to how

25  we'd like it if we scripted it from day 1.



EXHIBIT 14
PAGE 229

Northern Holding, LLC

1    MR. MANG:  So the answer is yes, there were agreements

2  that the trustee never signed for the purchase and sale of

3  grapes?

4    MR. CODDING:  Yes.

5    MR. MANG:  Okay.

6    MR. CODDING:  Those occurred -- those were place,

7  however, before the -- in many cases before the conversion and

8  before the farming agreement.  It's in our legacy --

9    MR. MARSHACK:  But isn't it true that we had an

10  agreement that I would counter -- I would sign -- every

11  agreement we amended -- or at a minimum I would countersign

12  every purchase and sale agreement for grapes leaving the

13  property?

14    MR. CODDING:  Well, what happened was by the time we

15  came to the party together, there were some agreements that

16  were in place.  And I went back to start to convert those.  We

17  also had a number of weeks where you and I, between our -- your

18  office and me, were going back and forth trying to get the

19  process set up to -- to effectively get these agreements

20  memorialized like you needed them to be or you wanted them to

21  be.  And not all of them made it through that process.

22    MR. MARSHACK:  Well, but --

23    MR. CODDING:  Not (indiscernible) --

24    MR. MARSHACK:  Wasn't that a requirement of the farm

25  management agreement?

17

Northern Holding, LLC

1          MR. CODDING:  There's what's practical and there's

2    what's black and white.  And we weren't living in black and

3    white.  So --

4          MR. MARSHACK:  Was it -- was it impractical -- I do

5    agree with you.  Sometimes people strike agreements that are

6    impractical.  I'm not agreeing that we did, but I do agree that

7    sometimes people do strike agreements that are impractical.

8    Having said that, was it impractical for all the payments that

9    you received to be transmitted to me so that I could put it

10   into the -- so I could put it into the bankruptcy estate's bank

11   account?

12         MR. CODDING:  Yes.

13         MR. MARSHACK:  What was impractical?

14         MR. CODDING:  Well, the funds that came in were

15   reinvested in farming.  So the impracticality was those funds

16   were due to me anyway.  And they were going to get subjected

17   out of cost recovery later.  And they got plowed back in

18   literally into the fields so we can bring the rest of the crop

19   in and produce income for the estate.

20         MR. MARSHACK:  Okay.  So in signing the farm

21   management agreement, you did so with the understanding that

22   you would be financing it until the crops came in.

23         MR. CODDING:  Yes.

24         MR. MARSHACK:  So did you at the time of signing the

25   agreement have an ability or -- did you have an ability or did



EXHIBIT 14
PAGE 231

18

Northern Holding, LLC

1   you know of an ability to be able to finance or advance all

2   funds necessary to fulfill the farm management agreement?

3           MR. CODDING:  I believed I had that ability.  What

4   happened was the farming got a lot more extensive than I had

5   envisioned or that I had experienced before on either of

6   estates.  So in -- case in point, we signed an agreement in

7   July that capped the cost recovery at 400,000 dollars.  I spent

8   over a half a million dollars on this operation.  I would not

9   have signed that agreement had I known how things were going to

10  go.

11          MR. MARSHACK:  Now, who was your --

12          MR. CODDING:  And I would have had --

13          MR. MARSHACK:  Who was the -- who was the broker on

14  these transactions?  Who was the grape broker that we hired?

15          MR. CODDING:  Oh, with the fruit?  In many cases, Bill

16  Tolar.

17          MR. MARSHACK:  Now, did Bill Tolar --

18          MR. CODDING:  I don't think he was on every single one

19  but --

20          MR. MARSHACK:  Did Bill Tolar -- was he involved in

21  all the contracts that I executed?

22          MR. CODDING:  I believe maybe not -- I'd have to look

23  back.  I think most of them, but yeah, not -- not --

24          MR. MARSHACK:  Okay.  And was he --

25          MR. CODDING:  -- I don't think every single one.

19

Northern Holding, LLC

1      MR. MARSHACK:  Was he involved in all the contracts

2  that -- where you received the money directly instead of taking

3  it through the estate?

4      MR. CODDING:  There may have been two or three that he

5  wasn't.  But most of them, yeah.  And those were the -- most of

6  the business was new customers that I developed in some cases

7  with him, some cases not.  But most of the fruit had not been

8  sold in previous vintages, or at least not that I know of or we

9  knew of.

10      MR. MARSHACK:  So when people would buy -- in the --

11  in the transactions that didn't go through my account, would

12  they pay in cash?

13      MR. CODDING:  No.  No.  You have all the records.  I

14  submitted meticulous records on all of those payments that

15  there's --

16      MR. MARSHACK:  And did all the -- if the checks

17  weren't paid -- we produced a lot of -- we produced grapes this

18  year.  And most of our grapes --

19      MR. CODDING:  Right.

20      MR. MARSHACK:  -- got sold pursuant to contract that

21  was countersigned by me and you and the buyer.

22      MR. CODDING:  Right.

23      MR. MARSHACK:  Right?

24      MR. CODDING:  Right.

25      MR. MARSHACK:  And those checks were made payable to

EXHIBIT 14
PAGE 233

Northern Holding, LLC

1   Northern Limited, right, Northern Holding Limited, right?

2        MR. CODDING:  I don't know.  I've never seen one of

3   them.  But they -- I think they were payable to the U.S.

4   Trustee on behalf of or something like that.

5        MR. MARSHACK:  You're right.

6        MR. CODDING:  There's some language --

7        MR. MARSHACK:  They're made payable to Richard

8   Marshack, bankruptcy trustee of Northern Holding.

9        MR. CODDING:  Okay.

10       MR. MARSHACK:  Okay.

11       MR. CODDING:  And --

12       MR. MARSHACK:  But the checks that you received --

13   well, did you always receive -- did you always receive checks

14   for the grape sales where the money didn't go through my

15   account?

16       MR. CODDING:  Did I always receive -- those went to

17   Rabbit Ridge Wine Sales which was the traditional seller of

18   fruit from that estate --

19       MR. MARSHACK:  So every one of those --

20       MR. CODDING:  -- (indiscernible) farming it.

21       MR. MARSHACK:  So buyers of the fruit that came from

22   our farm either wrote it to Richard Marshack, bankruptcy

23   trustee of Northern or they wrote it to Rabbit Ridge, what?

24       MR. CODDING:  Yeah.  Rabbit Ridge Wine Sales, Inc.

25       MR. MARSHACK:  Okay.  Did -- were there -- did any of

EXHIBIT 14
PAGE 234

21

Northern Holding, LLC

1    your buyers make a check payable to any other entity than those

2    two that I just described?

3              MR. CODDING:  No.

4              MR. MARSHACK:  Did they ever pay cash?

5              MR. CODDING:  No.

6              MR. MARSHACK:  Did they ever barter, like, here --

7              MR. CODDING:  No.

8              MR. MARSHACK:  -- I'll give you a truck in exchange

9    for grapes?

10             MR. CODDING:  No.

11             MR. MARSHACK:  Okay.  So the whole scope of the

12   universe, the whole scope of the universe is Rabbit Ridge

13   Winery deposits and my deposits?

14             MR. CODDING:  Right.  And I did a meticulous

15   accounting that I provided to Lori (ph.) sometime around the

16   1st of December on all the -- all those deposits.  And that's

17   why that amount was backed out of the 400,000 even though I

18   spent over 500,000 on this.  That's why the -- that amount was

19   backed out of the cost recovery request on the 400- cap.

20             MR. MARSHACK:  So you will agree that I found out

21   about the direct payments to Rabbit Ridge from you, correct?

22             MR. CODDING:  I reported that information to you in

23   December.

24             MR. MARSHACK:  Right.  But did you -- but prior to

25   December, we found out about -- isn't it correct that we found

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 235

22

Northern Holding, LLC

1  out about that -- that there were contracts and payments being

2  made where I had no -- that there were contracts and payments

3  that were made that I had no knowledge of and that were not

4  paid payable to me by someone other than you, correct?

5       MR. CODDING:  Correct.

6       MR. MARSHACK:  Okay.  So you didn't come to me or

7  Tinho or Lori or Pam or anybody on my team and say, hey, we got

8  contracts other than the ones you've signed and they're going

9  to be made payable to Rabbit Ridge?  You never told us about

10 that prior to payment, right?

11      MR. CODDING:  Until payments started coming in, I did

12 not tell you about that.  When payments were coming in, yes,

13 you were informed and everything was accounted for.

14      MR. MARSHACK:  What do you mean when payments were

15 coming in?

16      MR. CODDING:  As the estate started to collect

17 payments for the fruit that was done under the official

18 contracts, then I submitted a full accounting of the other as

19 well as --

20      MR. MARSHACK:  Right.

21      MR. CODDING:  -- an adjustment to the cost recovery

22 request.

23      MR. MARSHACK:  Right.  But your payments on yours were

24 all made prior to me starting to receive payments on the

25 official contracts, right?



EXHIBIT 14
PAGE 236

23

Northern Holding, LLC

1          MR. CODDING:  There might have been some overlap, but

2    that's pretty much accurate.

3          MR. MARSHACK:  Now, was the prices you're selling

4    your -- was the price that you were selling your fruit for the

5    same price as I was selling the fruit for under the contracts?

6          MR. CODDING:  It was not all the same fruit

7    necessarily.  But yeah, it was all in the same range of

8    acceptable market-based pricing.  So there were not -- the one

9    big exception was the one we did where there was more fruit at

10   Texas, San Marcos, than anticipated.  So for the WarRoom Group,

11   we did a lower price for them.  But that was when you and I

12   worked together and everything else --

13         MR. MARSHACK:  It was a lower -- why did they get a

14   lower price?

15         MR. CODDING:  Because we had the fruit unsold.  There

16   was more fruit out there than we realized.  And it was getting

17   late in the growing season, or at least late for that block.

18   So we needed to have -- basically sell it or it goes to -- goes

19   to waste.

20         MR. MARSHACK:  What do you -- what do you think the

21   total proceeds of all of our fruit sales have been for the --

22   for the fruit that we picked in 2021?

23         MR. CODDING:  Somewhere around 490-, 500,000.

24         MR. MARSHACK:  And how do you get to those numbers?

25         MR. CODDING:  Well, I'm just pulling that off the top



EXHIBIT 14
PAGE 237

24

Northern Holding, LLC

1  of my head.  But from all the -- all the estimates and forecast

2  I was -- I was doing.

3          MR. MARSHACK:  And have you received any monies for

4  fruit -- for the sale of fruit or the sale of any assets of

5  Northern other than the 140,000?

6          MR. CODDING:  No.

7          MR. MARSHACK:  Okay.  And Tinho, aren't our -- aren't

8  our contracts totaling about 260-?

9          MR. MANG:  Our expected collection based on what I've

10  been receiving -- I think we've projected out we've received

11  between 220- to 270,000.

12          MR. MARSHACK:  So we're projected to -- how much --

13  how much are we to be paid -- after we contacted all the

14  vendors, what are the -- what are the numbers that they've

15  advised us that they owe us based on weight tags?

16          MR. MANG:  For the ones that have provided weight

17  tags, I have estimates for them.  But I do not have weight tags

18  for everybody, so I cannot answer that question.

19          MR. MARSHACK:  Okay.  What is your -- what is your --

20  what is your estimate that we're going to be paid total on the

21  contracts that I executed?

22          MR. MANG:  The estimate for the contracts that Mr.

23  Marshack executed that I have is between 220- to 270,000.

24          MR. MARSHACK:  So if we round down to 260-, being

25  generous, 260- plus 140- is 400-.



EXHIBIT 14
PAGE 238

25

Northern Holding, LLC

1    So Mr. Codding, your sales, according to you, were

2    140-.  And my sales I'm estimating at 260-.  It could be as

3    high as 270-; it could be as low as 220-.  If my numbers are

4    right, we're at 400- or we're less than 400-.  What happened --

5    MR. CODDING:  Well, that's a shape.

6    MR. MARSHACK:  What happened to the other 100,000.

7    MR. CODDING:  There wasn't another 100,000 if that's

8    not what's getting paid.  But I think you're missing some

9    numbers somewhere.  So I'd be happy to confer with Mr. Mang and

10    see where we can --

11    MR. MARSHACK:  Mr. Mang --

12    MR. CODDING:  -- (indiscernible).

13    MR. MARSHACK:  -- why don't you send -- why don't you

14    send that spreadsheet to him and see where the problem is?

15    This would be a great time to have this discussion.

16    MR. CODDING:  Yeah.

17    MR. MANG:  Sure.  Right now or --

18    MR. MARSHACK:  Yeah, right now.

19    MR. MANG:  Oh, right now?

20    MR. MARSHACK:  Right now.

21    MR. MANG:  All right.

22    MR. MARSHACK:  Especially since I have Mr. Gomez on

23    the line.  And he's thinking that, you know -- I don't always

24    know what he's thinking.  But I'm going to speculate that he's

25    thinking this is my collateral and I want to know how much



(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 239

26

Northern Holding, LLC

1  I'm -- how much my bank is owed.  And I want to know where this

2  is currently residing.  So I'm just --

3  　　　　MR. MANG:  Just give me a second to split this up.  I

4  have a bunch of other things in here.

5  　　　　MR. CODDING:  We would have been -- you know, if you

6  knew the P&Ls on the farming, we would have been better off not

7  farming.  But I think the property would have been devalued

8  based on letting it go fallow.  So, you know, I wanted a better

9  outcome, but I think it was worth the effort although it's --

10 　　　　MR. MARSHACK:  I think -- I appreciate your effort.  I

11 really, really --

12 　　　　MR. CODDING:  Thank you.

13 　　　　MR. MARSHACK:  -- do appreciate your effort.  I kind

14 of was having my expectations set at the 600,000-dollar level

15 where we -- where they originally -- where -- I was originally

16 told we would be in the 600,000-dollar range.

17 　　　　MR. CODDING:  Right.

18 　　　　MR. MARSHACK:  And --

19 　　　　MR. CODDING:  Yeah.  That's what I was hopeful for

20 too.  I mean --

21 　　　　MR. MARSHACK:  While he's looking for this --

22 　　　　MR. CODDING:  -- getting half a ton --

23 　　　　MR. MARSHACK:  -- why didn't it happen?

24 　　　　MR. CODDING:  Water.  Getting half a ton an acre at

25 Live Oak is unheard of -- or not unheard of for me because of

escribers

EXHIBIT 14
PAGE 240

Northern Holding, LLC

1   other farms I've had before.  But two and a half tons, three

2   tons of acres, normal yield for a low-yielding hillside

3   difficult-to-farm arduous vineyard, I wouldn't say this to

4   anybody else who might want to buy it, but that -- half of that

5   should be ripped out.  I mean, there's no value in farming

6   there the way he set it up and the site that they picked.  I

7   guess in a good rain year maybe, like, maybe this year they'll

8   do better.  But it was just abysmal.  The Cabernet Sauvignon

9   and all blocks did okay.  But everything else --

10       MR. MARSHACK:  So wait, wait.  Are you saying Live Oak

11  is not set up properly for good production?  Should the rows

12  have been one direction and not another or -- explain.

13       MR. CODDING:  Well, the trellising on the

14  (indiscernible) should be different.  That should be -- there's

15  different types of trellising.  And I'm going to -- not to bore

16  you, but I'll draw out what I'm talking about here.  There's --

17  you know when you see a normal vineyard and it's the cordon

18  that looks like that where --

19       MR. MARSHACK:  Uh-huh.

20       MR. CODDING:  -- the vine goes up and the arms go out

21  and then --

22       MR. MARSHACK:  Yeah.

23       MR. CODDING:  -- shoots like this and there's wires up

24  here and they grow fruit.  What they did at Live Oak was called

25  a TB which is this.  It's three vines up three different poles



EXHIBIT 14
PAGE 241

28

Northern Holding, LLC

1   that go to one point.  And then you have to go back through and

2   trim.  And the fruit zone is in here instead of in here.  So

3   there's a whole bunch of water loss and evaporative losses from

4   this leaf canopy here.  And the wind beats the heck out of it

5   because it's not supported by wires.

6        There's one vineyard in the United States that does this.

7   The rest of them are in Cote-Rotie in their own region in

8   France.  The one vineyard that does this Live Oak.  And I think

9   we learned why this year.

10          MR. MARSHACK:  What do you call that?  Vining --

11          MR. CODDING:  TB.

12          MR. MARSHACK:  No.  What do you call that whole thing?

13          MR. CODDING:  Oh, trellising.

14          MR. MARSHACK:  Trellising.

15          MR. CODDING:  Yeah.  And the Cabernet there is on the

16  old system, like, the first picture I drew where the vines are

17  spread out and they protect each other and there's shade and

18  everything.  The other issue there is --

19          MR. MARSHACK:  What would it cost to retrellis the

20  property, Live Oak?

21          MR. CODDING:  You probably want to retrellis thirty

22  acres.  And that would cost -- to do it with living vines in

23  there is about 20,000 an acre if somebody wanted to do that.  I

24  haven't shared that with anybody besides the inner circle here

25  because I didn't -- I mean, somebody that's thinking about



EXHIBIT 14
PAGE 242

Northern Holding, LLC

1    buying it may or may not want to hear that.  But --

2         MR. MARSHACK:  Okay.  So do you have the thing -- you

3    have the email from Mr. Mang?

4         MR. CODDING:  No.  I'm going to have to get off -- I

5    don't know if I can go off.  Can you guys still see me or hear

6    me?

7         MR. MARSHACK:  Well, why don't you try it on your

8    phone then?  Why don't you --

9         MR. CODDING:  Am I there still?

10        MR. MARSHACK:  No.  Come back live.

11        MR. MANG:  We can -- we can hear you.

12        MR. MARSHACK:  Come back live.

13        MR. MANG:  But we can't see you.

14        MR. CODDING:  I'm going to send it --

15        MR. MARSHACK:  Come back live.

16        MR. CODDING:  Okay.

17        MR. MANG:  I also copied it to Mr. Gomez in case he

18   wants to follow along.

19        MR. CODDING:  Okay.

20        MR. MARSHACK:  Lee, let me --

21        MR. CODDING:  Yes.

22        MR. MARSHACK:  Put on your video.  Can you work --

23        MR. CODDING:  okay.

24        MR. MARSHACK:  Can you work from your phone?  Can you

25   look at the document on your phone?

EXHIBIT 14
PAGE 243

30

Northern Holding, LLC

1          MR. CODDING:  Yeah.  Just let me send it to my phone.

2          MR. MARSHACK:  I'll be right back.  I'm getting some

3     water.

4          MR. CODDING:  All right.  Bear with me.

5          MR. MANG:  No problem.

6          MR. CODDING:  All right.  There we go.  Okay.  Thanks

7     for the copy.

8          So, Mr. Mang -- is it okay if I call you Tinho?  It

9     feels weird calling -- it feels so formal.

10         MR. MANG:  Do whatever you want.

11         MR. CODDING:  All right.  You can call me Lee in this.

12         I see -- it looks like you've got actuals.  See, I

13    think there's a discrepancy with Dow.  And I think that's

14    probably the biggest part of this deal.  But what -- I believe

15    we already addressed.  They waived off some fruit that went to

16    Down.  Corbett --

17         MR. MANG:  Right.  We never gotten the weight tags

18    from Dow.  If you could --

19         MR. CODDING:  Okay.

20         MR. MANG:  -- see if they ever sent it to you.  And

21    then --

22         MR. CODDING:  They -- yeah.

23         MR. MANG:  -- we'll follow up on our end.

24         MR. CODDING:  I'm going to go see her tomorrow and get

25    those.

EXHIBIT 14
PAGE 244

31

Northern Holding, LLC

1   MR. MANG:  Yeah.  And we do need the weight tags for

2   everybody because we need to provide a report to the secured

3   creditor as well because --

4        MR. CODDING:  Sure.

5        MR. MANG:  -- we sold their collateral --

6        MR. CODDING:  Yeah.

7        MR. MANG:  -- pursuant to agreement.

8        MR. CODDING:  Sure.

9        MR. MANG:  And we need to provide a full record to

10  them and the United States Trustee.

11       MR. CODDING:  Yeah.  Not a problem.  Anyway, I think

12  that's the biggest hole in this.  There's -- whether they're

13  deferring part of their payment or what, that's way too low.

14  Riboli is fine.  Corbett is -- they still owe or did they pay?

15       MR. MANG:  If you look at the notes column, it says

16  1,800 that's unexpected, 39,762.  If that comes in, they're

17  only under by a little tiny bit.

18       MR. CODDING:  Okay.  But they're overdue by quite a

19  bit at this point.

20       MR. MANG:  That's true.

21       MR. CODDING:  Okay.  Riboli, Corbett, WarRoom.  We

22  talked about WarRoom last week.  Do you want me to go see them?

23  Are you going to talk to them or -- they shouldn't have done

24  that deduction.  That's why they paid 1,200 to begin with.  You

25  can't get a discount twice.



EXHIBIT 14
PAGE 245

32

Northern Holding, LLC

1    MR. MANG:  Right.  Well, I think when we last talked

2  about this, Mr. Marshack had stepped away.  But basically,

3  there was a recommendation that they had self-credited

4  $19,533.60 for, quote, excess raisining.  And --

5    MR. MARSHACK:  Excess -- oh, raisining, okay.

6    MR. MANG:  Raisining.  And in Mr. Codding's

7  experience, that was probably overstated.  Plus they had

8  already gotten the very favorable price for the amount

9  received.  So --

10    MR. CODDING:  Not only that, but they --

11    MR. MANG:  -- economic calculation.

12    MR. CODDING:  Yeah.  They came out and inspected the

13  fruit.  And we walked -- it was blocks together.  They knew

14  exactly what they were getting.  And yes, you can pull some

15  raisins out to a certain degree, but you can't -- it's not

16  going to be perfect.  And that's what happens late in the

17  season.  It was excess unsold fruit.  They paid 1,200 bucks a

18  ton instead of 17- or 1,800.  I just feel like they ought to

19  have --

20    MR. MARSHACK:  What was the --

21    MR. CODDING:  -- just ponied up.

22    MR. MARSHACK:  What was the total purchase -- total

23  agreed-upon purchase price for the tonnage that they received?

24    MR. CODDING:  1,700 a ton for everything that was in

25  those -- or sorry, 1,200 a ton for everything that was in the



EXHIBIT 14
PAGE 246

33

Northern Holding, LLC

1   block.  And I don't have -- I guess, Tinho, you have a weight

2   here of 54.26.

3          MR. MANG:  Yeah.  That was their weight tag weight.

4          MR. CODDING:  Okay, got it.

5          MR. MANG:  So it was -- we'll plan that out --

6          MR. CODDING:  Great.

7          MR. MANG:  -- and get the number.

8          MR. CODDING:  All right.  Right.  So there you go.  So

9   yeah, 65,000- (audio interference).

10         MR. MANG:  (Indiscernible) grape, aren't they?

11         MR. CODDING:  They are.

12         MR. MANG:  (Indiscernible) --

13         MR. CODDING:  They are.

14         MR. MANG:  -- (indiscernible).

15         MR. CODDING:  And they -- they deducted -- good grief,

16  forty percent.

17         MR. MANG:  No, that's thirty percent.

18         MR. CODDING:  Okay.  Got it.  Yeah.  I just think

19  that's not right.  I mean, and I'm not saying, you know, go sue

20  them.  I mean, that's kind of ridiculous over that amount of

21  money.  But with your permission or, you know --

22         MR. MANG:  It's up to the trustee.

23         MR. CODDING:  -- he'll talk to him if he wants.  Yeah,

24  okay.

25         MR. MANG:  It's up to the trustee --

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 247

34

Northern Holding, LLC

1          MR. CODDING:  All right.

2          MR. MANG:  -- what to do with that.  He's got all the

3    info he needs.

4          MR. CODDING:  Okay.

5          MR. MANG:  And if he needs more --

6          MR. CODDING:  Well --

7          MR. MANG:  -- we'll --

8          MR. CODDING:  I stand by.  Okay.

9          MR. MARSHACK:  I'm going to be --

10          MR. CODDING:  So with that --

11          MR. MARSHACK:  I'm going to be taking a brief recess

12    from this meeting for nine minutes because I have another

13    meeting, but let's keep going.  So all the funds that you

14    received for -- that went to you were deposited in Rabbit

15    Ridge, Rabbit -- wait, Rabbit Ridge Wine Sales account?

16          MR. CODDING:  Right.  There were those two accounts

17    that I sent for all the pertinent periods to Lori with an

18    accounting and cross referencing and all of that.  She's been

19    through it all.  Tinho, I believe you have that --

20          MR. MANG:  Okay.

21          MR. CODDING:  -- in your --

22          MR. MARSHACK:  So let me ask you a question.

23          MR. CODDING:  -- files.

24          MR. MARSHACK:  Let me ask you a question.

25          MR. CODDING:  Yes.  Yeah.

EXHIBIT 14
PAGE 248

Northern Holding, LLC

1    MR. MARSHACK:  Have you paid to us all money, cash,

2  checks, and anything of value that you have received from

3  grapes that were grown on the Northern Holding property in

4  2021?

5    MR. CODDING:  Every drop of fruit that was sold has

6  been accounted for, yes.

7    MR. MARSHACK:  But have you forwarded all the money

8  that you received -- have you -- if you received it, have --

9  oh, I see what you're saying.  Have you disclosed all the

10  money -- now I understand.  Have you disclosed all the money

11  that you received for fruit that was picked -- that was picked

12  from Northern Holdings property in 2021?

13    MR. CODDING:  Yes.  All the fruit has been accounted

14  for.  All the funds have been accounted for.  And the funds

15  that were paid to my entity were backed out of the cost

16  recovery request.

17    MR. MARSHACK:  Okay.  So I will let Tinho go ahead and

18  proceed.  Again, I'll be off -- I'll be off in seven minutes.

19  But if you'll proceed.

20    MR. CODDING:  Okay.

21    MR. MARSHACK:  And you have the power to conclude or

22  continue as you see fit.  Please make -- if I'm not back,

23  please make sure you offer Mr. Gomez an opportunity to examine,

24  okay?

25    MR. MANG:  Okay.



EXHIBIT 14
PAGE 249

36

Northern Holding, LLC

1          MR. CODDING:  Thank you, Richard.

2          MR. MARSHACK:  You're welcome.  I'll listen for a few

3    minutes.

4          MR. MANG:  Mr. Codding, I'm not trying to be

5    repetitive, but I just need to have this be a full and complete

6    record of what was disclosed in email and what --

7          MR. CODDING:  Okay.

8          MR. MANG:  -- we discussed last week.  So I'm just

9    going to run through these again --

10         MR. CODDING:  Okay.

11         MR. MANG:  -- point by point just for the purposes of

12   this meeting, okay?

13         MR. CODDING:  Yes.

14         MR. MANG:  Okay.  So Nicora Wines, you stated that

15   Rabbit Ridge received 44,000 dollars as a prepayment for

16   grapes; is that correct?

17         MR. CODDING:  Right.  And we shorted them when

18   delivery time came because the crop was short.  So we spread

19   out the shortage -- spread out the pain accordingly.  So I paid

20   him back myself the overage.  But that's -- that's been

21   addressed.

22         MR. MANG:  Okay.  So for Nicora, was there a grape

23   purchase agreement that was entered into without the knowledge

24   and consent of the trustee?

25         MR. CODDING:  Well, it was before the trustee was

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 250

Northern Holding, LLC

1  around, so no.  I mean, yes and no I guess.  It's a timing

2  issue.

3          MR. MANG:  So this grape purchase agreement existed

4  prior to the trustee's appointment?  Is that what you're

5  saying?

6          MR. CODDING:  Right.  Prior to the conversion, right.

7  And prior to the conversion, I was going to collect fruit

8  revenue and submit back to the bank at some later to be

9  determined formula.

10          MR. MANG:  Did you ever provide a copy of this

11  purchase agreement to the trustee?

12          MR. CODDING:  I don't believe so.  I think I just

13  provided an accounting of the fruit that came off those blocks

14  and the funds that came off those blocks.

15          MR. MANG:  Did you ship grapes to Nicora Wines from

16  the fall 2021 harvest?

17          MR. CODDING:  2021, yes.

18          MR. MANG:  And did you inform the trustee prior to

19  shipping those grapes to Nicora Wines?

20          MR. CODDING:  No.  I informed the trustee after.

21          MR. MANG:  For Rangeland, you said that Rabbit Ridge

22  received 7,752 dollars for the purchase of grapes coming from

23  the estate properties.  Same question.  Did you enter into a

24  grape purchase agreement with Rangeland without knowledge and

25  consent of the trustee?

Northern Holding, LLC

1    MR. CODDING:  No.  Look, he -- let's just stop with

2    the legalese.  This is getting ridiculous.  The trustee didn't

3    know because it was in place before he was involved.  I didn't

4    disclose it because we would have lost the contracts.  And I

5    was trying to preserve (indiscernible) the estate.  These

6    grapes were shipped.  The money was collected.  I accounted for

7    the money and subtracted it out of my cost recovery request.

8    So that's -- for all those guys in that category, we can just

9    say that's what happened.  And it wasn't -- Richard didn't do

10   anything wrong.  He wasn't -- the trustee's office wasn't, you

11   know, not paying attention.  They were just -- come into the

12   picture too late for that to be part of that -- part of the

13   official deal.

14        So that's for -- I'm going to just pull up your

15   spreadsheet here and tell you so we don't miss anything.

16   Nicora, Rangeland.

17        MR. MANG:  And I'd like to get the actual numbers

18   received by Rabbit Ridge for each of these -- from each of

19   these entities as part of the record.

20        MR. CODDING:  Okay.  Do you have that handy?  Because

21   I don't.

22        MR. MANG:  Yes.  I will --

23        MR. CODDING:  Okay.

24        MR. MANG:  I'll just say blanket questions.  You have

25   the --



EXHIBIT 14
PAGE 252

39

Northern Holding, LLC

1      MR. CODDING:  Okay.

2      MR. MANG:  -- blanket response.

3      MR. CODDING:  Right.  You've got my --

4      MR. MANG:  And will confirm the numbers.

5      MR. CODDING:  You've got my bank statements, so you

6  know everything that's there.  Yeah.

7      MR. MANG:  Okay.

8      MR. CODDING:  Okay.

9      MR. MANG:  Cathartes Aura, LLC, also known as

10  Anarchist --

11      MR. CODDING:  Right.

12      MR. MANG:  -- received 30,000 (indiscernible).

13      MR. CODDING:  Right.

14      MR. MANG:  And exact same situation.

15      MR. CODDING:  Right.

16      MR. MANG:  Correct?

17      MR. CODDING:  Right.

18      MR. MANG:  O'Neill Vineyards or O'Neill Wineries

19  received -- or paid to Rabbit Ridge $22,297.89, correct?

20      MR. CODDING:  That looks wrong, but I'm going to

21  reconfirm.  I think that's somehow doubled up.  But I'll dig in

22  and confirm.

23      MR. MANG:  Okay.

24      MR. CODDING:  But yes, some amount was received.  Yes.

25      MR. MANG:  That was from the email that you sent us.

EXHIBIT 14
PAGE 253

40

Northern Holding, LLC

1          MR. CODDING:  Oh, okay.

2          MR. MANG:  And totaling it --

3          MR. CODDING:  All right.

4          MR. MANG:  Totaling it all up, it goes to 140-.

5          MR. CODDING:  Okay.

6          MR. MANG:  So if there's any adjustment to that --

7          MR. CODDING:  Perfect.  Okay, no worries.

8          MR. MANG:  -- just let us know.

9          MR. CODDING:  I'm sorry.  Yes, we're good.  I

10  apologize.

11          MR. MANG:  You know, it's okay for you to check and

12  let me know if I'm mistaken because we want it to be accurate.

13          MR. CODDING:  Oh, that's okay.

14          MR. MANG:  If it doesn't sound right to you --

15          MR. CODDING:  No.  If it's -- if it's in my recap

16  email, it's good.  I'm just looking at your spreadsheet.  So

17  I'm sorry.

18          MR. MANG:  Okay.

19          MR. CODDING:  Yeah.

20          MR. MANG:  Sycamore paid $2,747.90.  Same situation,

21  correct?

22          MR. CODDING:  Yeah.

23          MR. MANG:  Okay.  Graveyard paid $3,285.00.  Same

24  situation?

25          MR. CODDING:  Right.

EXHIBIT 14
PAGE 254

41

Northern Holding, LLC

1          MR. MANG:  Pali --

2          MR. CODDING:  Pali is not in here?

3          MR. MANG:  Pali is just not in --

4          MR. CODDING:  Oh, there it is.  Okay.  Sorry.

5          MR. MANG:  Yeah, it's on the bottom.

6          MR. CODDING:  Yeah, all right.  Good.

7          MR. MANG:  It's just not formatted the same.  So Pali

8    paid $30,877.52.  Is that correct?

9          MR. CODDING:  Right.

10         MR. MANG:  And then it's the exact same situation as

11   we discussed before?

12         MR. CODDING:  Correct.

13         MR. MANG:  Was the money received by Rabbit Ridge

14   thereafter spent by Rabbit Ridge?

15         MR. CODDING:  Yes.

16         MR. MANG:  Is there any money left?

17         MR. CODDING:  No, not anymore.  Ever since we got cut

18   off from inventory, the revenue stream has sort of dried up for

19   that entity.  But it was -- those funds were invested in (audio

20   interference).

21         MR. MANG:  Okay.  And was there ever a contract

22   between you and Humanity Wine, LLC for the purchase of grapes

23   from the properties?

24         MR. CODDING:  No.  We had at one point the idea that

25   they would take some excess fruit.  And there wasn't excess

EXHIBIT 14
PAGE 255

42

Northern Holding, LLC

1   fruit from the blocks that they interested in.  So that never,

2   never came to pass.

3        MR. MANG:  And is -- who controls Humanity Wine, LLC?

4        MR. CODDING:  That is Steven Jones' entity.  And so

5   that's one of the ones where it's his and I have nothing to do

6   with it.  That's his entity (audio interference).

7        MR. MANG:  Okay.  Do you have any ownership interest

8   in Humanity Wine?

9        MR. CODDING:  I have no ownership interest or

10  involvement in Humanity Wine.  I don't know -- I'm not a

11  managing anything in it.  I'm not a consultant to it.  I've got

12  no relation to it.

13       MR. MANG:  Did you ever tell Don Brady to pay 17,000

14  dollars to Humanity Wine?

15       MR. CODDING:  I don't think so.  I remember telling

16  him -- I don't think so.

17       MR. MANG:  Just for a little context, do you know who

18  Don Brady is?

19       MR. CODDING:  Yes.  He's the winemaker at O'Neill and

20  the proprietor of Brady Vineyard.

21       MR. MANG:  And did you ship ten tons of grapes to Mr.

22  Brady?

23       MR. CODDING:  That sounds right, yes.

24       MR. MANG:  And then later there was a dispute that

25  arose by Mr. Brady when he had some confusion about who he was

EXHIBIT 14
PAGE 256

43

Northern Holding, LLC

1   to pay; is that right?

2        MR. CODDING:  Yes.  And we got that cleared up.  And

3   he was -- I told him to pay Richard's office when the question

4   came up.

5        MR. MANG:  Okay.  And you've provided to the trustee's

6   office a number of documents and receipts and invoices.  As we

7   discussed last week, have you provided -- or did you -- did you

8   provide records of expenditures after about August 2021?

9        MR. CODDING:  Not -- well, I provided records of

10  expenditures that added up to in excess of what I might redo

11  under this agreement, less 140,000.  So there's plenty more if

12  we wanted to take more time to go through this.  But it's kind

13  of a moot point because there's no hope of recovering that.

14  I'm just trying to get -- I'm trying to get an incremental

15  progress payment on what was spent by me over the last fourteen

16  months.

17       MR. MANG:  Understood.  So the invoices and receipts

18  that you provided, they sort of go up to a certain date.  And

19  then you decided that it was not economical for you to provide

20  any more invoices.  And those were provided?

21       MR. CODDING:  Right.  Well, it -- yeah.  They don't

22  matter.  I mean, they're not going to get the money back.  It's

23  not economical.  And it's, frankly, embarrassing how much I

24  spent to bring in as little fruit as we got.  But bygones.  So

25  right now I'm just trying to get a small token progress payment



EXHIBIT 14
PAGE 257

44

Northern Holding, LLC

1   on this.

2      MR. MANG:  When was the first time you told the

3   trustee that Rabbit Ridge has received direct payments without

4   his knowledge?

5      MR. CODDING:  I want to say that was beginning of

6   December.  Actually, I can probably find out when it was.  We

7   had a phone conversation.  I think you were on it.  Actually, I

8   believe it was a Zoom.  I bet we can figure this out right now,

9   if you don't mind me --

10     MR. MANG:  No.  I strive for accuracy here.

11     MR. CODDING:  Well, I'm not finding our phone date,

12  but it was sometime -- sometime -- I think it was the first

13  week of December.

14     MR. MANG:  Just let me know if you find it or if you

15  give up.

16     MR. CODDING:  Okay.  For now I give up, but I'll do

17  some more digging.  So sometime the last week of November,

18  first week of December.

19     MR. MANG:  All right.  And around the time that you

20  told the trustee that Rabbit Ridge had directly received funds,

21  had all the funds already been paid and spent?

22     MR. CODDING:  Yes.  Everything that came in was

23  reinvested in the farming effort to try to bring the rest of

24  the crop in.  And a full accounting was provided within the few

25  days of that conversation, along with bank statements, full

EXHIBIT 14
PAGE 258

Northern Holding, LLC

1    transparency, open kimono.

2        MR. MANG:  All right.  We go to -- what is this?  The

3    farm operator agreement provides that you agree to provide

4    proof of worker's compensation insurance and other required

5    insurances --

6        MR. CODDING:  Uh-huh.

7        MR. MANG:  -- and compliance with tax withholding

8    obligations.  Have you provided that --

9        MR. CODDING:  Uh-huh.

10       MR. MANG:  -- to the trustee?

11       MR. CODDING:  Yes.

12       MR. MANG:  And that's in the form of the payroll

13   summary that you provided to us, correct?

14       MR. CODDING:  Payroll summary and then the bills and

15   payments for the worker's comp.  I think prior -- that was in

16   the -- in the submission for cost recovery request

17   reimbursement.  But on a fairly regular basis, prior to that, I

18   had been sending -- I'm talking, like, July, August, September,

19   sending in the workman's comp proof of coverage to the trustee

20   office.

21       MR. MANG:  Okay.  And paragraph 10 of the agreement

22   provided that you agreed to "provide trustee a weekly listed

23   expenses."  Was that ever done?

24       MR. CODDING:  No.

25       MR. MANG:  Okay.  Paragraph 6 of the agreement

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 259

46

Northern Holding, LLC

1    provided that you agreed to "cancel any and all existing

2    purchase contracts for the grapes and present new contracts to

3    trustee for execution.  New contracts shall be at fair market

4    value.  And the seller shall be Richard Marshack, bankruptcy

5    trustee."  Is that correct?

6         MR. CODDING:  That's what I recall, yes.

7         MR. MANG:  And as we've discussed, not all the

8    purchase contracts were canceled.  And you've explained why,

9    correct?

10        MR. CODDING:  Correct.

11        MR. MANG:  Okay.  The agreement also provided that

12   operator agrees and understands they are not to remove or work

13   with any casks or bottles or cases of wines or any other

14   personal property; further, operator shall not use any

15   equipment or inventory.  Is that correct?

16        MR. CODDING:  Not under the farming agreement.  That's

17   correct.  That was not part of the farming agreement.

18        MR. MANG:  I'm going to send you a copy of the farming

19   agreement that I just read off of.

20        MR. CODDING:  Okay.  It was -- I think it was okay for

21   the crew to use equipment, wasn't it?

22        MR. MANG:  I just read you the paragraph off of page 2

23   of the farming agreement.  So I just --

24        MR. CODDING:  Okay.

25        MR. MANG:  -- sent you a copy.  Take a look.

EXHIBIT 14
PAGE 260

47

Northern Holding, LLC

1        MR. CODDING:  It was not -- it was not my impression

2   that we were unable to use tractors and that kind of thing

3   because how else would we do it.  Was I supposed to lease those

4   as well and spend another 100,000?

5        MR. MANG:  You see also on page 2, going down a little

6   bit, no access shall be allowed to operate for any other

7   reason.  And no access shall be allowed to operate or to any

8   other asset or aspect of the real properties except with

9   express written permission of the trustee.  Do you see that?

10       MR. CODDING:  Right.

11       MR. MANG:  Did you ever ask the trustee in writing for

12  permission to turn over the wines or to otherwise use any

13  winery equipment?

14       MR. CODDING:  Not in writing, no.

15       MR. MANG:  Did the trustee ever authorize you to use

16  any winery equipment or to process any wines?

17       MR. CODDING:  We had a verbal agreement.  And there

18  was a limited number of gallons that were processed.  And

19  everybody is aware of this.  I've talked about this since

20  before we did it until after it was done.  If you don't do

21  that, the license goes dormant.  And then whoever buys that

22  place doesn't have access to a functioning winery.  You also

23  lose the wastewater treatment permits if you don't do

24  fermentation.  So --

25       MR. MANG:  The license does not belong to the debtor,



EXHIBIT 14
PAGE 261

48

Northern Holding, LLC

1      Northern Holding; is that correct?

2            MR. CODDING:  That's correct.  But a functioning

3      license as the property is an enhancement to the value of the

4      property.

5            MR. MANG:  All right.

6            MR. CODDING:  So when stuff was being done, it was not

7      at the behest of Northern.  But it was occurring during the

8      duration of this farming contract.  I'm baffled at the

9      equipment thing though.

10           MR. MANG:  It's right there in the agreement.

11           After the trustee was appointed, did you ever enter

12     into any contracts on behalf of the debtor?

13           MR. CODDING:  I don't believe so, no.  No, because

14     Richard took over basically in place of Northern -- or took

15     over Northern in place of me really.

16           MR. MANG:  Well, for example, what about the contract,

17     just this -- just for example, between Northern Holding and

18     Corbett Vineyards, LLC, which was signed on September 24, 2021

19     without the knowledge and consent of the trustee?  And then

20     an --

21           MR. CODDING:  What --

22           MR. MANG:  And then an addendum had to be made where

23     the trustee was inserted as a party after --

24           MR. CODDING:  That was --

25           MR. MANG:  -- it had originally been signed.

EXHIBIT 14
PAGE 262

Northern Holding, LLC

1      MR. CODDING:  That was the process.  We'd agree to

2  something.  Richard would okay it.  I'd get the paper.  Then

3  your office and me would get the addendum on there.  In that

4  one, I think he interlineated pretty -- pretty excessively.

5  But yeah, that's the process.  I mean, that was all under the

6  purview of our agreement.

7      MR. MANG:  So just to recap the process, you're saying

8  the process was that you would enter into an agreement, then

9  tell Richard, and then he would sign an addendum?

10     MR. CODDING:  Well, no.  I would tell him I'm working

11  on this agreement.  And you have to give the producer

12  something.  The customer needs something in their hands to say

13  what happened, you know, here's what we're doing.  And then

14  Richard and I would interlineate or do whatever is necessary

15  because the customers want to use their own -- their own form

16  in some cases, in the case of Center of Effort being one of

17  them.  And yeah, then we would do the addendum, and that's

18  that.

19         So when you ask, you know, enter into a contract on

20  behalf of Northern, no.  This was all part of the process that

21  was outlined by the farming agreement.

22     MR. MANG:  Okay.  So when the signature line says by

23  Lee Codding, managing member, that's not on behalf of Northern?

24     MR. CODDING:  No.  That's then handed off to Richard's

25  office so he can ratify the contract.  We went through this,



EXHIBIT 14
PAGE 263

Northern Holding, LLC

1   and it took us weeks to get this system down.  And in fact,

2   some of the legacy buyers that had contracts in place weren't

3   included in that process.  The exception process that I had to

4   create ad hoc on the fly to preserve value for the estate was

5   done because we were fiddling around for weeks trying to get

6   this process that you're describing done.

7          Do you have Center of Effort contract that's signed by

8   Richard and me?

9          MR. MANG:  Yes.

10         MR. CODDING:  So there -- on every single one of them,

11  there's a place for me to sign.  And on every single one of

12  them, there's a place for him to sign.  And there's an

13  addendum.  And there's instructions about how payment should

14  get made.

15         MR. MANG:  By every single one, do you mean the

16  contracts that Richard signed, all of them had a signature

17  block for it?

18         MR. CODDING:  The official -- yes, everything that we

19  did with the trustee's office, there's an addendum and a

20  signature by him.

21         MR. MANG:  Because as we discussed, there were a

22  couple of contracts that the trustee did not sign.  So is there

23  a signature block for the trustee on any of the contracts that

24  he didn't sign?  I know it may sound like a dumb question

25  but --



EXHIBIT 14
PAGE 264

51

Northern Holding, LLC

1    MR. CODDING:  Everything that we did he signed off on.

2    If I sent something into your office and somebody didn't get it

3    filed with his signature on it, then I'm not -- I'm not in your

4    office.  I don't know what you see.  But each one of those was

5    executed according to the process we painstakingly put together

6    to be compliant.

7    MR. MANG:  All right.  I think -- all right.  I'm

8    probably done with my questions.

9    Mr. Gomez, are you there?

10   MR. GOMEZ:  I am.  Give me a moment.

11   MR. MANG:  Okay.  Do you want to take a quick break

12   and then we can come back in a little bit?  Because I know Mr.

13   Codding has been going for an hour and a quarter now.

14   MR. GOMEZ:  Yeah.  I that makes sense.  Do you want to

15   do two minutes or five?  What's your preference?

16   MR. MANG:  Let's take a five-minute break, come back

17   at 3:20.  And then we'll have Mr. Gomez ask his questions of

18   debtor.

19   MR. CODDING:  Okay.  Thank you.

20   MR. MANG:  Okay.  Thank you, everyone.

21   (Whereupon a recess was taken)

22   MR. MANG:  All right.  Welcome back.  We thought --

23   MR. CODDING:  Thank you.

24   MR. MANG:  -- we had lost you forever.

25   MR. CODDING:  Audio still okay?

EXHIBIT 14
PAGE 265

52

Northern Holding, LLC

1        MR. MANG:  Yeah, audio is still okay.

2        MR. CODDING:  Great.  Thank you.

3        MR. MANG:  All right.  I think we're back on the

4   record.  So just for sanity of the proceedings, I will now turn

5   it over to Mr. Gomez for questions on behalf of his client.

6   And if you could identify yourself before you speak just so we

7   can transcribe this and have everyone identified, that would be

8   great.

9        MR. GOMEZ:  Good afternoon.  This is Michael Gomez on

10  behalf of secured creditor Farm Credit West, FLCA.

11        MR. CODDING:  Good afternoon.

12        MR. GOMEZ:  Good afternoon, Mr. Codding.

13        So earlier you mentioned Mr. Tolar.  Do you have his

14  contact information?

15        MR. CODDING:  I do.

16        MR. GOMEZ:  All right.  What is it?

17        MR. CODDING:  Bear with me here.

18        MR. GOMEZ:  Sure.

19        MR. CODDING:  Direct line, this is a mobile, is 909 --

20        UNIDENTIFIED SPEAKER:  Hold on one second.  Do we want

21  this on the record, or do you want to email it to him?  Do you

22  know?  What do we think?

23        MR. MANG:  I think on the record is fine.

24        UNIDENTIFIED SPEAKER:  Okay.

25        MR. MANG:  Yeah.  He's not a minor.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 266

53

Northern Holding, LLC

1          UNIDENTIFIED SPEAKER:  Okay.  Okay.

2          MR. CODDING:  Okay.  So area code 909-855-7235.  And

3    then there's a different number.  Do you care about the text

4    number?

5          MR. GOMEZ:  Did you say text, T-E-X-T?

6          MR. CODDING:  Right.

7          MR. GOMEZ:  Yeah, go ahead.  Give me a text messaging

8    number.

9          MR. CODDING:  Okay.  805-698-9384.

10         MR. GOMEZ:  All right.  And is there a mailing address

11   for him?

12         MR. CODDING:  Yeah, but I don't have it handy.  But I

13   can get you that.

14         MR. GOMEZ:  All right.  And do you have an email

15   address for him?

16         MR. CODDING:  I do, but I'll have to go off my screen.

17   Let me look it up here.  That is Vino Tinto -- it's

18   V-I-N-O-T-I-N-T-O-C-O-N-S@aol.com.

19         MR. GOMEZ:  So I have vinotintoconsulting@aol.com and

20   the word Vino Tinto Consulting is all one word, right?

21         MR. CODDING:  It's one word except he dropped the

22   last -- consulting, so it's Vinto Tinto C-O-N-S@aol.com.

23         MR. GOMEZ:  I'm sorry.  Can you repeat that again?  I

24   missed what you said.

25         MR. CODDING:  Sure.  So it's

EXHIBIT 14
PAGE 267

54

Northern Holding, LLC

1    V-I-N-O-T-I-N-T-O-C-O-N-S@aol.com.

2            MR. GOMEZ:  So no "ulting", just --

3            MR. CODDING:  Exactly.

4            MR. GOMEZ:  -- C-O-N-S?

5            MR. CODDING:  Correct.

6            MR. GOMEZ:  All right.  When is the last time you

7    spoke to Mr. Tolar?

8            MR. CODDING:  Probably yesterday.

9            MR. GOMEZ:  Okay.  And earlier there was a company

10   referenced named Humanity Wine.

11           MR. CODDING:  Uh-huh.

12           MR. GOMEZ:  And you have no involvement with Humanity

13   Wine; is that correct?

14           MR. CODDING:  That's correct.  I also have no

15   involvement with Vino Tinto Consulting other than they're our

16   grape broker.

17           MR. GOMEZ:  Grape broker.  All right.  When you say

18   "our," you mean for Rabbit Ridge?

19           MR. CODDING:  Right.  Buying and selling of fruit over

20   the years.  I've used Bill for other things too in other

21   capacities before my involvement with that, but he's kind of a

22   fixture.

23           MR. GOMEZ:  All right.  And Humanity Wine, you said

24   that is Mr. Jones, Steve Jones's company?

25           MR. CODDING:  That's correct.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 268

Northern Holding, LLC

1    MR. GOMEZ:  Okay.  And Mr. Jones -- does anyone else

2  have an interest in Humanity Wine that you know of?

3    MR. CODDING:  Not that I know of, no.

4    MR. GOMEZ:  All right.  Are there any other officers

5  of Humanity Wine other than Mr. Jones?

6    MR. CODDING:  Not that I know of.

7    MR. GOMEZ:  Okay.  And what is Rabbit Ridge's

8  involvement with Humanity Wine?

9    MR. CODDING:  Well, there's -- they have an agreement

10  to produce wine for them as a client.  So Rabbit Ridge

11  producing for Humanity as a client.  But I don't believe much

12  work was yet done on that arrangement.

13    MR. GOMEZ:  How much work do you believe was done?

14    MR. CODDING:  Humanity bought some shiners that are in

15  the winery facility still.

16    MR. GOMEZ:  What do you mean by shiners for the

17  record?

18    MR. CODDING:  Those are bottles of wine that are

19  finished but unlabeled, ready for labeling and shipment.

20    MR. GOMEZ:  When were those bottles bottled?

21    MR. CODDING:  2020.  I don't remember if there's --

22    MR. GOMEZ:  Is it fair to say --

23    MR. CODDING:  -- (indiscernible) on that though.

24    MR. GOMEZ:  Is it fair to say that the wine that was

25  sold to Humanity was bottled prior to the Northern Holding

EXHIBIT 14
PAGE 269

Northern Holding, LLC

1   bankruptcy?

2       MR. CODDING:  It is fair.  It was also from vintages

3   prior to 2021.  And I don't think it was actually bottled.  In

4   fact, I know it wasn't bottled for Humanity Wine Company.  It

5   was bottled, but it was in the stock and purchased by Humanity,

6   but it hasn't gone anywhere.  It's just sitting there.

7       MR. GOMEZ:  Okay.  Are any of the wines that were held

8   by Rabbit Ridge on its own behalf source the grapes from any

9   third-party sources other than the San Marcos, Texas Road, or

10  the Live Oak properties?

11      MR. CODDING:  Yes.

12      MR. GOMEZ:  Okay.  Were all of those growers paid?

13      MR. CODDING:  Yes.

14      MR. GOMEZ:  And would that be reflected in Rabbit

15  Ridge's records?

16      MR. CODDING:  Yeah.  We'd have to do some digging for

17  that.  We're talking, again, 2020 harvest and prior.

18      MR. GOMEZ:  Okay.  Do you know which other growers

19  grapes were obtained from?

20      MR. CODDING:  This is prior to my involvement, but it

21  was -- there was a grower down in San Ynez, Santa Barbara

22  County, that did a sauvignon block and then one in the Lodi

23  area that did a Carignan.  Those are the only two that I'm

24  aware of.

25      MR. GOMEZ:  And they have been repaid in full.  They

EXHIBIT 14
PAGE 270

Northern Holding, LLC

1    never demanded any payment for anything they're owed?

2           MR. CODDING:  Not in the time I've been around.

3           MR. GOMEZ:  And what did the Lodi grower grow?

4           MR. CODDING:  Carignan.  It's a French variety, not

5    too common in California, but C-A-R-I-G-N-A-N.

6           MR. GOMEZ:  All right.  So if -- now, did Humanity pay

7    Rabbit Ridge for the bottles that it was purchasing?

8           MR. CODDING:  Well, when you buy shiners, you're

9    paying for a case of wine.  So yeah, you pay for the materials,

10   the cork, the packaging, the juice, everything that's in there.

11          MR. GOMEZ:  All right.  Is there anything outstanding

12   owed by Humanity to Rabbit Ridge?

13          MR. CODDING:  Nothing outstanding is owed, but they

14   can't get their wine.  So that's a different kind of problem I

15   guess.  Probably Rabbit Ridge owes them money at this point.

16          MR. GOMEZ:  All right.  So on the bank records of

17   Rabbit Ridge, there was some money transferred to Humanity.

18   Why?  Why was Rabbit Ridge transferring money to Humanity?

19          MR. CODDING:  That's a separate arrangement that

20   wasn't related to product that was done on a -- I believe it

21   was for management consulting by Mr. Jones who's acting as --

22   or was acting as the CFO for Rabbit Ridge.

23          MR. GOMEZ:  All right.  So earlier we were going over

24   a spreadsheet.  Do you have that in front of you?

25          MR. CODDING:  I can pull it back up on my phone.



EXHIBIT 14
PAGE 271

58

Northern Holding, LLC

1          MR. GOMEZ:  Sure.

2          MR. CODDING:  Got it.

3          MR. GOMEZ:  Okay.  Are these all the third parties to

4   whom Rabbit Ridge or rather you, in your capacity as the farm

5   manager for the estate, sold grapes to?

6          MR. CODDING:  Yes.

7          MR. GOMEZ:  All right.  Is anyone else -- is there

8   anyone else that you sold grapes to that's not on this list?

9          MR. CODDING:  No.

10         MR. GOMEZ:  Okay.  And approximately how many tons of

11  grapes did Rabbit Ridge harvest -- or did you harvest?  I'm

12  sorry.

13         MR. CODDING:  Now, we can look up -- I'm going to have

14  to do a -- back of the envelope.  I don't have that.  Actually,

15  you know what, I can look at -- I'm going to go off screen

16  again.  Sorry.  Can you still hear me?

17         MR. GOMEZ:  Yes, sir.

18         MR. CODDING:  All right.  I'm just looking back at my

19  forecast updates.  Oops.

20         Okay.  Sorry.  I'm still --

21         MR. GOMEZ:  I've texted the trustee to mute his line.

22  We'll see if it goes through.

23         MR. CODDING:  Just going -- bear with me one more

24  second.  I'm sorry.  I will get you the official count when I

25  put the weight takes together, but I'd say about 250 tons.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 272

59

Northern Holding, LLC

1    Here we go.  All right.  I'm back.

2         MR. GOMEZ:   All right.  So you harvested about 250

3    tons?

4         MR. CODDING:  Yeah, just off the top of my head.

5         MR. GOMEZ:  Okay.  And how do you sell to Booker or My

6    Favorite Neighbor?

7         MR. CODDING:  Well, here on the spreadsheet, it looks

8    like about just under six.

9         MR. GOMEZ:  And you believe that's accurate?

10        MR. CODDING:  Well, yeah.  I mean, we can look -- we

11   can -- that one came from a weight tag because you -- that's

12   why it's an oddball number like that.  So yeah, I think that

13   one is correct.

14        MR. GOMEZ:  Okay.  And who made --

15        MR. CODDING:  That was on the -- well, they waived it.

16   The buyer always waives when it gets to their crush pad.

17   That's whose weight tag you go off of.

18        MR. GOMEZ:  All right.  What about Dow?

19        MR. CODDING:  Dow I'm getting the -- that's the one we

20   were talking about earlier.  We're inputing the weight tags

21   together from them.  That's what I'm going to go see her about

22   tomorrow so we get everything squared away.  They had a

23   contract for sixty-five tons.  I think they got about that.

24        MR. GOMEZ:  And they didn't give you any weight tags

25   when the grapes were delivered?

EXHIBIT 14
PAGE 273

60

Northern Holding, LLC

1      MR. CODDING:  Well, I don't have the complete set.  So

2  that's why I'm going to go see them tomorrow.

3      MR. GOMEZ:  All right.  What about Riboli?

4      MR. CODDING:  Him I can pull up what he's got.

5  That'll take me a minute to --

6      MR. GOMEZ:  Sure.

7      MR. MANG:  If I can just interject real quick on the

8  Dow contract.  Mr. Codding, you said that you think that Dow --

9      MR. CODDING:  Sure.

10      MR. MANG:  -- actually received sixty tons of grapes

11  or sixty-five tons of grapes?

12      MR. CODDING:  Do I think they did?

13      MR. MANG:  Yes.

14      MR. CODDING:  I think it was close, yeah, which is why

15  I think they're underpaid.

16      MR. MANG:  All right.  Thank you.

17      MR. GOMEZ:  And to be clear, I think you said the

18  number was sixty-five tons, correct?

19      MR. CODDING:  Well, you know, I'm just going to off

20  the top of my head, but I think that's what the contract was

21  for.  Not to say, I mean, the arrangement got super light, so

22  it could be that they were shorted by half, you know.  Looking

23  up -- I've got the Riboli weight tag.  Yeah.  This is the one

24  where -- and I hate to repeat myself, but there's mentioning --

25  they had originally intentionally of buying cabernet sauvignon

EXHIBIT 14
PAGE 274

61

Northern Holding, LLC

1   and cabernet franc, and they bought only cabernet franc.  And

2   they got, according to their tag, 3.145 tons.  And that's, what

3   they paid off of.

4         MR. GOMEZ:  So let me restate that to make sure I

5   heard it correctly.  The number you said was 3.145, so just

6   over three tons?

7         MR. CODDING:  Right.  Yeah, which is --

8         MR. GOMEZ:  And that was --

9         MR. CODDING:  Go ahead.  I'm sorry.

10        MR. GOMEZ:  And you said that was only the sauvignon

11  blank, blanc?

12        MR. CODDING:  Cabernet franc.  Yeah.  They picked a

13  block of cabernet franc that they wanted, and that's what came

14  off that block.  So that's what they got.  And then on their

15  cabernet sauvignon, they were experiencing a changeover in

16  their winemaker and vineyard management team at the time.  So

17  she decided she didn't want or need the cabernet sauvignon,

18  which, you know, if that were something more obscure that

19  couldn't easily be sold for the same price, it would have been

20  more of an issue.  But it wasn't an issue because that was

21  happy to take it.  So --

22        MR. GOMEZ:  Okay.  And where did the cabernet

23  sauvignon blocks that were originally intended for Riboli go?

24        MR. CODDING:  They had rows marked off.  Those went to

25  Dow.



EXHIBIT 14
PAGE 275

Northern Holding, LLC

1          MR. GOMEZ:  Okay.  So that's part of the sixty-five

2  tons?

3          MR. CODDING:  Right.  We're going to get to the bottom

4  of that tomorrow in exactly detailed form.  But yeah, that's

5  part of the sixty-five.

6          MR. GOMEZ:  All right.  And going back to the

7  spreadsheet, I see it's says Corbett has 22.09 tons.  Is that

8  accurate?

9          MR. CODDING:  Yeah.  That's right.

10         MR. GOMEZ:  Okay.  And then below that, WarRoom, 54.26

11  tons.  Is that accurate?

12         MR. CODDING:  I believe so.

13         MR. GOMEZ:  Okay.  All right.  Now, we're -- it

14  says -- let me go back to Corbett where it says the 22.09 tons.

15  There's two entries for 21,600.  Is that for the entire

16  twenty-two tons or are there -- are there a different set of

17  twenty-two tons going for another 21,000 dollars?

18         MR. CODDING:  That should be -- well, let's see here,

19  1,800 a ton.  So twenty-two times -- yeah, that's -- it should

20  be 39,600.  So I guess that was the original estimate if

21  twenty-four tons shipped.  So it should be nineteen-eight times

22  two.

23         MR. GOMEZ:  All right.  So the 22.09 is the total,

24  correct?

25         MR. CODDING:  Right.  But both those -- yeah, exactly.

EXHIBIT 14
PAGE 276

63

Northern Holding, LLC

1   It should be nineteen-eight.  There should be two payments of

2   19,800 based on that.

3            MR. GOMEZ:  All right.  It says Brady received ten

4   tons.  Is that accurate?

5            MR. CODDING:  Yes.

6            MR. GOMEZ:  Okay.  And O'Neill, O'Neill.  Do you know

7   how many tons O'Neill received?

8            MR. CODDING:  I believe twelve.  And they're down

9   below.  That's where it's 22.297.

10            MR. GOMEZ:  Okay.  And John Anthony Michael, you

11   believe that's accurate he received -- it looks like there's

12   two entries for him.  He received 2.7055 and .325.  So over --

13            MR. CODDING:  Right.

14            MR. GOMEZ:  -- three tons; is that right?

15            MR. CODDING:  Yeah.  Yeah.

16            MR. GOMEZ:  Okay.  And then going down below on the

17   spreadsheet down around line 35, we have Nicora.

18            MR. CODDING:  Right.

19            MR. GOMEZ:  How much did Nicora receive in terms of

20   tonnage?

21            MR. CODDING:  They've got about six tons.

22            MR. GOMEZ:  What about Rangeland?

23            MR. CODDING:  Rangeland, I think, got one and a half.

24            MR. GOMEZ:  And Cathartes, also known as Anarchist?

25            MR. CODDING:  Yeah.  He got -- let's see.  This is

EXHIBIT 14
PAGE 277

64

Northern Holding, LLC

1    by -- I need to look all this up.  I'm just not going to

2    torture us by doing it while we're sitting here on the phone.

3    But Anarchist got eight -- I believe -- no, it couldn't be that

4    much -- eighteen I believe.

5           MR. GOMEZ:  All right.  We talked about O'Neill.  What

6    about Sycamore?

7           MR. CODDING:  Sycamore was one bin, so half a ton.

8           MR. GOMEZ:  And Graveyard?

9           MR. CODDING:  I think one ton.

10          MR. GOMEZ:  And Pali?

11          MR. CODDING:  Pali was about twenty-four tons.  Again,

12   I'll look that up for you, but plus or minus.

13          MR. GOMEZ:  So when I total it up, I understand that

14   these are just estimates, I come out to approximately 158 tons,

15   no more than 158 tons.  So let's just round that up to 160

16   tons.  I believe you said that 250 tons were harvested.

17          MR. CODDING:  Well, that was just spit balling off

18   of -- and it was just backing off of that.  But let's add this

19   up again.  Six plus -- I'm at 150 tons, and I'm only at

20   WarRoom.

21          MR. GOMEZ:  I don't think so.  Wow, sorry, you're

22   right.  Dow.  You said sixty-five tons?

23          MR. CODDING:  Yeah.

24          MR. GOMEZ:  And you said Riboli had 3.145?

25          MR. CODDING:  Yeah.  I get 242.

EXHIBIT 14
PAGE 278

65

Northern Holding, LLC

1          MR. GOMEZ:  I have 226.  So let's just call it --

2          MR. CODDING:  All right.

3          MR. GOMEZ:  -- 225 roughly.

4          MR. CODDING:  All right.

5          MR. GOMEZ:  I know it's a little lower.  But so we're

6    short about twenty-five tons.  Any ideas where those are or

7    what they were used for?

8          MR. CODDING:  I see what you're getting at, but you're

9    thinking of it all wrong.  I was spit balling off of the

10   revenue projections when I threw that number out there before.

11   I wasn't trying to create a cute situation here.

12         MR. GOMEZ:  I'm not --

13         MR. CODDING:  This --

14         MR. GOMEZ:  -- being cute.

15         MR. CODDING:  Those projections were -- those

16   projections were based on expected yields.  And yields were low

17   due to the water conditions.  So where those twenty-five tons

18   went was they never existed.  They were stillborn, cluster

19   weights and that was it.  Probably all of that should have been

20   Syrah.  It was a good year.

21         MR. GOMEZ:  All right.  Was Rabbit Ridge processing

22   any grapes in 2021?

23         MR. CODDING:  Yes.  As I've stated many times over the

24   months that we've talked about this, there was a thin pick,

25   basically waste that had to get removed from a section of

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 279

66

Northern Holding, LLC

1    Mourvedre in order for it to get ripe for the intended customer

2    to take delivery on it.  So at my expense, we went through and

3    did a thin pick.  And instead of composting that fruit, we

4    fermented it.  The purpose of that was to maintain the license

5    so that a purchaser of the facility could have an operating

6    winery, you know, ferment, and of course, of a vintage, the

7    license gets made inactive.  And that means the new operator

8    has to come in and do an entire reapplication process if

9    they're able to get it.  That's why I was freaking out about

10   this wastewater treatment, because if the wastewater treatment

11   isn't activated, then the winery is not a winery.  It's just a

12   big storage facility.

13        MR. GOMEZ:  When did you complete the thin pick?

14        MR. CODDING:  Early on in the -- in the season, early

15   October, I believe.

16        MR. GOMEZ:  All right.  And were any of the harvested

17   grapes other than the thin pick something -- anything other

18   than 250 tons used by Rabbit Ridge?

19        MR. CODDING:  No.  There was no -- we just did a

20   cursory fermentation to maintain the licensing.  And there's

21   no -- no 2021 juice, bottled or barreled, at the facility.

22        MR. GOMEZ:  All right.  The weight tags that were used

23   for this, have they all been turned into the trustee, the

24   spreadsheet?

25        MR. CODDING:  Everything I have I've shared, but we



EXHIBIT 14
PAGE 280

67

Northern Holding, LLC

1    still need to get the complete set of tags from Dow.

2           MR. GOMEZ:  All right.  And does Rabbit Ridge use

3    QuickBooks?

4           MR. CODDING:  It does.

5           MR. GOMEZ:  And who has possession of the QuickBooks

6    files?

7           MR. CODDING:  I have access to them.

8           MR. GOMEZ:  Are they in the cloud or --

9           MR. CODDING:  They are.

10           MR. GOMEZ:  -- is it on --

11           MR. CODDING:  They're in the cloud.

12           MR. GOMEZ:  All right.  What about the farming

13    records?  Where are those records kept?

14           MR. CODDING:  You mean fertilizer application and that

15    kind of thing?

16           MR. GOMEZ:  Everything from payments to workers to

17    what was harvested.

18           MR. CODDING:  Well, the contacts set up what was to be

19    harvested.  And the weight tags confirmed that.  In some cases

20    producers want invoices.  In those cases, they get sent.  Other

21    times the -- the producers, I mean the grape buyers pay off the

22    contracts.  So it just depends on whatever is common practice

23    with each relationship.  In terms of payments to vendors and

24    that kind of thing, yeah, that's on the -- in the bank records.

25    And then the -- what was your other question?  Oh, fertilizer

EXHIBIT 14
PAGE 281

68

Northern Holding, LLC

1    application and that kind of thing, that's kept by the

2    outsourced firms that do that.  So like Buttonwillow Warehouse,

3    for example, keeps those records.  That's their obligations as

4    licensed pest control advisor.  So they do that kind of

5    recordkeeping.

6            MR. GOMEZ:  All right.  You said one of the practices

7    was to send invoices to the buyers of the grapes.  Who sent

8    those invoices?  Was it you or Mr. Marshack?

9            MR. CODDING:  It was me.

10           MR. GOMEZ:  Okay.

11           MR. CODDING:  Where they wanted them.  You know, they

12   didn't all want them.  But those that did -- or, like, Center

13   of Effort asked for it three times, for example.  But yeah, I

14   sent it.

15           MR. GOMEZ:  Sorry.  Center of Effort -- which one of

16   those on the list here is Center of Effort?

17           MR. CODDING:  That would be Corbett Vineyards, LLC,

18   parenthesis COE.

19           MR. GOMEZ:  Okay.  And do you have copies of the

20   invoices that you submitted?

21           MR. CODDING:  Yeah.  The trustee's office does as

22   well.

23           MR. GOMEZ:  Right.  And where do you keep -- for your

24   records, where do you keep copies of those invoices?

25           MR. CODDING:  I just have them in a paper file.

EXHIBIT 14
PAGE 282

69

Northern Holding, LLC

1        MR. GOMEZ:  Paper file.  And where is that paper file

2   located?

3        MR. CODDING:  It's in my briefcase.

4        MR. GOMEZ:  Okay.  Was Rabbit Ridge selling any wines

5   out of the winery the last months of 2021?

6        MR. CODDING:  Yes.  Rabbit Ridge was operating as an

7   independent company, which it is.  And yes, it was conducting

8   business.  Those efforts ceased at the beginning of December,

9   however.

10       MR. GOMEZ:  Were there any tastings being conducted?

11       MR. CODDING:  No.

12       MR. GOMEZ:  So it was just bottled wine that was being

13   sold?

14       MR. CODDING:  Right.

15       MR. GOMEZ:  And were those online sales or in-person

16   sales or both?

17       MR. CODDING:  Online and (indiscernible) to the trade.

18   So in other words, ship it out on a truck to another licensee

19   who then resells it.

20       MR. GOMEZ:  All right.  And you have those records in

21   your QuickBooks files?

22       MR. CODDING:  Yes. And it's no problem to share on

23   that kind of stuff.  Like I've told you many, many times, we'd

24   like to get this guarantor status thing put to bed.  If there's

25   a business left after that, that would be great.  There won't

EXHIBIT 14
PAGE 283

70

Northern Holding, LLC

1  be if we don't do something quick because when you say no to

2  every customer that sends you an order, pretty soon they find

3  some other wine to buy.

4      MR. GOMEZ:  If you could send us the QuickBook files,

5  that would be beneficial.

6      MR. CODDING:  Okay.

7      MR. GOMEZ:  All right.  And for that thin pick that

8  you were discussing earlier, how many grapes were picked as

9  part of the thin pick?  Is it, you know, a ton or less than

10  that?

11      MR. CODDING:  It was about -- it was four bins, I want

12  to say, because it was picking light, about just under two

13  tons.

14      MR. GOMEZ:  All right.  And these would not have been

15  saleable grapes anyways, correct, you said?

16      MR. CODDING:  Right.  These were grapes that would

17  have been -- they're suitable for making rose.  And they

18  enabled the grapes that were left behind to ripen the rest of

19  the way to meet the contract requirements for red wine which

20  was still a stretch.  But anyway, it worked.  So --

21      MR. GOMEZ:  All right.  Mr. Mang, I don't have any

22  further questions.

23      MR. MANG:  All right.  So I think because the trustee

24  has asked all the questions that the trustee needs to ask and

25  all the creditors have appeared to have asked all the questions



(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 284

Northern Holding, LLC

1   they needed to ask, we can conclude this meeting with

2   creditors.  And thank you, everyone, for all your time.  Thank

3   you.

4          MR. CODDING:  Thank you both.

5          MR. MANG:  All right.  Let's tell the trustee.  And

6   everyone have a good rest of your day.

7          MR. CODDING:  Okay.  Thanks for your time, everybody.

8   We'll be in touch.  Thanks.  Okay.  Thanks, Tinho.

9          UNIDENTIFIED SPEAKER:  Oh, Tinho?

10         MR. MANG:  Yeah.

11         UNIDENTIFIED SPEAKER:  Did you continue or anything?

12         MR. MANG:  No, I concluded.

13         UNIDENTIFIED SPEAKER:  Concluded, cool.  Thank you.

14         MR. MANG:  Yeah, because Richard told me I could.  So

15  it's concluded.

16         UNIDENTIFIED SPEAKER:  Okay.  Let me call him and see

17  if he can come turn this off.

18         MR. MANG:  I'll stay on.

19         UNIDENTIFIED SPEAKER:  Okay.

20         Hi, we're finished up.  Can you come finish?  I see

21  you walking up.

22         MR. MARSHACK:  Hello.

23         UNIDENTIFIED SPEAKER:  Hi.

24         MR. MANG:  Hi.  Are you still on your phone?

25         MR. MARSHACK:  Yeah.

EXHIBIT 14
PAGE 285

72

Northern Holding, LLC

1          MR. MANG:  All right.  Call me after.  I don't want

2    to --

3          MR. MARSHACK:  Well, let me ask you.  Have we

4    concluded the 341(a)?

5          MR. MANG:  Yes.  It's concluded.

6          MR. MARSHACK:  341(a) examination is concluded.

7       (Whereupon these proceedings were concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 286

73

1                        C E R T I F I C A T I O N

2

3    I, Michael Drake, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ MICHAEL DRAKE, CER-513, CET-513

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  February 21, 2022

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

EXHIBIT 14
PAGE 287

# EXHIBIT 15

**From:** Lee Codding <lecoddingiv@icloud.com>
**Sent:** Friday, February 11, 2022 10:25 PM
**To:** Richard Marshack <RMarshack@MarshackHays.com>; Pam Kraus <pkraus@marshackhays.com>
**Cc:** Tinho Mang <tmang@marshackhays.com>; Kevin Otus <kotus@thinkonyx.com>
**Subject:** Cost Reimbursement IMG_8136-preview.pvt

Richard,

Well that was fun. I'll be back Monday.

Not asking for a full reimbursement. Maybe just a modest progress payment of $120,000.00.

Please see to it that a check is ready this time. Last chance.

Regards,
Lee

1

EXHIBIT 15
PAGE 289



EXHIBIT 15
PAGE 290

**EXHIBIT 16**

**LEE CODDING**

February 17, 2022

Richard Marshack
Marshack Hayes LLP
870 Roosevelt
Irvine, CA

lecoddingiv@icloud.com

13217 Jamboree Rd
Tustin, CA 92782

via in-person service/ certified mail

Dear Richard,

This letter is to offer you an opportunity to rectify our farm contract payment arrangement. Your office owes me $400,000.00 as contractually allowed less $137,668.00 for a total of $262,332.00.  Your office has had my payment request and supporting documentation for months. I have a proposal for you but first some more detail on how we got here.

While it may be true that some revenue was received by my licensed entity those numbers were reconciled in December 2021 with full reporting to your office. I have not asked for reimbursement on those payments, only for what remains due under our agreement. There is no reason or excuse to delay payment. To reiterate, you are in breach.

Your refusal to remit refund payments to me (these are refunds for expenditures advanced not any remuneration for my 14 months of work on the project you've collected funds on) has put me in a precarious position. So I am still scrambling to get this together.

I've requested from your office a full accounting of funds received by your office on my behalf. This accounting has been denied me by your office. I've suggested a payment plan and have received no response. I am willing to accept a reasonable payment plan. The initial payment must available for me to pickup with no further demands from your office no later than Tuesday 22 February 2022. If I don't receive said payment I will have no choice but to file a regulatory complaint. Multiple market enforcement actions on all grape buyers that paid your office on my behalf will be considered as well. That's not something I want to do but I won't have a choice.

In summary, rather than both of us spending money on legal resolution I'd like to offer an alternative course of action: a reasonable payment plan. Additionally we have bigger fish to fry with the $15.8 million PSA for 1172 San Marcos and Texas Road.

So, let's quit the posturing and do what's right.

Sincerely,

Lee Codding

EXHIBIT 16
PAGE 292



EXHIBIT 16
PAGE 293

# EXHIBIT 17

**M A R S H A C K   H A Y S** LLP

**ATTORNEYS AT LAW** | LITIGATION | REORGANIZATION | BANKRUPTCY

Richard A. Marshack

D. Edward Hays

Chad V. Haes

David A. Wood

Judith E. Marshack

Laila Masud

Tinho Mang

Bradford N. Barnhardt

*Of Counsel*

Kristine A. Thagard

Matthew W. Grimshaw

Reference No. 1015-146
Sender: Tinho Mang on behalf of Richard A.
Marshack, Trustee

February 25, 2022

*VIA E-MAIL ONLY*

LeRoy E. Codding IV
lecoddingiv@icloud.com

**Re:    *In re Northern Holding, LLC***
**Case No. 8:20-bk-13014-MW**
**Re: Response to your demand for progress payments**

Dear Mr. Codding:

This letter serves as a formal response to your repeated demands via e-mail, certified mail, telephone, and in person at my law firm office for payment, arising from the farming operations on properties owned by Northern Holding, LLC and under my sole administration in my capacity as Chapter 7 trustee. As previously stated, I am not permitted to make any payments out of the ordinary course of business without a specific order of the Court. Because of the irregularities in your handling of your employment as the farm manager for the bankruptcy estate ("Estate"), I am not permitted to make any reimbursement payments to you absent a specific and definite order of the Court.

   **1.  You failed to comply with the terms of the farm management agreement**
       **and remain in breach of contract.**

As detailed in our prior correspondences, you failed to comply with the terms of the farm management agreement which was presented to and approved by the Court. Specifically, you agreed to cancel all existing grape purchase contracts and ensure that the proceeds of all sales of grapes was received and held in trust, as is the required procedure for any bankruptcy case. Instead of complying with the farm management agreement, you retained preexisting contracts and directly received (through Rabbit Ridge Wine Sales, Inc. or other entities) payments derived from the sale of Estate property, which you had no authority or right to control. Despite your protests to the

**M A R S H A C K   H A Y S** LLP | www.marshackhays.com
870 Roosevelt | Irvine, CA 92620 | 949.333.7777 | Fax 949.333.7778

EXHIBIT 17
PAGE 295

February 25, 2022
Page 2

contrary, you have thereafter failed to provide a full accounting of the diverted grapes
and proceeds to me, including failing to provide a copy of the contracts for these diverted
assets, and failing to account for the expenditure of these funds, as all of the expenses you
have provided to me and my office generally pre-date your employment on behalf of the
Chapter 7 bankruptcy estate. As a result, and as more fully explained below, I am not
authorized to provide you with the reimbursements that you continually demand.

2. **As a result of your concealment and diversion of funds, the Estate was
deprived of substantial rights.**

As the Trustee, I am a fiduciary responsible for the administration of the
bankruptcy estate. While you served in a consulting capacity, the nature of the farm
management agreement and the constraints of the Bankruptcy Code forbade you from
directly making any business decisions unrelated to farming, such as the negotiation and
sale of crops. Instead, your responsibility was to advise me as the Trustee regarding such
decisions. By unilaterally diverting crops and proceeds without my oversight, you
deprived the Estate of the ability to negotiate its own terms. Furthermore, even if your
explanation was true that customers would be lost if the preexisting contracts were
cancelled in accordance with the farm management agreement, you have never provided
any explanation why the proceeds were concealed from me and could not be immediately
redirected to me in accordance with the Bankruptcy Court's orders. In short, your
diversion and concealment of funds from the Estate is a breach of duties on your part and
may rise to the level of embezzlement. To illustrate, if one of your employees wrote
himself a check out of your company's general account and explained that it was an
advance against his future paychecks, that may similarly constitute embezzlement. This is
precisely what you did. Additionally, on February 8, 2022, you testified for the first time
(and contrary to your prior representations to me) that you misappropriated crop grown
on the property to process into wines, which I never authorized and in fact expressly
prohibited. Remember: the only reason that we knew about your diversion of funds was
because one of the customers you attempted to sell directly to contacted us because it did
not want to pay any unauthorized party – and only when confronted with this discovery,
you finally confessed to receiving the $140,000 derived from the unauthorized sale of
Estate property.

3. **You have continually failed to provide basic information to assist me in
determining the extent of your allowable reimbursements.**

Despite months of requesting basic information from you either directly, through
my agents, or my attorneys, you have failed to keep, maintain, or disclose basic records
that would allow me to determine the extent of your benefit to the Estate. For example,
although you apparently personally oversaw the harvest and weighed the hand-picked

EXHIBIT 17
PAGE 296

February 25, 2022
Page 3

crop on site, you failed to provide any report of the harvest to me and any measurements of the tonnage picked. You also failed to provide me with any proof of payroll payments made to any employees or contracted labor, and failed to provide me with any information regarding the laborers growing, harvesting, and shipping crop. More specifically, your documentation regarding payroll to your employees fails to differentiate between work performed on the farming operations and work performed on any other unauthorized business being conducted by Rabbit Ridge or your related entities. Any professional and responsible farm manager would have provided me regular reports on the status of the crop, and especially provided a full report of the timing and status of the harvest. Your deliberate and intentional concealment of information from me has crippled my ability to protect the Estate.

4. **The Memorandum of Understanding that you signed provides a hard cap on your reimbursements, to the extent that you are entitled to any, net of the diverted funds.**

On December 20, 2021, you signed a Memorandum of Understanding acknowledging and agreeing that "the total amount of funds due" to you and your entities "do not collectively exceed $232,000." You further agreed that "any invoices or requests for reimbursement submitted after January 5, 2022 will not and do not have to be paid." The previous documentation you provided to me and my office, which fails to include almost any itemized expense following your authorized employment period, is seriously deficient and does not show that you are entitled to receive any reimbursements over and above the $140,960.31 you diverted from the Estate. Furthermore, under the Memorandum of Understanding, you would be entitled to receive *at most* approximately $92,000 in additional reimbursements after the setoff for the diverted funds – but only if you provide documentation sufficient to substantiate at least $232,000 in reimbursements. To be clear, I am not suggesting that your production of documentation for the $232,000 in reimbursements automatically entitles you to receive an additional $92,000 in reimbursements, as your misconduct has created an issue about what other monies have been taken and what remedies the Estate possesses. In your letter dated February 17, 2022, you assert that you are owed $400,000. Given the above, especially the Memorandum of Understanding which you signed, the Estate does not owe you $400,000.

5. **Absent a specific order of the Court, I am not authorized to make any payments or reimbursements.**

Pursuant to Section 363(b) of the Bankruptcy Code, I may only use (i.e. disburse) property of the estate with an order of the Court. The crop proceeds constitute property of the Estate which I would need, under these circumstances, either consent by all creditors

EXHIBIT 17
PAGE 297

February 25, 2022
Page 4

or a specific court order authorizing a payment to you. Not only were those proceeds property of the Estate, they were also cash collateral of Farm Credit West, FCLA ("FCW"). Section 363(c) further prohibits me from using or expending cash collateral without consent from the secured creditor or a specific court order. Unless you provide me with specific and definite documentation showing ***actual payments and disbursements*** made during my authorized farm operation period, I am unable to evaluate whether I should file a motion requesting authorization from the Court to make the payments you continually demand.

To that end, you must provide detailed documentation for all of the expense reimbursements you claim, including all invoices for vendors, all cancelled checks (front and back) related to any unpaid invoices, and all bank statements for Rabbit Ridge Wine Sales, Inc. and all other entities which you used to operate or pay any farming expenses, for the calendar year of 2021 through today's date. Your excuse that you lost the login information for Wells Fargo and therefore cannot retrieve any bank statements defies logic. Even if you were unable to use the online services, you can go in-person to the bank branch to request the relevant statements. Second, for any requested reimbursement for employee payroll, you must provide proof of actual payroll disbursements (i.e. specific evidence that the laborers were actually paid) and, consistent with the farm management agreement, proof of compliance with applicable federal and state withholding obligations. Finally, the vast majority of the receipts you provided to me show that the expenses incurred pre-date my administration as the Chapter 7 Trustee, which began on June 15, 2021, and further pre-date my authorized period to farm the land pursuant to motion filed on August 9, 2021. Any claim for reimbursement pre-dating June 15, 2021 is a Chapter 11 administrative claim – and the Bankruptcy Code requires prior court approval before payment of a Chapter 11 administrative claim. Thus, even if you believed you were entitled to an offset for the $140,000 you unilaterally misappropriated from the Estate, I have never received any documentation showing that you are entitled to a reimbursement in that amount, let alone $400,000. I reserve all rights to exercise appropriate remedies under the Bankruptcy Code in the event that you fail to prove your reimbursements.

Finally, you have made representations to my office that I authorized you to receive a progress payment check. These representations are false. As you have categorically failed to prove your requested reimbursements, I have never authorized any payments to you due to your failure of proof. Furthermore, as explained here, the Bankruptcy Code requires a specific order of the Court before any payments can be made.

EXHIBIT 17
PAGE 298

February 25, 2022
Page 5

### 6.  You have no lien rights.

In your communications to me, you threatened to file a producer's lien in the abstract, and subsequently threatened to file a regulatory complaint and "multiple market enforcement actions." However, you are not entitled to any such rights whatsoever, as nothing more than a narrow-scope agent of the Estate. If you choose to unilaterally file a lien against the Estate, I will file a motion with the Court to void such lien and subject you to appropriate sanctions. Furthermore, to the extent that you file any action outside of bankruptcy court, the federal courts have exclusive jurisdiction to determine issues regarding the administration of the bankruptcy estate, and any action filed outside of bankruptcy court is subject to immediate dismissal and possible federal sanctions, including a violation of the automatic stay of 11 U.S.C. § 362(a) and the doctrine first explained by the U.S. Supreme Court in *Barton v. Barbour*, 104 U.S. 126 (1886), which provides that parties "must obtain authorization from the bankruptcy court before initiating an action in another forum against certain officers appointed by the bankruptcy court for actions the officers have taken in their official capacities." *In re Yellowstone Mountain Club, LLC*, 841 F.3d 1090, 1094 (9th Cir. 2016).

Mr. Codding, I placed my trust in you to assist with management of the valuable assets of the Estate, and relied heavily on your asserted expertise with crop cultivation to bring in the Fall 2021 harvest. It is increasingly apparent to me that this trust was unfortunately misplaced. Given the above, your request and demand for payment is denied.

Sincerely,

RICHARD A. MARSHACK
Chapter 7 Trustee

EXHIBIT 17
PAGE 299

# EXHIBIT 18

**Attachments:**    Lee Codding email&texts-2022.pdf
LiveOakINVOICE-2021.pdf

---

**From:** Wayne Cooper Ag Services <wcoop01@yahoo.com>
**Sent:** Wednesday, March 16, 2022 5:27 PM
**To:** Tinho Mang <tmang@marshackhays.com>; Richard Marshack
<RMarshack@MarshackHays.com>
**Cc:** Charity Doherty <charitydoherty@hotmail.com>
**Subject:** Lee Codding situation

Mr. Mang,

I am writing in regards to a debt owed by Lee Codding to Wayne Cooper Ag Services.  We (Wayne
Cooper Ag Services) performed pump test services for Live Oak Vineyard requested by Lee Codding
under the business name of Fluid Advisors.

Mr. Codding requested the pump efficiency tests for the wells at Live Oak Vineyard on a rush basis for a
real estate deal.  He told us that the Vineyard was in escrow and he needed the pump tests and the
results quickly for the deal to close.  The potential buyer was Riboli Wines and Anthony Riboli, who also
had a representative present at the pump tests, Lee Alegre.  There were also multiple other irrigators and
vineyard employees present at the pump tests.

We performed 6 pump tests on site at Live Oak Vineyard.   A pump test measures the efficiency of a well
which includes measuring the standing water level and pumping water level of the well; the gallons per
minute while the pump is running; the pressure the pump is running against; and the energy input into the
well.  Multiple calculations are performed with these measurements to find an efficiency of the well as it is
running.  Various other details of the well are recorded and put into the pump test software to create a
complete report of the well for the customer.  The wells are located across the vineyard in various
locations, we use our own vehicle and equipment to complete the pump tests.

A pump test costs $250 each to the customer, and we charged a rush fee of $100 because Lee wanted
the results the same day.  These costs were quoted and agreed to before the pump tests were
performed.  We performed the pump tests, processed the reports, emailed the results to Lee Codding,
Lee Alegre, and Mike (the Vineyard Mechanic) on 8/10/2021.  We then emailed the invoice to Lee
Codding who responded that he received the results and would "get this out to you," referring to payment.

We did not hear anything more from him, so texted to remind him about the invoice on 9/30/21.  This is
not terribly uncommon for customers who are emailed the invoice, sometimes they forget to forward to an
accounting department, or just forget to print and send payment.  I usually wait at least a month for
payment before I send a reminder.  In response to the 9/30/21 email,Lee said he would send it out, and
so we waited.  With no response, we sent another reminder on 10/21/21 by text and email.  His email was
returned as an incorrect email address.  We then sent the invoice to the original email group and Anthony
Riboli.  Lee immediately had a miraculous restoration of his email and called to reassure us that he is
having his accounting people cut a check.  We called, emailed and texted Mr. Codding and on occasion,
Erich Russell and Steven Jones, at least 10 more times between October and today.  Each time we
received a response of some form of "the check is on the way" or no response at all.

At one point, we contacted Anthony Riboli for any advice that he could give us on collecting from Lee

EXHIBIT 18

PAGE 301

Codding.  He gave us the contact information for the Bankruptcy Trustee Mr. Marshack of Marshack-Hays.  We are now contacting you for assistance, support, and advice on collecting this debt.

Our company has been in business for over 20 years, providing pump efficiency testing, water level measuring, and various other water resource management services to farmers, vintners, municipalities, and more all over California.  We are a women owned and women run small business.  We have NEVER had this issue with a customer in all of our years of business.  It is unfortunate that Mr. Codding has now made us wary of our customers, and suspicious of real estate deals that we are asked to provide services for, so much that we now require a check at the time of service.  It is unfortunate that one person can hire a small business to do a services, most likely having no intention to ever pay them, and then be able to continue on with running their business as usual.  And we, the small business have to put in countless extra hours of research and work just to try and collect on the original debt that is owed.

I have attached all of the emails and texts we have exchanged with Lee Codding and other relevant people along with the original invoice that was sent to Lee Codding.

We truly appreciate any and all help that you can provide to Wayne Cooper Ag Services in collecting this debt from Lee Codding, Fluid Advisors, Live Oak Vineyard, Rabbit Ridge Winery, etc.

Thank you,

Debbie Cooper and Charity Doherty

**Wayne Cooper Ag Services, LLC**
www.waynecooperagservices.com
7340 Atascadero Ave.
Atascadero, CA  93422
**(805) 235-5218 Office**
(805) 423-9144 Debbie - records
(805) 235-5218 Charity - scheduling

EXHIBIT 18

PAGE 302





## Wayne Cooper Ag Services, llc
7340 Atascadero Ave.
Atascadero, CA  93422
(805)466-6030  (805)235-5218
wcoop01@yahoo.com

## Invoice

| Number | 1916 |
|---|---|
| Date | 8/10/2021 |

**Bill To**
Lee Codding
Fluid Advisors
179 Niblick, #406
Paso Robles, CA, 93446

**PO Number**

**Project**

| Date | Description | Quantity | Rate | Amount |
|---|---|---|---|---|
| 8/10/2021 | Electric Pump Test | 6 | $250.00 | $1,500.00 |
| | Pump Test Report Rush Fee | 1 | $100.00 | $100.00 |

Live Oak Vineyard
2380 Live Oak Way
Paso Robles, CA 93446

| | |
|---|---|
| **Sub Total** | $1,600.00 |
| **Total Due** | $1,600.00 |

EXHIBIT 18

PAGE 303

Re: Pump Test Reports for Live Oak Vineyard

From:   Lee Codding (lecoddingiv@icloud.com)

To:     wcoop01@yahoo.com

Cc:     mjwelder@rocketmail.com; alegre.ag@charter.net

Date:   Tuesday, August 10, 2021, 04:26 PM PDT

Hi Debbie,

Great meeting you and Charity too!
Thank you!

We appreciate your time and expertise. Also the quick turnaround on write up!

Looking forward to further working together in future.

Best regards,
Lee


Lee Codding
Managing Partner
Fluid Advisors, LLC |  Strategy for Wine
952/220-8216 / lecoddingiv@icloud.com

> On Aug 10, 2021, at 3:50 PM, Wayne Cooper Ag Services <wcoop01@yahoo.com> wrote:
>
> Lee,
>
> It was great to meet you all today.  The pump test reports are attached.
>
> Please let me know if you have any questions about the pump test reports or the results.
>
> Have a great week,
>
> Debbie Cooper
>
> **Wayne Cooper Ag Services, LLC**
> **www.waynecooperagservices.com**
> 7340 Atascadero Ave.
> Atascadero, CA  93422
> **(805) 235-5218 Office**
> (805) 423-9144 Debbie - records
> (805) 235-5218 Charity - scheduling

EXHIBIT 18

PAGE 304

Re: Pump Test Invoice

From: Lee Codding (lecoddingiv@icloud.com)

To: wcoop01@yahoo.com

Date: Tuesday, August 10, 2021, 04:34 PM PDT

Hi Debbie,

Thank you I'll get this out to you. Thanks again for your work and expertise!

Best,
Lee

Lee Codding
Managing Partner
Fluid Advisors, LLC | Strategy for Wine
952/220-8216 / lecoddingiv@icloud.com

> On Aug 10, 2021, at 3:54 PM, Wayne Cooper Ag Services <wcoop01@yahoo.com> wrote:
>
> Lee,
>
> Attached is the invoice for the pump tests we did today.
>
> Please let me know if you have any questions.
>
> Thanks,
>
> Debbie Cooper
>
> **Wayne Cooper Ag Services, LLC**
> **www.waynecooperagservices.com**
> 7340 Atascadero Ave.
> Atascadero, CA 93422
> **(805) 235-5218 Office**
> (805) 423-9144 Debbie - records
> (805) 235-5218 Charity - scheduling
>

 LiveOakINVOICE-2021.pdf
283.6kB

EXHIBIT 18

PAGE 305

Re: Lee A's email address?

From: Lee Codding (lecoddingiv@icloud.com)

To:    wcoop01@yahoo.com

Date:  Wednesday, August 11, 2021, 02:44 PM PDT

Hi Debbie,

I'll gladly send him.

For your reference, here is his email:

alegreag@charter.net

Best,
Lee

Lee Codding
Managing Partner
Fluid Advisors, LLC | Strategy for Wine
952/220-8216 / lecoddingiv@icloud.com

> On Aug 11, 2021, at 2:39 PM, Wayne Cooper Ag Services <wcoop01@yahoo.com> wrote:
>
> Lee,
>
> I got Lee Alegre's email kicked back to me. I must have written it down incorrectly. If you happen to have it, can you please send it to me, or forward the pump test results to him?
>
> Thanks!
>
> Debbie Cooper
>
> **Wayne Cooper Ag Services, LLC**
> **www.waynecooperagservices.com**
> 7340 Atascadero Ave.
> Atascadero, CA  93422
> **(805) 235-5218 Office**
> (805) 423-9144 Debbie - records
> (805) 235-5218 Charity - scheduling

EXHIBIT 18

PAGE 306

Re: Pump Test Reports for Live Oak Vineyard

From:  charity doherty (charitydoherty@hotmail.com)

To:    anthony@riboliwines.com; lecoddingiv@icloud.com

Cc:    wcoop01@yahoo.com

Date:  Thursday, October 21, 2021, 10:00 AM PDT

Good morning Anthony,
We were instructed to send the invoice to Lee, but it seems that this email is no good and I have also texted Lee with no response.
The invoice is still outstanding from the August pump tests.
Can you advise where we should send the bill for the day of work?
Thank you!
-Charity

Get Outlook for iOS

**From:** Anthony Riboli <anthony@riboliwines.com>
**Sent:** Wednesday, August 11, 2021 3:58:41 PM
**To:** charity doherty <charitydoherty@hotmail.com>; Lee Codding <lecoddingiv@icloud.com>
**Cc:** Wayne Cooper <wcoop01@yahoo.com>
**Subject:** RE: Pump Test Reports for Live Oak Vineyard

Adding Lee Codding to the email chain.  His email was incorrect.

**From:** Anthony Riboli
**Sent:** Wednesday, August 11, 2021 3:54 PM
**To:** charity doherty <charitydoherty@hotmail.com>; leecoddingiv@icloud.com
**Cc:** Wayne Cooper <wcoop01@yahoo.com>
**Subject:** RE: Pump Test Reports for Live Oak Vineyard

Thanks Charity.  We'll be in touch.

**From:** charity doherty <charitydoherty@hotmail.com>
**Sent:** Wednesday, August 11, 2021 3:02 PM
**To:** Anthony Riboli <anthony@riboliwines.com>; leecoddingiv@icloud.com
**Cc:** Wayne Cooper <wcoop01@yahoo.com>
**Subject:** RE: Pump Test Reports for Live Oak Vineyard

Hello Anthony,

We do not usually suggest what kind of test should be done during the due diligence of real estate transactions, but we can offer various scenarios that may fit the needs of the situation.

August 31 or Sept 1 are the earliest available dates.

EXHIBIT 18

PAGE 307

If we run tests every 4 hours for 12 hours, the duration of the day will be, at the minimum, 14 hours. Of course, that is doable, it just makes for a very long day.

Check with Mike the current operator for common run times for each well.

He also may alert you to potential problems. He seems to be very honest and up front regarding well information.

You might check with Cleath for a recommendation.

We will try our best to accommodate whatever plan you come up with, just let us know what suits the situation best!

Charity


Charity Doherty

Wayne Cooper Ag Services

805/235-5218

www.waynecooperagservices.com


**From:** Wayne Cooper Ag Services
**Sent:** Wednesday, August 11, 2021 1:20 PM
**To:** Charity Doherty
**Subject:** Fw: Pump Test Reports for Live Oak Vineyard


**Wayne Cooper Ag Services, LLC**

www.waynecooperagservices.com

7340 Atascadero Ave.

Atascadero, CA  93422

(805) 235-5218 Office

(805) 423-9144 Debbie - records

(805) 235-5218 Charity - scheduling


----- Forwarded Message -----

**From:** Anthony Riboli <anthony@riboliwines.com>

EXHIBIT 18

PAGE 308

**To:** wcoop01@yahoo.com <wcoop01@yahoo.com>

**Cc:** Lee Codding <lecoddingiv@icloud.com>

**Sent:** Wednesday, August 11, 2021, 11:54:23 AM PDT

**Subject:** FW: Pump Test Reports for Live Oak Vineyard

Hi Charity/Debbie,

Thanks for the chat today.  Let's regroup regarding a plan to do more extensive testing at the Live Oak Vineyard.  I think we need to run tests every 4 hours for 12 hours.

Cleath-Harris hydrologists will be onsite tomorrow.   They may also have some suggestions.

Best regards,

Anthony

_____

**From:** Lee Codding <lecoddingiv@icloud.com>
**Sent:** Tuesday, August 10, 2021 4:24 PM
**To:** Anthony Riboli <anthony@riboliwines.com>
**Subject:** Fwd: Pump Test Reports for Live Oak Vineyard

Anthony,

Wow. Quick results.

Lee Codding
Managing Partner
Fluid Advisors, LLC |  Strategy for Wine
952/220-8216 / lecoddingiv@icloud.com

Begin forwarded message:

**From:** Wayne Cooper Ag Services <wcoop01@yahoo.com>
**Date:** August 10, 2021 at 3:50:26 PM PDT
**To:** lecoddingiv@icloud.com
**Cc:** mjwelder@rocketmail.com, alegre.ag@charter.net
**Subject: Pump Test Reports for Live Oak Vineyard**
**Reply-To:** Wayne Cooper Ag Services <wcoop01@yahoo.com>

Lee,

EXHIBIT 18

PAGE 309

It was great to meet you all today.  The pump test reports are attached.

Please let me know if you have any questions about the pump test reports or the results.

Have a great week.

Debbie Cooper

**Wayne Cooper Ag Services, LLC**

www.waynecooperagservices.com

7340 Atascadero Ave.

Atascadero, CA  93422

(805) 235-5218 Office

(805) 423-9144 Debbie - records

(805) 235-5218 Charity - scheduling

EXHIBIT 18

PAGE 310

Re: Live Oak Pump Test Invoice

From:  Wayne Cooper Ag Services (wcoop01@yahoo.com)

To:    lecoddingiv@icloud.com

Date:  Saturday, November 20, 2021, 11:34 AM PST

Lee,

We would be happy to get you on the schedule for more pump tests as soon as we get this invoice taken care of.

Payment by check is perfect.  You can send to the address on the invoice.

Thanks,

Debbie Cooper

**Wayne Cooper Ag Services, LLC**
**www.waynecooperagservices.com**
7340 Atascadero Ave.
Atascadero, CA  93422
(805) 235-5218 Office
(805) 423-9144 Debbie - records
(805) 235-5218 Charity - scheduling


On Tuesday, November 9, 2021, 06:39:36 AM PST, Lee Codding <lecoddingiv@icloud.com> wrote:

Hi Debbie,

Thank you this is perfect. Can I have our controller pay by check from this?

Also, separate topic, can we please look at getting on your schedule to do these tests on three wells at San Marcos/Texas Rd.?


Best regards,
Lee


Lee Codding
Managing Partner
Fluid Advisors, LLC |  Strategy for Wine
952/220-8216 / lecoddingiv@icloud.com

> On Nov 8, 2021, at 5:41 PM, Wayne Cooper Ag Services <wcoop01@yahoo.com> wrote:
>
> Lee,
>
> Attached is the invoice for the pump tests done at Live Oak Vineyard on 8/10/21.
>
> Let me know if you would like me to send it by mail, or to another email address.
>
> Please let me know if you have any questions about this invoice.
>
> Thanks,

EXHIBIT 18

PAGE 311

Debbie Cooper

**Wayne Cooper Ag Services, LLC**
www.waynecooperagservices.com
7340 Atascadero Ave.
Atascadero, CA  93422
(805) 235-5218 Office
(805) 423-9144 Debbie - records
(805) 235-5218 Charity - scheduling
<LiveOakINVOICE-2021.pdf>

 LiveOakINVOICE-2021.pdf
283.6kB

EXHIBIT 18

PAGE 312

RE: Pump tests

From:  charity doherty (charitydoherty@hotmail.com)

To:      lecoddingiv@icloud.com

Date:  Tuesday, January 11, 2022, 06:49 PM PST

Thank you Lee.

We aren't used to having to be so far out for payment!

Yes, as soon as you can, take care of this and we'll get you on schedule for San Marcos.

Our calendar is filling up already. Each year I think will be slower than the last for work, but each year I am proven wrong!

Charity Doherty

Wayne Cooper Ag Services

805/235-5218

www.waynecooperagservices.com

**From:** Lee Codding
**Sent:** Monday, January 10, 2022 5:10 PM
**To:** Charity Doherty
**Subject:** Re: Pump tests

Hi Charity,

Understood!

This is earmarked for you. I'm waiting for cost recovery payments from farming (late and due to me) and will remit to you immediately.

To be clear, while I scheduled these tests originally to be helpful to we are not affiliated in any way with Riboli. The work you do for him shouldn't be contingent on anything you've done for me.

Additionally, I intend to try to get on your schedule for San Marcos and another when you're on the east side in short order. Understood our old invoice would have to be clear in order to perform that work.

Thank you for your patience in the meantime.

Best regards,

Lee

**EXHIBIT 18**

**PAGE 313**

On Jan 10, 2022, at 5:03 PM, charity doherty <charitydoherty@hotmail.com> wrote:

Hi Lee,

We would like to be paid for the pump tests we performed.

Anthony Riboli is asking to schedule a test.

Charity

Charity Doherty

Wayne Cooper Ag Services

805/235-5218

www.waynecooperagservices.com

EXHIBIT 18

PAGE 314

Re: Pump Test invoice for Wayne Cooper Ag Services

From:  Wayne Cooper Ag Services (wcoop01@yahoo.com)

To:     lecoddingiv@icloud.com

Cc:     russells@rabbitridgewinery.com; steven.jones@philanthropywines.com; info@rabbitridgewinery.com

Date:   Wednesday, January 12, 2022, 03:26 PM PST

Lee,

Thank you for your response and the phone call today.  Charity and I are a team and any correspondence with her also gets to me.  It has now been 5 months since this work was done, so it is definitely not settled and there has not ever been a plan communicated to us.  We have been patient up to this point, but we do not want you to think that we have forgotten about this bill or are going to let it go away.

Please let me know what your plan is, how and when you plan to pay this debt, and the sooner the better.

Thanks,

Debbie Cooper

**Wayne Cooper Ag Services, LLC**
www.waynecooperagservices.com
7340 Atascadero Ave.
Atascadero, CA  93422
**(805) 235-5218 Office**
(805) 423-9144 Debbie - records
(805) 235-5218 Charity - scheduling

On Tuesday, January 11, 2022, 05:55:15 PM PST, Lee Codding <lecoddingiv@icloud.com> wrote:

Ms. Cooper,

Thank you for your email. I've been in constant contact with your colleague Ms. Doherty on this, in fact as recently as yesterday.

This is a concern and we have a plan to settle the bill. The circumstances are unique and we appreciate your patience. I'll call you at 9am tomorrow.

Best regards,

Lee

Lee Codding
Managing Member
Fluid Wine Fund I, LLC
952/220-8216 / lecoddingiv@icloud.com

On Jan 11, 2022, at 5:29 PM, Wayne Cooper Ag Services <wcoop01@yahoo.com> wrote:

Mr. Russell, Mrs. Russell, Mr. Jones, and Mr. Codding,

I am writing to try and collect on a debt that is owed to Wayne Cooper Ag Services.  We performed 6 electric pump tests for Rabbit Ridge Winery and the company, Fluid Advisors on August 10, 2021.  We also did this as a rush job to accommodate your need for the results as soon as possible.

EXHIBIT 18

PAGE 315

It has been more than 5 months now since this work was performed for your company and we have not received any payment, only a few correspondences from Mr. Codding and promises to pay. We have attempted to contact and or collect at least 8 times over the last 5 months, with no results.

Like you, we are a family owned and operated company. We are in business to help farmers, vintners, municipalities and other businesses manage, conserve and sustain our precious resource of water. This is something that many of your websites also claim that you are committed to. We donate, volunteer, live, worship, raise our children and serve on the central coast where you also do business. It is heartbreaking that you claim to run humanitarian, philanthropic and charitable companies but have to do so on the backs of small, family owned companies that you hire to do services and then never pay, and apparently never had any intention of paying. This $1600 bill is apparently not a big deal to you, but it is to us.

We have been in business for over 20 years. Right here, based in Atascadero, traveling up and down the state of California performing pump tests, measuring water levels and more. We have never had this situation, where a company, especially an established winery, has just refused to pay us for the work that we performed, or even taken 5 months to pay. I know that there are many many companies, holdings, and groups associated with all of you and your names. We will continue to send our invoice to any and all addresses and emails associated with all of these companies until we find the correct one that belongs to whomever is responsible and will pay this bill.

Please let me know if you have an email address, mailing address, phone number, PO Box, etc. for anyone else to send this invoice to that is responsible for payment. Rest assured, I will send it.

I have attached the invoice, in case you have not seen it yet by mail, email, or text previously.

Thank you for your attention to this matter.

Debbie Cooper

**Wayne Cooper Ag Services, LLC**
**www.waynecooperagservices.com**
7340 Atascadero Ave.
Atascadero, CA 93422
(805) 235-5218 Office
(805) 423-9144 Debbie - records
(805) 235-5218 Charity - scheduling

EXHIBIT 18

PAGE 316

Re: Pump Test invoice for Wayne Cooper Ag Services

From:  Wayne Cooper Ag Services (wcoop01@yahoo.com)

To:      lecoddingiv@icloud.com

Cc:      russells@rabbitridgewinery.com; steven.jones@philanthropywines.com; info@rabbitridgewinery.com

Date:  Wednesday, January 12, 2022, 03:30 PM PST

Mr. Russell,

Thanks for you response.

Your name is listed as the owner and winemaker on many websites and articles related to Rabbit Ridge winery and Vineyards. I would hope that you would be concerned and responsive to anything that would tarnish the business and label that you worked so hard and long to create.

You might not be legally responsible for this debt, but we did this work for your company and it is unfortunate that you do not feel personally responsible for the debts that your company incurred.

I hope this can be resolved soon.

Debbie Cooper

**Wayne Cooper Ag Services, LLC**
www.waynecooperagservices.com
7340 Atascadero Ave.
Atascadero, CA  93422
(805) 235-5218 Office
(805) 423-9144 Debbie - records
(805) 235-5218 Charity - scheduling

On Wednesday, January 12, 2022, 03:26:49 PM PST, Wayne Cooper Ag Services <wcoop01@yahoo.com> wrote:

Lee,

Thank you for your response and the phone call today.  Charity and I are a team and any correspondence with her also gets to me.  It has now been 5 months since this work was done, so it is definitely not settled and there has not ever been a plan communicated to us.  We have been patient up to this point, but we do not want you to think that we have forgotten about this bill or are going to let it go away.

Please let me know what your plan is, how and when you plan to pay this debt, and the sooner the better.

Thanks,

Debbie Cooper

**Wayne Cooper Ag Services, LLC**
www.waynecooperagservices.com
7340 Atascadero Ave.
Atascadero, CA  93422
(805) 235-5218 Office
(805) 423-9144 Debbie - records
(805) 235-5218 Charity - scheduling

On Tuesday, January 11, 2022, 05:55:15 PM PST, Lee Codding <lecoddingiv@icloud.com> wrote:

EXHIBIT 18

PAGE 317

Ms. Cooper,

Thank you for your email. I've been in constant contact with your colleague Ms. Doherty on this, in fact as recently as yesterday.

This is a concern and we have a plan to settle the bill. The circumstances are unique and we appreciate your patience. I'll call you at 9am tomorrow.

Best regards,

Lee


Lee Codding
Managing Member
Fluid Wine Fund I, LLC
952/220-8216 / lecoddingiv@icloud.com

> On Jan 11, 2022, at 5:29 PM, Wayne Cooper Ag Services <wcoop01@yahoo.com> wrote:
>
> Mr. Russell, Mrs. Russell, Mr. Jones, and Mr. Codding,
>
> I am writing to try and collect on a debt that is owed to Wayne Cooper Ag Services. We performed 6 electric pump tests for Rabbit Ridge Winery and the company, Fluid Advisors on August 10, 2021. We also did this as a rush job to accommodate your need for the results as soon as possible.
>
> It has been more than 5 months now since this work was performed for your company and we have not received any payment, only a few correspondences from Mr. Codding and promises to pay. We have attempted to contact and or collect at least 8 times over the last 5 months, with no results.
>
> Like you, we are a family owned and operated company. We are in business to help farmers, vintners, municipalities and other businesses manage, conserve and sustain our precious resource of water. This is something that many of your websites also claim that you are committed to. We donate, volunteer, live, worship, raise our children and serve on the central coast where you also do business. It is heartbreaking that you claim to run humanitarian, philanthropic and charitable companies but have to do so on the backs of small, family owned companies that you hire to do services and then never pay, and apparently never had any intention of paying. This $1600 bill is apparently not a big deal to you, but it is to us.
>
> We have been in business for over 20 years. Right here, based in Atascadero, traveling up and down the state of California performing pump tests, measuring water levels and more. We have never had this situation, where a company, especially an established winery, has just refused to pay us for the work that we performed, or even taken 5 months to pay. I know that there are many many companies, holdings, and groups associated with all of you and your names. We will continue to send our invoice to any and all addresses and emails associated with all of these companies until we find the correct one that belongs to whomever is responsible and will pay this bill.
>
> Please let me know if you have an email address, mailing address, phone number, PO Box, etc. for anyone else to send this invoice to that is responsible for payment. Rest assured, I will send it.
>
> I have attached the invoice, in case you have not seen it yet by mail, email, or text previously.
>
> Thank you for your attention to this matter.
>
>
> Debbie Cooper
>
>
> **Wayne Cooper Ag Services, LLC**
> **www.waynecooperagservices.com**
> 7340 Atascadero Ave.
> Atascadero, CA 93422
> (805) 235-5218 Office

EXHIBIT 18

PAGE 318

Lee Codding

From:  charity doherty (charitydoherty@hotmail.com)

To:    wcoop01@yahoo.com

Date:  Wednesday, March 9, 2022, 04:14 PM PST



EXHIBIT 18

PAGE 319



EXHIBIT 18

PAGE 320



Hi Charity-

EXHIBIT 18

PAGE 321



4:12

Hi Lee,
Checking in.
Anthony Riboli is wanting to
schedule a pump test.
We would like to be paid for the
others please.

Hi Lee, checking in again.
This small business could sure
use a little niceness from you.
We spent all day working for you!
Thanks so much.
Charity

Hi Charity-
I don't wanna waste your time
but I'd like to schedule a call to
talk about this.

I'm waiting for reimbursement
from the so-called US trustee.
That's where your funds are
coming from too.
He's in breach of contract since
December.

Charity Doherty

EXHIBIT 18

PAGE 322

**EXHIBIT 19**

PAGE 323

**From:** Trycel Alvarez-Pihl <Trycel@javwine.com>
**Sent:** Thursday, March 17, 2022 4:01 PM
**To:** Tinho Mang <tmang@marshackhays.com>; Jeff Kandarian <jeff@javwine.com>; Ljensley <ljensley@aol.com>
**Cc:** Richard Marshack <RMarshack@MarshackHays.com>; Zephyr Peling <Zephyr@javwine.com>
**Subject:** RE: John Anthony Wine Payment

This is for Rabbit Ridge 0.33 tons of Syrah and 2.71 tons of CS?

We sent checks in December, however I check and they have not been cashed.  Please confirm to whom and where you would like the payments to go.

Thank you,

Trycel Alvarez-Pihl
**Vice President of Finance**
John Anthony Family of Wines
c: 707.479.0928

Trycel@JAVWine.com
JohnAnthonyFamilyofWines.com
JaM Cellars | John Anthony Vineyards | Serial Wines | Weather Wines | Wishlist
P.O. Box 120, Napa CA 94559

CONNECT in | SHARE f | ENJOY >

**From:** Tinho Mang <tmang@marshackhays.com>
**Sent:** Thursday, March 17, 2022 3:52 PM
**To:** Jeff Kandarian <jeff@javwine.com>; Ljensley <ljensley@aol.com>
**Cc:** Richard Marshack <RMarshack@MarshackHays.com>; Trycel Alvarez-Pihl <Trycel@javwine.com>; Zephyr Peling <Zephyr@javwine.com>
**Subject:** RE: John Anthony Wine Payment

We do not have any contract showing the correct price per ton of grapes, so we cannot generate an invoice. Our farm operator Lee Codding has also failed to provide a copy of the purchase contract to us. Please provide us with the full contract (not just the addendum) so we can generate the invoice. Thank you sir.

Tinho

**From:** Jeff Kandarian <jeff@javwine.com>
**Sent:** Thursday, March 17, 2022 3:32 PM

1

EXHIBIT 19
PAGE 324

**To:** Ljensley <ljensley@aol.com>
**Cc:** Richard Marshack <RMarshack@MarshackHays.com>; Tinho Mang <tmang@marshackhays.com>; Trycel Alvarez-Pihl <Trycel@javwine.com>; Zephyr Peling <Zephyr@javwine.com>
**Subject:** Re: John Anthony Wine Payment

My accounting team informed me they never received an invoice.  They are now copied. Please reforward or provide invoice for the grapes in question.

Cheers,

Jeff Kandarian
**Executive Vice President Of Winemaking**
John Anthony Family of Wines
c: 541.520.3319

Jeff@JAVWine.com
JohnAnthonyFamilyofWines.com
JaM Cellars | John Anthony Vineyards | Serial Wines | Weather Wines | Wishlist
P.O. Box 120, Napa CA 94559

CONNECT **in** | SHARE **f** | ENJOY >
Sent from my iPhone

On Mar 17, 2022, at 9:48 AM, Ljensley <ljensley@aol.com> wrote:


Dear Jeff:

I am the agent for the trustee, Richard Marshack, and we have not yet received payment on the grapes you bought from Northern Holdings. When can we expext payment? It is overdue.

Thank you,

Lori Ensley
Agent for the Trustee
(909) 239-9875

2

EXHIBIT 19
PAGE 325

# VINO TINTO CONSULTING

Office Phone: 1-909-391-1582 Cell Phone: 1-909-855-7235 CDFA License #: M17416

E-Mail: vinotintocons@aol.com /536 N. Cucamonga Ontario, Calif. 91764

## WINE GRAPE PURCHASE AGREEMENT

This Agreement is made and entered into this 30th day of April, 2021. By and between Rabbit Ridge Wine Sales, Inc. 1172 San Marcos Road Paso Robles, California 93446 , referred to herein as the "Seller" and John Anthony Vineyards, LLC PO Box 120 Napa, California 94559, herein referred to as the "Buyer".

**THE GRAPES REFERRED TO IN THIS AGREEMENT ARE AS DESCRIBED BELOW:**

| AVA | DISTRICT | VARIETY | VINEYARD ADDRESS | RANCH | BLOCK/ACRES | TONS |
|-----|----------|---------|------------------|-------|-------------|------|
| Paso Robles | Willow Creek | Syrah | 2380 Live Oak Road Paso Robles, Cal. 93446 | Live Oak | F1- 13 Top | 3 |

1.  **PURCHASE QUANTITY:** Seller shall not be liable or obligated to supply grapes Buyer beyond the actual yields of the vineyard (s) described in this Agreement. The weight for payment of the grapes will be determined by a licensed winery weigh master on a certified scale. Actual tonnage delivered to the Buyer may vary from year to year given the variations of the yield in the vineyard described herein. The minimum acceptable tonnage per acre shall be 1.5 tons per acre and the maximum 3 tons to the acre. The Seller shall perform a minimum of one green drop prior to harvest.  The term "Product of the Blocks" as it pertains to this Agreement shall mean all grapes produced by the Blocks.

2. **QUALITY/CHEMISTRY:** The minimum Brix acceptable to the Buyer shall be 24 Brix and the Maximum Brix level being 27 Brix with a target of 26 Brix at harvest. The determination of picking date shall be at the discretion of the Buyer with reasonable consideration to the Seller as to the overall quality of the crop at harvest.

3. **HARVEST AND DELIVERY:** The grapes shall be harvested by hand in the early morning hours into one half ton bins supplied by the Buyer. Said bins shall be delivered at the cost of the Buyer in a timely manner and in sufficient quantity to

EXHIBIT 19
PAGE 326

transport the grapes described in this Agreement. The costs of arranging for and the harvest of the grapes shall be paid by the Seller. The cost of arranging for and the delivery of the grapes to the Buyers processing facility shall be paid by the Buyer. The Buyer shall inform the Seller in a timely manner of the type of transport in which the Buyer will make delivery of the grapes as well as any special equipment that may be required. Neither party shall cause unreasonable delay in the delivery of the grapes to the Buyers processing facility.

**4. TERM.** The term of this Agreement which shall commence on the date thereof, shall be for the grape crop year of 2021 (A 1 year Agreement). With a 1 year Evergreen Extension to be exercised by either party on or before the designated Date of Notice of March 15, 2022. Notice of Cancellation and or Proposal of Alterations to this Agreement by either party must be made in writing and received via U. S. Mail on or before the Date of Notice. If no notice is received by either party the Agreement shall continue on as written until such time. The first opportunity after March 15, 2022 to alter this Agreement shall be on or before March 15, 2023. With any changes taking affect for the crop year 2023.

**5. COMPLIANCE WITH LAWS:** Seller warrants that in compliance with any and all laws and regulations that all grapes under this contract, at the point of delivery to buyer, shall not be adulterated or misbranded within the meaning of any law including the Federal Food, Drug and Cosmetics Act as amended (21 U.S.C Section 301, et seq. - the "Act") nor will they be an article which may not, under the Provisions of Section 404 and 405 of the Act be introduced to Interstate commerce. Seller further warrants that grapes will not contain pesticide residue prohibited by or in excess of tolerances established by any state and/or federal regulatory authority and that the grapes shall meet all standards of the Act and the Sherman Food, Drug and Cosmetics Law, California Health and Safety Code, Section 26,000 et seq.

**6. QUALITY STANDARDS:** Buyer will accept for purchase from the seller only those grapes meeting the following minimum quality standards. All grapes, at the point of delivery to buyer, shall be sound, fully matured, ripe and in merchandisable condition with all containers, at the point of delivery to buyer, having less than 2% defects by weight and not more than 2% material other than grapes (MOG). At the time of delivery all grapes shall be in suitable condition for processing by the buyer. For the purpose of this agreement the term "Defects" shall include, but not be limited to, decomposition of decay induced by Fungi or Bacteria, damage caused by exposure to sub-freezing temperatures and breaks in grape skins not caused by mechanical

EXHIBIT 19
PAGE 327

harvest. For the purpose of this agreement, materials other than grapes shall include, but not limited to, leaves, leaf stems, grape canes, trellis, or irrigation construction materials and any other non grape material.

**7. PRICE PER TON:** The purchase price for the Syrah wine grapes described above shall be $4,000.00 per ton.

**8. PAYMENT TERMS:** Payment in full for the Syrah wine grapes described in this Agreement shall be made in two equal payments. The first payment within 30 days of harvest and the second on or about December 15 of the grape crop year in which the fruit was harvested. Seller to Invoice Buyer

**9. SALES COMMISION TO VINO TINTO CONSULTING:** 3% of the gross value of the Agreement from the Seller. Vino Tinto Consulting to Invoice Seller.

**10. SELLERS WARRANTIES:** The Seller warranties that #1. The Seller is the sole owner of the grapes described in this agreement. #2. The Seller has the full right and authority to enter into this Agreement. #3. The Seller will deliver the Grapes described in this Agreement to the Buyer free of any and all crop mortgages, liens, security interests and other encumbrances except as notified in writing.

**11. LITIGATION OF DISAGREEMENTS:** In the event of a disagreement between the parties arising as a result of this Agreement. The parties reserve the right to seek relief in the Superior Court of the State of California, County of San Luis Obispo. Or upon the agreement of the parties, Binding Arbitration. A single Arbitrator, agreed upon by the parties, with sufficient knowledge of the wine grape and or wine industry shall be chosen to conduct the proceeding. The costs of which to be borne by the losing party.

**12. NOTICES:** All contacts regarding this agreement should be forwarded:

**If to Seller:**
Mr. Lee Codding
Rabbit Ridge Wine Sales, Inc.
1172 San Marcos Road
Paso Robles, California 93446
Cell Phone: 1-925-220-8216
E-Mail: lecoddingiv@icloud.com

EXHIBIT 19
PAGE 328

**If to Buyer:**
Mr. Jeff Kandarian
John Anthony Wines, LLC
P. O. Box 120
Napa, California 94559
Cell Phone: 1-541-520-3319
E-Mail: jeff@JAVwine.com

AFTER CAREFULLY READING AND FULLY UNDERSTANDING THE AGREEMENT AS SET FORTH
ABOVE. THE UNDERSIGNED PARTIES DO WITH OUR AUTHORIZED SIGNATURES BELOW DO
HEREBY AGREE TO THE TERMS CONDITIONS AND SPIRIT OF THE GRAPE SALES
AGREEMENT.

**Agreed to by:**

For: Rabbit Ridge Wine Sales, Inc.          For: John Anthony Vineyards, LLC

Signature: _____          _____

Print Name: ___Lee Cadding___          ___Jeff Kandarian___

Title: ___G.M.___          ___winemaker___

Date: ___5/1/2021___          ___4/30/21___

EXHIBIT 19
PAGE 329

# VINO TINTO CONSULTING

Office Phone: 1-909-391-1582 Cell Phone: 1-909-855-7235 CDFA License #: M17416
E-Mail: vinotintocons@aol.com /536 N. Cucamonga Ontario, Calif. 91764

## WINE GRAPE PURCHASE AGREEMENT

This Agreement is made and entered into this 30th day of April, 2021. By and between Rabbit Ridge Wine Sales, Inc. 1172 San Marcos Road Paso Robles, California 93446 , referred to herein as the "Seller" and John Anthony Vineyards, LLC PO Box 120 Napa, California 94559, herein referred to as the "Buyer".

**THE GRAPES REFERRED TO IN THIS AGREEMENT ARE AS DESCRIBED BELOW:**

| AVA | DISTRICT | VARIETY | VINEYARD ADDRESS | RANCH | BLOCK/ACRES | TONS |
|-----|----------|---------|------------------|-------|-------------|------|
| Paso Robles | Willow Creek | Cabernet Sauvignon | 2380 Live Oak Road Paso Robles, Cal. 93446 | Live Oak | F3-B2 2.90 | 3 |

1. **PURCHASE QUANTITY:** Seller shall not be liable or obligated to supply grapes Buyer beyond the actual yields of the vineyard (s) described in this Agreement. The weight for payment of the grapes will be determined by a licensed winery weigh master on a certified scale. Actual tonnage delivered to the Buyer may vary from year to year given the variations of the yield in the vineyard described herein. The minimum acceptable tonnage per acre shall be 1.5 tons per acre and the maximum 3 tons to the acre. The Seller shall perform a minimum of one green drop prior to harvest.  The term "Product of the Blocks" as it pertains to this Agreement shall mean all grapes produced by the Blocks.

2. **QUALITY/CHEMISTRY:** The minimum Brix acceptable to the Buyer shall be 24 Brix and the Maximum Brix level being 27 Brix with a target of 26 Brix at harvest. The determination of picking date shall be at the discretion of the Buyer with reasonable consideration to the Seller as to the overall quality of the crop at harvest.

3. **HARVEST AND DELIVERY:** The grapes shall be harvested by hand in the early morning hours into one half ton bins supplied by the Buyer. Said bins shall be delivered at the cost of the Buyer in a timely manner and in sufficient quantity to

EXHIBIT 19
PAGE 330

transport the grapes described in this Agreement. The costs of arranging for and the harvest of the grapes shall be paid by the Seller. The cost of arranging for and the delivery of the grapes to the Buyers processing facility shall be paid by the Buyer. The Buyer shall inform the Seller in a timely manner of the type of transport in which the Buyer will make delivery of the grapes as well as any special equipment that may be required. Neither party shall cause unreasonable delay in the delivery of the grapes to the Buyers processing facility.

**4. TERM.** The term of this Agreement which shall commence on the date thereof, shall be for the grape crop year of 2021 (A 1 year Agreement). With a 1 year Evergreen Extension to be exercised by either party on or before the designated Date of Notice of March 15, 2022. Notice of Cancellation and or Proposal of Alterations to this Agreement by either party must be made in writing and received via U. S. Mail on or before the Date of Notice. If no notice is received by either party the Agreement shall continue on as written until such time. The first opportunity after March 15, 2022 to alter this Agreement shall be on or before March 15, 2023. With any changes taking affect for the crop year 2023.

**5. COMPLIANCE WITH LAWS:** Seller warrants that in compliance with any and all laws and regulations that all grapes under this contract, at the point of delivery to buyer, shall not be adulterated or misbranded within the meaning of any law including the Federal Food, Drug and Cosmetics Act as amended (21 U.S.C Section 301, et seq. - the "Act") nor will they be an article which may not, under the Provisions of Section 404 and 405 of the Act be introduced to Interstate commerce. Seller further warrants that grapes will not contain pesticide residue prohibited by or in excess of tolerances established by any state and/or federal regulatory authority and that the grapes shall meet all standards of the Act and the Sherman Food, Drug and Cosmetics Law, California Health and Safety Code, Section 26,000 et seq.

**6. QUALITY STANDARDS:** Buyer will accept for purchase from the seller only those grapes meeting the following minimum quality standards. All grapes, at the point of delivery to buyer, shall be sound, fully matured, ripe and in merchandisable condition with all containers, at the point of delivery to buyer, having less than 2% defects by weight and not more than 2% material other than grapes (MOG). At the time of delivery all grapes shall be in suitable condition for processing by the buyer. For the purpose of this agreement the term "Defects" shall include, but not be limited to, decomposition of decay induced by Fungi or Bacteria, damage caused by exposure to sub-freezing temperatures and breaks in grape skins not caused by mechanical

EXHIBIT 19
PAGE 331

harvest. For the purpose of this agreement, materials other than grapes shall include, but not limited to, leaves, leaf stems, grape canes, trellis, or irrigation construction materials and any other non grape material.

**7. PRICE PER TON:** The purchase price for the Cabernet Sauvignon wine grapes described above shall be $4,000.00 per ton.

**8. PAYMENT TERMS:** Payment in full for the Cabernet Sauvignon wine grapes described in this Agreement shall be made in two equal payments. The first payment within 30 days of harvest and the second on or about December 15 of the grape crop year in which the fruit was harvested. Seller to Invoice Buyer

**9. SALES COMMISION TO VINO TINTO CONSULTING:** 3% of the gross value of the Agreement from the Seller. Vino Tinto Consulting to Invoice Seller.

**10. SELLERS WARRANTIES:** The Seller warranties that #1. The Seller is the sole owner of the grapes described in this agreement. #2. The Seller has the full right and authority to enter into this Agreement. #3. The Seller will deliver the Grapes described in this Agreement to the Buyer free of any and all crop mortgages, liens, security interests and other encumbrances except as notified in writing.

**11. LITIGATION OF DISAGREEMENTS:** In the event of a disagreement between the parties arising as a result of this Agreement. The parties reserve the right to seek relief in the Superior Court of the State of California, County of San Luis Obispo. Or upon the agreement of the parties, Binding Arbitration. A single Arbitrator, agreed upon by the parties, with sufficient knowledge of the wine grape and or wine industry shall be chosen to conduct the proceeding. The costs of which to be borne by the losing party.

**12. NOTICES:** All contacts regarding this agreement should be forwarded:

**If to Seller:**
Mr. Lee Codding
Rabbit Ridge Wine Sales, Inc.
1172 San Marcos Road
Paso Robles, California 93446
Cell Phone: 1-925-220-8216
E-Mail: lecoddingiv@icloud.com

EXHIBIT 19
PAGE 332

**If to Buyer:**
Mr. Jeff Kandarian
John Anthony Wines, LLC
P. O. Box 120
Napa, California 94559
Cell Phone: 1-541-520-3319
E-Mail: jeff@JAVwine.com

AFTER CAREFULLY READING AND FULLY UNDERSTANDING THE AGREEMENT AS SET FORTH
ABOVE. THE UNDERSIGNED PARTIES DO WITH OUR AUTHORIZED SIGNATURES BELOW DO
HEREBY AGREE TO THE TERMS CONDITIONS AND SPIRIT OF THE GRAPE SALES
AGREEMENT.

Agreed to by:

For: Rabbit Ridge Wine Sales, Inc.          For: John Anthony Vineyards, LLC

Signature: _____              _____

Print Name: ___Lee Gdding_____             ___Jeff Kandarian_____

Title: _____G.M_____                      ___winemaker_____

Date: _____5/1/21_____                      ___4/30/21_____

EXHIBIT 19
PAGE 333

**EXHIBIT 20**

**Subject:**               FW: Northern Holding - Nevarez
**Attachments:**     Rabbit Ridge Account Summary With Payments.pdf

**From:** Juan Nevarez <juan@nevarezfarmlabor.com>
**Sent:** Monday, March 28, 2022 4:47 PM
**To:** Richard Marshack <RMarshack@MarshackHays.com>; Eufemia Nevarez <eufemia@nevarezfarmlabor.com>
**Cc:** Tinho Mang <tmang@marshackhays.com>; Accounting <accounting@nevarezfarmlabor.com>; Pam Kraus
<pkraus@marshackhays.com>
**Subject:** RE: Northern Holding - Nevarez

Hello all good afternoon,

I have reviewed our accounting system and found an error in our Interest rate schedule. As pointed out by Mr. Mang
The interest rate was being reflected as 12% on the monthly total rather than the appropriate 12% per annum. I have
attached the breakdown to hopefully answer all of your questions regarding outstanding balances and type of services
furnished. Please See Below. On another note we don't know who Mr Jones and Mr Codding intend to sue. We were
invited to join some legal resources they are currently engaging with. We are not interested in joining in with such
actions. We are just interested in forwarding these invoices to the appropriate parties to get the balances paid.

Warm Regards
Juan Nevarez
805-835-5986

| Invoice # | 2217 | 2386 | 2422 | 2439 | 2438 | 2470 |
|---|---|---|---|---|---|---|
| Invoice Amount | $ 7,577.47 | $6,183.50 | $7,134.96 | $ 9,743.44 | $5,042.97 | $11,439.50 |
| Annual Interest Rate | 12% | 12% | 12% | 12% | 12% | 12% |
| Compounding Periods Per Year | 12 | 12 | 12 | 12 | 12 | 12 |
| Past Due Period in Months | 12.36 | 10.56 | 10.32 | 10.08 | 10.08 | 9.84 |
| Interest Charges | $991.65 | $ 685.10 | $ 771.61 | $ 1,027.95 | $ 532.04 | $ 1,176.72 |
| Total Due | $8,569.12 | $6,868.60 | $7,906.57 | $10,771.39 | $5,575.01 | $12,616.22 |

| Category | Totals |
|---|---|
| Invoice Ammount | $ 56,803.97 |
| Interest Charges | $6,155.55 |
| Total Due As Of 3/28/22 | $ 62,959.52 |

Labor Analysis Charts

| Property Location | Rabbit Ridge Live Oak | Rabbit Ridge San Marcos | Total Hours |
|---|---|---|---|
| Total Labor Hours | 5373.5 | 1999 | 7372.5 |

1

EXHIBIT 20
PAGE 335



| | |
|---|---|
| Prunning | 1874 |
| Tying | 1256 |
| Training Plants | 1262 |
| Shoot Thinning | 2853.5 |
| Trellis Wire Adjustment | 127 |
| Total Labor Hours | 7372.5 |



**From:** Richard Marshack <RMarshack@MarshackHays.com>
**Sent:** Monday, March 28, 2022 6:43 AM
**To:** Eufemia Nevarez <eufemia@nevarezfarmlabor.com>
**Cc:** Tinho Mang <tmang@marshackhays.com>; Accounting <accounting@nevarezfarmlabor.com>; Pam Kraus <pkraus@marshackhays.com>; Juan Nevarez <juan@nevarezfarmlabor.com>
**Subject:** Re: Northern Holding - Nevarez

Good morning and thank you for your e mail.   I am the Bankruptcy Trustee assigned to the case.

EXHIBIT 20
PAGE 336

I will meet with my attorney, Tinho Mang, and figure out how to respond.  We feel terrible that you were not paid.  Have you been paid any sums of money?

What work were your employees doing at the winery?  Were your employees doing any bottling?  What percentage of the work was picking grapes?

Who was Steve Jones intending to sue?

I do not know if you understand the relationship with Lee Codding and me.  I hired his company to do several things including maintain the vines and pick the grapes.  From the sales proceeds he would be reimbursed if and when we received a timely and full accounting required under the agreement.

I hope to analyze and resolve this soon.  It is complicated because Northern is not responsible to pay your company.  Our obligation to reimburse, if any,  runs to Rabbit Ridge.  We have substantial unresolved accounting issues with them.

Richard Marshack
MARSHACK HAYS LLP
870 Roosevelt
Irvine, CA 92620
Telephone: (949) 333-7777

(Sent from my iPad)

> On Mar 27, 2022, at 11:26 PM, Eufemia Nevarez <eufemia@nevarezfarmlabor.com> wrote:
>
> Hello Tinho,
>
> I apologize for the delay in getting back to you. I was out of the office for a funeral out of town.
>
> I have attached the invoices and accompanying Grower Labor Reports (GLR) for each invoice. I have also attached an account summary and Past Due Balance Letter issued to Rabbit Ridge after 90 days with no payments.
>
> We also have corresponding emails with Steven Jones and Lee Codding. Our accounting department did most of the correspondence and I need to locate those emails. Most of the payments made on this account came from checks from Northern Holding LLC and a few from Rabbit Ridge Wine Sales. We have copies of those checks if you need them. Please let me know if you need anything else from us. The best address to send mail is 5880 N River Road Paso Robles, CA 93446.
>
> This account created a financial burden to our company, and we were forced to tap into our credit lines to carry this balance. We delivered our services and held our end of the deal and when our invoices were delivered in a timely manner the invoices were ignored. After no payments were received for 90 days, we let Rabbit Ridge know of our intentions to collect the original invoice amount and notified them of our intentions to apply interest to the unpaid balance. Steven Jones accepted the terms and requested additional time to pay as he was working on getting funds released to pay our unpaid invoices. The last communication we had with Steven was him saying we (NFL) should join him in a lawsuit. We have not communicated with him since then and we do not wish to sue anyone at this time as all we would like is for this account to be paid in full.
>
> *Eufemia Nevarez*

3

EXHIBIT 20
PAGE 337

*5880 N River Road*
*Paso Robles, CA 93446*
*805-478-1416*

---

**From:** Tinho Mang <tmang@marshackhays.com>
**Sent:** Friday, March 25, 2022 3:09 PM
**To:** Accounting <accounting@nevarezfarmlabor.com>
**Cc:** Richard Marshack <RMarshack@MarshackHays.com>; Pam Kraus <pkraus@marshackhays.com>
**Subject:** RE: Northern Holding - Nevarez

Hi Eufenia,

I am following up on this email from Wednesday. I need those invoices for the unpaid farm labor which you informed me were approximately $70,000. The trustee is copied on this so please reply all when responding with the invoices.

Tinho

---

**From:** Tinho Mang
**Sent:** Wednesday, March 23, 2022 2:28 PM
**To:** accounting@nevarezfarmlabor.com
**Cc:** Richard Marshack <RMarshack@MarshackHays.com>; Pam Kraus <PKraus@marshackhays.com>
**Subject:** RE: Northern Holding - Nevarez

Hi,

This is Tinho Mang, I got the voicemail about some possible unpaid invoices for Nevarez Farm Labor. Please forward these invoices to me as soon as you can and the trustee for Northern Holding (copied here) will review for payment.

Please also provide us with the best address with which to send legal papers to, in case there is a need for the trustee to obtain a court order to authorize the payment.

Tinho

_____
Working remotely.

EXHIBIT 20
PAGE 338

Nevarez Farm Labor, Inc.
Customer Account Inquiry

Account # 75
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA  93446
Phone:

Starting Date:  01/01/2021
Ending Date:  03/28/2022

| Date | Invoice # | Cust PO # | Inv Total | Amt Paid | Disc | Bal Due | Date | Check # | Age |
|------|-----------|-----------|-----------|----------|------|---------|------|---------|-----|
| 01/15/2021 | 2058.00 | | 6,704.44 | 6,704.44 | | 0.00 | 01/21/2021 | 2016 | 6 |
| 01/22/2021 | 2098.00 | | 6,416.40 | 6,416.40 | | 0.00 | 02/22/2021 | 1307 | 31 |
| 01/29/2021 | 2099.00 | | 5,721.12 | 5,721.12 | | 0.00 | 02/08/2021 | 1304 | 10 |
| 02/04/2021 | 2141.00 | | 5,403.28 | 5,403.28 | | 0.00 | 03/02/2021 | 1308 | 26 |
| 02/11/2021 | 2142.00 | | 6,098.56 | 6,098.56 | | 0.00 | 03/09/2021 | 1312 | 26 |
| 02/18/2021 | 2155.00 | | 5,989.30 | 5,989.30 | | 0.00 | 03/16/2021 | 1314 | 26 |
| 02/25/2021 | 2163.00 | | 6,754.10 | 6,754.10 | | 0.00 | 03/23/2021 | 1313 | 26 |
| 03/04/2021 | 2196.00 | | 8,354.95 | 8,354.95 | | 0.00 | 03/30/2021 | 1315 | 26 |
| 03/11/2021 | 2199.00 | | 13,650.00 | 13,650.00 | | 0.00 | 04/06/2021 | 1317 | 26 |
| 03/18/2021 | 2217.00 | | 7,577.47 | 0.00 | | 7,577.47 | | | 375 |
| 03/25/2021 | 2255.00 | | 10,712.72 | 10,712.72 | | 0.00 | 05/06/2021 | 1305 | 42 |
| 04/01/2021 | 2294.00 | | 5,286.49 | 5,286.49 | | 0.00 | 04/11/2021 | 1318 | 10 |
| 05/06/2021 | 2368.00 | | 5,500.55 | 5,500.55 | | 0.00 | 05/31/2021 | 1325 | 25 |
| 05/12/2021 | 2386.00 | | 6,183.50 | 0.00 | | 6,183.50 | | | 320 |
| 05/13/2021 | 2387.00 | | 2,518.06 | 2,518.06 | | 0.00 | 07/26/2021 | 2157 | 74 |
| 05/18/2021 | 2422.00 | | 7,134.96 | 0.00 | | 7,134.96 | | | 314 |
| 05/20/2021 | 2403.00 | | 3,921.63 | 3,921.63 | | 0.00 | 07/02/2021 | 2158 | 43 |
| 05/26/2021 | 2439.00 | | 9,743.44 | 0.00 | | 9,743.44 | | | 306 |
| 05/27/2021 | 2438.00 | | 5,042.97 | 0.00 | | 5,042.97 | | | 305 |
| 06/03/2021 | 2470.00 | | 11,439.50 | 0.00 | | 11,439.50 | | | 298 |
| 06/09/2021 | 2471.00 | | 9,682.13 | 0.00 | | 9,682.13 | | | 292 |
| 03/28/2022 | 3247.00 | | 6,155.55 | 0.00 | | 6,155.55 | | | 0 |

Totals:                    155,991.12    93,031.60              62,959.52

| 0 to 30 | 31 to 60 | 61 to 90 | Over 90 | Invoices Due: | 62,959.52 |
|---------|----------|----------|---------|---------------|-----------|
| 6,155.55 | 0.00 | 0.00 | 56,803.97 | Unapplied Credit: | 0.00 |

Net Owed:        62,959.52

Number of Invoices Paid:  14
Average Days to Pay:  28

EXHIBIT 20
PAGE 339

**10.27.2021**

# FIRST NOTICE: Past Due Balance

**To: Rabbit Ridge**

**1172 San Marcos Rd**
**Paso Robles, CA**

**From: Nevarez Farm**
**Labor**

**5880 N. River Rd**
**Paso Robles, CA**

**CC:**

**Re: Past Due Balance**

Our records indicate you have an outstanding balance of $56,803.97, dating 06/09/21. I have attached a copy of the account summary and outstanding invoices.

If you have any questions about these invoices or wish to contest this debt, please contact Eufemia Nevarez at 805-478-1416 or Eufemia@nevarezfarmlabor.com.

Otherwise, please remit the outstanding balance by {11/15/21} to avoid late fees and/or interest accruing on the balance. Due to the balance not being paid in a timely manner, a credit line has been issued under your account and the balance of your account accrues interest. Please pay the outstanding balance of $56,803.97 to avoid the above-mentioned fees.

If the past due balance is not paid in full prior to 11/15/21 an interest fee of 12% will be added to the balance and this interest will accrue every month the balance is not paid in full.

Thank you for your attention to this matter.

## Nevarez Farm Labor

**Tel**: 805-478-1416          5880 N River Road Paso          accounting@
                              Robles, CA, 93446              nevarezfarmlabor.com



EXHIBIT 20
PAGE 340

Nevarez Farm Labor, Inc.
Customer Account Inquiry

Account # 75
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA  93446
Phone:

| Date | Invoice # | Cust PO # | Inv Total | Amt Paid | Disc | Bal Due | Date | Check # | Age |
|------|-----------|-----------|-----------|----------|------|---------|------|---------|-----|
| 01/15/2021 | 2058.00 | | 6,704.44 | 6,704.44 | | 0.00 | 01/21/2021 | 2016 | 6 |
| 01/22/2021 | 2098.00 | | 6,416.40 | 6,416.40 | | 0.00 | 02/22/2021 | 1307 | 31 |
| 01/29/2021 | 2099.00 | | 5,721.12 | 5,721.12 | | 0.00 | 02/08/2021 | 1304 | 10 |
| 02/04/2021 | 2141.00 | | 5,403.28 | 5,403.28 | | 0.00 | 03/02/2021 | 1308 | 26 |
| 02/11/2021 | 2142.00 | | 6,098.56 | 6,098.56 | | 0.00 | 03/09/2021 | 1312 | 26 |
| 02/18/2021 | 2155.00 | | 5,989.30 | 5,989.30 | | 0.00 | 03/16/2021 | 1314 | 26 |
| 02/25/2021 | 2163.00 | | 6,754.10 | 6,754.10 | | 0.00 | 03/23/2021 | 1313 | 26 |
| 03/04/2021 | 2196.00 | | 8,354.95 | 8,354.95 | | 0.00 | 03/30/2021 | 1315 | 26 |
| 03/11/2021 | 2199.00 | | 13,650.00 | 13,650.00 | | 0.00 | 04/06/2021 | 1317 | 26 |
| 03/18/2021 | 2217.00 | | 7,577.47 | 0.00 | | 7,577.47 | | | 374 |
| 03/25/2021 | 2255.00 | | 10,712.72 | 10,712.72 | | 0.00 | 05/06/2021 | 1305 | 42 |
| 04/01/2021 | 2294.00 | | 5,286.49 | 5,286.49 | | 0.00 | 04/11/2021 | 1318 | 10 |
| 05/06/2021 | 2368.00 | | 5,500.55 | 5,500.55 | | 0.00 | 05/31/2021 | 1325 | 25 |
| 05/12/2021 | 2386.00 | | 6,183.50 | 0.00 | | 6,183.50 | | | 319 |
| 05/13/2021 | 2387.00 | | 2,518.06 | 2,518.06 | | 0.00 | 07/26/2021 | 2157 | 74 |
| 05/20/2021 | 2403.00 | | 3,921.63 | 3,921.63 | | 0.00 | 07/02/2021 | 2158 | 43 |
| 05/18/2021 | 2422.00 | | 7,134.96 | 0.00 | | 7,134.96 | | | 313 |
| 05/27/2021 | 2438.00 | | 5,042.97 | 0.00 | | 5,042.97 | | | 304 |
| 05/26/2021 | 2439.00 | | 9,743.44 | 0.00 | | 9,743.44 | | | 305 |
| 06/03/2021 | 2470.00 | | 11,439.50 | 0.00 | | 11,439.50 | | | 297 |
| 06/09/2021 | 2471.00 | | 9,682.13 | 0.00 | | 9,682.13 | | | 291 |
| 11/16/2021 | 2927.00 | | 6,816.48 | 0.00 | | 6,816.48 | | | 131 |
| 12/16/2021 | 2990.00 | | 7,634.45 | 0.00 | | 7,634.45 | | | 101 |
| 01/16/2022 | 3050.00 | | 8,550.58 | 0.00 | | 8,550.58 | | | 70 |
| 02/16/2022 | 3108.00 | | 9,576.66 | 0.00 | | 9,576.66 | | | 39 |
| 03/16/2022 | 3228.00 | | 10,725.86 | 0.00 | | 10,725.86 | | | 11 |

| | | | Totals: | 193,139.60 | 93,031.60 | | 100,108.00 |
|---|---|---|---|---|---|---|---|

| 0 to 30 | 31 to 60 | 61 to 90 | Over 90 | Invoices Due: | 100,108.00 |
|---------|----------|----------|---------|---------------|------------|
| 10,725.86 | 9,576.66 | 8,550.58 | 71,254.90 | Unapplied Credit: | 0.00 |

Net Owed:    100,108.00

Number of Invoices Paid:  14
Average Days to Pay:  28

EXHIBIT 20
PAGE 341

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 03/18/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75          Grower Name: RABBIT RIDGE

Worker's Comp Co: Preferred Employers Inc.
Policy #: FLN-169583-1

| Acct # | Employee Name | Crew # | Day | Description | Type | Hours | Pieces | Rate | Amount |
|--------|---------------|--------|-----|-------------|------|-------|--------|------|--------|
| 5032 | ROMERO, LEONEL | LR | 08 | PRUNING | Reg. Hrs | 8.50 | | 17.0000 | 144.50 |
| 5032 | ROMERO, LEONEL | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 17.0000 | 119.00 |
| 5032 | ROMERO, LEONEL | LR | 13 | PRUNING | Reg. Hrs | 8.50 | | 17.0000 | 144.50 |
| 5032 | ROMERO, LEONEL | LR | 14 | PRUNING | Reg. Hrs | 8.50 | | 17.0000 | 144.50 |
| 17028 | MURILLO, ALESSANDRA | LR | 08 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17028 | MURILLO, ALESSANDRA | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 14.5000 | 101.50 |
| 17028 | MURILLO, ALESSANDRA | LR | 14 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17103 | PONCE CHAVEZ, JAVIER | LR | 08 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17103 | PONCE CHAVEZ, JAVIER | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 14.5000 | 101.50 |
| 17103 | PONCE CHAVEZ, JAVIER | LR | 13 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17111 | TELLEZ SANTIAGO, ZENAIDA | LR | 08 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17111 | TELLEZ SANTIAGO, ZENAIDA | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 14.5000 | 101.50 |
| 17111 | TELLEZ SANTIAGO, ZENAIDA | LR | 13 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17111 | TELLEZ SANTIAGO, ZENAIDA | LR | 14 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17115 | TELLEZ SANTIAGO, SALVADOR | LR | 08 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17115 | TELLEZ SANTIAGO, SALVADOR | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 14.5000 | 101.50 |
| 17115 | TELLEZ SANTIAGO, SALVADOR | LR | 13 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17115 | TELLEZ SANTIAGO, SALVADOR | LR | 14 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17364 | HERNANDEZ CASTILLOS, BEATRI | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 14.5000 | 101.50 |
| 17364 | HERNANDEZ CASTILLOS, BEATRI | LR | 13 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17364 | HERNANDEZ CASTILLOS, BEATRI | LR | 14 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17387 | NARANJO VELAZQUEZ, ESTEBAN | LR | 08 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17387 | NARANJO VELAZQUEZ, ESTEBAN | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 14.5000 | 101.50 |
| 17387 | NARANJO VELAZQUEZ, ESTEBAN | LR | 13 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17387 | NARANJO VELAZQUEZ, ESTEBAN | LR | 14 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17406 | TELLES-SANTIAGO, GONZALO | LR | 08 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17406 | TELLES-SANTIAGO, GONZALO | LR | 09 | PRUNING | Reg. Hrs | 7.00 | | 14.5000 | 101.50 |
| 17406 | TELLES-SANTIAGO, GONZALO | LR | 13 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 17406 | TELLES-SANTIAGO, GONZALO | LR | 14 | PRUNING | Reg. Hrs | 8.50 | | 14.5000 | 123.25 |
| 16632 | LEONARDO GALVEZ, JAVIER | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 16632 | LEONARDO GALVEZ, JAVIER | AL | 14 | PRUNING | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17003 | LEONARDO GALVEZ, RAUL | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17003 | LEONARDO GALVEZ, RAUL | AL | 13 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17004 | ORTIZ GALVEZ, LAURA | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17026 | AMADO LEON, PAULINO | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17026 | AMADO LEON, PAULINO | AL | 13 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17034 | LEONARDO GALVEZ, ADOLFO | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17034 | LEONARDO GALVEZ, ADOLFO | AL | 13 | PRUNING | Reg. Hrs | 8.50 | | 16.0000 | 136.00 |
| 17034 | LEONARDO GALVEZ, ADOLFO | AL | 14 | PRUNING | Sick Pay | 8.00 | | 16.0000 | 128.00 |
| 17042 | ALBINO DE JESUS, ARELIANO | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17141 | ORTIZ GALVEZ, MAXIMILIANO | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17373 | ROJAS AMADO, MAURILIO | AL | 08 | PRUNING | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17373 | ROJAS AMADO, MAURILIO | AL | 14 | PRUNING | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17401 | MARTINEZ MATEO, JAVIER | AL | 08 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17401 | MARTINEZ MATEO, JAVIER | AL | 13 | PRUNING | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17401 | MARTINEZ MATEO, JAVIER | AL | 14 | PRUNING | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |

Total for Crop ID RABLIVE Rabbit Ridge Live oak          369.50          5,531.00

Gross Wages, This Report:          361.50          5,531.00
8.00 Sick Pay Hours

**Employee information for the week ending 03/14/2021:**

| Employee Name/Address | S.S. #/Acct # | Hours | Pieces | Report Wages | Gross Wages | SDI | FICA Medicare | Fed Wht St Wht | Other | Net Check | Check # |
|----------------------|----------------|-------|--------|--------------|-------------|-----|---------------|----------------|-------|-----------|---------|
| ALBINO DE JESUS, ARELIANO 724 23RD STREET UNIT B PASO ROBLES, CA 93446 | XXX-XX-1872 17042 | 8.00 | 0 | 120.00 | 247.50 | 2.97 | 15.35 3.59 | 0.00 0.00 | 0.00 | 225.59 | 174116 |
| AMADO LEON, PAULINO 3025 VINE ST | XXX-XX-9797 17026 | 16.00 | 0 | 240.00 | 360.00 | 4.32 | 22.32 5.22 | 0.00 0.00 | 0.00 | 328.14 | 174114 |

EXHIBIT 20
PAGE 342

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date:  03/18/2021
Farm Labor #:  FLC000172472
Federal ID #:  77-0550948
State ID #:  513-8203-4
Grower #:  75    Grower Name:  RABBIT RIDGE

Worker's Comp Co:  Preferred Employers Inc.
Policy #:  FLN-169583-1

| Name / Address | ID | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| HERNANDEZ CASTILLOS, BEATRIZ 5815 VISTA SERRANO PASO ROBLES, CA 93446 | XXX-XX-1472 17364 | 24.00 | 0 | 348.00 | 348.00 | 4.18 | 21.58 5.05 | 0.00 0.00 | 0.00 | 317.19 | 174082 |
| LEONARDO GALVEZ, ADOLFO 1339 STONEY CREEK ROAD PASO ROBLES, CA 93446 | XXX-XX-2159 17034 | 16.50 | 0 | 392.00 | 528.00 | 6.34 | 32.74 7.66 | 0.00 0.00 | 0.00 | 481.26 | 174115 |
| LEONARDO GALVEZ, JAVIER 151 FEIN AVE #B PASO ROBLES, CA 93446 | XXX-XX-0654 16632 | 16.50 | 0 | 247.50 | 375.00 | 4.50 | 23.25 5.44 | 0.00 0.00 | 0.00 | 341.81 | 174111 |
| LEONARDO GALVEZ, RAUL 515 FEIN AVE #B PASO ROBLES, CA 93446 | XXX-XX-6182 17003 | 16.00 | 0 | 240.00 | 367.50 | 4.41 | 22.78 5.33 | 0.00 0.00 | 0.00 | 334.98 | 174112 |
| MARTINEZ MATEO, JAVIER 1213 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-8326 17401 | 24.50 | 0 | 367.50 | 367.50 | 4.41 | 22.79 5.33 | 0.00 0.00 | 0.00 | 334.97 | 174119 |
| MURILLO, ALESSANDRA 346 12TH ST #B SAN MIGUEL, CA 93451 | XXX-XX-7549 17028 | 24.00 | 0 | 348.00 | 348.00 | 4.17 | 21.58 5.05 | 0.00 0.00 | 0.00 | 317.20 | 174078 |
| NARANJO VELAZQUEZ, ESTEBAN 1355 MISSION ST SAN MIGUEL, CA 93451 | XXX-XX-7804 17387 | 32.50 | 0 | 471.25 | 471.25 | 5.66 | 29.22 6.84 | 0.00 0.00 | 0.00 | 429.53 | 174083 |
| ORTIZ GALVEZ, LAURA 515 FEIN AVE #B PASO ROBLES, CA 93446 | XXX-XX-8773 17004 | 8.00 | 0 | 120.00 | 120.00 | 1.44 | 7.44 1.74 | 0.00 0.00 | 0.00 | 109.38 | 174113 |
| ORTIZ GALVEZ, MAXIMILIANO 3520 SPRING STREET APT# 202 PASO ROBLES, CA 93446 | XXX-XX-3244 17141 | 8.00 | 0 | 120.00 | 240.00 | 2.88 | 14.88 3.48 | 0.00 0.00 | 0.00 | 218.76 | 174117 |
| PONCE CHAVEZ, JAVIER 1530 N STREET SAN MIGUEL, CA 93451 | XXX-XX-5893 17103 | 24.00 | 0 | 348.00 | 348.00 | 4.17 | 21.58 5.04 | 0.00 0.00 | 0.00 | 317.21 | 174079 |
| ROJAS AMADO, MAURILIO 121 OAK STREET PASO ROBLES, CA 93446 | XXX-XX-8585 17373 | 13.50 | 0 | 202.50 | 330.00 | 3.96 | 20.46 4.79 | 0.00 0.00 | 0.00 | 300.79 | 174118 |
| ROMERO, LEONEL PO BOX 750 5032 SAN MIGUEL, CA 93451 | XXX-XX-7641 | 32.50 | 0 | 552.50 | 552.50 | 6.63 | 34.25 8.01 | 0.00 0.00 | 0.00 | 503.61 | 174077 |
| TELLES-SANTIAGO, GONZALO 1220 L STREET SAN MIGUEL, CA 93451 | XXX-XX-4977 17406 | 32.50 | 0 | 471.25 | 471.25 | 5.65 | 29.22 6.83 | 0.00 0.00 | 0.00 | 429.55 | 174084 |
| TELLEZ SANTIAGO, ZENAIDA 3200 SPRING ST APT 25 PASO ROBLES, CA 93446 | XXX-XX-4722 17111 | 32.50 | 0 | 471.25 | 471.25 | 5.66 | 29.22 6.83 | 0.00 0.00 | 0.00 | 429.54 | 174080 |
| TELLEZ SANTIAGO, SALVADOR 3200 SPRING STREET #24 PASO ROBLES, CA 93446 | XXX-XX-4735 17115 | 32.50 | 0 | 471.25 | 471.25 | 5.66 | 29.22 6.84 | 0.00 0.00 | 0.00 | 429.53 | 174081 |
| Totals: | | 361.50 | 0 | 5,531.00 | 6,417.00 | 77.01 | 397.88 93.07 | 0.00 0.00 | 0.00 | 5,849.04 | |

EXHIBIT 20
PAGE 343



**Invoice**

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

03/08/2021 to 03/14/2021

**Invoice #:** 2217
**Invoice Date:** 03/18/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| AURELIANO ALBINO D | 8.00 | Hrs | 15.00 | 120.00 |
| PAULINO AMADO LEON | 16.00 | Hrs | 15.00 | 240.00 |
| BEATRIZ HERNANDEZ CASTILLOS | 24.00 | Hrs | 14.50 | 348.00 |
| ADOLFO LEONARDO GALVEZ | 16.50 | Hrs | 16.00 | 264.00 |
| ADOLFO LEONARDO GALVEZ | 8.00 | SP | 16.00 | 128.00 |
| JAVIER LEONARDO GALVEZ | 16.50 | Hrs | 15.00 | 247.50 |
| RAUL LEONARDO GALVEZ | 16.00 | Hrs | 15.00 | 240.00 |
| JAVIER MARTINEZ MATEO | 24.50 | Hrs | 15.00 | 367.50 |
| ALESSANDRA MURILLO | 24.00 | Hrs | 14.50 | 348.00 |
| ESTEBAN NARANJO VELAZQUEZ | 32.50 | Hrs | 14.50 | 471.25 |
| LAURA ORTIZ GALVEZ | 8.00 | Hrs | 15.00 | 120.00 |
| MAXIMILIANO ORTIZ GALVEZ | 8.00 | Hrs | 15.00 | 120.00 |
| JAVIER PONCE CHAVEZ | 24.00 | Hrs | 14.50 | 348.00 |
| MAURILIO ROJAS AMADO | 13.50 | Hrs | 15.00 | 202.50 |
| LEONEL ROMERO | 32.50 | Hrs | 17.00 | 552.50 |
| GONZALO TELLES-SANTIAGO | 32.50 | Hrs | 14.50 | 471.25 |
| ZENAIDA TELLEZ SANTIAGO | 32.50 | Hrs | 14.50 | 471.25 |
| SALVADOR TELLEZ SANTIAGO | 32.50 | Hrs | 14.50 | 471.25 |
| Labor Subtotal | 361.50 | Hrs | | 5,531.00 |
| | 8.00 | SP | | |
| | | | | |
| LABOR FEE | 37.00% | | | 2,046.47 |

Invoice Total:     $7,577.47

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 344



**Invoice**                                          Page #: 2

| | |
|---|---|
| **Bill To:** | **License #:** FLC000172472 |
| RABBIT RIDGE | **Federal ID#:** 77-0550948 |
| 1172 SAN MARCOS ROAD | **State ID#:** 513-8203-4 |
| PASO ROBLES, CA 93446 | **W/C Company:** Preferred Employers Inc. |
| | **W/C Policy #:** FLN-169583-1 |

03/08/2021 to 03/14/2021

**Invoice #:** 2217
**Invoice Date:** 03/18/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| | **Totals:** | | | |
| | Other | | | 7,577.47 |

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 345

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | | | | | |
|---|---|---|---|---|---|
| Date: | 05/12/2021 | | | Worker's Comp Co: | Preferred Employers Inc. |
| Farm Labor #: | FLC000172472 | | | Policy #: | FLN-169583-1 |
| Federal ID #: | 77-0550948 | | | | |
| State ID #: | 513-8203-4 | | | | |
| Grower #: | 75 | Grower Name: | RABBIT RIDGE | | |

| Acct # | Employee Name | Crew # | Day | Description | Type | Hours | Pieces | Rate | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 16131 | DELFINO SANCHEZ, MARCELO | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 17.0000 | 144.50 |
| 15704 | REYES SILVA, ANDRES | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16600 | MERINO CAVERO, OLEGARIO | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17461 | SANTIAGO GARCIA, ALEJANDRA | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17462 | VILLANUEVA, MOISES DE JESUS | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17460 | VILLANUEVA, ARTEMIO DE JESUS | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17127 | VILLANUEVA, VENANCIO DE JESU | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16294 | MENDOZA PEREZ, TRANQUILINO | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16295 | MENDOZA JIMENEZ, ROCIO | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17458 | PACHECO, ANDRES LUCAS | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17459 | GONZALEZ CRECENSIO, RUFINO | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16032 | SANTIAGO CRUZ, JUAN | MD | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| | Total for Crop ID RABBIT RABBIT RIDGE VINEYARD | | | | | 102.00 | | | 1,547.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 17.0000 | 144.50 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 17.0000 | 144.50 |
| 17447 | VASQUEZ OLEA, RICARDO | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 08 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 09 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| | Total for Crop ID RABLIVE Rabbit Ridge Live oak | | | | | 195.50 | | | 2,966.50 |
| | Gross Wages, This Report: | | | | | 297.50 | | | 4,513.50 |

**Employee information for the week ending 05/09/2021:**

| Employee Name/Address | S.S. #/Acct # | Hours | Pieces | Report Wages | Gross Wages | SDI | FICA Medicare | Fed Wht St Wht | Other | Net Check | Check # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| VILLANUEVA, VENANCIO DE JESUS PO BOX 949 SAN MIGUEL, CA 93451 | XXX-XX-4286 17127 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 1.85 | 0.00 0.00 | 0.00 | 116.21 | 175466 |
| DELFINO SANCHEZ, MARCELO 101 RIVER DRIVE SPC#75 KING CITY, CA 93930 | XXX-XX-8734 16131 | 8.50 | 0 | 144.50 | 144.50 | 1.73 | 8.96 2.09 | 0.00 0.00 | 0.00 | 131.72 | 175460 |
| GERVACIO GONZALEZ, ANTONINO 1209 ALAMO CREEK APT#10 PASO ROBLES, CA `93446 | XXX-XX-0242 17452 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81 3.70 | 0.00 0.00 | 0.00 | 232.43 | 175459 |
| GONZALEZ CRECENSIO, RUFINO 1063 L STREET SAN MIGUEL, CA 93451 | XXX-XX-2855 17459 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 1.85 | 0.00 0.00 | 0.00 | 116.21 | 175470 |
| LOPEZ GARCIA, DOMINICA 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-7870 17457 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81 3.70 | 0.00 0.00 | 0.00 | 232.43 | 175455 |

EXHIBIT 20
PAGE 346

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 05/12/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75    Grower Name: RABBIT RIDGE

Worker's Comp Co: Preferred Employers Inc.
Policy #: FLN-169583-1

| Name / Address | SSN / ID | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| LOPEZ GARCIA, HELIODORO<br>1208 CORRAL CREEK APT#1<br>PASO ROBLES, CA 93446 | XXX-XX-6792<br>17446 | 17.00 | 0 | 289.00 | 289.00 | 3.47 | 17.92<br>4.19 | 0.00<br>0.00 | 0.00 | 263.42 | 175448 |
| LOPEZ GARCIA, HERMENEGILDO<br>1208 CORRAL CREEK APT# 7<br>PASO ROBLES, CA 93446 | XXX-XX-0304<br>17449 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175457 |
| LOPEZ CUELLAR, ISMAEL<br>1209 ALAMO CREEK APT#10<br>PASO ROBLES, CA 93446 | XXX-XX-5853<br>17448 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175453 |
| LOPEZ GARCIA, JUVENTINO<br>1208 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-1820<br>17450 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175458 |
| LOPEZ CUELLAR, MARCELINO<br>1209 ALAMO CREEK APT#10<br>PASO ROBLES, CA 93446 | XXX-XX-2089<br>17451 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175454 |
| LOPEZ GARCIA, ZENAIDA<br>1208 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-8683<br>17456 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175456 |
| MENDOZA JIMENEZ, ROCIO<br>322 COLLINS STREET APT#1<br>KING CITY, CA 93930 | XXX-XX-7847<br>16295 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175468 |
| MERINO CAVERO, OLEGARIO<br>207 NORTH THIRD STREET<br>KING CITY, CA 93930 | XXX-XX-5101<br>16600 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175462 |
| MIGUEL LOPEZ, MODESTA<br>1222 CORAL CREEK APT#6<br>PASO ROBLES, CA 93446 | XXX-XX-0535<br>17454 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175451 |
| PACHECO, ANDRES LUCAS<br>1116 L STREET<br>PASO ROBLES, CA 93446 | XXX-XX-0126<br>17458 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175469 |
| PENIAFORT HILARIO, SAMUEL<br>1222 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-4127<br>17453 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175450 |
| MENDOZA PEREZ, TRANQUILINO<br>PO BOX 1051<br><br>KING CITY, CA 93930 | XXX-XX-1127<br><br>16294 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.90<br><br>1.85 | 0.00<br>0.00 | 0.00 | 116.22 | 175467 |
| PINZON PENIAFORT, ALONSO<br>1222 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-7643<br>17455 | 17.00 | 0 | 255.00 | 255.00 | 3.06 | 15.81<br>3.70 | 0.00<br>0.00 | 0.00 | 232.43 | 175452 |
| SANTIAGO GARCIA, ALEJANDRA<br>1077 L STREET<br>SAN MIGUEL, CA 93451 | XXX-XX-9631<br>17461 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175463 |
| SANTIAGO CRUZ, JUAN<br>324 2ND STREET<br>KING CITY, CA 93930 | XXX-XX-5761<br>16032 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175471 |
| REYES SILVA, ANDRES<br>PO BOX 378<br>KING CITY, CA 93930 | XXX-XX-4321<br>15704 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.90<br>1.85 | 0.00<br>0.00 | 0.00 | 116.22 | 175461 |
| VASQUEZ OLEA, RICARDO<br>727 N TRIGO LANE<br>PASO ROBLES, CA 93446 | XXX-XX-0268<br>17447 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175449 |
| VILLANUEVA, ARTEMIO DE JESUS<br>1077 L STREET<br>SAN MIGUEL, CA 93451 | XXX-XX-2328<br>17460 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175465 |
| VILLANUEVA, MOISES DE JESUS<br>1077 L STREET<br>SAN MIGUEL, CA 93451 | XXX-XX-0424<br>17462 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91<br>1.85 | 0.00<br>0.00 | 0.00 | 116.21 | 175464 |
| Totals: | | 297.50 | 0 | 4,513.50 | 4,513.50 | 54.16 | 279.88<br>65.48 | 0.00<br>0.00 | 0.00 | 4,113.98 | |

EXHIBIT 20
PAGE 347



**Invoice**



**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

| | |
|---|---|
| **License #:** | FLC000172472 |
| **Federal ID#:** | 77-0550948 |
| **State ID#:** | 513-8203-4 |
| **W/C Company:** | Preferred Employers Inc. |
| **W/C Policy #:** | FLN-169583-1 |

05/03/2021 to 05/09/2021

| | |
|---|---|
| **Invoice #:** | 2386 |
| **Invoice Date:** | 05/12/2021 |
| **Terms:** | Net On Receipt |

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| VENANCIO DE JESUS VILLANUEVA | 8.50 | Hrs | 15.00 | 127.50 |
| MARCELO DELFINO SANCHEZ | 8.50 | Hrs | 17.00 | 144.50 |
| ANTONINO GERVACIO GONZALEZ | 17.00 | Hrs | 15.00 | 255.00 |
| RUFINO GONZALEZ CRECENSIO | 8.50 | Hrs | 15.00 | 127.50 |
| DOMINICA LOPEZ GARCIA | 17.00 | Hrs | 15.00 | 255.00 |
| HELIODORO LOPEZ GARCIA | 17.00 | Hrs | 17.00 | 289.00 |
| HERMENEGILDO LOPEZ GARCIA | 17.00 | Hrs | 15.00 | 255.00 |
| ISMAEL LOPEZ CUELLAR | 17.00 | Hrs | 15.00 | 255.00 |
| JUVENTINO LOPEZ GARCIA | 17.00 | Hrs | 15.00 | 255.00 |
| MARCELINO LOPEZ CUELLAR | 17.00 | Hrs | 15.00 | 255.00 |
| ZENAIDA LOPEZ GARCIA | 17.00 | Hrs | 15.00 | 255.00 |
| ROCIO MENDOZA JIMENEZ | 8.50 | Hrs | 15.00 | 127.50 |
| OLEGARIO MERINO CAVERO | 8.50 | Hrs | 15.00 | 127.50 |
| MODESTA MIGUEL LOPEZ | 17.00 | Hrs | 15.00 | 255.00 |
| ANDRES LUCAS PACHECO | 8.50 | Hrs | 15.00 | 127.50 |
| SAMUEL PENIAFORT HILARIO | 17.00 | Hrs | 15.00 | 255.00 |
| TRANQUILINO MENDOZA PEREZ | 8.50 | Hrs | 15.00 | 127.50 |
| ALONSO PINZON PENIAFORT | 17.00 | Hrs | 15.00 | 255.00 |
| ALEJANDRA SANTIAGO GARCIA | 8.50 | Hrs | 15.00 | 127.50 |
| JUAN SANTIAGO CRUZ | 8.50 | Hrs | 15.00 | 127.50 |
| ANDRES REYES SILVA | 8.50 | Hrs | 15.00 | 127.50 |
| RICARDO VASQUEZ OLEA | 8.50 | Hrs | 15.00 | 127.50 |
| ARTEMIO DE JESUS VILLANUEVA | 8.50 | Hrs | 15.00 | 127.50 |
| MOISES DE JESUS VILLANUEVA | 8.50 | Hrs | 15.00 | 127.50 |
| Labor Subtotal | 297.50 | Hrs | | 4,513.50 |

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 348



**Invoice**                                          Page #: 2

**Bill To:**                        **License #:** FLC000172472
RABBIT RIDGE                   **Federal ID#:** 77-0550948
1172 SAN MARCOS ROAD           **State ID#:** 513-8203-4
PASO ROBLES, CA 93446          **W/C Company:** Preferred Employers Inc.
                               **W/C Policy #:** FLN-169583-1

05/03/2021 to 05/09/2021       **Invoice #:** 2386
                               **Invoice Date:** 05/12/2021
                               **Terms:** Net On Receipt

| Description | Quantity Unit | Price | Total |
|---|---|---|---|
| LABOR FEE | 37.00% | | 1,670.00 |

Invoice Total: $6,183.50

Totals:
Other                                        6,183.50

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 349

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 05/18/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75    Grower Name: RABBIT RIDGE

Worker's Comp Co: Preferred Employers Inc.
Policy #: FLN-169583-1

| Acct # | Employee Name | Crew # | Day | Description | Type | Hours | Pieces | Rate | Amount |
|--------|---------------|--------|-----|-------------|------|-------|--------|------|--------|
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17409 | MAYA ALEJANDRO, MISAEL | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17409 | MAYA ALEJANDRO, MISAEL | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17409 | MAYA ALEJANDRO, MISAEL | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17412 | SANTIAGO CASTILLO, RAFAELA | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17412 | SANTIAGO CASTILLO, RAFAELA | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17412 | SANTIAGO CASTILLO, RAFAELA | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17413 | MAYA ALEJANDRO, RODOLFO | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17413 | MAYA ALEJANDRO, RODOLFO | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17413 | MAYA ALEJANDRO, RODOLFO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17447 | VASQUEZ OLEA, RICARDO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17482 | GERVACIO ORTEGA, HECTOR | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17482 | GERVACIO ORTEGA, HECTOR | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17482 | GERVACIO ORTEGA, HECTOR | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17483 | BONIFACIO SANTIAGO, NIEVE | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17483 | BONIFACIO SANTIAGO, NIEVE | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17485 | GERVACIO LOPEZ, SEBASTIAN | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17485 | GERVACIO LOPEZ, SEBASTIAN | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17485 | GERVACIO LOPEZ, SEBASTIAN | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17486 | LOPEZ FLORES, SUSANA | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17486 | LOPEZ FLORES, SUSANA | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17486 | LOPEZ FLORES, SUSANA | HE | 14 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 12 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 13 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 15704 | REYES SILVA, ANDRES | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16032 | SANTIAGO CRUZ, JUAN | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16131 | DELFINO SANCHEZ, MARCELO | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 17.0000 | 144.50 |
| 16294 | MENDOZA PEREZ, TRANQUILINO | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16295 | MENDOZA JIMENEZ, ROCIO | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 16401 | JIMENEZ LOPEZ, JERONIMO | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |
| 17383 | PAULINO DIAZ, ALEJANDRA | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | | 15.0000 | 127.50 |

EXHIBIT 20
PAGE 350

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 05/18/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75        Grower Name: RABBIT RIDGE

Worker's Comp Co:    Preferred Employers Inc.
Policy #:    FLN-169583-1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17490 | LOPEZ ENCARNACION, ELIZABET | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | 15.0000 | 127.50 |
| 17491 | CAMPOS MELO, HELADIA | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | 15.0000 | 127.50 |
| 17492 | PEREZ VASQUEZ, RAMIRO | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | 15.0000 | 127.50 |
| 17382 | GUZMAN, MAURILIO DE LA CRUZ | MD | 16 | Shoot Thinning | Reg. Hrs | 8.50 | 15.0000 | 127.50 |
| | Total for Crop ID RABLIVE Rabbit Ridge Live oak | | | | | 345.00 | | 5,208.00 |

Gross Wages, This Report:                              345.00                      5,208.00

**Employee information for the week ending 05/16/2021:**

| Employee Name/Address | S.S. #/Acct # | Hours | Pieces | Report Wages | Gross Wages | SDI | FICA Medicare | Fed Wht St Wht | Other | Net Check | Check # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BONIFACIO SANTIAGO, NIEVE 1012 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-4336 17483 | 8.00 | 0 | 120.00 | 120.00 | 1.44 | 7.44 1.74 | 0.00 0.00 | 0.00 | 109.38 | 175694 |
| CAMPOS MELO, HELADIA 532 CALLE DE LEON APT#4 GREENFIELD, CA 93927 | XXX-XX-0077 17491 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 1.85 | 0.00 0.00 | 0.00 | 116.21 | 175710 |
| DELFINO SANCHEZ, MARCELO 101 RIVER DRIVE SPC#75 KING CITY, CA 93930 | XXX-XX-8734 16131 | 8.50 | 0 | 144.50 | 144.50 | 1.73 | 8.95 2.10 | 0.00 0.00 | 0.00 | 131.72 | 175703 |
| GERVACIO GONZALEZ, ANTONINO 1209 ALAMO CREEK APT#10 PASO ROBLES, CA `93446 | XXX-XX-0242 17452 | 12.50 | 0 | 187.50 | 435.00 | 5.22 | 26.97 6.31 | 0.00 0.00 | 0.00 | 396.50 | 175679 |
| GERVACIO ORTEGA, HECTOR 1012 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-3288 17482 | 12.00 | 0 | 180.00 | 180.00 | 2.16 | 11.16 2.61 | 0.00 0.00 | 0.00 | 164.07 | 175693 |
| GERVACIO LOPEZ, SEBASTIAN 1210 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-2387 17485 | 12.00 | 0 | 180.00 | 180.00 | 2.16 | 11.16 2.61 | 0.00 0.00 | 0.00 | 164.07 | 175696 |
| GERVACIO SANTIAGO, SEVERIANO 1210 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-2891 16468 | 12.00 | 0 | 180.00 | 180.00 | 2.16 | 11.16 2.61 | 0.00 0.00 | 0.00 | 164.07 | 175668 |
| GONZALEZ SOLANO, FEDERICO 1210 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-8463 17484 | 12.00 | 0 | 180.00 | 180.00 | 2.16 | 11.16 2.61 | 0.00 0.00 | 0.00 | 164.07 | 175695 |
| GUZMAN, MAURILIO DE LA CRUZ 116 CALLE 6 ST GREENFIELD, CA 93927 | XXX-XX-5874 17382 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 1.85 | 0.00 0.00 | 0.00 | 116.21 | 176134 |
| JIMENEZ LOPEZ, JERONIMO 323 LYNN STREET APT#6 KING CITY, CA 93930 | XXX-XX-0675 16401 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 1.85 | 0.00 0.00 | 0.00 | 116.21 | 175706 |
| LOPEZ GARCIA, DOMINICA 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-7870 17457 | 8.00 | 0 | 120.00 | 375.00 | 4.50 | 23.25 5.44 | 0.00 0.00 | 0.00 | 341.81 | 175684 |
| LOPEZ ENCARNACION, ELIZABETH 435 CALABERA STREET GREENFIELD, CA 93927 | XXX-XX-6724 17490 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 1.85 | 0.00 0.00 | 0.00 | 116.21 | 175709 |
| LOPEZ GARCIA, HELIODORO 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-6792 17446 | 8.00 | 0 | 136.00 | 493.00 | 5.91 | 30.56 7.15 | 0.00 0.00 | 0.00 | 449.38 | 175673 |
| LOPEZ GARCIA, HERMENEGILDO 1208 CORRAL CREEK APT# 7 PASO ROBLES, CA 93446 | XXX-XX-0304 17449 | 20.50 | 0 | 307.50 | 435.00 | 5.22 | 26.97 6.31 | 0.00 0.00 | 0.00 | 396.50 | 175676 |
| LOPEZ CUELLAR, ISMAEL 1209 ALAMO CREEK APT#10 PASO ROBLES, CA 93446 | XXX-XX-5853 17448 | 12.50 | 0 | 187.50 | 495.00 | 5.94 | 30.69 7.18 | 0.00 0.00 | 0.00 | 451.19 | 175675 |
| LOPEZ GARCIA, JUVENTINO 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-1820 17450 | 12.50 | 0 | 187.50 | 495.00 | 5.94 | 30.69 7.18 | 0.00 0.00 | 0.00 | 451.19 | 175677 |
| LOPEZ CUELLAR, MARCELINO 1209 ALAMO CREEK APT#10 17451 | XXX-XX-2089 | 12.50 | 0 | 187.50 | 495.00 | 5.94 | 30.69 7.18 | 0.00 0.00 | 0.00 | 451.19 | 175678 |

EXHIBIT 20
PAGE 351

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 05/18/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75    Grower Name: RABBIT RIDGE

Worker's Comp Co: Preferred Employers Inc.
Policy #: FLN-169583-1

| Name / Address | SSN | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ FLORES, SUSANA | XXX-XX-3312 | 12.00 | 0 | 180.00 | 180.00 | 2.16 | 11.16 | 0.00 | 0.00 | 164.07 | 175697 |
| 1210 CORRAL CREEK AVENUE APT# 17486 | | | | | | | 2.61 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ GARCIA, ZENAIDA | XXX-XX-8683 | 12.00 | 0 | 180.00 | 435.00 | 5.22 | 26.97 | 0.00 | 0.00 | 396.50 | 175683 |
| 1208 CORRAL CREEK APT#7 | 17456 | | | | | | 6.31 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ, LUIS | XXX-XX-7743 | 8.50 | 0 | 127.50 | 255.00 | 3.06 | 15.81 | 0.00 | 0.00 | 232.43 | 175699 |
| 165 N 3RD STREET | 17488 | | | | | | 3.70 | 0.00 | | | |
| SHANDON, CA 934461 | | | | | | | | | | | |
| MAYA ALEJANDRO, MISAEL | XXX-XX-0459 | 12.00 | 0 | 180.00 | 307.50 | 3.69 | 19.07 | 0.00 | 0.00 | 280.28 | 175670 |
| 828 TOBY WAY | 17409 | | | | | | 4.46 | 0.00 | | | |
| SHANDON, CA 93461 | | | | | | | | | | | |
| MAYA ALEJANDRO, RODOLFO | XXX-XX-1980 | 12.00 | 0 | 180.00 | 307.50 | 3.69 | 19.07 | 0.00 | 0.00 | 280.28 | 175672 |
| 828 TOBY WAY | 17413 | | | | | | 4.46 | 0.00 | | | |
| SHANDON, CA 93451 | | | | | | | | | | | |
| MENDOZA JIMENEZ, ROCIO | XXX-XX-7847 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.90 | 0.00 | 0.00 | 116.22 | 175705 |
| 322 COLLINS STREET APT#1 | 16295 | | | | | | 1.85 | 0.00 | | | |
| KING CITY, CA 93930 | | | | | | | | | | | |
| MIGUEL LOPEZ, MODESTA | XXX-XX-0535 | 12.00 | 0 | 180.00 | 435.00 | 5.22 | 26.97 | 0.00 | 0.00 | 396.50 | 175681 |
| 1222 CORAL CREEK APT#6 | 17454 | | | | | | 6.31 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| PAULINO DIAZ, ALEJANDRA | XXX-XX-8521 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 | 0.00 | 0.00 | 116.21 | 175708 |
| 116 CALLE 6 | 17383 | | | | | | 1.85 | 0.00 | | | |
| GREENFIELD, CA 93927 | | | | | | | | | | | |
| PENIAFORT HILARIO, SAMUEL | XXX-XX-4127 | 4.00 | 0 | 60.00 | 495.00 | 5.94 | 30.69 | 0.00 | 0.00 | 451.19 | 175680 |
| 1222 CORRAL CREEK APT#7 | 17453 | | | | | | 7.18 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| PEREZ VASQUEZ, RAMIRO | XXX-XX-6945 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 | 0.00 | 0.00 | 116.21 | 175711 |
| 411 ELLIS STREET APT#A | 17492 | | | | | | 1.85 | 0.00 | | | |
| KING CITY, CA 93930 | | | | | | | | | | | |
| MENDOZA PEREZ, TRANQUILINO | XXX-XX-1127 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 | 0.00 | 0.00 | 116.21 | 175704 |
| PO BOX 1051 | | | | | | | | | | | |
| | 16294 | | | | | | 1.85 | | | | |
| KING CITY, CA 93930 | | | | | | | | | | | |
| PINZON PENIAFORT, ALONSO | XXX-XX-7643 | 12.50 | 0 | 187.50 | 495.00 | 5.94 | 30.69 | 0.00 | 0.00 | 451.19 | 175682 |
| 1222 CORRAL CREEK APT#7 | 17455 | | | | | | 7.18 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| SANTIAGO PONCE, JOSEFINA | XXX-XX-2253 | 8.00 | 0 | 120.00 | 120.00 | 1.44 | 7.44 | 0.00 | 0.00 | 109.38 | 175698 |
| 1208 CORRAL CREEK AVENUE APT# 17487 | | | | | | | 1.74 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| SANTIAGO CRUZ, JUAN | XXX-XX-5761 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.90 | 0.00 | 0.00 | 116.22 | 175702 |
| 324 2ND STREET | 16032 | | | | | | 1.85 | 0.00 | | | |
| KING CITY, CA 93930 | | | | | | | | | | | |
| SANTIAGO CASTILLO, RAFAELA | XXX-XX-8852 | 12.00 | 0 | 180.00 | 307.50 | 3.69 | 19.07 | 0.00 | 0.00 | 280.28 | 175671 |
| 828 TOBY WAY | 17412 | | | | | | 4.46 | 0.00 | | | |
| SHANDON, CA 93461 | | | | | | | | | | | |
| REYES SILVA, ANDRES | XXX-XX-4321 | 8.50 | 0 | 127.50 | 127.50 | 1.53 | 7.91 | 0.00 | 0.00 | 116.21 | 175701 |
| PO BOX 378 | 15704 | | | | | | 1.85 | 0.00 | | | |
| KING CITY, CA 93930 | | | | | | | | | | | |
| VASQUEZ OLEA, RICARDO | XXX-XX-0268 | 4.00 | 0 | 60.00 | 307.50 | 3.69 | 19.06 | 0.00 | 0.00 | 280.29 | 175674 |
| 727 N TRIGO LANE | 17447 | | | | | | 4.46 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| Totals: | | 345.00 | 0 | 5,208.00 | 9,127.50 | 109.52 | 565.93 | 0.00 | 0.00 | 8,319.65 | |
| | | | | | | | 132.40 | 0.00 | | | |

EXHIBIT 20
PAGE 352

**Invoice**



**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

05/10/2021 to 05/16/2021

**Invoice #:** 2422
**Invoice Date:** 05/18/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| NIEVE BONIFACIO SANTIAGO | 8.00 | Hrs | 15.00 | 120.00 |
| HELADIA CAMPOS MELO | 8.50 | Hrs | 15.00 | 127.50 |
| MARCELO DELFINO SANCHEZ | 8.50 | Hrs | 17.00 | 144.50 |
| ANTONINO GERVACIO GONZALEZ | 12.50 | Hrs | 15.00 | 187.50 |
| HECTOR GERVACIO ORTEGA | 12.00 | Hrs | 15.00 | 180.00 |
| SEBASTIAN GERVACIO LOPEZ | 12.00 | Hrs | 15.00 | 180.00 |
| SEVERIANO GERVACIO SANTIAGO | 12.00 | Hrs | 15.00 | 180.00 |
| FEDERICO GONZALEZ SOLANO | 12.00 | Hrs | 15.00 | 180.00 |
| MAURILIO DE LA CRUZ GUZMAN | 8.50 | Hrs | 15.00 | 127.50 |
| JERONIMO JIMENEZ LOPEZ | 8.50 | Hrs | 15.00 | 127.50 |
| DOMINICA LOPEZ GARCIA | 8.00 | Hrs | 15.00 | 120.00 |
| ELIZABETH LOPEZ ENCARNACION | 8.50 | Hrs | 15.00 | 127.50 |
| HELIODORO LOPEZ GARCIA | 8.00 | Hrs | 17.00 | 136.00 |
| HERMENEGILDO LOPEZ GARCIA | 20.50 | Hrs | 15.00 | 307.50 |
| ISMAEL LOPEZ CUELLAR | 12.50 | Hrs | 15.00 | 187.50 |
| JUVENTINO LOPEZ GARCIA | 12.50 | Hrs | 15.00 | 187.50 |
| MARCELINO LOPEZ CUELLAR | 12.50 | Hrs | 15.00 | 187.50 |
| SUSANA LOPEZ FLORES | 12.00 | Hrs | 15.00 | 180.00 |
| ZENAIDA LOPEZ GARCIA | 12.00 | Hrs | 15.00 | 180.00 |
| LUIS LOPEZ | 8.50 | Hrs | 15.00 | 127.50 |
| MISAEL MAYA ALEJANDRO | 12.00 | Hrs | 15.00 | 180.00 |
| RODOLFO MAYA ALEJANDRO | 12.00 | Hrs | 15.00 | 180.00 |
| ROCIO MENDOZA JIMENEZ | 8.50 | Hrs | 15.00 | 127.50 |
| MODESTA MIGUEL LOPEZ | 12.00 | Hrs | 15.00 | 180.00 |
| ALEJANDRA PAULINO DIAZ | 8.50 | Hrs | 15.00 | 127.50 |
| SAMUEL PENIAFORT HILARIO | 4.00 | Hrs | 15.00 | 60.00 |

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 353



**Invoice**                                                          Page #: 2

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

05/10/2021 to 05/16/2021

**Invoice #:** 2422
**Invoice Date:** 05/18/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| RAMIRO PEREZ VASQUEZ | 8.50 | Hrs | 15.00 | 127.50 |
| TRANQUILINO MENDOZA PEREZ | 8.50 | Hrs | 15.00 | 127.50 |
| ALONSO PINZON PENIAFORT | 12.50 | Hrs | 15.00 | 187.50 |
| JOSEFINA SANTIAGO PONCE | 8.00 | Hrs | 15.00 | 120.00 |
| JUAN SANTIAGO CRUZ | 8.50 | Hrs | 15.00 | 127.50 |
| RAFAELA SANTIAGO CASTILLO | 12.00 | Hrs | 15.00 | 180.00 |
| ANDRES REYES SILVA | 8.50 | Hrs | 15.00 | 127.50 |
| RICARDO VASQUEZ OLEA | 4.00 | Hrs | 15.00 | 60.00 |
| Labor Subtotal | 345.00 | Hrs | | 5,208.00 |
| | | | | |
| LABOR FEE | 37.00% | | | 1,926.96 |

Invoice Total:    $7,134.96

**Totals:**
Other                                                                 7,134.96

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 354

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | |
|---|---|
| Date: | 05/27/2021 |
| Farm Labor #: | FLC000172472 |
| Federal ID #: | 77-0550948 |
| State ID #: | 513-8203-4 |
| Grower #: | 75 |

Grower Name:  RABBIT RIDGE

Worker's Comp Co:  Preferred Employers Inc.
Policy #:  FLN-169583-1

| Acct # | Employee Name | Crew # | Day | Description | Type | Hours | Pieces | Rate | Amount |
|--------|---------------|--------|-----|-------------|------|-------|--------|------|--------|
| 16358 | MARTINEZ, ISAIAS | DOM | 17 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 16358 | MARTINEZ, ISAIAS | DOM | 18 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 16358 | MARTINEZ, ISAIAS | DOM | 19 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 16358 | MARTINEZ, ISAIAS | DOM | 20 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 16358 | MARTINEZ, ISAIAS | DOM | 21 | Training New Plants | Reg. Hrs | 5.50 | | 15.0000 | 82.50 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 17 | Training New Plants | Reg. Hrs | 5.50 | | 15.0000 | 82.50 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 18 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 20 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 21 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 22 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 17 | Training New Plants | Reg. Hrs | 7.00 | | 16.0000 | 112.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 18 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 20 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 21 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 22 | Training New Plants | Reg. Hrs | 5.00 | | 16.0000 | 80.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 17 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 18 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 19 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 20 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 21 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 22 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 17 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 18 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 19 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 20 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 21 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 22 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 17 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 18 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 19 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 20 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 21 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 22 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| | Total for Crop ID RABLIVE Rabbit Ridge Live oak | | | | | 243.00 | | | 3,681.00 |

Gross Wages, This Report:          243.00          3,681.00

**Employee information for the week ending 05/23/2021:**

| Employee Name/Address | S.S. #/Acct # | Hours | Pieces | Report Wages | Gross Wages | SDI | FICA Medicare | Fed Wht St Wht | Other | Net Check | Check # |
|------------------------|---------------|-------|--------|--------------|-------------|-----|---------------|----------------|-------|-----------|---------|
| GERVACIO ORTEGA, ERNESTO 1210 CORRAL CREEK AVE APT#3 PASO ROBLES, CA 93446 | XXX-XX-0994 17502 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85 9.79 | 0.00 0.00 | 0.00 | 615.26 | 176001 |
| GONZALES, DOMINGO VAZQUEZ 1210 CORRAL CREEK ATP 3 PASO ROBLES, CA 93446 | XXX-XX-9679 17100 | 36.00 | 0 | 576.00 | 576.00 | 6.91 | 35.72 8.36 | 0.00 0.00 | 0.00 | 525.01 | 175998 |
| LEAL GONZALES, TOMASA 1210 CORRAL CREEK AVE APT 3 PASO ROBLES, CA 93446 | XXX-XX-6219 17099 | 34.50 | 0 | 517.50 | 517.50 | 6.21 | 32.09 7.51 | 0.00 0.00 | 0.00 | 471.69 | 175997 |
| MARTINEZ, ISAIAS 125 11TH ST. SAN MIGUEL, CA 93451 | XXX-XX-7865 16358 | 37.50 | 0 | 562.50 | 562.50 | 6.75 | 34.88 8.16 | 0.00 0.00 | 0.00 | 512.71 | 175996 |
| PADILLA MENDIOLA, ROBERTO 5825 VISTA SERRANO PASO ROBLES, CA 93446 | XXX-XX-9895 17475 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85 9.79 | 0.00 0.00 | 0.00 | 615.26 | 175999 |
| RAMIREZ RAMON, ABEL 2749 E NORMAN DRIVE VISALIA, CA 93292 | XXX-XX-5509 17499 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85 9.79 | 19.23 0.00 | 0.00 | 596.03 | 176000 |

EXHIBIT 20
PAGE 355

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | | |
|---|---|---|
| Date: | 05/27/2021 | |
| Farm Labor #: | FLC000172472 | |
| Federal ID #: | 77-0550948 | |
| State ID #: | 513-8203-4 | |
| Grower #: | 75 | Grower Name: RABBIT RIDGE |

Worker's Comp Co:   Preferred Employers Inc.
Policy #:   FLN-169583-1

| Totals: | 243.00 | 0 | 3,681.00 | 3,681.00 | 44.17 | 228.24 | 19.23 | 0.00 | 3,335.96 |
|---------|--------|---|----------|----------|-------|--------|-------|------|----------|
| | | | | | | 53.40 | 0.00 | | |

EXHIBIT 20
PAGE 356

**Invoice**



| | |
|---|---|
| **Bill To:** | **License #:** FLC000172472 |
| RABBIT RIDGE | **Federal ID#:** 77-0550948 |
| 1172 SAN MARCOS ROAD | **State ID#:** 513-8203-4 |
| PASO ROBLES, CA 93446 | **W/C Company:** Preferred Employers Inc. |
| | **W/C Policy #:** FLN-169583-1 |

05/17/2021 to 05/23/2021

**Invoice #:** 2438
**Invoice Date:** 05/27/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| ERNESTO GERVACIO ORTEGA | 45.00 | Hrs | 15.00 | 675.00 |
| DOMINGO VAZQUEZ GONZALES | 36.00 | Hrs | 16.00 | 576.00 |
| TOMASA LEAL GONZALES | 34.50 | Hrs | 15.00 | 517.50 |
| ISAIAS MARTINEZ | 37.50 | Hrs | 15.00 | 562.50 |
| ROBERTO PADILLA MENDIOLA | 45.00 | Hrs | 15.00 | 675.00 |
| ABEL RAMIREZ RAMON | 45.00 | Hrs | 15.00 | 675.00 |
| Labor Subtotal | 243.00 | Hrs | | 3,681.00 |
| | | | | |
| LABOR FEE | 37.00% | | | 1,361.97 |
| | | | | |
| | | | Invoice Total: | $5,042.97 |

**Totals:**
Other                5,042.97

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 357

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 05/26/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75          Grower Name: RABBIT RIDGE

Worker's Comp Co: Preferred Employers Inc.
Policy #: FLN-169583-1

| Acct # | Employee Name | Crew # | Day | Description | Type | Hours | Pieces | Rate | Amount |
|--------|---------------|--------|-----|-------------|------|-------|--------|------|--------|
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 16468 | GERVACIO SANTIAGO, SEVERIAN | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17409 | MAYA ALEJANDRO, MISAEL | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17409 | MAYA ALEJANDRO, MISAEL | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17409 | MAYA ALEJANDRO, MISAEL | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17409 | MAYA ALEJANDRO, MISAEL | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17412 | SANTIAGO CASTILLO, RAFAELA | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17412 | SANTIAGO CASTILLO, RAFAELA | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17412 | SANTIAGO CASTILLO, RAFAELA | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17412 | SANTIAGO CASTILLO, RAFAELA | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17413 | MAYA ALEJANDRO, RODOLFO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17413 | MAYA ALEJANDRO, RODOLFO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17413 | MAYA ALEJANDRO, RODOLFO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17413 | MAYA ALEJANDRO, RODOLFO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17414 | PENIAFORT ALEJO, BENITO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17414 | PENIAFORT ALEJO, BENITO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17414 | PENIAFORT ALEJO, BENITO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17414 | PENIAFORT ALEJO, BENITO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17447 | VASQUEZ OLEA, RICARDO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17447 | VASQUEZ OLEA, RICARDO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17447 | VASQUEZ OLEA, RICARDO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |

**EXHIBIT 20**
**PAGE 358**

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date:   05/26/2021
Farm Labor #:   FLC000172472
Federal ID #:   77-0550948
State ID #:   513-8203-4
Grower #:   75          Grower Name:  RABBIT RIDGE

Worker's Comp Co:   Preferred Employers Inc.
Policy #:   FLN-169583-1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17482 | GERVACIO ORTEGA, HECTOR | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17482 | GERVACIO ORTEGA, HECTOR | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17482 | GERVACIO ORTEGA, HECTOR | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17482 | GERVACIO ORTEGA, HECTOR | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17483 | BONIFACIO SANTIAGO, NIEVE | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17483 | BONIFACIO SANTIAGO, NIEVE | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17483 | BONIFACIO SANTIAGO, NIEVE | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17483 | BONIFACIO SANTIAGO, NIEVE | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17484 | GONZALEZ SOLANO, FEDERICO | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17485 | GERVACIO LOPEZ, SEBASTIAN | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17485 | GERVACIO LOPEZ, SEBASTIAN | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17485 | GERVACIO LOPEZ, SEBASTIAN | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17485 | GERVACIO LOPEZ, SEBASTIAN | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17486 | LOPEZ FLORES, SUSANA | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17486 | LOPEZ FLORES, SUSANA | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17486 | LOPEZ FLORES, SUSANA | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17486 | LOPEZ FLORES, SUSANA | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 17 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 18 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 19 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 20 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 21 | Shoot Thinning | Reg. Hrs | 4.00 | 15.0000 | 60.00 |

Total for Crop ID RABLIVE Rabbit Ridge Live oak          472.00                    7,112.00

Gross Wages, This Report:          472.00                    7,112.00

**Employee information for the week ending 05/23/2021:**

EXHIBIT 20
PAGE 359

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date:  05/26/2021
Farm Labor #:  FLC000172472
Federal ID #:  77-0550948
State ID #:  513-8203-4
Grower #:  75          Grower Name:  RABBIT RIDGE

Worker's Comp Co:  Preferred Employers Inc.
Policy #:  FLN-169583-1

| Employee Name/Address | S.S. #/Acct # | Hours | Pieces | Report Wages | Gross Wages | SDI | FICA Medicare | Fed Wht St Wht | Other | Net Check | Check # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BONIFACIO SANTIAGO, NIEVE 1012 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-4336 17483 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88 3.48 | 0.00 0.00 | 0.00 | 218.76 | 175911 |
| DE LA CRUZ VASQUEZ, MAURILIO 4750 JARDINE ROAD PASO ROBLES, CA 93446 | XXX-XX-0528 14708 | 16.00 | 0 | 240.00 | 480.00 | 5.76 | 29.76 6.96 | 0.00 0.00 | 0.00 | 437.52 | 175883 |
| GERVACIO GONZALEZ, ANTONINO 1209 CORRAL CREEK APT#10 PASO ROBLES, CA `93446 | XXX-XX-0242 17452 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 7.83 | 0.00 0.00 | 0.00 | 492.21 | 175896 |
| GERVACIO ORTEGA, HECTOR 1012 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-3288 17482 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88 3.48 | 0.00 0.00 | 0.00 | 218.76 | 175910 |
| GERVACIO LOPEZ, SEBASTIAN 1210 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-2387 17485 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88 3.48 | 0.00 0.00 | 0.00 | 218.76 | 175913 |
| GERVACIO SANTIAGO, SEVERIANO 1210 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-2891 16468 | 20.00 | 0 | 300.00 | 300.00 | 3.60 | 18.60 4.35 | 0.00 0.00 | 0.00 | 273.45 | 175884 |
| GONZALEZ SOLANO, FEDERICO 1210 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-8463 17484 | 20.00 | 0 | 300.00 | 300.00 | 3.60 | 18.60 4.35 | 0.00 0.00 | 0.00 | 273.45 | 175912 |
| IGNACIO SANTIAGO, PABLO 304 SPRING STREET PASO ROBLES, CA 93446 | XXX-XX-6642 17474 | 16.00 | 0 | 240.00 | 480.00 | 5.76 | 29.76 6.96 | 0.00 0.00 | 0.00 | 437.52 | 175908 |
| LOPEZ GARCIA, DOMINICA 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-7870 17457 | 16.00 | 0 | 240.00 | 480.00 | 5.76 | 29.76 6.96 | 0.00 0.00 | 0.00 | 437.52 | 175901 |
| LOPEZ GARCIA, HELIODORO 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-6792 17446 | 16.00 | 0 | 272.00 | 544.00 | 6.53 | 33.73 7.89 | 0.00 0.00 | 0.00 | 495.85 | 175890 |
| LOPEZ GARCIA, HERMENEGILDO 1208 CORRAL CREEK APT# 7 PASO ROBLES, CA 93446 | XXX-XX-0304 17449 | 20.00 | 0 | 300.00 | 427.50 | 5.13 | 26.51 6.19 | 0.00 0.00 | 0.00 | 389.67 | 175893 |
| LOPEZ CUELLAR, ISMAEL 1209 ALAMO CREEK APT#10 PASO ROBLES, CA 93446 | XXX-XX-5853 17448 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 7.83 | 0.00 0.00 | 0.00 | 492.21 | 175892 |
| LOPEZ GARCIA, JUVENTINO 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-1820 17450 | 16.00 | 0 | 240.00 | 367.50 | 4.41 | 22.79 5.32 | 0.00 0.00 | 0.00 | 334.98 | 175894 |
| LOPEZ CUELLAR, MARCELINO 1209 ALAMO CREEK APT#10 PASO ROBLES, CA 93446 | XXX-XX-2089 17451 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 7.83 | 0.00 0.00 | 0.00 | 492.21 | 175895 |
| LOPEZ FLORES, SUSANA 1210 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-3312 17486 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88 3.48 | 0.00 0.00 | 0.00 | 218.76 | 175914 |
| LOPEZ GARCIA, ZENAIDA 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-8683 17456 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 7.83 | 0.00 0.00 | 0.00 | 492.21 | 175900 |
| LOPEZ, LUIS 165 N 3RD STREET SHANDON, CA 934461 | XXX-XX-7743 17488 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 7.83 | 0.00 0.00 | 0.00 | 492.21 | 175916 |
| MAYA ALEJANDRO, MISAEL 828 TOBY WAY SHANDON, CA 93461 | XXX-XX-0459 17409 | 16.00 | 0 | 240.00 | 352.50 | 4.23 | 21.85 5.11 | 0.00 0.00 | 0.00 | 321.31 | 175886 |
| MAYA ALEJANDRO, RODOLFO 828 TOBY WAY SHANDON, CA 93451 | XXX-XX-1980 17413 | 16.00 | 0 | 240.00 | 352.50 | 4.23 | 21.85 5.11 | 0.00 0.00 | 0.00 | 321.31 | 175888 |
| MIGUEL LOPEZ, MODESTA 1222 CORAL CREEK APT#6 PASO ROBLES, CA 93446 | XXX-XX-0535 17454 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 7.83 | 0.00 0.00 | 0.00 | 492.21 | 175898 |
| PENIAFORT ALEJO, BENITO 4750 JARDINE ROAD | XXX-XX-6729 17414 | 16.00 | 0 | 240.00 | 480.00 | 5.76 | 29.76 6.96 | 0.00 0.00 | 0.00 | 437.52 | 175889 |

EXHIBIT 20
PAGE 360

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date: | 05/26/2021 | | | | | | Worker's Comp Co: | | Preferred Employers Inc. | |
| Farm Labor #: | FLC000172472 | | | | | | Policy #: | | FLN-169583-1 | |
| Federal ID #: | 77-0550948 | | | | | | | | | |
| State ID #: | 513-8203-4 | | | | | | | | | |
| Grower #: | 75 | Grower Name: | RABBIT RIDGE | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PASO ROBLES, CA 93446 | | | | | | | | | | |
| PENIAFORT HILARIO, SAMUEL | XXX-XX-4127 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 | 0.00 | 0.00 | 492.21 | 175897 |
| 1222 CORRAL CREEK APT#7 | 17453 | | | | | | 7.83 | 0.00 | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | |
| PINZON PENIAFORT, ALONSO | XXX-XX-7643 | 20.00 | 0 | 300.00 | 540.00 | 6.48 | 33.48 | 0.00 | 0.00 | 492.21 | 175899 |
| 1222 CORRAL CREEK APT#7 | 17455 | | | | | | 7.83 | 0.00 | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | |
| ROJAS GALVEZ, ELENA | XXX-XX-2881 | 16.00 | 0 | 240.00 | 480.00 | 5.76 | 29.76 | 0.00 | 0.00 | 437.52 | 175885 |
| 304 SPRING STREET | 17404 | | | | | | 6.96 | 0.00 | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | |
| SANTIAGO PONCE, JOSEFINA | XXX-XX-2253 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88 | 0.00 | 0.00 | 218.76 | 175915 |
| 1208 CORRAL CREEK AVENUE APT# | 17487 | | | | | | 3.48 | 0.00 | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | |
| SANTIAGO CASTILLO, RAFAELA | XXX-XX-8852 | 16.00 | 0 | 240.00 | 352.50 | 4.23 | 21.85 | 0.00 | 0.00 | 321.31 | 175887 |
| 828 TOBY WAY | 17412 | | | | | | 5.11 | 0.00 | | |
| SHANDON, CA 93461 | | | | | | | | | | |
| VASQUEZ OLEA, RICARDO | XXX-XX-0268 | 12.00 | 0 | 180.00 | 307.50 | 3.69 | 19.07 | 0.00 | 0.00 | 280.28 | 175891 |
| 727 N TRIGO LANE | 17447 | | | | | | 4.46 | 0.00 | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | |
| | | | | | | | | | | |
| Totals: | | 472.00 | 0 | 7,112.00 | 11,224.00 | 134.69 | 695.89 | 0.00 | 0.00 | 10,230.69 | |
| | | | | | | | 162.73 | 0.00 | | |

EXHIBIT 20
PAGE 361

**Invoice**



**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

| | |
|---|---|
| **License #:** | FLC000172472 |
| **Federal ID#:** | 77-0550948 |
| **State ID#:** | 513-8203-4 |
| **W/C Company:** | Preferred Employers Inc. |
| **W/C Policy #:** | FLN-169583-1 |

05/17/2021 to 05/23/2021

| | |
|---|---|
| **Invoice #:** | 2439 |
| **Invoice Date:** | 05/26/2021 |
| **Terms:** | Net On Receipt |

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| NIEVE BONIFACIO SANTIAGO | 16 | Hrs | 15.00 | 240.00 |
| MAURILIO DE LA CRUZ VASQUEZ | 16 | Hrs | 15.00 | 240.00 |
| ANTONINO GERVACIO GONZALEZ | 20 | Hrs | 15.00 | 300.00 |
| HECTOR GERVACIO ORTEGA | 16 | Hrs | 15.00 | 240.00 |
| SEBASTIAN GERVACIO LOPEZ | 16 | Hrs | 15.00 | 240.00 |
| SEVERIANO GERVACIO SANTIAGO | 20 | Hrs | 15.00 | 300.00 |
| FEDERICO GONZALEZ SOLANO | 20 | Hrs | 15.00 | 300.00 |
| PABLO IGNACIO SANTIAGO | 16 | Hrs | 15.00 | 240.00 |
| DOMINICA LOPEZ GARCIA | 16 | Hrs | 15.00 | 240.00 |
| HELIODORO LOPEZ GARCIA | 16 | Hrs | 17.00 | 272.00 |
| HERMENEGILDO LOPEZ GARCIA | 20 | Hrs | 15.00 | 300.00 |
| ISMAEL LOPEZ CUELLAR | 20 | Hrs | 15.00 | 300.00 |
| JUVENTINO LOPEZ GARCIA | 16 | Hrs | 15.00 | 240.00 |
| MARCELINO LOPEZ CUELLAR | 20 | Hrs | 15.00 | 300.00 |
| SUSANA LOPEZ FLORES | 16 | Hrs | 15.00 | 240.00 |
| ZENAIDA LOPEZ GARCIA | 20 | Hrs | 15.00 | 300.00 |
| LUIS LOPEZ | 20 | Hrs | 15.00 | 300.00 |
| MISAEL MAYA ALEJANDRO | 16 | Hrs | 15.00 | 240.00 |
| RODOLFO MAYA ALEJANDRO | 16 | Hrs | 15.00 | 240.00 |
| MODESTA MIGUEL LOPEZ | 20 | Hrs | 15.00 | 300.00 |
| BENITO PENIAFORT ALEJO | 16 | Hrs | 15.00 | 240.00 |
| SAMUEL PENIAFORT HILARIO | 20 | Hrs | 15.00 | 300.00 |
| ALONSO PINZON PENIAFORT | 20 | Hrs | 15.00 | 300.00 |
| ELENA ROJAS GALVEZ | 16 | Hrs | 15.00 | 240.00 |
| JOSEFINA SANTIAGO PONCE | 16 | Hrs | 15.00 | 240.00 |
| RAFAELA SANTIAGO CASTILLO | 16 | Hrs | 15.00 | 240.00 |

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 362



**Invoice**                                          Page #: 2

**Bill To:**

RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

05/17/2021 to 05/23/2021

**Invoice #:** 2439
**Invoice Date:** 05/26/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| RICARDO VASQUEZ OLEA | 12 | Hrs | 15.00 | 180.00 |
| Labor Subtotal | 472 | Hrs | | 7,112.00 |
| LABOR FEE | 37.00% | | | 2,631.44 |
| | | | Invoice Total: | $9,743.44 |

**Totals:**
Other                                                           9,743.44

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 363

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | | | |
|---|---|---|---|
| Date: | 06/03/2021 | Worker's Comp Co: | Preferred Employers Inc. |
| Farm Labor #: | FLC000172472 | Policy #: | FLN-169583-1 |
| Federal ID #: | 77-0550948 | | |
| State ID #: | 513-8203-4 | | |
| Grower #: | 75 | Grower Name: | RABBIT RIDGE |

| Acct # | Employee Name | Crew # | Day | Description | Type | Hours | Pieces | Rate | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 25 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 29 | Training New Plants | Reg. Hrs | 5.00 | | 16.0000 | 80.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 25 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 29 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 16358 | MARTINEZ, ISAIAS | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 25 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 29 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 25 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 29 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 25 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 29 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 9915 | PACHECO CERVANTES, EUTIQUIO | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 9915 | PACHECO CERVANTES, EUTIQUIO | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 9915 | PACHECO CERVANTES, EUTIQUIO | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 9915 | PACHECO CERVANTES, EUTIQUIO | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 9915 | PACHECO CERVANTES, EUTIQUIO | DOM | 29 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17371 | CERVANTES BAUTISTA, MISAEL | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17371 | CERVANTES BAUTISTA, MISAEL | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17371 | CERVANTES BAUTISTA, MISAEL | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17371 | CERVANTES BAUTISTA, MISAEL | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 15956 | HERNANDEZ SARMIENTO, ROGEL | DOM | 24 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 15956 | HERNANDEZ SARMIENTO, ROGEL | DOM | 26 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 15956 | HERNANDEZ SARMIENTO, ROGEL | DOM | 27 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 15956 | HERNANDEZ SARMIENTO, ROGEL | DOM | 28 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 15956 | HERNANDEZ SARMIENTO, ROGEL | DOM | 29 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| | Total for Crop ID LIVEOAK Live Oak Vineyard | | | | | 331.00 | | | 5,010.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17404 | ROJAS GALVEZ, ELENA | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |

**EXHIBIT 20**
**PAGE 364**

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | |
|---|---|
| Date: 06/03/2021 | |
| Farm Labor #: FLC000172472 | |
| Federal ID #: 77-0550948 | |
| State ID #: 513-8203-4 | |
| Grower #: 75 | Grower Name: RABBIT RIDGE |

Worker's Comp Co:  Preferred Employers Inc.
Policy #:  FLN-169583-1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17449 | LOPEZ GARCIA, HERMENEGILDO | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 25 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17474 | IGNACIO SANTIAGO, PABLO | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17487 | SANTIAGO PONCE, JOSEFINA | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 24 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 26 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 27 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 28 | Training New Plants | Reg. Hrs | 4.00 | 15.0000 | 60.00 |

Total for Crop ID RABLIVE Rabbit Ridge Live oak                                     220.00                                   3,340.00

Gross Wages, This Report:                                     551.00                                   8,350.00

**Employee information for the week ending 05/30/2021:**

| Employee Name/Address | S.S. #/Acct # | Hours | Pieces | Report Wages | Gross Wages | SDI | FICA Medicare | Fed Wht St Wht | Other | Net Check | Check # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CERVANTES BAUTISTA, MISAEL 3450 PARK ST UNIT 102 PASO ROBLES, CA 93446 | XXX-XX-2319 17371 | 32.00 | 0 | 480.00 | 607.50 | 7.29 | 37.67 8.81 | 0.00 0.00 | 0.00 | 553.73 | 176296 |
| DE LA CRUZ VASQUEZ, MAURILIO 4750 JARDINE ROAD PASO ROBLES, CA 93446 | XXX-XX-0528 14708 | 16.00 | 0 | 240.00 | 300.00 | 3.60 | 18.60 4.35 | 0.00 0.00 | 0.00 | 273.45 | 176094 |
| GERVACIO GONZALEZ, ANTONINO 1209 ALAMO CREEK APT#10 PASO ROBLES, CA `93446 | XXX-XX-0242 17452 | 8.00 | 0 | 120.00 | 555.00 | 6.66 | 34.41 8.04 | 0.00 0.00 | 0.00 | 505.89 | 176105 |
| GERVACIO ORTEGA, ERNESTO 1210 CORRAL CREEK AVE APT#3 PASO ROBLES, CA 93446 | XXX-XX-0994 17502 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85 9.79 | 0.00 0.00 | 0.00 | 615.26 | 176292 |
| GONZALES, DOMINGO VAZQUEZ 1210 CORRAL CREEK ATP 3 PASO ROBLES, CA 93446 | XXX-XX-9679 17100 | 45.00 | 0 | 720.00 | 720.00 | 8.64 | 44.64 10.44 | 0.00 0.00 | 0.00 | 656.28 | 176289 |

EXHIBIT 20
PAGE 365

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | | | | | | | Worker's Comp Co: | Preferred Employers Inc. |
|---|---|---|---|---|---|---|---|---|

Date:  06/03/2021
Farm Labor #:  FLC000172472
Federal ID #:  77-0550948
State ID #:  513-8203-4
Grower #:  75      Grower Name:  RABBIT RIDGE

Worker's Comp Co: Preferred Employers Inc.
Policy #:  FLN-169583-1

| Name / Address | SSN / ID | Hours | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HERNANDEZ SARMIENTO, ROGELI<br>815 34TH ST.  #B | XXX-XX-4851 | 37.00 | 0 | 555.00 | 682.50 | 8.19 | 42.32 | 0.00 | 0.00 | 622.09 | 176297 |
| | 15956 | | | | | | 9.90 | 0.00 | | | |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| IGNACIO SANTIAGO, PABLO<br>304 SPRING STREET | XXX-XX-6642<br>17474 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88<br>3.48 | 0.00<br>0.00 | 0.00 | 218.76 | 176119 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LEAL GONZALES, TOMASA<br>1210 CORRAL CREEK AVE APT 3 | XXX-XX-6219<br>17099 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85<br>9.78 | 0.00<br>0.00 | 0.00 | 615.27 | 176290 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ GARCIA, DOMINICA<br>1208 CORRAL CREEK APT#7 | XXX-XX-7870<br>17457 | 20.00 | 0 | 300.00 | 427.50 | 5.13 | 26.51<br>6.19 | 0.00<br>0.00 | 0.00 | 389.67 | 176110 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ GARCIA, HELIODORO<br>1208 CORRAL CREEK APT#7 | XXX-XX-6792<br>17446 | 20.00 | 0 | 340.00 | 629.00 | 7.55 | 39.00<br>9.12 | 0.00<br>0.00 | 0.00 | 573.33 | 176100 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ GARCIA, HERMENEGILDO<br>1208 CORRAL CREEK APT# 7 | XXX-XX-0304<br>17449 | 12.00 | 0 | 180.00 | 180.00 | 2.16 | 11.16<br>2.61 | 0.00<br>0.00 | 0.00 | 164.07 | 176102 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ CUELLAR, ISMAEL<br>1209 ALAMO CREEK APT#10 | XXX-XX-5853<br>17448 | 20.00 | 0 | 300.00 | 427.50 | 5.13 | 26.51<br>6.19 | 0.00<br>0.00 | 0.00 | 389.67 | 176101 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ GARCIA, JUVENTINO<br>1208 CORRAL CREEK APT#7 | XXX-XX-1820<br>17450 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88<br>3.48 | 0.00<br>0.00 | 0.00 | 218.76 | 176103 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ CUELLAR, MARCELINO<br>1209 ALAMO CREEK APT#10 | XXX-XX-2089<br>17451 | 20.00 | 0 | 300.00 | 555.00 | 6.66 | 34.41<br>8.04 | 0.00<br>0.00 | 0.00 | 505.89 | 176104 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ GARCIA, ZENAIDA<br>1208 CORRAL CREEK APT#7 | XXX-XX-8683<br>17456 | 20.00 | 0 | 300.00 | 555.00 | 6.66 | 34.41<br>8.04 | 0.00<br>0.00 | 0.00 | 505.89 | 176109 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| LOPEZ, LUIS<br>165 N 3RD STREET | XXX-XX-7743<br>17488 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88<br>3.48 | 0.00<br>0.00 | 0.00 | 218.76 | 176121 |
| SHANDON, CA 934461 | | | | | | | | | | | |
| MARTINEZ, ISAIAS<br>125 11TH ST. | XXX-XX-7865 | 8.00 | 0 | 120.00 | 120.00 | 1.44 | 7.44 | 0.00 | 0.00 | 109.38 | 176291 |
| | 16358 | | | | | | 1.74 | 0.00 | | | |
| SAN MIGUEL, CA 93451 | | | | | | | | | | | |
| MIGUEL LOPEZ, MODESTA<br>1222 CORAL CREEK APT#6 | XXX-XX-0535<br>17454 | 4.00 | 0 | 60.00 | 300.00 | 3.60 | 18.60<br>4.35 | 0.00<br>0.00 | 0.00 | 273.45 | 176107 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| PACHECO CERVANTES, EUTIQUIO<br>3200 SPRING STREET APT # 25 | XXX-XX-1532<br>9915 | 37.00 | 0 | 555.00 | 682.50 | 8.19 | 42.32<br>9.90 | 0.00<br>0.00 | 0.00 | 622.09 | 176295 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| PADILLA MENDIOLA, ROBERTO<br>5825 VISTA SERRANO | XXX-XX-9895<br>17475 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85<br>9.78 | 0.00<br>0.00 | 0.00 | 615.27 | 176294 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| PENIAFORT HILARIO, SAMUEL<br>1222 CORRAL CREEK APT#7 | XXX-XX-4127<br>17453 | 4.00 | 0 | 60.00 | 427.50 | 5.13 | 26.51<br>6.19 | 0.00<br>0.00 | 0.00 | 389.67 | 176106 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| PINZON PENIAFORT, ALONSO<br>1222 CORRAL CREEK APT#7 | XXX-XX-7643<br>17455 | 4.00 | 0 | 60.00 | 555.00 | 6.66 | 34.41<br>8.04 | 0.00<br>0.00 | 0.00 | 505.89 | 176108 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| RAMIREZ RAMON, ABEL<br>2749 E NORMAN DRIVE | XXX-XX-5509<br>17499 | 37.00 | 0 | 555.00 | 555.00 | 6.66 | 34.41<br>8.04 | 0.00<br>0.00 | 0.00 | 505.89 | 176293 |
| VISALIA, CA 93292 | | | | | | | | | | | |
| ROJAS GALVEZ, ELENA<br>304 SPRING STREET | XXX-XX-2881<br>17404 | 16.00 | 0 | 240.00 | 240.00 | 2.88 | 14.88<br>3.48 | 0.00<br>0.00 | 0.00 | 218.76 | 176095 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| SANTIAGO PONCE, JOSEFINA<br>1208 CORRAL CREEK AVENUE APT# | XXX-XX-2253<br>17487 | 8.00 | 0 | 120.00 | 120.00 | 1.44 | 7.44<br>1.74 | 0.00<br>0.00 | 0.00 | 109.38 | 176120 |
| PASO ROBLES, CA 93446 | | | | | | | | | | | |
| Totals: | | 551.00 | 0 | 8,350.00 | 11,384.00 | 136.61 | 705.84 | 0.00 | 0.00 | 10,376.55 | |

EXHIBIT 20
PAGE 366

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 06/03/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75          Grower Name: RABBIT RIDGE

Worker's Comp Co:    Preferred Employers Inc.
Policy #:    FLN-169583-1

165.00       0.00

**Invoice**



**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

| | |
|---|---|
| **License #:** | FLC000172472 |
| **Federal ID#:** | 77-0550948 |
| **State ID#:** | 513-8203-4 |
| **W/C Company:** | Preferred Employers Inc. |
| **W/C Policy #:** | FLN-169583-1 |

05/24/2021 to 05/30/2021

| | |
|---|---|
| **Invoice #:** | 2470 |
| **Invoice Date:** | 06/03/2021 |
| **Terms:** | Net On Receipt |

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| MISAEL CERVANTES BAUTISTA | 32 | Hrs | 15.00 | 480.00 |
| MAURILIO DE LA CRUZ VASQUEZ | 16 | Hrs | 15.00 | 240.00 |
| ANTONINO GERVACIO GONZALEZ | 8 | Hrs | 15.00 | 120.00 |
| ERNESTO GERVACIO ORTEGA | 45 | Hrs | 15.00 | 675.00 |
| DOMINGO VAZQUEZ GONZALES | 45 | Hrs | 16.00 | 720.00 |
| ROGELIO HERNANDEZ SARMIENTO | 37 | Hrs | 15.00 | 555.00 |
| PABLO IGNACIO SANTIAGO | 16 | Hrs | 15.00 | 240.00 |
| TOMASA LEAL GONZALES | 45 | Hrs | 15.00 | 675.00 |
| DOMINICA LOPEZ GARCIA | 20 | Hrs | 15.00 | 300.00 |
| HELIODORO LOPEZ GARCIA | 20 | Hrs | 17.00 | 340.00 |
| HERMENEGILDO LOPEZ GARCIA | 12 | Hrs | 15.00 | 180.00 |
| ISMAEL LOPEZ CUELLAR | 20 | Hrs | 15.00 | 300.00 |
| JUVENTINO LOPEZ GARCIA | 16 | Hrs | 15.00 | 240.00 |
| MARCELINO LOPEZ CUELLAR | 20 | Hrs | 15.00 | 300.00 |
| ZENAIDA LOPEZ GARCIA | 20 | Hrs | 15.00 | 300.00 |
| LUIS LOPEZ | 16 | Hrs | 15.00 | 240.00 |
| ISAIAS MARTINEZ | 8 | Hrs | 15.00 | 120.00 |
| MODESTA MIGUEL LOPEZ | 4 | Hrs | 15.00 | 60.00 |
| EUTIQUIO PACHECO | 37 | Hrs | 15.00 | 555.00 |
| ROBERTO PADILLA MENDIOLA | 45 | Hrs | 15.00 | 675.00 |
| SAMUEL PENIAFORT HILARIO | 4 | Hrs | 15.00 | 60.00 |
| ALONSO PINZON PENIAFORT | 4 | Hrs | 15.00 | 60.00 |
| ABEL RAMIREZ RAMON | 37 | Hrs | 15.00 | 555.00 |
| ELENA ROJAS GALVEZ | 16 | Hrs | 15.00 | 240.00 |
| JOSEFINA SANTIAGO PONCE | 8 | Hrs | 15.00 | 120.00 |
| Labor Subtotal | 551 | Hrs | | 8,350.00 |

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 368



**Invoice**                                        Page #: 2

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

05/24/2021 to 05/30/2021

**Invoice #:** 2470
**Invoice Date:** 06/03/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| LABOR FEE | 37.00% | | | 3,089.50 |

Invoice Total:  $11,439.50

Totals:
Other                      11,439.50

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 369

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 06/09/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75     Grower Name: RABBIT RIDGE

Worker's Comp Co:   Preferred Employers Inc.
Policy #:   FLN-169583-1

| Acct # | Employee Name | Crew # | Day | Description | Type | Hours | Pieces | Rate | Amount |
|--------|---------------|--------|-----|-------------|------|-------|--------|------|--------|
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 14708 | DE LA CRUZ VASQUEZ, MAURILIO | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17446 | LOPEZ GARCIA, HELIODORO | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 17.0000 | 68.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17448 | LOPEZ CUELLAR, ISMAEL | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17450 | LOPEZ GARCIA, JUVENTINO | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17451 | LOPEZ CUELLAR, MARCELINO | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17452 | GERVACIO GONZALEZ, ANTONIN | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17453 | PENIAFORT HILARIO, SAMUEL | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17454 | MIGUEL LOPEZ, MODESTA | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17455 | PINZON PENIAFORT, ALONSO | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17456 | LOPEZ GARCIA, ZENAIDA | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17457 | LOPEZ GARCIA, DOMINICA | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17488 | LOPEZ, LUIS | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17518 | VASZQUEZ SANTIAGO, ALVARO | HE | 31 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17518 | VASZQUEZ SANTIAGO, ALVARO | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17519 | JIMENEZ PALACIOS, NELIDA | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 17520 | SALGADO, MARIO | HE | 01 | Training New Plants | Reg. Hrs | 4.00 | | 15.0000 | 60.00 |
| 15956 | HERNANDEZ SARMIENTO, ROGEL | DOM | 31 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 01 | Training New Plants | Reg. Hrs | 6.50 | | 15.0000 | 97.50 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17099 | LEAL GONZALES, TOMASA | DOM | 05 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 01 | Training New Plants | Reg. Hrs | 6.50 | | 16.0000 | 104.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | | 16.0000 | 128.00 |
| 17100 | GONZALES, DOMINGO VAZQUEZ | DOM | 05 | Training New Plants | Reg. Hrs | 5.00 | | 16.0000 | 80.00 |
| 17371 | CERVANTES BAUTISTA, MISAEL | DOM | 31 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 31 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 02 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17475 | PADILLA MENDIOLA, ROBERTO | DOM | 05 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 31 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 02 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17499 | RAMIREZ RAMON, ABEL | DOM | 05 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 31 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 02 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17502 | GERVACIO ORTEGA, ERNESTO | DOM | 05 | Training New Plants | Reg. Hrs | 5.00 | | 15.0000 | 75.00 |
| 17062 | AMADO LEON, AGUSTIN | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17062 | AMADO LEON, AGUSTIN | DOM | 02 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17062 | AMADO LEON, AGUSTIN | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17062 | AMADO LEON, AGUSTIN | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17063 | ORTEGA LEONARDO, AMALIA | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17063 | ORTEGA LEONARDO, AMALIA | DOM | 02 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |
| 17063 | ORTEGA LEONARDO, AMALIA | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | | 15.0000 | 120.00 |

EXHIBIT 20
PAGE 370

**Nevarez Farm Labor, Inc.**
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

| | |
|---|---|
| Date: 06/09/2021 | Worker's Comp Co:  Preferred Employers Inc. |
| Farm Labor #:  FLC000172472 | Policy #:  FLN-169583-1 |
| Federal ID #:  77-0550948 | |
| State ID #:  513-8203-4 | |
| Grower #:  75    Grower Name:  RABBIT RIDGE | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17063 | ORTEGA LEONARDO, AMALIA | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17401 | MARTINEZ MATEO, JAVIER | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17401 | MARTINEZ MATEO, JAVIER | DOM | 02 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17401 | MARTINEZ MATEO, JAVIER | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17401 | MARTINEZ MATEO, JAVIER | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17498 | GARCIA ORTEGA, ALFONSO | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17498 | GARCIA ORTEGA, ALFONSO | DOM | 02 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17498 | GARCIA ORTEGA, ALFONSO | DOM | 03 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17498 | GARCIA ORTEGA, ALFONSO | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17498 | GARCIA ORTEGA, ALFONSO | DOM | 05 | Training New Plants | Reg. Hrs | 4.50 | 15.0000 | 67.50 |
| 17498 | GARCIA ORTEGA, ALFONSO | DOM | 05 | Training New Plants | OT Hrs | 0.50 | 22.5000 | 11.25 |
| 17515 | FLORES ORTIZ, MICHELLE | DOM | 01 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17515 | FLORES ORTIZ, MICHELLE | DOM | 04 | Training New Plants | Reg. Hrs | 8.00 | 15.0000 | 120.00 |
| 17515 | FLORES ORTIZ, MICHELLE | DOM | 05 | Training New Plants | Reg. Hrs | 5.00 | 15.0000 | 75.00 |
| | Total for Crop ID RABLIVE Rabbit Ridge Live oak | | | | | 468.00 | | 7,067.25 |

| | | | |
|---|---|---|---|
| | Gross Wages, This Report: | 468.00 | 7,067.25 |

**Employee information for the week ending 06/06/2021:**

| Employee Name/Address | S.S. #/Acct # | Hours | Pieces | Report Wages | Gross Wages | SDI | FICA Medicare | Fed Wht St Wht | Other | Net Check | Check # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AMADO LEON, AGUSTIN 1213 CORRAL CREEK AVENUE APT# PASO ROBLES, CA 93446 | XXX-XX-3478 17062 | 32.00 | 0 | 480.00 | 607.50 | 7.29 | 37.67 8.81 | 0.00 0.00 | 0.00 | 553.73 | 176459 |
| CERVANTES BAUTISTA, MISAEL 3450 PARK ST UNIT 102 PASO ROBLES, CA 93446 | XXX-XX-2319 17371 | 8.00 | 0 | 120.00 | 120.00 | 1.44 | 7.44 1.74 | 0.00 0.00 | 0.00 | 109.38 | 176357 |
| DE LA CRUZ VASQUEZ, MAURILIO 4750 JARDINE ROAD PASO ROBLES, CA 93446 | XXX-XX-0528 14708 | 8.00 | 0 | 120.00 | 180.00 | 2.16 | 11.16 2.61 | 0.00 0.00 | 0.00 | 164.07 | 176301 |
| FLORES ORTIZ, MICHELLE 1106 ALAMO CREEK TERRACE APT# PASO ROBLES, CA 93446 | XXX-XX-0738 17515 | 21.00 | 0 | 315.00 | 442.50 | 5.31 | 27.43 6.42 | 0.00 0.00 | 0.00 | 403.34 | 176467 |
| GARCIA ORTEGA, ALFONSO 1106 ALAMO CREEK APT#3 PASO ROBLES, CA 93446 | XXX-XX-4832 17498 | 37.00 | 0 | 558.75 | 686.25 | 8.24 | 42.55 9.95 | 0.00 0.00 | 0.00 | 625.51 | 176465 |
| GERVACIO GONZALEZ, ANTONINO 1209 ALAMO CREEK APT#10 PASO ROBLES, CA `93446 | XXX-XX-0242 17452 | 8.00 | 0 | 120.00 | 495.00 | 5.94 | 30.69 7.18 | 0.00 0.00 | 0.00 | 451.19 | 176307 |
| GERVACIO ORTEGA, ERNESTO 1210 CORRAL CREEK AVE APT#3 PASO ROBLES, CA 93446 | XXX-XX-0994 17502 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85 9.78 | 0.00 0.00 | 0.00 | 615.27 | 176360 |
| GONZALES, DOMINGO VAZQUEZ 1210 CORRAL CREEK ATP 3 PASO ROBLES, CA 93446 | XXX-XX-9679 17100 | 27.50 | 0 | 440.00 | 440.00 | 5.28 | 27.28 6.38 | 0.00 0.00 | 0.00 | 401.06 | 176356 |
| HERNANDEZ SARMIENTO, ROGELI 815 34TH ST. #B  PASO ROBLES, CA 93446 | XXX-XX-4851 15956 | 8.00 | 0 | 120.00 | 120.00 | 1.44 | 7.44 1.74 | 0.00 0.00 | | 109.38 | 176354 |
| JIMENEZ PALACIOS, NELIDA 1112 E WHITNEY STREET APT# J3 AVENAL, CA 93204 | XXX-XX-6065 17519 | 4.00 | 0 | 60.00 | 60.00 | 0.72 | 3.72 0.87 | 0.00 0.00 | 0.00 | 54.69 | 176315 |
| LEAL GONZALES, TOMASA 1210 CORRAL CREEK AVE APT 3 PASO ROBLES, CA 93446 | XXX-XX-6219 17099 | 27.50 | 0 | 412.50 | 412.50 | 4.95 | 25.57 5.98 | 0.00 0.00 | 0.00 | 376.00 | 176355 |
| LOPEZ GARCIA, DOMINICA 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-7870 17457 | 8.00 | 0 | 120.00 | 375.00 | 4.50 | 23.25 5.44 | 0.00 0.00 | 0.00 | 341.81 | 176312 |
| LOPEZ GARCIA, HELIODORO 1208 CORRAL CREEK APT#7 PASO ROBLES, CA 93446 | XXX-XX-6792 17446 | 8.00 | 0 | 136.00 | 416.50 | 5.00 | 25.82 6.04 | 0.00 0.00 | 0.00 | 379.64 | 176302 |

EXHIBIT 20
PAGE 371

Nevarez Farm Labor, Inc.
5880 North River Road
Paso Robles, CA 93446
Labor Contractor Report

Date: 06/09/2021
Farm Labor #: FLC000172472
Federal ID #: 77-0550948
State ID #: 513-8203-4
Grower #: 75    Grower Name: RABBIT RIDGE

Worker's Comp Co: Preferred Employers Inc.
Policy #: FLN-169583-1

| Name / Address | SSN / ID | Hours | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LOPEZ CUELLAR, ISMAEL<br>1209 ALAMO CREEK APT#10<br>PASO ROBLES, CA 93446 | XXX-XX-5853<br>17448 | 8.00 | 0 | 120.00 | 495.00 | 5.94 | 30.69<br>7.18 | 0.00<br>0.00 | 0.00 | 451.19 | 176303 |
| LOPEZ GARCIA, JUVENTINO<br>1208 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-1820<br>17450 | 8.00 | 0 | 120.00 | 247.50 | 2.97 | 15.34<br>3.59 | 0.00<br>0.00 | 0.00 | 225.60 | 176305 |
| LOPEZ CUELLAR, MARCELINO<br>1209 ALAMO CREEK APT#10<br>PASO ROBLES, CA 93446 | XXX-XX-2089<br>17451 | 8.00 | 0 | 120.00 | 375.00 | 4.50 | 23.25<br>5.44 | 0.00<br>0.00 | 0.00 | 341.81 | 176306 |
| LOPEZ GARCIA, ZENAIDA<br>1208 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-8683<br>17456 | 8.00 | 0 | 120.00 | 375.00 | 4.50 | 23.25<br>5.44 | 0.00<br>0.00 | 0.00 | 341.81 | 176311 |
| LOPEZ, LUIS<br>165 N 3RD STREET<br>SHANDON, CA 934461 | XXX-XX-7743<br>17488 | 4.00 | 0 | 60.00 | 120.00 | 1.44 | 7.44<br>1.74 | 0.00<br>0.00 | 0.00 | 109.38 | 176313 |
| MARTINEZ MATEO, JAVIER<br>1213 CORRAL CREEK AVENUE APT#<br>PASO ROBLES, CA 93446 | XXX-XX-8326<br>17401 | 32.00 | 0 | 480.00 | 607.50 | 7.29 | 37.66<br>8.81 | 0.00<br>0.00 | 0.00 | 553.74 | 176463 |
| MIGUEL LOPEZ, MODESTA<br>1222 CORAL CREEK APT#6<br>PASO ROBLES, CA 93446 | XXX-XX-0535<br>17454 | 8.00 | 0 | 120.00 | 495.00 | 5.94 | 30.69<br>7.17 | 0.00<br>0.00 | 0.00 | 451.20 | 176309 |
| ORTEGA LEONARDO, AMALIA<br>3025 VINE ST<br>PASO ROBLES, CA 93446 | XXX-XX-7263<br>17063 | 32.00 | 0 | 480.00 | 607.50 | 7.29 | 37.66<br>8.81 | 0.00<br>0.00 | 0.00 | 553.74 | 176460 |
| PADILLA MENDIOLA, ROBERTO<br>5825 VISTA SERRANO<br>PASO ROBLES, CA 93446 | XXX-XX-9895<br>17475 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85<br>9.79 | 0.00<br>0.00 | 0.00 | 615.26 | 176358 |
| PENIAFORT HILARIO, SAMUEL<br>1222 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-4127<br>17453 | 8.00 | 0 | 120.00 | 495.00 | 5.94 | 30.69<br>7.18 | 0.00<br>0.00 | 0.00 | 451.19 | 176308 |
| PINZON PENIAFORT, ALONSO<br>1222 CORRAL CREEK APT#7<br>PASO ROBLES, CA 93446 | XXX-XX-7643<br>17455 | 8.00 | 0 | 120.00 | 240.00 | 2.88 | 14.88<br>3.48 | 0.00<br>0.00 | 0.00 | 218.76 | 176310 |
| RAMIREZ RAMON, ABEL<br>2749 E NORMAN DRIVE<br>VISALIA, CA 93292 | XXX-XX-5509<br>17499 | 45.00 | 0 | 675.00 | 675.00 | 8.10 | 41.85<br>9.79 | 0.00<br>0.00 | 0.00 | 615.26 | 176359 |
| SALGADO, MARIO<br>1112 E WHITNEY STREET APT J3<br>AVENAL, CA 93204 | XXX-XX-4552<br>17520 | 4.00 | 0 | 60.00 | 60.00 | 0.72 | 3.72<br>0.87 | 0.00<br>0.00 | 0.00 | 54.69 | 176316 |
| VASZQUEZ SANTIAGO, ALVARO<br>1148 L STREET<br>PASO ROBLES, CA 93446 | XXX-XX-3416<br>17518 | 8.00 | 0 | 120.00 | 240.00 | 2.88 | 14.88<br>3.48 | 0.00<br>0.00 | 0.00 | 218.76 | 176314 |
| Totals: | | 468.00 | 0 | 7,067.25 | 10,737.75 | 128.86 | 665.72<br>155.71 | 0.00<br>0.00 | 0.00 | 9,787.46 | |

EXHIBIT 20
PAGE 372

**Invoice**



**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

05/31/2021 to 06/06/2021

**Invoice #:** 2471
**Invoice Date:** 06/09/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| AGUSTIN AMADO LEON | 32.00 | Hrs | 15.00 | 480.00 |
| MISAEL CERVANTES BAUTISTA | 8.00 | Hrs | 15.00 | 120.00 |
| MAURILIO DE LA CRUZ VASQUEZ | 8.00 | Hrs | 15.00 | 120.00 |
| MICHELLE FLORES ORTIZ | 21.00 | Hrs | 15.00 | 315.00 |
| ALFONSO GARCIA ORTEGA | 36.50 | Hrs | 15.00 | 547.50 |
| ALFONSO GARCIA ORTEGA | 0.50 | OT Hrs | 22.50 | 11.25 |
| ANTONINO GERVACIO GONZALEZ | 8.00 | Hrs | 15.00 | 120.00 |
| ERNESTO GERVACIO ORTEGA | 45.00 | Hrs | 15.00 | 675.00 |
| DOMINGO VAZQUEZ GONZALES | 27.50 | Hrs | 16.00 | 440.00 |
| ROGELIO HERNANDEZ SARMIENTO | 8.00 | Hrs | 15.00 | 120.00 |
| NELIDA JIMENEZ | 4.00 | Hrs | 15.00 | 60.00 |
| TOMASA LEAL GONZALES | 27.50 | Hrs | 15.00 | 412.50 |
| DOMINICA LOPEZ GARCIA | 8.00 | Hrs | 15.00 | 120.00 |
| HELIODORO LOPEZ GARCIA | 8.00 | Hrs | 17.00 | 136.00 |
| ISMAEL LOPEZ CUELLAR | 8.00 | Hrs | 15.00 | 120.00 |
| JUVENTINO LOPEZ GARCIA | 8.00 | Hrs | 15.00 | 120.00 |
| MARCELINO LOPEZ CUELLAR | 8.00 | Hrs | 15.00 | 120.00 |
| ZENAIDA LOPEZ GARCIA | 8.00 | Hrs | 15.00 | 120.00 |
| LUIS LOPEZ | 4.00 | Hrs | 15.00 | 60.00 |
| JAVIER MARTINEZ MATEO | 32.00 | Hrs | 15.00 | 480.00 |
| MODESTA MIGUEL LOPEZ | 8.00 | Hrs | 15.00 | 120.00 |
| AMALIA ORTEGA LEONARDO | 32.00 | Hrs | 15.00 | 480.00 |
| ROBERTO PADILLA MENDIOLA | 45.00 | Hrs | 15.00 | 675.00 |
| SAMUEL PENIAFORT HILARIO | 8.00 | Hrs | 15.00 | 120.00 |
| ALONSO PINZON PENIAFORT | 8.00 | Hrs | 15.00 | 120.00 |
| ABEL RAMIREZ RAMON | 45.00 | Hrs | 15.00 | 675.00 |

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 373



**Invoice**                                   Page #: 2

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

05/31/2021 to 06/06/2021

**Invoice #:** 2471
**Invoice Date:** 06/09/2021
**Terms:** Net On Receipt

| Description | Quantity | Unit | Price | Total |
|---|---|---|---|---|
| MARIO SALGADO | 4.00 | Hrs | 15.00 | 60.00 |
| ALVARO VASZQUEZ SANTIAGO | 8.00 | Hrs | 15.00 | 120.00 |
| Labor Subtotal | 467.50 | Hrs | | 7,067.25 |
| | 0.50 | OT Hrs | | |
| LABOR FEE | 37.00% | | | 2,614.88 |

Invoice Total:          $9,682.13

**Totals:**
Other                          9,682.13

*Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446*

EXHIBIT 20
PAGE 374



**Invoice**

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

Interest Accrued Invoice

**Invoice #:** 2927
**Invoice Date:** 11/16/2021
**Terms:** Net On Receipt

| Description | Quantity | Price | Total |
|---|---|---|---|
| 12% Interest on Unpaid ($56,803.97) Invoices | 1 | 6,816.48 | 6,816.48 |

Invoice Total: $6,816.48

**Totals:**
Other                6,816.48

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 375



**Invoice**

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

2nd Interest Accrued Invoice

**Invoice #:** 2990
**Invoice Date:** 12/16/2021
**Terms:** Net On Receipt

| Description | Quantity | Price | Total |
|---|---|---|---|
| 12% Interest on Unpaid ($63,620.45) Invoices | 1 | 7,634.45 | 7,634.45 |
| | | Invoice Total: | $7,634.45 |

**Totals:**
Other                                                          7,634.45

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 376



**Invoice**

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

3rd Interest Accrued Invoice

**Invoice #:** 3050
**Invoice Date:** 01/16/2022
**Terms:** Net On Receipt

| Description | Quantity | Price | Total |
|---|---|---|---|
| 12% Interest on Unpaid ($71,254.90) Invoices | 1 | 8,550.58 | 8,550.58 |

Invoice Total: $8,550.58

**Totals:**
Other                                              8,550.58

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 377

**Invoice**



| | |
|---|---|
| **Bill To:** | **License #:** FLC000172472 |
| RABBIT RIDGE | **Federal ID#:** 77-0550948 |
| 1172 SAN MARCOS ROAD | **State ID#:** 513-8203-4 |
| PASO ROBLES, CA 93446 | **W/C Company:** Preferred Employers Inc. |
| | **W/C Policy #:** FLN-169583-1 |

4th Interest Accrued Invoice

**Invoice #:** 3108
**Invoice Date:** 02/16/2022
**Terms:** Net On Receipt

| Description | Quantity | Price | Total |
|---|---|---|---|
| 12% Interest on Unpaid ($79,805.49) Invoices | 1 | 9,576.66 | 9,576.66 |
| | | Invoice Total: | $9,576.66 |

**Totals:**
Other                                                                        9,576.66

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 378



**Invoice**

**Bill To:**
RABBIT RIDGE
1172 SAN MARCOS ROAD
PASO ROBLES, CA 93446

**License #:** FLC000172472
**Federal ID#:** 77-0550948
**State ID#:** 513-8203-4
**W/C Company:** Preferred Employers Inc.
**W/C Policy #:** FLN-169583-1

5th Interest Accrued Invoice

**Invoice #:** 3228
**Invoice Date:** 03/16/2022
**Terms:** Net On Receipt

| Description | Quantity | Price | Total |
|---|---|---|---|
| 12% Interest on Unpaid ($89,382.15) Invoices | 1 | 10,725.86 | 10,725.86 |

**Invoice Total:** $10,725.86

**Totals:**
Other                                         10,725.86

Please Send all Payments to 5880 North River Road, Paso Robles, CA 93446

EXHIBIT 20
PAGE 379

**EXHIBIT 21**

1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  TINHO MANG, #322146
   tmang@marshackhays.com
3  MARSHACK HAYS LLP
   870 Roosevelt
4  Irvine, California 92620
   Telephone: (949) 333-7777
5  Facsimile: (949) 333-7778

6  Attorneys for Chapter 7 Trustee,
   RICHARD A. MARSHACK

7

8                    UNITED STATES BANKRUPTCY COURT

9           CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

10
    In re                                    Case No. 8:20-bk-13014-ES
11
    NORTHERN HOLDING, LLC,                   Chapter 7 (converted)
12
              Debtor.                        [PROPOSED] ORDER TO SHOW CAUSE
13                                           RE: CIVIL CONTEMPT FOR WILLFUL
                                             VIOLATION OF AUTOMATIC STAY
14                                           AND THE COURT'S FARM OPERATOR
                                             ORDER
15
                                             [MOTION – DOCKET NO. X]
16
                                             [HEARING NOT REQUIRED –
17                                           LBR 9020-1(D)]

18        The Court has read and considered the application ("Motion") filed on April 1 2022, as

19  Docket No. __, by Richard A. Marshack, the duly-appointed and acting chapter 7 trustee ("Trustee")

20  of the bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor") for issuance of an order to

21  show cause re: civil contempt pursuant to Local Bankruptcy Rule 9020-1, against alleged contemnor

22  LeRoy E. Codding IV ("Codding"), in his individual capacity and as the manager of any other entity

23  including Rabbit Ridge Wine Sales, Inc. ("RR") for unlawfully receiving money constituting cash

24  collateral and property of the Estate.

25        After review of the Motion and evidence attached thereto, and the oppositions and responses

26  to the Motion filed on _____ by _____, as Docket No. __, the Court

27  finds good cause to commence contempt proceedings regarding Codding's alleged disobedience of

28  specific and definite orders of the Court, including (as discussed in the Motion) the "Operate Order"

EXHIBIT 21
PAGE 381

1  entered on September 7, 2021, as Docket No. 211, and the "Turnover Order" entered on August 23,

2  2021, as Docket No. 196, violated the automatic stay of 11 U.S.C. § 362, and Codding may not be

3  entitled to a claim for reimbursement against the Estate pursuant to 11 U.S.C. § 502(d).

4      After reviewing the Motion, filed on April 1, 2022, as Dk. No. ___, the Court has found good

5  cause to issue an Order to Show Cause as follows;

6      **IT IS ORDERED THAT** the personal attendance of LeRoy E. Codding IV is required, in

7  Courtroom 5A of the United States Bankruptcy Court, Central District, located at 411 W. Fourth

8  Street, Santa Ana, CA 92701, on _____ ___, 2022 at _____ ___.m. At that time, Codding is

9  **ORDERED** to appear and show cause why the Court should not hold Codding in contempt and

10  impose appropriate civil contempt sanctions. Pursuant to the Court's remote hearing procedures, and

11  in light of the ongoing COVID-19 pandemic, the hearing shall be conducted remotely via Zoom for

12  Government, and appearances may be made using the following information:

13      [INSERT ZOOM INFORMATION]

14  Codding shall appear via Zoom video and may appear alongside counsel. However, Codding's

15  personal attendance at the hearing is required.

16      **IT IS FURTHER ORDERED** that Codding may file a written response to this Order to

17  Show Cause no later than _____, 2022, and may attach any evidence, including declarations

18  and documents, in response to this Order to Show Cause; and the Trustee may file a reply brief no

19  later than _____, 2022.

20      At the hearing, Codding shall appear in person and be prepared to show cause why the Court

21  should not issue an order:

22      (1)   Finding Codding and his related entities, such as Rabbit Ridge Wine Sales, Inc. or

23  Humanity Wine Company, LLC, in civil contempt of the Operate Order by disobeying the Court's

24  directive that all proceeds shall be paid to the Trustee prior to the payment of reimbursements;

25      (2)   Finding Codding and his related entities, such as Rabbit Ridge Wine Sales, Inc. or

26  Humanity Wine Company, LLC, in civil contempt of the Turnover Order by their continued use and

27  unauthorized access to buildings, equipment, and inventory at 1172 San Marcos Road, Paso Robles,

28  CA ("San Marcos Property") when Codding had agreed in both a turnover stipulation and the farm

EXHIBIT 21
PAGE 382

operator agreement not to access the San Marcos Property or to operate any equipment at the San Marcos Property;

(3) Finding Codding knowingly and willfully violated the automatic stay of 11 U.S.C. § 362(a)(3) by knowingly receiving and refusing to turn over funds constituting property of the Estate derived from the sale of crops on Estate properties in an amount no less than $140,960.31 totaling the amounts Codding admitted to receiving in an e-mail dated December 8, 2021, and by unilaterally negotiating grape purchase agreements with third-party buyers without informing Trustee, which prevented Trustee from having sufficient knowledge and negotiating power to obtain the best result for the Estate; and

(4) Issuing coercive civil contempt sanctions under the Court's inherent authority and pursuant to 11 U.S.C. § 105(a), including:

    a. Imposition of compensatory damages incurred by the Estate, to remedy the willful violation of the Operate Order, including but not limited to the following:

        i. Attorneys' fees and costs;

        ii. The entire amount of proceeds unlawfully received by Codding derived from crops grown on property of the Estate;

        iii. Any claims for unpaid farm laborers or other third-party incurred during Codding's period of operations in the Chapter 7 period, including but not limited to the invoices of Miller Drilling Company and Wayne Cooper, or any unpaid farm laborer, or any unpaid trucking or shipping company; and/or

        iv. Any claims for breach of contract, if any, from third party grape purchasers dissatisfied with the shipment of crop received in 2021.

    b. Disallowance of any claim of reimbursement by Codding unless and until he has paid the compensatory damages and turned over all property of the Estate and proceeds of property of the Estate to Trustee pursuant to 11 U.S.C. § 502(d).

(5) Directing Codding to provide, within 30 days of the entry of such order, documentation to Trustee which fully and satisfactorily explains the following:

    a. All direct farming expenses incurred from the date of the Operate Order (September

EXHIBIT 21
PAGE 383

1    7, 2021) through October 31, 2021, the last date of authorized farming operations;

b.   To the extent that additional reimbursements are sought, an explanation and check image or other proof of payment of any actual expense reasonably related to farming operations;

c.   All crops and grapes harvested on Estate property for the Fall 2021 harvest, including a report for each grape varietal of acreage grown, acres and tonnage harvested, acres and tonnage shipped (including recipients), and tonnage wasted;

d.   All crops and grapes processed on property of the Estate, including any crops and grapes harvested from the Properties or any other grapes crushed or pressed using equipment located at the San Marcos Property after June 15, 2021;

e.   All proceeds of grapes or wine/inventory sales received by Codding or his related entities since June 15, 2021, including bank statements and check images, or credit card processing records;

f.   All subsequent expenditures, transfers, distributions, or disbursements of the proceeds of grapes received by Codding or his related entities, including but not limited to the $140,960.31 in funds that he admitted to receiving directly; and

g.   All grape purchase contracts for the purchase of grapes and crop from the Properties from the Petition Date through March 2022, whether or not Trustee was a party to such agreement, and whether or not such agreement was ultimately executed and performed by any party.

h.   Copies (front and back) of all cancelled checks or check images, where they exist, for all payments made by check – for payments not made by check, copies of proof of payment (cashier's check, cash, credit, etc.) for any other expenses.

i.   All utility bills including gas, electric, power, and water which were actually paid by Codding or any related entity for the months of June 2021 through March 2022.

/ / /

/ / /

EXHIBIT 21
PAGE 384

(6)    Providing injunctive and declaratory relief regarding any of the foregoing, including a declaratory order finding that no other court, commission, panel, committee, or federal or state authority, has jurisdiction regarding property of the Estate and the administration of property of the Estate absent an express order from this Court pursuant to *Barton v. Barbour*.

# # #

EXHIBIT 21
PAGE 385

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled: **NOTICE AND APPLICATION FOR ISSUANCE OF AN ORDER TO SHOW CAUSE RE: CIVIL CONTEMPT FOR WILLFUL VIOLATION OF AUTOMATIC STAY AND THE COURT'S FARM OPERATOR ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RICHARD A. MARSHACK AND LORI ENSLEY; REQUEST FOR JUDICIAL NOTICE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 31, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **April 1, 2022**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 1, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>VIA PERSONAL DELIVERY:</u>
**PRESIDING JUDGE'S COPY**
HONORABLE ERITHE A. SMITH
UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA
RONALD REAGAN FEDERAL BUILDING AND COURTHOUSE
411 WEST FOURTH STREET, SUITE 5040 / COURTROOM 5A
SANTA ANA, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 1, 2022 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:
   - **INTERESTED PARTY COURTESY NEF:** William H Brownstein Brownsteinlaw.bill@gmail.com
   - **INTERESTED PARTY COURTESY NEF:** Steve Burnell sburnell@sulmeyerlaw.com, sburnell@ecf.courtdrive.com; sburnell@ecf.inforuptcy.com; mviramontes@sulmeyerlaw.com
   - **ATTORNEY FOR INTERESTED PARTY LEE CODDING:** Robert P Goe kmurphy@goeforlaw.com, rgoe@goeforlaw.com; goeforecf@gmail.com
   - **ATTORNEY FOR U.S. TRUSTEE (SA):** Nancy S Goldenberg nancy.goldenberg@usdoj.gov
   - **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Michael J Gomez mgomez@frandzel.com, dmoore@frandzel.com
   - **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** D Edward Hays ehays@marshackhays.com, ehays@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@marshackhays.com; cmendoza@ecf.courtdrive.com
   - **ATTORNEY FOR INTERESTED PARTY LEE CODDING:** Brandon J Iskander biskander@goeforlaw.com, kmurphy@goeforlaw.com
   - **ATTORNEY FOR RESPONDENTS ERICH RUSSELL AND JOANNE RUSSELL:** Kari L Ley Ley1238@att.net
   - **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** Tinho Mang tmang@marshackhays.com, tmang@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com; cmendoza@ecf.courtdrive.com
   - **TRUSTEE RICHARD A MARSHACK (TR):** Richard A Marshack (TR) pkraus@marshackhays.com, rmarshack@iq7technology.com; ecf.alert+Marshack@titlexi.com
   - **ATTORNEY FOR INTERESTED PARTY BANK DIRECT CAPITAL FINANCE:** Elissa Miller emiller@sulmeyerlaw.com, emillersk@ecf.inforuptcy.com; ccaldwell@sulmeyerlaw.com
   - **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Roksana D. Moradi-Brovia roksana@rhmfirm.com, matt@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
   - **ATTORNEY FOR CREDITOR ADLER BELMONT GROUP, INC.:** Paul F Ready tamara@farmerandready.com
   - **ATTORNEY FOR DEBTOR NORTHERN HOLDING LLC:** Matthew D. Resnik matt@rhmfirm.com, roksana@rhmfirm.com; janita@rhmfirm.com; susie@rhmfirm.com; max@rhmfirm.com; priscilla@rhmfirm.com; pardis@rhmfirm.com; russ@rhmfirm.com; rebeca@rhmfirm.com; david@rhmfirm.com; sloan@rhmfirm.com
   - **ATTORNEY FOR INTERESTED PARTY RIBOLI PASO ROBLES, LLC:** Victor A Sahn vsahn@sulmeyerlaw.com, pdillamar@sulmeyerlaw.com; pdillamar@ecf.inforuptcy.com; vsahn@ecf.inforuptcy.com; cblair@sulmeyerlaw.com; cblair@ecf.inforuptcy.com
   - **ATTORNEY FOR TRUSTEE RICHARD A MARSHACK (TR):** Kristine A Thagard kthagard@marshackhays.com, kthagard@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com
   - **UNITED STATES TRUSTEE (SA):** United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
   - **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Reed S Waddell rwaddell@frandzel.com, sking@frandzel.com
   - **ATTORNEY FOR CREDITOR FARM CREDIT WEST, FLCA:** Gerrick Warrington gwarrington@frandzel.com, sking@frandzel.com
   - **INTERESTED PARTY COURTESY NEF:** David Wood dwood@marshackhays.com, dwood@ecf.courtdrive.com; lbuchananmh@ecf.courtdrive.com; kfrederick@ecf.courtdrive.com

2. **SERVED BY UNITED STATES MAIL**: CONTINUED:

| **DEBTOR** | **INTERESTED PARTY** |
|---|---|
| NORTHERN HOLDING, LLC<br>ATTN: OFFICER, A MANAGING OR GENERAL AGENT,<br>OR TO ANY OTHER AGENT AUTHORIZED BY<br>APPOINTMENT OR LAW TO RECEIVE SERVICE<br>13217 JAMBOREE RD #429<br>TUSTIN, CA 92782 | LEE CODDING<br>13217 JAMBOREE ROAD, #429<br>TUSTIN, CA 92782 |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_

**F 9013-3.1.PROOF.SERVICE**

**ATTORNEYS FOR FARM CREDIT WEST, FLCA**
MICHAEL J. GOMEZ, REED S. WADDELL, GERRICK
WARRINGTON
FRANDZEL ROBINS BLOOM & CSATO, LC
1000 WILSHIRE BLVD, FL 19
LOS ANGELES, CA 90017

**CREDITOR (CA SOS WEBSITE)**
RABBIT RIDGE WINE SALES, INC.
ATTN: LEROY CODDING, AGENT FOR SERVICE OF
PROCESS
179 NIBLICK ROAD, SUITE 406
PASO ROBLES, CA 93446-9693

**INTERESTED PARTY (CA SOS WEBSITE)**
FLUID WINE FUND LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT,
OR TO ANY OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE SERVICE
1244 PINE STREET, 101B
PASO ROBLES, CA 93446

**INTERESTED PARTY (CA SOS WEBSITE)**
HUMANITY WINE COMPANY LLC
ATTN: STEVEN JONES, AGENT FOR SERVICE OF
PROCESS
2814 COTTAGE LANE
PASO ROBLES, CA 93446

**INTERESTED PARTY (CA SOS WEBSITE)**
HUMANITY WINE COMPANY LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT,
OR TO ANY OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE SERVICE
179 NIBLICK ROAD, SUITE 326
PASO ROBLES, CA 93446-9693

**CREDITOR (MAIL MATRIX & CA SOS WEBSITE)**
RABBIT RIDGE WINE SALES, INC.
ATTN: OFFICER, A MANAGING OR GENERAL AGENT,
OR TO ANY OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE SERVICE
179 NIBLICK ROAD, #406
PASO ROBLES, CA 93446-9693

**INTERESTED PARTY (CA SOS WEBSITE)**
FLUID WINE FUND LLC
ATTN: STEVEN JONES, AGENT FOR SERVICE OF
PROCESS
2814 COTTAGE LANE
PASO ROBLES, CA 93446

**INTERESTED PARTY (CA SOS WEBSITE)**
FLUID WINE FUND LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT,
OR TO ANY OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE SERVICE
179 NIBLICK ROAD, SUITE 406
PASO ROBLES, CA 93446-9693

**INTERESTED PARTY (CA SOS WEBSITE)**
HUMANITY WINE COMPANY LLC
ATTN: OFFICER, A MANAGING OR GENERAL AGENT,
OR TO ANY OTHER AGENT AUTHORIZED BY
APPOINTMENT OR LAW TO RECEIVE SERVICE
2814 COTTAGE LANE
PASO ROBLES, CA 93446

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**