Robert P. Goe – State Bar No. 137019
Brandon J. Iskander – State Bar No. 300916
**GOE FORSYTHE & HODGES, LLP**
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
rgoe@goeforlaw.com
biskander@goeforlaw.com

Telephone: (949) 798-2460
Facsimile:  (949) 955-9437

Attorneys for Leroy "Lee" Codding

```
           FILED

        JUL - 1 2022

   CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk
```

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>NORTHERN HOLDING, LLC,<br><br>       Debtor. | Case No. 8:20-bk-13014-ES<br><br>Chapter 7 Proceeding<br><br>**OPPOSITION OF LEROY "LEE" CODDING (AND ANY RELATED ENTITIES) TO RICHARD A. MARSHACK'S APPLICATION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE: CIVIL CONTEMPT FOR WILLFUL VIOLATION OF AUTOMATIC STAY AND THE COURT'S FARM OPERATOR ORDER; DECLARATION OF LEROY "LEE" CODDING IN SUPPORT THEROF**<br><br>**[NO HEARING REQUIRED]** |

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE, THE TRUSTEE AND HIS COUNSEL, AND ALL PARTIES IN INTEREST:**

LeRoy "Lee" Codding ("Mr. Codding") hereby opposes ("Opposition") Chapter 7 Trustee Richard A. Marshack's ("Trustee") Notice and Application for Issuance of an Order to Show Cause

1

1  re: Civil Contempt for Willful Violation of Automatic Stay and the Court's Farm Operator Order

2  filed April 1, 2022 [Docket No. 304] ("Motion").[1]

3  **I.**      **PRELIMINARY STATEMENT**

4        In an absolutely unprecedented filing, Trustee seeks contempt against his own hand-picked

5  agent, Mr. Codding (a farmer), who Trustee admits facilitated the sale of a $9.1 million asset and

6  turned "water into wine" by harvesting grapes that no one else would touch.  The Court should

7  closely review the Chapter 7 Trustee's Motion to Operate ("Operate Motion"), which is attached as

8  Exhibit "3" to the Motion.

9        The unsecured claims in this case listed on the Claims Register total $62,365.24.  After the

10  Trustee receives the $468,000 that he earmarked for himself and his law firm, the Estate will still

11  hold over $230,000 of grape proceeds from grapes the Mr. Codding grew and harvested.  Adding

12  insult to the injury of having to respond to the Motion, the Trustee freely admits that but for

13  Codding's efforts, he would not have received these proceeds.

14        But today—the Estate being $230,000 richer (attached to the Declaration of LeRoy "Lee"

15  Codding ("Codding Declaration") as **Exhibit "B"** is the Trustee's Form 1 and 2)—the Trustee is

16  now dissatisfied with the rush operation that he solicited Mr. Codding to enter into (an operation

17  that literally no one else would do nor would Debtor's lender fund). So, the Trustee asks that the

18  Mr. Codding be denied any compensation under Section 502(d) of the Bankruptcy Code.  Moreover,

19  the Trustee would have the Court inflict the pain of contempt on perceived slights by Mr. Codding.

20        The Court should not be fooled by the Trustee's grandiose claims.  The Motion is simply a

21  bargaining tactic in a monetary dispute that the Mr. Codding has attempted to resolve in good faith

22  and will continue to do so.  The Motion must be denied and no OSC issued.[2]

23        \\\

24

25

26  _____

27  [1] As the parties attempted to resolve their dispute, pursuant to multiple Stipulations and Order (the latest filed June 29, 2022 [Docket No. 344], Codding's deadline to respond to the OSC was extended to July 1, 2022 and, therefore, this Opposition is timely filed.

28  [2] The Motion at 3:4-5, admits this is just an accounting matter to determine the amount Mr. Codding is entitled to be reimbursed.

|  |  | Taken literally, Mr. Codding could not store any harvested grapes and was required to leave them to rot once harvested.[7] |  |

Given the above, far from rising to the level of a specific and definite order, the Operate Order, which authorizes the Operate Agreement, does not give clear notice of what Mr. Codding was required to do or else be in contempt. Instead, Mr. Codding was called upon to *exercise judgment* under an agreement that was hastily-drafted and entered into. (*See* Codding Declaration.)

**B.**    **The Turnover Order**

The bankruptcy case was converted to one under Chapter 7 of the Bankruptcy Code on June 15, 2021. On August 2, 2021, the Trustee filed a procedurally-defective[8] Turnover Motion for occupancy and possession of the Properties against non-debtors "Rabbit Ridge Winery" and the family of Erich Russell (Docket No. 162) ("Turnover Motion"). Despite this, Mr. Codding as

---

[7] During questioning by the Trustee's counsel Mr. Mang at the February 8, 2022 deposition, Codding noted how baffling and unworkable it would be for there to be an agreement to harvest grapes while prohibiting the use of any equipment:

> MR. CODDING: It was not -- it was not my impression that we were unable to use tractors and that kind of thing because how else would we do it. Was I supposed to lease those as well and spend another 100,000?
> MR. MANG: You see also on page 2, going down a little bit, no access shall be allowed to operate for any other reason. And no access shall be allowed to operate or to any other asset or aspect of the real properties except with express written permission of the trustee. Do you see that?
> MR. CODDING: Right.
> MR. MANG: Did you ever ask the trustee in writing for permission to turn over the wines or to otherwise use any winery equipment?
> MR. CODDING: Not in writing, no.
> MR. MANG: Did the trustee ever authorize you to use any winery equipment or to process any wines?
> MR. CODDING: We had a verbal agreement. And there was a limited number of gallons that were processed. And everybody is aware of this. I've talked about this since before we did it until after it was done. If you don't do that, the license goes dormant. And then whoever buys that place doesn't have access to a functioning winery. You also lose the wastewater treatment permits if you don't do fermentation. So --
> MR. MANG: The license does not belong to the debtor, Northern Holding; is that correct?
> MR. CODDING: That's correct. But a functioning license as the property is an enhancement to the value of the property.
> MR. MANG: All right.
> MR. CODDING: So when stuff was being done, it was not at the behest of Northern. But it was occurring during the duration of this farming contract. I'm baffled at the equipment thing though.

(Motion, at 264-66.)

[8] Bankruptcy Rule 7001(1) is clear that any proceeding to recovery money or property other than to compel the debtor to deliver property to the trustee, with limited exceptions, is an adversary proceeding.

1   manager of Rabbit Ridge Wine Sales, Inc. cooperated and voluntarily entered into a stipulation with

2   the Trustee to turn over possession of the San Marcos Property (Docket No. 184) ("Turnover

3   Stipulation").  On August 23, 2021, the Court entered its Order Approving Stipulation for Turnover

4   of the San Marcos Property (Docket No. 196) ("Turnover Order").  The Turnover Order provided

5   that the lease of Rabbit Ridge Wine Sales Inc. for the San Marcos Property was terminated and that

6   Rabbit Ridge Wine Sales Inc. would vacate, turn over possession, and turn over all keys, gate

7   openers, and all other methods of access to the San Marcos Property by July 31, 2021.  The Trustee

8   was apparently satisfied with performance under the Turnover Stipulation since he entered into a

9   further Operate Agreement contemporaneously with the signing of the Turnover Stipulation.

10  (*Compare* Operate Agreement dated July 26, 2021 *with* Turnover Stipulation signed July 27, 2021.)

11      **C.    The Automatic Stay Under 11 U.S.C. § 362(a)(3)**

12          Ordinarily, the automatic stay prevents an entity from acting "to obtain possession of

13  property of the estate or of property from the estate" or acting "to exercise control over property of

14  the estate."  11 U.S.C. § 362(a)(3).  However, when the Trustee employs an agent *to operate the*

15  *Estate*, the Court must necessarily alter the stay and excuse acts by the employed agent to possess,

16  obtain, or exercise control over property of the Estate.  If not, then no one would contract to be an

17  agent of the bankruptcy Estate.  Any professional from an attorney or accountant obtaining and

18  using Estate documents to a broker marketing and selling property of the Estate would be in

19  violation of the automatic stay, subject to contempt, based on the whims and whimsy of a trustee.

20          Here, the automatic stay with respect to the Properties was modified by the Court-approved

21  Operate Agreement to authorize Mr. Codding: (1) to possess property of the Estate by maintaining

22  crops, including to "take all steps" to that end; (2) to exercise control, to possess, and to take from

23  property of the Estate by harvesting/picking grapes and with no direction at all on what to do with

24  the harvested grapes thereafter; (3) to possess and control property of the Estate by observing

25  unspecified "practices" with respect to the same; and (4) to possess and exercise control over

26  property of the Estate by transacting business with respect to the same.  (See Operate Agreement, at

27  ¶¶ 1-8.)

28

### D.    Revenue and Pre-Existing Sales Contracts

One term of particular focus for the Trustee in the Operate Agreement is as follows: "All revenue shall be made payable solely to 'Richard Marshack, Bankruptcy Trustee.'" However, as drafted, that term imposes obligations on non-parties to the Operate Agreement. Mr. Codding was not the purchaser of harvested grapes and would have no direct control the manner in which a purchaser's invoice department elected to pay. Moreover, as discussed *supra*, the Operate Agreement does not require the cancellation of all existing purchase contracts because the Operate Order does not require to Trustee to cancel them either. If there were existing grape contracts that the Trustee authorized verbally or in writing, said revenue would not be payable solely to Richard Marshack, Bankruptcy Trustee and would not violate the Operate Agreement.

At the February 8, 2022 341a in which Mr. Codding was unrepresented and not advised by the Trustee about the purpose and scope of questioning, Mr. Codding testified before being cut off by the Trustee that the Operate Agreement was not clear: "MR. CODDING: There's what's practical and there's what's black and white. And we weren't living in black and white. So --" (Motion, at 235:1-3.) Not satisfied with that response, the Trustee deflected blame over the unclear nature of their agreement and insinuated that he had fraud claims against Mr. Codding. (Motion, at 235:4-25, 236:1-2.) In response, Mr. Codding testified that some pre-existing contracts were necessary to preserve the value of the Properties as well as to fund the remainder of the harvest. (Motion for Contempt, at 235-36.) Certainly, nothing in the Operate Agreement provided that Codding was required to warrant the ability to fund the entire harvest without a penny's compensation from the Trustee. This is so especially given that no one else was available or interested in entering into an agreement with him to harvest grapes at the Properties. (*See* entirety of Operate Motion, Motion, Exhibit "4".)

### E.    Codding Was the Only Person Willing to Harvest the Grapes

As the Trustee represented to the Court, the alternative to the Operate Agreement was that the grapes would wither and die. (*See* Motion, at 64:8-10.) But for Mr. Codding's "constant maintenance," the Trustee faced the prospect of seeking to administer a withered and rotting vineyard and a dangerous source of blight. (*See* Motion, at 71:22-25). Mr. Codding's efforts which

8

1  the Trustee deemed crucial, preserved the value of the Live Oak Property, which the Trustee was

2  able to sell with receipts of $9.1 million.[9]  Not denying that he now possesses over $230,000 for

3  harvested grapes due solely to Mr. Codding's efforts, the Trustee would now make the perfect the

4  enemy of the good.  The Trustee has not disputed that but for the pre-existing grape contracts, the

5  Trustee would have no harvested grapes.  And the Trustee cannot dispute that but for Mr. Codding's

6  efforts, the Trustee would have zero grape proceeds today.

7          Far from providing specific and definite instructions to Mr. Codding as to what conduct was

8  allowed or forbidden, the Operate Agreement granted Mr. Codding full custody and control over all

9  arable land located at the Properties with limited and unclear supervision.  As further discussed

10 below, while misunderstandings and disagreements will inevitably arise in an operation of the size

11 and scope that the Trustee solicited Mr. Codding to enter into on a few days' notice, the Operate

12 Agreement and Operate Order cannot provide notice and clear instructions the violation of which

13 amounts to sanctionable conduct let alone contempt.

14 **III.    ARGUMENT**

15         This is a financial dispute between Trustee and his agent, Mr. Codding, over how much is

16 owed to Mr. Codding based on ambiguous agreements Trustee put before a layman, Mr. Codding,

17 without the benefit of counsel.  It is not even remotely close to contempt.

18         In order for the Trustee to establish cause to enter an order show cause for contempt, he must

19 establish (1) the existence of a specific and definite order, (2) sufficient notice to the alleged

20 contemnor of its terms, (3) sufficient notice to the alleged contemnor that he would be held in

21 contempt for failure to comply with the order, and (4) a violation of the order where the alleged

22 contemnor did not substantially comply with the same. *See Hansbrough v. Birdsell (In re Hercules*

23 *Enters.),* 387 F.3d 1024, 1028 (9th Cir. 2004); *General Signal Corp. v. Donallco, Inc.*, 787 F.2d

24 1376. 1379 (9th Cir. 1986).  Even if cause is established to conduct an evidentiary hearing as to

25 whether a person may be held in contempt, a bankruptcy court's authority to sanction an act of

26

27  ─────────────────

28  [9] The Trustee represented to the Court that Mr. Codding was "extremely cooperative with the Trustee's administration and has been instrumental in facilitating the due diligence of various buyers on the Properties." (Motion, at 71:20-23.) Even though Mr. Codding's efforts were "crucial" (*id.*), the Trustee's high marks and friendship proved fickle.

9

contempt under its civil contempt powers is limited to (1) coercing compliance with the order alleged to have been violated, or (2) imposing compensatory damages. *F.J. Handshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1137-38 (9th Cir. 2001).

Here, the Motion for Contempt must fail on numerous grounds:

First, all of the orders that Mr. Codding is alleged to have violated are not definitive enough to invoke the Court's contempt authority because they were either orders to authorize Mr. Codding to use Estate property or to turn over possession of the Properties, which the Trustee does not deny that he had. As to the first order, the Court did not (and could not) order Mr. Codding to harvest grapes, but rather authorized an agreement to do so. Similarly, the Court did not order the Trustee to cancel all existing sale contracts for grapes of the Estate. Again, the Court authorized the Trustee to do so. Nothing in the Operate Agreement or Operate Order suggests that Mr. Codding would be held in contempt. A contractual dispute does not become contempt of court simply because one of the parties to it is a trustee. The Trustee is not the Court.

Second, at no time up until the Trustee's due-process-violating deposition of Mr. Codding did the Trustee inform Mr. Codding that he was an adversary, was in legal jeopardy, and faced a contempt proceeding. By the time of the February 8, 2022 meeting of creditors, the Fall harvest for which Mr. Codding was deemed by the Trustee "instrumental" had already been completed, from which the Trustee received over $230,000.

Third, the Trustee cannot meet his burden of showing that Mr. Codding did not substantially comply with the orders complained of being violated. Respectfully, the Trustee does not know how to operate a vineyard and that is made clear by the Operate Agreement.[10] An agreement that calls for harvesting grapes without the use of any equipment, bottles, casks, or any personal property, and no provision as to how picked grapes are then to be handled or stored is at best vague and at worst unworkable.

And fourth, there is no order that the Trustee can seek to coerce compliance with or grounds to obtain compensatory damages. The Trustee is holding over $230,000 of grape harvest proceeds

---

[10] The Trustee admitted his lack of knowledge about the agricultural trade when he nevertheless personally drafted a contract for agricultural services. (Motion. at 13:22-23.)

1   solely because of Mr. Codding's efforts and without payment to Mr. Codding.  If anyone is entitled

2   to compensatory damages, it is Mr. Codding, whose efforts have unjustly been *un*compensated.

3       To be clear, the Estate now holds over $230,000 of grape harvest proceeds as a direct result

4   of Mr. Codding's services and the Trustee has not compensated Mr. Codding with one penny.  By

5   separate proceeding to be filed shortly, Mr. Codding will be requesting damages for unjust

6   enrichment, promissory estoppel, *quantum meruit*, common counts, and violations of the California

7   Food and Agriculture Code for the Trustee's solicitation and non-payment for harvesting services.

8   In any event, the Court should not grant its *imprimatur* on the Trustee's sharp tactics and convert a

9   monetary dispute into a contempt proceeding.

10  **A.    The Trustee Has Not Made a Prima Facie Showing Justifying the Entry of an**

11  **Order to Show Cause**

12      The first order the Trustee asserts that Respondent "willfully violated" is the Operate Order.

13  However, the Operate Order was for the purpose of approving the Operate Agreement.  The Operate

14  Agreement, while approved by court order, is a void contract as a matter of California law.  Even if

15  the underlying agreement was not void, it is also so hopelessly vague and contradictory that the

16  failure to comply with all of its terms could never rise to the level of contempt of court.

17      1.    The Trustee is Barred from Enforcing Any Term of the Operate Agreement

18      The Operate Agreement is a writing between two parties residing and doing business in

19  California for services rendered on land in California.   Because the Operate Agreement must be

20  interpreted in accordance with California law, it is also unenforceable.

21      The Operate Agreement imposes multiple pages of (contradictory) obligations (discussed

22  *supra*) on Mr. Codding.  On the one hand, Mr. Codding was required to maintain practices, care for

23  and harvest grapes with no guidance on how to store them except that no equipment may be used.

24  On the other hand, the "Trustee may terminate this agreement or assignment of the rights created

25  under this agreement at any time and for any reason and without any notice."  (Operate Agreement,

26  Docket No. 186, at 20.)

27      \\\

28

11

An elementary aspect of contract law is as follows:

> Where the parties assume to make a contract in which one's promise is the consideration for the promise by the other, the promises must be mutual. To be obligatory on either party, the contract must be mutual and reciprocal in its obligations. *One who promises to do a thing only if it pleases him, is not bound to perform. Where a contract imposes no definite obligation on one party to perform, it lacks mutuality of obligation. It is elementary that where performance is optional with one of the parties no enforceable obligation exists.*

*Kowal v. Day*, 20 Cal. App. 3d 720, 724, 98 Cal. Rptr. 118, 120 (1971) (internal citations omitted) (emphasis added). While some rescission clauses may be enforceable to the extent they can be the subject of an objective inquiry, here, like in *Kowal v. Day*, "[t]he lack of any restrictive requirement of reasonable or good faith dissatisfaction in the rescission clause of the agreement . . . causes the appellant's promise to be illusory, and the agreement fails as a bilateral contract." *Id.* The Trustee made it clear that he viewed his ability to cancel the Operate Agreement at any time and for any reason as a material component of the agreement. (See Motion, at 140 ("I will be deciding whether to terminate the agreement. I have a unilateral right to do so."))

Thus, while the Operate Order permitted the Trustee to enter into the Operate Agreement, it is still an unenforceable contract under California law because the Trustee's promise to perform was non-binding and illusory. Not only are there no grounds for contempt for allegedly violating a half-baked Operate Agreement, there is no contract available for the Trustee to seek to enforce. Accordingly, Mr. Codding will be seeking leave from the Court to sue for unjust enrichment, promissory estoppel, *quantum meruit*, common counts, and violations of the California Food and Agriculture Code.

2.    The Court Should Not Invoke its Contempt Powers to Enforce a Void Contract for an Expired Period

A bankruptcy court may exercise civil contempt powers. *In re Dyer*, 322 F.3d 1178, 1189-90 (9th Cir. 2003). Civil contempt may be exercised for two purposes: to coerce compliance with court orders or to compensate losses sustained. *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016). Civil contempt becomes moot when the proceeding out of which it

1    arises terminates. *See id.* at 630 (citing *Klett v. Pim*, 965 F.2d 587, 590 (8th Cir. 1992) ("A court

2    cannot impose a coercive civil contempt sanction if the underlying injunction is no longer in effect.")

3        Here, the Trustee seeks to either coerce compliance with the Operate Order or to impose

4    compensatory damages for losses sustained under the Operate Agreement. However, the Operate

5    Order provided that the harvest period was from August 2021 terminating October 31, 2021. The

6    term applicable to the Operate Order has expired. Further, as the Operate Agreement was a void

7    contract, the Trustee is entitled to no damages arising from the same.

8            3.    <u>The Trustee Cannot Show that Mr. Codding Did Not Substantially Comply with the</u>

9                  <u>Operate Order</u>

10        The first and most important term of the Operate Order is to approve the Operate Agreement,

11    which the Trustee drafted and negotiated in an unrepresented capacity, not as an attorney employed

12    by the Estate. As demonstrated *supra*, the Operate Agreement did not address critical aspects of a

13    harvesting operation and, if read literally, required that as soon as Mr. Codding harvested the grapes,

14    he was required to leave them to rot.

15        Nevertheless, Mr. Codding made the best of a shoddy agreement by, among other things:

16           •   Taking all reasonable steps to maintain and increase the value of the soil and crops.

17               In point of fact, the Trustee sold the Live Oak Property and realized receipts of $9.1

18               million. (Operate Agreement, Docket No. 186, at 19, ¶ 2.) and

19           •   Cancelling existing sale contracts where possible while still completing the Fall 2021

20               harvest, a task that Trustee admits no one else could or would do. (Operate

21               Agreement, Docket No. 186, at 19, ¶ 6.)

22    A person should not be held in contempt if his action appears to be based on a good faith and

23    reasonable interpretation of the court's order. *See Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1018

24    (N.D. Cal. 2013) (citing *In re Dual—Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693,

25    695 (9th Cir.1993)). Setting aside that the Court never ordered Mr. Codding to harvest grapes or to

26    cancel contracts, Mr. Codding nevertheless did harvest grapes and did cancel contracts to the best

27    of his ability, which was his testimony at the February 8, 2022 deposition without the benefit of

28    counsel. (Motion, at 234-35.) Given that there was no one else who could possibly assist the Trustee

1   in his fledgling quest to harvest grapes on six days' notice, Mr. Codding's performance which

2   resulted in over $230,000 of receipts by the Estate is not only not contemptible, it is a minor miracle.

3       4.    The Trustee Cannot Meet His Burden of Proving Under Clear and Convincing

4            Evidence that Codding Caused Rabbit Ridge to Violate the Turnover Order

5       The Trustee asserts that Mr. Codding caused Rabbit Ridge Wine Sales Inc. to violate the

6   Turnover Order because his agent Lori Ensley observed unknown, unidentified persons at the San

7   Marcos Property "[o]n December 9, 2022 [sic.]."  (Motion, at 36:11-15.)   Attorney Timothy

8   Lambirth then mistakenly sent a demand letter to counsel for Farm Credit West asserting that the

9   creditor unlawfully locked Rabbit Ridge Wine Sales Inc. from access to the premises.  (Motion, at

10  183-84.)

11      However, the Turnover Order provides that Rabbit Ridge Wine Sales turn over and vacate

12  the San Marcos Property by July 31, 2021.  The Trustee has not alleged that there was a failure to

13  do so nor does the Trustee allege that he was not given all means of accessing the San Marcos

14  Property.   If there was a lack of complete turnover, the reason would have been that the Trustee on

15  July 26, 2021 entered into the Operate Agreement with Mr. Codding with the express understanding

16  that the same vacating Rabbit Ridge Wine Sales entity would be present and operating at the

17  Properties: "Codding shall be permitted to subcontract the labor from employees of Rabbit Ridge

18  Wine Sales Inc."  (Operate Agreement, Motion, at 81, ¶ 8.)  To suggest that Mr. Codding must be

19  held in contempt is intentionally obtuse when Mr. Codding was simultaneously required to vacate

20  and also asked to operate at the San Marcos Property through Rabbit Ridge Wine Sales Inc.

21  Moreover, the San Marcos Property was apparently lost to foreclosure on January 31, 2022 by court

22  order entered on September 7, 2021 (Docket No. 210, at 2:11-15).  The Trustee has not identified

23  or explained how or why the presence of unspecified persons at the San Marcos Property on one

24  occasion is a violation for which the Trustee is entitled to compensatory damages.

25      5.    Taken to Its Logical Conclusion, A Contempt Motion Against the Trustee's

26           Employed Agent Would Mean No Agent is Authorized to Act

27      Mr. Codding cannot emphasize enough the mischief that is inherent in the Trustee's request

28  to hold him in contempt for entering into *any* written agreement with the Estate, let alone the Operate

1   Agreement personally drafted by a trustee who is unfamiliar with the agricultural trade. Nothing in

2   Section 362(a)(3) of the Bankruptcy Code requires the Trustee's agent to perform perfectly to the

3   Trustee's passing fancy or else be held to have unlawfully used estate property.  If that were the

4   case, then no accountant should prepare tax returns of the estate for threat of fines and jail time upon

5   making an accounting error; no broker should prepare a listing agreement for the estate for threat of

6   fines and jail time for accidentally checking a box; and no attorney should agree to represent the

7   estate for threat of fines and jail time for pursuing what may ultimately be an unsuccessful legal

8   strategy.  Should the Court enter an order to show cause for contempt of court based on the

9   circumstances presented, there will be a chilling effect of the willingness of persons to enter into

10  agreements to provide services to bankruptcy estates.  At root, Mr. Codding and the Trustee have a

11  simple monetary dispute that can be (and should have already been) resolved among the parties.

12  Nothing in the Motion warrants the Court's use of its powers to punish misconduct when the

13  underlying conduct complained of was trying to make the best of a poorly-drafted agreement.

14  **IV.    CONCLUSION**

15          **WHEREFORE**, based on the foregoing, Respondent respectfully requests that the Motion

16  be denied with prejudice.

17                                      Respectfully submitted,

18  DATED: July 1, 2022                 **GOE FORSYTHE & HODGES LLP**

19
                                        By: /s/ Brandon J. Iskander
20                                          Robert P. Goe
                                            Brandon J. Iskander
21                                          Attorneys for LeRoy "Lee" Coddling

22

23

24

25

26

27

28

## DECLARATION OF LEROY "LEE" CODDING

I, LeRoy "Lee" Codding, declare and state as follows:

1.      I was the Operator of the vineyards of Northern Holding, LLC hired by the Trustee on July 26, 2021. I am an individual over 18 years of age and competent to make this declaration. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto. I make this declaration in support of my Opposition to the Trustee's Notice and Application for Issuance of an Order to Show Cause re Civil Contempt for Willful Violation of the Automatic Stay and the Court's Farm Operator Order (Docket No. 304) ("Motion"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Opposition.

2.      I have been in the wine business since 1993, which I entered upon graduating from Cal Poly with a degree in agricultural business and a concentration in wine marketing. I grew up in a farming family, which is what drew me to agriculture. I have no legal training at all and relied and trusted the Trustee to guide me through this process by allowing him to prepare any required agreement without having an attorney review it. I acted as his tour guide for the properties and was instrumental in not only harvesting the grapes but showing the properties to interested buyers and answering questions which resulted in a $9.1 million sale.

3.      For about a decade, I was chiefly involved in sales and marketing/sales management in wine. Then in my early 30s, I became involved in operations. There was a basis for this in my formal education and training.

4.      Thereafter, I was responsible for operations, finance, sales/ marketing and public relations for a family-owned winery: Talbott Vineyards. We were the largest private vineyard holder in Monterey county.

5.      My area of responsibility included 1200 acres under vine in three distinct sub-AVAs across five parcels. I was also responsible for a winery facility producing 120,000 9L cases annually and financial management, including profit and loss responsibility, as well as cash flow was under my purview.

6.      After leaving day to day responsibilities at Talbott, I remained on the board until the wine company was sold to Gallo some years later. During that time, I ran a wine distribution and

1  import company with the purpose of getting it rehabilitated and sold. When we accomplished this

2  sale to Southern Wine and Spirits, I restructured another small wine wholesaler/ importer. This was

3  when the Northern Holding LLC was founded. Subsequent to that, I was responsible for initiating

4  the business plan and obtaining funding for a ground-up national import company with a portfolio

5  from Italy, France, Chile, Argentina and South Africa.

6      7.      On July 26. 2021, the Trustee solicited me to enter into an agreement with him for

7  the harvesting of planted grapes in the vineyards located at the Live Oak, San Marcos, and Texas

8  Road Properties. The Trustee and I agreed that I would begin harvesting operations right away, as

9  I understood that the Operate Agreement called for harvesting to begin on August 1, 2021, or six

10 days later. I had already invested approximately $284,000 of my own money to harvest the grapes,

11 which fact was set forth in both the Trustee's and my declaration in support of the Operate Motion.

12 For ease of reference, attached as **Exhibit "A"** are the Trustee's and my declaration filed in support

13 of the Operate Motion.

14     8.      During the course of our discussions over entering into the Operate Agreement and

15 subsequently, it was clear to me that the Trustee had no experience harvesting or selling grapes and

16 was relying on my judgment and expertise in order to do so. The Trustee never informed me that I

17 could later be held in contempt of the Bankruptcy Court over our agreement. Had I known that the

18 Trustee could later, and vindictively, seek to hold me in contempt for perceived breaches of the

19 agreement, I would never have entered into the Operate Agreement.

20     9.      Although the Operate Agreement was vague and had contained significant gaps, it

21 was my understanding based on my discussions with the Trustee that I was afforded discretion to

22 exercise judgment and fill in the gaps to the best of my ability utilizing my expertise in agricultural

23 trade to (a) complete the harvest and (b) preserve value of property of the Estate.

24     10.     Likewise, the Trustee never informed me that I was subject to an automatic stay

25 preventing me from use of the Properties while at the same time acting under an agreement to

26 operate the Properties.

27     11.     The Fall 2021 Harvest was completed in approximately mid-November 2021.

28

12.     I understand based on reports provided by the Trustee to my counsel that the Trustee began collecting grape harvest proceeds on December 13, 2021, notated by the Trustee as "Asset #6" of Form 2. I am informed and believe that the Trustee has collected and is holding $230,363.12 in a segregated account from the harvest proceeds. A true and correct copy of Forms 1 and 2 provided by the Trustee to my counsel on or about March 22, 2022 is attached hereto as **Exhibit "B."**

13.     During the course of the Fall 2021 Harvest, I dedicated enormous resources through Rabbit Ridge Wine Sales Inc., which the Trustee called upon me to utilize in order to subcontract for manual labor, as well as personally, using bank accounts and credit cards to fund the operation. Unfortunately, the cost of the harvest was higher than anticipated, but I proceeded nevertheless to complete the harvest and prevent the blight and dangers which would have resulted if I did not complete the harvest.

14.     The Trustee never told me I was required to cancel all existing grape contracts, nor was that my understanding upon reviewing the Operate Order. The proceeds I received from any existing grape sales contracts were used to fund completing the harvest. Without said funds, I would not have been able to complete the harvest, and the Trustee would not have begun receiving grape sales proceeds beginning December 13, 2021.

15.     On December 17, 2021, by sending seven (7) separate emails to Trustee agent Lori Ensley at her AOL email address, I provided an accounting for proceeds ($140,961.31) that Rabbit Ridge Wine Sales received from existing grape contracts and that were used to fund completion of the harvest. (*See* Motion, Exhibit "11".)

16.     In my final invoice to the Trustee, I placed the cost of the harvest at $372,066.26.

17.     In my discussions with the Trustee and his counsel regarding payment for completing the harvest, I told them that I was only seeking cost reimbursement of approximately $232,000, which was the total when deducting $140,960.31 in existing grape contract proceeds from the $372,066.26 total ($372,000 - $140,000 = $232,000).

18.     I was relying on the Trustee that he would pay me for my work, I cooperated with various requests that I have further discussions and sign documents to that end. The Memorandum

1  of Understanding dated December 20, 2021 ("MOU") (Motion, <u>Exhibit "12"</u>) that the Trustee asked

2  me to sign actually double-counted the $140,960.31 offset that I provided to the Estate by deducting

3  $140,960.31 from the $232,000 that I had requested.  I felt deceived by the Trustee in being

4  convinced to sign the MOU when I learned by his February 25, 2022 letter that the Trustee had no

5  intention of paying me anything for the harvest.

6      19.    Among the Trustee's demands that I acceded to was appearing at a February 8, 2022

7  meeting of creditors.  The Trustee did not tell me that he intended to sue me and that the meeting

8  was for the purpose of suing me.  I had no legal representation at the meeting and I declined the

9  Trustee's offer of representation because I thought he was sincere in his representation on the record

10  that the discussion was to be about him paying me for the harvest.  Had I known in advance the

11  Trustee's true purpose for the meeting, I would have arranged to be represented by counsel.

12     20.    Overall, I feel that I have gone to extraordinary lengths to provide multiple services

13  to the Estate, which has gone uncompensated by the Trustee.  In the weeks and months since

14  November 2021, I have only encountered an effort by the Trustee and his law firm to intimidate me

15  and unjustly deny any payment for my services.

16     I declare under penalty of perjury under the laws of the United States of America that the

17  foregoing is true and correct.

18     Executed on July 1, 2022, at Orange, California.

19

20     LeRoy "Lee" Codding

19

# EXHIBIT A

## Declaration of Richard A. Marshack

I, RICHARD A. MARSHACK, declare and state as follows:

1.     I am the Chapter 7 trustee ("Trustee") for the bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor").

2.     I am an individual over 18 years of age and competent to make this declaration. Except as set forth as matters of judicial notice, I have personal knowledge of the matters set forth in this Declaration, and if called upon to do so I could and would competently testify to these facts.

3.     All terms not defined herein are used as they are defined in the Motion.

4.     I conducted the meeting of creditors pursuant to 11 U.S.C. § 341(a) on July 13, 2021. At this meeting, Lee Codding appeared as the representative for the Debtor and testified on behalf of the Debtor.

5.     Because the Properties and the crops growing there require daily maintenance, Mr. Codding has been supervising the tending of the crops without prior expectation of reimbursement and I am informed that he also has advanced over $280,000 in costs to date without any revenues. I have been coordinating my marketing efforts in part through Mr. Codding, who has been instrumental in answering questions from the interested buyer parties and showing the Properties to the buyers, along with my brokers. Based on my conversations with Mr. Codding, I believe that he is motivated to see the fall 2021 harvest completed and he has committed to advancing all expenses to complete the harvest. I personally drafted, revised, and negotiated the farm operator agreement with Mr. Codding and he signed the operator agreement in my presence. A true and correct copy of the farm operator agreement is attached as Exhibit "1."

6.     On July 27, 2021, I personally toured the Properties along with my proposed farm operator Lee Codding (who acted as my tour guide and provided me with all information related to crop cultivation and production). Mr. Codding had deep knowledge and expertise regarding the Properties and the crops growing on the Properties. I believe that his familiarity with the crops on the Properties is essential to a successful harvest this year. No other party or secured or unsecured creditor has proposed an alternative to retaining prior management to complete the harvest. Additionally, the Riboli parties are not interested in taking over current farming operations, which I

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
EXHIBIT "A"
4824-2330-5952,v.1

1  am informed are substantially different from the method by which the Riboli parties would grow

2  crop. I am informed that the harvest will begin in September and will end in October. The Estate has

3  no reasonable alternative to hiring Mr. Codding if we are to complete the harvest this year.

4         7.     When I toured the Properties, a significant amount of the vines appeared to be

5  healthy, but a substantial portion also appeared somewhat less healthy, which I am informed was due

6  to a lack of funds available to properly maintain the crops. In my business judgment, it is extremely

7  important that the crops be adequately maintained.

8         8.     Mr. Codding informed me that he expects and projects the crops to result in gross

9  revenues of around $800,000 by the end of harvest, and agreed to be reimbursed expenses. Thus,

10  according to Mr. Codding, the harvest of crop is anticipated to generate proceeds of at least double

11  the expenses. Because Mr. Codding as the operator has agreed to advance all costs of farming and to

12  procure and maintain adequate insurance, the Estate will not be bearing the financial risk of the

13  farming operations.

14         9.     Provided that the harvest generates substantial revenues in excess of expenditures, I

15  believe that it is necessary and appropriate for the harvest to be completed in order to pay down the

16  secured debt owed to Farm Credit West.

17

18       I declare under penalty of perjury that the foregoing is true and correct. Executed on

19  August___, 2021.

20                               _____

21                               RICHARD A. MARSHACK

22

23

24

25

26

27

28

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS

EXHIBIT "A"

4824-2330-5952,v.1

# Declaration of Leroy Codding

I, LEROY "LEE" CODDING, declare and state as follows:

1.    I am the managing member of Northern Holding, LLC ("Debtor").

2.    I am an individual over 18 years of age and competent to make this declaration. Except as set forth as matters of judicial notice, I have personal knowledge of the matters set forth in this Declaration, and if called upon to do so I could and would competently testify to these facts.

3.    All terms not defined herein are used as they are defined in the Motion.

4.    I am the Trustee's chosen operator for to complete the cultivation and harvest of crops at the Debtor's properties, including the Live Oak Property, the San Marcos Property, and the Texas Road Property. There are crops growing on all three properties, but the majority of the crops are currently being grown at Live Oak.

5.    Below is a table showing all my estimated expenses for the successful completion of the harvest. Prior to entering into the Agreement and termination of the lease between Debtor and Rabbit Ridge, I expended an additional $284,000 for costs of cultivation and crop maintenance.

| Cost item | Amount | Running total |
|---|---|---|
| Farm Labor<br>- $12,000/month for tending vineyards<br>- $350/ton labor contractor to harvest | $123,500 | $123,500 |
| Workers' compensation insurance | $6,000 | $129,500 |
| Power & Water Utilities | $22,000 | $151,500 |
| Well service & maintenance | $20,000 | $171,500 |
| Nutrients | $8,000 | $179,500 |
| Licensing | $1,200 | $180,700 |
| Equipment maintenance | $10,000 | $190,700 |

///

///

14

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
EXHIBIT "A"
4824-2330-5952,v.1

6.    A true and correct copy of pictures that I took of the currently growing crop as of August 2021, and a diagram of the growing areas that I personally prepared is attached as Exhibit "2."

7.    A true and correct copy of my crop yield estimates as of August 5, 2021 is attached as Exhibit "3."

8.    I have over 28 years of experience in the wine business. I graduated in 1993 from Cal Poly with a degree in agricultural business and a concentration in wine marketing. I grew up in a farming family and have been involved in farming for nearly my entire life. I am well-qualified to supervise the cultivation and harvest of the crop currently growing on the Properties. The estimates that I have provided to the Trustee are based on my 28 years' expertise and education in the wine production industry, and I believe that they are accurate to a high degree. A true and correct copy of my resume is attached as Exhibit "4."

9.    I personally discussed and negotiated with the Trustee regarding the farm management agreement which is attached to Mr. Marshack's declaration as Exhibit "1." I am committed to completing the Fall 2021 harvest and advancing all costs, provided that I am reimbursed pursuant to the terms of the Agreement. If I am permitted to receive reimbursement of reasonable expenses incurred, I have agreed that the total amount of reimbursed expenses will be limited to $400,000, which includes the $190,700 in projected future expenses. I have also agreed to compensation to me pursuant to the Agreement of 5% of the net revenue. I understand that all proceeds from the sale of crop must be directed to and turned over to the Trustee.

10.    I have been intimately involved in the daily farming operations of the Debtor since the bankruptcy filing, including that I have rented housing in the local area so I can be more accessible to the Properties and supervise them daily. I am deeply committed to seeing that the harvest is completed and I fully support the Trustee's marketing efforts and I will continue to do so, including providing information to interested purchasers upon request. I also provided a tour of the Properties to the Trustee on July 27, 2021 and have been personally involved with negotiating with Erich Russell and his family to secure a voluntary turnover of the Live Oak Property.

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
EXHIBIT "A"
4824-2330-5952,v.1

1    11.    I have obtained a grower's license and a pest control application license and will

2    maintain such licensing. I will procure and maintain adequate workers' compensation insurance.

3    12.    In October 2020, I on behalf of Rabbit Ridge Wine Sales, Inc. executed a document

4    entitled "Scope of Work: Russell/Rabbit Ridge: Founder Roles" where Mr. Erich Russell and Mrs.

5    Joanne Russell were contracted by Rabbit Ridge for consulting services in exchange for a consulting

6    fee of $15,000 per month in cash and "12,000 value of residential lease on Russell Live Oak Villa."

7    The only parties to that agreement were Rabbit Ridge, Erich Russell, and Joanne Russell. To be

8    clear, none of the proceeds that will be received from the harvest and sale of the grapes discussed in

9    the motion and budget will be used to fund any obligation or reimburse any expense owed to Mr.

10   Erich Russell or Mrs. Joanne Russell.

11

12   I declare under penalty of perjury that the foregoing is true and correct. Executed on August

13   ___, 2021.

14                                                   _____

15                                                   LEROY CODDING

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR ORDER AUTHORIZING LIMITED OPERATION OF DEBTOR'S BUSINESS
EXHIBIT "A"
4824-2330-5952,v.1

# EXHIBIT B

Page: 1

**FORM 1**
**INDIVIDUAL ESTATE PROPERTY RECORD AND REPORT**
**ASSET CASES**

Case Number: 20-13014 ES
Case Name: Northern Holding LLC
Period Ending: 03/22/22

Trustee: Richard A. Marshack
Filed (f) or Converted (c): 06/15/21 (c)
§341(a) Meeting Date: 07/13/21
Claims Bar Date: 11/01/21

| Ref # | 1 Asset Description (Scheduled And Unscheduled (u) Property) | 2 Petition/ Unscheduled Values | 3 Estimated Net Value (Value Determined By Trustee, Less Liens, Exemptions, and Other Costs) | 4 Property Abandoned OA=§554(a) Abandon | 5 Sale/Funds Received by the Estate | 6 Asset Fully Administered (FA)/ Gross Value of Remaining Assets |
|---|---|---|---|---|---|---|
| 1 | Equipment (see attached list) $0.00 Appraisal (u) | 2,500,000.00 | 2,500,000.00 | | 0.00 | 2,500,000.00 |
| 2 | 1172 San MarcosRoad, Paso Robles, CA 93446 ("1172property"); wineryfacility (42,000 sq ft)and residentialapartment; APN026-104-001. Winery/tenant is Rabbit RidgeWine Winery; baserate of $15,000/month(rents are current andsegregated); profitshare of third party/Custom Crush revenuebilled monthly inarrears. Apartmenttenant is Bill Tolar whopays $1,600 (rents arecurrent andsegregated); leaseends 6/30/2021.Debtor is working onsecuring a contractwith a third party toform the land and willreceive revenue fromrents and fruit sales. Fee simple $0.00 Appraisal | 11,500,000.00 | 11,500,000.00 | | 0.00 | 11,500,000.00 |
| 3 | 2380 Live Oak Road Paso Robles, CA93446 ("Live Oakproperty"); 2 homes onthe property andvineyard; APN026-342-039. Unit #1("small") is currentlyvacant; new tenantislated to move in on/orabout 12/1/2020 for$1,800/month. Unit #2 ("large") is leased toformer owner ErichRussell for $12,000monthly (rents arecurrent andsegregated); leaseends 1/1/2022. Debtoris working on securinga contract with a thirdparty to farm the landand will receiverevenue from rents andfruit sales. Fee simple $0.00 Appraisal | 9,700,000.00 | 9,700,000.00 | | 9,100,000.00 | FA |
| 4 | APN 027-145-022(("Texas Roadproperty"); no streetaddress for thisproperty. accessthrough 1172 SanMarcos Road, PasoRobles, CA 93446; 42acre vineyard. Debtoris working on securinga contract with a thirdparty to farm the landand will receiverevenue from rents andfruit sales. Fee simple $0.00 Appraisal | 4,300,000.00 | 4,300,000.00 | | 0.00 | 4,300,000.00 |
| 5 | DIP Wells Fargo Accounts | 0.00 | 100.00 | | 566.00 | FA |
| 6 | Grape Sale Proceeds (u) | 0.00 | 550,000.00 | | 230,363.12 | 319,636.88 |
| | **TOTALS (Excluding Unknown Values)** | **$28,000,000.00** | **$28,550,100.00** | | **$9,330,928.12** | **$18,619,636.88** |

**Major activities affecting case closing:**

INSURANCE: Trustee obtained liability policies to cover two parcels - San Marcos and Live Oak through 8/15/22 and 10/18/22. The lender has force placed coverage on the collateral.

Initial Projected Date of Final Report (TFR):  June 12, 2024                    Current Projected Date of Final Report (TFR):  June 12, 2024

EXHIBIT "B"

Page: 1

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES | | Trustee: | Richard A. Marshack |
| Case Name: | Northern Holding LLC | | Bank Name: | Signature Bank |
| | | | Account: | *****3965 - Checking |
| Taxpayer ID#: | *****4440 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period Ending: | 03/22/22 | | Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | Uniform Tran. Code | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | | Receipts $ | Disbursements $ | Checking Account Balance |
| 07/01/21 | Asset #5 | Northern Holding DIP 7694 | Turnover Wells Fargo 7694 | 1229-000 | 68.00 | | 68.00 |
| 07/01/21 | Asset #5 | Northern Holding DIP | Turnover Wells Fargo 7686 | 1229-000 | 55.00 | | 123.00 |
| 07/01/21 | Asset #5 | Northern Holding DIP | Turnover Wells Fargo 7678 | 1229-000 | 42.00 | | 165.00 |
| 09/17/21 | Asset #5 | Northern Holding DIP | Turnover Wells Fargo 3473 | 1229-000 | 400.00 | | 565.00 |
| 10/02/21 | Asset #3 | Riboli Paso Robles LLC | Deposit for sale | 1129-000 | 273,000.00 | | 273,565.00 |
| 10/08/21 | | To Account# XXXXX1992 | | 9999-000 | | 273,000.00 | 565.00 |
| 10/29/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 102.97 | 462.03 |
| 12/13/21 | Asset #6 | Daou | Payment 1 of 4 | 1230-000 | 33,752.37 | | 34,214.40 |
| 12/20/21 | Asset #6 | Brady Vineyard | Grape sales | 1230-000 | 17,000.00 | | 51,214.40 |
| 12/29/21 | Asset #6 | My Favorite Neighbor LLC | grape sales | 1230-000 | 16,219.76 | | 67,434.16 |
| 12/31/21 | | Signature Bank | Bank and Technology Services Fee | 2600-000 | | 42.24 | 67,391.92 |
| 01/11/22 | 1001 | International Sureties, Inc. | Bond renewal to 1/4/23 | 2300-000 | | 191.86 | 67,200.06 |
| 01/12/22 | 1002 | Bicher & Associates | 6/15 to 12/31/21 - out of pocket expenses (not including mileage or gas) | 3992-410 | | 686.17 | 66,513.89 |
| 01/14/22 | Asset #6 | Daou | Payment 2 of 4 | 1230-000 | 33,752.37 | | 100,266.26 |
| 01/24/22 | Asset #6 | Riboli Family Wines | Invoice 11444 - cab franc | 1230-000 | 10,535.75 | | 110,802.01 |

EXHIBIT "B"

Page: 2

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES | | Trustee: | Richard A. Marshack |
| Case Name: | Northern Holding LLC | | Bank Name: | Signature Bank |
| Taxpayer ID#: | ******4440 | | Account: | ******3965 - Checking |
| Period Ending: | 03/22/22 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| | | | Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | | Uniform | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | | Tran. Code | Receipts $ | Disbursements $ | Checking Account Balance |
| 01/24/22 | Asset #6 | Doon Wines LLC / WarRoom | Invoice 11445 - less credit ($19,533.60) | | 1230-000 | 45,578.40 | | 156,380.41 |
| 01/26/22 | 1003 | Bicher & Associates | 6/15 to 12/31/21 - out of pocket expenses - mileage at .40/mile | | 3992-410 | | 893.20 | 155,487.21 |
| 01/27/22 | 1004 | Bicher & Associates | Per employment order 10/4/21 and farming agreement order 9/7/21 - 80% of agent fees after 7/26/21 related to farming/grapes | | 3991-400 | | 5,581.44 | 149,905.77 |
| 01/31/22 | | Signature Bank | Bank and Technology Services Fee | | 2600-000 | | 162.75 | 149,743.02 |
| 02/07/22 | | District Attorney for San Luis Obispo | Reimburse bad check written by Rabbit Ridge to Miller Drilling for services provided to estate; approved by Peter Anderson via email on 2/5/22 | | 2690-000 | | 6,899.03 | 142,843.99 |
| 02/15/22 | Asset #6 | Corbett Vineyards - COE | Center of Effort invoice | | 1230-000 | 19,881.00 | | 162,724.99 |
| 02/25/22 | Asset #6 | Daou | Payment 3 of 4 | | 1230-000 | 33,762.47 | | 196,487.46 |
| 02/28/22 | | Signature Bank | Bank and Technology Services Fee | | 2600-000 | | 238.25 | 196,249.21 |
| 03/02/22 | Asset #6 | Corbett Vineyards - COE | Center of Effort invoice 09152021-1 22.09 tons zinfandel | | 1230-000 | 19,881.00 | | 216,130.21 |

EXHIBIT "B"

Page: 3

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES | | Trustee: | Richard A. Marshack |
| Case Name: | Northern Holding LLC | | Bank Name: | Signature Bank |
| Taxpayer ID#: | ******4440 | | Account: | ******3965 - Checking |
| Period Ending: | 03/22/22 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| | | | Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | Uniform Tran. Code | Receipts $ | Disbursements $ | Checking Account Balance |
| 03/15/22 | | A & A Escrow Services Inc. | Sale of Live Oak - carve-out from lender: Attorney Fees $31,750 reimbursement for advance insurance $6,770.78 to MH reserve for future insurance costs $15,000 estate proceeds miscellaneous contribution $30,000 Bicher fees to Lori Ensley, field agent $12,000 hold for attorney fees to reduce property tax liability $6,000 | | 101,520.78 | | 317,650.99 |
| 03/15/22 | | Buyer | 2nd 1/2 taxes 2021-2022 at $18,755.63/semi-annually from 03/15/2022 to 07/01/2022 | 2820-000 | 11,044.98 | | 317,650.99 |
| 03/15/22 | Asset #3 | | Sale of Live Oak REF# 20220315B6B7261F 005682031517591T01 000003253FROM: A & A ESCROW SERVICES INC ABA: 122016066 BANK: OBI: DISBURSEMENTS PER COURT ORDER//2380LIVE OAK ROAD, PASOOBI: ROBLES, CA93446 OBI: | 1110-000 | 9,100,000.00 | | 317,650.99 |
| 03/15/22 | | Hilco Real Estate, LLC | Commission Charges | 3510-000 | -159,250.00 | | 317,650.99 |
| 03/15/22 | | Onyx Asset Advisors, LLC | Commission Charges | 3510-000 | -159,250.00 | | 317,650.99 |

EXHIBIT "B"

Page: 4

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES |
|---|---|
| Case Name: | Northern Holding LLC |
| Taxpayer ID#: | ******4440 |
| Period Ending: | 03/22/22 |

| Trustee: | Richard A. Marshack |
|---|---|
| Bank Name: | Signature Bank |
| Account: | ******3965 - Checking |
| Blanket Bond: | $5,000,000.00 (per case limit) |
| Separate Bond: | N/A |

| 1<br>Trans.<br>Date | 2<br>Check or<br>Ref. # | 3<br>Paid To / Received From | 4<br>Description of Transaction | Uniform<br>Tran. Code | 5<br>Receipts<br>$ | 6<br>Disbursements<br>$ | 7<br>Checking<br>Account Balance |
|---|---|---|---|---|---|---|---|
| 03/15/22 | | Farm Credit West | -8,312,289.11 | 4110-000 | | | 317,650.99 |
| 03/15/22 | | Fidelity National Title | MyNHD, Inc. for NHD Disclosure Report -74.95 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | Fidelity National Title | Title - Owner's Title Insurance -7,060.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | Fidelity National Title | Title - Messenger Fee -59.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | Fidelity National Title | Title - Sub Escrow Fee -62.50 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | Fidelity National Title | Recording Sub & Recon -20.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | Fidelity National Title | Recording Sub & Recon -20.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | Fidelity National Title | Recording Court Order -41.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | A&A Escrow | Title - Escrow Fee -9,100.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | A&A Escrow | Title - 1099 Processing Fee to A & A Escrow Services Inc. -75.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | A&A Escrow | Title - Drawing Documentation Fee -75.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | A&A Escrow | Title - Wire Fee to A & A Escrow Services Inc -25.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | | A&A Escrow | Title - Messenger/FedEx Fees to A & A Escrow Services Inc. -45.00 | 2500-000 | | | 317,650.99 |

EXHIBIT "B"

**Form 2**
**Cash Receipts and Disbursements Record**

| Case Number: | 20-13014 ES | | Trustee: | Richard A. Marshack |
| Case Name: | Northern Holding LLC | | Bank Name: | Signature Bank |
| | | | Account: | ******3965 - Checking |
| Taxpayer ID#: | ******4440 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period Ending: | 03/22/22 | | Separate Bond: | N/A |

| 1 Trans. Date | 2 Check or Ref. # | 3 Paid To / Received From | 4 Description of Transaction | | Uniform Tran. Code | 5 Receipts $ | 6 Disbursements $ | 7 Checking Account Balance |
|---|---|---|---|---|---|---|---|---|
| 03/15/22 | | A&A Escrow | Title - File Archive Fee* to Archive It! | -50.00 | 2500-000 | | | 317,650.99 |
| 03/15/22 | Asset #3 | Bankruptcy Estate EMD | | -273,000.00 | 1110-000 | | | 317,650.99 |
| 03/15/22 | | San Luis Obispo County Tax Collector | Transfer Tax - County to San Luis Obispo County | -10,010.00 | 2820-000 | | | 317,650.99 |
| 03/15/22 | | San Luis Obispo County Tax Collector | 1st 1/2 Property Taxes 2021-22 +penalty to San Luis Obispo County Tax Collector | -20,631.19 | 2820-000 | | | 317,650.99 |
| 03/15/22 | | San Luis Obispo County Tax Collector | 2nd 1/2 Property taxes 2021-22 to San Luis Obispo County Tax Collector | -18,755.63 | 2820-000 | | | 317,650.99 |
| 03/15/22 | | San Luis Obispo County Tax Collector | Supplemental taxes 2020-2021 to San Luis Obispo County Tax Collector | -5,940.01 | 2820-000 | | | 317,650.99 |
| 03/15/22 | | San Luis Obispo County Tax Collector | Default Taxes 2020 -good to January 2022 to San Luis Obispo County Tax Collector | -33,690.81 | 2820-000 | | | 317,650.99 |
| 03/17/22 | | To Account# XXXXX1992 | | | 9999-000 | | 44,521.00 | 273,129.99 |
| 03/17/22 | | To Account# XXXXXX0045 | | | 9999-000 | | 12,000.00 | 261,129.99 |
| 03/17/22 | | To Account# XXXXXX0053 | | | 9999-000 | | 15,000.00 | 246,129.99 |
| 03/18/22 | 1005 | Bicher & Associates | Per employment order 10/4/21 - 80% of agent fees | | 3991-400 | | 2,991.36 | 243,138.63 |

Page: 6

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES |
| Case Name: | Northern Holding LLC |
| Taxpayer ID#: | ******4440 |
| Period Ending: | 03/22/22 |

| Trustee: | Richard A. Marshack |
| Bank Name: | Signature Bank |
| Account: | ******3965 - Checking |
| Blanket Bond: | $5,000,000.00 (per case limit) |
| Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | Uniform Tran. Code | Receipts $ | Disbursements $ | Checking Account Balance |
| 03/21/22 | | A & A Escrow Services Inc. | REF# 20220321B6B7261F0051770321163 9FT01 0000027611 FROM: A & A ESCROW SERVICES INC    ABA: 122016066  OBI: BANK: PROCEEDS TO HOLD PENDING COURT ORDER // 2380 LIVE OAK ROBI: OAD, PASO ROBLES, CA, 93446    OBI: | 1210-000 | 159,250.00 | | 402,388.63 |
| 03/21/22 | | From Account# XXXXXX0045 | Per order, Bicher's fees paid from sale proceeds but these fees were attributed to grape sales and farming. | 9999-000 | 5,581.44 | | 407,970.07 |
| 03/21/22 | | To Account# XXXXXX0568 | | 9999-000 | | 230,363.12 | 177,606.95 |
| 03/22/22 | | To Account# XXXXXX0053 | Check to Marshack Hays for reimbursement of liability insurance should have been paid from "general" estate funds - not segregated funds. | 9999-000 | | 6,770.78 | 170,836.17 |

|  | | |
|---|---|---|
| ACCOUNT TOTALS | 770,280.34 | 599,444.17 |
| Less: Bank Transfers | 5,581.44 | 581,654.90 |
| Subtotal | 764,698.90 | 17,789.27 |
| Less: Payment to Debtors | | 0.00 |
| NET Receipts / Disbursements | $764,698.90 | $17,789.27 |

Checking Account Balance: $170,836.17

EXHIBIT "B"

Page: 7

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES |
|---|---|
| Case Name: | Northern Holding LLC |
| Taxpayer ID#: | ******4440 |
| Period Ending: | 03/22/22 |

| Trustee: | Richard A. Marshack |
|---|---|
| Bank Name: | Signature Bank |
| Account: | ******1992 - Atty fees from Segregated SALE Account |
| Blanket Bond: | $5,000,000.00 (per case limit) |
| Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | Uniform Tran. Code | Receipts $ | Disbursements $ | Checking Account Balance |
| 10/08/21 | | From Account# XXXXXX3965 | | 9999-000 | 273,000.00 | | 273,000.00 |
| 03/17/22 | | From Account# XXXXXX3965 | | 9999-000 | 44,521.00 | | 317,521.00 |

|  |  |  |  |
|---|---|---|---|
| ACCOUNT TOTALS | | 317,521.00 | 0.00 | $317,521.00 |
| Less: Bank Transfers | | 317,521.00 | 0.00 | |
| Subtotal | | 0.00 | 0.00 | |
| Less: Payment to Debtors | | | 0.00 | |
| NET Receipts / Disbursements | | $0.00 | $0.00 | |

EXHIBIT "B"

Page: 8

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES | Trustee: | Richard A. Marshack |
| Case Name: | Northern Holding LLC | Bank Name: | Signature Bank |
| | | Account: | *****0045 - Bicher - Ensley Fees; balance to FCW |
| Taxpayer ID#: | ******4440 | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period Ending: | 03/22/22 | Separate Bond: | N/A |

| 1 | 2 | 3 | 4 | | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Trans. Date | Check or Ref. # | Paid To / Received From | Description of Transaction | Uniform Tran. Code | Receipts $ | Disbursements $ | Checking Account Balance |
| 03/17/22 | | From Account# XXXXX3965 | | 9999-000 | 12,000.00 | | 12,000.00 |
| 03/21/22 | | To Account# XXXXX3965 | Per order, Bicher's fees paid from sale proceeds but these fees were attributed to grape sales and farming. | 9999-000 | | 5,581.44 | 6,418.56 |

|  |  |  |  |
|---|---|---|---|
| ACCOUNT TOTALS | | 12,000.00 | 5,581.44 | **$6,418.56** |
| Less: Bank Transfers | | 12,000.00 | 5,581.44 | |
| Subtotal | | 0.00 | 0.00 | |
| Less: Payment to Debtors | | 0.00 | 0.00 | |
| NET Receipts / Disbursements | | $0.00 | $0.00 | |

EXHIBIT "B"

Page: 9

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES | | Trustee: | Richard A. Marshack |
| Case Name: | Northern Holding LLC | | Bank Name: | Signature Bank |
| | | | Account: | *****0053 - Insurance carve-out from sale; balance to FCW |
| Taxpayer ID#: | ******4440 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period Ending: | 03/22/22 | | Separate Bond: | N/A |

| 1 Trans. Date | 2 Check or Ref. # | 3 Paid To / Received From | 4 Description of Transaction | Uniform Tran. Code | 5 Receipts $ | 6 Disbursements $ | 7 Checking Account Balance |
|---|---|---|---|---|---|---|---|
| 03/17/22 | | From Account# XXXXXX3965 | | 9999-000 | 15,000.00 | | 15,000.00 |
| 03/17/22 | 1001 | Marshack Hays LLP | Reimburse advance payment to insurance for Live Oak; per order 3/4/22 | 2420-000 | | 6,770.78 | 8,229.22 |
| 03/22/22 | | From Account# XXXXXX3965 | Check to Marshack Hays for reimbursement of liability insurance should have been paid from "general" estate funds - not segregated funds | 9999-000 | 6,770.78 | | 15,000.00 |
| | | | **ACCOUNT TOTALS** | | 21,770.78 | 6,770.78 | |
| | | | Less: Bank Transfers | | 21,770.78 | 0.00 | |
| | | | **Subtotal** | | 0.00 | 6,770.78 | |
| | | | Less: Payment to Debtors | | | 0.00 | |
| | | | **NET Receipts / Disbursements** | | **$0.00** | **$6,770.78** | **$15,000.00** |

EXHIBIT "B"

Page: 10

## Form 2
## Cash Receipts and Disbursements Record

| Case Number: | 20-13014 ES | | Trustee: | Richard A. Marshack |
| Case Name: | Northern Holding LLC | | Bank Name: | Signature Bank |
| | | | Account: | ******0568 - Segregated GRAPE Sales |
| Taxpayer ID#: | ******4440 | | Blanket Bond: | $5,000,000.00 (per case limit) |
| Period Ending: | 03/22/22 | | Separate Bond: | N/A |

| 1 Trans. Date | 2 Check or Ref. # | 3 Paid To / Received From | 4 Description of Transaction | Uniform Tran. Code | 5 Receipts $ | 6 Disbursements $ | 7 Checking Account Balance |
|---|---|---|---|---|---|---|---|
| 03/21/22 | | From Account# XXXXX3965 | | 9999-000 | 230,363.12 | | 230,363.12 |
| | | | ACCOUNT TOTALS | | 230,363.12 | 0.00 | $230,363.12 |
| | | | Less: Bank Transfers | | 230,363.12 | 0.00 | |
| | | | Subtotal | | 0.00 | 0.00 | |
| | | | Less: Payment to Debtors | | 0.00 | 0.00 | |
| | | | NET Receipts / Disbursements | | $0.00 | $0.00 | |

| | Net Receipts: | $764,698.90 |
| | Plus Gross Adjustments: | 8,725,479.22 |
| | Net Estate: | $9,490,178.12 |

| TOTAL - ALL ACCOUNTS | Net Receipts | Net Disbursements | Account Balances |
|---|---|---|---|
| Checking # ******0045 | 0.00 | 0.00 | 6,418.56 |
| Checking # ******0053 | 0.00 | 6,770.78 | 15,000.00 |
| Checking # ******0568 | 230,363.12 | 0.00 | 230,363.12 |
| Checking # ******1992 | 0.00 | 0.00 | 317,521.00 |
| Checking # ******3965 | 764,698.90 | 17,789.27 | 170,836.17 |
| | $764,698.90 | $24,560.05 | $740,138.85 |

EXHIBIT "B"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **OPPOSITION OF LEROY "LEE" CODDING (AND ANY RELATED ENTITIES) TO RICHARD A. MARSHACK'S APPLICATION FOR ISSUANCE OF ORDER TO SHOW CAUSE RE: CIVIL CONTEMPT FOR WILLFUL VIOLATION OF AUTOMATIC STAY AND THE COURT'S FARM OPERATOR ORDER; DECLARATION OF LEROY "LEE" CODDING IN SUPPORT THEROF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 1, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) July 1, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) July 1, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Erithe A. Smith, USBC, 411 West Fourth Street, Santa Ana, CA 92701

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 1, 2022 | Susan C. Stein | /s/Susan C. Stein |
| Date | Printed Name | Signature |

20

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **William H Brownstein**    Brownsteinlaw.bill@gmail.com
- **Steve Burnell**    sburnell@sulmeyerlaw.com,
  sburnell@ecf.courtdrive.com;sburnell@ecf.inforuptcy.com;mviramontes@sulmeyerlaw.com
- **Robert P Goe**    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Nancy S Goldenberg**    nancy.goldenberg@usdoj.gov
- **Michael J Gomez**    mgomez@frandzel.com, dmoore@frandzel.com
- **D Edward Hays**    ehays@marshackhays.com,
  ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmend
  oza@ecf.courtdrive.com
- **Brandon J Iskander**    biskander@goeforlaw.com, kmurphy@goeforlaw.com
- **Kari L Ley**    Ley1238@att.net
- **Tinho Mang**    tmang@marshackhays.com,
  tmang@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com
- **Richard A Marshack (TR)**    pkraus@marshackhays.com,
  rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com
- **Elissa Miller**    emiller@sulmeyerlaw.com,
  emillersk@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com
- **Roksana D. Moradi-Brovia**    roksana@rhmfirm.com,
  matt@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfir
  m.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan
  @rhmfirm.com
- **Paul F Ready**    tamara@farmerandready.com
- **Matthew D. Resnik**    matt@rhmfirm.com,
  roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rh
  mfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;slo
  an@rhmfirm.com
- **Victor A Sahn**    vsahn@sulmeyerlaw.com,
  pdillamar@sulmeyerlaw.com;pdillamar@ecf.inforuptcy.com;vsahn@ecf.inforuptcy.com;cblair@sul
  meyerlaw.com;cblair@ecf.inforuptcy.com
- **Kristine A Thagard**    kthagard@marshackhays.com,
  kthagard@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Reed S Waddell**    rwaddell@frandzel.com, sking@frandzel.com
- **Gerrick Warrington**    gwarrington@frandzel.com, sking@frandzel.com
- **David Wood**    dwood@marshackhays.com,
  dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com