1 | D. EDWARD HAYS, #162507
ehays@marshackhays.com
2 | TINHO MANG, #322146
tmang@marshackhays.com
3 | MARSHACK HAYS LLP
870 Roosevelt
4 | Irvine, CA 92620
Telephone: (949) 333-7777
5 | Facsimile: (949) 333-7778

6 | Attorneys for Chapter 7 Trustee,
RICHARD A. MARSHACK
7

8 |                UNITED STATES BANKRUPTCY COURT

9 |        CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| 10 | In re | Case No. 8:20-bk-13014-SC |
|---|---|---|
| 11 | NORTHERN HOLDING, LLC, | Chapter 7 |
| 12 | Debtor. | CHAPTER 7 TRUSTEE'S TRIAL BRIEF RE: EVIDENTIARY HEARING ON ORDER TO SHOW CAUSE RE: CIVIL CONTEMPT |
| 13 | | |
| 14 | | |
| 15 | | [OSC DOCKET NO. 359] |
| 16 | | Evidentiary Hearing |
| 17 | | Date: May 11, 2023 Time: 10:00 a.m. Ctrm: 5C- IN PERSON Address: 411 W. Fourth Street, Santa Ana, CA 92701 |
| 18 | | |
| 19 | | |

20 | / / /

21 | / / /

22

23

24

25

26

27

28

REPLY IN SUPPORT OF ISSUANCE OF ORDER TO SHOW CAUSE
4824-2330-5952,v.1

# TABLE OF CONTENTS

1.    Summary of Argument .................................................................................2

2.    Background Facts.........................................................................................3

    A.    Prebankruptcy History .......................................................................3

    B.    Chapter 11 Filing and Initial Operations ...........................................5

    C.    Conversion and Trustee's operations period......................................6

    D.    Filing of the Motion and Extensions................................................13

    E.    Discovery and Pre-Hearing Matters.................................................15

3.    Legal Argument .........................................................................................16

    A.    Standard for Civil Contempt............................................................16

        i.    Codding clearly violated the Operate Order. ........................17

        ii.    Codding clearly violated the automatic stay by receiving and misappropriating property of the Estate................................19

        iii.    Codding clearly violated the Turnover Order. ......................19

        iv.    Codding's actions cannot be characterized as a reasonable effort to comply with the Court's orders...............................20

    B.    Codding fails to prove that he had any entitlement to any funds....................21

    C.    Codding must purge his contempt by turning over all misappropriated funds as required by the Operate Order. ........................................21

    D.    Compensatory sanctions are appropriate. ........................................22

    E.    A criminal referral is also appropriate, given the circumstances....................23

4.    Conclusion ................................................................................................24

REQUEST FOR JUDICIAL NOTICE ..................................................................26

EVIDENTIARY HEARING TRIAL BRIEF

4824-2330-5952,v.1

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Abercrombie v. Hayden Corp. (In re Abercrombie),*

4

   139 F.3d 755, 757 (9th Cir. 1998) ............................................................ 21

5

*APJL Consulting, LLC v. Treasures, Inc. (In re Treasures, Inc.),*

6

   2015 Bankr. LEXIS 662 at *55-60 (B.A.P. 9th Cir. March 3, 2015) ............................. 22

7

*FTC v. Affordable Media,*

8

   179 F.3d 1228, 1239 (9th Cir.1999) ............................................................ 17

9

*In re Abrams,*

10

   127 B.R. 239, 242 (B.A.P. 9th Cir. 1991) ...................................................... 19

11

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation,*

12

   10 F.3d 693, 695 (9th Cir. 1993) ............................................................. 17

13

*In re Dyer,*

14

   322 F.3d at 1190–91 ................................................................... 17, 22

15

*In re Wallace,*

16

   490 B.R. 898, 905 (B.A.P. 9th Cir. 2013) ...................................................... 17

17

*Knupfer v. Lindblade (In re Dyer),*

18

   322 F.3d 1178, 1189–90 (9th Cir.2003) ....................................................... 16

19

*Newman v. Schwartzer (In re Newman),*

20

   487 B.R. 193, 202 (B.A.P. 9th Cir. 2013) ...................................................... 22

21

*Rediger Investments Corp. v. H Granados Communications, Inc. (In re H Granados*

22

   *Communications, Inc.),*

23

   503 B.R. 726, 736 (B.A.P. 9th Cir. 2013).  ..................................................... 22

24

*Reno Air Racing Association v. McCord,*

25

   452 F.3d 1126, 1130 (9th Cir. 2006) .......................................................... 17

26

*Shapiro v. Henson,*

27

   739 F.3d 1198, 1200 (9th Cir. 2014) .......................................................... 21

28

EVIDENTIARY HEARING TRIAL BRIEF

4824-2330-5952,v.1

*Shuffler v. Heritage Bank*,

   720 F.2d 1141, 1146–47 (9th Cir. 1983) .......................................................... 17

*Taggart v. Lorenzen*,

   139 S.Ct. 1795, 1801-02 (2019) .......................................................... 17

*Vertex Distribution, Inc. v. Falcon Foam Plastics, Inc.*,

   689 F.2d 885, 891 (9th Cir. 1982) .......................................................... 17

*Walls v. Wells Fargo Bank*,

   276 F.3d 502, 507 (9th Cir.2002) .......................................................... 16

**Statutes**

11 U.S.C. § 105(a) .......................................................... 16

11 U.S.C. § 362(a)(3) .......................................................... 19

11 U.S.C. § 502(d) .......................................................... 22

11 U.S.C. § 503(b) .......................................................... 21

11 U.S.C. § 541(a)(1) .......................................................... 19

11 U.S.C. §542 .......................................................... 21

18 U.S. Code § 152 .......................................................... 24

18 U.S.C. § 3057(a) .......................................................... 23

Cal. Pen. Code § 476 .......................................................... 24

**Rules**

Local Bankruptcy Rule 9020-1(b) .......................................................... 14

iii

TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE,
THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

Richard A. Marshack, in his capacity as Chapter 7 Trustee ("Trustee") of the Bankruptcy
Estate ("Estate") of Northern Holding, LLC ("Debtor"), files his trial brief regarding the Court's
order to show cause re: civil contempt entered as Docket No. 359 ("OSC").

## 1.    Summary of Argument

In the course of the administration of this Chapter 7 case, Trustee was authorized to operate
for a limited period of time solely to grow, harvest, and sell grapes from vines which existed on the
date of conversion. All of these crops and their proceeds were subject to a lien by secured creditor
Farm Credit West, FCLA ("FCW"). To assist with Trustee's farming operations, he negotiated an
agreement with Debtor's principal LeRoy Codding ("Codding"), where Codding represented and
agreed that he would fund all cultivation costs out of pocket, direct all proceeds to the Estate, and
then receive a reimbursement of cultivation costs and a percentage-based compensation. Given the
urgency of the situation and Codding's familiarity with the farming operations, Trustee employed
Codding with the approval of the Court, and the stipulated consent of FCW. However, Codding did
not comply with the Court's order authorizing operations. Despite drafting, negotiating, and signing
the farm operator agreement which plainly provided that all grape proceeds must be paid to the
Trustee, and the Court's order stating the same, Codding instead instructed some customers to pay
him and/or entities under his control. Trustee only was made aware of Codding's misappropriation
and concealment of grape proceeds when a confused customer reached out to Trustee asking why he
was being asked to pay one of Codding's entities. After being caught red-handed, Codding admitted
to receiving over $140,000 of proceeds derived from the sale of grapes. When confronted with this
misappropriation of funds, Codding attempted to explain that he believed that he was justified in
taking the proceeds because of his farming expenses. For months afterwards, Trustee requested that
Codding provide documentation to support his demanded reimbursements, including proof of actual
distributions. In response, Codding failed to provide sufficient documentation to show an entitlement
to nearly any reimbursements. As it became increasingly clear to Trustee that Codding had not in
fact paid any farming expenses, or was unable to prove up such expenses in any event, Trustee

informed Codding in writing that his reimbursement demands were rejected for failure of proof. In response, Codding began to make dramatic threats against Trustee and the Estate, necessitating the filing of a motion for issuance of an order to show cause re: civil contempt to prevent Codding from causing any further damage to the Estate, and to make the Estate whole for Codding's willful violation of Court orders. In the course of Trustee's investigation and months of negotiations with Codding's retained counsel (who has now withdrawn), Trustee discovered additional concealed transfers and violations of court orders. The Court issued an order to show cause ("OSC") on October 26, 2022, and set this evidentiary hearing. At the evidentiary hearing, Trustee will show, in detail, the extent of the misappropriation of Estate property from Codding, and request that the Court adjudicate Codding in civil contempt, determine that he is not entitled to any compensation or reimbursement, and impose compensatory sanctions. Moreover, Trustee supports the Court providing a criminal referral for Codding's willful misappropriation and concealment of Estate property.

## 2.    Background Facts

### A.    Prebankruptcy History

On December 17, 1996, Erich Russell ("Russell") took title to real property commonly known as 1172 San Marcos Road, Paso Robles, CA ("San Marcos Property").

On October 7, 1999, Russell took title to real property commonly known as 2380 Live Oak Road, Paso Robles, CA ("Live Oak Property").

On December 29, 2000, Russell took title to vacant agricultural land APN 027-145-022 ("Texas Road Property"), which was adjacent to the San Marcos Property. Collectively, the San Marcos Property, Live Oak Property, and Texas Road Property shall be referred to as the "Properties."

In 2007, Russell refinanced the Properties with Farm Credit West, FCLA ("FCW"), and built an approximately 43,000 square foot winery facility on the San Marcos Property. The principal balance of the loan, which was cross-collateralized by the three Properties, was $17,500,000, and secured by a recorded deed of trust and assignment of rents, which was recorded on March 23, 2007 in San Luis Obispo County.

EVIDENTIARY HEARING TRIAL BRIEF
4824-2330-5952,v.1

1  Russell operated a winery business named Rabbit Ridge Wine Sales, Inc ("Rabbit Ridge")

2  out of the San Marcos Property, and lived in the large residence located at the Live Oak Property.

3  Over the course of the FCW loan, multiple forebearances and amendments were negotiated.

4  However, FCW soon lost patience and began taking steps to enforce its loan rights. In late 2019,

5  Russell filed an action for injunctive relief against FCW, seeking an injunction against FCW to

6  prevent them from enforcing their lien rights.

7  By this point, Russell was seeking to sell the Properties and get out from under the massive

8  FCW debt, in addition to millions of dollars of deferred property taxes owed to the County of San

9  Luis Obispo.

10  During this time, two individuals named Steven Jones ("Jones") and Leroy E. Codding, IV

11  (previously defined as "Codding") became involved with equity groups attempting to purchase the

12  Properties from Russell.

13  On January 10, 2020, the Superior Court entered an order denying Russell's motion for a

14  preliminary injunction and dissolving a temporary restraining order.

15  On the same date, Russell filed a voluntary Chapter 11 petition in the bankruptcy court for

16  the Central District of California, Northern Division, commencing bankruptcy case number 9:20-bk-

17  10035-DS ("Russell Bankruptcy").

18  On March 11, 2020, the Office of the United States Trustee ("OUST") filed a motion to

19  dismiss or convert the Russell Bankruptcy.

20  An appraisal was obtained in March 2020, right around the time that the COVID-19 global

21  pandemic severely disrupted global business operations. As a result of the pandemic, the private

22  equity groups withdrew from considering the purchase of the Properties.

23  In connection with the Russell Bankruptcy, Russell managed to negotiate a further

24  forbearance from FCW.

25  On May 11, 2020, Russell filed a motion to voluntarily dismiss the Russell Bankruptcy.

26  On June 4, 2020, the Court entered an order dismissing the Russell Bankruptcy with a 180-

27  day bar to refiling.

28

EVIDENTIARY HEARING TRIAL BRIEF

Despite the further forbearance, Russell failed to sell the Properties and pay off FCW. With the failures in state court, and now a Court-imposed 180-day bar to refiling, Russell was running out of options, and FCW renewed its efforts to foreclose and remove Russell from his residence.

## B.    Chapter 11 Filing and Initial Operations

On April 30, 2012, Northern Holding, LLC (previously defined as "Debtor") was registered with the Secretary of State for the State of Minnesota. Debtor's manager was Lee Codding. The entity was essentially inactive until October 2020.

Grapes were harvested at the Properties through October 2020. On October 27, 2020, Russell quitclaimed the Properties to Debtor, for no cash consideration. Russell and Codding (on behalf of Debtor) signed agreements assigning the Properties and all assets of Rabbit Ridge to Debtor, and Debtor would assume all liabilities associated with the assigned assets. The assumption and assignment agreement was recorded, along with the quitclaim deeds, on the morning of October 28, 2020.

On the same date, Codding countersigned various agreements purporting to transfer back certain assets from Debtor to Rabbit Ridge. The intention appeared to be that Rabbit Ridge would be an operating entity with all of the winery business assets and persona property, whereas Debtor would be a holding company for the real estate.

On October 28, 2020, at approximately 8PM, a voluntary petition for bankruptcy under Chapter 11 of Title 11 of the United States Code was filed in Debtor's name, initiating the above-captioned bankruptcy case in the Central District of California. On the petition date, Debtor's managing member was Codding.

On October 29, 2020, as Dk. No. 5, FCW filed a notice of continuing security interest, demand for adequate protection, and demand for sequestration of cash collateral. Debtor, however, never filed a motion seeking approval to use cash collateral, and also never entered into any agreement with FCW to use cash collateral.

On November 5, 2020, articles of organization were filed for Debtor with the California Secretary of State.

Through the bankruptcy case, Debtor continued to receive and spend cash for operating expenses. Debtor's counsel never provided any legal advice to Codding that he was permitted to use and spend cash collateral without court authorization. Debtor's counsel never advised Codding that his business practices were legal and authorized.

On or about April 30, 2021, Debtor entered into an agreement with John Anthony Vineyards for the purchase of grapes. This agreement was not provided to Trustee by Codding at any time.

Prior to June 9, 2021, farm labor was provided to Debtor on the Properties by Nevarez Farm Labor ("Nevarez"). Nevarez was not paid for the pre-conversion work performed on the Properties. *See* Exh. 14.

## C. Conversion and Trustee's operations period

On June 15, 2021, the bankruptcy case was converted to Chapter 7. Upon conversion, the Chapter 7 Trustee was the sole party in interest with respect to property of the Estate.

Trustee investigated the assets of the Estate and was informed by Codding that there was perhaps $800,000 worth of grapes growing on the Properties. *See* Exh. 2, pg. 19, ¶ 8 ("Mr. Codding informed me that he expects and projects the crops to result in gross revenues of around $800,000 by the end of harvest…"). Codding insisted that Trustee permit him to continue farming the Properties. *See, e.g.,* Exh. 36 pg. 3343 (6/18/2021 e-mail from Codding: "…it's vital we keep farming."); pg. 3352 (6/22/2021 e-mail from Codding requesting permission to continue farming uninterrupted); pg. 3374 (6/22/2021 e-mail from Codding stating "The crop should gross $750,000 to $1,000,000 in revenue at harvest. That is, if continuity of farming is allowed by operator without interruption."); *id.* pg. 3473 (7/21/2021 e-mail from Codding arguing that farming was essential).

Prior to July 22, 2021, Codding personally drafted a farm operator agreement for his employment on behalf of the Estate to grow, harvest, and sell crops.

On July 22, 2021, Codding transmitted a draft farm operator agreement to Trustee, which Codding personally prepared. *See* Exh. 36, pg. 3488 (7/22/2021 e-mail from Codding to Trustee enclosing draft farm operator agreement). Multiple rounds of revisions were exchanged between the parties, including both Trustee and Trustee's counsel.

1   Also on July 22, 2021, Codding sent an e-mail to Trustee stating: "As noted I'm working

2   with grape broker to gather grape sales agreements for your reference. Understood we want to

3   reassign." *See* Exh. 36, pg. 3491 (7/22/2021 e-mail from Codding to Trustee).

4   On July 27, 2021, Trustee personally visited the Properties, and discussed various matters

5   with Codding. On that date, Codding signed a stipulation for turnover of the Properties on behalf of

6   Rabbit Ridge, and also the farm operator agreement.

7   On or about August 2, 2021, two grape purchase agreements were prepared between Rabbit

8   Ridge and Pali Wine Company ("Pali"), for the purchase of grapes from the San Marcos Property.

9   On August 9, 2021, as Dk. No. 184, Trustee filed a stipulation for turnover of the Properties

10  with Rabbit Ridge ("Turnover Stipulation"). Codding signed on behalf of Rabbit Ridge. *See* Exh. 1.

11  On August 9, 2021, as Dk. No. 186, Trustee filed a motion to approve the farm operator

12  agreement and approve limited operations ("Operate Motion"). Exh. 2. Codding signed a declaration

13  in support of the Operate Motion, which stated in paragraph 9: "I understand that all proceeds from

14  the sale of crop must be directed to and turned over to the Trustee. *See* Exh. 2, pg. 21, ¶ 9.

15  On August 12, 2021, Codding submitted a crop estimate spreadsheet to Trustee. *See* Exh. 36,

16  pg. 3749.

17  On or about August 19, 2021, three grape purchase agreements were prepared between

18  Rabbit Ridge and Nicora Wine ("Nicora"), for the purchase of grapes from the Live Oak Property.

19  *See* Exh. 20.

20  On August 23, 2021, the Court entered an order approving turnover of the Properties

21  ("Turnover Order"). *See* Exh. 3.

22  On August 26, 2021, Codding submitted another crop estimate spreadsheet to Trustee. *See*

23  Exh. 36 pg, 3757.

24  Also on August 26, 2021, Codding changed the locks on the Facility and delivered key

25  copies to Trustee via overnight mail. Codding retained his own set of keys and retained access to the

26  Facility and gate codes. *See* Exh. 36, pg. 3759 (8/26/2021 e-mail from Codding).

27  On August 30, 2021, Rabbit Ridge received three checks totaling $44,000 from Nicora, for

28  the purchase of grapes, check numbers 1865, 1866, and 1867. *See* Exh. 13, pp. 2656-59.

7

EVIDENTIARY HEARING TRIAL BRIEF

The three checks from Nicora were deposited into a bank account with Wells Fargo Bank, N.A. ("Wells Fargo"), account number ending in -7783 ("WF Account"). *See* Exh. 13, pg. 2489.

On September 7, 2021, as Dk. No. 211, the Court entered an order approving the Operate Motion ("Operate Order"). Exh. 4. The Operate Order provided that "[t]he proceeds of all agricultural products ('Crop') grown on [the Properties] shall be paid directly to the Estate… *See* Exh. 4 at pg. 27.

On September 10, 2021, Rabbit Ridge received a check in the amount of $30,000 from Cathartes Aura LLC, also known as Anarchist, for the purchase of grapes, check number 3222/8578, which was deposited into the WF Account.

On September 22, 2021, Codding and Trustee were contacted by Nathan R. Carlson, on behalf of Corbett Vineyards dba Center of Effort Wine ("COE"), requesting to negotiate a grape purchase contract. *See* Exh. 36, pg. 3900 (e-mail from Nathan Carlson to Trustee).

Prior to September 22, 2021, Codding never sent any grape purchase contracts to Trustee.

Also on September 22, 2021, Rabbit Ridge received an electronic check deposit in the amount of $27,471.90 from Pali, for the purchase of grapes, which was deposited into an account with CoastHills Credit Union ("CoastHills"), account number ending in -xx91 ("CH Account"). *See* Exh. 12, pg. 2255.

On September 28, 2021, Codding sent various copies of grape purchase agreements with DAOU FAMILY ESTATES, LLC ("Daou") to Trustee, for the purchase of grapes.  *See* Exh. 36, pg. 3975.

On September 30, 2021, Rabbit Ridge received a check in the amount of $3,285 from Graveyard Vineyards ("Graveyard"), check number 3060, for the purchase of grapes, which was deposited in the CH Account. *See* Exh. 12, pg. 2357.

On October 4, 2021, Codding sent a copy of a grape purchase agreement addendum and corresponding contract to Trustee for the purchase of grapes by WarRoom Ventures, LLC ("WarRoom"). *See* Exh. 36, pg. 4016.

On October 5, 2021, Codding sent a copy of a grape purchase agreement addendum to Trustee for the purchase of grapes by San Antonio Winery, Inc. ("Riboli"). *See* Exh. 36, pg. 4025.

8

4824-2330-5952,v.1

Also on October 5, 2021, Trustee sent an e-mail to Codding in response to Codding's comments that he or Rabbit Ridge had sold and shipped out grapes without prior approval by Trustee, notifying Codding that he was in breach of the farm management agreement. *See* Exh. 36, pg. 4047.

In response to Trustee's e-mail on October 5, 2021, Codding provided Trustee with a contract recap, disclosing the following seven grape purchasers: (1) Naked Wines (COE); (2) Daou; (3) WarRoom; (4) Riboli; (5); John Anthony Michael ("JAM"); (6) "Hayseed"; and (7) Humanity Wine Company, LLC ("Humanity"). *See* Exh. 36, pg. 4044.

Codding did not disclose at the time that Humanity was a company owned and operated by Steven L. Jones ("Jones").

On October 11, 2021, Codding sent a harvest revenue projection to Trustee, disclosing an estimated revenue of $579,462, with the seven purchasers described above.

On October 16, 2021, Rabbit Ridge submitted a Report of Wine Premises Operations to the United States Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau ("TTB") disclosing that in the month of September 2021, it received and used 19,427 pounds of uncrushed grapes in its operations, all of which were received and "[u]sed in wine production." *See* Exh. 31, pg. 2972.

Rabbit Ridge never paid any cash to the Estate for any grapes in the 2021 harvest season.

There was never any contract between the Estate and Rabbit Ridge for the use, purchase, or processing of any grapes on behalf of the Estate.

On October 22, 2021, Rabbit Ridge received a check in the amount of $2,250 from Sycamore Ranch Vineyard & Winery, LLC ("Sycamore"), check number 2570, for the purchase of Petite Verdot grapes, which was deposited in the CH Account. *See* Exh. 12, pg. 2361.

Also on October 22, 2021, Rabbit Ridge received a second electronic check deposit in the amount of $3,877.52 from Pali, for the purchase of grapes, which was deposited into the CH Account. *See* Exh 12, pg. 2258.

On October 26, 2021, Rabbit Ridge received a check in the amount of $22,297.89 from O'Neill Beverages Co., LLC dba O'Neill Vintners & Distillers, check number 5826, for the purchase

1  of grapes, which was deposited into the CH Account. *See* Exh. 12, pg. 2363.

2       Between September 1, 2021 through October 31, 2021, Codding subcontracted farm labor to

3  three companies for harvesting services. These companies were three related companies called

4  SoMoCo Labor Supply, Inc., Emerald Valley Labor, and Azcona Harvesting LLC (collectively,

5  "Harvesters").

6       Harvesters collected between 217 and 218 tons of grapes from the Properties at Codding's

7  request. Harvesters were not contracted by the Estate.

8       Harvesters submitted invoices collectively totaling $88,962.72 to Codding, none of which

9  were ever paid. *See* Exhs. 15-17.

10      On November 24, 2021, Rabbit Ridge received a check in the amount of $7,752 from

11  Adelaida Springs Ranch/Rangeland Wines, check number 8711, for the purchase of grapes, which

12  was deposited into the WF Account. *See* Exh. 13, pg. 2670.

13      In total, Codding received (through Rabbit Ridge) payments from grape purchasers in the

14  amount of $140,934.91.

15      For all of the transactions identified above, Codding did not make any grape purchaser

16  available to negotiate pricing or terms with Trustee. Instead, Codding negotiated all of the contract

17  terms and then sometimes sent a contract addendum directing payment of the purchase price to

18  Trustee. At Codding's insistence, all of the contracts above were initially drafted between the

19  purchaser and Rabbit Ridge. *See, e.g.,* Exh. 36, pg. 3906 (9/22/2021 e-mail from Codding to Trustee

20  stating "[a]ll sales agreements will evaporate" if Trustee directly negotiates with purchasers).

21      On December 8, 2021, Codding sent a grape shipment recap to Trustee and his agents, in the

22  form of a one-page Microsoft Excel spreadsheet with no supporting documentation. The grape

23  shipment recap stated that 228 tons of grapes had been shipped, and $549,700 was due. The grape

24  shipment recap was prepared by Codding. *See* Exh. 36, pg. 4266-67.

25      At the time that Codding sent the grape shipment recap to Trustee, it was not accurate.

26  Codding knew that the grape shipment recap was materially inaccurate, especially because it omitted

27  all of the other grape purchasers identified above.

28

EVIDENTIARY HEARING TRIAL BRIEF

4824-2330-5952,v.1

1   Also on December 8, 2021, Rabbit Ridge sent a payment reminder to Don Brady of Brady

2   Vineyard ("Brady"), stating: "We're sending a reminder to let you know that invoice 11436 has not

3   been paid." The invoice requested payment of $17,000 for grapes shipped from the Properties.

4   Brady contacted Trustee and spoke with Trustee's agents on December 8, 2021. Brady then

5   provided documentation, including the grape purchase agreement which failed to identify Trustee as

6   the party selling grapes. *See* Exh. 26.

7   On December 9, 2021, Trustee's agent Lori Ensley made an unannounced visit to the

8   Facility. At the time, Rabbit Ridge employees were discovered on the premises operating winery

9   equipment without express authorization from Trustee.

10   Upon discovery of the unauthorized winery operations on the Facility, Trustee and his

11   agents, in coordination with FCW, re-secured the Facility with no access granted to Rabbit Ridge or

12   its employees.

13   Through December 9, 2021 (including after entry of the Turnover Order), Rabbit Ridge

14   operated a winery business out of the Facility. Trustee never gave any permission for Rabbit Ridge

15   to operate any winery business or winery equipment at the Facility. Codding also never informed

16   Trustee that he and Rabbit Ridge were bottling and selling wines out of the Facility.

17   On December 16, 2021, Trustee and Codding had a telephone conversation where Trustee

18   informed Codding that Brady had contacted him regarding Rabbit Ridge's demand for payment.

19   During that conversation, Trustee demanded a full accounting from Codding.

20   On December 17, 2021, Codding provided to Trustee via e-mail an explanation of diverted

21   grape revenue, in the total amount of $140,960.31. *See* Exh. 36, pg. 4294.

22   On December 20, 2021, Trustee sent a document entitled "Memorandum of Understanding

23   Between Lee Codding and Related Entities as more specifically defined below and Richard

24   Marshack, Bankruptcy Trustee of Northern Holding LLC ("Trustee"), bankruptcy case number 8:20-

25   bk-13014-MW" ("MOU") to Codding via e-mail.

26   On the same day it was sent, Codding sent back a document purporting to be a fully executed

27   copy of the MOU. *See* Exh. 36, pp. 4310-12.

28

1    Two signature lines on the MOU were for Steve Jones, CFO of Rabbit Ridge and Steve

2  Jones, managing member of Humanity, and bore signatures on the lines. *See id.*

3    Steve Jones never in fact signed the MOU. Instead, Codding inserted a signature on the lines

4  which Steve Jones had not approved. Codding did sign the signature blocks for himself.

5    According to the MOU, Codding was to provide "backup documentation including paid

6  invoices and cleared checks to support" any requested reimbursements from the Estate, and to

7  provide such documentation "no later than January 5, 2022." *See* Exh. 36, pg. 4311.

8    On December 30, 2021, Codding provided an invoice and documentation to Trustee and his

9  agents via e-mail.  The invoice requested $372,066.28 in reimbursements. *See* Exh. 36, pg. 4449-77.

10   The documentation sent to Trustee on December 30, 2021 failed to identify and corroborate

11  substantial expenses incurred during the Chapter 7 operations period which were incurred and

12  actually paid by Codding. Codding has never submitted documentation to Trustee showing that he

13  made significant expenditures on farm operations after Trustee's appointment.

14   On January 4, 2022, Codding requested via e-mail "a modest progress payment on the cost

15  recovery" from Trustee. *See* Exh. 36, pg. 4392 (1/4/22 e-mail from Codding to Trustee).

16   On January 24, 2022, Codding provided another projected collections schedule to Trustee in

17  the form of a one-page Excel spreadsheet. *See* Exh. 36, pg. 4441-42. The total of the projected

18  collections was $394,680.

19   On February 1, 2022, Codding voluntarily appeared for an examination under oath by

20  Trustee and his attorney, regarding the farming reimbursement issues. *See* Exh. 34.

21   On February 8, 2022, Codding voluntarily appeared for an examination under oath pursuant

22  to 11 U.S.C. § 341(a), at which Trustee and counsel for FCW asked questions. *See* Exh. 35.

23   On February 11, 2022, Codding visited Trustee's office at 870 Roosevelt, Irvine, CA and

24  informed the front desk receptionist that he was there to pick up a check. Codding had never been

25  told by Trustee that any check was available for him to pick up.

26   After Codding left Trustee's office, he sent an e-mail to Trustee with a picture of the front of

27  the office. *See* Exh. 36, pg. 4530.

28

EVIDENTIARY HEARING TRIAL BRIEF

On or about February 17, 2022, Codding sent a letter via certified mail to Trustee demanding payment of $262,332.

On February 25, 222, Trustee sent a response letter to Codding.

Codding responded to the February 25, 2022 response letter with an e-mail stating: "Fuck you. Pay me." *See* Exh. 36, pg. 4533. The same was also sent to Trustee via text message. *See* Exh. 10, pg. 615.

Trustee received a total of $16,219.76 from My Favorite Neighbor (Booker), on account of 5.904 tons of grapes shipped. Exh. 37, pg. 4560.

Trustee received a total of $101,267.21 from Daou, on account of 30.26 tons of grapes shipped. Exh. 37, pp. 4544-55.

Trustee received a total of $10,535.75 from Riboli, on account of 3.145 tons of grapes shipped. Exh. 37, pg. 4561.

Trustee received a total of $39,762 from COE, on account of 22.09 tons of grapes shipped. Exh. 37, pp. 4556, 4558.

Trustee received $45,578.40 from WarRoom, on account of 54.26 tons of grapes shipped. *See* Exh. 37, pg. 4562-69.

Trustee received $17,000 from Brady, on account of 10 tons of grapes shipped. Exh. 37, pg. 4557.

Trustee received $12,122 from JAM, on account of 3.0305 tons of grapes shipped. Exh. 37, pg. 4559.

In total, Trustee received $242,485.12 in funds from grape purchasers. Exh. 37, pg. 4570.

## D.    Filing of the Motion and Extensions.

On February 24, 2022, with the retirement of presiding judge Mark S. Wallace, the case was reassigned to the Hon. Erithe A. Smith.

On March 21, 2022, Trustee was contacted by counsel for Codding, Goe Forsythe & Hodges, LLP ("GFH").

On April 1, 2022, as Dk. No. 304, Trustee filed a motion requesting issuance of an order to show cause re: civil contempt ("OSC Motion") with detailed declarations and 20 exhibits explaining

EVIDENTIARY HEARING TRIAL BRIEF

1   good cause for the issuance of an order to show cause. Pursuant to Local Bankruptcy Rule 9020-

2   1(b), the responding party ordinarily has only seven days to object to the issuance of an order to

3   show cause.

4          On April 4, 2022, as Dk. No. 305, Codding (through counsel) filed an objection and request

5   for extension to respond to the OSC Motion.

6          On April 5, 2022, as Dk. No. 308, Trustee filed a stipulation to extend Codding's period to

7   respond or object to the Motion through and including April 20, 2022 ("First Stipulation").

8          On April 8, 2022, as Dk. No. 313, the Court entered an order approving the First Stipulation.

9          On April 19, 2022, as Dk. No. 319, Trustee filed a second stipulation to extend Codding's

10  period to respond or object to the Motion through and including May 11, 2022 ("Second

11  Stipulation").

12         On April 19, 2022, as Dk. No. 320, the Court entered an order approving the Second

13  Stipulation.

14         On May 6, 2022, as Dk. No. 329, Codding filed a third stipulation to extend his period to

15  respond or object to the Motion through and including June 6, 2022 ("Third Stipulation").

16         On May 6, 2022, as Dk. No. 330, the Court entered an order approving the Third Stipulation.

17         On June 6, 2022, as Dk. No. 336, Codding filed a fourth stipulation to extend his period to

18  respond or object to the Motion through and including June 20, 2022 ("Fourth Stipulation").

19         On June 6, 2022, as Dk. No. 337, the Court entered an order approving the Fourth

20  Stipulation.

21         On June 16, 2022, as Dk. No. 341, Codding filed a fifth stipulation to extend his period to

22  respond or object to the Motion through and including June 27, 2022 ("Fifth Stipulation").

23         On June 21, 2022, as Dk. No. 342, the Court entered an order approving the Fifth Stipulation.

24         On June 23, 2022, as Dk. No. 343, Codding filed a sixth stipulation to extend his period to

25  respond or object to the Motion through and including June 29, 2022 ("Sixth Stipulation").

26         On June 23, 2022, as Dk. No. 344, the Court entered an order approving the Sixth

27  Stipulation.

28

EVIDENTIARY HEARING TRIAL BRIEF

1    On June 29, 2022, as Dk. No. 347, Codding filed a seventh stipulation to extend his period to

2    respond or object to the Motion through and including July 1, 2022.

3    On July 1, 2022, as Dk. No. 350, Codding filed an opposition to the OSC Motion ("OSC

4    Opposition"). Despite having three months to prepare the OSC Opposition under seven stipulated

5    extensions (in addition to approximately four months pre-filing of the Motion where documents

6    were requested by Trustee), no documents, receipts, or evidence of disbursements was attached to

7    the OSC Opposition filed by Codding.

8    On September 1, 2022, the case was reassigned to the Hon. Scott C. Clarkson after the

9    retirement of the Hon. Erithe A. Smith.

10    On September 8, 2022, as Dk. No. 355, the Court entered an order setting a hearing on the

11    OSC Motion.

12    On October 26, 2022, the Court conducted a hearing on the OSC Motion. A true and correct

13    copy of the transcript of the hearing on the OSC Motion is attached to the Request for Judicial

14    Notice ("RJN") as Exhibit "1."

15    After the hearing, on October 26, 2022, as Dk. No. 359, the Court entered an order to show

16    cause re: civil contempt ("OSC").

17    ### E.    Discovery and Pre-Hearing Matters

18    The OSC provided that there would be a discovery cutoff date of January 15, 2023, and that

19    the parties were to cooperate and comply with applicable rules. In November, Trustee contacted

20    GFH and requested to confer regarding a deposition date for Codding. No deposition date was ever

21    provided.

22    On December 1, 2022, Trustee served one set of written discovery on Codding, through his

23    counsel GFH. The discovery included requests for production of documents, requests for

24    admissions, and interrogatories.

25    On December 8, 2022, as Dk. No. 365, GFH filed a motion to withdraw as counsel

26    ("Withdrawal Motion").

27    Also on December 8, 2022, Codding (through GFH) served one set of requests for production

28    of documents.

1     On December 9, 2022, Trustee served a notice of deposition and subpoena for Codding.

2     On December 30, 2022, as Dk. No. 372, a stipulation between Trustee and Codding was filed

3 where discovery deadlines would be continued for approximately 45 days, and providing for a

4 limited extension of time for Codding to serve an answer to written discovery ("Discovery

5 Stipulation").

6     On January 3, 2023, as Dk. No. 373, the Court entered an order approving the Discovery

7 Stipulation, extending the discovery cutoff to March 31, 2023, and providing that "[t]he deadline for

8 Codding to respond to the Trustee Written Discovery is extended to the earlier of: (1) thirty days

9 after the entry of an order by the Court granting the Withdrawal Motion; or (2) March 1, 2023."

10     On January 4, 2023, as Dk. No. 375, the Court entered an order granting the Withdrawal

11 Motion. This meant that the deadline for Codding to provide written discovery responses would be

12 February 4, 2023. No discovery responses were received from Codding by February 4, 2023.

13     On January 24, 2023, Trustee conducted a half-day deposition of Jones via Zoom.

14     No discovery responses were received from Codding even by March 1, 2023. No discovery

15 responses have ever been received despite specific notice to Codding.

16     The hearing on the OSC was originally scheduled for April 20, 2023. On March 20, 2023, as

17 Dk. No. 380, the Court entered an order continuing the hearing on the OSC to May 11, 2023.

18     On April 11, 2023, as Dk. No. 382, Trustee filed a motion in limine to permit remote

19 appearances of witnesses. No opposition was filed as of the date of this brief, and the Court has

20 posted a tentative ruling granting the motion and waiving appearances on the scheduled day of the

21 hearing on May 2, 2023.

22 **3.     Legal Argument**

23     **A.     Standard for Civil Contempt**

24     A bankruptcy court has the authority to "issue any order, process, or judgment that is

25 necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The bankruptcy

26 court has the authority to impose civil contempt sanctions under § 105(a). *Knupfer v. Lindblade (In*

27 *re Dyer)*, 322 F.3d 1178, 1189–90 (9th Cir. 2003); *Walls v. Wells Fargo Bank*, 276 F.3d 502, 507

28 (9th Cir. 2002). To find a party in civil contempt, the court must find that the offending party

EVIDENTIARY HEARING TRIAL BRIEF

knowingly violated a definite and specific court order, and the moving party has the burden of showing the violation by clear and convincing evidence. *Dyer*, 322 F.3d at 1190-91; *In re Wallace*, 490 B.R. 898, 905 (B.A.P. 9th Cir. 2013). But "civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801-02 (2019) (citation omitted) (establishing the objective fair ground of doubt standard in the context of a discharge order). The burden then shifts to the contemnors to demonstrate why they were unable to comply. *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). A person fails to act as ordered by the court when he fails to take all the reasonable steps within his power to insure compliance with the court's order. *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146–47 (9th Cir. 1983). "[A] person should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the court's order." *Reno Air Racing Association v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993)). " 'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *Dual-Deck*, 10 F.3d at 695 (quoting *Vertex Distribution, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891 (9th Cir. 1982)).

At the evidentiary hearing, Trustee will prove by clear and convincing evidence that Codding knowingly violated both the Operate Order and the Turnover Order.

### i.    Codding clearly violated the Operate Order.

Essentially, Trustee contends that Codding violated the Operate Order when Codding:

1) Negotiated and executed grape purchase contracts with third-party buyers and concealed such contracts from Trustee, where the grapes were derived from the Properties – property of the Estate;

2) Received at least $140,000 in grape sale proceeds and concealed such proceeds from Trustee; and

3) Conducting non-harvest-related activities at the Properties, such as processing, creating, bottling, and selling wines, including but not limited to the crushing and fermentation of nearly 10 tons of grapes from the 2021 harvest.

EVIDENTIARY HEARING TRIAL BRIEF

Codding's e-mail on December 17, 2021, *see* Exh. 36, pg. 4294, constituted Codding's first admission that he (either individually or through his entities) received over $140,000 from the sale of grapes grown on the Properties, and did not comply with the Operate Order which directed all such proceeds to be paid to Trustee. Codding could not have done this by accident. As the evidence will show, Codding negotiated and executed contracts with the customers and decided which contracts to provide to Trustee, and which to retain for his own benefit and/or Rabbit Ridge. Preventing Trustee from negotiating any deal terms with customers was extremely detrimental to the Estate, because it is now unknown whether Codding negotiated back-room deals with customers for favorable treatment, or under-sold any products. For example, the price per ton for Cabernet Sauvignon grapes sold to JAM was $4,000 per ton, but the price per ton for Daou was $3,350. Though subsequent discovery obtained by Trustee (after subpoenas to Bank of America, CoastHills Credit Union, and Wells Fargo – minimal bank statements provided by Codding), Trustee has identified the dates and amounts of the checks received from misappropriated grapes. Damningly, all of the checks that Codding received were received *after* the filing of the Operate Motion, under which Codding executed a declaration stating he understood that all proceeds were to be paid to Trustee. *See* Exh. 2, pg. 21, ¶ 9. Based on bank records obtained via subpoena, Trustee will show that Codding misappropriated property of the Estate in violation of the Operate Order and the automatic stay (discussed *infra*) when he received the following payments (all of these payments were received prior to Trustee receiving any payments at all):

| Date | Customer | Amount | Institution |
|------|----------|--------|-------------|
| 08/30/2021 | Nicora | $44,000 | Wells Fargo |
| 09/10/2021 | Cathartes Aura LLC (Anarchist) | $30,000 | Wells Fargo |
| 09/22/2021 | Pali Wines | $27,471.90 | CoastHills FCU |
| 09/30/2021 | Graveyard | $3,285 | CoastHills FCU |
| 10/22/2021 | Pali Wines | $3,877.52 | CoastHills FCU |
| 10/22/2021 | Sycamore | $2,250 | CoastHills FCU |
| 10/26/2021 | O'Neill | $22,297.89 | CoastHills FCU |
| 11/24/2021 | Rangeland | $7,752 | Wells Fargo |

| | | SUBTOTAL | $140,934.91 | |
|---|---|---|---|---|

Trustee does not know if there are any other undisclosed diversions of funds. Because of Codding's demonstrated history of concealment and misappropriation of property, Trustee cannot represent that the amounts admitted by Codding are accurate or complete. However, it is clear that Codding was not authorized to directly receive any grape sale proceeds, and Codding's receipt of these grape proceeds was in violation of the automatic stay and the Operate Order.

### ii.      Codding clearly violated the automatic stay by receiving and misappropriating property of the Estate.

Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "[T]he failure to return property of the estate with knowledge of the bankruptcy is a violation of both the automatic stay and of the turnover requirements of the Bankruptcy Code." *In re Abrams*, 127 B.R. 239, 242 (B.A.P. 9th Cir. 1991). Indeed, the stay prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Codding's actions in knowingly selling estate property and pocketing the proceeds clearly violates the automatic stay. Additionally, Trustee is informed that Codding processed approximately 10 tons of grapes into wine, without any compensation to the Estate. Depending on the varietal of grapes, this amounts to a conversion of from $20,000 to $40,000 worth of grapes. Moreover, Trustee suspects that there is a significant possibility of additional, undisclosed misappropriations of Estate property, because Codding's initial harvest and revenue estimates were drastically short of what has been documented as harvested and sold. Codding never produced any evidence-based harvest report to Trustee, and the extent of his misappropriations is truly unknown.

### iii.      Codding clearly violated the Turnover Order.

In addition to violating the automatic stay and Operate Order by Codding's misappropriation of funds constituting Estate property, Codding also plainly violated the Turnover Order. Codding signed the Turnover Stipulation on behalf of Rabbit Ridge and was informed multiple times in writing (including in the Turnover Stipulation) that he was not permitted to access the Facility or

1  process or bottle wines at the Facility. Trustee's agent Lori Ensley visited the Facility a number of

2  times, with advance notice to Codding. During each visit, Ms. Ensley did not observe anyone using

3  any equipment or the Facility – likely because advance notice was given. After Trustee discovered

4  Codding's misappropriation of funds, he sent Ms. Ensley to the Facility without advance notice to

5  Codding. At that time, Ms. Ensley discovered that there were Rabbit Ridge employees at the Facility

6  using the winery equipment and processing wines. Ms. Ensley directed all of the Rabbit Ridge

7  workers to leave, and they did. Moreover, Trustee was provided with federal reports showing that

8  Codding continued to operate a winery and process wines, including approximately 10 tons of

9  grapes in September 2021. After being caught, Codding has never denied continuing to operate a

10 winery business in direct violation of the Turnover Order. Instead, Codding argues that the Turnover

11 Order somehow does not apply to him or his entities. This argument is frivolous.

12    **iv.    Codding's actions cannot be characterized as a reasonable**

13    **effort to comply with the Court's orders.**

14        Codding previously made a single conclusory argument relating to his alleged substantial

15 compliance with the Operate Order: "Setting aside that the Court never ordered Mr. Codding to

16 harvest grapes or to cancel contracts, Mr. Codding nevertheless did harvest grapes and did cancel

17 contracts to the best of his ability…Mr. Codding's performance which resulted in over $230,000 of

18 receipts by the Estate is not only not contemptible, it is a minor miracle." OSC Opposition [Dk. 350-

19 1] at 13:25-14:2.

20        The receipt of any funds by the Estate does not demonstrate that Codding adequately

21 performed or discharged his duties. Codding, in fact, represented to Trustee that the value of the

22 crops as of August 5, 2021, was approximately 250 tons with a value of approximately $550,000.

23 *See* Exh. 36, pg. 3683. Trustee, however, only received $230,000, which is just over half of

24 Codding's estimated revenue. Codding has never explained this discrepancy and Codding cannot

25 congratulate himself for misappropriating only one-half to one-third of the total proceeds. Moreover,

26 Codding deliberately continued to operate a winery business out of the Facility without paying any

27 compensation to the Estate (i.e. for rent and use of the premises and equipment) and in direct

28 violation of the Turnover Order which plainly stated that use of the Facility and equipment was

1  prohibited.

2  **B.    Codding fails to prove that he had any entitlement to any**

3  **funds.**

4  Administrative expenses are only allowed "after notice and a hearing." 11 U.S.C. § 503(b).

5  The burden of proof lies on the claimant to establish an allowable administrative expense. *See*

6  *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir. 1998).

7  Initially, Trustee considered the receipt of funds by Codding to be potentially resolved

8  through setoff and settlement. To investigate whether Codding had any setoff rights, Trustee

9  demanded that Codding provide receipts showing actual expenses which could be reimbursed.

10  Codding proceeded to provide self-generated reports and limited financial statements which showed

11  that the majority of the funds he claimed to have expended on farming costs were actually expended

12  prior to the case converting to Chapter 7. Indeed, every few months, Trustee would be contacted by

13  yet another unpaid vendor, including the company which provided harvesting labor services on the

14  Properties – and was left completely unpaid. Given that Trustee received significant unpaid invoices

15  for the farming and harvesting operations, coupled with Codding's abject failure to produce any

16  documentation showing that he even expended significant funds on post-conversion farming

17  operations, it appears that Codding did not in fact pay for farming expenses, and is not entitled to

18  any claim for reimbursement or setoff.

19  **C.    Codding must purge his contempt by turning over all**

20  **misappropriated funds as required by the Operate Order.**

21  Section 542 requires "an entity" which is "in possession, custody or control, during the case,

22  of property that the trustee may use, sell or lease under section 363," to "deliver to the trustee, and

23  account for, such property of the value of such property, unless such property is of inconsenquential

24  value or benefit to the estate." 11 U.S.C. § 542(a). "[T]he statute only specifies that an entity 'in

25  possession, custody, or control, during the case' of estate property must turn it over to the trustee."

26  *Shapiro v. Henson*, 739 F.3d 1198, 1200 (9th Cir. 2014). Even an employed professional in

27  possession of property of the estate is required to turn such property over. *See, e.g., APJL*

28  *Consulting, LLC v. Treasures, Inc. (In re Treasures, Inc.)*, 2015 Bankr. LEXIS 662 at *55-60

21

EVIDENTIARY HEARING TRIAL BRIEF

(B.A.P. 9th Cir. March 3, 2015) (auctioneer employed under Section 327 denied compensation and ordered to disgorge funds held which constituted property of the estate – remanded only as to recalculate the amount of compensatory damages). In *Treasures*, the BAP held that even where there was a pending adversary proceeding regarding the accounting issues between the trustee and auctioneer, "APJL again confuses the accounting issue with the property of the estate issue… We agree that there are material disputes with respect to the accounting, but that does not excuse APJL from turning over property of the estate…" *Treasures*, 2015 Bankr. LEXIS 662 at *61-62.

Just as in the *Treasures* case, an employed agent or paraprofessional received and retained possession of funds constituting property of the Estate, and Trustee has made demand that such funds be turned over. Codding fails and refuses to turn over the misappropriated funds, and instead argues that this is a mere "accounting" issue even though he has failed to produce any evidence or documentation demonstrating that the funds were used to pay vendors that performed work for the Estate. Without regard to whether Codding is entitled to a reimbursement or administrative claim, the Bankruptcy Code is unambiguous that he must turn over property of the Estate to the Trustee. Unless or until he does, any alleged claim is disallowed. 11 U.S.C. § 502(d). Moreover, even if the individual is not in possession of the funds, "the trustee is entitled to recovery of a money judgment for the value of the property of the estate." *Newman v. Schwartzer (In re Newman)*, 487 B.R. 193, 202 (B.A.P. 9th Cir. 2013).

### D.    Compensatory sanctions are appropriate.

Civil sanctions include compensatory damages. *See Dyer*, 322 F.3d 1178; *see, e.g.,* "Attorneys' fees are an appropriate component of civil contempt sanctions." *Rediger Investments Corp. v. H Granados Communications, Inc. (In re H Granados Communications, Inc.)*, 503 B.R. 726, 736 (B.A.P. 9th Cir. 2013).

In addition to the Estate property misappropriated by Codding, his belligerent posture and unreasonable demands for hundreds of thousands of dollars of unproven reimbursements resulted in the OSC proceeding and this evidentiary hearing. In addition to sanctioning Codding for the full amount of Estate property misappropriated, Trustee also requests that the Court consider the imposition of reasonable attorneys' fees in relation to this contempt proceeding and investigating

Codding's misappropriation of Estate property starting from December 2021. All of these attorneys'
fees could have been avoided if Codding had simply complied with the Court's orders and
cooperated with Trustee's request for documents and information. Instead, the Estate has incurred
tens of thousands of dollars in attorneys' fees to prove up Codding's theft of Estate property. An
award of compensatory sanctions including attorneys' fees and costs is appropriate.

### E.    A criminal referral is also appropriate, given the circumstances.

"Any judge, receiver, or trustee having reasonable grounds for believing that any violation
under chapter 9 of this title or other laws of the United States relating to insolvent debtors,
receiverships or reorganization plans has been committed, or that an investigation should be had in
connection therewith, shall report to the appropriate United States attorney all the facts and
circumstances of the case, the names of the witnesses and the offense or offenses believed to have
been committed. Where one of such officers has made such report, the others need not do so." 18
U.S.C. § 3057(a). Section 152 of the federal criminal code provides as follows:

A person who—

(1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;

(2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;

(3) knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;

(4) knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney;

(5) knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;

(6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;

(7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and

fraudulently transfers or conceals any of his property or the property of such other person or corporation;

(8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or

(9) after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, shall be fined under this title, imprisoned not more than 5 years, or both.

The second aspect of the OSC refers to "referral to the Department of Justice pursuant to 18 U.S. Code § 152, or any other applicable statute, pertaining to potential bankruptcy crimes." On February 18, 2022, Trustee provided a criminal referral to the Office of the United States Trustee ("OUST") based on what was known at the time. If the evidence adduced at the evidentiary hearing on May 11 leads the Court to have reasonable grounds for believing that a violation of Title 18 has been committed, Trustee supports the Court providing its own referral to the Department of Justice. In addition to federal criminal investigations, Trustee is informed that the San Luis Obispo County District Attorney's office is investigating Codding for check fraud under Cal. Pen. Code § 476.

## 4.  Conclusion

Codding clearly violated multiple orders of the Court and has caused significant damage that probably will never be fully ascertainable. At the conclusion of the evidentiary hearing and presentation of evidence, Trustee will request that the Court:

1.    Adjudge Codding in contempt of the Operate Order;

2.    Adjudge Codding in contempt of the automatic stay;

3.    Adjudge Codding in contempt of the Turnover Order;

4.    Direct Codding to turnover funds in an amount equal to the proceeds and value of assets (such as the 10 tons of misappropriated grapes) which he unlawfully received;

5.    Impose compensatory damages against Codding including actual economic damages and reasonable attorneys' fees and costs;

/ / /

/ / /

4824-2330-5952,v.1

6.      Disallowing any claim for administrative expense or reimbursement by Codding; and

7.      Such other and further relief which the Court deems just and proper.

DATED: April 27, 2023                    MARSHACK HAYS LLP

                                                    /s/ Tinho Mang
                                         By:_____
                                            D. EDWARD HAYS
                                            TINHO MANG
                                            Attorneys for Chapter 7 Trustee
                                            RICHARD A. MARSHACK

4824-2330-5952,v.1

1

## REQUEST FOR JUDICIAL NOTICE

2          Richard A. Marshack, the duly-appointed and acting chapter 7 trustee ("Trustee") of the

3   bankruptcy estate ("Estate") of Northern Holding, LLC ("Debtor"), hereby requests pursuant to

4   Federal Rule of Evidence 201, that this Court take judicial notice of the following documents:

5

| EXHIBIT | JUDICIALLY NOTICED DOCUMENTS |
|---------|------------------------------|
| 1. | A true and correct copy of Transcript of Zoom Proceedings re: Hearing re: Application for Issuance of an Order to Show Cause re: Civil Contempt for Willful Violation of Automatic Stay and the Court's Farm Operator Oder, filed on December 21, 2022, as Dk. No. 371. |

6

7

8

9

10   DATED: April 27, 2023                    MARSHACK HAYS LLP

11                                              /s/ Tinho Mang
                                        By:_____
12                                              D. EDWARD HAYS
                                              TINHO MANG
13                                              Attorneys for Chapter 7 Trustee
                                              RICHARD A. MARSHACK
14

15   4861-2996-9246, v. 1

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE

4861-2996-9246, v. 1

**EXHIBIT 1**

1     UNITED STATES BANKRUPTCY COURT

2    CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA

3        --oOo--

4 In Re:       ) Case No. 8:20-bk-13014-SC
            )
5 NORTHERN HOLDING, LLC,  ) Chapter 7
            )
6 Debtor,       ) Santa Ana, California
            ) Wednesday, 11:00 A.M.
7 ------------------------------) October 26, 2022

8

9          HEARING RE: APPLICATION
            FOR ISSUANCE OF AN ORDER
            TO SHOW CAUSE RE: CIVIL
10          CONTEMPT FOR WILLFUL
            VIOLATION OF AUTOMATIC
11          STAY AND THE COURT'S FARM
            OPERATOR ORDER

12

13

14      TRANSCRIPT OF ZOOM PROCEEDINGS
     BEFORE THE HONORABLE SCOTT CLARKSON
15      UNITED STATES BANKRUPTCY JUDGE

16

17 APPEARANCES:

18 For the Chapter 7   TINHO MANG, ESQ.
  Trustee:      Marshack Hays, LLP
19          870 Roosevelt
          Irvine, California  92620
20
  The Chapter 7 Trustee:  RICHARD MARSHACK, ESQ.
21          Marshack Hays, LLP
          870 Roosevelt
22          Irvine, California  92620

23

24
  Proceedings produced by electronic sound recording;
25 transcript produced by transcription service.



P 888.272.0022 F 818.343.7119    www.benhyatt.com
Certified Deposition Reporters

```
 1   For Lee Codding:          ROBERT P. GOE, ESQ.
                               Goe Forsythe & Hodges, LLP
 2                             18101 Von Karman Avenue
                               Suite #1200
 3                             Irvine, California  92612

 4   Court Recorder:           James Le
                               U.S. Bankruptcy Court
 5                             Central District of California
                               Ronald Reagan Federal Building and
 6                             United States Courthouse
                               411 West Fourth Street
 7                             Santa Ana, California  92701-4593
                               (855) 460-9641
 8
     Court Transcriptionist:   Ruth Ann Hager, C.E.T.**D-641
 9                             Ben Hyatt Certified Deposition
                                  Reporters
10                             17835 Ventura Boulevard
                               Suite #310
11                             Encino, California  91316

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page                                                                    3

1          SANTA ANA, CALIFORNIA, WEDNESDAY, OCTOBER 26, 2022

2                          11:02 A.M.

3                          --oOo—

4          THE COURT:  Good morning, everyone, and welcome

5   to the October 26, 2022, 11:00 calendar.  Let us call item

6   #14.00 in Northern Holding, LLC.

7          May I have appearances, please?

8          MR. MANG:  Good morning, Your Honor.  Tinho Mang,

9   Marshack Hays, for the Chapter 7 Trustee, Richard Marshack,

10  and moving party.

11         THE COURT:  Good morning, Mr. Mang.

12         MR. CODDING:  Good morning, Judge Clarkson.  Lee

13  Codding appearing on behalf of myself as the farm

14  operator/contractor.

15         THE COURT:  Hello, Mr. Codding.

16         MR. GOE:  And Robert Goe, Goe Forsythe & Hodges

17  for Mr. Codding.

18         THE COURT:  And good morning to you, Mr. Goe.

19  Great to see all of you.

20         Are there any other appearances?

21         (No response.)

22         All right.  Mr. Mang, this is your motion.  What

23  I want to try to do today is create the beginning of a

24  fairly good record that both Mr. Goe, Mr. Codding and you

25  can utilize for future references.

P 888.272.0022  F 818.343.7119        www.benhyatt.com

Case 8:20-bk-13014-SC   Doc 371   Filed 12/21/22   Entered 12/21/22 15:38:27   Desc
Main Document    Page 4 of 74

Page                                                                    4

1          So what I'd like you to do is give us an overview

2   of what has happened.  And I also want to thank you for

3   providing the Court with docket #358, which was a

4   compendium of all the orders that have been entered into

5   this case with respect to the proceeding that is before us

6   today and relevant matters.

7          Mr. Mang.

8          MR. MANG:  Our pleasure, Your Honor.  This is the

9   Court's first hearing in this bankruptcy case.  This is the

10  third judge that I've appeared in front of for this case.

11  The case was originally filed as a Chapter 11 bankruptcy

12  case about two years ago.  It was -- operated as a debtor

13  in possession for a number of months and the Honorable Mark

14  Wallace presided in front of that case until it was

15  eventually converted to Chapter 7, at which point the

16  Trustee, Mr. Marshack, came into control of the estate.

17  And what he was presented with was there was a property,

18  hundreds of acres of vineyards out in Paso Robles actually

19  situated on two lots, tens of miles away from each other.

20         So he had an issue at first with what was he to

21  do with these properties.  The schedules showed that there

22  were secured liens by Farm Credit West on all of the

23  properties in the amount of about 19 to 20 million dollars

24  and he didn't know exactly what to do.  So what he did is

25  he called up Mr. Codding, had a conversation with him and

Case 8:20-bk-13014-SC    Doc 371    Filed 12/21/22    Entered 12/21/22 15:38:27    Desc
Main Document    Page 5 of 74

Page                                                                    5

1   basically tried to figure out how he was to administer this

2   case.

3          There was value in the properties for sure.

4   There were many acres of vineyards that were fallow and

5   there were many acres that were growing grapes.  So

6   Mr. Marshack hired counsel and tried to secure the

7   properties as best he could.  And in all of this

8   Mr. Codding was friendly.  He was helpful and he was

9   actually very useful in terms of providing information to

10  the Trustee.

11         So Mr. Marshack and Mr. Codding has built a level

12  of trust starting from the beginning of Mr. Marshack's

13  appointment.  So one of the things that he had to do was

14  to -- there were two things he had to do; first was market

15  the properties to be sold and second was to make sure the

16  properties maintained their value so they could be sold.

17         One of the key things that he had to maintain was

18  the crop level and make sure that a potential buyer knew

19  that it was viable to grow grapes on the property and that

20  they didn't have to start from scratch.

21         So Mr. Marshack asked the secured creditor, Farm

22  Credit, for options.  You know, this was their collateral

23  and Farm Credit basically told the Trustee that they

24  weren't interested in funding operations.  There were, I

25  suppose, two options at that point: (1) was the Trustee

Case 8:20-bk-13014-SC   Doc 371   Filed 12/21/22   Entered 12/21/22 15:38:27   Desc
Main Document   Page 6 of 74

Page                                                                        6

1  would just let everything go to waste; or (2) he would do

2  his best with whoever he could find to help harvest.

3  Problem was, this was right in the middle of the harvest

4  season, so he had to find someone fairly quickly.  Then I

5  think the harvest is in the fall and this was July already.

6          The only option that the Trustee reasonably had

7  to operate the properties was to contract with Mr. Codding.

8  Mr. Codding made representations that he would be helpful

9  as he was before, that he would comply with the Trustee's

10 administration, and that he would fund out of pocket all of

11 the costs of farming and receive a reimbursement on the

12 back end, and he would also get a five percent compensation

13 provided that everything was approved by the court.

14         THE COURT:  Well, stop right there for a second.

15 July 2021?

16         MR. MANG:  Correct.

17         THE COURT:  Well, okay.  Now, five percent of

18 what?

19         MR. MANG:  Five percent of the net proceeds is

20 what was negotiated.

21         THE COURT:  What does that mean?  I know what

22 gross proceeds are and I know what net proceeds are.  What

23 does that mean, five percent of net proceeds?  What was the

24 net?

25         MR. MANG:  The intention of the calculation of

Page                                                                    7

1  net was that -- so to back up a little bit --

2          THE COURT:  Well, why don't you just give me the

3  answer on what the net is?

4          MR. MANG:  It's the money left over after payment

5  of expenses as set forth in the agreement.

6          THE COURT:  And is that written out?  Is that

7  defined in the agreement?

8          MR. MANG:  Yes, Your Honor, I believe it is.

9          THE COURT:  Okay.  I don't need to have it right

10  now.  You're telling me that it's in the agreement, the

11  definition of "net"?

12          MR. MANG:  Yes, Your Honor.

13          THE COURT:  Okay.  Please proceed.

14          MR. MANG:  So the Trustee filed a motion --

15          THE COURT:  Well, wait.  One -- I apologize.

16  Wasn't there a cap on the out of pocket?

17          MR. MANG:  Yes, Your Honor.  There was a cap on

18  the out of pocket and that was $400,000 in the operating

19  agreement.

20          THE COURT:  Okay.  Does that mean that

21  Mr. Codding could only spend $200,000 or that he would only

22  be eligible for reimbursement up for $400,000?

23          MR. MANG:  He would only be eligible for

24  reimbursement up to $400,000.

25          THE COURT:  Okay.  And so if his expenses were

**P** 888.272.0022 **F** 818.343.7119          **BENHYATT**          www.benhyatt.com
                                              Certified Deposition Reporters

EXHIBIT 1, PAGE 33

Page                                                                    8

1   more than $400,000 would that be taken out of the net, even

2   though he wouldn't be eligible for the $400,000 -- I mean,

3   eligible for anything above $400,000?

4           MR. MANG:  Your Honor, he would not be eligible

5   for reimbursement in excess of $400,000.

6           THE COURT:  I understand that.  I did not ask you

7   that question.  I asked you, let's suppose his out-of-

8   pocket expenses were $600,000.  Would that still be taken

9   out of the gross before the five percent commission would

10  be calculated?

11          MR. MANG:  No, Your Honor.  He would only -- the

12  net would be calculated based on actual reimbursement.

13          THE COURT:  Well, that's what I'm saying.  So --

14  oh, are you telling me that the agreement says that you

15  only get up to $400,000 and that is the cap of the amount

16  that can be subtracted from the operating expenses before

17  you calculate the five percent net?

18          MR. MANG:  I believe it would be that you could

19  only deduct 400,000 out of the operating income before the

20  net was calculated.

21          THE COURT:  You -- so if it was $450,000 in

22  actual operating payments that he had to make, he couldn't

23  subtract the 50,000 also from the net to get to the five

24  percent commission?

25          MR. MANG:  He would not be allowed to seek

P 888.272.0022  F 818.343.7119        BENHYATT        www.benhyatt.com
                                      Certified Deposition Reporters

Page                                                                          9

1   reimbursement of the overage, the additional $50,000, so --

2           THE COURT:  I didn't ask -- see, you're missing

3   my point.  I'm not asking you about reimbursement.  I'm

4   talking about the calculation of the gross versus the net.

5           MR. MANG:  I --

6           THE COURT:  Let's suppose he spent a million

7   dollars in harvesting the grapes.  He would only be

8   eligible for 400, right?

9           MR. MANG:  Correct, correct.

10          THE COURT:  But he still spent a million dollars.

11  I'm not saying he did this, but I'm just trying to

12  understand your position.  He spent a million dollars and,

13  therefore, let's say that there was 1,200,000 in gross.

14  Would he have to subtract the million dollars that he

15  actually spent or just 400,000 before he comes to the net,

16  which was then the five percent eligibility?

17          MR. MANG:  I'm not sure the agreement goes into

18  this level of detail, but I believe the answer would be he

19  would only subtract 400,000 before getting to the net.

20          THE COURT:  Are you telling me that there is a

21  provision in the agreement that says that?

22          MR. MANG:  I would have to re-review for that

23  specific question, Your Honor, but my under --

24          THE COURT:  Okay.  Then just say you don't know

25  instead.

P 888.272.0022  F 818.343.7119        **BENHYATT**        www.benhyatt.com
                                       Certified Deposition Reporters

Page                                                                    10

1          All right.  Keep going.

2          MR. MANG:  All right.  So the Trustee filed a

3    motion and sought approval from the court to approve the

4    farm operator agreement and the farm operator agreement had

5    certain provisions in it, including that the Trustee would

6    be the only one who would be paid any money and he would

7    hold the money and Mr. Codding would advance the costs of

8    operation and request reimbursement on the back end when

9    all the grape money came in, which would --

10         THE COURT:  When you say "paid any money," paid

11   any money by whom?

12         MR. MANG:  Paid any money by purchasers who would

13   buy grapes that were grown and harvested.

14         THE COURT:  Okay.  And how was that transactional

15   facility provided?  Did -- was there an escrow account?

16   Was there checks or wire transfers that would go directly

17   to the Trustee?  Was there a designation of that account

18   where Mr. Codding could tell people, you know, you don't

19   pay me, you pay the Trustee?

20         MR. MANG:  The agreement was that all the --

21         THE COURT:  I'm not -- I don't care about the

22   agreement.  I'm asking about the reality.  What was the

23   reality?  When someone purchased grapes from the estate --

24   when someone purchased grapes from the estate, where were

25   they supposed to have sent the money?

Page                                                                        11

1          MR. MANG:  They were supposed to have sent it by

2   check to 870 Roosevelt.  That's the Trustee's office and

3   make a check out --

4          THE COURT:  I don't know what 870 Roosevelt is.

5          MR. MANG:  That's a street address.

6          THE COURT:  Well, did they -- were they supposed

7   to send the money to the Trustee?

8          MR. MANG:  Yes.

9          THE COURT:  And were they supposed to write

10  Richard Marshack, Chapter 7 Trustee, on the check?

11         MR. MANG:  Yes.

12         THE COURT:  And then what was Mr. Marshack going

13  to do with that check?

14         MR. MANG:  Mr. Marshack was going to deposit and

15  segregate those funds as specific cash collateral subject

16  to agreements by the lender and court order on how those

17  funds would be subsequently disbursed.

18         THE COURT:  And how did he -- how did he

19  segregate those funds or did he just put it into his

20  Trustee general account?

21         MR. MANG:  I believe the funds were placed into

22  the general account and then moved immediately to a

23  segregated account where they sit today.

24         THE COURT:  So there is an account that was

25  formed for the specific purpose of holding the cash

Page                                                           12

1  collateral of the bank.  What's the name of the bank again?

2             MR. MANG:  Farm Credit West FCLA.

3             THE COURT:  Okay.  Farm Credit West.  And Farm

4  Credit West required that, is that correct?

5             MR. MANG:  I don't believe that they specifically

6  required it, but it's typical practice for us to separate

7  cash collateral because it was subject to a special

8  procedure.

9             THE COURT:  Okay.  And so -- and that truly

10 happened with this Trustee, is that correct?

11            MR. MANG:  Yes.

12            THE COURT:  Okay.  Keep going.

13            MR. MANG:  The Trustee filed a motion to approve

14 the operator agreement and that motion was filed in August

15 2021.  It was set for hearing and after the motion was

16 filed, the Trustee negotiated a stipulation with the lender

17 from Farm Credit West for the disposition and expenditure

18 of those funds.  In essence, the stipulation was that Farm

19 Credit agreed all operating expenses could be paid off the

20 top.  The Trustee's costs of administration, including his

21 compensation under Section 326 could be paid off the top

22 certain amount of attorney's fees.  And then Mr. Codding

23 received his five percent compensation and will remain --

24            THE COURT:  Well, stop, stop again.  I appreciate

25 this explanation, but I need more clarification.  So when

P 888.272.0022  F 818.343.7119          BENHYATT
                                        Certified Deposition Reporters          www.benhyatt.com

Page                                                                          13

1   money arrived to the Trustee and put into the general

2   account and then placed into the trust account -- not the

3   trust account, the segregated cash collateral account,

4   there was an agreement between the Trustee and the secured

5   lender that money operating reimbursements could be made to

6   Mr. Codding?

7           MR. MANG:  Yes.

8           THE COURT:  Okay.  Were there any operating

9   reimbursements made to Mr. Codding?

10          MR. MANG:  Not out of the Trustee's account.

11          THE COURT:  Let's try it again.  Were there any

12  made by the Trustee to Mr. Codding?

13          MR. MANG:  No.

14          THE COURT:  Zero?

15          MR. MANG:  Zero.

16          THE COURT:  Okay.  Now, you would think that

17  Mr. Codding then never received any operating

18  reimbursements at this time, correct?

19          MR. MANG:  Correct.

20          THE COURT:  But, in fact, it sounds like to me

21  that he did receive some operating reimbursements.  Am I

22  wrong about that?

23          MR. MANG:  Your Honor, we understand that he

24  received money and he's attempting to credit those towards

25  his operating expenses.

P 888.272.0022  F 818.343.7119                www.benhyatt.com

Page                                                          14

1          THE COURT:  Well, how did he receive money from

2    the sale of the grapes when the buyers of the grapes were

3    told, I assume, by him that they had to pay the Trustee and

4    you're telling me the Trustee has never made any payments

5    to Mr. Codding?

6          MR. MANG:  Your Honor, we understand from what

7    Mr. Codding has told us that he received over $100,000 in

8    funds from buyers who when he didn't tell them that the

9    Trustee was the one to be paid.  And so he simply received

10   those funds into his or his entity's bank account and only

11   told us that he had done so after he got caught doing it.

12         THE COURT:  Okay.  Please continue with your

13   recitation for the record.

14         MR. MANG:  Okay.  So the -- the stipulation was

15   negotiated with Farm Credit West, so there was a structure.

16   The stipulation was read into the record at the hearing in

17   September -- I think it's August 30th, actually, and then

18   the Court approved the agreement and the Court authorized

19   limited operation of the properties.  There are two

20   properties essentially to make note of.  One is the Live

21   Oak property.  That was a large --

22         THE COURT:  Why don't we -- I don't care -- I

23   don't care about it.  Tell me about why your motion -- more

24   about this particular motion.

25         MR. MANG:  Okay.  One of the -- this is relevant

P 888.272.0022  F 818.343.7119          **BEN**HYATT          www.benhyatt.com
Certified Deposition Reporters

Page                                                                    15

1    to the motion, Your Honor.  There was one --

2            THE COURT:  There are two properties.

3            MR. MANG:  There were two properties.  Both of

4    them grew grapes and one of those properties was a

5    residence that has been sold.  One of the other properties

6    was a medium-sized winery facility.  That's what we're

7    calling the San Marcos property.  At that facility there is

8    bottling equipment, grape crushing equipment, wine

9    processing equipment of all kinds, barrels, bottles.  And

10   the Trustee specifically did not request authorization to

11   operate a winery.  He did not believe that that constituted

12   a good use of estate property and there was a disagreement

13   about who, in fact, owned the winery business itself

14   because Northern Holding perhaps owned the real estate, but

15   not the wine.

16           So the Trustee requested operating --

17           THE COURT:  Well, who -- wait a minute.  Who had

18   the disagreement?  Who was the disagreement between?

19           MR. MANG:  The disagreement was between Rabbit

20   Ridge Wine Sales, Inc. and the debtor and Farm Credit

21   West --

22           THE COURT:  Now, who owns Rabbit Ridge Wine

23   Sales, Inc.?

24           MR. MANG:  I believe it's currently owned by Lee

25   Codding.

P 888.272.0022  F 818.343.7119          **BEN**HYATT
                                        Certified Deposition Reporters          www.benhyatt.com

Page                                                        16

1          THE COURT:  By Mr. Codding.  Okay.  When did that

2    disagreement arise?

3          MR. MANG:  I can explain it, but it might take

4    more than a very brief moment, Your Honor.

5          THE COURT:  Well, why don't you just tell me, did

6    it arise before or after the stipulation was approved by

7    Judge Smith?

8          MR. MANG:  I believe it was before because the

9    debtor, Northern Holding, actually received a day of

10   bankruptcy transfer of all of the assets of Rabbit Ridge

11   Wine Sales, Inc., which was the owner of all these

12   properties before and then the day of bankruptcy there were

13   also transfers back to Rabbit Ridge Wine Sales, Inc., and

14   all these documents were signed by Mr. Codding.

15         THE COURT:  And who controlled Northern Holding?

16         MR. MANG:  I believe that was --

17         THE COURT:  Who authorized the filing of Northern

18   Holding?

19         MR. MANG:  Mr. Codding as the managing member.

20         THE COURT:  Okay.  So Mr. Codding was the

21   managing member of Northern Holding -- once second -- LLC

22   and he's the one who authorized the filing of the

23   Chapter 11 petition?

24         MR. MANG:  Correct.

25         THE COURT:  What was the date of that?

P 888.272.0022  F 818.343.7119                www.benhyatt.com

Page                                                                    17

1           MR. MANG:  Your Honor, let me grab that.  I could

2    try to say it offhand, but I don't want to be wrong.

3           The filing date was October 28, 2020.

4           THE COURT:  2020.

5           MR. MANG:  Correct.

6           THE COURT:  And it was converted on what date?

7           MR. MANG:  June 15, 2021.

8           THE COURT:  Okay.  And the dispute that you're

9    speaking about is that Rabbit Ridge Wine Sales, Inc. was

10   controlled allegedly by Mr. Codding and both that entity

11   and Northern Holding was controlled by Mr. Codding as

12   managing member and that there was -- there were assets

13   transfers back and forth or maybe just back or forth to and

14   from Northern Holding to Rabbit Ridge?

15          MR. MANG:  That's correct, Your Honor.

16          THE COURT:  Okay.  All right.  That's all I need

17   to know about that.  Keep going.

18          MR. MANG:  So there were two properties, and the

19   reason this is relevant is because when the Trustee was

20   appointed the properties were both being run in a Chapter

21   11 and when the Trustee was appointed he needed to get

22   control of the property, then evict people who weren't

23   allowed to be there or weren't supposed to operate the

24   property except with court authorization.  This is a

25   Chapter 7.

P 888.272.0022  F 818.343.7119        BENHYATT        www.benhyatt.com
                                      Certified Deposition Reporters

Page                                                                    18

1          So the Trustee only got authorizations to operate

2   farming, to harvest the crop --

3          THE COURT:  Well, stop, stop, stop.

4          MR. MANG:  -- (indiscernible).

5          THE COURT:  Did he try to get authorization to

6   operate the Rabbit Ridge facility?

7          MR. MANG:  There was no request to the court for

8   that.  The Trustee did not attempt to operate the winery.

9          THE COURT:  Did he abandon the assets?

10         MR. MANG:  No, not -- not at --

11         THE COURT:  So they were --

12         MR. MANG:  -- that time.

13         THE COURT:  So -- and was it the Trustee's belief

14  that the Rabbit Ridge facility was part of the bankruptcy

15  estate?

16         MR. MANG:  Yes.  The property and the facility

17  was itself part of the bankruptcy estate.

18         THE COURT:  What does -- what do the original

19  Chapter 11 schedules say?

20         MR. MANG:  The original Chapter 11 schedules say

21  that the real property is part of the estate and there is

22  some confusion I think in the schedules about to what

23  extent the equipment and inventory is owned by the estate.

24         THE COURT:  And was there a 341(a) hearing

25  conducted by the -- or meeting conducted by the Chapter

P 888.272.0022  F 818.343.7119          BEN HYATT          www.benhyatt.com
                                         Certified Deposition Reporters

Page                                                                    19

1   11 -- pardon me, by the United States Trustee?

2          MR. MANG:  Yes.

3          THE COURT:  And did -- have you examined the

4   transcript or listened to the audio transcript of that

5   341(a) meeting of creditors?

6          MR. MANG:  I believe I have in the past, Your

7   Honor.

8          THE COURT:  What do you recall with respect to

9   the responses, if any, to the question of the ownership of

10  those personal property assets?

11         MR. MANG:  My understanding is that the inventory

12  and equipment was not part of the bankruptcy estate per the

13  testimony.

14         THE COURT:  And have you examined the security

15  agreements with the secured lender regarding the personal

16  property at the Rabbit Ridge facility or, as you call it,

17  the San Marcos property?

18         MR. MANG:  Your Honor, I don't believe I have

19  specific security agreements for the equipment because the

20  lender has a blanket lien and contended that their blanket

21  lien covered everything.

22         THE COURT:  What has the -- well, has the secured

23  lender sought to acquire an order on a motion for relief

24  with respect to the personal property?

25         MR. MANG:  Your Honor, I believe they did --

P 888.272.0022  F 818.343.7119     BENHYATT   www.benhyatt.com
Certified Deposition Reporters

EXHIBIT 1, PAGE 45

Page                                                                20

1            THE COURT:  Or equipment?

2            MR. MANG:  They did file a motion for relief from

3    the automatic stay with respect to all property and

4    equipment and they have foreclosed on San Marcos and

5    everything in it.

6            THE COURT:  Did you review or have you reviewed

7    that motion for relief and any oppositions that were filed,

8    including from any third parties?

9            MR. MANG:  Yes.

10           THE COURT:  And what -- what were those

11   oppositions stating with respect to the ownership?

12           MR. MANG:  Your Honor, I don't recall

13   specifically on that issue.

14           THE COURT:  Okay.  Continue.  Please proceed.

15           MR. MANG:  So the Trustee did not operate

16   wineries and, in fact, he obtained a stipulated turnover

17   order signed by Mr. Codding on behalf of Rabbit Ridge Wine

18   Sales --

19           THE COURT:  Well, stop right there.  He got a

20   turnover order from Judge Smith?

21           MR. MANG:  Yes.

22           THE COURT:  Okay.

23           MR. MANG:  From Judge Wallace, Your Honor.

24           THE COURT:  From Judge Wallace.

25           Now, I have, in fact, your firm's provision to me

**P** 888.272.0022  **F** 818.343.7119          **BENHYATT**          www.benhyatt.com
                                          Certified Deposition Reporters

Page                                                                21

1  and are you referring to Exhibit 1, the order approving

2  stipulation for turnover of real property located at 1172

3  San Marcos Road, docket #196?

4          MR. MANG:  Yes, Your Honor.

5          THE COURT:  Oh.

6          MR. MANG:  That is the turnover order.

7          THE COURT:  Okay.  Are there any other turnover

8  orders?

9          MR. MANG:  Yes, Your Honor, there are other

10 turnover orders (indiscernible) --

11         THE COURT:  With respect to this asset or these

12 assets.

13         MR. MANG:  Yes, Your Honor.

14         THE COURT:  Okay.  Where would I find those in

15 your compendium of orders that you filed on 10/18/22,

16 docket #358?

17         MR. MANG:  Your Honor, we did not include the

18 other turnover orders on this property because they did

19 not -- they were not directed to Mr. Codding.

20         THE COURT:  Okay.  This turnover order on

21 8/23/2021, docket #196, it concerned only real property?

22         MR. MANG:  Your Honor, it included the real

23 property and everything on that real property to the extent

24 it was fixtures and not fixtures.  We didn't want to have

25 any dispute over that.

P 888.272.0022  F 818.343.7119     **BENHYATT**     www.benhyatt.com
Certified Deposition Reporters

Page                                                                    22

1           THE COURT:  Okay.  One second.

2           Mr. Goe, did you receive and did you print out --

3    or do you have access to the compendium of orders also,

4    just to make sure you have them?

5           MR. GOE:  Looking at them right now.

6           THE COURT:  Terrific.  Okay.

7           So this turnover order, as I refer to it as,

8    docket number -- well, it looks like 211 filed on --  or

9    entered on 9/7/21.  This looks like it's the -- yes, it is

10   the order.  I'm reading it again, so be patient with me.

11          So I don't see anything about equipment on this

12   turnover order.  Oh, that's Exhibit 2.  I'm sorry.  Let's

13   look at Exhibit 1.  Let's see.  "Possession of the property

14   and all keys, gate openers, and all methods of access."

15   It's sort of -- paragraph 3 was sort of a quitclaim with

16   respect to occupancy, possessory and rights to use the

17   Rabbit Ridge -- of Rabbit Ridge at the property.

18          And then paragraph 6 has an interesting paragraph

19   saying that they should turn over in the course of vacating

20   the property and turnover to the Trustee "Rabbit Ridge

21   shall not remove, destroy, disturb or tamper with

22   furniture, fixtures, trade fixtures, inventory," but it

23   doesn't say that you're transferring or you're turning over

24   those properties, does it, in paragraph 6, Mr. Mang?

25          MR. MANG:  That's correct, because there is a

Case 8:20-bk-13014-SC    Doc 371    Filed 12/21/22    Entered 12/21/22 15:38:27    Desc
Main Document    Page 23 of 74

Page                                                                    23

1  dispute as to whether or not it was property of the estate.

2  We didn't know if we could get turnover on non-estate

3  property.

4          THE COURT:  Okay.  And what result as of today

5  has occurred on that dispute?

6          MR. MANG:  Your Honor, I believe that all of it

7  has been foreclosed by the lender.  Lender doesn't care who

8  owns it.  Lender says it's all our collateral and they took

9  it.

10          THE COURT:  Okay.  But that's not what I asked.

11          Where does the dispute rise?  Is there a

12  continued dispute?

13          MR. MANG:  Your Honor, the estate is not

14  interested in pursuing the personal property.

15          THE COURT:  So are you conceding that Rabbit

16  Ridge owns all of that property?

17          MR. MANG:  I think the estate has conceded that

18  it doesn't own it.

19          THE COURT:  Really.  Okay.

20          MR. MANG:  And does not opine as to who owns it.

21          THE COURT:  Yeah.  Well, but you -- you're

22  telling me right now as a judicial admission that the

23  furniture, fixtures, trade fixtures, inventory,

24  agricultural assets, such as crops, vines, seeds and raw

25  and unfinished product, wine barrels and casks, machinery

P 888.272.0022  F 818.343.7119          **BEN**HYATT
                                        Certified Deposition Reporters          www.benhyatt.com

Page                                                           24

1   and equipment are not property and never were property of

2   the estate?

3            MR. MANG:  Your Honor, certainly not the crops.

4            THE COURT:  Well, it says --

5            MR. MANG:  The crops -- the crops --

6            THE COURT:  It says there right here in -- right

7   in paragraph 6.

8            MR. MANG:  The crops themselves are property of

9   the estate.

10           THE COURT:  Well, then I don't understand.  I'm

11  confused, Mr. Mang.  What are you telling me?  Are you

12  conceding that the crops are property or not property of

13  the estate, even though they were foreclosed on?

14           MR. MANG:  Your Honor, the crops I don't believe

15  were foreclosed on.  It was all of the equipment in the

16  facility that was foreclosed upon.

17           THE COURT:  All right.  Anyway, please continue.

18           MR. MANG:  So the Trustee obtained the stipulated

19  turnover order and, as we've gone through on the record,

20  the turnover order contained certain provisions saying that

21  Rabbit Ridge shall not essentially operate a winery on the

22  facility.  That was the intention.  And the Trustee was

23  very clear in all this communication with Mr. Codding that

24  no winery business shall be operated.  The Trustee had no

25  interest in running a winery.  The Trustee did not believe

P 888.272.0022  F 818.343.7119            BENHYATT
                                          Certified Deposition Reporters
                                          www.benhyatt.com

Page                                                                    25

1   that had any value for the estate.

2           Fast-forward, you know, through the harvesting

3   time and Mr. Codding provided no information to the Trustee

4   about what the status of the harvest was, what was

5   happening on the property, provided no contracts to the

6   Trustee to assign and sell any of those grapes.

7           THE COURT:  Wait a minute.  Contracts between the

8   Trustee and Mr. Codding or Codding and third parties?

9           MR. MANG:  Any contracts for the Trustee to

10  approve to sell grapes to third parties.

11          THE COURT:  Was that required?

12          MR. MANG:  Yes.  That was required because the

13  Trustee was the only one authorized to sell grapes.

14          THE COURT:  I understand that, but why couldn't

15  Mr. Codding just shake hands with somebody and say, I'll

16  sell you these grapes, and send the check to the Trustee?

17          MR. MANG:  Operate order provided that and the

18  operating agreement provided that Mr. Codding would cancel

19  all existing contracts and present them to the Trustee so

20  that everything could be corrected as to who was the seller

21  and who was the payee.

22          THE COURT:  Well, first of all, you've skipped

23  over a few things.  The contracts are cancelled, is that

24  right?

25          MR. MANG:  The contracts were supposed to be

P 888.272.0022  F 818.343.7119        BENHYATT        www.benhyatt.com
Certified Deposition Reporters

Page                                                                    26

1  cancelled, but the order did not cancel those contracts

2  because that would be trying to bind third parties to an

3  order and they were not party to the proceeding.

4          THE COURT:  Well, wait.  Were these contracts

5  between the debtor and these third parties?

6          MR. MANG:  Apparently when the Trustee received

7  them they were between the third parties and Rabbit Ridge

8  Wine Sales, Incorporated.

9          THE COURT:  Okay.  So now you've got a situation

10 where if those contracts weren't even property of the

11 bankruptcy estate.

12         MR. MANG:  Yes.  They're --

13         THE COURT:  So they couldn't -- they weren't

14 terminated with respect to the provisions of the Bankruptcy

15 Code.

16         MR. MANG:  Those contracts would not have been

17 terminated under the court's order.

18         THE COURT:  So under what stipulation -- I've

19 asked -- I'm not questioning you on this.  I'm just asking

20 for direction.  Under what particular stipulation did

21 Mr. Codding's company Rabbit Ridge or Mr. Codding agree to

22 terminate those contracts and send them -- and then send

23 new ones over to the Trustee?

24         MR. MANG:  That would be the farm operator

25 agreement and that would be Exhibit 1, the farm operator

EXHIBIT 1, PAGE 52

Page                                                                    27

1   agreement.

2          THE COURT:  Okay.  Do you have that in front of

3   you?

4          THE WITNESS:  Yes.

5          THE COURT:  Give me page and line, please.

6          MR. MANG:  In our motion, docket #304 --

7          THE COURT:  Oh, no, no, no.  In the compendium of

8   orders.

9          MR. MANG:  Okay.  In Exhibit 1 -- sorry,

10  Exhibit 2 in the compendium of orders says on page 8 of

11  53 --

12         THE COURT:  Well, Mr. Mang -- Mr. Mang, do

13  yourself a real favor.  Start saying, Judge, docket #211,

14  filed on 9//7/2021, entered -- and that was entered

15  September 7, 2021, on page blank, lines blank.  Do yourself

16  a favor and make yourself a good record here.

17         MR. MANG:  Yes, Your Honor.

18         THE COURT:  Now, start over again and tell me

19  where that requirement exists in -- on docket #211, which

20  is entered on September 7, 2021.

21         MR. MANG:  Docket #201 entered on --

22         THE COURT:  211 -- 211.

23         MR. MANG:  211.  Entered on September 7, 2021,

24  paragraph 4, starting on line 16 and page 2 says:

25         "Trustee is authorized to cancel all currently

P 888.272.0022  F 818.343.7119   BEN**HY**ATT
                                 Certified Deposition Reporters   www.benhyatt.com

Page                                                                      28

1          existing grape sales agreements and to renegotiate all

2          such agreements including answering into and executing

3          a reasonably prudent subsequent grape sales agreements

4          without further order of the court."

5          THE COURT:  Now, you understand that Mr. Goe is

6    saying that -- and Mr. Codding is saying that you may be

7    authorized to cancel all, but they weren't cancelled?

8          MR. MANG:  That's correct.

9          THE COURT:  Okay.  So the Trustee has

10   authorization.  What -- where do I get to the point where

11   Mr. Codding is required to cancel all current existing

12   grape sales agreements?

13         MR. MANG:  Your Honor, that was not part of the

14   order of the Court.  That was part of the operating

15   agreement signed by the parties.

16         THE COURT:  Where do I find that and the approval

17   of the operating agreement?

18         MR. MANG:  I'm going to find it in a second, Your

19   Honor.

20         THE COURT:  Thank you.

21         MR. MANG:  One second.

22         THE COURT:  And while he's looking, Mr. Goe, I

23   don't mean to be ignoring you, but I'm getting their story

24   pinned down so that you can then -- and you will have all

25   the time you need to respond, but I didn't want you to

EXHIBIT 1, PAGE 54

Page                                                            29

1    worry about that.

2            MR. GOE:  Oh, I think you're asking all the right

3    questions, Your Honor, because there's nothing in these

4    orders that can hold Mr. Codding in contempt, so I

5    appreciate your line of questioning.

6            THE COURT:  I appreciate it.  I mean, this is

7    serious stuff.  I mean, I could put Mr. Codding in jail

8    until he turns over money.  You know, Judge Albert is very

9    good at that.  He held a guy in for six years and I don't

10   think you want to be in Santa Ana jail for six years,

11   Mr. Codding, but I know how to do it, Mr. Codding.

12           Keep going, Mr. Mang.

13           MR. CODDING:  Understood, Judge.  Thank you.  No,

14   you're correct.

15           MR. MANG:  Okay.  On docket #304 filed on

16   April 1, 2022, the farm operator agreement is attached as

17   Exhibit 1 starting on page 81 of 392, paragraph 6, states:

18           "Cancel any and all existing purchase contracts

19       for the grapes including" --

20           THE COURT:  Well, I'm sorry.  What is the docket

21   again?

22           MR. MANG:  304, which is our motion for OSC.

23           THE COURT:  And what is the exhibit number there?

24           MR. MANG:  It's Exhibit 1.

25           THE COURT:  Okay.  One second, please.



P 888.272.0022  F 818.343.7119        BENHYATT        www.benhyatt.com
                                      Certified Deposition Reporters

EXHIBIT 1, PAGE 55

Case 8:20-bk-13014-SC    Doc 371    Filed 12/21/22    Entered 12/21/22 15:38:27    Desc
                    Main Document      Page 30 of 74

Page                                                                    30

1                            (Pause)

2            You would like me to go to Exhibit Number --

3            MR. MANG:  1.

4            THE COURT:  -- 1.

5            MR. MANG:  Page 81 of 392.

6            THE COURT:  One second.  Page what of 392?

7            MR. MANG:  81.

8            THE COURT:  Thank you.  Okay.  Farm operator

9   agreement 2021 and then there's a date July 26, 2021, and

10  this appears on docket #304, page 81 of 392.  Okay.  Now I

11  am there, Mr. Mang.

12           Now, Codding is retained by the Trustee for the

13  following purposes.  And where would you like me to read?

14           MR. MANG:  Paragraph 6, near the middle of the

15  page.  They --

16           THE COURT:  Okay.

17           "Cancel any and all existing purchase contracts

18       for the grapes and present new contracts to the

19       Trustee for execution.  New contracts shall be at fair

20       market value and the seller shall be Richard Marshack,

21       Bankruptcy Trustee."

22           Thank you for pointing that out to me.  And just

23  for the record, tell me again when this agreement was

24  approved by the Bankruptcy Court.

25           MR. MANG:  This agreement was approved by the

Page                                                          31

1   Bankruptcy Court in the Court's order, docket #211, entered

2   on September 7, 2022, and for the original place where this

3   agreement can be found, that's docket #186, filed on August

4   9, 2021, starting on page 18 and that's Exhibit 1.

5          THE COURT:  Thank you very much.  Now please

6   continue.

7          MR. MANG:  The Trustee was supposed to receive

8   under the combination of the operate order and the

9   operating agreement the existing grape purchase contracts

10  and be able to renegotiate them where he could be

11  substituted in as the seller of the grapes.

12         THE COURT:  Now -- wait now.  It says "cancel any

13  and all purchase contracts."  Where does it say, send those

14  cancellations to the Trustee?

15         MR. MANG:  That would be the part where it says,

16  "Present new contracts to Trustee for execution."

17         THE COURT:  Well, in other words, they needed to

18  present new contracts.  They didn't need to give the

19  Trustee the existing purchase contracts.

20         MR. MANG:  Sure.  That's correct.

21         THE COURT:  Okay.  Did the Trustee ever receive

22  any new contracts?

23         MR. MANG:  The Trustee received some existing

24  contracts, which were never cancelled, and he revised and

25  interlineated them so that the contracts would be

P 888.272.0022  F 818.343.7119

**BENHYATT**
Certified Deposition Reporters

www.benhyatt.com

Page                                                          32

1   corrected.

2           THE COURT:  So by novation the Trustee took some

3   of the contracts, revised them, and did they -- did the

4   Trustee then send it back to Mr. Codding?

5           MR. MANG:  It was a, I think, three-way

6   negotiation between Mr. Codding, the Trustee and the buyer

7   where Mr. Codding presented certain contracts to the

8   Trustee.  He would interlineate the revisions and they

9   would jointly send it back to the purchaser because at this

10  point Mr. Codding was assisting --

11          THE COURT:  Okay.  So when --

12          MR. MANG:  -- and facilitating.

13          THE COURT:  When did those discussions occur and

14  was it really between the Trustee and Mr. Codding or was it

15  between another attorney or agent of Mr. Marshack?

16          MR. MANG:  These were directly between the

17  Trustee, Mr. Codding and the purchaser.  These happened in

18  September --

19          THE COURT:  No, wait.  No, no, no, no, no.  You

20  just told me that there were meetings between Mr. Codding

21  and Mr. Marshack.  Were there three parties there?

22          MR. MANG:  Your Honor, I believe these were all

23  over the phone and I do not know specifically if the third

24  party was always on the line with them at the time, but it

25  was definitely Mr. Codding and Mr. Marshack.

EXHIBIT 1, PAGE 58

Page                                                                    33

1          THE COURT:  Okay.  Do you have the dates and

2    times of those meetings?

3          MR. MANG:  I do not have specific dates and

4    times, only --

5          THE COURT:  All right.  I'll want those,

6    Mr. Mang.

7          MR. MANG:  -- dates --

8          THE COURT:  I'll want the dates and times of

9    Mr. Marshack and Mr. Codding's telephonic communications.

10   I don't need them now, but I'm telling you that I'll need

11   those.

12         And then, do you have the final results of those

13   discussions and why -- what I mean by that is, do you have

14   the altered contracts or the revised contracts that are

15   then presented to grape buyers?

16         MR. MANG:  Yes, Your Honor.  We do have five of

17   the altered contracts.

18         THE COURT:  Okay.  When you say "altered," let's

19   just say that they were amended, okay, because "altered"

20   can be turned into a pejorative term.  It sounds like the

21   Trustee and Mr. Codding agreed on the terms and then

22   presented them to a buyer of grapes.  Would that be a

23   correct statement?

24         MR. MANG:  Yes, Your Honor.

25         THE COURT:  And there were five of them?

```
Page                                                        34

 1              MR. MANG:  Yes.

 2              THE COURT:  And do you have a date range of those

 3   five contracts when they were signed by at least

 4   Mr. Marshack or Mr. Codding?

 5              MR. MANG:  That would be September 27, 2021,

 6   through October 5, 2021.

 7              THE COURT:  Okay.  And there were five of them?

 8              MR. MANG:  Yes.

 9              THE COURT:  Okay.  Please continue.

10              MR. MANG:  The Trustee received and amended five

11   grape purchase contracts and --

12              THE COURT:  Well, wait, wait, wait, wait.  What

13   do you mean, the Trustee received five amended grape con --

14   you -- the Trustee discussed amending them with Mr. Codding

15   and then they both amended them and sent them to the buyer?

16              MR. MANG:  Correct, Your Honor.  I meant to say,

17   received, comma, and amended five contracts.

18              THE COURT:  Okay.  You've told me that twice.

19              MR. MANG:  Yes.  And the Trustee asked

20   Mr. Codding whether or not these were all the contracts for

21   the purchases of grapes on the property; Mr. Codding said

22   yes.

23              THE COURT:  Now, when did he say that?  On

24   September 27 or September 29 or October?  When did he say

25   that?
```

P 888.272.0022  F 818.343.7119          BENHYATT          www.benhyatt.com
                                     Certified Deposition Reporters

Page                                                                      35

1          MR. MANG:  Your Honor, I will find our exhibit so

2   I can be more precise.

3          THE COURT:  Yes.

4          MR. MANG:  On our motion, that's docket #304,

5   Exhibit 7.

6          THE COURT:  All right.  One second.  I am now at

7   Exhibit 7 on your motion.  I think that's the grape

8   purchase agreement.

9          MR. MANG:  And, Your Honor, I'm at page 142 of

10  392 --

11         THE COURT:  What docket number?

12         MR. MANG:  #304.

13         THE COURT:  I am -- and what page number are you

14  on?

15         MR. MANG:  142 of 192 on the filing --

16         THE COURT:  Is this an email?

17         MR. MANG:  Yes.

18         THE COURT:  Okay.  And it's from Mr. Codding to

19  Mr. Mang and copied is Pam Kraus (phonetic) and Lori Ensley

20  (phonetic).  Pardon me if I don't pronounce that name

21  right.

22         "This looks complete.  Buyer will pay

23      contracts -- nevertheless, I will be sending remain --

24      reminder invoices and statements since initial

25      payments are coming due later on in November.  Okay.

P 888.272.0022  F 818.343.7119          **BENHYATT**          www.benhyatt.com
                                        Certified Deposition Reporters

EXHIBIT 1, PAGE 61

Page                                                                36

1        Please, are these five the only grape purchase sales

2        agreements for this year's harvest?"

3           Okay.  That's when you asked the question.  And

4    are you telling me that the email that is the first email

5    on page 142 is the reply to your inquiry?

6           MR. MANG:  Yes, that is correct.

7           THE COURT:  It says, "This looks to be complete."

8    Does that mean that are these five the only grape purchase

9    sales agreements for this harvest?  Is that how you read

10   it?

11          MR. MANG:  That is how I understood it.

12          THE COURT:  Okay.  We'll find out from Mr. Goe

13   and Mr. Codding what they meant by that.

14          All right.  Please continue.

15          MR. MANG:  The Trustee was told that there were

16   only five purchase contracts.  The Trustee was told that

17   the harvest was thinner than expected.  Original projection

18   in the farm operate motion ranged from seven to $900,000.

19          THE COURT:  And where do I find that?

20          MR. MANG:  Again, finding the cite, Your Honor.

21   We're going back to docket #186 is where it originally

22   appears.  I can also cite it in the contempt motion, #304,

23   if that helps.

24          THE COURT:  Let's do #304 since I have it up.

25          MR. MANG:  Okay.



Page                                                                    37

1                         (Pause)

2              Docket #304, page 67 of 392.

3              MR. MANG:  One second.

4              THE COURT:  67?

5              MR. MANG:  67 of 392.

6              THE COURT:  All right.  One second.  All right.

7    I am in docket #304, page 67 of 392.

8              MR. MANG:  And I'm going down to line 21.

9              THE COURT:  I'm sorry.  It says -- who's -- this

10   is your motion.

11             MR. MANG:  Correct.

12             THE COURT:  Where did he say it?

13             MR. MANG:  I have attached to that same motion,

14   docket #304, page 77 of 392.

15             THE COURT:  Okay.  One second, please.  77.

16             MR. MANG:  Correct.  That --

17             THE COURT:  Well --

18             MR. MANG:  -- authenticates --

19             THE COURT:  One second.

20             MR. MANG:  -- an exhibit --

21             THE COURT:  One second.  Starting on page 76 of

22   docket #304 is the declaration of Leroy Codding.  And if

23   you turn to the second page of that declaration, which is

24   page 77, Mr. Mang is going to point out where Mr. Codding

25   described the yield of the crops.

P 888.272.0022  F 818.343.7119       www.benhyatt.com

```
Page                                                                    38
```

1            MR. MANG:  Right.  Paragraph 7 says:

2            "A true and correct copy of my crop yield

3       estimates as of August 5, 2021 is attached as

4       Exhibit 3."

5            So we're going to jump to Exhibit 3, which is

6    starting on page 124 of 392.  Same document.

7            THE COURT:  124?

8            MR. MANG:  Correct.

9            THE COURT:  I am on page 124.  Now, tell me how I

10   should be reading this document, the spreadsheet.

11           MR. MANG:  This is a spreadsheet generated by

12   Mr. Codding and sent to me.  I simply dropped it into a

13   document as he prepared it.  I understood from the

14   spreadsheet, looking at the bottom, at the row that says

15   "Revenue" it says $811,700.  It also says above it, "Total

16   Yield" $550,500.  So I understood these to be Mr. Codding's

17   crop projections and revenue estimates.

18           THE COURT:  Well, total yield, it looks like it

19   says 253.5 tons, correct?

20           MR. MANG:  Correct.

21           THE COURT:  All right.  Where does it says it was

22   less than anticipated?

23           MR. MANG:  Your Honor, that -- this crop estimate

24   from August was then requested to be updated and then my

25   recollection is the harvest was said to be thinner via

Page                                                                        39

1   phone conversations with Mr. Codding.

2           THE COURT:  So what is your evidence of that,

3   those phone conversations?

4           MR. MANG:  I'm going to review our declaration

5   report.

6           THE COURT:  Who would he have the phone

7   conversation with, Mr. Mang?

8           MR. MANG:  It would be either myself,

9   Mr. Marshack or (indiscernible).

10          THE COURT:  All right.  So please, don't look

11  up -- don't look that up now.

12          Are you telling me that this exhibit on page 124,

13  392 of docket #304 is incorrect?

14          MR. MANG:  Those projections appeared to be

15  ultimately incorrect regarding the revenues and were

16  slightly inaccurate in terms of the tonnage.

17          THE COURT:  Okay.  Please proceed.

18          MR. MANG:  The Trustee -- just to reset us to

19  where I was, the Trustee was told that these five contracts

20  were the only five contracts and the Trustee received some

21  monies and some commitments for payment, but not

22  everything.

23          In December of 2021, Trustee was contacted and I

24  spoke with personally a man named Don Brady, D-O-N  B-R-A-

25  D-Y.

P 888.272.0022  F 818.343.7119      BEN**HY**ATT
                                     Certified Deposition Reporters     www.benhyatt.com

Case 8:20-bk-13014-SC    Doc 371    Filed 12/21/22    Entered 12/21/22 15:38:27    Desc
Main Document    Page 40 of 74

Page                                                                40

1           THE COURT:  B-R-O --

2           MR. MANG:  B-R-A-D-Y.

3           THE COURT:  Brady.  Okay.

4           MR. MANG:  Like the quarterback.

5           THE COURT:  Well, no, that would be Tom Brady.

6  This is Don Brady.

7           MR. MANG:  Yes.  Yes.

8           THE COURT:  Probably a younger and more virile

9  football player than Tom Brady.

10          MR. MANG:  I'm not sure, Your Honor.  I only

11 spoke to him on the phone, but what he had done is he

12 purchased ten tons of grapes from Mr. Codding and He was

13 confused.  Mr. Codding told him, "You must pay my company,

14 Humanity Wine Company, LLC."  Mr. Brady was confused

15 because he knew that these grapes had been harvested off of

16 property of the bankruptcy estate and he believed that he

17 didn't want to be involved in a dispute about who should

18 pay who.  He thought he should pay the Trustee.

19          THE COURT:  He didn't want to pay twice.

20          MR. MANG:  Correct.  Absolutely not.

21          THE COURT:  So did you do any follow-up with Don

22 Brady?  Did you --

23          MR. MANG:  Yes.

24          THE COURT:  -- subsequently get a copy of the

25 contract?



```
Page                                                      41
```

1           MR. MANG:  Yes.

2           THE COURT:  And the contract, was that a contract

3  that involved grapes owned by the estate?

4           MR. MANG:  Yes.

5           THE COURT:  And was the contract clear on who was

6  selling the grapes?

7           MR. MANG:  The contract stated that the seller

8  was Rabbit Ridge Wine Sales, Inc.

9           THE COURT:  How interesting.  Is that the

10  contract that Mr. Marshack approved?

11           MR. MANG:  Mr. Marshack did not see this contract

12  until Mr. Brady provided it to me.

13           THE COURT:  I see.  And what evidence do you have

14  that it was Mister -- that it was the estate's grapes that

15  Mr. Codding sold?

16           MR. MANG:  The evidence is that the grapes were

17  harvested off of 1172 San Marco Road, Paso Robles,

18  California, which is property of the estate.

19           THE COURT:  And how do you know that?

20           MR. MANG:  The grape purchase agreement says it

21  and Mr. Brady verified it.

22           THE COURT:  Very good.  All right.  Please

23  continue.

24           MR. MANG:  For the record, if you want to look at

25  the actual agreement, it is attached to our motion as

P 888.272.0022  F 818.343.7119          **BENHYATT**
                                        Certified Deposition Reporters          www.benhyatt.com

EXHIBIT 1, PAGE 67

Page                                                                42

1  Exhibit 9, page 178 of 392.

2          THE COURT:  Mr. Mang, you need to understand

3  you're making a record for possible appeals.  It's not that

4  I want to look at it.  It's that if you have something that

5  supports your position, you need to make sure that the

6  record is clear of what you're directing both me and the

7  Court of Appeals to, actually, and important to look at.

8          So when you say, "if you want to," I think that

9  you're telling me that it's not important and I don't think

10 that's -- I don't think that's the case here.

11         MR. MANG:  Your Honor, it is important,

12 everything is important.  I just don't want to flood the

13 record either, but --

14         THE COURT:  Well, would you like to lose your

15 motion?

16         MR. MANG:  Your Honor, I would not like to lose

17 my motion --

18         THE COURT:  Then I would be prudent and do

19 what -- do your job here.  Keep going.

20         MR. MANG:  On Exhibit 9, which is the grape

21 purchase agreement, it identifies the seller of the grapes

22 as Rabbit Ridge Wine Sales, Inc.  And then it says, "The

23 grapes referred to in this agreement are as described

24 below," and it says the vineyard address is 1172 San Marcos

25 Road, Paso Robles, California, Plot 1 nine acres,

Page                                                                          43

1    (indiscernible).

2            THE COURT:  Okay.  So did you -- who did

3    Mr. Brady pay?

4            MR. MANG:  Mr. Brady ultimately paid the

5    bankruptcy estate after he contacted us and we gave him

6    instructions.

7            THE COURT:  And once he received the message from

8    Mr. Brady did you discuss any of this with Mr. Codding?

9            MR. MANG:  Yes, we contacted Mr. Codding.  We

10   said:

11           "Mr. Codding, a third party has contacted us

12       informing us that you have apparently been trying to

13       sell grapes that are considered property of the estate

14       and demanding payment to your own entities, rather

15       than the Trustee."

16           His --

17           THE COURT:  Is that communication in writing?

18           MR. MANG:  Yes, I believe so, Your Honor, but it

19   may not have been attached to our motion.

20           THE COURT:  Wouldn't you think that would be

21   important?

22           MR. MANG:  Yes, Your Honor, and unfortunately --

23           THE COURT:  Okay.  Now, do you have any other --

24           MR. MANG:  -- (indiscernible) --

25           THE COURT:  -- sellers -- well, when you



Page                                                                44

1   approached Mr. Codding, what did he say?

2           MR. MANG:  Mr. Codding said that he directed Don

3   Brady to pay the Trustee and that he would provide to us an

4   accounting of any other contracts that had been signed and

5   not previously discussed to the Trustee.

6           THE COURT:  Did he do it?

7           MR. MANG:  Yes, he did.

8           THE COURT:  And how many contracts were there?

9           MR. MANG:  I believe there were -- there was six,

10  not including Mr. Brady.

11          THE COURT:  So there were a total of seven that

12  you know of?

13          MR. MANG:  Sorry, Your Honor.  There was seven,

14  other than Mr. Brady, so there's eight that we did not know

15  of.

16          THE COURT:  And do you have copies of all of

17  those contracts?

18          MR. MANG:  No, Your Honor.

19          THE COURT:  Why not?

20          MR. MANG:  We asked for them from Mr. Codding.

21  He promised to provide them and he did not provide them.

22          THE COURT:  Did he provide any of them?

23          MR. MANG:  No, Your Honor.

24          THE COURT:  Okay.  Did he tell you whether or not

25  those contracts had been fulfilled?

Case 8:20-bk-13014-SC   Doc 371   Filed 12/21/22   Entered 12/21/22 15:38:27   Desc
Main Document    Page 45 of 74

Page                                                                45

1          MR. MANG:  Yes, he did.  He told us that certain

2  amounts had been paid, so this is an email --

3          THE COURT:  Well, just tell me.  Did he tell you

4  in an email that certain of the contracts were paid?

5          MR. MANG:  Yes, Your Honor, he did tell --

6          THE COURT:  How many?

7          MR. MANG:  He told us he had been paid.  He or

8  his entities had been paid on seven contracts.

9          THE COURT:  Seven contracts.  Okay.  So that

10  would be minus the one that Mr. Brady paid the Trustee on?

11          MR. MANG:  Correct.

12          THE COURT:  Okay.  And is that in writing?

13          MR. MANG:  Yes.

14          THE COURT:  Okay.  How much did he say he had

15  been paid on those seven contracts?

16          MR. MANG:  The total amount was $140,960.31.

17          THE COURT:  Okay.  Did you take any further

18  efforts to get that $140,960.31 back?

19          MR. MANG:  Yes, Your Honor, culminating in this

20  proceeding.

21          THE COURT:  Well, tell me what you did.  Did you

22  write him a nice letter and say, I think you ought to send

23  that money over?

24          MR. MANG:  Your Honor, it started off as an

25  accounting dispute --

Page                                                                    46

1        THE COURT:  Let's try it again.  Did you ask him

2   whether he would send the $140,000 over?  Did you make a

3   demand on it?

4        MR. MANG:  I believe so, Your Honor.

5        THE COURT:  You believe so.  Well, believing

6   don't make it so.

7        MR. MANG:  That's true.

8        THE COURT:  Did you or did you not politely ask

9   Mr. Codding for the money?

10        MR. MANG:  Not initially.

11        THE COURT:  Okay.  Why not?

12        MR. MANG:  That's because we knew that

13   Mr. Codding had completed the harvest and had likely made

14   expenditures, so --

15        THE COURT:  Yes, so you were trying to cut short

16   the process of the agreement of where all of the money was

17   supposed to go to the Trustee and then the reimbursement

18   would be made later.  You were just cutting it short?

19        MR. MANG:  Your Honor, we were gathering evidence

20   to determine whether or not we needed an order to approve

21   the offset or whether or not he needed to turn over the

22   money and we could pay it right back.

23        THE COURT:  So you never thought about calling

24   him up and saying, send the money back and we'll provide

25   for the reimbursement?

Page                                                                              47

1          MR. MANG:  Your Honor, that was our -- that was

2    our desire, but we did not want to have it turn into

3    litigation from the outset.

4          THE COURT:  So you said that there may be an

5    offset available and so generally just send us over -- and

6    you keep that $140,000 and apply it to the money we owe you

7    for harvesting.  Is that what you were trying to do?

8          MR. MANG:  Your Honor, we did not tell him that

9    he could keep the money.

10         THE COURT:  I didn't ask you what you told him,

11   Mr. Mang.  I asked you what you were trying to do.

12         MR. MANG:  Your Honor, we were trying to see if

13   he could get an offset for the 140.

14         THE COURT:  Okay.  So you were trying to shortcut

15   the situation by saying, look, you -- you know, you -- and

16   I'll put it into the vernacular.

17         Don't take this personally, Mr. Codding.

18         So you ripped us off for 140, but it's only 140

19   and we know we owe you more than that for the harvesting,

20   so we're just going to let it lay.

21         MR. MANG:  Your Honor, not in so many terms, of

22   course.

23         THE COURT:  Yeah, but I'll bet Mr. Goe likes that

24   way to say it.

25         MR. MANG:  Your Honor --

P 888.272.0022  F 818.343.7119          BEN**HYATT**  www.benhyatt.com
                                        Certified Deposition Reporters

Page                                                                                    48

1          THE COURT:  Mr. Goe, I'm going to include you in

2  on that conversation.  Do you -- am I being unclear about

3  what I think happened here?

4          MR. GOE:  No, this isn't a contempt proceeding.

5  This is an accounting proceeding with the Trustee --

6          THE COURT:  Well, you don't need to make your

7  argument.

8          MR. GOE:  Okay.  Yes.

9          THE COURT:  Am I just stating it right?

10          MR. GOE:  Yes.

11          THE COURT:  Yeah.

12          Mr. Mang, how much do you think you owe

13  Mr. Codding for harvesting the crops?

14          MR. MANG:  Your Honor, we don't think we owe --

15          THE COURT:  Now, I'm not talking about legally.

16  Let's -- let me put it another way.  Has Mr. Codding told

17  you how much it has cost him and that if he seeks

18  reimbursement he will seek this X amount of money?  Has he

19  done that?

20          MR. MANG:  Yes, Your Honor.  He has told us.

21          THE COURT:  Okay.  How much?

22          MR. MANG:  He has told us that he is owed

23  $372,066.28.  And this was attached to our motion as

24  Exhibit 13, page 192 or 392.

25          THE COURT:  Okay.  So he claims that his cost for

Page                                                                49

1  harvesting was $372,600 and did you say 60?

2          MR. MANG:  372,066.28.

3          THE COURT:  Okay.  So 372,066.

4          MR. MANG:  Correct.

5          THE COURT:  .28.

6          MR. MANG:  Correct.

7          THE COURT:  And what was the date of that?

8          MR. MANG:  The date of this invoice was dated

9  December 30, 2021.  I did not receive it until January 25.

10         THE COURT:  Okay.  And so let me ask you this.

11 What is the Trustee's -- let's forget all of the issues for

12 now that bring this motion into play.  Let's just ask this

13 question.  You've received a bill for $372,066.28.  If

14 nothing else occurred, what would have been the Trustee's

15 response to receiving that bill and reimbursing him?

16         MR. MANG:  The invoice needed to include receipts

17 and while the invoice stated a total number, the receipts

18 and the documentation attached to the invoice does not

19 demonstrate, in the Trustee's view, that Mr. Codding was

20 entitled to reimbursement.

21         THE COURT:  So you wanted receipts?

22         MR. MANG:  Correct.  We wanted proof of actual

23 disbursements by Mr. Codding so we could reimburse him.

24         THE COURT:  Well, okay.  And did that include his

25 own -- and the five percent, by the way, was the -- his --

Case 8:20-bk-13014-SC    Doc 371    Filed 12/21/22    Entered 12/21/22 15:38:27    Desc
Main Document    Page 50 of 74

Page                                                          50

1   for his work, not the reimbursement, so the reimbursements

2   are for out-of-pocket expenses?

3              MR. MANG:  Yes.

4              THE COURT:  Okay.  And so did he -- did you ever

5   ask him for receipts?

6              MR. MANG:  Yes, Your Honor.  We asked him for

7   documentation showing actual disbursements that we could

8   reimburse.

9              THE COURT:  Um-hum.

10             MR. MANG:  And we asked and we asked and we

11  asked.  We asked and we are still asking.  We have never

12  received it.

13             THE COURT:  Well, maybe you didn't ask

14  Mr. Codding politely, like I can do, you know, because I'm

15  a very polite guy.  And of course, while I believe Al

16  Capone always was right when he said, "You can get more

17  with a smile and a gun than just a smile," I think that if

18  we ask him politely, we can uncover some of this

19  information.

20             But at this point you're talking about $140,000

21  of money that he's collected that should have been

22  convert -- sent to the Trustee, right?

23             MR. MANG:  That's correct.

24             THE COURT:  So much is in the Trustee's account

25  right now?

Page                                                                        51

1              MR. MANG:  The current amount for the crop

2  proceeds is about $232,000.  I think that's a more exact

3  figure.

4              THE COURT:  Whoa, whoa, whoa.  Let me -- that was

5  the wrong question.  I apologize.

6              How much has the Trustee completely received that

7  has gone into that segregated account?

8              MR. MANG:  The gross amount is $242,485.12.

9              THE COURT:  Okay.  And then we add 14,960.31

10  [*sic*], which were further contracts, right?

11              MR. MANG:  Yes.

12              THE COURT:  Okay.

13              MR. MANG:  Those were the amounts received by

14  Mr. Codding.

15              THE COURT:  Right.  Okay.  So now we go to the

16  calculator and we write 242,485.12, plus 140,960.31 and we

17  add that and we get $383,445.43.  That's the gross, right?

18              MR. MANG:  Yes, Your Honor.

19              THE COURT:  And you've already apparently

20  received permission to disburse some of that money, is that

21  correct?

22              MR. MANG:  Yes, Your Honor.

23              THE COURT:  So what is the remaining balance

24  today, just for my notes?

25              MR. MANG:  Your Honor, I don't have that exactly,

Page                                                                52

1   but I believe it's around 232,000.

2            THE COURT:  Okay.  We'll live with that for now.

3   So you must have disbursed $150,000.

4            MR. MANG:  Your Honor, we did not disburse 150.

5   We disbursed about 10.

6            THE COURT:  Well, if you have -- oh, I'm sorry.

7   That's right.  You had $242,000.  You didn't get the 140?

8            MR. MANG:  That's correct.

9            THE COURT:  Okay.  Et cetera.  So in this whole

10  proposition you would have received $383,000 and allegedly

11  had Mr. Codding paid $372,066.28 for harvesting grapes that

12  would have brought in all contracts and receipts were paid

13  to the Trustee $382,445.42?

14           MR. MANG:  Correct, Your Honor.  But if I can

15  throw one more fact onto the pile.

16           THE COURT:  Please.

17           MR. MANG:  And that is that we are informed by

18  Mr. Codding including in his testimony at a 341(a) that he,

19  in fact, harvested certain tons of grapes and crushed them

20  in the winery without authorization by the Trustee and

21  we're still trying to figure out how much that was.

22           THE COURT:  Okay.  What do you -- do you have any

23  estimate at all about that?

24           MR. MANG:  I have document from the -- what are

25  they called -- Alcohol and Tobacco Tax and Trade Bureau,

```
Page                                                            53

1  because wineries are required to provide monthly reports

2  and the record from September 2021 shows that Rabbit Ridge

3  crushed about ten tons of grapes in September 2021 and we

4  believe those were property of the estate that Mr. Codding

5  did not receive authorization to take or crush or process

6  or have for his own benefit.

7          THE COURT:  Okay.  So ten tons.  How much is that

8  worth?

9          MR. MANG:  Your --

10         THE COURT:  If you sold ten tons -- you sold ten

11 tons to Mr. Brady --

12         MR. MANG:  Yes.

13         THE COURT:  -- and how much did Mister -- what

14 was Mr. Brady's contract?

15         MR. MANG:  Mr. Brady's contract was for 1700 a

16 ton.  The varietal was Zinfandel.

17         THE COURT:  I don't care.  Tell me what the

18 amount was.

19         MR. MANG:  17,000.

20         THE COURT:  17,000.  Okay.  And I have no idea

21 what you're implying because it was the Zinfandel.  Are you

22 saying that it would have gotten more if it was wine that

23 you -- or grapes that you would use for (indiscernible) or

24 what -- what are you trying to tell me?

25         MR. MANG:  Your Honor, the Zinfandel was cheaper
```



P 888.272.0022  F 818.343.7119    BENHYATT    www.benhyatt.com
Certified Deposition Reporters

EXHIBIT 1, PAGE 79

Page                                                                      54

1  than some of the other varietals.

2          THE COURT:  Okay.  That's all I needed to know.

3  So we're in a range of may $25,000.

4          MR. MANG:  Perhaps, Your Honor.

5          THE COURT:  Okay.  So now you have alleged the

6  wrinkle, as you call it, another slippage or spillage, to

7  be polite, Mr. Codding, of about $25,000.

8          MR. MANG:  Yes, Your Honor.  Perhaps.  And we

9  don't if --

10         THE COURT:  Are there any other wrinkles?

11         MR. MANG:  The other wrinkle, Your Honor, is that

12 we need to reconcile the weight of the grapes harvested

13 with the weight of the grapes sold.

14         THE COURT:  How would you do that?

15         MR. MANG:  Every -- every purchaser of grapes

16 buys it by the ton and they weigh it down to decimal

17 points.  We've actually received from the purchasers the

18 weight tags of the grapes that they paid for.

19         THE COURT:  And what is the answer to that,

20 according to you?

21         MR. MANG:  I've totaled up the weight tags for

22 grapes that we have sold and the total amount that we were

23 paid for was 128.6895 tons.

24         THE COURT:  And what is the value of that?

25         MR. MANG:  The value of that was the $242,000

P 888.272.0022  F 818.343.7119                BENHYATT        www.benhyatt.com
                                              Certified Deposition Reporters

Page                                                            55

1   that we received.

2           THE COURT:  Okay.  And tell me now what purpose

3   and what use of that number is for this motion.

4           MR. MANG:  The purpose of that is we have further

5   evidence from the three companies who harvested the grapes

6   that they harvested perhaps 217 tons of grapes.

7           THE COURT:  Okay.  So if your evidence is

8   correct -- again, I'm not making any judgments here --

9   you're saying that while you are told that 128 tons were

10  sold, in fact, 217 tons were harvested?

11          MR. MANG:  Yes.

12          THE COURT:  Okay.  Do you have anything else?

13          MR. MANG:  So I just want to highlight that

14  that's the difference of 88 tons.

15          THE COURT:  Well, I appreciate it because I just

16  went to state school and I'm immensely stupid, Mr. Mang,

17  about subtraction.

18          MR. MANG:  Your Honor, I --

19          THE COURT:  Thank you.

20          MR. MANG:  I did not intend to imply anything.

21          THE COURT:  Not at all.  I can add and subtract,

22  Mr. Mang.  All right.  Thank you.

23          Mr. Goe, we've taken up a lot of time.  I'd like

24  you to have the same similar opportunity to make a

25  statement.  Not just respond.  Of course, you should

P 888.272.0022  F 818.343.7119      **BENHYATT**      www.benhyatt.com
Certified Deposition Reporters

EXHIBIT 1, PAGE 81

Case 8:20-bk-13014-SC    Doc 371    Filed 12/21/22    Entered 12/21/22 15:38:27    Desc
Main Document    Page 56 of 74

Page                                                                56

1  respond, but please proceed.

2          MR. GOE:  Your Honor, Mr. Codding obviously takes

3  this quite seriously.  He's on the phone here today -- or

4  on the Zoom here today.  Mr. Codding is a farmer.  He's not

5  an attorney.  He's not a professional.  Mr. Marshack has

6  obviously been a trustee for decades.  He's an attorney.

7  He's a sophisticated party and a lot of the facts here

8  are -- really don't need to go over again, but Mr. Mang

9  laid them out and the pleadings laid them out clearly.

10         Mr. Marshack was in a difficult position where he

11 had these crops that needed to be sold and Farm Credit,

12 represented by Frandzel, refused to advance him a penny to

13 do anything with them, and they were going to wither and

14 die.  And in fact, the declarations that Mr. Marshack

15 submitted in connection with the motion to approve the

16 operating agreement admitted so much.

17         And, Your Honor, it's unfortunate that you're

18 having to take this case up to the third judge.  Judge

19 Smith really didn't have much time on it, but Judge Wallace

20 was there.  You need to understand the big picture of this

21 case.

22         THE COURT:  I would suggest that I spent more

23 time now on this case than both judges combined.

24         MR. GOE:  Yeah, may -- maybe, Your Honor.  I know

25 courts are loath oftentimes to deal with trustees

Case 8:20-bk-13014-SC   Doc 371   Filed 12/21/22   Entered 12/21/22 15:38:27   Desc
Main Document   Page 57 of 74

Page                                                                57

1  administering over-encumbered assets.  That's exactly what

2  happened here.  This case is going to be a situation that

3  they're lucky they're in front of you and not in front of

4  Wayne Johnson because they're going to rack up

5  administrative --

6            THE COURT:  No, no, no, no, Mr. Goe.

7            MR. GOE:  Yeah.

8            THE COURT:  Do yourself a big favor right now

9  and --

10           MR. GOE:  Yeah.

11           THE COURT:  -- just say, I would like to take

12 that back.

13           MR. GOE:  I'll take that back, Your Honor.

14           THE COURT:  Please do.

15           MR. GOE:  Okay.  I will, Your Honor.

16           THE COURT:  Mr. Goe, you've just crossed the line

17 that you should not want to cross.

18           MR. GOE:  Okay.  I'll take that back, Your Honor.

19           THE COURT:  Mister -- I will tell you right now

20 for the record that Wayne Johnson is one of our finest

21 jurists.  And to make a public slight like that is beyond

22 the pale and, more importantly, it's beyond your great

23 reputation, Mr. Goe.

24           And just keep in mind that you may have a case in

25 front of Judge Johnson --



www.benhyatt.com

EXHIBIT 1, PAGE 83

```
Page                                                           58
```

1           MR. GOE:  I do.

2           THE COURT:  -- but the fact is, don't ever do

3    that again.

4           MR. GOE:  Okay.  I --

5           THE COURT:  Let me assure you of something.  If

6    you'll say it about Judge Johnson, you'll say it about me

7    somewhere else.

8           MR. GOE:  I will not, Your Honor.  The point I

9    was making is this.  This is a case where over encumbered

10   property was administered.  Administrative claims are now

11   exceeding 500,000 where the unsecured debt is $62,000.  As

12   was put forth before, no one wanted to touch this crop,

13   except for a farmer.  And I don't mean that in a bad way,

14   but that's the truth.  Mr. Codding is a farmer.  And

15   Mr. Marshack in his declaration specifically sets forth

16   that -- and Mr. Mang admits it -- Mr. Codding was a tour

17   guide.  He's the one who showed him around the property.

18   He's the one that assisted in every bit of this case which

19   resulted in an asset being sold for 9.1 million dollars.

20   It was a short sale but still, there's no question.

21   Mr. Codding was one of the parties that was most

22   instrumental in allowing that nine million-dollar sale to

23   occur here, okay.

24          THE COURT:  Mr. Goe, have you looked at

25   Mr. Codding's inLink online biography?



P 888.272.0022  F 818.343.7119                www.benhyatt.com

Page                                                                      59

1          MR. GOE:  I think I've seen it before.

2          THE COURT:  You keep telling me he's a farmer and

3  you didn't even go and look at his inLink -- inLink

4  biography, if you think he's just a farmer.

5          MR. GOE:  No.  He's --

6          THE COURT:  And first of all, you're denigrating

7  farmers to a Missourian who had a soybean field in his

8  backyard, so again, you're just stepping all over it,

9  Mr. Goe.  Mr. Codding is a well-educated man who runs LLCs

10 and a wine business.  He's a graduate of the university --

11 he went to Cal Poly.  The man knows his stuff.

12         MR. GOE:  I understand but he was the one that

13 went out and cultivated this crop --

14         THE COURT:  Yeah, but to tell me to be saying,

15 oh, he's a farmer, come on.  Half my friends in Missouri

16 are farmers and they're brilliant and you know what they

17 know most about is the United States Tax Code.  They

18 understand taxes back and forth.  They understand the Farm

19 Bureaus, they understand what a -- something that nobody

20 else on this telephone call but me and Mr. Codding knows --

21 and we know what farm agents are.

22         I know what a power take-off is, Mr. Codding.

23 Nobody else knows what a power -- Mr. Mang knows that a

24 power take-off happens at John Wayne Airport.  So Mr. Goe,

25 you don't need to tell me that Mr. Codding doesn't know

Case 8:20-bk-13014-SC   Doc 371   Filed 12/21/22   Entered 12/21/22 15:38:27   Desc
Main Document   Page 60 of 74

Page                                                                60

1   what he's doing.  He's a professional.

2            MR. GOE:  I --

3            THE COURT:  And I know he is.  So let's move on

4   to the substance of this motion instead of trying to tell

5   me how awful it is that Mr. Codding came to the aid of a

6   Chapter 7 Trustee.

7            MR. GOE:  Very well, Your Honor, and I will, Your

8   Honor.

9            THE COURT:  You should get to the point of why he

10  didn't give the money and why did he write secret

11  contracts.  You really should talk about that.

12           MR. GOE:  Oh, well, okay.  Well, I will, Your

13  Honor.  I'm going to get to that, Your Honor.

14           So what I think we need to first turn to, the

15  farm operator agreement, which Your Honor has already had a

16  look at, which was docket 4 -- 304 of the contempt

17  proceeding, page 81.

18           Now, if you look at that agreement, you'll notice

19  that it was prepared by Mr. Marshack and he says that he

20  personally prepared it and it was signed by Mr. Codding and

21  Mr. Marshack and no attorneys had signed it.

22           Now, the documents as I've already noticed, I

23  mean, we have to keep in mind we're not here today on a

24  breach of contract suit.  We're here today on a contempt

25  proceeding and when you start with the farm operator

Page                                                             61

1  agreement, Your Honor, it's littered with ambiguities that

2  to a normal layman who is in the business of cultivating

3  wine wouldn't necessarily look at it the same way that you

4  or I or, for that matter, Mr. Marshack would, and he was

5  the person who has to put this contract together.

6          And you'll notice that -- and again, this is a

7  contempt proceeding by clear and convincing evidence that

8  Mr. Codding has violated a court order.  So let's start

9  with the fund -- the basic agreement that was the farmer

10 operator agreement.  In that agreement it doesn't re -- it

11 doesn't state that Mr. Codding to do anything.  It talks

12 about he's being retained by the Trustee for the following

13 reasons -- you know, purposes and I'm going to talk about

14 in a moment how the operating order contradicts the forum

15 operator agreement.

16         You know, it talks about the issues of cancelling

17 any and all existing contracts and things.  Well, we talked

18 about the order and I'm going to that -- get to that in a

19 moment where it says the Trustee is authorized to cancel

20 contracts.

21         Nothing in the farm operator agreement, docket

22 #304, pages 81 and through 83, required Mr. Codding or his

23 order to do anything.

24         Now, let's now turn because I think we're

25 talking, you know -- we're getting to Mr. Mang and I

Page                                                                  62

1   appreciate his, you know, narrative.  It actually helps

2   Mr. Codding's cause.  Well, let's just talk about the crux

3   of the issue here.  Let's turn to docket #304, page 134 of

4   392.  This is the order granting the Trustee's motion to

5   approve farm operator agreements.

6          Now, I can read the provisions and Your Honor can

7   see them for themselves -- yourself, but there's not one

8   provision in there that orders Mr. Codding to do anything.

9   I'll give you an example.  It says, "Trustee's authorized

10  to cancel all currently existing contracts."  It doesn't

11  say Mr. Codding has to do anything.

12         It talks about the proceeds shall be paid

13  directly to the estate and the Trustee.  It doesn't say

14  Mr. Codding has to do anything, et cetera.  It's a three-

15  page document.  And this is really the entirety of their

16  case is that he violated this order and with clear and

17  convincing evidence.

18         And as we've set forth in our pleading in the

19  Ninth Circuit in the *Hansbrough* case, in order for -- to

20  find Mr. Hansbrough in contempt, the Court had to find that

21  he violated a specific and definite order and that he had

22  sufficient notice of its terms and the fact that he would

23  be sanctioned if he did not comply.

24         THE COURT:  So Mr. Goe, let me ask you a very

25  simple question.  If Mr. Codding had simply taken all of

Page                                                                63

1   the grapes and sold them to some other person and didn't

2   give a penny to the Chapter 7 Trustee, you're telling me he

3   wouldn't be violating a court order and, therefore, not

4   subject to anything with respect to the estate property?

5              MR. GOE:  I think he could have been vio -- in

6   breach of a contract --

7              THE COURT:  Well, what about the --

8              MR. GOE:  -- with the operator --

9              THE COURT:  Are you telling me that he's not

10  subject to -- not just civil but criminal activities under

11  Title XVIII for taking estate property that doesn't belong

12  to him?  I mean, that's estate property.  That's a United

13  States Criminal Code violation that if I discover, by the

14  way, it has occurred I'm going to refer to the Department

15  of Justice and the FBI.

16             MR. GOE:  Well, Your Honor --

17             THE COURT:  So you're telling me that we

18  shouldn't be here today because you don't think that he

19  violated any order of this court by taking grapes and if,

20  in fact, he had taken all of them he still wouldn't be in

21  violation of the order.

22             Is that what you're telling me, Mr. Goe?

23             MR. GOE:  What I'm telling you is -- I'm saying

24  that he got --

25             THE COURT:  It's a yes-or-no question, Mr. Goe.

P 888.272.0022  F 818.343.7119       BEN HYATT       www.benhyatt.com
                                    Certified Deposition Reporters

Page                                                                64

1   It's a yes-or-no question.

2          MR. GOE:  He --

3          THE COURT:  Are you telling me that if he had

4   taken all of the grapes and sold them to third parties and

5   not told the Trustee about anything he wouldn't be in

6   trouble?

7          MR. GOE:  Well, the answer to your question --

8   there's a difference being in trouble and contempt.

9          THE COURT:  Well, let's just say contempt, then,

10  or is it your point that by taking the property of the

11  estate and selling it and let's say he did all of it

12  without telling anything, your argument is he didn't have

13  to do anything, but he did do something.  He took property

14  of the estate and he sold it and we're going to find out,

15  by the way, how much he sold.  We're going to find that out

16  because I know how to issue orders to compel, especially

17  when I know that there's a question that there is property

18  of the estate on this thing and we now know that

19  Mr. Codding has done it.

20         So I just want to understand your position that

21  this contempt motion is the request for an order to show

22  cause why he shouldn't be held in contempt is non-viable

23  because there is no specific order -- which I, by the way,

24  disagree with -- that he didn't violate.  Is that your

25  point?

P 888.272.0022  F 818.343.7119        **BEN**HYATT        www.benhyatt.com
Certified Deposition Reporters

Page                                                                    65

1          MR. GOE:  My point is based upon Ninth Circuit

2   case law that the grounds for contempt are not met here

3   because of the fact that (1) it was not a definitive order

4   that ordered him to do anything and --

5          THE COURT:  I disagree, Mr. Goe.  I disagree.  I

6   read these orders.  They're very clear.  That's the first

7   thing I did was I said I want copies of these orders and I

8   got them and I reviewed them.

9          You need to move on to another point.

10         MR. GOE:  Okay.

11         THE COURT:  And you really ought to be -- start

12  talking about what he did -- why isn't he giving

13  information to the Trustee about the other seven contracts

14  and why did he -- why did he fail to turn over money and

15  why didn't he provide receipts and on and on and on.

16         MR. GOE:  Well --

17         THE COURT:  He is giving indicia -- indicia by

18  his non-cooperation of things that I can consider in a

19  motion to com -- a motion for an order to show cause why he

20  shouldn't be held in contempt.

21         But more importantly, I have other opportunities

22  here.  So I do want to hear about the fact that he took

23  grapes.  There may be an allegation of mislaying or not

24  reporting accurately to the Trustee.  By the act, by the

25  way, of reporting what the grapes were weighed in as

Page                                                                         66

1   compared to what the evidence might produce that it was --

2   it was a 80,000 -- pardon me, 80 tons more, I mean, that's

3   indicia of fraud.

4            So I want to understand those points, Mr. Goe.

5   And tell -- just tell me he didn't do it, if that's the

6   case.  Did he, in fact, sell estate grapes and pocket the

7   money?

8            MR. GOE:  Well, let me answer your first

9   question.  On the first --

10           THE COURT:  No, no.  Let's do that one first.

11   Did your client take estate property, sell it and not give

12   the proceeds to the Chapter 7 Trustee?  It's a very simple

13   question.

14           MR. GOE:  By good faith he believed that he was

15   entitled to be reimbursed directly, yes, $140,000 was paid

16   to him which he thought was, in good faith, part of the

17   reimbursement he was entitled to.  And let me --

18           THE COURT:  Is it your position that that's all

19   he got was $140,000?

20           MR. GOE:  As far as I'm aware, that's it.

21           THE COURT:  As far as you've aware.  Have you

22   consulted with your client about that?  And besides -- and

23   let me just point out, he does have Fifth Amendment rights

24   at this point because I am now considering Title 18 of the

25   United States Criminal Code.

Page                                                                  67

1            MR. GOE:  Okay.  Well, I'm not testifying, so I'm

2    just -- I'm making my argument here today, Your Honor,

3    so --

4            THE COURT:  Yes, but I -- I want to hear the

5    argument, but I want to hear specifics to what Mr. Mang has

6    said.  I've pulled out some of the histrionics and I'm just

7    trying to find out is it -- he took $140,000 and put it in

8    his pocket and didn't turn it over to the Trustee.  And

9    he's now saying, well, I didn't understand I had to do

10   that.  Is that the case?

11           MR. GOE:  That's my understanding, Your Honor.

12   I'm not -- it's not --

13           (Speaking simultaneously.)

14           THE COURT:  I (indiscernible) that order.

15           MR. GOE:  The ans -- but the answer to your

16   question about did he tell the Trustee what funds he

17   received, yes.  On December 17th pursuant to docket #304,

18   page 186 of 392, he sent an email to the Trustee where he

19   specifically stated the funds that he received.

20           THE COURT:  Well, is that under oath?

21           MR. GOE:  An email.  I mean --

22           THE COURT:  Is it under oath?  No.  See, it's not

23   under oath.

24           MR. GOE:  All right.  Well, I -- I suppose --

25           THE COURT:  Maybe during the -- I've heard enough



Page                                                                    68

1  now and I appreciate it.  I hear what your defense is to

2  this request for an order to show cause why he shouldn't be

3  held in contempt, but I think there's more to it now.  And

4  I think there may be issues of theft of property of the

5  estate and I've heard enough that I don't need clear and

6  convincing evidence to refer things to the United States

7  Department of Justice and the Federal Bureau of

8  Investigation.

9              MR. CODDING:  Your Honor, may I --

10             THE COURT:  Excuse me --

11             MR. CODDING:  I'm sorry.

12             THE COURT:  -- Mr. Codding, we don't interrupt

13 here.

14             MR. CODDING:  I apologize.

15             THE COURT:  And you have a counsel.

16             MR. CODDING:  Sorry.

17             THE COURT:  And he's doing a good job.

18             MR. CODDING:  Thank you.

19             THE COURT:  So Mr. Goe, let's -- let me ask you,

20 do you have anything else to say of why an order to show

21 cause based upon the motion that's before me should not be

22 entered?

23             MR. GOE:  Yes, Your Honor.  A few more points.

24             As it relates to the turnover of the premises

25 where there was a discussion about whether or not there was

P 888.272.0022  F 818.343.7119    BEN**HY**ATT    www.benhyatt.com
Certified Deposition Reporters

EXHIBIT 1, PAGE 94

Case 8:20-bk-13014-SC   Doc 371   Filed 12/21/22   Entered 12/21/22 15:38:27   Desc
Main Document    Page 69 of 74

Page                                                          69

1  equipment known, it was not owned, part to the bankruptcy

2  estate, et cetera, there's been no showing that there was

3  any sort of violation of that order.  In fact, the order

4  requiring the turnover was entered prior to the operator

5  order and there was no order that stated that he couldn't

6  use equipment and things to harvest the grapes.

7          And in sum, Your Honor, there simply isn't any

8  evidence that he was aware of the orders, let alone clear

9  and convincing evidence that he was aware of any order that

10 he would be held in contempt.

11         THE COURT:  Well, I'm not holding him in contempt

12 today.  I'm issuing an order to show cause why he shouldn't

13 be held in contempt and let the Trustee prove up its case

14 with whatever standard they're required to prove and to

15 actually exhibit and see what Mr. Codding's response is,

16 because -- and I'm glad he's here today --  because part of

17 the work that judges do is to examine the credibility of

18 people and whether they are transparent to both this court

19 and to the officers of this court who are appointed by the

20 United States Department of Justice, United States

21 Trustee's Office.

22         I mean, Mr. Codding and Mr. Goe, you know.

23 You're a chap -- Sub V Trustee and you've been -- you've

24 acted as both Chapter 11 Trustee and especially a Chapter 7

25 Trustee.  You know that Chapter 7 trustees have the full

P 888.272.0022  F 818.343.7119    BENHYATT   www.benhyatt.com
Certified Deposition Reporters

EXHIBIT 1, PAGE 95

Page                                                                     70

1  weight of the Department of Justice behind them and that

2  means the FBI.  And we're not talking about the civil part.

3  We're talking about the criminal part.

4           So I've heard enough.  This is what we're going

5  to do.  I'm ordering that Mr. Codding show cause why he

6  shouldn't be held in civil contempt for violation of the

7  automatic stay and the Court's farm operator report -- farm

8  operator order as requested by the Trustee.

9           But I'm also going to fashion another order to

10 talk about why I shouldn't have this referred directly to

11 the United States Department of Justice.

12          In the meantime, Mr. Codding and Mr. Goe and

13 Mr. Mang, I recommend that you do something here.  I

14 recommend that you have a sit-down and you start discussing

15 and becoming transparent about everything because the

16 Trustee is going to do discovery on this order to show

17 cause and they're going to ask you to present everything

18 you've done, and your declining of that process will be an

19 indicator of liability.  It will be an indicator of

20 credibility.  It will be an indicator of whether or not

21 this goes over to the United States Department of Justice.

22 I don't want that to happen if we can avoid it.

23          You know, again, on civil contempt I have

24 personal experience of actually mediating a person getting

25 out of the Santa Ana jailhouse after six years, so I know

P 888.272.0022  F 818.343.7119        BEN**HYATT**
                                      Certified Deposition Reporters        www.benhyatt.com

Page                                                                71

1  what to do and I know how to do it.

2          And, as Mr. Goe knows, I support my trustees.

3  And the reason I support the trustees is I actually support

4  the Bankruptcy Code and their powers and their obligations.

5  So you may want to consider getting together as soon as

6  possible and forget the legal arguments for a few minutes

7  on ambiguity because, in the end, this will all come to

8  light.

9          So now, I need to set some dates on when this

10 motion for -- when the OSC should actually be held and we

11 will do this live, by the way.

12         Where are you, Mr. Codding?

13         MR. CODDING:  Your Honor, I am typically between

14 Orange County and Paso Robles, so --

15         THE COURT:  That's perfect.

16         MR. CODDING:  -- getting to you is no problem.

17         THE COURT:  That's good because we'll have U.S.

18 Marshals here, Mr. Codding, in Courtroom 5C.

19         MR. CODDING:  Understood.

20         THE COURT:  You don't want to see those U.S.

21 Marshals.  Okay.

22         So now I need some proposed dates.

23         MR. GOE:  We're going to need a little time for

24 some discovery.  I would --

25         THE COURT:  Of course.  Oh, no.  We're going

P 888.272.0022  F 818.343.7119            www.benhyatt.com

Page                                                                72

1   to -- this thing is going to be discovered.  Everybody has

2   rights here and what we're going to do is make sure that

3   everybody has complete time.  I'm not going to -- make this

4   very quick.  I'm going to let everybody understand where

5   they are and what their obligations are in an evidentiary

6   hearing and, you know, other things will -- may arise from

7   this matter on civil contempt.

8           And I would get in front of this, Mr. Codding.  I

9   don't know if you're understanding me, but I would get in

10  front of it.  You want to --

11          MR. CODDING:  Yes, Your Honor.

12          THE COURT:  -- (indiscernible) something.  If

13  Mr. Goe allows you, I'll be glad to have you say something,

14  but it's up to Mr. Goe.  He's your attorney.

15          MR. GOE:  I would advise him against this.

16          THE COURT:  I -- good advice.

17          Mr. Codding?

18          MR. CODDING:  Yes, Your Honor.

19          THE COURT:  I urge you to take your lawyer's

20  advice.

21          MR. CODDING:  Well, I respect your urging and I

22  respect his opinion, although I do think there's plenty

23  that I could say that is factually accurate and transparent

24  and wouldn't get me in trouble, but I guess we'll save that

25  for the next (indiscernible) --



P 888.272.0022  F 818.343.7119                          www.benhyatt.com

Page                                                              73

1              THE COURT:  Well, Mr. Goe has already told us

2    that you're just a simple farmer and I know that --

3              MR. CODDING:  Well, I am a farmer.

4              THE COURT:  Yeah, well, me, too.  I have tomatoes

5    on my backyard.

6              MR. CODDING:  Right, right.

7              THE COURT:  But the fact is that you don't want

8    to go there.

9              MR. CODDING:  No.

10             THE COURT:  I'm not going to allow you to speak

11   at this point.  There's too many rights that would be

12   unprotected.

13             February 16, 2023.  February 16, 2023, at 9:00

14   a.m. will be a live hearing, Thursday.  And this will be a

15   hearing on the actual show cause, so I am issuing an order

16   to show cause why Mr. Codding should not be held in

17   contempt pursuant to the motion filed by the Chapter 7

18   Trustee.  I will allow briefing.

19             You know what I'm going to do?  I'll just issue

20   my own order and I'll set out a very generous briefing

21   schedule and discovery schedule.  And if you need more time

22   after February 16, we'll give you more time, too.

23             All right.  Is there anything else I can do for

24   anyone today?

25             MR. MANG:  No, thank you, Your Honor.

P 888.272.0022  F 818.343.7119          **BEN HYATT**
                                         Certified Deposition Reporters          www.benhyatt.com

Case 8:20-bk-13014-SC    Doc 371    Filed 12/21/22    Entered 12/21/22 15:38:27    Desc
Main Document    Page 74 of 74

Page                                                                    74

1            THE COURT:  All right.  I appreciate all of your

2     comments.  This is serious business.  Get together and

3     talk.

4            Hello, Mr. Marshack.  I'm glad you're here today

5     but I don't want you responding.  You have -- just like Mr.

6     Codding, all you can do is just get in trouble,

7     Mr. Marshack, when you have your own attorney.

8            All right.  Thank you very much.

9            Are there any other parties wishing to be heard

10    on the 11:00 calendar?  If not, court is in recess until

11    1:30.  Thank you.

12            PARTIES:  Thank you, Your Honor.

13    (End at 12:41 p.m.)

14                      * * * * * * * *

15          I certify that the foregoing is a correct

16    transcript from the electronic sound recording of the

17    proceedings in the above-entitled matter.

18

19    *Ruth Ann Hager*

20    _____        Date:  12/9/2022

21    RUTH ANN HAGER, C.E.T.**D-641

22

23

24

25



# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
870 Roosevelt, Irvine, CA 92620

A true and correct copy of the foregoing document entitled: **CHAPTER 7 TRUSTEE'S TRIAL BRIEF RE: EVIDENTIARY HEARING ON ORDER TO SHOW CAUSE RE: CIVIL CONTEMPT STIPULATION** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 27, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **April 27, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

| **DEBTOR** | **INTERESTED PARTY** |
|---|---|
| NORTHERN HOLDING, LLC | LEE CODDING |
| ATTN: OFFICER, A MANAGING OR GENERAL AGENT, | 13217 JAMBOREE ROAD, #429 |
| OR TO ANY OTHER AGENT AUTHORIZED BY | TUSTIN, CA 92782 |
| APPOINTMENT OR LAW TO RECEIVE SERVICE | |
| 13217 JAMBOREE RD #429 | |
| TUSTIN, CA 92782 | |

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 27, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>VIA PERSONAL DELIVERY:</u>
**PRESIDING JUDGE'S COPY**
HONORABLE SCOTT C. CLARKSON
US BANKRUPTCY COURT
411 WEST FOURTH STREET, SUITE 5-097
SANTA ANA, CA 92701-4593

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 27, 2023 | Layla Buchanan | /s/ Layla Buchanan |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: CONTINUED:

- **William H Brownstein**    Brownsteinlaw.bill@gmail.com
- **Steve Burnell**    Steve.Burnell@gmlaw.com,
  sburnell@ecf.courtdrive.com;sburnell@ecf.inforuptcy.com;cheryl.caldwell@gmlaw.com;denise.walker@gmlaw.com
- **ATTORNEY FOR INTERESTED PARTY LEE CODDING: Robert P Goe**    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;goeforecf@gmail.com
- **Nancy S Goldenberg**    nancy.goldenberg@usdoj.gov
- **Michael J Gomez**    mgomez@frandzel.com, dmoore@frandzel.com
- **D Edward Hays**    ehays@marshackhays.com,
  ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.court
  drive.com
- **Kari L Ley**    Ley1238@att.net
- **Tinho Mang**    tmang@marshackhays.com,
  tmang@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com
- **Richard A Marshack (TR)**    pkraus@marshackhays.com,
  rmarshack@iq7technology.com;ecf.alert+Marshack@titlexi.com
- **Elissa Miller**    elissa.miller@gmlaw.com, emillersk@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com
- **Roksana D. Moradi-Brovia**    Roksana@rhmfirm.com,
  matt@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;davi
  d@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com
- **Paul F Ready**    becky@farmerandready.com
- **Matthew D. Resnik**    Matt@rhmfirm.com,
  roksana@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;d
  avid@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com
- **Victor A Sahn**    victor.sahn@gmlaw.com,
  vsahn@ecf.courtdrive.com;pdillamar@ecf.courtdrive.com;patricia.dillamar@gmlaw.com,Karen.Files@gmlaw.com
- **Kristine A Thagard**    kthagard@marshackhays.com,
  kthagard@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Reed S Waddell**    rwaddell@frandzel.com, sking@frandzel.com
- **Gerrick Warrington**    gwarrington@frandzel.com, achase@frandzel.com
- **David Wood**    dwood@marshackhays.com,
  dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com

4870-6853-1548

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.